Rosanne L. Mah (State Bar No. 242628)
Email: rmah@zlk.com
**LEVI & KORSINSKY LLP**
388 Market Street, Suite 1300
San Francisco, California 94111
Telephone: (415) 373-1671
Facsimile: (415) 484-1294

*Attorneys for Individual and Representative*
*Plaintiff Esteban Koffsmon*

*[Additional Counsel listed on signature block.]*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTEBAN KOFFSMON, on behalf of themselves and all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>GREEN DOT CORPORATION, STEVEN W. STREIT and MARK SHIFKE,<br><br>    Defendants. | Case No.<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Esteban Koffsmon ("Plaintiff") alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Green Dot Corporation ("Green Dot" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that additional

1
COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Green Dot securities between May 9, 2018, and November 7, 2019, inclusive (the "Class Period").

2.     This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

## JURISDICTION AND VENUE

3.     The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa.

5.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District.

## PARTIES

7.     Plaintiff Esteban Koffsmon purchased Green Dot securities within the Class Period and, as a result, was damaged thereby. Plaintiff's certification evidencing

his transactions is attached hereto as Exhibit A.

8. Green Dot is a Delaware corporation with its principal executive offices located at 3465 E. Foothill Blvd., Pasadena, California 91107. Green Dot Class A common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "GDOT."

9. Defendant Steven W. Streit ("Streit") was the Chief Executive Officer ("CEO") and Chairman of the Board of Directors of the Company at all relevant times.

10. Defendant Mark Shifke ("Shifke") was the Chief Financial Officer ("CFO") of the Company at all relevant times.

11. Defendants Streit and Shifke are collectively referred to herein as the "Individual Defendants."

12. Green Dot and the Individual Defendants are collectively referred to as the "Defendants."

## CONTROL PERSON ALLEGATIONS

13. By reason of the Individual Defendants' positions with the Company as executive officers, the Individual Defendants possessed the power and authority to control the contents of Green Dot's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

14.     Green Dot identifies itself as a financial technology leader and bank holding company with a mission to "reinvent banking for the masses." The Company operates a platform referred to as "Banking as a Service" or "BaaS" to provide banking and financial services products to consumers under brand names such as Green Dot, GoBank and RapidPay.

15.     Green Dot's products and services include, among others, deposit account programs, branded reloadable prepaid debit cards, consumer checking accounts, small business checking accounts, branded gift cards, secured credit cards.

### Material Misrepresentations and Omissions

16.     The Class Period begins on May 9, 2018, when, after market close, Green Dot issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC, reporting the Company's financial and operating results for the first fiscal quarter ended March 31, 2018 ("Q1 2018 Press Release"). Therein, Green Dot stated in pertinent part:

**Green Dot Reports First Quarter 2018 Results**

> **• Sets New Record for Revenue, Adjusted EBITDA, non-GAAP EPS and GAAP EPS**
> **• Raises Top and Bottom Line Guidance for Full Year 2018**
> **• First Quarter 2018 Total Operating Revenues, GAAP Net Income and GAAP Diluted EPS up 25%, 72% and 65%, respectively**
> **• First Quarter 2018 Adjusted EBITDA and non-GAAP EPS up 16% and 40%, respectively**

**Pasadena, CA - May 9, 2018** - Green Dot Corporation (NYSE: GDOT), today reported financial results for the quarter ended March 31, 2018.

For the first quarter of 2018, Green Dot reported total operating

4
COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

revenues of $315.0 million and GAAP net income and GAAP diluted earnings per common share of $70.0 million and $1.29, respectively. Green Dot also reported adjusted EBITDA1 and non-GAAP diluted earnings per common share1 of $104.1 million and $1.40, respectively.

Said Green Dot Founder and CEO, Steve Streit, "***Green Dot's unique "Products and Platform" model and the disciplined execution of our "2018 Six Step Plan" continues to yield very impressive results***, delivering yet another consecutive quarter where we've exceeded our top and bottom line financial expectations and set new records for nearly all key operating metrics in both reporting segments. ***The ongoing financial momentum we are seeing in both Green Dot's own established product lines and those new products being powered by Green Dot's "Banking-as-a-Service," or BaaS, Platform provides us the ability to raise both top and bottom line full year financial guidance***."

Emphasis added.

17.     During a conference call to discuss the Company's financial and operating results for the first fiscal quarter ended March 31, 2018 ("Q1 2018 Conf. Call"), Green Dot's CEO stated in relevant part:

***Of course, in our business, attracting and retaining the right kinds of customers is actually more important than the number of active customers in and of itself***. Specifically, we have previously shared that a direct deposit customer typically has a meaningfully higher lifetime value than accounts that do not receive direct deposit. ***Given the ongoing momentum in our efforts to attract and retain direct deposit accounts, we're proud to share that the number of Green Dot customers who are now receiving direct deposit increased by 930,000 customers year-over-year, meaning that we added 900,000 new direct deposit accounts to our active portfolio as compared to the prior year period, with 80% of all GDV in the quarter being sourced through direct deposit, also setting a new record***. The continuing long-term portfolio mix shift towards higher lifetime value accounts helped push the Account Services gross dollar volume or GDV flowing through our various Account Services

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

products up by 57% year-over-year to more than $11.7 billion, setting another new record for our company.

Emphasis added.

18.     On August 8, 2018, after market close, Green Dot issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the Company's financial and operating results for the second fiscal quarter and six months period ended June 30, 2018 ("Q2 2018 Press Release"). Therein, Green Dot stated in relevant part:

**Green Dot Reports Second Quarter 2018 Results**

• **Achieves Double-Digit Organic Growth Rates in All Key Business Metrics**
• **Second Quarter 2018 Total Operating Revenues, GAAP Net Income and GAAP Diluted EPS up Organically by 16%, 55% and 49%, respectively**
• **Second Quarter 2018 Adjusted EBITDA and non-GAAP EPS up 15% and 35%, respectively**
• **Raises Top and Bottom Line Guidance for Full Year 2018**

**Pasadena, CA - August 8, 2018** - Green Dot Corporation (NYSE: GDOT) today reported financial results for the quarter ended June 30, 2018.

For the second quarter of 2018, Green Dot reported total operating revenues of $258.3 million and GAAP net income and GAAP diluted earnings per common share of $29.8 million and $0.55, respectively. Green Dot also reported adjusted EBITDA1 and non-GAAP diluted earnings per common share1 of $57.6 million and $0.74, respectively.

Said Green Dot Founder and CEO, Steve Streit, "***Our long term strategic plan to be a 'New Kind of Bank' is yielding very impressive organic results.*** By a New Kind of Bank, we mean a bank that uses technology, ubiquitous digital and retail brick and mortar distribution and large partnerships to acquire customers

instead of branches, and that generates revenue from increasing customer satisfaction, not from increasing customer penalty fees. ***We're very pleased with how we are executing both on our longer term corporate strategies and with our progress toward hitting our targets in the 2018 six step plan***."

Emphasis added.

19.     During a conference call to discuss the Company's financial and operating results for the second fiscal quarter ended June 30, 2018 ("Q2 2018 Conf. Call"), Green Dot's CEO stated in relevant part:

The question of whether BaaS is bigger depends on how our product side continues to grow, ***and that's also been growing really, really well***. I mean we're experience growth with our -- hate to use the word legacy because the products aren't legacy, they've been redone many, many times. ***But that original part of the business, if you will, selling cards and retail, and what not, that's really growing well for us.*** And the direct deposit penetration and the usage on that also continues to grow very, very well. So it's all growing, and that's what's giving the kind of growth we've had. I mean for a company to be at our size and having record-setting organic growth.

Emphasis added.

20.     On November 7, 2018, after market close, Green Dot issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the Company's financial and operating results for the third fiscal quarter and nine months period ended September 30, 2018 ("Q3 2018 Press Release"). Therein, Green Dot stated in relevant part:

**Green Dot Reports Third Quarter 2018 Results**
   • **Achieves record-setting Q3 revenue**
   • **Raises top and bottom line guidance again for full year 2018**

**Pasadena, CA - November 7, 2018** - Green Dot Corporation (NYSE: GDOT) today reported financial results for the quarter ended September 30, 2018.

7
COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

For the third quarter of 2018, Green Dot reported total operating revenues of $230.6 million and GAAP net income and GAAP diluted earnings per common share of $4.6 million and $0.08, respectively. Green Dot also reported adjusted EBITDA1 and non-GAAP diluted earnings per common share1 of $45.1 million and $0.59, respectively.

\*       \*       \*

Said Green Dot Founder and CEO, Steve Streit, "***As evidenced by our double-digit year over year organic growth thus far in 2018, we believe Green Dot's products and platform strategy is in the right place at the right time***. Furthermore, our expanding margins and increasing profitability provides us the ability to incrementally invest selectively in the many new business opportunities and platform enhancements before us such that we can be best positioned to deliver yet another year of double-digit top and bottom line growth in 2019."

Emphasis added.

21.    On February 20, 2019, after market close, Green Dot issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the Company's financial and operating results for the fourth fiscal quarter and fiscal year ended December 31, 2018 ("FY 2018 Press Release"). Therein, Green Dot stated in relevant part:

**Green Dot Reports Fourth Quarter 2018 Results**
**• Fourth Quarter 2018 Total Operating Revenues, GAAP Net Income and GAAP Diluted EPS up Organically by 12%, 17%, and 13%, respectively**
**• Fourth Quarter Adjusted EBITDA and non-GAAP EPS up 37% and 93%, respectively**
**• Announces 2019 financial outlook with expectations for 100% organic double-digit top and bottom line growth rates at the midpoint of guidance ranges**

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

**Pasadena, CA - February 20, 2019** - Green Dot Corporation (NYSE: GDOT) today reported financial results for the quarter ended December 31, 2018.

For the fourth quarter of 2018, Green Dot reported total operating revenues of $237.8 million and GAAP net income and GAAP diluted earnings per common share of $14.3 million and $0.26, respectively. Green Dot also reported adjusted EBITDA1 and non-GAAP diluted earnings per common share1 of $43.9 million and $0.56, respectively.

Said Green Dot Founder and CEO, Steve Streit, "***Green Dot's products and platform model generated strong consolidated organic growth in Q4 which capped another truly amazing year of double-digit top and bottom line growth for our company***. Both in the quarter and the full year, Green Dot succeeded in growing topline revenue, adjusted EBITDA and non-GAAP EPS, all well in excess of original guidance, and once again expanded both Q4 and full year operating and adjusted EBITDA margins, despite the continued material investments we've made in our operating platform and our future innovations roadmap.

Emphasis added.

22.     During a conference call to discuss the Company's financial and operating results for the fourth fiscal quarter and year ended December 31, 2018 ("FY 2018 Conf. Call"), Green Dot's CEO continued touting Green Dot's strategy by emphasizing the increasing success in penetrating its total addressable market ("TAM"). In relevant part:

Green Dot's long-term strategy is to create a unique sustainable and highly valuable FinTech ecosystem that fuels the engine of innovation for Green Dot and its many business partners, innovation sells and it's our belief that continuing to focus our energy and resources on our strategy to build the industry's most prolific platform for FinTech innovation, BaaS, Banking-as-a-Service, will help keep Green Dot vital and growing for many years to come.

***A tangible illustration of this vitality is the increasing success we're having in penetrating Green Dot's growing TAM. Our total***

*addressable market that we believe has expanded over the years to effectively represent the aggregate size of the domestic TAMs of all of our BaaS partners.* To that point, here is an illustration of the success we're having and increasingly penetrating that total addressable market. *In 2016, we estimate that approximately 30 million customers used our products and services that year.*

\*     \*     \*

In 2017, the customers we touch with products and services grew to around 35 million customers, as we added secured credit cards SimplyPaid, Uber and Apple Pay Cash products. Then, in 2018, we served just over 50 million customers, who used a Green Dot product or service as we added into it TaxHawk and other programs, while BaaS partners who went live in prior years continue to see broadening adoption. Because Green Dot started out as a monoline prepaid Company with the legacy active card KPI that reflects only that legacy card business, some might think that the active card KPI is the sum total of our entire active customer base. *But of course nowadays our card programs are just one part of Green Dot's diverse product suite and our actual customer base is much larger than that.*

Emphasis added.

23.    The statements in above paragraphs ¶16-22, were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Green Dot's strategy to attract "high-value" long-term customers was at the expense of "one and done" customers; (2) Green Dot's "one and done" customers represented a significant source of revenues in its legacy segment; (3) consequently, Green Dot's strategy was self-sabotaging; and (4) as a result of the foregoing, Defendants' statements about its business and operations were materially false and misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

24.    During the FY 2018 conference call, Defendant Streit also began to reveal the truth, i.e. how Green Dot strategy was self-sabotaging. In relevant part:

> In our Account Services segment total revenue in that segment increased by 11% to $200 million with 5.34 million quarterly active accounts up around 1% year-over-year. Our key metrics for the portfolio's health and vibrancy continue to be extremely strong. Specifically, the number of active accounts receiving direct deposit grew by 10% year-over-year and purchase volume grew by very large 11% year-over-year to a new Q4 record of $6 billion.
>
> ***So how can our direct deposit and purchase volume metrics be so strong and yet actives be up only 1%. The reason is that we are somewhat a victim of our own success in converting more and more of our quarterly active accounts to direct deposit active accounts.*** Here's how the math works. An active account is defined as a single card that has at least one customer generated transaction in the quarter. So, for example, a customer who buys one card every two weeks to say low their wages to the card and then pay bills, shop online or whatever their purpose may be, that one customer would be generating six active accounts in the quarter, but when that same customer buys Just one card in the quarter, decides to enroll in direct deposit and then keep same card in their wallet and uses it the same way every two weeks to pay bills, shop online or whatever their purpose may have been, that same customer is now generating account of just one active account in the quarter.
>
> To this point, of the major Green Dot Bank issued card portfolios. The number of weekly active accounts grew around 8.5% on average in the quarter as compared with a number of weekly active accounts in last year's Q4. The reason is that more customers appear to be increasingly using the card as their top of wallet card with transactions occurring every week, whereas a short-term customer, who doesn't use our card as their top of wallet card, will only use the card occasionally, maybe once every few weeks, but not every week.
>
> While the mix shift towards direct deposit and more engaged customers is clearly better for profitability and growth. The lower

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

churn also means fewer accounts issued are short-term customers, which weighs down on unit sales and therefore the quarterly active account metric.

Emphasis added.

25.    On this news, the stock price declined from a close of $74.67 per share of Green Dot Class A common stock on February 20, 2019 to a close of $67.20 per share on February 21, 2019, *a drop of approximately 10.00 percent.*

26.    On May 8, 2019, after market close, Green Dot issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the Company's financial and operating results for the first fiscal quarter ended March 31, 2019 ("Q1 2019 Press Release"). Therein, Green Dot suddenly disclosed a large "investment in growth for the purpose of aggressively marketing new products." In relevant part:

> Said Mark Shifke, Green Dot's Chief Financial Officer, "We believe now is the right time to accelerate investment in initiatives designed to materially grow both the Products and Platform parts of our business, creating the opportunity to achieve material incremental growth into 2020 and beyond. To that end, we intend to invest an incremental $60 million for the purpose of aggressively marketing our new products that are set to launch later this year, and to advance the development and deployment of our BaaS 3.0 and BaaS 4.0 technology platforms in order to meet the increasing demand for these services and capitalize on the resulting revenue opportunities sooner and more assuredly. We expect the incremental $60 million investment could deliver over one million incremental active accounts at the exit of 2019, which, at that number of incremental active accounts, would be expected to deliver incremental lifetime revenue of approximately $200 million to $300 million, at an approximate average contribution margin of 50%. As a result of this $60 million incremental investment, we are revising our 2019 full year adjusted EBITDA and Non-GAAP EPS outlook."

27.    During a conference call to discuss the Company's financial and operating results for the first fiscal quarter ended March 31, 2019 ("Q1 2019 Conf. Call"), Green

Dot's CEO further disclosed the self-inflicted wounds caused by the Company's strategy. In relevant part:

> At the same time, we are experiencing some erosion in the number of legacy product line, non-direct deposit active accounts, primarily from our legacy brick and mortar retail channel and to a lesser degree from our RushCard and account now digital direct brands. ***Since 2016, when we first introduced our now popular cash back rewards cards, our risk controls, product design elements and marketing strategies have collectively been designed to attract high-value long-term customers sometimes at the expense of low value or what we call one and done customers.***
>
> To help you size the revenue difference between the different active account types. A typical direct deposit account across all product lines generates around three times the amount of revenue as an average non-direct deposit active account, while these legacy non-direct deposit customers and especially the non reloading one and done customers that are within that segment are not our best customers by a long shot, ***those accounts still generate revenue for us at a better than average contribution margin.***
>
> So while the decline in this low value active component isn't in and of itself, a long-term strategic problem. It is a short-term headwind to overall segment revenue, since revenue is revenue and declining actives in any segment means less revenue. Our belief is that our new Gen Z targeted products as referenced in step one of our Six Step Plan and that are on track to launch in the second half of this year, along with the new and dramatically more compelling value proposition of these new products, will help increase the number of active accounts acquired from our legacy retail and digital direct acquisition channels in an amount sufficient to overcome these active card declines.
>
> But if left uncorrected, we would worry that a continued long-term decline in these legacy non-direct deposit active accounts could pose a headwind to our overall Account Services segment financial plan, although, as you can tell from our Q1 results, this factor didn't appear to impact results in a material way after that point. We do however expect a lower number of legacy non-direct deposit actives

to have an impact in Q2, so something for us to watch for sure as we seek to improve this trend when we launch our new and more compelling products in the second half.

Emphasis added.

28.   On this news, the stock price declined from a close of $63.27 per share of Green Dot Class A common stock on May 8, 2019 to a close of $46.56 per share on May 9, 2019, **a drop of approximately 26.41 percent.**

29.   On August 7, 2019, after market close, Green Dot issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the Company's financial and operating results for the second fiscal quarter and six months period ended June 30, 2019 ("Q2 2019 Press Release"). Therein, Green Dot disclosed additional problems with the legacy products and reduced its fiscal year outlook, stating in relevant part:

Said Mark Shifke, Green Dot's Chief Financial Officer, "***On a year-over-year basis, we experienced an accelerated loss of unit sales in our prepaid product lines, resulting in lower active accounts from both non-reloading customers and cash reloading customers***. We expect the trend of lower active accounts to continue into Q3, before starting to moderate in Q4. We believe the launch of our new branded products and certain BaaS programs that are expected to ramp over time will lead us back to active account and associated revenue growth in 2020. Based on the lower number of active accounts at the end of Q2, our expectations for prepaid unit sales through the end of the year, and that our new product launched only one week ago, we now believe there is insufficient time remaining in the year for the revenue generated from the issuance of our new product to overcome the loss of revenue resulting from the lower number of active accounts in our legacy prepaid product line. As such, we are readjusting our expectations for the remainder of this year."

\*     \*     \*

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

Total Non-GAAP Operating Revenues
  • Green Dot now expects its full year non-GAAP total operating revenues2 to be between $1.060 billion and $1.080 billion, representing 5% year-over-year increase at the mid-point, versus its previous guidance of $1.114 billion to $1.134 billion.
  • For Q3, Green Dot expects non-GAAP total operating revenues2 to be between $225 million and $230 million.

Adjusted EBITDA
  • Green Dot now expects its full year adjusted EBITDA2 to be between $240 million and $244 million, representing a 12% year-over-year decline at the mid-point, versus its previous guidance of $255 million to $261 million.
  • For Q3, Green Dot expects adjusted EBITDA2 to be between $12 million and $14 million. This guidance includes a majority of the $60 million incremental marketing and technology investments we allocated during the second half of 2019.

Non-GAAP EPS2
  • Green Dot now expects its full year non-GAAP EPS2 to be between $2.71 and $2.77, representing a 17% year-over-year decline at the mid-point, versus its previous guidance range of $2.82 to $2.91.
  • For Q3, Green Dot expects non-GAAP EPS2 to be approximately $0.02.

Footnotes omitted, emphasis added.

30.     During a conference call to discuss the Company's financial and operating results for the second fiscal quarter ended June 30, 2019 ("Q2 2019 Conf. Call"), Green Dot's CEO stated in relevant part:

While Mark will share more context around our financial performance and guidance during his section of the call, I want to address upfront that we're lowering full year guidance. While disappointing and unfortunate, it is necessary as a result of an acceleration in declining unit sales in our legacy prepaid card product line combined with a later than expected launch of our new and limited product and a large BaaS program that together make it

now unrealistic for us to achieve the growth we had attended in the second half.

We believe the underlying reasons are contained to only our legacy prepaid business line and are likely to impact only this year's revenue growth trajectory as expected performance of our new products and our BaaS programs should help us return to healthy growth rates again next year. So now let's get into the numbers.

Green Dot's products and platform model generated Q2 consolidated non-GAAP total operating revenues of $265 million, a 5% year-over-year increase. The largest drivers of the growth were our BaaS Platform product line and from growth in our processing and settlement segment. ***However, our Account Services segment underperformed our expectations in the quarter and the first half in general, due primarily to a decline in our legacy non[-]direct deposit active accounts, which we identified as a potential headwind on our last call. These declines continued and accelerated in Q2, resulting in lower than anticipated prepaid unit sales that has caused a material reduction in active prepaid accounts.***

Emphasis added.

31.     On this news, the stock price declined from a close of $47.26 per share of Green Dot Class A common stock on August 7, 2019 to a close of $27.42 per share on August 8, 2019, ***a drop of approximately 41.98 percent.***

32.     On November 7, 2019, after market close, Green Dot released its financial and operating results for the third fiscal quarter and nine months period ended September 30, 2019. During the conference call to discuss the results ("Q3 2019 Conf. Call"), Green Dot's CEO revealed that the continuing year-over-year decline of accounts in its active consumer business approximated 620,000 and were mostly "one-time use accounts." Defendant Shifke added that while they were iterating the full year guidance, they expected Green Dot's financial results to be at the lower end of it.

33.     On this news, the stock price declined from a close of $29.95 per share of

16

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

Green Dot Class A common stock on November 7, 2019 to a close of $24.54 per share on November 8, 2019, *a drop of approximately 18.06 percent.*

## LOSS CAUSATION AND ECONOMIC LOSS

34.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price and operated as a fraud or deceit on acquirers of the Company's securities. As detailed above, when the truth about Green Dot's misconduct and its lack of operational and financial controls was revealed, the value of the Company's securities declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in Green Dot's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's share, price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

35.   At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. The statements were materially false and misleading through their failure to disclose a true and accurate picture of Green Dot's business, operations and financial condition, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Green Dot's securities to be artificially inflated. Plaintiff and other Class

members purchased Green Dot's securities at those artificially inflated prices, causing them to suffer the damages complained of herein.

## SCIENTER ALLEGATIONS IN SUPPORT OF EXCHANGE ACT VIOLATIONS

36.     Collectively, the following factual allegations strongly support an inference of scienter on the part of Defendants. Further, Defendants' actions, intentions, and deliberately reckless conduct are imputed to the Company as a matter of law. Because of their key roles in the Company, the Individual Defendants caused Green Dot to act in the manner it did and perpetuate the material misrepresentations and omissions it made throughout the Class Period. Defendants acted with the requisite intent to establish liability under the Exchange Act. Their conduct with respect to Green Dot's statements was intentionally misleading and/or reckless with regard to the risk of investors being misled.

37.     For the reasons stated above, the factual allegations strongly support an inference of scienter on the part of Defendants.

## PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

38.     At all relevant times, the market for Green Dot securities was an efficient market for the following reasons, among others:

a)  Green Dot securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

b)  During the Class Period, Green Dot securities were actively traded, demonstrating a strong presumption of an efficient market;

c)  As a regulated issuer, Green Dot filed with the SEC periodic public reports during the Class Period;

d)  Green Dot regularly communicated with public investors via established market communication mechanisms;

e)  Green Dot was followed by securities analysts employed by major

brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

f) Unexpected material news about Green Dot was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

39. As a result of the foregoing, the market for Green Dot securities promptly digested current information regarding Green Dot from all publicly available sources and reflected such information in Green Dot's stock price. Under these circumstances, all purchasers of Green Dot securities during the Class Period suffered similar injury through their purchase of Green Dot's securities at artificially inflated prices, and a presumption of reliance applies.

40. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to purchase or sell the subject security. Here, the facts withheld are material because an investor would have considered the Company's true net losses and adequacy of internal controls over financial reporting when deciding whether to purchase and/or sell stock in Green Dot.

## NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

41. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

42.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

43.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Green Dot who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

44.     Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired Green Dot securities on the public market during the Class Period, and were damaged, excluding the Company, the defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

45.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Green Dot securities were actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate

discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Green Dot or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of October 31, 2019, Green Dot had 51,496,511 outstanding shares of Class A common stock outstanding. Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

46.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

47.     Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

48.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether the federal securities laws were violated by the defendants' respective acts as alleged herein;

b) whether the defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

c) whether the price of Green Dot securities during the Class Period was artificially inflated because of the defendants' conduct complained of herein; and

d) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

49.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Violation of Section 10(b) and Rule 10b-5 Against All Defendants*

50.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

51.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Green Dot securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

52.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Green Dot securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

53.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information

about the business, operations and future prospects of Green Dot as specified herein.

54.    These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Green Dot's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Green Dot and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Green Dot securities during the Class Period.

55.    Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

56.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that

they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Green Dot's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

57. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Green Dot's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Green Dot's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Green Dot's securities during the Class Period at artificially high prices and were or will be damaged thereby.

58. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Green Dot's financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Green Dot securities, or, if they had acquired such securities during the

Class Period, they would not have done so at the artificially inflated prices that they paid.

59.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

60.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

61.     This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

## COUNT II

### *The Individual Defendants Violated Section 20(a) of the Exchange Act*

62.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

63.     The Individual Defendants acted as controlling persons of Green Dot within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

64.     In particular, each of these Defendants had direct and supervisory

involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

65.     As set forth above, Green Dot and the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

66.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

67.     This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

**PRAYER FOR RELIEF**

68.     WHEREFORE, Plaintiff prays for relief and judgment as follows:

a) Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

b) Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

d) Granting extraordinary equitable and/or injunctive relief as permitted by law; and

e) Such other and further relief as the Court may deem just and proper.

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a jury trial.

DATED: December 18, 2019                  Respectfully submitted,

**LEVI & KORSINSKY, LLP**

By:   /s/ *Rosanne L. Mah*
Rosanne L. Mah
388 Market Street, Suite 1300
San Francisco, California 94111
Telephone: (415) 373-1671
Facsimile: (415) 484-1294

Eduard Korsinsky (to be admitted *pro hac vice*)
55 Broadway, 10th Floor
New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

*Counsel for Individual and Representative*
*Plaintiff Esteban Koffsmon and Proposed Lead*

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW