ROBBINS GELLER RUDMAN
& DOWD LLP
JASON A. FORGE (181542)
RACHEL L. JENSEN (211456)
CHRISTOPHER R. KINNON (316850)
JOHN M. KELLEY (339965)
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
jforge@rgrdlaw.com
rjensen@rgrdlaw.com
ckinnon@ rgrdlaw.com
jkelley@ rgrdlaw.com

Lead Counsel for Lead Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re GREEN DOT CORPORATION SECURITIES LITIGATION | Case No. 2:19-cv-10701-DDP (Ex) |
| | CLASS ACTION |
| | AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| | DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

Page


I. SUMMARY OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 2

III. THE PARTIES ..... 3

IV. OVERVIEW ..... 4

A. Defendants' High-Fee Prepaid Debit Cards ..... 4

B. Defendants Prop Up the Prepaid Business by Buying Up the Competition ..... 6

C. Defendants' Manipulation Obscures Declines in the Core Prepaid Card Business During the Class Period ..... 8

V. DEFENDANTS' FRAUDULENT SCHEME, WRONGFUL COURSE OF BUSINESS, AND MISLEADING STATEMENTS ..... 10

A. May 2018 Statements ..... 11

B. August 2018 Statements ..... 15

C. November 7, 2018 Statements ..... 18

D. February 2019 Statements ..... 20

E. May 2019 Statements ..... 22

F. August 2019 Statements ..... 23

VI. THE CORRECTIVE DISCLOSURES ..... 24

A. February 20, 2019 Corrective Disclosure ..... 25

B. May 8, 2019 Corrective Disclosure ..... 26

C. August 7, 2019 Corrective Disclosure ..... 27

D. November 7, 2019 Corrective Disclosure ..... 29

VII. ADDITIONAL SCIENTER ALLEGATIONS ..... 31

VIII. THE PRESUMPTION OF RELIANCE APPLIES ..... 34

IX. CLASS ACTION ALLEGATIONS ..... 35

X. CAUSES OF ACTION ..... 37

COUNT I ..... 37

**Page**

COUNT II ........................................................................................ 39

XI. PRAYER FOR RELIEF ........................................................................ 39

XII. JURY DEMAND ................................................................................ 40

## I. SUMMARY OF THE ACTION

1. This is a securities fraud class action brought on behalf of purchasers of Green Dot Corporation ("Green Dot" or the "Company") common stock between May 9, 2018 and November 7, 2019, inclusive (the "Class Period"), against Green Dot, Steven W. Streit ("Streit"), its founder and former Chief Executive Officer ("CEO"), and Mark Shifke ("Shifke"), its former Chief Financial Officer ("CFO") (collectively, "Defendants") for violations of the Securities Exchange Act of 1934 ("Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.

2. Green Dot's primary business is selling high-fee, prepaid debit cards ("legacy prepaid" cards) to lower-income Americans who lack access to a personal bank account. By 2018, it was apparent to Green Dot's senior insiders that sales of the Company's "bread and butter" legacy prepaid cards were faltering. Rather than come clean with investors, however, Green Dot's now-former senior executives chose to mislead the market and capitalize on their deception by selling $62 million dollars of their own Green Dot shares at artificially inflated prices, while investors lost hundreds of millions buying Green Dot stock at prices inflated by Defendants' misconduct.

3. Defendants' fraudulent scheme and wrongful course of business was designed to and did defraud investors as they repeatedly made misleading statements concerning the value of Green Dot's prepaid customers and business, the scope of the decline in its prepaid business, and the effect of and reason for its shift to digital and direct deposit accounts. Choosing to speak about the performance of Green Dot's prepaid debit cards, its active-account growth, and its shift to digital and direct deposit accounts, Defendants misled investors by concealing critical information about Green Dot's declining core prepaid debit card business, which generated the largest portion of Green Dot's revenue. Green Dot's former CEO and CFO also obfuscated Green Dot's account and fee losses by intentionally conflating active accounts, high-fee

legacy prepaid accounts, low- to no-fee direct-deposit accounts, and low- to no-fee digital accounts (Banking as a Service ("BaaS") accounts). In doing so, Defendants Streit and Shifke propped up Green Dot's stock price long enough to sell $62 million dollars of their own Green Dot shares at artificially inflated prices.

4. The truth about Green Dot's operations began to emerge starting on February 20, 2019, when the Company disclosed a slowdown in account growth, and Green Dot's stock price declined 10%. Green Dot's stock dropped another 26% on May 8, 2019, when the Company disclosed that it had experienced a loss of 300,000 prepaid accounts and would have to expend $60 million to market Company cards. Then, on August 7, 2019, Green Dot revealed a loss of 500,000 prepaid accounts, a decline in the Company's active accounts, and slashed the Company's fiscal 2019 outlook. On this news, Green Dot's stock dropped another 42%. On November 7, 2019, Green Dot further revealed that the declines in pre-paid accounts would continue through the first half of 2020, causing Green Dot's stock to drop an additional 18% to a near-record low. Soon thereafter, Green Dot also announced that Streit and Shifke would "retire" at year-end and that Streit would be terminating his membership on Green Dot's Holding Company Board and as Chairman of the Green Dot Bank Board.

## II. JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa) because the claims arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

6. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because Green Dot maintained its corporate headquarters in this District at all relevant times. Additionally, many of the acts charged herein, including the preparation and dissemination of materially misleading information, occurred in substantial part in this District.

7. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications and/or facilities of the national securities exchanges.

## III. THE PARTIES

8. Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund purchased Green Dot's common stock during the Class Period and suffered damages due to Defendants' misconduct.

9. Plaintiff Teamsters Local Union No. 727 Pension Fund purchased Green Dot's common stock during the Class Period and suffered damages due to Defendants' misconduct.

10. New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund and Teamsters Local Union No. 727 Pension Fund are collectively referred to herein as "Plaintiffs."

11. Defendant Green Dot is a Delaware corporation with its principal executive offices located at 3465 East Foothill Boulevard, Pasadena, California 91107, at all relevant times. The Company's Class A common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "GDOT."

12. Defendant Steven W. Streit founded Green Dot and was its CEO from 2001 until immediately following the Class Period in December 2019. Streit also served as a Director and President of Green Dot from October 1999 until December 2019.

13. Defendant Mark Shifke was CFO of Green Dot from 2015 until immediately following the Class Period in December 2019. Prior to assuming the CFO role, Shifke was Green Dot's Senior Vice President of Corporate Strategy and M&A.

14. Defendants Streit and Shifke are collectively referred to herein as the "Individual Defendants."

15. The Individual Defendants, by virtue of their positions, had the power and authority to control the contents of Green Dot's statements to the market, including in earnings calls, SEC reports, shareholder letters, press releases, and other presentations to analysts, money and portfolio managers, and institutional investors. The Individual Defendants were provided with copies of releases and SEC reports before or shortly after issuance and had the ability and opportunity to prevent their issuance or to correct them. By virtue of their positions, and their personal knowledge of or access to material non-public information, the Individual Defendants knew and/or recklessly disregarded that material facts were being withheld from the investing public.

## IV. OVERVIEW

### A. Defendants' High-Fee Prepaid Debit Cards

16. Measured by market capitalization, Green Dot is the world's largest prepaid debit card company. Its high-fee, prepaid products are sold at nearly 100,000 retail stores, including at CVS, Rite Aid, Walgreens, Dollar Tree, with discounted offerings at Walmart and Meijer, and it sells co-branded cards with Walmart, Boost Mobile, AT&T and Citibank. Green Dot also operates a BaaS platform for consumer and technology companies.

17. Green Dot's legacy prepaid cards are debit cards, not lines of credit. A user loads money onto a card and subsequent purchases are then deducted from the stored balance. For a fee, the user can add more money to the card (called "reloading") by paying cash at a retailer or from their paycheck. The target market for Green Dot's legacy prepaid cards has historically been lower-income customers who lack access to a personal bank account. Defendants referred to this target group as the "unbanked" and "underbanked."

18. Leading up to and during the Class Period, revenue from legacy prepaid cards was Green Dot's core "bread-and-butter" business. As analysts at The Street noted in 2014, "Green Dot's bread and butter is made up of lower-income and lower-

credit consumers who have historically operated outside of the country's banking system." At the time Green Dot went public, over 75% of its revenue was legacy prepaid-related: 50.8% from new card, maintenance, ATM, and other fees; and 26.6% from cash transfer revenues. Green Dot's 2017 Form 10-K likewise stated that most of the Company's operating revenues "derived from prepaid financial services sold at our four largest retail distributors" and that operating revenue derived from products and services sold at Walmart store locations "was approximately 40%." Streit underscored the significance of prepaid cards to Green Dot's overall operations in a February 21, 2018 earnings call, emphasizing that "our bread and butter from the old days is still our bread and butter today."

19. Green Dot's legacy prepaid cards are extremely lucrative, as they generate high fees that traditional credit and debit cards do not, do not require interest to be paid to consumers on card balances, and lack of basic consumer protections that apply to traditional credit and debit cards. As a result, however, this core component of Green Dot's business model is particularly vulnerable to less-exploitive alternatives for the same customers.

20. Founder and former CEO Streit built Green Dot and his personal fortune by identifying and targeting unbanked and underbanked Americans. As Streit said on the Company's May 9, 2018 earnings call:

> [W]hen we first launched the company, if you think back to the IPO in 2010, we thought the TAM [total addressable market], we described as underbanked and unbanked American families. We said they were 60 million adults, I think is what the quote was, or the number was at that time, and we got that number from one of the federal agencies.

21. Before founding Green Dot, Streit was a radio DJ who went by the moniker "Ayatollah of Rock 'n' Rolla." As Streit told *Forbes* in 2011, when he and his first investor, Shifke, got started: "'We didn't have a product. We didn't have a bank. We didn't have a contract to give them.'"

22. But by 2018, Green Dot was earning $1 billion annually targeting the unbanked and underbanked, with the bulk of the revenue from its legacy prepaid card fees. Green Dot's Prepaid Visa Card, for example, was widely available at retailers, including Walmart, 7-Eleven, CVS/Pharmacy, and Dollar Tree in 2018 and 2019 and charged users, among other fees: a $1.95 purchase/activation fee; a $7.95 monthly fee; a $2.50 ATM fee; and a cash reload fee up to $4.95. All told, the fees exceeded $35 per month for 20 purchases. By comparison, the average monthly fee for a low-balance checking account in 2018 was around $10.

23. The Company's legacy prepaid cards were a "high-margin" product, retaining (or re-upping) debit-card customers for additional monthly and reloading fees was critical to maintaining Green Dot's high margins and profitability.

24. Given the importance of legacy prepaid card fees to Green Dot's business model, investors were laser focused on the growth of this core business. Investment analysts recognized this, noting that "the company's core business is still a prepaid card issuer focused on unbanked/underbanked market segment" (February 21, 2018 Deutsche Bank analyst report) and that "underserved customers spent nearly $175B in fees and interest in 2016 across all products" (July 10, 2018 Jefferies analyst report).

### B. Defendants Prop Up the Prepaid Business by Buying Up the Competition

25. Defendants tracked in real-time the performance of Green Dot's legacy prepaid business. By 2017, competition from new, less-exploitive digital banking alternatives was starting to squeeze Green Dot's core business. For example, Venmo, PayPal, and 'neo-banks' like Chime provided low-fee or no-fee services through digital platforms. To compensate and mask declines in its own legacy prepaid business, Green Dot repeatedly acquired other prepaid card companies. Although Green Dot was running out of competitors to buy, in January Green Dot acquired one of the last remaining, UniRush, for $147 million. UniRush was a leading general-

purpose reloadable prepaid card provider, and the acquisition added 750,000 active accounts to Green Dot's total.

26. During 2017, Defendants emphasized growth in the legacy prepaid card business. For example, Green Dot's Q2 2017 Form 10-Q highlighted the UniRush acquisition as incremental to its existing legacy prepaid business, citing increasing revenue from prepaid cards, the cards' improved unit economics, and increased prepaid card fees: "We believe this increase in revenue reflects the increasing quality of customers within our active card base and improved unit economics on our suite of prepaid card products, which increased monthly maintenance fees and ATM fees earned within our Account Services segment . . . ."

27. On the Company's August 8, 2017 earnings call, Streit told investors that Green Dot "continue[d] to create and sell more of [their] own products that increasingly appeal[ed] to a more committed and more profitable customer base." Streit also said the Company's "old legacy [prepaid card] customers . . . deliver[ed] a lot of revenue, because ***these are your best customers***," telling investors that the newer prepaid products had even "better fees . . . and generating more natural usage revenue and that's why you're seeing this continuing increased revenue per card holder." Streit said the Green Dot prepaid cards were "continuing to spin the wheel of synergy and revenue on top of a lower cost base."

28. On the November 7, 2017 earnings call, Streit again emphasized "solid growth across our enterprise, especially from our prepaid business lines." Streit stressed the health of Green Dot's legacy prepaid business, citing "momentum we're seeing in the retail demand for our products" and "retail demand for our products" at Walmart was driving "revenue growth 33% year-over-year for the consumer accounts segment." In response to a question from an analyst, Streit said "retention is showing up in that active card growth" and told investors to "expect that trend to continue into next year where you're going to see active card growth continue at some pace."

### C. Defendants' Manipulation Obscures Declines in the Core Prepaid Card Business During the Class Period

29. As Green Dot's founder, Streit was a very hands-on CEO to the point of micromanagement. For example, he participated in weekly financial planning meetings and was aware of year-over-year declines in Green Dot's prepaid accounts (excluding acquisitions) during the Class Period, as reflected on near-real-time basis in Customer Relationship Management Reports, which Streit and Shifke received (the declining growth rate for these "home grown" legacy prepaid accounts began from mid-2017 to early 2018). By late 2017, Green Dot's home-grown products, including its significant Walmart offerings, were declining at a steady pace and this continued throughout 2018 due to declines in both daily active card activity and numbers of cards sold. By 2018, the Company was projecting flat active account growth, despite growth in BaaS. Green Dot was losing legacy prepaid customers, in part, due to competition from cheap digital alternatives such as Chime, Venmo, Netspend and a Square product/service called "Cash."

30. Other reports to which Streit and Shifke had free access reflected this grim performance and outlook, including the BIA dashboard, Financial Key Metrics, the Cohort Report, the Tableau Report, and the Revenue Pacing Report, as well as Consolidated Activity Reports ("CARs"), which the finance department (headed by Shifke) generated to reflect current and projected customer bases for the Company's product lines. CARs included active customer base numbers broken down into 12 client portfolios, including current numbers, historical numbers, and projections. Like Streit, Shifke also adopted a hands-on management approach. Both regularly reviewed all performance and forecasting metrics, including those for the failing legacy prepaid cards, and were intimately involved in marketing, which provided additional insight into Green Dot's decaying "bread and butter" legacy prepaid business. For example, Streit ended a marketing campaign in August 2018 after

concluding that it was not attracting enough new customers to overcome significant drop-offs in new customer acquisitions.

31. Because of the Company's struggles to grow its own customer base, Green Dot had purchased several regional card companies to show growth, with an estimated 40%-50% of customers obtained through acquisition. But by 2018, this well had run dry (actually, Defendants' acquisitions had largely drained it).

32. Desperate to stop the account bleed, Streit personally halted the efforts of Green Dot's Fraud Management team to tighten loose customer identification procedures, also known as onboarding rules. To avoid losing more accounts, Streit forced Green Dot employees to accept an account base that was rife with fraud and made change recommendations to Customer Identification Procedures that influenced higher account-approval rates and aggravated a situation in which 30%-40% of accounts had some sort of negative status (*e.g.*, unmatched address or name, excessive disputes, and/or negative balance). At times, various individual customers could each have hundreds of accounts; one customer reached 1,000 accounts.

33. In sum, by early 2018, Defendants knew: (i) the growth of the legacy prepaid card business was declining; (ii) the Company was facing existential competition from new low-fee digital banking; and (iii) that upon acquiring UniRush, the Company could no longer use acquisitions to hide declining growth in legacy prepaid cards. Seasonal bumps from Green Dot's tax business and the last gasps of growth from prior acquisitions had allowed Defendants to conceal declining growth in the legacy prepaid card business in the short term, but Defendants knew this mirage could not last.

34. Between May 2018 and November 2019, Defendants misled investors about declining growth in Green Dot's legacy prepaid debit card business and diverted investor attention from this "bread and butter" product to BaaS and direct-deposit accounts, even though the vast majority of such accounts were offered with no fees. And Defendants concealed the reasons for their new emphasis, which included the

declining performance of the legacy prepaid cards and new competition from much less expensive digital alternatives, such as PayPal, Venmo, and neobanks like Chime.

35. By 2019, Defendants could no longer entirely obscure the declining growth in the legacy prepaid card business. Instead of being truthful with investors, however, Defendants changed tactics by understating the importance of the legacy prepaid business and overstating the value of new digital and direct deposit products.

## V. DEFENDANTS' FRAUDULENT SCHEME, WRONGFUL COURSE OF BUSINESS, AND MISLEADING STATEMENTS

36. Throughout the Class Period, Defendants engaged in a scheme to defraud investors by multiple methods and means, including:

(a) Repeatedly choosing to speak about the performance of Green Dot's prepaid debit cards, its active-account growth, and its shift to digital and direct deposit accounts in a misleading manner by omitting critical information about Green Dot's declining core prepaid debit card business, which comprised the largest portion of its revenue. In doing so, Defendants intentionally withheld information that reasonable investors would have viewed as significantly altering the information Defendants chose to make available.

(b) Making misleading statements concerning the value of Green Dot's prepaid customers and business, the scope of the decline in its prepaid business, and the effect of and reason for its shift to digital and direct deposit accounts. In doing so, Defendants intentionally withheld information that reasonable investors would have viewed as significantly altering the information Defendants chose to make available.

(c) Obscuring account and fee losses by conflating active accounts, legacy prepaid accounts, low- to no-fee direct-deposit accounts and low- to no-fee BaaS accounts. In doing so, Defendants intentionally withheld information that reasonable investors would have viewed as significantly altering the information Defendants chose to make available.

(d) Propping up Green Dot's stock price long enough for the Individual Defendants to sell millions of dollars of their own Green Dot shares at artificially inflated prices.

37. Defendants held quarterly earnings calls on May 9, August 8, and November 7, 2018, during which defendants Streit and Shifke delivered prepared remarks and answered analysts' questions. Additionally, on May 16, 2018, Streit and Shifke spoke at the JPMorgan Global Technology, Media and Communications Conference ("JPMorgan Conference"), during which they delivered prepared remarks and answered analysts' questions.

**A. May 2018 Statements**

38. During the May 9, 2018 earnings call, Streit and Shifke emphasized the performance of Green Dot's prepaid debit cards, its active-account growth, and its shift to digital and direct deposit accounts in a misleading manner, as they omitted critical information about Green Dot's declining core prepaid debit card business, which comprised the largest and highest margin portion of its revenues but its growth rate was shrinking, which would inevitably impact the Company's bottom line. Yet, Streit discussed the momentum of Green Dot's business, including Green Dot's legacy prepaid cards, stating:

(a) "On the branded side of our shop, Green Dot continues to gain traction on nearly all fronts."

(b) "Additionally, Green Dot has earned more than 5,000 new incremental shelf facings for its products and services at Safeway Albertson stores and other locations where Green Dot now occupies space formerly occupied by the now defunct American Express prepaid product line."

(c) "Walmart MoneyCards and Green Dot classic Visa cards and MasterCards and GoBank . . . ***continue[] to do extremely well***" and "I think we still have a ***long way to go*** before we come anywhere near what you'd call maxed out."

(d) "***We don't intend to imply that we see a slowdown forthcoming***. In fact, as both Steve and I mentioned in our remarks, we feel upbeat about the likelihood of ***continued strong momentum***."

39. Streit's May 9, 2018 statements regarding the momentum of Green Dot's business were each misleading when made. The true facts, which Defendants knew and/or recklessly disregarded included the following:

(a) Green Dot was losing traction on its most important front (*i.e.*, its legacy prepaid cards).

(b) Despite 5,000 new shelf facings, Green Dot was losing traction on its most important front (*i.e.*, its legacy prepaid cards).

(c) The growth rate of Green Dot's legacy, high-margin prepaid card business was already declining and would inevitably impact the Company's bottom line.

40. Streit also made the following statements during the May 9, 2018 conference call concerning Green Dot's product mix and account value:

(a) "The continuing long-term portfolio ***mix shift towards higher lifetime value accounts*** helped push the Account Services gross dollar volume or GDV flowing through our various Account Services products up by 57% year-over-year to more than $11.7 billion, setting another new record for our company."

(b) "[A]ttracting and retaining the right kinds of customers is actually more important than the number of active customers in and of itself. Specifically, we have previously shared that a ***direct deposit customer typically has a meaningfully higher lifetime value*** than accounts that do not receive direct deposit."

(c) "In our Account Services segment on a consolidated basis, total active accounts increased for the fifth consecutive quarter, ***growing by 21% year-over-year*** or an additional ***nearly 1 million*** more active accounts year-over-year, totaling 6 million active accounts in the quarter, a new record for Green Dot."

(d) "Step 1 was to continue to grow the number of active accounts year-over-year and to ***improve the unit economics*** of those accounts. . . . ***[W]e are well ahead on this goal***, having added nearly 1 million new active accounts while increasing the number of accounts receiving direct deposit by 930,000."

(e) "So we're ***not seeing any competitive pressure***, and you can see the growth is pretty robust. And we like the fact that there's more and more digital offerings because customers don't see the world as a net zero-sum game. . . . So the answer is no, ***we're not feeling competitive pressure*** from any of those . . . ."

41. Streit's May 9, 2018 statements concerning Green Dot's product mix and account value were each misleading when made. The true facts, which Defendants knew and/or recklessly disregarded were that:

(a) Competition from new low-fee or no-fee digital products was forcing Green Dot to shift from high-fee legacy prepaid cards to largely free products.

(b) The claimed increase in "GDV" (total card-loaded funds) masked a less-lucrative product-mix trend.

(c) Direct-deposit accounts were not generating the high-margin card fees of legacy prepaid accounts.

(d) The "vast majority" of the direct deposit and BaaS accounts were free.

(e) The only "revenue stream that would be enhanced" by direct deposit accounts was "from interchange," which was extremely low-margin.

(f) That as a result of (a)-(e) above, the per-unit economics of Green Dot's active accounts was part of a product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

42. During the May 9, 2018 earnings call, Shifke further stated, "[a]ll told, in the quarter, we attracted more highly engaged customers than ever before ***with better unit economics***, as evidenced by the record interchange and fee revenue."

43. Shifke's May 9, 2018 statement was misleading when made. The true facts, which Defendants knew and/or recklessly disregarded were that the per-unit economics of Green Dot's card portfolio was part of a product-mix trend that had reversed card-revenue-and-fee-growth and would inevitably impact the Company's bottom line. Moreover, behind the increase in overall active accounts was a product-mix trend that was reversing card-revenue-and-fee growth and would inevitably impact the Company's bottom line.

44. Defendants' statements had the desired effect of misleading the market, as demonstrated by contemporaneous analyst reports. For example, Jefferies issued a May 9, 2018 report emphasizing Green Dot's "solid fundamentals" in its "core business," noting that "guidance was raised on the back of strong Q1 results" and emphasizing the "momentum in the core business." SunTrust Robinson Humphrey ("SunTrust") issued a May 9, 2018 report entitled, "Momentum Building Off Core Cards as Platform Programs Ramp," which reiterated that Green Dot's "legacy GPR business drives rev growth." And Morgan Stanley issued a May 10, 2018 report, which reiterated Streit's claim that there was "[n]o impact from seemingly increased competition" and Green Dot was seeing "no impact in its customer acquisition or attrition."

45. Streit and Shifke spoke at the May 16, 2018 JPMorgan Conference. Their statements highlighted the performance of Green Dot's prepaid cards, its active-account growth, and its shift to digital and direct deposit accounts while omitting critical information about Green Dot's declining core prepaid card business. For example, Streit represented that:

(a) "***[E]very one of our products is hitting it*** and is either at or above plan, which is not common."

(b) "[O]ur ***digital platform*** has really been taking off, and the customers who get it online through the app stores are ***many times more profitable***

than retail customers as they tend to be – use the account in a more sustainable, higher-quality way. They're more likely to be on direct deposit."

(c) "I think if you had to rank them in terms of the revenue per customer, our digital customers tend to be ***higher-revenue customers***."

46. Defendant Shifke further represented that "we've concentrated on focusing on our direct deposit customer base. We've grown that very nicely. Now about 80% of our GDV comes from direct deposit. Nearly 50% of our active customers are on ***direct deposit***. And with that, GDV is growing phenomenally, and ***that's driving the engine to get the fees***, ATMs, purchase volume, interest income."

47. Streit and Shifke's May 16, 2018 statements were each misleading when made. The true facts, which Defendants knew and/or recklessly disregarded, were that:

(a) Digital and direct deposit accounts were not generating the high-margin fees associated with Green Dot's legacy prepaid accounts and thus were part of a product-mix trend that had reversed card-revenue-and-fee-growth which Defendants knew would inevitably adversely impact the Company's bottom line.

(b) The growth rate of Green Dot's legacy prepaid card business was shrinking.

**B. August 2018 Statements**

48. On August 8, 2018, Defendants convened an earnings call to discuss Green Dot's Q2 2018 performance. During the call, Streit and Shifke highlighted the performance of Green Dot's prepaid debit cards, its active-account growth, and its shift to digital and direct deposit accounts in a misleading manner by omitting critical information about Green Dot's declining core prepaid debit card business, which comprised the largest and highest-margin portion of its revenues and was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line. For example, during the earnings call, defendant Streit assured investors that:

(a) "The BaaS side of the business grew a lot of accounts, obviously, with programs like the TurboTax program and the Uber driver program, those are active cards. But our ***established product lines***, Bob, ***are just really doing well***. So we're seeing growth from both. . . . So everything's growing in relative lockstep."

(b) "I mean, we experienced growth with our – I hate to use the word legacy because the products aren't legacy, they've been redone many, many times. But that ***original part of the business***, if you will, selling cards and retail and whatnot. That's ***really going well*** for us."

(c) "Consolidated GAAP total operating revenue came in at $258.3 million, representing a year-over-year growth rate of just over 16%. We would note that this quarter's performance was entirely organic, with ***material growth being driven for both our established product lines*** and our new BaaS platform programs."

(d) "The ***continuing long-term portfolio mix shift towards higher lifetime value accounts*** helped push the gross dollar volume, or GDV, flowing through our various products to more than $9.4 billion, representing organic year-over-year GDV growth of 25%."

(e) "Step 1, as you'll recall, is to continue to grow the number of active accounts year-over-year and to ***improve unit economics*** of those accounts. As you know from our Q2 results and our first half results more broadly, ***we're hitting the step 1 objective out of the park***."

(f) "Every metric in the Account Services segment reflects the powerful dynamic of an increasing number of active account holders who are generating far more usage and engagement with our products. The result continues to be an ***ongoing tailwind to the profitability and value of our account active portfolio***."

49. Streit's August 8, 2018 statements were each misleading when made. The true facts, which Defendants knew and/or recklessly disregarded, were that:

(a) The growth rate for Green Dot's legacy prepaid card business was shrinking.

(b) The increase in overall active accounts was part of a product-mix trend that was reversing card-revenue-and-fee-growth, which Defendants knew would inevitably adversely impact the Company's bottom line.

(c) The per-unit economics of Green Dot's card portfolio was part of a product-mix trend that reversed card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

(d) That direct-deposit accounts did not generate high-margin fees associated with Green Dot's legacy prepaid accounts and thus were part of a product-mix trend that had reversed card-revenue-and-fee-growth, which the Individual Defendants knew would inevitably impact the Company's bottom line.

50. During the August 8, 2018 earnings call, defendant Shifke similarly emphasized the positive impact of the Company's "healthy growth metrics," stating:

(a) "We increased total active accounts in the quarter by 14% year-over-year to approximately 5.9 million active accounts. This active account growth was spectacular and ***well ahead*** of our internal expectations. Even more encouraging is that the growth in active accounts is being driven both by our newer BaaS Platform programs and ***our own products***."

(b) "[T]he larger portfolio of actives also continues to demonstrate healthy growth metrics and a ***more profitable*** average account."

(c) "As you see the portfolio mix move more towards direct deposit customers as a percentage of total and away from one-and-dones, by definition, you'll have ***more revenue per active on the direct deposit customers*** than you will on your one-and-dones."

51. Shifke's August 8, 2018 statements were each misleading when made. Defendants knew and/or recklessly disregarded the fact that the increase in overall active accounts masked an underlying (and undisclosed) product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

52. Defendants' August 8, 2018 representations had the desired effect of misleading the market, as demonstrated by contemporaneous analyst reports. For example, BTIG issued an August 9, 2018 report, noting "solid organic growth in [Green Dot's] core prepaid debit card business." And William Blair issued an August 8, 2018 report, which cited Green Dot's "improving customer mix."

**C. November 7, 2018 Statements**

53. On November 7, 2018, Defendants convened an earnings call in connection with Green Dot's release of its Q3 2018 results. During that call, Streit again emphasized the performance of Green Dot's prepaid debit cards, its active-account growth, and its shift to digital and direct deposit accounts in a misleading manner by omitting critical information about Green Dot's declining core prepaid debit card business, which comprised the largest and highest-margin portion of its revenues, was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line. For example, Streit stated:

(a) Green Dot achieved its "seventh consecutive quarter of active card growth . . . ." In fact, as Defendants knew and/or recklessly disregarded, growth in Green Dot's legacy products and established product lines was declining, including prepaid active accounts which had declined by hundreds of thousands of accounts since December 2017.

(b) "And then unrelated to BaaS, of course, we have ***our own legacy products*** and established business lines, which are no slouches. I mean, ***those are doing very well and continue to grow***." In fact, as Defendants knew and/or recklessly disregarded, growth in Green Dot's own legacy products and established business lines was declining. For example, prepaid active accounts had declined by hundreds of thousands of accounts since December 2017.

(c) "The percentage of people who acquire our accounts now are far more likely to reload and when they reload, they're far more likely to do it through electronic means, meaning direct deposit. And that does mean ***more revenue per***

***card***. That is real, and is a trend we see continuing." In fact, as Defendants knew and/or recklessly disregarded, direct-deposit accounts did not generate the high-margin card fees of legacy prepaid accounts and thus were part of a product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

(d) "Step 1 is to continue to grow the number of active accounts year-over-year and to improve the ***unit economics*** on those accounts. Total active accounts have grown 12% year-to-date compared to the same period last year . . . . So we are on track with step 1 and feel like our future prospects for further growth in both actives and the quality of those actives are very strong." In fact, as Defendants knew and/or recklessly disregarded, the per-unit economics of Green Dot's card portfolio was part of a product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

54. Streit's November 7, 2018 statements were each misleading when made. The true facts, which Defendants knew and/or recklessly disregarded, were that:

(a) The increase in overall active accounts was part of a product-mix trend that was reversing card-revenue-and-fee-growth, which Defendants knew would inevitably adversely impact the Company's bottom line.

(b) Green Dot's legacy prepaid card business was shrinking.

(c) That direct-deposit accounts did not generate high-margin fees associated with Green Dot's legacy prepaid accounts and thus were part of a product-mix trend that had reversed card-revenue-and-fee-growth, which the Individual Defendants knew would inevitably impact the Company's bottom line.

(d) The per-unit economics of Green Dot's card portfolio was part of a product-mix trend that reversed card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

55. Defendants' repeated representations had the desired effect of misleading the market as demonstrated by contemporaneous analyst reports. For example,

Jefferies issued a November 8, 2018 report, which emphasized Green Dot's "solid core business fundamentals." William Blair issued a November 7, 2018 report, which noted the Company "continues to benefit from improving customer mix highlighted by growth of direct deposit customers." And Craig-Hallum issued a November 8, 2018 report, which emphasized that Green Dot's "[c]ard economics continued to improve."

**D. February 2019 Statements**

56. By the end of 2018, Green Dot's legacy prepaid card users were dropping so rapidly that they negated nearly all the Company's growth in low-margin BaaS and direct-deposit business, amounting to a total user growth of only 1%. The disclosure of this low total-growth rate caused Green Dot's stock price to drop 10%. Still, Defendants perpetuated their scheme by continuing to mislead investors about the fact that this was a continuation of Green Dot product-mix trend, which would negatively impact profitability. Instead, Defendants presented this adverse news as good news, proclaiming that "we are somewhat a victim of own success."

57. After the market closed on February 20, 2019, Defendants convened an investor earnings call concerning Green Dot's Q4 2018 performance. On that call, Streit assured investors the slowed growth in accounts was "not relevant to our performance" and that Green Dot's prepaid card business was "growing nicely," stating:

(a) "[Cards business] ***has been growing nicely – very nicely***, in fact." In fact, as Defendants knew and/or recklessly disregarded, the Company's card business had been declining for months, and during 2018, the Company had lost 271,000 accounts. Even as Defendants were speaking, this downward trend was accelerating, resulting in a year-over-year loss of 586,000 accounts by July 30, 2019.

(b) "So I wouldn't say we're satisfied with [active accounts] being up 1%, that's not great. ***It's not relevant to our performance*** and I'm glad that the people we're having are real customers who went to buy a real account to enroll in

direct deposit . . . ." In fact, as Defendants knew and/or recklessly disregarded, direct-deposit accounts did not generate the high-margin card fees of legacy prepaid accounts and thus were part of a product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

(c) "While the mix shift towards direct deposit and more engaged customers is ***clearly better for profitability and growth***, the lower churn also means fewer accounts issued to short-term customers, which weighs down on unit sales and therefore the quarterly active account metric." In fact, as Defendants knew and/or recklessly disregarded, direct deposit accounts were not "clearly better for profitability and growth" because they did not generate the high-margin card fees of legacy prepaid accounts and thus were part of a product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

(d) "[S]trong year-over-year margin expansion of over 300 basis points was the net result of improving margins flow through across the business. And in particular, from ***our base of direct deposit active accounts*** where improving purchase volume and higher retention have a ***positive impact on profitability***." In fact, as Defendants knew and/or recklessly disregarded, direct deposit accounts were not having a "positive impact on profitability" relative to the faltering legacy prepaid card accounts, as direct-deposit accounts were largely free, so they were part of a product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

58. Defendants' statements had the desired effect of misleading the market as demonstrated by contemporaneous analyst reports. Although analysts noted the news of slowing active accounts, they continued to credit Defendants' misleading explanations, thereby blunting the market's reaction. For example, Guggenheim issued a February 21, 2019 report, which reiterated Defendants' message that "direct deposit customers are creating more robust, durable revenue streams for the company" and noted "a stronger company with a higher quality financial profile [is] emerging."

J.P. Morgan issued a February 21, 2019 report, which took Defendants at their word that the decline in active cards was the result of "a more engaged user base (fewer 'one and done' users), which is supported by continued double-digit growth in direct deposit users and purchase volume growth."

**E. May 2019 Statements**

59. On May 8, 2019, Green Dot filed a Form 8-K with the SEC, which incorporated a press release announcing the Company's Q1 2019 financial results. The Form 8-K stated that "our future prospects are looking ***materially stronger and incrementally more assured***."

60. Defendants also convened an investor earnings call on May 8, 2019, during which Streit and Shifke delivered prepared remarks and answered questions from analysts concerning Green Dot's Q1 2019 performance. During the call, Defendants chose to speak about Green Dot's declining core prepaid debit card business and perpetuated their scheme by assuring investors those customers and accounts were low value and that the decline "didn't appear to impact results in a material way." Streit made the following statements:

(a) "So while the decline in this ***low-value active component [legacy prepaid] isn't in and of itself a long-term strategic problem***, it is a short-term headwind to overall segment revenue since revenue is revenue and declining actives in any segment means less revenue." In fact, as Defendants knew and/or recklessly disregarded, the decline in the high-margin card fees of legacy prepaid accounts was part of a product-mix trend that posed a long-term strategic problem because it had reversed card-revenue-and-fee-growth and would impact the Company's year-end bottom line.

(b) "So the goal isn't to issue more ***low value [legacy prepaid] customers*** to try to get that segment to reembrace us. We don't want that. The goal is to sell enough new high-value customers to overcome it. So that means if you're selling – if you're losing 4 low-value customers, we want to sell 1 or 1.5 new high-

value customers." In fact, as Defendants knew and/or recklessly disregarded, the legacy prepaid customers generated the Company's highest fees and revenues, which meant, on average, it would take more than 4 non-legacy customers to make up for the loss of 4 legacy prepaid customers. Further, the vast majority of non-legacy customers (BaaS and direct deposit) paid little to no fees.

(c) "Higher purchase volume and attracting the more committed customer base should in turn lead to ***higher revenue and a better profit margin*** on those accounts. Step two is to continue that trend. As our Q1 active [account] KPIs indicate, we are very much on track with this step two. . . . So, so far so good on step two." In fact, as Defendants knew and/or recklessly disregarded, for at least a year, this product-mix trend had yielded and would continue to yield lower revenue and worse profit margins, as the declining legacy prepaid customers generated the Company's highest fees and revenues.

(d) "But if you think about it roughly 3.5 to 1 difference of the value of a long-term customer, whether they're direct deposit or cash reloading, but ***the relative value of a long-term customer versus a short-term customer on average is 3.5 to 1 and we're being generous***. If you're a one-and-done guy, 8 or 9 to 1. So the average is call it 3.5 to 1." In fact, as Defendants knew and/or recklessly disregarded, the legacy prepaid customers generated the Company's highest fees and revenues, which meant, on average, it would take more than 4 non-legacy customers to make up for the loss of 4 legacy prepaid customers as the vast majority of non-legacy customers (BaaS and direct deposit) paid little to no fees.

**F. August 2019 Statements**

61. On August 7, 2019, Defendants convened an earnings call with investors to discuss Green Dot's Q2 2019 performance. They reduced FY 2019 guidance but continued to mislead investors with assurances about the short-term nature of the strategic problem posed by the product-mix change away from legacy prepaid cards:

(a) Streit reassured investors "that ***the challenges we are currently experiencing are short to intermediate term in nature***" and were "likely to impact ***only this year's revenue growth trajectory***."

(b) In response to an analyst question concerning Green Dot's launching of products that "are going head-on to address" the decline in the core business, Streit stated: "I think to expand upon that this is why we believe it's contained and sort of help you size it. And this will lead into the growth. ***We expect to be back to growth in Q4***."

(c) Shifke underscored Streit's positive comments stating: "And so ***we feel pretty good about a return to growth in Q4*** based on what we're seeing today and also assuming maybe something goes bump in the night."

62. Streit and Shifke's foregoing August 7, 2019 statements were misleading as Defendants knew and/or recklessly disregarded that the decline in the high-margin fees of legacy prepaid card accounts was part of a product-mix trend that posed a long-term strategic problem for Green Dot because it had reversed card-revenue-and-fee-growth to such an extent that the Company could not realistically return to positive growth in Q4.

## VI. THE CORRECTIVE DISCLOSURES

63. As a result of Defendants' scheme, Green Dot common stock traded at artificially inflated levels throughout the Class Period, reaching a high of $93.00 per share on November 8, 2018.

64. Defendants' scheme was revealed to the market through a series of partial disclosures in 2019. As depicted below, the inflation in Green Dot's stock price dissipated via price declines starting on February 20, 2019, continuing on May 8, 2019, and August 7, 2019, and culminating on November 7, 2019.




### A. February 20, 2019 Corrective Disclosure

65. On the February 20, 2019, Q4 2018 earnings call, Defendants partially disclosed declining growth for the first time, stating that "quarterly active accounts [were] up around 1% year-over-year."

66. Defendant Streit also admitted on the February 20, 2019 earnings call that a single new direct deposit account replaced as many as six (6) prepaid card active accounts:

> Here's how the math works: An active account is defined as a single card that has at least one customer generated transaction in the quarter. So for example, a customer who buys one card every 2 weeks to, say, load their wages to the card and then pay bills, shop online or whatever their purpose may be, that one customer would be generating 6 active accounts in the quarter. But when that same customer buys just one card in the quarter, decides to enroll in direct deposit and then keeps that card in their wallet and uses at the same way every 2 weeks to pay bills, shop online or whatever their purpose may have been; that same customer is now generating account of just one active account in the quarter.

67. As a result of the February 20, 2019 corrective disclosure, Green Dot's stock price fell $7.47 per share from a closing price of $74.67 per share on February 20, 2019, to $67.20 per share on February 21, 2019.

68. Analysts noted Defendants' February 20, 2019 corrective disclosure. For example, Deutsche Bank issued a February 20, 2019 report, which lowered its price target on Green Dot and noted that "Active Cards Disappoint; Revenue Growth Slowing Down." Likewise, Guggenheim reduced its price target for Green Dot shares in a February 21, 2019 report, noting that "active accounts metrics . . . were below consensus expectations this quarter (1% growth)." And J.P. Morgan issued a February 21, 2019 report, reducing its Green Dot price target dramatically, stating that "[a]ctive cards increased only 1% from the prior year period" and that "shares could take a breather near-term."

**B. May 8, 2019 Corrective Disclosure**

69. On the May 8, 2019 earnings call, Defendants disclosed a loss of 300,000 prepaid, non-direct deposit accounts and made the unexpected disclosure that Green Dot would expend on a $60 million marketing campaign.

70. Analysts took note of Defendants' May 8, 2019 corrective disclosure. For example, Cowen issued a May 8, 2019 report, lowering its price target and noting that "GDOT has tempered its revenue expectation to +3%, now factoring in lower legacy non-direct deposit active accounts." BTIG issued a May 9, 2019 report, which downgraded Green Dot and lowered its price target for Green Dot shares, citing the Company's $60 million marketing-campaign and noting that "GDOT shares plunged during extended trading" as a result of "the abrupt and disconcerting shift in management's outlook, which created significant uncertainty." SunTrust issued a May 9, 2019 report, which likewise lowered its price target by $20 and remarked that "[w]e suspect greater investment is partially a response to legacy business erosion." Northland Capital Markets issued a May 9, 2019 report, downgrading Green Dot, reducing its price target for Green Dot shares because of the "surprising shift in the

company's strategy," and noting that the "economics of new BaaS customers vs legacy WMT customers paying a $6 monthly fee . . . [have] ***not been clear for a while***." And J.P. Morgan issued a May 9, 2019 report, which noted that "Mgmt was previously dismissive of slowing active card growth."

71. As a result of the May 8, 2019 corrective disclosure, Green Dot's stock price declined $16.71 per share from a closing price of $63.27 per share on May 8, 2019, to $46.56 per share on May 9, 2019.

**C. August 7, 2019 Corrective Disclosure**

72. On Green Dot's August 7, 2019 earnings call, Defendants revealed a severe decline in Green Dot's "legacy prepaid" business, significantly reducing the Company's guidance for FY 2019. Defendant Streit also revealed that this prepaid decline resulted from competitive pressures, stating:

> I want to address upfront that we're lowering full year guidance. While disappointing and unfortunate, it is necessary as a result of an acceleration in declining unit sales in our legacy prepaid card product line combined with a later than expected launch of our new limited product and a large BaaS program that together make it now unrealistic for us to achieve the growth we had intended in the second half.
>
> * * *
>
> In Q2 on a year-over-year basis, we were down by around 500,000 active prepaid accounts, primarily from the loss of nonreloading customers and cash reloading customers . . . . The digital banking industry segment has become incredibly competitive this year.

73. Streit also revealed that "the vast majority of our customers are free today because you have fee waivers for direct deposits. So if you think about the customer base of Green Dot today, both in terms of the BaaS side of the house and the prepaid side of the house, the product side, the vast majority are free."

74. Defendant Streit also disclosed that competition "is taking its toll on our new customer acquisition" and acknowledged "the damage the free neo-bank segment has done to our legacy product line."

75. Analysts took note of Defendants' August 7, 2019 corrective disclosure. For example, Cowen issued an August 7, 2019 report, which reduced Green Dot's price target by $22.00 per share, citing an "accelerated decline in the core" business and noting that "[r]evenue from new products is no longer expected to overcome the loss of revenue from lower active accounts in the legacy prepaid product." Barclays issued an August 7, 2019 report, noting that "[f]ull-year guidance [was] lowered on softness in legacy prepaid business." BTIG also issued an August 7, 2019 report, which stated: "While we expect the company's shares to become much less expensive tomorrow given their plunge during today's extended trading, we believe the stock is unownable at this point given the significant uncertainty arising from the sudden, steep drop in demand for its products in what remains its largest segment." On August 8, 2019, Deutsche Bank issued a report, noting the "shift [in] the revenue model cannibalizing the card fees (45% of revenues), and impair[ing] profitability by driving higher marketing expenses." The report attributed the stock decline to "***uncertainty brought on by decline in active cards as well as significant pressure on profitability and earnings***." Citing "limited visibility," the Deutsche Bank report concluded that it "will continue to monitor the ability to sustainably turn around the card growth given majority of revenues are still generated from the legacy prepaid product." And Northland Capital Markets issued an August 8, 2019 Green Dot report, which reduced its price target and questioned the "surprising shift in the company's strategy": "[W]hat are the economics of these BaaS accounts, we worry it takes several new BaaS accounts to equal one legacy 2016/2017 vintage WMT Moneycard with a $6 monthly fee"?

76. As a result of the August 7, 2019 corrective disclosure, Green Dot's stock price dropped $19.84 per share from a closing price of $47.26 per share on August 7, 2019, to $27.42 per share on August 8, 2019.

**D. November 7, 2019 Corrective Disclosure**

77. On the November 7, 2019 earnings call, Defendants disclosed disappointing Q3 2019 results with regard to active accounts and quarterly revenue. Specifically, defendant Streit revealed:

(a) "The year-over-year decline was around 250,000 accounts on a net basis, comprised of around 620,000 fewer active accounts from our Consumer Business, of which most were onetime use accounts . . . ."

(b) "[T]he number of 90-day actives across all 6 portfolios in our Consumer Business declined year-over-year by around 586,000 accounts in aggregate by July 30, the date we launched Unlimited."

(c) "It may be that we don't bottom now until, perhaps, Q1 of next year and then start climbing back to narrow the year-over-year gap. So perhaps, a quarter or 2 later than we first expected . . . ."

(d) "[T]he entire consolidated Consumer Business [will] bottom some time in Q1 or so – Q1 or Q2, given there – we're about a quarter later than we thought we would be, but pretty close and then in – pushing that boulder up. So the boulder is already going up but we need to go past where we used to come down."

78. Streit further explained that "the revenue per active is a combination of several different fees or revenue streams" and the only "revenue stream that would be enhanced" by direct deposit accounts was "from interchange," which is low-margin. Streit also noted that the separate "revenue stream" from its legacy prepaid cards included a "monthly fee or the subscription fee" that "can range anywhere from $3 to $9.95" and other generics fees like ATM fees.

79. During the November 7, 2019 earnings call, Shifke further disclosed:

(a) "[W]e expect the margin flow-through from revenue in Q4 to be somewhat lower as Platform Services revenue, while still profitable, ***does not fully make up for the lost margins on the lower consumer account revenue***."

(b) "Based on the 2019 exit run rate, we expect the Consumer Business to enter 2020 at a ***materially lower non-GAAP revenue run rate*** than it had at the exit of 2018."

(c) "So as Steve discussed, the headwinds in 2019 and heading into 2020, are ***primarily related to our consumer accounts business***."

80. As depicted in the chart below the decline in Green Dot's prepaid card product line caused its card revenues and other fees to plummet during the Class Period:




81. Securities analysts issued reports in response to the November 7, 2019 partial disclosure. For example, Cowen issued a November 8, 2019 earnings update, which stated that "the company's 2020 outlook was disappointing" and its 2020 revenue would fall to 2019 levels "***due to declines in the consumer card segment***." Jeffries issued a November 8, 2019 report, which stated: "Q319 Takeaways: Long Road Ahead." The report further stated that the Company's 2020 commentary

"implies ***meaningful downside*** to Street est[imate]s as the company continues to face ***headwinds in its legacy consumer prepaid business that are unlikely to abate*** . . . ."

82. On this news, Green Dot's stock price declined $5.41 per share from a close of $29.95 per share on November 7, 2019 to a close of $24.54 per share on November 8, 2019.

83. On December 18, 2019, the Company further surprised the market when it announced the departures of Streit and Shifke. The announcement jolted the market, with Deutsche Bank stating in a December 19, 2019 report, "[w]e were not expecting the management changes which came as a surprise to us." SunTrust said of the "surprise announcement" that "the damage done to management credibility, and the stock price (-67% YTD, vs SPX +27%) became too much for the BoD to ignore."

84. The timing and magnitude of the declines in the price of Green Dot common stock negates any inference that losses suffered by Plaintiffs and other Class members were fully caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

85. For the entire period from the initial partial disclosure in February 2019 to the final disclosure in November 2019, Green Dot's stock dropped from $74.67 per share to $24.54 per share, or more than $50 per share, a decline of more than 67%. In contrast, the S&P 500 rose 11% during the same time period.

86. As a result of their purchases of Green Dot common stock during the Class Period, and the subsequent decline in the value of those shares when the truth was revealed to the market, Plaintiffs and other members of the Class suffered economic loss (*i.e.*, damages), under the federal securities laws.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

87. Each Defendant knew or acted with deliberate recklessness that material facts were being concealed from investors during the Class Period and the statements set forth in ¶¶38, 40, 42, 45, 46, 48, 50, 53, 57, 60, and 61 above would be misleading to investors when made.

88. Defendants had the motive and opportunity to commit fraud. Defendants' misconduct was knowing or deliberately reckless based on the factual allegations above and the following:

89. **The Individual Defendants' Knowledge**: As revealed in Green Dot's November 7, 2019 Form 8-K regarding Q3 2019 earnings, Defendants had access to key metrics, including gross dollar volume and active accounts at quarter end, disaggregated by account type. The data was available since at least Q1 2018 and indicates that Defendants knew the year-over-year erosion of the core prepaid business. As just one example, during the May 9, 2018 earnings call, Streit responded as follows to a question concerning the quantity of active card growth that was attributable to the UniRush acquisition: "You're going to make me disaggregate[] [it] anyhow, aren't you? Okay, hold on, let me think about this. . . . We know what the internal numbers are."

90. **The Allegations Concern Green Dot's Core Operations**: Streit and Shifke were top executives at the Company and led its day-to-day operations. Likewise, Streit and Shifke monitored and/or oversaw the overall business strategy, which hinged upon knowledge of the growth (or lack thereof) of active accounts, direct-deposit accounts and legacy prepaid accounts each of the Individual Defendants attended meetings where declining active accounts were discussed. The Individual Defendants had ultimate responsibility for directing and managing the Company's business, operations, and communications to investors, and had to keep themselves informed of the Company's day-to-day business and operations.

91. Additionally, the Individual Defendants each made public statements on earnings calls and investor conferences about the growth or decline in active accounts, direct-deposit accounts, and legacy prepaid accounts, as well as the unit economics of each type of account. For example, on the Company's November 7, 2018 earnings call, Streit celebrated the "seventh consecutive quarter of active card growth," while dismissing "the active card number [a]s somewhat passé" and "not as relevant." And

on the August 7, 2019 earnings call, Streit referred to the same metrics, explaining lowered guidance because Green Dot was "down by around 500,000 active prepaid accounts, primarily from the loss of nonreloading customers and cash reloading customers."

92. Shifke made similar statements demonstrating his personal knowledge regarding active accounts and unit economics per each account. For example, in Q2 2018 Shifke said, "[a]s you see the portfolio mix move more towards direct deposit customers as a percentage of total and away from one-and-dones, by definition, you'll have more revenue per active on the direct deposit customers than you will on your one-and-dones."

93. **The Individual Defendants Held Themselves Out as Knowledgeable**: The Individual Defendants held themselves out as knowledgeable about the prepaid business, active accounts, market competition, and unit economics during earnings calls and investment conferences.

94. **The Individual Defendants Received Briefings**: As senior executive officers, the Individual Defendants were privy to confidential and proprietary information concerning the active accounts, failing legacy prepaid business, market competition and the unit economics underlying the Company's business strategies. Each had access to internal documents, internal communications, management meetings, Board of Directors meetings, and committee meetings, as well as information provided to them or made available to them.

95. **The Individual Defendants Executed SOX Certifications**: Streit and Shifke signed SOX certifications, undertaking the affirmative obligation to ensure the Company's disclosures to the market were not false or misleading and so represented that they had evaluated the effectiveness of Green Dot's disclosure controls.

96. **The Individual Defendants Directed Public Statements**: Streit and Shifke were able to, and did, control the content of SEC filings, press releases and other public statements. They attended earnings calls and spoke on behalf of Green

Dot throughout the Class Period. Streit and Shifke participated in the drafting, preparation, review, approval of and/or signed Green Dot's Forms 10-K, 10-Q and other public statements, and had the ability and/or opportunity to prevent their issuance or correct them.

97. **The Individual Defendants Pocketed Millions from Insider Trades**: Defendants' scheme inflated Green Dot's stock price, and the Individual Defendants capitalized on this artificial inflation, pocketing millions of dollars via the sale of their own Green Dot shares at artificially inflated prices. Streit reaped $56 million (nearly 40% of his total reported lifetime proceeds from stock sales) from sales during the Class Period, selling 731,191 shares at an average price of $76.87 per share. For his part, Shifke collected $6 million (nearly 45% of his total reported lifetime proceeds from stock sales) during the Class Period, selling 77,500 shares at an average price of $77.90 per share. When the dust had settled following Green Dot's final revelation, Green Dot stock was trading at less than $25 per share.

## VIII. THE PRESUMPTION OF RELIANCE APPLIES

98. The Class is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

99. The Class is entitled to a presumption of reliance under the *Basic* fraud-on-the-market doctrine because, among other things:

(a) Defendants failed to disclose material facts;

(b) The omissions and misrepresentations were material;

(c) The Company's stock traded in an efficient market; and

(d) Defendants' misleading statements and omissions would tend to induce a reasonable investor to misjudge the value of the Company.

100. Plaintiffs and other Class members purchased Green Dot common stock between the time Defendants misstated or failed to disclose material facts and the time that the truth was disclosed.

101. At all relevant times, the market for Green Dot common stock was efficient because, *inter alia*:

(a) Green Dot common stock met the requirements for listing, was listed, and was actively traded on the NYSE;

(b) Average daily trading volume exceeded 600,000 shares;

(c) As a regulated issuer, Green Dot filed periodic reports with the SEC;

(d) At least a dozen analysts covered Green Dot;

(e) Green Dot was eligible to file a SEC Registration Form S-3;

(f) Green Dot regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

(g) Unexpected material news about Green Dot was rapidly incorporated into its stock price.

102. The market for Green Dot common stock promptly digested current information from all publicly available sources and reflected such information in the prices of Green Dot common stock. Accordingly, all purchasers of Green Dot common stock during the Class Period suffered similar injury when the truth was revealed to the market in a series of partial disclosures, causing the stock price to decline.

## IX. CLASS ACTION ALLEGATIONS

103. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of a putative class consisting of all those who purchased or otherwise acquired the common stock of Green Dot between May 9, 2018 and November 7, 2019, inclusive (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, their immediate families

and their legal representatives, heirs, successors, or assigns, any entity in which Defendants have or had a controlling interest, and any judicial officer who presides over this action and their immediate families.

104. Class members are so numerous that joinder is impracticable. Throughout the Class Period, Green Dot's stock was actively traded on the NYSE, with over 50 million shares outstanding and average daily trading volume exceeding 600,000 shares. While the exact number of Class members can be determined only by appropriate discovery, there are likely thousands of Class members who are geographically dispersed. Record owners and other Class members may be identified from records maintained by Green Dot or its transfer agent. Notice can be provided to such record owners by a combination of publication notice and first-class mail, using techniques and a form of notice similar to those customarily used in securities class actions.

105. There is a well-defined community of interest in the questions of law and fact in this case. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members, including:

(a) whether Defendants violated the Exchange Act;

(b) whether Defendants engaged in a scheme to defraud;

(c) whether Defendants made misleading statements;

(d) whether Defendants concealed material facts;

(e) whether Defendants engaged in fraudulent course of business;

(f) whether Defendants knew, or were deliberately reckless in disregarding, that their public statements were misleading or otherwise acted with the requisite scienter;

(g) whether Defendants' misconduct artificially inflated the stock price during the Class Period; and

(h) the extent and appropriate measure of damages sustained by the Class.

106. Plaintiffs believe their claims are typical of those of the Class, as all Class members were similarly damaged by Defendants' misconduct alleged herein.

107. Plaintiffs believe they will adequately protect the interests of the Class and have retained counsel who are competent and experienced in class action securities litigation. Moreover, neither Plaintiff nor Lead Counsel has any known interest that conflicts with those of the Class.

108. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for all members of the Class to individually redress the wrongs done to them.

109. Plaintiffs are aware of no difficulty in the management of this action as a class action.

## X. CAUSES OF ACTION

### COUNT I

### For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5 Against All Defendants

110. Plaintiffs incorporate by reference and expressly re-allege all of the above allegations, as if fully set forth herein.

111. During the Class Period, Green Dot and the Individual Defendants made statements that they knew or recklessly disregarded were untrue or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

112. Defendants violated §10(b) of the Exchange Act and the subsections of Rule 10b-5 in that, by the use of means and instrumentalities of interstate commerce, the mails, and/or the facilities of a national securities exchange, they:

(a) Employed devices, schemes, and/or artifices to defraud;

(b) Omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made not misleading; and/or

(c) Engaged in acts, practices, and a course of business which operated as a fraud or deceit upon Plaintiffs and the Class in connection with their purchase of Green Dot common stock during the Class Period.

113. Defendants and the Company's officers, management, and agents, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information about Green Dot's business as detailed herein.

114. Green Dot is liable for the alleged misconduct of its employees and agents, including the Individual Defendants, under the principle of respondent superior. As CEO and CFO, respectively, throughout the Class Period, Streit and Shifke are liable for the misleading statements and omissions of Green Dot employees during the Class Period.

115. Defendants had actual knowledge of the scheme, omitted material facts, and/or deceptive business practices, or acted with reckless disregard for the truth.

116. As a result of Defendants' scheme, misleading statements, and wrongful course of business, Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Green Dot stock. Plaintiffs and the Class would not have purchased or acquired the stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' misconduct.

117. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their transactions in Green Dot common stock during the Class Period.

118. By virtue of the foregoing, Green Dot and the Individual Defendants each violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

**COUNT II**

**For Violation of §20(a) of the Exchange Act Against Defendants Streit and Shifke**

119. Plaintiffs incorporate by reference and expressly re-allege all of the above allegations, as if fully set forth herein.

120. As alleged herein, Defendants violated §10(b) and SEC Rule 10b-5, and Plaintiffs and other members of the Class suffered damages due to their misconduct.

121. During the Class Period, the Individual Defendants were controlling persons of Green Dot within the meaning of §20(a) of the Exchange Act. By virtue of their high-level positions, their awareness of Green Dot's operations, knowledge of information disseminated to the public, and their ability to control and direct the Company's decision making and day-to-day operations, the Individual Defendants had the power and ability to control and influence – and, in fact, did control and influence, directly or indirectly – the wrongful conduct alleged herein, including, without limitation, the methods and means of the scheme set forth herein.

122. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act, jointly and severally with, and to the same extent as Green Dot is liable.

123. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. Certifying this as a class action pursuant to Federal Rule of Civil Procedure 23, appointing Plaintiffs to serve as Class Representatives and appointing Lead Counsel to serve as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and other Class members and against all Defendants, jointly and severally, for all damages sustained

as a result of Defendants' violations of the federal securities laws, in an amount to be proven at trial, including pre- and post-judgment interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, expenses and expert fees; and

D. Awarding such other further relief as the Court may deem just.

## XII. JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: April 1, 2022

ROBBINS GELLER RUDMAN
& DOWD LLP

/s/
JASON A. FORGE

JASON A. FORGE
RACHEL L. JENSEN
CHRISTOPHER R. KINNON
JOHN M. KELLEY
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Lead Plaintiffs

PITTA LLP
VINCENT F. PITTA
120 Broadway, 28th Floor
New York, NY 10271
Telephone: 212/652-3890
212/652-3891 (fax)

Additional Counsel for Lead Plaintiff

CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

NEW YORK HOTEL TRADES COUNCIL & HOTEL ASSOCIATION OF NEW YORK CITY, INC. PENSION FUND ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing. Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*In re Livent Corporation Sec. Litig.*, No. 2:19-cv-02218 (E.D. Pa.)

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 17 day of March, 2022.

NEW YORK HOTEL TRADES COUNCIL & HOTEL ASSOCIATION OF NEW YORK CITY, INC. PENSION FUND

By: [signature]
John Heim, Chief Financial Officer

GREEN DOT

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 04/12/2019 | 2,020 | $62.48 |
| 04/12/2019 | 6,090 | $62.12 |
| 04/15/2019 | 4,037 | $62.25 |
| 05/17/2019 | 6,343 | $48.96 |
| 07/11/2019 | 6,653 | $48.76 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 08/12/2019 | 6,494 | $28.52 |
| 08/13/2019 | 8,952 | $29.09 |
| 08/14/2019 | 3,730 | $28.80 |
| 08/15/2019 | 5,967 | $29.36 |

Prices listed are rounded up to two decimal places.

CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

TEAMSTERS LOCAL UNION NO. 727 PENSION FUND ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 17th day of March, 2022.

TEAMSTERS LOCAL UNION NO. 727
PENSION FUND

By: Robert J. Laino
Robert Laino, Fund Manager

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 01/22/2019 | 2,282 | $77.67 |
| 06/11/2019 | 552 | $50.17 |
| 06/26/2019 | 621 | $47.84 |
| 06/28/2019 | 838 | $48.90 |
| 09/06/2019 | 822 | $28.26 |

Prices listed are rounded up to two decimal places.

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on April 1, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

/s/
JASON A. FORGE

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

Email: jforge@rgrdlaw.com

# Mailing Information for a Case 2:19-cv-10701-DDP-E In re Green Dot Corporation Securities Litigation

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ian D Berg**
  iberg@pgmbm.us,tkellar@aftlaw.com
- **Jason A Forge**
  jforge@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Mark Samuel Greenstone**
  mgreenstone@greenstonelaw.com,mark-greenstone-9025@ecf.pacerpro.com,info@glancylaw.com,cynthia-5403@ecf.pacerpro.com,info@greenstonelaw.com
- **Rachel L. Jensen**
  rjensen@rgrdlaw.com,agonzales@rgrdlaw.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Takeo A Kellar**
  tkellar@aftlaw.com
- **John M. Kelley**
  JKelley@rgrdlaw.com
- **Christopher R. Kinnon**
  CKinnon@rgrdlaw.com
- **Eduard Korsinsky**
  ek@zlk.com
- **James N Kramer**
  jkramer@orrick.com,lpatts@orrick.com,casestream@ecf.courtdrive.com
- **Nicole Lavallee**
  nlavallee@bermantabacco.com,sfservice@bermantabacco.com
- **Tricia L McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Kristin J Moody**
  kmoody@bermantabacco.com,sfservice@bermantabacco.com
- **Danielle S Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com
- **Jeffrey V Rocha**
  jrocha@bermantabacco.com
- **Laurence M Rosen**
  lrosen@rosenlegal.com,lrosen@ecf.courtdrive.com

- **Juan Carlos Sanchez**
  jsanchez@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Alexander K Talarides**
  atalarides@orrick.com,lpatts@orrick.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)