ROBBINS GELLER RUDMAN
& DOWD LLP
JASON A. FORGE (181542)
RACHEL L. JENSEN (211456)
CHRISTOPHER R. KINNON (316850)
JOHN M. KELLEY (339965)
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
jforge@rgrdlaw.com
rjensen@rgrdlaw.com
ckinnon@ rgrdlaw.com
jkelley@ rgrdlaw.com

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re GREEN DOT CORPORATION SECURITIES LITIGATION | Case No. 2:19-cv-10701-DDP (Ex) |
| | <u>CLASS ACTION</u> |
| | PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT |
| | DATE: November 7, 2022<br>TIME: 10:00 a.m.<br>CTRM: 9C<br>JUDGE: Hon. Dean D. Pregerson |

4862-6066-5902.v1

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION.................................................................................... 1

II.     OVERVIEW OF THE FACTUAL ALLEGATIONS ................................... 2

     A.    Green Dot's Core Business Model Relied on High Fees from Legacy Prepaid Card Business................................................................. 2

     B.    Leading Up to the Class Period, Defendants Propped Up the Legacy Business by Buying Up the Competition.................................. 3

     C.    By the Beginning of the Class Period, Defendants Knew the Core Legacy Business Was in Trouble....................................................... 4

     D.    Defendants Orchestrated a Scheme to Obscure Green Dot's Faltering Legacy Prepaid Card Business. .............................................. 6

     E.    The Truth Was Revealed Through a Series of Partial Disclosures. ...................................................................................... 7

     F.    Defendants Cashed in on the Fraud and Then Retired. ....................... 8

III.    APPLICABLE LEGAL STANDARDS ......................................................... 9

IV.     THE COMPLAINT STATES CLAIMS UNDER THE EXCHANGE ACT AND SEC RULE 10b-5 ....................................................................... 10

     A.    Defendants Do Not Challenge the SEC Rule 10b-5(a) and (c) Claims. ....................................................................................... 10

     B.    The Complaint States a Claim Under SEC Rule 10b-5(b). ................ 11

          1.    The Complaint Provides Adequate Notice of the Claims. ....... 12

          2.    The Complaint Adequately Alleges Statements that Were Misleading by Omission When Made. ..................................... 14

               a.    Misleading Statements About the Health and Value of the Legacy Prepaid Card Business. ................. 16

               b.    Misleading Statements About Product-Mix Shift and Unit Economics. ..................................................... 18

               c.    Misleading Statements About Active Accounts. ........... 22

          3.    Defendants Find No Refuge for Their Misleading Statements in the "Safe Harbor."............................................. 23

          4.    Defendants' Misleading Statements Are Not Inactionable Opinions.................................................................................. 25

- i -

4862-6066-5902.v1

**Page**

5.   Defendants' Misleading Statements Were Not Mere Puffery. ........................................................................................27

C.   The Complaint Adequately Pleads Scienter. .....................................29

1.   The Complaint Alleges Actual Knowledge...............................31

2.   The Complaint Satisfies the Core-Operations Doctrine...........32

3.   Defendants' Insider Sales and Abrupt Retirement at the End of the Class Period Also Support Scienter.........................33

D.   Defendants Do Not Dispute the Substance of §20(a) Claim. .............35

V.   ALTERNATIVELY, PLAINTIFFS SHOULD BE AFFORDED AN OPPORTUNITY TO AMEND ......................................................................35

VI.   CONCLUSION .........................................................................................35

4862-6066-5902.v1

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................... 9

*Axonic Cap. LLC v. Gateway One Lending & Fin.*,
2019 WL 4138024 (C.D. Cal. May 22, 2019).............................................. 29, 32

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................................... 9

*Brodsky v. Yahoo! Inc.*,
592 F. Supp. 2d 1192 (N.D. Cal. 2008) ...................................................... 28

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002)................................................................... 15, 19

*Casella v. Webb*,
883 F.2d 805 (9th Cir. 1989).......................................................................... 28

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014) ......................................................................... 28

*City of Plantation Police Officers Pension Fund v. Meredith Corp.*,
16 F.4th 553 (8th Cir. 2021)......................................................................... 28

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
527 F. Supp. 3d 1151 (N.D. Cal. 2021) ..................................................... 16, 35

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013) ................................................... 17

*Erickson v. Corinthian Colls., Inc.*,
2015 WL 12732435 (C.D. Cal. Apr. 22, 2015)............................................. 12

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995)........................................................................ 17

*Flynn v. Sientra, Inc.*,
2016 WL 3360676 (C.D. Cal. June 9, 2016).................................................. 13

- iii -

4862-6066-5902.v1

|  | **Page** |
|---|---|
| *Heliotrope Gen., Inc. v. Ford Motor Co.*,<br>189 F.3d 971 (9th Cir. 1999) | 21 |
| *Howard v. Everex Sys.*,<br>228 F.3d 1057 (9th Cir. 2000) | 35 |
| *Hsingching Hsu v. Puma Biotechnology, Inc.*,<br>2018 WL 4945703 (C.D. Cal. Oct. 5, 2018) | 15 |
| *Hsu v. Puma Biotechnology, Inc.*,<br>213 F. Supp. 3d 1275 (C.D. Cal. 2016) | 10 |
| *In re Alphabet, Inc. Sec. Litig.*,<br>1 F.4th 687 (9th Cir. 2021), *cert. denied*,<br>__ U.S. __, 142 S. Ct. 1227 (2022) | *passim* |
| *In re Amgen Inc. Sec. Litig.*,<br>544 F. Supp. 2d 1009 (C.D. Cal. 2008) | 15, 20 |
| *In re Apple Comput. Sec. Litig.*,<br>886 F.2d 1109 (9th Cir. 1989) | 15, 20, 27 |
| *In re Apple Inc. Sec. Litig.*,<br>2020 WL 2857397 (N.D. Cal. June 2, 2020) | 22, 26 |
| *In re Caere Corp. Sec. Litig.*,<br>837 F. Supp. 1054 (N.D. Cal. 1993) | 21 |
| *In re Cisco Sys. Inc. Sec. Litig.*,<br>2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) | 28 |
| *In re Convergent Techs. Sec. Litig.*,<br>948 F.2d 507 (9th Cir. 1991) | 20 |
| *In re Cutera Sec. Litig.*,<br>610 F.3d 1103 (9th Cir. 2010) | 24, 28 |
| *In re Daou Sys.*,<br>411 F.3d 1006 (9th Cir. 2005) | 12 |
| *In re Diamond Foods, Inc., Sec. Litig.*,<br>2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) | 31 |

4862-6066-5902.v1

**Page**

*In re Fibrogen, Inc., Sec. Litig.*,
2022 WL 2793032 (N.D. Cal. July 15, 2022) ........................................... 9, 26, 33

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014) ....................................................... 12, 27, 29

*In re MannKind Sec. Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011) .................................................................. 24

*In re Mellanox Techs. Ltd. Sec. Litig.*,
2014 WL 12650991 (N.D. Cal. Mar. 31, 2014) ................................................... 28

*In re Merit Med. Sys., Inc. Sec. Litig.*,
2021 WL 1192133 (C.D. Cal. Mar. 29. 2021) *report & rec. adopted*,
2021 WL 1753612, at *1 (C.D. Cal. May 3, 2021) ............................................. 24

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ................................................................ 12

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) .......................................................................*passim*

*In re QuantumScape Sec. Class Action Litig.*,
2022 WL 137729 (N.D. Cal. Jan. 14, 2022) ........................................................ 26

*In re Questcor Sec. Litig.*,
2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ........................................................ 16

*In re Read-Rite Corp.*,
335 F.3d 843 (9th Cir. 2003), *abrogated by*
*S. Ferry*, 542 F.3d 776 .................................................................................... 29, 30

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ................................................................................ 17

*In re Silicon Graphics Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999), *abrogated by*
*S. Ferry*, 542 F.3d 776 .................................................................................... 29, 30

*In re SolarCity Corp. Sec. Litig.*,
274 F. Supp. 3d 972 (N.D. Cal. 2017) .................................................................. 28

- v -

4862-6066-5902.v1

**Page**

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
160 F. Supp. 2d 1059 (N.D. Cal. 2001) ............................................................24

*In re Stable Rd. Acquisition Corp.*,
2022 WL 2762213 (C.D. Cal. July 13, 2022) ...............................................*passim*

*In re Stac Elecs. Sec. Litig.*,
89 F.3d 1399 (9th Cir. 1996) ...........................................................................21

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002)...........................................................20, 29, 30

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) ..................................................................... 12, 29

*In re Verifone Sec. Litig.*,
784 F. Supp. 1471 (N.D. Cal. 1992), *aff'd*,
11 F.3d 865 (9th Cir. 1993) .............................................................................21, 22

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) ...........................................................................21

*Kairalla v. Advanced Med. Optics, Inc.*,
2008 WL 2879087 (C.D. Cal. June 6, 2008).......................................................20

*Karinski v. Stamps.com, Inc.*,
2020 WL 281716 (C.D. Cal. Jan. 17, 2020)................................................. 12, 13

*Kendall v. Odonate Therapeutics, Inc.*,
2021 WL 3406271 (S.D. Cal. Aug. 4, 2021) .....................................................29

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018)........................................................................*passim*

*Lorenzo v. SEC*,
__ U.S. __, 139 S. Ct. 1094 (2019) .................................................................. 10

*Lu v. Align Tech., Inc.*,
417 F. Supp. 3d 1266 (N.D. Cal. 2019) ...........................................................13

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
519 F.3d 1025 (9th Cir. 2008).............................................................................9

4862-6066-5902.v1

**Page**

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ...............................................................................................21, 23

*McDonald v. Compellent Techs., Inc.*,
2011 WL 13228408 (D. Minn. Aug. 3, 2011)......................................................28

*Melot v. JAKKS Pac., Inc.*,
2016 WL 6902093 (C.D. Cal. Nov. 18, 2016)......................................................28

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008)..............................................................................16

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008).................................................................................15

*Mulderrig v. Amyris, Inc.*,
492 F. Supp. 3d 999 (N.D. Cal. 2020)..................................................................28

*Mulligan v. Impax Labs., Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014)........................................................24, 26, 27

*N.M. State Inv. Council v. Ernst & Young LLP*,
641 F.3d 1089 (9th Cir. 2011)..............................................................................33

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) .............................................................................................26

*Owens v. Kaiser Found. Health Plan, Inc.*,
244 F.3d 708 (9th Cir. 2001).................................................................................35

*Patel v. Parnes*,
253 F.R.D. 531 (C.D. Cal. 2008) ..........................................................................14

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014)..........................................................................26, 28

*Primo v. Pac. Biosciences of Cal., Inc.*,
940 F. Supp. 2d 1105 (N.D. Cal. 2013) ................................................................14

*Reese v. BP Expl. (Alaska) Inc.*,
643 F.3d 681 (9th Cir. 2011).................................................................................14

4862-6066-5902.v1

|                                                                                             | **Page** |
| ------------------------------------------------------------------------------------------- | -------- |
| *Ronconi v. Larkin*,<br>253 F.3d 423 (9th Cir. 2001) ...................................................................... | 17 |
| *S. Ferry LP v. Killinger*,<br>542 F.3d 776 (9th Cir. 2008) ......................................................... | 20, 30, 31, 32 |
| *SEB Inv. Mgmt. AB v. Align Tech., Inc.*,<br>485 F. Supp. 3d 1113 (N.D. Cal. 2020) ........................................... | 20 |
| *Shenwick v. Twitter, Inc.*,<br>282 F. Supp. 3d 1115 (N.D. Cal. 2017) .................................... | 18, 21, 22 |
| *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,<br>551 U.S. 308 (2007) ..................................................................*passim* | |
| *Todd v. STAAR Surgical Co.*,<br>2016 WL 6699284 (C.D. Cal. Apr. 12, 2016)...................................... | 26 |
| *United States v. Corinthian Colls.*,<br>655 F.3d 984 (9th Cir. 2011) ...................................................... | 9 |
| *Vaughn v. Teledyne, Inc.*,<br>628 F.2d 1214 (9th Cir. 1980) .................................................... | 21 |
| *Wenger v. Lumisys, Inc.*,<br>2 F. Supp. 2d 1231 (N.D. Cal. 1998)............................................ | 13, 21 |
| *Wochos v. Tesla, Inc.*,<br>985 F.3d 1180 (9th Cir. 2021) .................................................... | 25, 26 |
| *Yourish v. Cal Amplifier*,<br>191 F.3d 983 (9th Cir. 1999) ...................................................... | 17 |
| *Zaghian v. Farrell*,<br>675 F. App'x 718 (9th Cir. 2017)................................................... | 24 |
| *Zucco Partners, LLC v. Digimarc Corp.*,<br>552 F.3d 981 (9th Cir. 2009) ...................................................... | 31, 32 |

**STATUTES, RULES AND REGULATIONS**

Private Securities Litigation Reform Act of 1995...........................................*passim*

4862-6066-5902.v1

**Page**

15 United States Code
    §78 ...................................................................................................................... 9
    §78j(b) ............................................................................................................... 35
    §78t(a)........................................................................................................... 1, 35

Federal Rules of Civil Procedure
    Rule 9(b) ............................................................................................................ 12
    Rule 12(b)(6) ....................................................................................................... 9
    Rule 15................................................................................................................ 35
    Rule 56................................................................................................................. 9

17 Code of Federal Regulations
    §240.10b-5...................................................................................................*passim*
    §240.10b-5(a) ............................................................................................ 1, 10, 11
    §240.10b-5(b) ..............................................................................................*passim*
    §240.10b-5(c) ............................................................................................ 1, 10, 11

4862-6066-5902.v1

## I. INTRODUCTION

Defendants' 1,147-page dismissal bid rivals the length of Tolstoy's *War and Peace*, so it is all the more notable that they do not challenge several of Plaintiffs' security-fraud claims, including scheme liability and wrongful-course-of-business under Securities and Exchange Commission ("SEC") Rule 10b-5(a) and (c), nor the substance of the Securities Exchange Act of 1934 ("Exchange Act") §20(a) claim.[1] The case will, therefore, proceed notwithstanding Defendants' outsized motion.

Defendants implicitly concede the sufficiency of Rule 10b-5(b) misleading-statement claim by ignoring the Complaint's actual allegations in favor of an alternative reality they seek to construct with 1,100 pages of extrinsic materials not yet subject to discovery. The Ninth Circuit disfavors such "unscrupulous use of extrinsic documents to resolve competing theories against the complaint [which] risks premature dismissals of plausible claims that may turn out to be valid after discovery." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). At this stage, the Complaint's factual allegations are deemed true – and they control for purposes of the Court's analysis. Defendants will get a chance to tell their alternative "facts" after Plaintiffs get a chance to test them with discovery.

Here, the Complaint specifies the who, what, and when of Defendants' misleading statements about the health and purported growth of Green Dot's "bread-and-butter" business of high-fee, prepaid debit cards to "unbanked" Americans ("legacy prepaid cards"), even as they concealed key performance metrics showing *at the time* that Green Dot's core business model was in irreversible decline. *Khoja*, 899 F.3d at 1008-09. The Complaint also alleges the why, detailing Defendants' scheme

---

[1] Plaintiffs are Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund and Teamsters Local Union No. 727 Pension Fund. Defendants are Green Dot Corporation ("Green Dot" or the "Company"), Green Dot's founder and former Chief Executive Officer ("CEO") Steven W. Streit ("Streit"), and former Chief Financial Officer ("CFO") Mark Shifke ("Shifke") (the "Individual Defendants" and collectively with Green Dot, "Defendants").

- 1 -

4862-6066-5902.v1

to obscure the faltering business model in order to buy time and cash in on $62 million of artificially inflated stock before the truth – and inflation – came out.

Because the Complaint's allegations are sufficient, Defendants distract with material beyond its four corners, dispute allegations that must be accepted as true, and play fact-finder by declaring their misleading statements true and/or inactionable. But before this Court is a motion to dismiss. Defendants' disregard of the standards for a motion to dismiss should be rejected, as should their motion.

## II.   OVERVIEW OF THE FACTUAL ALLEGATIONS

### A.   Green Dot's Core Business Model Relied on High Fees from Legacy Prepaid Card Business.

As detailed in the Complaint, leading up to and during the Class Period, Green Dot's primary business was selling high-fee, prepaid debit cards to lower-income Americans who lacked access to a personal bank account. ¶2.[2] Green Dot's high-fee, prepaid products were sold at nearly 100,000 retail stores, including CVS, Rite Aid, Walgreens, Dollar Tree, with discounted offerings at Walmart and Meijer, and it has sold co-branded cards with Walmart, Boost Mobile, AT&T, and Citibank. ¶16.

As Defendant Streit acknowledged on a February 21, 2018 earnings call, Green Dot's "bread and butter" business was always the legacy prepaid debit cards and underscored that "our bread and butter from the old days is still our bread and butter today." ¶18. As a financial analyst explained, this "bread and butter is made up of lower-income and lower-credit consumers who have historically operated outside of the country's banking system." *Id*. Defendants have referred to this target group as the "unbanked" and "underbanked." ¶17.

Streit built Green Dot and his personal fortune on this "bread and butter" business of selling legacy prepaid cards to the "unbanked" and "underbanked," and

---

[2]   Citations to "¶__" and "¶¶__" are to the Amended Complaint for Violations of the Federal Securities Laws, filed on April 1, 2022 (ECF 83) ("Complaint").

- 2 -

4862-6066-5902.v1

over time Green Dot grew to become the world's largest prepaid debit card company by market capitalization. ¶¶16-20.

When Green Dot went public, over 75% of its revenue was legacy prepaid-related, and leading up to the Class Period, Green Dot was earning $1 billion annually, mostly from the high fees charged on prepaid debit cards. ¶¶18, 22. Green Dot's 2017 Form 10-K (filed in 2018) stated, for example, that "most" of the Company's operating revenues "derived from prepaid financial services sold at our four largest retail distributors," including 40% of its operating income from Walmart alone. ¶18. Streit also emphasized repeatedly the importance of the legacy prepaid card business and its target market as Green Dot's "best customers" due to the high-margin fees they generated for the Company. ¶27.

Given the importance of the legacy prepaid card business to Green Dot's business model, leading up to and during the Class Period, the market was laser-focused on its performance. ¶24. Investment analysts recognized this, noting that "the company's core business is still a prepaid card issuer focused on unbanked/underbanked market segment" (February 21, 2018 Deutsche Bank analyst report) and that "underserved customers spent nearly $175B in fees and interest in 2016 across all products" (July 10, 2018 Jefferies analyst report). *Id.*

**B. Leading Up to the Class Period, Defendants Propped Up the Legacy Business by Buying Up the Competition.**

Green Dot's legacy prepaid cards were extremely lucrative for Defendants. The cards generated high fees that traditional credit and debit cards do not, did not require interest to be paid to consumers on card balances, and lacked basic consumer protections that apply to traditional credit and debit cards. ¶19. For example, Green Dot's Prepaid Visa Card was widely available at retailers, including Walmart, 7-Eleven, CVS/Pharmacy, and Dollar Tree in 2018 and 2019, and charged customers, among other fees: a $1.95 purchase/activation fee; a $7.95 monthly fee; a $2.50 ATM fee; and a cash reload fee up to $4.95. ¶22. That meant a Green Dot customer

4862-6066-5902.v1

incurred over $35 in fees to make 20 purchases in a month at a time when the average monthly fee for a low-balance checking account was around $10.  ¶22.

Owing to the exorbitant fees that Green Dot's legacy prepaid cards charged "unbanked" and "underbanked" customers, the business model was vulnerable to less-exploitative alternatives.  ¶¶17, 19.  Leading up to the Class Period, Defendants knew Green Dot's legacy prepaid business was beginning to lose ground to competitive pressure from new, low-or-no-cost digital banking alternatives like Venmo, PayPal, and Chime.  ¶25.  Defendants obscured this decline temporarily by buying up the competition, acquiring the last of its big prepaid card competitors, UniRush, for $147 million in 2017 and claiming its 750,000 active accounts.  ¶25.  Far from organic growth, an estimated 40%-50% of Green Dot's legacy prepaid debit card customers were obtained through acquisitions.  ¶31.

Even as organic growth began to decline in Defendants' core business, Streit and Shifke continued to tout the health and growth of the core legacy business.  For example, on a November 7, 2017 earnings call, Streit touted Green Dot's "solid growth across our enterprise, especially from our prepaid business lines."  ¶28.

**C.    By the Beginning of the Class Period, Defendants Knew the Core Legacy Business Was in Trouble.**

By the beginning of the Class Period, Green Dot's insiders, including Streit and Shifke, knew that the Company's "bread and butter" legacy prepaid business was faltering.  This spelled trouble for the Company because the high fees charged for legacy prepaid cards were critical to its margins and profitability.  ¶23.

Defendants knew about this decline in real time because they tracked it in real time.  ¶¶23, 25, 30.  Both Streit and Shifke regularly reviewed internal performance and forecasting metrics, including those for the legacy prepaid cards.  ¶30.  As founder and CEO, Streit was a micromanager who participated in weekly financial planning meetings and received internal reports of granular performance and forecasting metrics of the legacy prepaid business, including Customer Relationship

- 4 -

4862-6066-5902.v1

Management Reports, as well as other internal reporting mechanisms, such as the BIA dashboard, Financial Key Metrics, Cohort Reports, Tableau Reports, and Revenue Pacing Reports. ¶¶29, 30. The finance department headed by Shifke also generated Consolidated Activity Reports ("CARs"), which reflected current and projected customer bases for all the Company's product lines. ¶30. CARs included active customer base numbers broken down into 12 client portfolios, including current numbers, historical numbers, and projections. ¶30.

Streit and Shifke were also intimately involved in marketing and thus had real-time insight into the competitive pressures facing Green Dot's "bread and butter" legacy prepaid business. ¶30. Due to their close involvement, Defendants knew the Company was having trouble growing its legacy business organically. For example, Streit called off a marketing campaign in August 2018 because it did not attract enough new customers to overcome significant drop-offs in customer acquisitions.

Based on these internal reports and Streit's and Shifke's personal involvement and knowledge of the performance of the legacy prepaid card business, Defendants knew during the Class Period that Green Dot's legacy business growth was eroding at a steady pace based on several key performance metrics including daily active card activity and the number of cards sold. ¶29. Furthermore, Green Dot was losing legacy prepaid customers, in part, due to increasingly existential competition from cheap digital alternatives such as Chime, Venmo, Netspend, and a Square product/service called "Cash." ¶29.

Desperate to stop the account bleed, Streit personally halted efforts of Green Dot's Fraud Management Team to tighten loose customer identification procedures, also known as onboarding rules. ¶32. To avoid losing more accounts, Streit forced Green Dot employees to accept an account base rife with fraud. For example, Streit made changes to Customer Identification Procedures to influence higher account-approval rates. *Id*. This aggravated a situation in which 30%-40% of accounts had a

- 5 -

4862-6066-5902.v1

negative status (*e.g.*, unmatched address or name, excessive disputes, or negative balance) and customers could maintain hundreds of active accounts.  *Id.*

### D. Defendants Orchestrated a Scheme to Obscure Green Dot's Faltering Legacy Prepaid Card Business.

By early 2018, Defendants knew: (i) legacy prepaid card growth was slowing; (ii) the Company was facing existential competition from new low-fee digital banking; and (iii) after acquiring UniRush, the Company could no longer use acquisitions to hide declining growth in legacy prepaid cards.  ¶33.  Seasonal bumps from Green Dot's tax business and the last gasps of growth from prior acquisitions allowed Defendants to obscure declines in the legacy prepaid card business in the short term, but Defendants knew the mirage could not last for long.  *Id.*

Defendants Streit and Shifke thus hatched a scheme to conceal the deterioration of Green Dot's "bread and butter" legacy prepaid card business to buy them time and cash out.  As alleged in the Complaint, Defendants' scheme included at least the following means and methods:

1.      Speaking positively on the topic of the performance of Green Dot's legacy prepaid cards, active-account growth, and the shift to digital and direct deposit accounts while concealing adverse information about the faltering legacy prepaid card business, which was the Company's "bread-and-butter" (¶36);

2.      Downplaying the value of Green Dot's legacy prepaid customers and business and the scope of the decline in its legacy prepaid business (¶36);

3.      Giving a misleading impression about the unit economics of Green Dot products and its shift to digital and direct deposit accounts (*e.g.*, ¶41(f));

4.      Obscuring account and card-revenue-and-fee losses by, among other things, conflating active accounts, legacy prepaid accounts, low- to no-fee direct-deposit accounts and low- to no-fee BaaS accounts (¶36); and

5.      Propping up Green Dot's stock price long enough for Streit and Shifke to sell $62 million of shares at artificially inflated prices (¶36).

- 6 -

As part of the scheme, Defendants disseminated misleading information to investors, including statements that Green Dot's legacy prepaid debit card business was driving "material growth" and "continuing to grow" (¶¶48(c), 53(b)); the Company was "attract[ing] more highly engaged customers than ever before with better unit economics" and experiencing a "long-term portfolio mix shift towards higher lifetime value accounts" with "more revenue per card" (¶¶42, 48(d), 53(c)); the Company was not facing "any competitive pressure" (¶40(e)); and its digital consumers were "many times more profitable than retail customers" (¶45(b)).  And when Defendants could no longer entirely hide the deterioration in the legacy prepaid card business, they changed tactics to denigrating those products and overstating the value of new digital and direct deposit products instead.  ¶35.

### E.    The Truth Was Revealed Through a Series of Partial Disclosures.

Defendants' scheme had the desired effect of misleading the market as demonstrated by contemporaneous analyst reports alleged in the Complaint.  *See, e.g.*, ¶¶44, 52, 55.  For example, Jefferies' May 9, 2018 report emphasized Green Dot's "solid fundamentals" in its "core business," noting "guidance was raised on the back of strong Q1 results" and highlighting "momentum in the core business."  *See, e.g.*, ¶44.  SunTrust issued a May 9, 2018 report entitled, "Momentum Building Off Core Cards as Platform Programs Ramp," which reiterated that Green Dot's "legacy GPR business drives rev growth."  *Id.*  As a result of Defendants' scheme, Green Dot common stock traded at artificially inflated levels during the Class Period, reaching a ***high of $93 per share*** on November 8, 2018.  ¶63.

The truth was slowly revealed to the market through a series of partial disclosures in 2019.  Each time Defendants revealed more of the truth, the market was caught by surprise as reflected in contemporaneous analyst reports, undermining Defendants' argument that they had already revealed the truth or the statements were not misleading.  ¶¶68, 70, 75, 81.  Green Dot's stock price fell precipitously with each partial disclosure, with a collective ***decline of 67% or $50 per share***.  ¶85.

- 7 -

4862-6066-5902.v1

Indeed, the concealed declines in Green Dot's legacy business match the declining growth in card revenues and other fees, which plummeted throughout the Class Period, not just the tail end of it as Defendants' motion suggests. Defendants knew these facts contemporaneously given their real-time monitoring of internal performance and forecasting metrics, including for legacy prepaid cards:



¶80; *see also* ¶¶18, 27, 30.

### F.     Defendants Cashed in on the Fraud and Then Retired.

Defendants' scheme allowed the Individual Defendants to sell $62 million of their own Green Dot shares at artificially inflated prices. Streit reaped $56 million from sales of his Green Dot stock, selling at an average price of $76.87 per share. ¶97. And Shifke collected $6 million from the sales of his Green Dot stock during the Class Period at an average price of $77.90 per share. *Id*.

Shortly after the Class Period, the Company announced that Streit and Shifke would "retire" and that Streit was terminating his membership on Green Dot's Holding Company Board and as Chairman of the Green Dot Bank Board. ¶4. The Company's announcement jolted the market, as exemplified by Deutsche Bank's December 19, 2019 analyst report: "[W]e were not expecting the management changes which came as a surprise to us." ¶83. SunTrust said of the "surprise

- 8 -

announcement" that "the damage done to management credibility, and the stock price (-67% YTD, vs SPX +27%) became too much for the BoD to ignore." *Id.*

### III. APPLICABLE LEGAL STANDARDS

As the Ninth Circuit holds: "'The focus of any rule 12(b)(6) dismissal – both in the trial court and on appeal – is the complaint.'" *United States v. Corinthian Colls.*, 655 F.3d 984, 991 (9th Cir. 2011).[3] "The court 'accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party.'" *In re Fibrogen, Inc., Sec. Litig.*, 2022 WL 2793032, at *5 (N.D. Cal. July 15, 2022) (quoting *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008)). Further, the Court "assess[es] all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 326 (2007).

To cross the "plausibility" threshold, a complaint need only plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007) (court draws inferences in plaintiff's favor). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

Here, Defendants seek to distract from the well-pled allegations of the Complaint, which plausibly alleges violations of the Exchange Act and SEC Rule 10b-5, with a side show about other facts that they wish were pleaded instead. But unless their 1,100 pages of extrinsic materials qualify for an exception to the rule that courts "'may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion'" (*Corinthian*, 655 F.3d at 998), their gambit requires the Court to convert the motion to dismiss into a Federal Rule of Civil Procedure 56 motion for summary judgment and afford Plaintiffs an opportunity to take discovery before

---

[3] Here, and throughout, citations are omitted and emphasis is added unless otherwise noted.

- 9 -

4862-6066-5902.v1

opposing. *See Hsu v. Puma Biotechnology, Inc.*, 213 F. Supp. 3d 1275, 1279 (C.D. Cal. 2016); *see also Khoja*, 899 F.3d at 999 (citing *Puma* with approval). Even if the Court were to consider Defendants' 1,100 pages of exhibits submitted with their motion, it cannot do so for the truth of their contents, as explained further in Plaintiffs' Opposition to Defendants' Request for Judicial Notice ("Pltfs' Opp. RJN"), filed concurrently.

Therefore, in deciding Defendants' motion to dismiss, the Complaint's factual allegations are deemed true and should control the Court's analysis, not Defendants' exhibits, unless the Court converts their motion to dismiss into a summary judgment and allows Plaintiffs to test the exhibits with discovery before deciding the motion.

## IV. THE COMPLAINT STATES CLAIMS UNDER THE EXCHANGE ACT AND SEC RULE 10b-5

### A. Defendants Do Not Challenge the SEC Rule 10b-5(a) and (c) Claims.

At the outset, Defendants' motion must be denied because it does not challenge two of the three claims under SEC Rule 10b-5, which makes it unlawful:

(a)    To employ any device, scheme, or artifice to defraud,

(b)    To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or,

(c)    To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit . . . in connection with the purchase or sale of any security.

17 C.F.R. §240.10b-5.

As the Supreme Court recently held, the above "provisions capture a wide range of conduct" and extend beyond making statements that are actionable under Rule 10b-5(b). *Lorenzo v. SEC*, __ U.S. __, 139 S. Ct. 1094, 1101 (2019). Just last year, the Ninth Circuit reversed a district court's dismissal of Rule 10b-5(a) and (c) claims

- 10 -

4862-6066-5902.v1

where, as here, the defendants' motion to dismiss did not specifically challenge those claims.  *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021), *cert. denied*, __ U.S. __, 142 S. Ct. 1227 (2022).

Here, the Complaint explicitly alleges a fraudulent scheme and wrongful course of business under Rule 10b-5(a) and (c), respectively.  The Complaint contains a heading for "***Defendants' Fraudulent Scheme, Wrongful Course of Business***, and Misleading Statements" and alleges a scheme by multiple means and methods, including the manipulation of metrics to obscure erosion in legacy prepaid business as well as insider trading during the Class Period.  *See, e.g.*, Cmpt. V & ¶36.  Accordingly, Plaintiffs allege Defendants violated all three subsections of Rule 10b-5, including "scheme liability" (subsection (a)) and "course of business" liability (subsection (c)).  *See* ¶¶112, 116.

Nevertheless, Defendants chose not to move to dismiss the Rule 10b-5(a) and (c) claims.  Instead, they limited their motion to the "misleading statements" claim under Rule 10b-5(b).  *See* ECF 86 at 10 ("Plaintiff, however, does not plead any facts to show that any of Defendants' public statements were false or misleading when made . . .").[4]  As in *Alphabet*, the limited scope of Defendants' motion here means that the Rule 10b-5(a) and (c) claims must be upheld, at a minimum.

**B.      The Complaint States a Claim Under SEC Rule 10b-5(b).**

In addition, Defendants do not challenge most elements of the Rule 10b-5(b) claim, including a connection to the purchase or sale of a security, reliance, loss causation, and economic loss or damages.  *See Khoja*, 899 F.3d at 1008.  Instead, Defendants argue that Plaintiffs' Rule 10b-5(b) claim is subject to dismissal based on the following baseless arguments: (1) it is a "puzzle pleading"; (2) the element of "falsity" is not adequately alleged; and (3) scienter is not adequately alleged.  But by "specif[ying] each statement alleged to be misleading, the reason or reasons why the

---

[4]   All pinpoint cites to "ECF" entries are to the pagination automatically generated by the CM/ECF system.

- 11 -

4862-6066-5902.v1

statement is misleading," and "stat[ing] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" scienter, the Complaint satisfies the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Federal Rule of Civil Procedure 9(b) pleading requirements. *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012); *In re Daou Sys.*, 411 F.3d 1006, 1022 (9th Cir. 2005). Each of Defendants' arguments fails for the reasons below.

### 1.   The Complaint Provides Adequate Notice of the Claims.

Defendants contend that the Rule 10b-5(b) claim is a "puzzle pleading," but such a label applies only when the claim "'place[s] the burden . . . on the reader to sort out the statements and match them with the corresponding adverse facts to solve the "puzzle" of interpreting plaintiffs' claims.'" *Erickson v. Corinthian Colls., Inc.*, 2015 WL 12732435, at *2 (C.D. Cal. Apr. 22, 2015); *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014) (puzzle pleading is "exceedingly difficult to discern precisely which statements are alleged to be misleading").

Here, Plaintiffs identified each of the allegedly misleading statements and specified the undisclosed facts that rendered the statement misleading at the time. ¶¶39-62. As a practical matter, many of Defendants' misleading statements were made on earnings calls and part of lengthy expositions. Thus, to satisfy the "clear and *concise*" requirement (*In re New Century*, 588 F. Supp. 2d 1206, 1219 (C.D. Cal. 2008)), the Complaint excerpts lengthy statements; identifies the specific source, speaker, and date of each statement; and organizes them chronologically and by subject matter. *See, e.g.*, ¶¶38-41, 48-51. The Complaint also provides specific factual reasons why each statement was misleading in the same paragraph as the statement and/or for the time period in which Defendants made the statement. *See* ¶¶39, 41, 43, 47, 49, 51, 54, 57, 60, 62.

Courts in this District routinely deny motions to dismiss similar complaints as puzzles. For example, in *Karinski v. Stamps.com, Inc.*, 2020 WL 281716 (C.D. Cal.

- 12 -

4862-6066-5902.v1

Jan. 17, 2020), the court held that a similar complaint, which also "quote[d] specific statements and then explain[ed] in the subsequent paragraphs why they are allegedly false and misleading," met the PSLRA specificity requirement. *Id.* at \*9; *see also Flynn v. Sientra, Inc.*, 2016 WL 3360676, at \*9 (C.D. Cal. June 9, 2016) (complaint not a puzzle when it highlighted "the particular statements in these filings that they shortly thereafter contend to be false or misleading") (emphasis removed).

Defendants go beyond nitpicking the format of the Complaint to quibble with its content by arguing the reasons the statements were misleading "'bear no connection to the substance of the statements themselves.'" ECF 86 at 23. But this argument raises factual disputes not appropriate at this stage. And the only example Defendants cite is a statement denying "competitive pressure" from "more and more digital offerings" but rather enjoying "robust" growth. ¶40(e). The Complaint explains that this statement was misleading because it omitted that most of the growth in accounts were free products, not the high-fee legacy prepaid cards. ¶41(a-d). Further, Defendants delete the "digital offerings" language from the statement and ignore its context, which the Complaint expressly says concerns "product mix and account value." ¶40. Any complete picture can be made to look like a puzzle when others start cutting out pieces from it, and the Court's review here will confirm the Complaint's completeness. Indeed, Defendants appear to have been able to identify the alleged misstatements and the reasons why they were misleading to challenge them in the motion to dismiss. *See Karinski*, 2020 WL 281716, at \*9.

Because Plaintiffs identify each misleading statement precisely and the particularized reasons why it is alleged to be misleading by omission, Defendants' cited cases are inapplicable. *Cf. Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1274-1275 (N.D. Cal. 2019) (plaintiff did not identify which statements were false or misleading and conceded that half "were not alleged to be actionable misstatements and were instead included 'solely for context.'"); *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1243 (N.D. Cal. 1998) (complaint "[did] not indicate which among the 14

- 13 -

pages of statements are alleged to be false, [did] not follow each allegedly false statement with factors showing it was false, and [did] not provide any inkling that any statement was false when made except to say that the 'true facts' . . . were 'available to the defendants'"); *Primo v. Pac. Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105, 1112 (N.D. Cal. 2013) (dismissing a complaint that "require[d] the reader to guess what particular statements they mean[t] or how those statements were rendered false and misleading."); *Patel v. Parnes*, 253 F.R.D. 531, 551-53 (C.D. Cal. 2008) (same). Defendants' puzzle-pleading argument fails.

### 2. The Complaint Adequately Alleges Statements that Were Misleading by Omission When Made.

Defendants' primary challenge is a self-serving decree that their statements were not misleading.  Preliminarily, Defendants do not specifically challenge seven statements (¶¶40(b), 45(c), 50(d), 57(c), 57(d), 60(b), 60(d)), except to play factfinder and declare based on a mountain of extrinsic materials that they at some point purportedly disclosed the facts allegedly omitted.  *See* ECF 86 at 30-32; 86-1.

Contrary to Defendants' counter-factual arguments, their statements are actionable because they "omit[ted] to omit to state a material fact necessary in order to make the statements made . . . not misleading."  17 C.F.R. §240.10b-5(b). Defendants' statements "'would give a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists."'" *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011).  Indeed, once Defendants "'tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.'" *Khoja*, 899 F.3d at 1009.

Importantly, "[b]oth the ***materiality and misleading nature of a misstatement or omission are usually questions for the trier of fact*.**"  *In re Stable Rd. Acquisition Corp.*, 2022 WL 2762213, at *8 (C.D. Cal. July 13, 2022).  "'Therefore, only if the adequacy of the disclosure or the materiality of the statement is so obvious that

- 14 -

reasonable minds could not differ are these issues appropriately resolved as a matter of law.'" *Id.* (citing, *inter alia*, *Alphabet*, 1 F.4th at 700); *see also Hsingching Hsu v. Puma Biotechnology, Inc.*, 2018 WL 4945703, at *6 (C.D. Cal. Oct. 5, 2018) ("'[W]hether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact.'").

Likewise, truth-on-the-market defenses are "intensely fact-specific, so courts rarely dismiss a complaint on this basis." *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008). "[T]o avoid Rule 10b-5 liability, any material information which insiders fail to disclose must be transmitted to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by the insiders' one-sided representations." *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989).

Here, Defendants assert that their statements were not affirmatively false (*see, e.g.*, ECF 86 at 26), but that is not the standard. Indeed, as their own cases hold, "a statement that is literally true can be misleading and thus actionable under the securities laws." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (*see* ECF 86 at 24); *see also Khoja*, 899 F.3d at 1008-09 (objectively true statement "may be misleading if it omits material information"); *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("Literally true statements may be misleading due to "their context and manner of presentation."); *Stable Rd.*, 2022 WL 2762213, at *8 ("A statement, although literally true, can be misleading.").

Defendants upend their own argument that they disclosed legacy-business declines by citing Class Period statements boasting of "'growth [] from our established programs, the legacy business.'" ECF 86 at 31. In any event, Defendants' 1,100 pages of extrinsic materials cannot save them because the Court cannot "resolv[e] factual disputes at the pleading stage" and "'must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff.'"

- 15 -

*Khoja*, 899 F.3d at 1003; *see also* Pltfs' Opp. RJN, filed concurrently herewith. Defendants' factual disputes are for another day.

Defendants also recast Plaintiffs' claims as relating solely to "future results," but as explained below, each category of statements gave a misleading impression of Green Dot's state of affairs ***at the time***.  The Complaint adequately pleads the misleading statements by detailing the who, what, when, and where, and providing specific factual reasons why each statement was allegedly misleading at the time (*i.e.*, because Defendants did not provide negative information that cut against the positive). *See, e.g.*, *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *8 (C.D. Cal. Oct. 1, 2013). Deceptiveness is adequately pled, even under Defendants' cases.[5]

### a.    Misleading Statements About the Health and Value of the Legacy Prepaid Card Business.

First, during the Class Period, Defendants chose to repeatedly speak about the purported health and growth of the legacy prepaid card business, which was Green Dot's "bread-and-butter" and made up most of its operating revenue.  *See, e.g.*, ¶¶38(a)-(d), 45(a), 48(a)-(c), 53(b), 56(a), 57(a), 61(a)-(c).  But in choosing to speak on the matter, Defendants concealed adverse information that cut against the positive information, including key internal metrics showing declines in this core business caused by competition from less-predatory alternatives. *See, e.g.*, ¶¶29-33, 80; *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 527 F. Supp. 3d 1151, 1181 (N.D. Cal. 2021) (statements about drivers of revenue growth were misleading as concealing coercive sales practices driving that growth).  And once Defendants could no longer entirely hide the declining health of the legacy prepaid card business, they pivoted to downplaying its importance as "low value." *See, e.g.*, ¶60(a)-(b).  But far from losing "low value" customers, Green Dot was losing its most profitable and "best

---

[5]  *Cf. Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) (finding insufficient "conclusory allegations that a company's class period statements regarding its financial well-being are *per se* false based on the plaintiff's allegations of fraud") (cited at ECF 86 at 24).

- 16 -

4862-6066-5902.v1

customers" due to the high fees they paid on the prepaid debit cards.  ¶¶18, 27.  In fact, declines in the legacy business caused card-fee revenue growth to plummet throughout the Class Period.  *See* ¶80 (chart).

Contrary to Defendants' claim, these statements were misleading ***when made***. The Complaint alleges contemporaneous facts contradicting Defendants' statements about the health and growth of the legacy prepaid business with details about specific reports and descriptions of their contents (*e.g.*, "current numbers, historical numbers, and projections" for 12 card portfolios).  ¶¶29-30.  The Company also kept detailed data on the legacy prepaid cards going back to at least Q1 2018, thereby distinguishing this case from Defendants' cases. *Cf. Ronconi v. Larkin*, 253 F.3d 423, 431 (9th Cir. 2001) (no "documents or facts suggesting that the defendants knew that the growth rate was not accelerating"); *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869 (9th Cir. 2012) (relying solely on later events); *Yourish v. Cal Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999) (same); *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1109 (E.D. Wash. 2013) (same).  Defendants also ignore that temporal proximity between optimistic statements and a downturn "is circumstantial evidence that the optimistic statements were false when made." *Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th Cir. 1995).

The Complaint also alleges that the Individual Defendants received reports during the Class Period showing year-over-year declines in legacy prepaid accounts. ¶¶29-30.  Notably, the Customer Relationship Management Reports showed on a near-real-time basis declines even before the Class Period.  ¶29.  The Company's CARs generated by Shifke's finance department also reflected the decay in Green Dot's "bread and butter" legacy prepaid business.  ¶30.  Streit was aware of these issues because he personally called off a 2018 marketing campaign when it could not overcome "significant drop-offs in new customer acquisitions."  ¶30.  To prop up numbers, Streit went so far as to stop efforts to tighten Green Dot's onboarding rules, thereby forcing employees to accept an account base rife with fraud.  ¶33.

*Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115 (N.D. Cal. 2017), is on point. There, the defendants spoke positively about Twitter's user growth and engagement while concealing that its DAU/MAU (engagement/growth) metric was declining. *See id.* at 1135. The court upheld Twitter's positive statements about user growth and "engagement" trends as misleading because, "'once defendants cho[o]se to tout positive information'" about user engagement and growth, "they were 'bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.'" *Id.* at 1137-40.

So too here. Defendants' positive statements about the health and growth of the legacy business were misleading as they failed to disclose adverse information cutting against the positive information, such as key metrics showing the legacy business was in structural decline due to existential competition from less predatory alternatives. ¶¶18, 27, 29-33. These alleged misleading statements are actionable.

### b. Misleading Statements About Product-Mix Shift and Unit Economics.

The Complaint also alleges misleading statements about Green Dot's product-mix shift and the unit economics of the legacy prepaid cards versus other products (¶¶40(a)-(e), 42, 45(b)-(c), 46, 48(d)-(e), 50(c), 53(c)-(d), 57(b)-(d), 60(c)-(d)).[6]

As detailed in the Complaint, Defendants told investors during the Class Period that Green Dot was enjoying a "continuing long-term portfolio mix shift towards higher lifetime value accounts," and that the "mix shift towards direct deposit . . . is clearly better for profitability and growth," creating "higher revenue and a better profit margin." ¶¶40(a), 48(d). Defendants claimed this mix-shift was achieving "better unit economics" (¶¶40(b), (d), 42, 45(b), 46) and that direct deposit was "driving the engine to get the fees" (¶¶40(b), 45(b), 46). Shifke assured investors there was not

---

[6] Defendants do not specifically challenge several statements (¶¶40(b), 45(c), 50(b), 57(c), 57(d), 60(b), and 60(d)), except to declare based on improperly submitted exhibits that they disclosed the omitted facts elsewhere. The Court should reject Defendants' attempt to dispute the factual allegations of the Complaint without affording Plaintiffs an opportunity for discovery. *Supra* at III.

- 18 -

4862-6066-5902.v1

"any competitive pressure" from digital alternatives. ¶40(d). And when Defendants could no longer completely hide the faltering legacy business, Streit said any declines in non-direct deposit accounts were "not relevant to our performance." ¶57(b). Analysts conveyed Defendants' statements to the market, reporting Green Dot's "improving customer mix," that "[c]ard economics continued to improve," and there was "[n]o impact from seemingly increased competition." ¶¶44, 52, 55.

Again, contrary to Defendants' argument, these statements were misleading when made. The Complaint points, for example, to internal performance and forecasting metrics Defendants received at the time, which showed declines in the legacy business and declining fee-revenue, as Green Dot was forced by competition to shift to low-and-no-fee direct deposit and BaaS cards. *See, e.g.*, ¶¶29-34, 41(a)-(f). As a result, Green Dot's true mix-shift was toward less lucrative products, and its unit economics were deteriorating, not improving. *Id.*

Defendants' statements are actionable because they "create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006. For example, by concealing that Green Dot was losing prepaid customers, Defendants created the impression that the growth in the digital accounts was incremental when it was actually replacing the lucrative "bread and butter" business. ¶¶41(a)-(e). Likewise, Defendants conflated active-accounts metrics and concealed until August 7, 2019, that the "vast majority" of direct-deposit and BaaS accounts were free. ¶¶72-73. Defendants also misleadingly compared fees from a lifetime direct-deposit user with card fees from a single "one-and-done" prepaid card, while omitting that prepaid users may buy hundreds of prepaid cards, each time paying lucrative fees. ¶¶40(a)-(b), 45(b)-(c), 48(d), 50(c).

- 19 -

4862-6066-5902.v1

The above omissions belie Defendants' broad statement that "***everything*** that Plaintiff claims was omitted was in fact disclosed." ECF 86 at 32.[7] And while beside the point on a motion to dismiss, so do Defendants' exhibits. Although Defendants now decree the market "had no problem understanding" Green Dot's "product-mix trend," their extrinsic materials include an August 8, 2019 analyst report, issued after Defendants' third partial corrective disclosure, which complained about "the limited visibility in [Green Dot's business] model" and tried to piece together the card data Defendants claim they were transparent about in their motion. ECF 86-30 at 2.

In any event, Defendants' diversionary tactic of pointing to vague statements about margins in documents extrinsic to the Complaint to dispute its factual allegations (ECF 86 at 31) are factual disputes for another day.[8] *Supra* at IV.B.2. After all, truth-on-the-market defenses are "intensely fact-specific, so courts rarely dismiss a complaint on this basis." *Amgen*, 544 F. Supp. 2d at 1025. "[T]o avoid Rule 10b-5 liability, any material information which insiders fail to disclose must be transmitted to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by the insiders' one-sided representations." *Apple*, 886 F.2d at 1116. Defendants have not made this showing.

Defendants' own cases further undercut their argument, holding that "the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *See In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991). By conflating active accounts and distorting the products' unit economics, Defendants led

---

[7] Defendants point to nothing specific to back up their assertion that the Complaint "selectively emphasizes" their statements; accordingly, *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1126 (N.D. Cal. 2020), is inapposite.

[8] Defendants rely on a generic statement of law in *Kairalla v. Advanced Med. Optics, Inc.*, 2008 WL 2879087, at *3 (C.D. Cal. June 6, 2008), but it was taken from a footnote in *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087 n.7 (9th Cir. 2002), a case that was abrogated in *S. Ferry LP v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (after *Tellabs*, *Vantive* is "too demanding and focused too narrowly").

- 20 -

4862-6066-5902.v1

"investors [to] interpret[] Defendants' statements as reassurances that the Company had experienced and would continue to experience positive growth." *Twitter*, 282 F. Supp. 3d at 1139. The allegations are sufficient at this stage.

Defendants' cases are also distinguishable. First, Defendants' present-tense statements concerned current facts, not past ones, including statements that "digital platform . . . customers . . . ***are*** many times more profitable" than legacy customers.[9] ¶¶40(a), 40(d), 45(b), 40(e). Such "statement[s] about current or past facts" are actionable as they "create[] an impression of a state of affairs that differ[s] in a material way from the one that actually exists." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017). Indeed, investors would have wanted to know the unit economics and revenue per card were deteriorating, not improving, as a result of existential competition. ¶¶29-34, 41(a)-(f); *see generally Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011) (upholding claims where reasonable investor would have plausibly viewed information as material).

Second, unlike Defendants' cases, Plaintiffs' allegations do not depend on Green Dot's future results but on then-existing product mix and account values.[10] ECF 86 at 29. For example, the Complaint alleges Green Dot's product-mix trend "was reversing," "had reversed card-revenue-and-fee-growth," and that the true "per-unit economics of Green Dot's card portfolio was part of [this] trend." *See, e.g.*, ¶¶41(f), 43, 49(c), 53(d), 54(d). While the Complaint explains Defendants' lost prepaid fees would inevitably impact Green Dot's bottom line, that is merely context to show the information was material to investors. *See, e.g.*, ¶¶33, 35. As in *Twitter*,

---

[9]   *Cf. Wenger*, 2 F. Supp. 2d at 1245 ("Sales for the first quarter were $5,110,000."); *In re Caere Corp. Sec. Litig.*, 837 F. Supp. 1054, 1058 (N.D. Cal. 1993) ("past . . . financial results"); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1407 (9th Cir. 1996) ("The Company has historically experienced significant fluctuations in its operating results"); *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1486 (N.D. Cal. 1992) ("historical data"), *aff'd*, 11 F.3d 865 (9th Cir. 1993).

[10]   *Cf. Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 980 (9th Cir. 1999) ("internal financial projections"); *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1221 (9th Cir. 1980) (same); *Stac*, 89 F.3d at 1406 ("forecast future events"); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1420 (9th Cir. 1994) ("future prospects").

- 21 -

Defendants' statements here omitted current facts, not just future trends, and are thus actionable. *See* 282 F. Supp. 3d at 1140 n.25 ("the omission of DAU was misleading as to current user engagement, not just future trends").

Nonetheless, even if Defendants' statements somehow implicated future predictions, "they [also] make representations about the past or present that 'can demonstrably be proven false'" – *i.e.*, the purported mix shift toward higher value accounts, improved unit economics, and revenue per card. *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *12 (N.D. Cal. June 2, 2020) (holding that statements involving future predictions are actionable when they make representations about the past or present that "'can demonstrably be proven false'"); *see also Verifone*, 784 F. Supp. 1471 (statements about projections actionable where defendant had no reasonable basis to believe them). This category of statements is also actionable.

**c.      Misleading Statements About Active Accounts.**

Finally, the Complaint adequately alleges misleading statements about Green Dot's active-account growth that conflated high-fee legacy prepaid business with low- and no-fee accounts. (Without a hint of irony, Defendants continue to conflate these card accounts in their motion to dismiss. *See, e.g.*, ECF 86 at 15.) For example, the Complaint alleges Defendants touted growth in "active accounts" during the Class Period, claiming for example that Green Dot was "growing by 21% year-over-year or an additional nearly 1 million more active accounts year-over-year" and enjoying a "more profitable average account." ¶¶40(c), 48(f), 50(a)-(b), 53(a).

Defendants do not specifically challenge the statement in paragraph 50(b), and the other statements were allegedly misleading when made for the reasons above. *Supra* at II.D. Defendants knew that growth in the most lucrative active accounts – legacy prepaid cards – was in decline since before the Class Period, despite growth in low- and no-fee products like BaaS and direct deposit. ¶¶29-30, 33, 80, 89. By purposefully conflating these disparate accounts as "active accounts," Defendants created a misleading impression regarding Green Dot's growth that masked a

- 22 -

declining product mix trend towards less lucrative and lower-fee accounts.  *Supra* at IV.B.2.b.  This "create[d] an impression of a state of affairs that differs in a material way from the one that actually exists."  *Quality Sys.*, 865 F.3d at 1142; *Khoja*, 899 F.3d at 1008-09 ("Even if a statement is not false, it may be misleading if it omits material information.").  Investors would want to know that organic growth in Green Dot's most lucrative active accounts – prepaid legacy cards – had not been increasing but declining since pre-Class Period.  ¶¶29-30, 33, 80, 89; *see Matrixx*, 563 U.S. at 47 (upholding claims where reasonable investor would have plausibly viewed information as material).  This category of statements is also actionable.

### 3.   Defendants Find No Refuge for Their Misleading Statements in the "Safe Harbor."

Defendants assert that the PSLRA "safe harbor" immunizes 16 of 39 allegedly misleading statements.  ECF 86 at 33-35.  But the PSLRA's safe harbor protects only "certain" forward-looking statements – those ***either*** "'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement'" ***or*** not "made with actual knowledge that the statement was false or misleading.'"  *Quality Sys.*, 865 F.3d at 1142.  Here, the safe harbor does not immunize Defendants' statements, which were not exclusively forward-looking (if at all); lacked meaningful cautionary statements; and were made with knowledge they were misleading.

Most of the challenged statements are not forward-looking on their face.  Half include the words "continue" or "ongoing" (¶¶38(a)-(d), 40(d), 48(f), 53(b)-(c), 60(c)), and the others include present-tense statements of current facts.  ¶45(a) ("[e]very one of our products is hitting it and is either at or above plan"); ¶60(a) ("it is a short-term headwind"); ¶61(a) ("the challenges we are currently experiencing are short to immediate term in nature").  Such "statements [] about current or past facts" do "not fall within the PSLRA safe harbor," even if mixed with a future-facing statement.  *See Quality Sys.*, 865 F.3d at 1150 ("non-forward-looking portions of

- 23 -

mixed statements are not eligible for the safe harbor"); *In re Merit Med. Sys., Inc. Sec. Litig.*, 2021 WL 1192133, at \*7-\*8 (C.D. Cal. Mar. 29. 2021) ("'sales continue to grow'" and "integration . . . 'continue[s] to drive growth'" not forward-looking), *report & rec. adopted*, 2021 WL 1753612, at \*1 (C.D. Cal. May 3, 2021); *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 964-65 (N.D. Cal. 2014) (statements that company had "'begun'" making changes and "'on track'" were representations of current fact).

The remaining statements lack meaningful cautionary language, and the Complaint adequately alleges that Defendants knew the statements were misleading. *See, e.g.*, ¶¶50(c), 53(d), 61(b)-(c). Defendants argue they provided risk disclosures, but it is well established that such boilerplate "risk" statements about "competition" and "demand" are defective, especially where the risks have already materialized. *Compare* ECF 86 at 35-36, *with In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 816-817 (C.D. Cal. 2011) (warnings "limited to rather boilerplate language concerning [inherent] risks" are "defective"). Furthermore, the safe harbor does not protect statements made "with actual knowledge," as the Complaint alleges. ¶¶51, 53(d), 61(b)-(c); *see Zaghian v. Farrell*, 675 F. App'x 718, 720 (9th Cir. 2017) (allegations that "Defendants knew of reliable [counter indicative] information . . . raise[d] a strong inference that Defendants knew their [] projections were false or misleading"). Defendants' authorities are, therefore, inapplicable.[11]

Lacking protected forward-looking statements, Defendants fabricate them, even citing statements Plaintiffs do not plead as misleading. *See* ECF 86 at 34 (citing ¶59 from Green Dot's Q1 2019 Form 8-K quoted only for background). Defendants also misleadingly quote only snippets of statements, bolding words and phrases irrelevant

---

[11] Defendants' cases are distinguishable because, among other reasons, they lacked well-pleaded facts of scienter. *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) (only one conclusory allegation of knowledge). Further, *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1070 (N.D. Cal. 2001), pre-dated *Tellabs* and thus was based on outdated case law. *See infra* at IV.C.

- 24 -

4862-6066-5902.v1

to the allegations and excising relevant ones.  For example, the Complaint quotes and bolds Defendants' statement it was "on track" with its concrete goal "to improve the unit economics [of active] accounts" and explains that this statement was misleading because "the per-unit economics of Green Dot's card portfolio was part of a product-mix trend that was reversing card-revenue-and-fee-growth."  ¶53(d).  To conjure a forward-looking statement, Defendants delete the "'unit economics'" phrase and include only a portion of the statement referencing "'future prospects.'"  ECF 86 at 34.  But Defendants cannot immunize their statement that unit economics were improving because "non-forward-looking portions of mixed statements are not eligible for the safe harbor provisions of the PSLRA." *Quality Sys.*, 865 F.3d at 1150. Defendants cannot find refuge in the safe harbor here.

### 4.    Defendants' Misleading Statements Are Not Inactionable Opinions.

Defendants next assert that five of 39 misleading statements are immunized as statements of opinion or belief.  ECF 86 at 38-39 (citing ¶¶38(c)-(d), 53(d), 57(b), 61(c)).  But all five statements are actionable even under Defendants' cases because they either contain "'embedded statements of fact'" or "the speaker [did not] actually hold[] the stated belief."  *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1189 (9th Cir. 2021) (cited at ECF 86 at 33).

Indeed, three of the challenged statements include express and untrue statements of fact that Defendants delete from their recitation.  *Compare* ECF 86 at 38, *with* ¶38(c) ("Walmart [and other specific legacy prepaid cards] . . . continue[] to do extremely well"); ¶38(d) ("We don't intend to imply that we see a slowdown forthcoming"); and ¶53(d) ("So we are on track with step 1" ["to improve the unit economics of those accounts"]).  A fourth statement, that "'[a]ctive accounts being up 1% . . . [is] not relevant to our performance,'" also expressly states verifiably untrue facts.  ECF 86 at 38 (citing ¶57(b)).

- 25 -

Despite Defendants' effort to rewrite the allegations, the Court must "examine the entire statement and its circumstances to determine if it is actionable." *Mulligan*, 36 F. Supp. 3d at 966. Because the statements express "'certainty' about an existing thing or occurrence," and at least a portion of each lacks "opinion-qualifying language such as 'I think' or 'I believe,'" they are actionable. *In re QuantumScape Sec. Class Action Litig.*, 2022 WL 137729, at *15 (N.D. Cal. Jan. 14, 2022) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015)); *Apple*, 2020 WL 2857397, at *16 (statement that China was "not facing emerging market issues like other countries and that [defendant]'s business there is strong" were actionable statements of fact even though they were framed as opinions); *Fibrogen*, 2022 WL 2793032, at *10-*11 (descriptions like "positive," "good," "favorable," and "right," followed by references to existing data were objective statements of fact).

The Complaint also alleges Defendants did not actually believe their fifth purported opinion statement, in which Streit assured investors that "we feel pretty good about a return to growth in Q4." ¶61(c); ¶62 ("Defendants knew . . . that the Company could not realistically return to positive growth in Q4"); *see also supra* at IV.B.2.c. (citing ¶¶29-30, 33, 80, 89, alleging knowledge); *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *9 (C.D. Cal. Apr. 12, 2016) ("Simply inserting the word 'believe' in front of a statement of fact does not, therefore, immunize Defendants from liability."). Given Defendants' alleged knowledge of the adverse facts cutting against their purported "opinions," the statements are actionable even under their own cases. *See Wochos*, 985 F.3d at 1189 (cited at ECF 86 at 33).[12]

---

[12] Defendants' only purported opinion-statement case actually concerns "corporate puffery," not opinions, and therefore does not support their argument. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014).

- 26 -

### 5.    Defendants' Misleading Statements Were Not Mere Puffery.

Finally, Defendants argue 12 of 39 statements are inactionable as puffery. ECF 86 at 36-38. But unlike the misleading statements here, puffery applies only where a statement is "'not capable of objective verification'" and lacks a standard against which a reasonable investor could expect them to be pegged. *Intuitive Surgical*, 65 F. Supp. 3d at 834. Even a statement that could be characterized as optimism is actionable if: (1) the speaker did not genuinely believe it; (2) it had no reasonable basis; or (3) the speaker was aware of undisclosed facts tending to seriously undermine its accuracy. *See id.* at 835 (citing *Apple*, 886 F.2d at 1113).

Defendants show the weakness of their position by deleting portions of the misleading statements in their motion to make their point. *Compare* ECF 86 at 37, *with* ¶38(d) ("We don't intend to imply that we see a slowdown forthcoming"); ¶45(a) ("[E]very one of our products is . . . either at or above plan"); ¶45(b) ("[O]ur digital platform has really been taking off, and the customers who get it online through the app stores are many times more profitable than retail customers . . ."); ¶46 ("Nearly 50% of our active customers are on direct deposit. . . . and that's driving the engine to get the fees . . ."); ¶48(a) ("So we're seeing growth from both [Baas and established product lines]. . . . everything's growing in relative lockstep"); ¶48(e) ("Step 1, as you'll recall, is to continue to grow the number of active accounts year-over-year and to improve unit economics of those accounts. As you know from our Q2 results and our first half results more broadly, we're hitting the step 1 objective out of the park."); ¶50(a) ("This active account growth was . . . well ahead of our internal expectations. Even more encouraging is that the growth in active accounts is being driven both by our newer BaaS Platform programs and our own products."). For each such statement that Defendants do not honestly analyze, their puffery argument should automatically fail. *Mulligan*, 36 F. Supp. 3d at 966 ("[T]he Court may not assess the statements listed in the FAC in a vacuum, 'plucking the statements out of their context to

- 27 -

determine whether the words, taken *per se*, are sufficiently "vague" so as to constitute puffery,' but rather will examine the entire statement and its circumstances to determine if it is actionable.").

Moreover, when viewed in context, Defendants' statements conveyed verifiable metrics. *See, e.g.*, *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1020 (N.D. Cal. 2020). For example, Defendants' statement that digital customers are "many times more profitable than retail customers" could be disproven by simple mathematics. ¶45(b). Likewise, Defendants' statements that "every one of our products . . . is either at or above plan," that account growth was "ahead of our internal expectations," that "established product lines" were driving "material growth," and improved "unit economics" all turned on objective metrics. ¶¶40(d), 42, 45(a), 48(a), 48(c), 48(e), 50(a). These statements go beyond the amorphous optimism in Defendants' cases that mimicked sports clichés like "giving 110%."[13]

And even if Defendants' statements *also* included expressions of optimism, they are still actionable because they "address specific aspects of a company's operation that the speaker knows to be performing poorly." *Quality Sys.*, 865 F.3d at 1143-44; *see also Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable

---

[13] *Cf. Melot v. JAKKS Pac., Inc.*, 2016 WL 6902093 (C.D. Cal. Nov. 18, 2016) (company's opportunity is "'large'" and "'reservedly optimistic'"); *City of Plantation Police Officers Pension Fund v. Meredith Corp.*, 16 F.4th 553, 557 (8th Cir. 2021) ("'industry-leading'" and "'proven strategies'"); *In re Mellanox Techs. Ltd. Sec. Litig.*, 2014 WL 12650991, at *8 (N.D. Cal. Mar. 31, 2014) ("we can continue growing"); *McDonald v. Compellent Techs., Inc.*, 2011 WL 13228408, at *9 (D. Minn. Aug. 3, 2011) ("'customers see the value proposition'" and statements about "'traction'" generally in marketplace without reference to specific products); *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *13 (N.D. Cal. Mar. 29, 2013) ("'extremely well-positioned'" and "'exceeding expectations'"); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 171 (3d Cir. 2014) (companies "'could advance directly into Phase III in the first half of 2007'" if the results were "'spectacular'"); *Cutera*, 610 F.3d at 1111 ("'our employee relations are good'"); *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1200 (N.D. Cal. 2008) ("'all the pieces are coming together'"); *In re SolarCity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 994-96 (N.D. Cal. 2017) ("'we're highly optimistic about the US'"); *Intuitive Surgical*, 759 F.3d at 1060 ("'reservedly optimistic' about sales" generally).

- 28 -

as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation."). Here, the misleading statements that Defendants challenge as puffery all implicate Green Dot's legacy prepaid business, a major aspect of Green Dot's operations that Streit and Shifke knew was performing poorly during the Class Period. *See Quality Sys.*, 865 F.3d at 1143-44; *Intuitive Surgical*, 65 F. Supp. 3d at 835; *supra* at IV.B.4. Accordingly, the puffery doctrine does not provide Defendants a get-out-of-jail-free card here.

### C.    The Complaint Adequately Pleads Scienter.

The Complaint also adequately alleges scienter. The Ninth Circuit holds that "'a reckless omission of material facts' satisfies the element of scienter, provided that such recklessness 'reflects some degree of intentional or conscious misconduct.'" *Alphabet*, 1 F.4th at 701. Scienter does not mean "a defendant 'actually knew' their statements were false or misleading, just that they 'recklessly turn[ed] a blind eye' to the falsity." *Kendall v. Odonate Therapeutics, Inc.*, 2021 WL 3406271, at *7 (S.D. Cal. Aug. 4, 2021) (quoting *VeriFone*, 704 F.3d at 708).

In assessing scienter, the Court's "inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 310. Under the holistic approach, "'a series of less precise allegations [can] be read together to meet the PSLRA requirement.'" *Axonic Cap. LLC v. Gateway One Lending & Fin.*, 2019 WL 4138024, at *10 (C.D. Cal. May 22, 2019). In other words, "a set of allegations may create an inference of scienter greater than the sum of its parts." *Id.*

And while Defendants admit the analysis is "holistic" under *Tellabs*, they ignore its ripple effects on Ninth Circuit law. After *Tellabs*, the Ninth Circuit revisited several decisions Defendants rely on, including *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 975 (9th Cir. 1999), *abrogated by S. Ferry*, 542 F.3d 776; *Vantive*, 283 F.3d at 1087-88, and *In re Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir.

- 29 -

2003), *abrogated by S. Ferry*, 542 F.3d 776. Specifically, in *S. Ferry*, the Ninth Circuit held these earlier cases "set[] a very high bar for securities plaintiffs under the PSLRA" – too high a bar under *Tellabs*:

> *Silicon Graphics*, *Vantive*, and *Read-Rite*, read without reference to *Tellabs*, will generally prevent a plaintiff from relying exclusively on the core operations inference to plead scienter under the PSLRA. . . . However, the Supreme Court's recent *Tellabs* decision also discusses the level of detail required under the PSLRA, and with its controlling and persuasive weight, it suggests that perhaps *Silicon Graphics*, *Vantive*, and *Read-Rite* are too demanding and focused too narrowly in dismissing vague, ambiguous, or general allegations outright.
>
> *          *          *
>
> ***The Supreme Court's reasoning in Tellabs permits a series of less precise allegations to be read together to meet the PSLRA requirement, the prior holdings of Silicon Graphics, Vantive, and Read-Rite notwithstanding***. Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter. ***Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis***. . . . In assessing the allegations holistically as required by Tellabs, the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective.

*Id.* at 783-84. Defendants fail to acknowledge *S. Ferry* or the change in Ninth Circuit law post-*Tellabs*. In doing so, Defendants set the scienter bar too high.

Here, as in *Alphabet* and *S. Ferry*, the Complaint's "specific allegations, taken as a whole, raise a strong inference" that Streit and Shifke – and therefore Green Dot –

- 30 -

4862-6066-5902.v1

knew or recklessly turned a blind eye to key metrics showing the legacy prepaid card business was deteriorating due to competitive pressure from less-predatory low- and no-fee alternatives, but they failed to disclose this adverse information to the market. *See, e.g., Alphabet*, 1 F.4th at 705; ¶87.

### 1.    The Complaint Alleges Actual Knowledge.

First, Defendants admitted they knew the information that was not disclosed, as Streit conceded: "***We know what the internal numbers are***."   ¶89.   Further, as revealed in Green Dot's November 7, 2019 Form 8-K regarding Q3 2019 earnings, Streit and Shifke had known all along the key metrics, including gross dollar volume and active accounts at quarter end, disaggregated by account type. ¶88. Because they had this data since at least Q1 2018, Defendants knew during the Class Period about the erosion of the legacy business and the resulting loss in card-fee-revenues. *Id.* It is implausible to infer otherwise.  Streit and Shifke had to know the numbers to issue guidance, to decide the Company needed to invest $60 million in marketing, to cancel a marketing campaign that fell flat, and for myriad other planning and operational purposes as alleged in the Complaint. ¶¶30-33, 69.  The Complaint adequately alleges Defendants knew the information they concealed about the faltering legacy business, thereby supplying a strong inference of scienter.

The Complaint also alleges additional corroborating details about how and why Defendants were exposed to and aware of the underlying facts during the Class Period, such as specific names of internal reports that showed the steady erosion of the legacy business even before the Class Period began.  ¶¶29-32; *Alphabet*, 1 F.4th at 705 (citing *S. Ferry*, 542 F.3d at 785-86) ("describing 'actual access to the disputed information'" as strongly inferring scienter).  And the Complaint provides additional facts about the roles that Streit and Shifke played in the fraud.  ¶¶29-62; *see Stable Rd.*, 2022 WL 2762213, at *10.  Accordingly, this case is distinguishable from *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009), cited by Defendants. *See In re Diamond Foods, Inc., Sec. Litig.*, 2012 WL 6000923, at *12 (N.D. Cal.

- 31 -

4862-6066-5902.v1

Nov. 30, 2012) (distinguishing *Zucco* on the basis that the individual defendants there "were exposed to and aware of the underlying facts").

### 2.    The Complaint Satisfies the Core-Operations Doctrine.

The Complaint also adequately alleges scienter under the core-operations doctrine based on Streit's and Shifke's respective roles as CEO and CFO, the top executives leading the Company's day-to-day operations. *See S. Ferry*, 542 F.3d at 784; *Axonic*, 2019 WL 4138024, at \*10 (holding, *inter alia*, "a reasonable person could infer that persons in Defendants' corporate officers' positions would have reviewed Reported CNL calculations and disclosures with a fine-tooth comb").

Here, the Complaint's allegations concern Green Dot's core business model, its "bread-and-butter" business responsible for the majority of revenues. ¶¶18, 22, 89-90. Streit and Shifke monitored and oversaw this business and business strategy, which required knowledge of the growth and profitability (or lack thereof) of active accounts, direct-deposit accounts, and legacy prepaid accounts. ¶89. Streit and Shifke had ultimate responsibility for directing and managing the Company's business, operations, and communications to investors, and had to keep themselves informed of the Company's day-to-day business and operations to do their jobs. ¶89. Under these circumstances, it is "absurd to suggest that management was without knowledge of the matter." *Alphabet*, 1 F.4th at 706; *see, e.g.*, *Stable Rd.*, 2022 WL 2762213, at \*10 (scienter adequately alleged because it was absurd to suggest no one told the CEO about the key operations information at issue).

Streit and Shifke also held themselves out as knowledgeable about the legacy prepaid business, and both made and directed public statements about the growth or decline in active accounts, direct-deposit accounts, and legacy prepaid accounts, as well as the unit economics of each type of account. ¶¶91-96. For example, on the Company's November 7, 2018 earnings call, Streit celebrated the "seventh consecutive quarter of active card growth," while dismissing "the active card number [a]s somewhat passé" and "not as relevant." ¶91. And on the August 7, 2019

- 32 -

earnings call, Streit referred to the same metrics, explaining the lowered guidance was because Green Dot was "down by around 500,000 active prepaid accounts, primarily from the loss of nonreloading customers and cash reloading customers." *Id.* Shifke made similar statements during the Class Period demonstrating his personal knowledge regarding active accounts and unit economics per each account. ¶92. For example, in Q2 2018, Shifke said, "[a]s you see the portfolio mix move more towards direct deposit customers as a percentage of total and away from one-and-dones, by definition, you'll have more revenue per active on the direct deposit customers than you will on your one-and-dones." *Id.*

And Streit and Shifke controlled the content of SEC filings and signed SOX certifications, and thereby both represented that they had evaluated the effectiveness of Green Dot's disclosure controls and the accuracy of its disclosures. ¶¶95-96; *see N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1103 (9th Cir. 2011) ("'[P]laintiffs allege "in your face facts, that cry out, "how could [defendants] not have known that the financial statements were false."'").

### 3. Defendants' Insider Sales and Abrupt Retirement at the End of the Class Period Also Support Scienter.

Although unnecessary given the above facts, Streit's and Shifke's insider sales and abrupt "retirement" at the end of the Class Period also weigh in favor of scienter as part of the holistic analysis. ¶¶2, 3, 97; *Fibrogen*, 2022 WL 2793032, at *25 (Because scienter is reviewed holistically, "[defendant's] abrupt resignation tends to support scienter and may be considered together with other allegations"). Streit reaped $56 million (nearly 40% of total reported lifetime proceeds) from sales of Green Dot shares during the Class Period, selling 731,191 shares at an average price of $76.87 per share. ¶97. Shifke collected $6 million (nearly 45% of total reported lifetime proceeds) during the Class Period, selling 77,500 shares at an average price of $77.90 per share. *Id.* When the dust had settled following Defendants' final revelations, Green Dot stock was trading at less than $25 per share. Then after the

- 33 -

bottom fell out, Streit and Shifke abruptly "retired."  Defendants' significant insider sales and surprise retirement on the heels of the Class Period (¶83), considered along with the rest of the allegations, weigh in favor of scienter.

Defendants' scienter challenges fail.  First, as the Ninth Circuit recently emphasized in *Alphabet*, confidential-witness allegations are not necessary.  *See* 1 F.4th at 707.  Second, Defendants cannot defeat scienter by introducing extrinsic materials regarding a purported Company stock buyback or the Individual Defendants' insider sales.  Scienter is decided based on a holistic assessment of "the ***allegations***," not disputed facts that Defendants try to inject into the record to tell a different story before Plaintiffs can debunk it with discovery.  *See Khoja*, 899 F.3d at 998.  Indeed, Defendants' improper extrinsic materials raise more questions than they answer.  For example, did the Individual Defendants set up a ***Company*** stock buy-back program to prop up the stock price temporarily so they could profit from their own insider sales before bailing?  And did the Individual Defendants set up trading plans (which are noticeably missing from Defendants' exhibits) so that they could evade suspicion for their insider sales during the Class Period?  These questions just scratch the surface.  Defendants' arguments, untethered to the actual allegations of the Complaint, demonstrate the peril of entertaining free-wheeling "facts" at the pleading stage before Defendants' self-serving statements are tested by document discovery and cross-examination.  The Court must reject Defendants' attempt to tell their own version of events at this stage.  *See id.*

In sum, a holistic review of the Complaint's allegations gives rise to an inference of scienter at least as strong as any Defendants' self-serving explanation. Here, as in *Alphabet* and *Stable Rd.*, the allegations permit a strong inference that Streit and Shifke knew or recklessly disregarded that the statements were misleading. ¶¶29, 30.  Scienter is, thus, adequately alleged as to each defendant.

- 34 -

**D.      Defendants Do Not Dispute the Substance of §20(a) Claim.**

The Complaint satisfies the low pleading hurdle for the §20(a) claim by alleging defendants Streit and Shifke were top executives at Green Dot with "actual power or control" over the Company, a primary violator under §10(b) and Rule 10b-5. *See Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Defendants' only argument here is that the predicate §10(b) and Rule 10b-5(b) primary-violation claim is inadequately pled. As Defendants' premise fails for the reasons herein, their challenge to §20(a) also fails. *Oracle*, 527 F. Supp. 3d at 1195.

## V.      ALTERNATIVELY, PLAINTIFFS SHOULD BE AFFORDED AN OPPORTUNITY TO AMEND

For all the reasons above, including Defendants' failure to challenge several of the claims, their motion should be denied. If the Court grants any portion of it, however, Plaintiffs request leave for 45 days to amend the Complaint consistent with the Ninth Circuit's liberal approach to Rule 15. *See Khoja*, 899 F.3d at 1011 (citing Fed. R. Civ. P. 15 and *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (Ninth Circuit interprets Rule 15 with "extreme liberality")).

## VI.     CONCLUSION

Defendants' motion to dismiss should be denied. Should the Court grant any portion of the motion, however, Plaintiffs request 45 days to amend the Complaint.

DATED: August 19, 2022

ROBBINS GELLER RUDMAN
 & DOWD LLP
JASON A. FORGE
RACHEL L. JENSEN
CHRISTOPHER R. KINNON
JOHN M. KELLEY

s/ Rachel L. Jensen
RACHEL L. JENSEN

655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

- 35 -

4862-6066-5902.v1

PITTA LLP
VINCENT F. PITTA
120 Broadway, 28th Floor
New York, NY  10271
Telephone: 212/652-3890
212/652-3891 (fax)

Additional Counsel for Plaintiffs

4862-6066-5902.v1

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on August 19, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Rachel L. Jensen
RACHEL L. JENSEN

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

Email: rjensen@rgrdlaw.com

4862-6066-5902.v1

# Mailing Information for a Case 2:19-cv-10701-DDP-E In re Green Dot Corporation Securities Litigation

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ian D Berg**
  iberg@pgmbm.us,tkellar@aftlaw.com

- **Jason A Forge**
  jforge@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Mark Samuel Greenstone**
  mgreenstone@greenstonelaw.com,mark-greenstone-9025@ecf.pacerpro.com,info@glancylaw.com,cynthia-5403@ecf.pacerpro.com,info@greenstonelaw.com

- **Rachel L. Jensen**
  rjensen@rgrdlaw.com,agonzales@rgrdlaw.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Takeo A Kellar**
  tkellar@pogustgoodhead.com

- **John M. Kelley**
  JKelley@rgrdlaw.com

- **Christopher R. Kinnon**
  CKinnon@rgrdlaw.com

- **Eduard Korsinsky**
  ek@zlk.com

- **James N Kramer**
  jkramer@orrick.com,lpatts@orrick.com,casestream@ecf.courtdrive.com

- **Nicole Lavallee**
  nlavallee@bermantabacco.com,sfservice@bermantabacco.com

- **Tricia L McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Kristin J Moody**
  kmoody@bermantabacco.com,sfservice@bermantabacco.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Jeffrey V Rocha**
  jrocha@bermantabacco.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com,lrosen@ecf.courtdrive.com

- **Juan Carlos Sanchez**
  jsanchez@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Alexander K Talarides**
  atalarides@orrick.com,lpatts@orrick.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)