UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

- - -

HONORABLE DEAN D. PREGERSON, DISTRICT JUDGE PRESIDING


IN RE: GREEN DOT SECURITIES      )
LITIGATION                       )
                                 )
                                 )
                                 )
                                 )
                                 )   No. CV 19-10701-DDP-E
                                 )
                                 )
                                 )
                                 )
                                 )
                                 )
_____ )



REPORTER'S TRANSCRIPT OF PROCEEDINGS

*ZOOM HEARING RE: MOTION TO DISMISS [86]*

LOS ANGELES, CALIFORNIA

MONDAY, DECEMBER 21, 2022

_____


MARIA R. BUSTILLOS
OFFICIAL COURT REPORTER
C.S.R. 12254
UNITED STATES COURTHOUSE
350 WEST 1ST STREET
SUITE 4455
LOS ANGELES, CALIFORNIA 90012
(213) 894-2739

**A P P E A R A N C E S**

**ON BEHALF OF THE PLAINTIFFS,
NEW YORK HOTEL TRADES**                ROBBINS GELLAR RUDMAN &
**COUNCIL & HOTEL ASSOCIATION**        DOWD, LLP
**of NEW YORK CITY, INC.**             BY:  RACHEL L. JENSEN, ESQ.
**PENSION FUND:**                      655 WEST BROADWAY
                                       SUITE 1900
                                       SAN DIEGO, CA 92101
                                       (619)231-1058


                                       ROBBINS GELLAR RUDMAN &
                                       DOWD, LLP
                                       BY:  CHRISTOPHER R. KINNON,
                                       ESQ.
                                       655 WEST BROADWAY
                                       SUITE 1900
                                       SAN DIEGO, CA 92101
                                       (619)231-1058


**ON BEHALF OF THE DEFENDANTS,
GREEN DOT, STEVEN STREIT &**           ORRICK HERRINGTON and
**MARK SHIFKE:**                       SUTCLIFFE, LLP
                                       BY:  ALEXANDER K. TALARIDES,
                                       ESQ.
                                       ORRICK BUILDING
                                       405 HOWARD STREET
                                       SAN DIEGO, CA 92101
                                       (619)231-1058

# **I N D E X**

ZOOM HEARING RE: MOTION TO DISMISS [86]:

PAGE
4

LOS ANGELES, CALIFORNIA; MONDAY, DECEMBER 12, 2022

-o0o-

(COURT IN SESSION AT 10:26 A.M.)

THE COURTROOM DEPUTY:  The first matter is on zoom.

Calling item number one, CV 19-10701-DDP:  In Re Green Dot Securities Litigation.  Will the parties please make their appearances.

MR. TALARIDES:  Good morning, Your Honor.  This is Alex Talarides.  And with me is my partner, James Kramer on behalf of the defendants, Green Dot, Steven Streit and Mark Shifke.

THE COURT:  Good morning.

Vanessa, do you have a calendar?

THE COURTROOM DEPUTY:  Yes, I gave it to you. It's up there.

THE COURT:  Oh, this is today's.  Oh, it was crossed out.  I mistook.  Okay.  I got it.

Yes, go ahead.  Continue with your appearances. Are we all set?  And can you folks on Green Dot hear me?

MR. TALARIDES:  I can, Your Honor.  This is Alex Talarides on behalf of the defendants.

THE COURT:  Okay.  Mr. Kramer, can you hear me? Mr. Kramer?

Can you hear me, Mr. Kramer?

MR. KRAMER:  I can, Your Honor.  I'm here -- I'm counsel with Mr. Talarides.

THE COURT:  Okay, understood.  Okay.  I'll hear -- I'll hear from the moving party.

MR. TALARIDES:  Thank you, Your Honor.  Just to note, I received an e-mail from Ms. Rachel Jensen, who's counsel for plaintiff.  And it appears she had an IT issue and couldn't be heard, and I'm wondering if that was resolved or not.  Ms. Jensen, are you there?

THE COURT:  Did she check in, Vanessa.

THE COURTROOM DEPUTY:  She did.  She is showing as on.

THE COURT:  Can you turn up the volume, Vanessa, a little bit.

THE COURTROOM DEPUTY:  Sure.

THE COURT:  She's showing that she's showing on your screen, because I don't have her on my screen.

THE COURTROOM DEPUTY:  Yes, she is showing on screen.

THE COURT:  As off?

THE COURTROOM DEPUTY:  No, as on.

MR. TALARIDES:  I think the issue is that she logged on as -- I believe the issues is that she logged on as an attendee and not as a participant -- not as a panelist.  I will --

THE COURT: Thank you. That would be a good idea. Just give her a call and tell her to log off and log on.

THE COURTROOM DEPUTY: It looks like she's okay now.

THE COURT: I don't see her on the screen though.

THE COURTROOM DEPUTY: You might in a moment.

Ms. Jensen, can you hear us?

THE COURT: Oh boy, can you unmute yourself or get closer to your microphone.

We can't hear you, Ms. Jensen.

MS. JENSEN: I'm unmuted.

THE COURTROOM DEPUTY: There you go.

THE COURT: We're getting maybe one out of ten words.

MS. JENSEN: Okay. I apologize. I'm going to need to get some assistance. Can you hear me better when I'm closer to the mic?

THE COURT: When you're far away from the mic, I get zero. If you're two inches from it, it might work.

MS. JENSEN: Can you hear me now?

THE COURT: No.

MR. TALARIDES: Your Honor, maybe we should --

UNITED STATES DISTRICT COURT

we'll be happy to have you pass the matter while Ms. Jensen works on her IT issues.

THE COURT:  Yeah, it's not acceptable, Ms. Jensen.  It won't be an effective hearing.  So we'll put you on second call.  Let's call the next matter.

THE COURTROOM DEPUTY:  Yes.

(Pause in the proceedings.)

THE COURTROOM DEPUTY:  Calling calendar item number one, CV 19-10701-DDP:  In Re Green Dot Securities Litigation.  If you can call and unmute yourselves and make your appearances again.

MR. TALARIDES:  Good morning, Your Honor. This is Alex Talarides.  And with me is my partner, Jim Kramer.  We're appearing on behalf of the defendants, Green Dot, Steven Streit and Mark Shifke.

MS. JENSEN:  Good morning, Your Honor.  This is Rachel Jensen from Robbins Geller, Rudman and Dowd on behalf of the plaintiff.

THE COURT:  Okay.  That's better.  And let's just turn it up a little bit more, Vanessa.  I don't know why it's still a little hard to hear.

MS. JENSEN:  Sure.  And I apologize.  I was right next to the mic last time, Your Honor, and for whatever reason -- but we switched out to different audio.  So I'm hopeful this is better.

8

THE COURT:  It is better.  We'll all speak very -- we'll enunciate and speak slowly, if -- if we could, please.

So I'll hear from the moving party.  Go ahead.

MR. TALARIDES:  Thank you, Your Honor.  And before I move into my argument, if there are any areas or issues you would like me to focus on, I'd be happy to, otherwise, I'll go straight to my argument.

THE COURT:  Well, there are a lot of issues. And, you know, I'm sort of turning to look at you, because I'm looking at my monitor, but, you know, should this be converted to a motion for summary judgment when you submit that volume of exhibits, what do you -- what are your realistic expectations?  And should we go through them page by page and have you tell me which ones are important and why they're important, and why that doesn't bleed into summary judgment?  And, you know, the rules allowing for the exceptions to things outside the pleadings, you know, I'm not sure the spirit of those rules, really encompass what you've submitted. So just as a matter of tactics and a matter of clarity for the Court, I don't think that that was a particularly effective way to present your arguments.

So with that, go ahead.  Tell me what you -- go ahead.  I'll hear your arguments.

UNITED STATES DISTRICT COURT

MR. TALARIDES:  Thank you, Your Honor.  And so I'll just begin right there.  So -- and we did submit a -- a voluminous binder of papers.  Let me first start by saying --

THE COURT:  Two binders, 1100 pages.  Go ahead.

MR. TALARIDES:  Binders, 100 pages.  Putting the volume aside -- and this is, you know, something we should have done a better job at doing, but none of that is necessary for the Court's decision here, and we cite the specific instances of each the document that the Court should look at in our opening brief.  We submitted the entirety of the documents for the sake of completeness.  Every single one of those documents though, Your Honor -- every single one of those documents is actually explicitly cited and relied upon by the plaintiff in its operative complaint.  And the citation --

THE COURT:  Every portion of every one of those documents is cited and relied on?

MR. TALARIDES:  No, Your Honor.  So not every portion, but every single document is actually cited and relied upon by the complaint.  And if you look at pages 5 through 7 of our reply in support of our request for judicial notice, we have a chart there that has the paragraph the -- the complaint paragraph citation to

10

each document.  And under the incorporation by reference doctrine, we're entitled to submit the documents --

THE COURT:  I don't really think so.  You know, if you have an agreement that has been referenced in a complaint, it's fair game to look at that agreement, but when you're dealing with -- you're dealing with a course of conduct over many months perhaps, and you're dealing with, you know, complex areas that -- that can involve credibility that, that can involve oral statements, that can involve all these other things, you -- you know, recognizing everything is -- on a continuum, it seems like you've -- you know, you've crossed the line into summary judgment land.  And, you know, you want me to weigh the credibility of those, the context?  You know, see to one extent they're consistent or inconsistent with other things, with other documents, it's just -- you know, at the 12(b)(6) stage, it's -- you know, you've done it, I understand.  You can make a technical argument that the law might allow you to do this, but, you know, I've said what I need to say.  So go ahead.

MR. TALARIDES:  Let me just clarify.  We are not submitting any of these documents for the truth of the matters asserted therein or for you to weigh any credibility of any statement that we're citing.  This is a securities fraud class action that says that various

statements over the course of an 18-month class period that over three dozen statements made by the defendants were false and misleading by virtue of information that was allegedly omitted to the market.  And the law is well established here that you're -- you're entitled to look at all these statements that are being challenged by the plaintiff where in the context of the statements -- of all the statements they made to the investors.  And so we're not asking the Court by any means to say yet, this statement is true.

THE COURT:  I'm not -- I'm not suggesting that that's is what I'm -- you know, that that's what -- I never understood that you were asking me to do that either.  But typically, things inter-relate.  People can say an inconsistent thing in a statement.  Later on, they can contradict themselves.  There can be a particular context which calls into question the meaning of certain words or phrases, qualifiers, all those issues.  So that's all I'm saying.  And --

MR. TALARIDES:  I understand.

THE COURT:  Go ahead.  Let's not spend anymore time on that issue.  Go ahead.

MR. TALARIDES:  Sure.  So, Your Honor, Green Dot is a financial tech and banking services company that originally started with the prepaid debit

12

cards with high margins on fees back in 2010 when it first started.  That was its bread and butter.  And as technology has evolved and the industry has evolved, there has been a shift from these debit cards -- prepaid debit cards that you can purchase, for example, in Wal-Mart to digital E banking services with direct deposit and on their phones and apps.  And at the beginning of the class period here -- and this -- the class period begins in May of 2018.  And beginning even prior to the class period and on the first day of the class period, the defendants announced to investors that they were actively changing or engaging in a product mixed shift to these banking as a service or digital products that the hope of the company was that over the lifetime of a consumers account that they would generate more revenue than these so-called one and done prepaid cards.  So even though they had lower margins than the prepaid cards, that the value of these customers would generate more income and earnings over time.  And they made it very clear at the beginning of the class period -- and this is one of the documents, for example, that is cited in the complaint and, but not -- but the quote is conveniently omitted from the complaint, is where the defendants explicitly disclose on the very first day of the class period that they are actively

UNITED STATES DISTRICT COURT

changing their product shift to these BAAS programs, and they told investors point blank that they had no quote, no expectation that margins on these new business lines would ever be as rich as Green Dot's lazy products, and that the margins on Green Dot's established lines were being offset by the materially lower margins generated on its large scale new product lines.  And these statements where they qualify the shift are made every single quarter throughout the class period.  And the theory of fraud here -- and, again, it's not just negligent.  It's fraud -- with an intent to defraud in this case, is that in May of 2018, the defendants knew that this product -- product mixed shift would inevitably lead to a decline to the company's bottom line -- 18 months later, six quarters later, that was ultimately disclosed or revealed in November of 2019. The interesting thing here is that for every single quarter throughout the class period -- and this is not disputed by the plaintiffs, nor could it be.  There's -- this is not a case of a restatement where false financial statements -- is that the company had every single quarter revenue growth -- and every single quarter, except the last quarter, Q3 of 2019, earnings growth.  And so the -- as a factual matter --

THE COURT:  Yes, but it's acceleration.

It's the rate of increase.  Those are much more significant to investors than having an incremental increase.  So I'm not sure I understand the materiality of that argument.

MR. TALARIDES:  Well, the argument is just to as a -- to set the stage in that -- the notion that it was inevitable, right?  In May of 2018, and the defendants knew it was inevitable that the bottom line would negatively be impacted and that they would have this large earnings miss.  In 2019 -- November of 2019 is just belied by the actual success of the company throughout the majority of the class period.

THE COURT:  What about the various corrective notices that were submitted?  Did they create some correlative decline in the stock price when they came out?

MR. TALARIDES:  So there is a disclosure in May of -- after the earnings -- after the completion of the first quarter of 2019 that -- and which also -- a disclosure that there was an erosion of the company's prepaid or legacy accounts, new active growth.  And that was disclosed in May.  And as a result, the company was revising its guidance.  And, now, mind you, Your Honor, this is five months -- six months, rather prior to the end of the class period.  And as soon as -- this is the

first time they're seeing erosion of these -- you know, accelerated erosion of these legacy accounts, and they disclosed it at the very first disclosure that they made to investors after the close of Q1 2019, which is actually antithesis of someone trying to deceive someone, otherwise you would just keep your mouth shut and don't say a word, but instead, they told people six months before the end of the class period.

THE COURT:  Well, but the argument is made that there was a lot of realtime data that indicated that -- you know, that there was a clear trend pattern.

MR. TALARIDES:  Well, so I guess to back up -- back to basics, Your Honor, is that you still have to have a statement that's rendered false and misleading by the internal data that is with the trends and --

THE COURT:  Or omissions.

MR. TALARIDES:  Or omission; but there's no freestanding duty to disclose under Section 10(b).  The omission has to render an existing statement, mislead, right?  It has to affirmatively create a false impression, leading you in a wrong direction.  There's no --

THE COURT:  Sure.  Sure.  So --

MR. TALARIDES:  And so if you look at -- but I mean, so there's about 37 or 38 --

THE COURT:  You know, the court reporter is giving me her patented look, which means, I can't keep up.  So let's just slow it down.  Go ahead.

MR. TALARIDES:  Yeah.

I apologize.  I will slow it down.

There's about three dozen alleged misstatements -- and, again, they're alleged to be false or misleading by virtue of omission, not being affirmatively false -- about ten of those statements --

THE COURT:  Well, I don't know if that's entirely true.  So -- let's -- let's not characterize that yet, but go ahead.

MR. TALARIDES:  Well, a good portion of these statements are actually describing the quarter that had just ended on a quarter-by-quarter basis and about the company's success which are not alleged to be false. They're not reporting false information.  And there's a whole body of case law in the Ninth Circuit that says that the reporting of accurate historical information does not become or is not rendered actionably misleading by a failure to disclose.  That phase may not be as rosy going forward.

So that's one set of documents -- the -- a legal argument, just putting aside the factual premise. Then you have about 15 to -- alleged misstatements, and

they are detailed on page 25 of our opening brief.  They are all forward-looking statements that are -- as we argue, are protected by the private securities litigation Reform Act's safe harbor for forward-alleging statements.  And we've laid them out in bullet-point format.  They are forward-looking, and they were accompanied by cautionary language.

THE COURT:  Let's still just as a reminder -- slower, please.

MR. TALARIDES:  I apologize.

And so we have cautionary language here that is directly on point to the issues raised by plaintiff's allegations.  There is a risk warnings that were included in the company's disclosures, both before and during the class period, warning investors that demand for its existing legacy products may not continue the way it has been going forward, and that the margin --

THE COURT:  Yeah, but is that sufficient if there's a -- for example, hypothetically a precipitous drop?  Is -- "may not match," is that actionable?  You know, one can say things, may not be so good when the truth is things have hypothetically fallen off a cliff.

MR. TALARIDES:  So, Your Honor, those are -- so there's two issues there.  That would be an argument, which is not being alleged here, by the way, that the

18

risk warnings themselves are false or misleading.  We don't have an allegation that the risk warnings themselves are false or misleading.  So the PSLRA asks two questions:  Is it a forward-looking statement?  Yes.  Are there -- is there cautionary language?  Yes.  It doesn't ask whether it may or contingent.  It just says, "cautionary language."  And if there is, as a matter of law, the statement is not action.  So they're not even alleging in their complaint that the cautionary statements are false or misleading.  So I don't see how the safe harbor would not apply, assuming -- and I don't think it's a stretch here that the statement -- that the cautionary language is directly on point.  It talks about the demand for existing legacy products and the margins on the new products going forward, which I might add, you know, that's one of the core allegations is that there was a failure or lack of disclosure about this disparity in margins.  I would just direct the Court to Exhibits 26 -- or sorry, apologize -- Exhibits 27, 28 and 29.  These are just some examples.  These are analyst reports that the complaint relies on.  And these analysts, using company disclosures, state explicitly that the companies, quote, in "newer initiatives" have lower margins.  Quote, the margins on the new BAAS business are below the corporate average.

And in particular, Exhibit 29 which is quoted or is -- and relied upon in the complaint, paragraph 75 of the complaint, this Exhibit 29 is the Deutsche Bank analyst report, and it has a chart on page two.  And it's -- actually, it's page 927 in our pagination of the RJN, and it shows every year from 2015 through the first quarter of 2019, the breakdown -- the composition of the company's new active account between legacy products and the new direct deposit products.  And it shows that from 2016, the percentage of new product -- of new products vis-à-vis, legacy products was 23.6 percent. 2017, 33.9 percent.  And 2019, 43.9 percent.  And 2019, 47.4 percent.  And so -- and they got this information, it says, "from company data."  And so there was a disclosure of the composition of these accounts. There was a disclosure that this new product makes initiative involved lower margins than the old legacy products.  And so at the end of the day, what we're left with is a failure -- an alleged failure to disclose that things might not go well 18 months down the line in an 18-month class period.  And there are no facts alleged in the complaint, and the Reform Act requires particularized factual allegation about any individual defendant's knowledge that fast-forward 12, 18 months later, that they would have to revise guidance, and for

the first time in the company's history, would not have earnings growth.  There's vague references in paragraphs 32 and 33 to internal reports, but there's no actual allegation about what those internal reports were shown, contradicting any particular statement or what time during the class period.

THE COURT:  Right.  But the plaintiffs don't have access yet to those reports, do they?

MR. TALARIDES:  Well, they don't.  And so --

THE COURT:  So how can you argue, in all fairness, that they should be -- that the -- that, you know -- that they should -- you know, that you can argue that they -- they haven't alleged anything when they -- it's been impossible for them to acquire those documents so far?

MR. TALARIDES:  Well, Your Honor, so the Reform Act imposes a -- a discovery --

THE COURT:  Yeah, I understand what it does.  I understand.  So let's not beat this up.  Go ahead.  Make your next point.

MR. TALARIDES:  And just, you know -- the Ninth Circuit, you know, to quote, negative characterizations or reports relied on by insiders without specific reference to the contents of those reports are insufficient to meet the heightened pleading

requirements of the PSLRA -- and this is police retirement systems of St. Louis.

THE COURT:  Yeah, I understand.  I don't need the cite.  Go ahead.

MR. TALARIDES:  And so I'll just shift over to the scienter requirement, the requirement that they must also plead specific facts, creating a strong or powerful inference that the defendants made these statements not just negligently as even assuming they're false -- and we don't agree here -- but they made them fraudulently with the intent to defraud or at a minimum, deliberate recklessness, which requires a showing of an extreme departure from the standard of ordinary care.  And the complaint here is -- is bearing; on that point, in particular.  In this analysis, the Court has to weigh the inferences.  The Supreme Court *Tellabs* decision directs courts to conduct this comparative analysis of the allegations in whether they give rise to a cogent or powerful inference of fraud.  And what do we have here? We have an allegation that the insider has sold stock during the class period; but what's not included in the complaint but is judicially noticeable, is that the amount of stock sold is a fraction of their total holdings.  In fact, the insiders here, the defendants, held the vast majority of their shares.  And when -- as

the stock price dropped, they were the largest -- you know, they suffered massive losses themselves.  And so it begs the question, if this was inevitable and they -- they supposedly knew it, per the complaints allegations, why did they hold onto their stock, and they didn't sell?  And the small sales that they did make, were pursuant to an automatic nondiscretionary trading plan.  The complaint also forgets to -- or omits the fact that the company itself bought back about a hundred million dollars of its own stock during the class period at allegedly artificially inflated prices, which would have made no sense buying the stock at an overvalued price.  As the complaint alleges, the defendants knew that this would inevitably happen, but they did buy the stock.

The defendants also, again, as I noted earlier in my comment -- in my argument that as soon as the very first quarter, Q1 of 2019 which ended in -- in -- in March of 2019, where there was an erosion of these prepaid legacy cards, they keep quiet about that.  They disclosed it five -- six months before the end of the class period and revised their guidance.  If they were -- if they had the intent of fraud here, or -- or being deliberately reckless, they would have just been quiet.  Why would you -- it makes no sense to inform and update the company -- the market that your prior

forecast may not hold true anymore, because of new information that they have received.  And so we submit that putting aside falsity -- and we don't think they get the to falsity, but on the scienter element which is a particular high burden in the Ninth Circuit here, the facts here do not create a strong inference of fraud; and wholistically here, the inference is that -- what many companies unfortunately -- you know, they had a good faith forecast.  And a year into the -- the class period, there was an unanticipated deceleration, an erosion of these high margin accounts; that the company was -- as disclosed repeatedly -- already shifting away. So this is not a secret -- and cost the company to revise its forecast.  And so there's no -- nothing here that would point to a deliberate attempt to defraud investors.  It's -- the facts here actually paint the picture of -- in the antithesis of fraud, it's conduct inconsistent with fraudulent intent.  Your Honor, if you have any other additional questions, I'm happy to answer them, otherwise, I'd like to reserve a few minutes, if possible.

THE COURT:  Sure.  That's fine.  You know what I'd like to do though, let's take about ten minutes. And then we'll pick up.  We'll take a ten-minute recess. Thank you.

(Recess.)

THE COURTROOM DEPUTY:  We're back on the record in item number one, CV 19-10701-DDP:  In Re Green Dot Securities Litigation.

THE COURT:  Go ahead, Ms. Jensen.

MS. JENSEN:  Thank you, Your Honor.

So at the outset, I'd like to point out that the defendants in their motion to dismiss did not move all of the claims in the complaint.  And that is a reason in and of itself to deny the defendant's motion. So, for example, the defendants did not specifically challenge the scheme liability claim under rule, 10(b)(a) -- sorry, 10b-5(a), which alleged conduct beyond the allegedly misleading statements, including the manipulation of a key performance metric that which obscured the declines in Green Dot's core business, as well as the declines in profitability from their shift to visual offerings.  So for that reason, Your Honor, we believe that you should deny the motion to dismiss.

In addition, the defendants did not specifically challenge nine of the alleged misleading statements, and that included paragraphs 40B, part of 45B -- sorry -- 40B, part of 45B, 45C, part of 50B, 50D, 57C, 57D, 60B and 60D.  And as Your Honor noted, in the *Feyko v. Yuhe International* case 2013 Westlaw 816409,

25

note two, the Court is under no obligation to evaluate every misrepresentation, because if the plaintiffs can survive the motion by alleging one single misrepresentation, the complaint can be upheld.

On the threshold issue, as well of what should be considered by Your Honor in deciding the motion to dismiss, Your Honor has our briefing in opposition to the request for judicial notice.  So Your Honor knows that we oppose that, but I did want to specifically point out that contrary to Defense counsel's statement, the complaint does not cite over half of the documents that are put forward by the request for judicial notice, and that is Exhibit Q through 15, Exhibit 27 and Exhibits 30 through 32.  And so for that reason, we believe that, at least, the exhibit should be -- we do think that this tactic which the Ninth Circuit criticized in *Khoja* that it does cross the line into a motion for summary judgment and that we should get discovery on this to the extent that the Court considers the materials submitted by the defendants.

Now, one thing I also wanted to correct from the Defense counsel was there -- the notion that they aren't citing these exhibits for the truth -- and one need not look any further than their motion to dismiss on page six, in which they have a whole chart here that

supports their argument that Green Dot thrived during the class period -- and they're citing to materials in their request for judicial notice for those numbers, and they are asserting that that is true.  And so I do think it's important --

THE COURT:  You know, maybe it is a fine point, but maybe the truth of the matter asserted is the sort of literal truth of a statement as opposed to whether a statement was made, and the -- the fact that it was made and made a certain disclosure -- or contained a certain disclosure, I don't know; but sure, go ahead.  I understand your point.

MS. JENSEN:  And yes, Your Honor -- and I understand what you're saying as well, the point that you raise.  I think here what we're talking about is, number one, many of the exhibits aren't even allegedly misleading statements.  And so it's not as though you can say, well, plaintiffs cited this line and not the next line.  So it's not that type of tactic -- or not that alone, at least in the way that they are using these materials.  They are arguing -- with a capital T -- the Truth of them largely profiting through the class period.  And in doing so, they're contradicting the allegations of the complaint to a certain degree. There is some -- some world in which -- some of this can

27

coexist, but what I'm saying is that it does read like a motion for summary judgment, because they are saying these are the facts as opposed to what we disclosed.

Now, getting to the disclosure point, that is a quintessential truth-on-the-market affirmative defense in the way that they are arguing it. They're saying, we put this truth out in the market. And we disagree that that can be done on a motion to dismiss in the way that they are arguing it, but I would say in addition, even within the disclosures that they are arguing, the -- these little snippets, these cherry-picked snippets from these various documents, number one, don't contain the context in which these statements were made, like, for example, the margin point that Defense counsel mentioned, but they're also sandwiched between contradictory statements. And so you've got, for example, on page 735 of the -- the extrinsic materials -- and we don't agree this should be, obviously, considered Your Honor; but I just make the point that it can't be necessarily taken at face value, because on page 735, the CEO makes multiple different statements about margins. And you see throughout these materials the defendants are saying -- to the extent that they talk about margins, they're jut saying, well, we're just scaling up. In other words, the margins may

be due to a -- the cost of scaling up.  This is a short-term issue, if anything.  And even that isn't completely straightforward, because within that context, the defendants are still making contradictory statements.  So I -- that is the objection.  And I don't think that it's as clear as the defendants have made it.  I also think that to the extent that we're going to talk about what is disclosed and not -- of course, we think this is beyond scope, but to the extent that that is undertaken, we get the benefit of the inference.  And so if there's a contradictory statement somewhere in the 1100 pages, well, then we get the inference.  We should be able to go forward.  I would also say that to the extent that there is any purported disclosure on the core business and the shift, number one, the company said this new business was incremental.  In other words, it's additive.  It's going to add to the core business, not take away from it.  Number two, they certainly didn't say the products were free, and that was disclosed in August of 2019 -- and you see the stock crater.  So this gets to the next point, which is they say that market understood.  Again, not appropriate for a motion to dismiss, but to the extent that you indulge that argument, Your Honor, the market reacted with surprise and disappointment.  So you've got a

70 percent -- 70 percent stock drop over the time of these disclosures.  When you also have analyst reports, that are saying they had limited visibility into these new products, once there's a disclosure, again with the frustration -- and, you know, and the Deutsche Bank analyst's report that Defense counsel cited -- and this is 926 of their extrinsic materials -- that was from August of 2019.  That is after the disclosure that a vast majority of these new products -- that, being the direct deposit and BAAS was free -- and to the extent that this analyst is able to put all these pieces together, this is only after the disclosure and the analyst goes hunting to rebuild the model.  So that is certainly not a disclosure that was during the time we're talking about.

As to the forward-looking or purportedly forward-looking statements, the defendants have argued that some of the statements are forward-looking, and they do so by excerpting or pruning parts of the statement, number one, and not addressing the present or past tense pieces of the statements.  And then on top of that, they also did not give meaningful -- meaningful warnings, because the -- the warnings were boilerplate. They were so vague as to not really put the market on notice, number one.  But number two, these risks had

30

already materialized.  So you can't say rain clouds are coming when it's already pouring.  That's not a meaningful warning.  So in that regard, we don't think that those forward-looking to the extent they existed, are afforded the safe -- the refuge.

So -- and then I will say also, that we do allege, as well that the defendants had sufficient information to know that their statements were not -- were false or misleading or were reckless to that fact.

Now, Defense counsel talked about the lack of detail, I guess in the reports that were available to the defendants.  And if Your Honor takes a look at paragraphs 29 and 30 of the -- of the amended complaint, it does go through both the reports that they had access to and the contents of them.  It doesn't quote from them, Your Honor, because we don't have them, but it certainly gives enough detail to understand what is contained in those reports and why is that material to the allegations in the complaint.  How does that elucidate the questions of what was being disclosed versus not.  So I think those are sufficient.  And I will also note that in addition to that, when you get back into the statements -- and I think this is paragraphs 53A and beyond, they -- the allegations specifically say what was false about it, and it talks

31

about the declines in a specific way.  So that also does bear on the question of whether there was enough detail.

THE COURT:  What about the argument that you're cherry-picking the negative portions and disregarding the -- you know, the other portions that provide additional disclosures?

MS. JENSEN:  So, Your Honor, do you mean that we're cherry-picking from, for example, certain statements on a topic at an arranged call, is that what you're referring to?

THE COURT:  Sure, sure.

MS. JENSEN:  Okay.  So I think there, we -- we actually -- we pointed this out in our opposition to the motion to dismiss.  Your Honor, there's very voluminous statements.  And so at some point, in order to avoid burning Your Honor with a 3- or 400-page complaint, we do have to excerpt out.  And so what we were trying to do, Your Honor, so we wouldn't be accused of a puzzle pleading was to point out to Your Honor what was -- what statements were misleading.  And I will say that to the extent that the defendants have seized on a word that may relate to it, we would say that at best, the statement was contradictory.  And we would say also, that we are -- we are entitled to the inference, and that we should have discovery on these issues and then

come back and go to the merits of the claims, but that way we have the information.

Lastly, I want to address the question of scienter. And I'll note the Defense counsel did not anywhere -- unless I missed it -- mention the core operations doctrine. And this is very important, Your Honor, because this related to the core business. Defense counsel even acknowledged that at the very beginning of his remarks. This was the core business. And so it would be absurd to say that the defendants didn't have the information, very much like *Twitter* -- and I will say, Your Honor, going back through the *Twitter* case again, I saw so many parallels. I think it's a very helpful case to ground the allegations here. Of course, that's *Shenwick vs. Twitter* 282 F.Supp.32 -- I'm sorry -- 3d 1115. And there, like here, the allegations concerned a core operation and information that the defendants would have obviously had. And, of course, we would have to just go with the inference. The defendant said it themselves. And so we quoted in our brief and we also quoted in the complaint the CEO saying, "we have the data." So it's not just an inference. This is from the defendant's own mouth. I would say also that here, we've got resignations that occurred for both the individual defendants right after

the class period.  And then we also have stock sales. And I would say to the extent the defendants are arguing well, this doesn't make sense, because they ended up disclosing this information, that's almost always true. It gets to a point where the defendants can't hide it anymore.  And that is what occurred here.  The declines forced the defendant's hands.  They obscured the losses at the beginning through changing the metrics from active cards to active accounts, and that allowed them to obscure the decline for some time; but at some point, it no longer offset it, and that's when they had the complaint --

THE COURT:  What about -- just sort of big picture.  So I understand that the legacy products -- the prepaid ATM-type visa cards I think they were, was really sort of the core business idea and concept that started this -- this enterprise -- but -- but wouldn't there have been a breakdown over time to potential investors of the -- their earning curve of that particular legacy product?  So wouldn't investors be paying enough attention to understand that core business and that any potential shift away from it with these -- this sort of other banking models might not generate the same type of explosive growth?

MS. JENSEN:  So Your Honor asks an excellent

question.  And that's why it's so important that they change these metrics, which they did at the beginning of the class period.  They had defined it as active cards, and then all of a sudden, they defined it as active accounts.  And by doing so, they lumped them all in together.  There was growth in the -- the free or -- the free or nearly free products.  And the -- and they were able to obscure it by conflating the two.  And then in terms of the profits that --

THE COURT:  Well, is that really your sort of core argument?  I mean, I understand the concept, which is it's a -- you're saying it's a labeling misrepresentation, in effect, by grouping things that don't really belong together, together, and calling them the same thing, right?

MS. JENSEN:  Yes, yes, Your Honor.  That is -- that is essentially the argument.  And in terms of the -- what --

THE COURT:  And are you saying the underlying data that was provided to investors and disclosures and the phone calls didn't provide that breakdown?

MS. JENSEN:  It did not.  And, in fact, the defendants' motion to dismiss admits that.  They say that -- the defendants say the class period, that they disclosed what's called "active accounts," but that

included both, the old products and the new.  So they admit that in their motion to dismiss.  I think that's a judicial admission.  Now, they do say in other parts that sometimes they disclose it.  And what we see in the record -- of course, this is beyond the scope I think of the motion to dismiss, but what we have seen is that they sometimes disclose little piece -- pieces here and there when they think it benefits them.

THE COURT:  So -- so the argument is that the legacy products had a clear margin of profitability.  The new products was much less.  And those two concepts were conflated in a way that investors were left with the false impression that -- that we were talking essentially about the same sort of product or else they wouldn't have been lumped together, and that that -- you know, that itself was -- was improper.

MS. JENSEN:  Yes, I would say that was misleading.  And the reason, in part we know that it was misleading was because you've got a 70 percent stock drop when the truth is revealed, and you've got analysts saying things like, wait, what is happening?  We've had limited visibility on these new products --

THE COURT:  Well, how do we know the analysts just weren't paying adequate attention?  They didn't get into the details, but they were there.

36

MS. JENSEN:  Your Honor, I would say that's something for discovery.

THE COURT:  Okay.  Go on.  Anything else?

MS. JENSEN:  I think -- the -- the only other thing I would say, Your Honor, is that to the extent that the Court was not persuaded by any of our arguments, we would seek an opportunity to amend the complaint.

THE COURT:  Okay.  Thank you.

Mr. Talarides....

MR. TALARIDES:  Thank you, Your Honor.

Let me quickly address some of the points that counsel made.

THE COURT:  Sure.  And let's just -- I know the court reporter is struggling.  So for everyone, just please, the slower the better.

MR. TALARIDES:  Understood, Your Honor.

Thank you.

With respect to the argument that we -- the motion should be denied, because we did not move on all of the claims and specifically subdivisions A and C and 10b-5, we address that in our reply brief.  That's just not right.

THE COURT:  So I'll look at that issue again.  You did address it.  Let's not belabor it at this point.

MR. TALARIDES:  Understood.  With respect to quickly on the documents, let me just say, we included -- I won't belabor it again.  I already addressed it before.  We included the documents to provide context of other disclosures, not to argue credibility.  But, Your Honor, you can just ignore all the disclosures, although, you can look at them, because the court -- the precedent in the Ninth Circuit permits you to -- to see what disclosures accompany the challenged statements, but ignore all of that.  You can.  And still grant this motion, because they have a burden under the PLSRA to allow specific contemporaneous facts to plead, should that each of the alleged misstatements were false or misleading when made, and they don't do that.  They -- you were pointed to paragraphs 29 and 30 of the complaint --

THE COURT:  Well, but aren't they saying, in effect, the truth came out later?

MR. TALARIDES:  Well, but that's -- you're right, Your Honor.

THE COURT:  And -- and just given the nature of the way this business operated, it would have been known, because it's essentially a realtime business.  You can look at a screen and just see what accounts are doing pretty much realtime.

MR. TALARIDES:  But, Your Honor, what they're -- that's exactly what they're doing.  That's -- there's a definition for that though.  That's fraud by hindsight, right?  It's you must have known, because that's what eventually was disclosed.

THE COURT:  Well, no, I don't think they're making a fraud by hindsight.  The argument is, the data is not that complicated.  It was readily accessible.  It was well-known.  There was a hands-on, you know, CEO or senior executive, and everybody -- everybody knew what was going on.  This isn't a situation where you're waiting to add up a bunch of paper towels in -- in a warehouse to figure out what your earnings are going to be.  This was sort of the modern age of instant access to information.

MR. TALARIDES:  Your Honor, notwithstanding that, the complaint still has to allege specific facts showing what that data would show, and they don't do that.  They just say it must have shown this.

THE COURT:  Well, how are they going to do that, if they have no discovery?  And hasn't the inferences that they've set forth sort of crossed the line to permit them to seek validation of, you know, the facts that have -- have subsequently come out?  That's sort of where we are.

MR. TALARIDES:  Yeah, well, let's speak about inferences, because we do know that *Tellabs* requires the Court to weigh inferences here, and they have to allege a compelling and powerful and cogent inference of not negligence but fraud.  And here, you heard counsel say that --

THE COURT:  Well, what about the merging of the accounts?  Let's talk about that one.  That seems to be a big-deal issue.  That seems simple.  You don't merge teeny accounts that are -- or you don't merge accounts that are not profitable or marginally profitable with those that are hugely profitable, and call them all the same thing, just as a general principle.

MR. TALARIDES:  Well, Your Honor, look, they clearly disclose the definition of "active account."  That's page ten of our motion and also page five of our motion.  These are clear disclosures, telling everybody what includes an active account.  They've also --

THE COURT:  Right, but did it explain what it meant, other than saying these two components are there?

MR. TALARIDES:  Yeah -- and you know how we know that it was clear?  Because, again, I can point you to these -- these analyst reports that the complaint relies, and contemporaneously, during the class period, these analyst reports that the complaints cite, says

40

specifically that the active account growth includes

BAAS banking as a service -- these new digital services,

plus their legacy products.  They explicitly --

THE COURT:  Right, sure.  We already know it

includes that, but in what numbers?

MR. TALARIDES:  Well, Your Honor, I -- they

disclose the active accounts in every quarter.

THE COURT:  Well, did they disclose the sort of

relative percentages just -- just -- I'm just asking --

I don't know the answer to that question, but....

MR. TALARIDES:  They did.  They did on the

arranged call.  They -- they spoke about the growth,

and, for example, this is page --

THE COURT:  Well, speaking about growth is a

little bit different.  It's not exactly what I asked.

You understand the -- the issue that was raised, that

you grouped the argument as -- that, you know, you

grouped the -- the stuff that was higher in volume,

higher in numbers but lower in margin and profitability

with stuff that was highly profitable, and called it all

the same thing.  And the fact that you said you grouped

them doesn't really answer the question, if you knew

that the -- the number was a bigger number and likely to

lead to a false impression, because you didn't disclose

that that bigger number was comprised in some material

41

percent of the non-profitable or marginally profitable or less profitable products.

MR. TALARIDES:  Understood.  Your Honor, I'll -- I'll move on.  I would just say that we disagree with that characterization that there was any mischaracterization of the active accounts.  I think the disclosures are crystal clear.  They're set forth in our motion.  And -- and by making --

THE COURT:  I understand that.  I just wanted to make sure I'd adequately sort of characterized Ms. Jensen's general argument.  Did I, Ms. Jensen?

MS. JENSEN:  Yes, Your Honor.

MR. TALARIDES:  And our response to that is, the disclosures speak for themselves.  But -- but more importantly, this is not -- even if you assume that there is some concealment here -- a deliberate concealment or -- and I don't think there is -- the disclosures are in our papers.  We quote the relevant portions of it.  They're judicially noticeable; but beyond that, this has to be a case of facts pled that support an inference of fraud here.  And Your Honor recognized -- or at least, acknowledged that there's a lack of specificity here.  And frankly, it just doesn't make a whole lot of sense here.  Counsel said that the stock price dropped 70 percent when this came out.

Guess who the largest losers were when the stock price dropped by 70 percent?  The defendants.  They own millions of shares and --

THE COURT:  So what does that go to?  Why is that -- why does that matter?  So you can argue it goes to scienter; but, you know, it would also -- it would also look bad to dump a lot of stock when you know it's going to go way down.  So I'm not sure that it really -- it's certainly -- it's an issue on scienter.  Let's -- let's -- I'll agree on that.

MR. TALARIDES:  Yeah, well, it motivates a highly relevant factor in weighing the comparative inferences as the Supreme Court instructs us to do.  It's not just a -- a regular 12(b)(6) analysis.  There's a comparative analysis.  And here, the conduct is actually antithetical to fraud.  They suffered massive losses.  They also repurchased a hundred million shares -- dollars worth of shares at the allegedly inflated prices which, again, would make no sense.  And --

THE COURT:  Well, don't companies repurchase shares to prop up a stock price?  So why does it not make sense?

MR. TALARIDES:  Well, you -- you buy the stock, Your Honor, when -- when the stock price is at a low,

#:2380

43

not at an over-price -- over-valued price, right?

The theory here is that --

THE COURT:  I don't know.  I can think of various reasons you might do it at different times.  So I understand the argument.  Sure.  Thank you.

MR. TALARIDES:  I'll move on, Your Honor.  And on the last piece on the disclosure, the -- the -- this is a class period that's 18 months.  And as soon as you have an erosion, there's a disclosure and a revising of guidance.  There's no allegation that the guidance that was provided to investors prior to May of 2019 was false or misleading.  So the implication and -- I mean, the acknowledgement really, is that that guidance was reasonably given.  It's not alleged to be false.  And if it's not false, that means that they provided their best estimate of what they thought the business would do.  And --

THE COURT:  And just to be clear, maybe I'm unclear on this -- sorry to interrupt you -- the corrective disclosures that were made did not correct historical data or provide more clarity as to the information, such that it could be analyzed in a more meaningful way?

MR. TALARIDES:  Well, so the corrective disclosure -- the alleged corrective disclosures did not

correct any prior information, because there's not -- there's no allegation that financial information was misreported, right?  The allegation is that you didn't provide more detail about your underlying business. And -- and when in -- and after the first quarter of 2019 --

THE COURT:  More detail, meaning what specifically in the context of what we've been discussing, the grouping of the various accounts?

MR. TALARIDES:  More detail -- the -- I would -- the allegation is the more detail about the specific composition of the higher margin accounts --

THE COURT:  Right.

MR. TALARIDES:  -- vis-à-vis, the newer accounts --

THE COURT:  Right.

MR. TALARIDES:  -- that have lowered.  So -- and the first disclosure -- or at least, the first negative disclosure that -- about the -- an erosion of the older high margin accounts was after the close of the first quarter of 2019 -- in May of 2019.  And on that same call where this disclosure is made, there's a revision of the guidance, because, of course, the company now has new information -- new data.  They can't stand by the old forecast that they had, but there's no

allegation with the prior forecast where -- where false, misleading or unreasonable, in light of the data that did exist prior to May 2019. And if that's -- there's no allegation those forecasts were false, then how could there be -- how could it have been inevitable or known back in May 2018 that this would happen 18 months later? You don't get any explanation or any facts alleged in the complaint about that. So I'll just conclude, Your Honor, by saying I think there's a lot of innuendo and assumptions and conclusions being made, based on things that are not actually alleged based on a lack of facts here in the complaint. If you look at just the complaint, this is a -- a theory of fraud that -- that looks at what happened ultimately and -- and ask the Court to draw an inference of well, there must have been fraud because this happened. There's -- it's a fraud by hindsight case. And the inference is here. I think under *Tellabs* and the PLSRA require a dismissal.

THE COURT: Thank you very much. Anything further from either party?

MS. JENSEN: Your Honor, I don't want to take up much more of your time, but I will just state that in terms of the quick disclosure that counsel has described, we allege in the complaint that the defendants knew about these declines from at least the

beginning of 2018.  The first disclosure -- the first partial disclosure isn't until February of 2019.  And also, I don't want to go through all the corrective disclosures, but very quickly, there was information in those disclosures that had to do with the economics of these new products that the defendants, obviously, knew about, including that these new products -- the vast majority of them, were free.  And that led to a very big stock reaction, because the market was not aware of that up until that point.

MR. TALARIDES:  Your Honor, can I respond one quick point?

THE COURT:  Go ahead.

MR. TALARIDES:  This notion that they were free, and -- and -- the company's revenue every single quarter -- every single quarter increased year over year, notwithstanding the allegation, by the way.

THE COURT:  I'm just -- I'm not sure I understand that.  The stock market isn't driven by incremental increases.  It's driven by expectations and what people perceive growth ratios to be and lots of different factors.  So the fact that you may have an incremental increase or some increase in revenue doesn't answer the question.

MR. TALARIDES:  My only point, Your Honor, is

that if -- if these products, which the allegation is that were increasingly dominating the portfolio mix were being offered for free, yet, the revenue is going up, I'm not sure how that works.  It's just not -- it's not the case.

THE COURT:  Okay.  Fair enough.  Thank you.  Understood.  It's submitted.  Thank you.

MS. JENSEN:  Thank you.

(Whereupon, proceeding adjourned.)

- - -

48

# C E R T I F I C A T E

  [!PLAINTIFF NAME]                              :

                                                 :  No. ^

                                                 :

I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

/S/  _____          //___

MARIA R. BUSTILLOS                        DATE
OFFICIAL REPORTER

**/**

/S [1] - 48:22

**1**

10(b) [1] - 15:18
10(b)(a [1] - 24:13
100 [1] - 9:6
10:26 [1] - 4:3
10b-5 [1] - 36:22
10b-5(a [1] - 24:13
1100 [2] - 9:5, 28:12
1115 [1] - 32:16
12 [2] - 4:1, 19:24
12(b)(6 [2] - 10:17, 42:14
12254 [1] - 1:22
15 [2] - 16:25, 25:13
18 [5] - 13:15, 19:20, 19:24, 43:8, 45:6
18-month [2] - 11:1, 19:21
19-10701-DDP [3] - 4:6, 7:9, 24:3
19-10701-DDP-E [1] - 1:10
1900 [2] - 2:6, 2:11
1ST [1] - 1:23

**2**

2010 [1] - 12:1
2013 [1] - 24:25
2015 [1] - 19:6
2016 [1] - 19:10
2017 [1] - 19:12
2018 [5] - 12:9, 13:12, 14:7, 45:6, 46:1
2019 [19] - 13:16, 13:23, 14:10, 14:19, 15:4, 19:7, 19:12, 19:13, 22:17, 22:18, 28:20, 29:8, 43:11, 44:6, 44:21, 45:3, 46:2
2022 [2] - 1:19, 4:1
21 [1] - 1:19
213 [1] - 1:25
23.6 [1] - 19:11
25 [1] - 17:1
26 [1] - 18:19
27 [2] - 18:20, 25:13
28 [2] - 18:20, 48:13
282 [1] - 32:16
29 [5] - 18:20, 19:1, 19:3, 30:13, 37:15

**3**

3 [1] - 31:16
30 [3] - 25:14, 30:13, 37:15

32 [2] - 20:3, 25:14
33 [1] - 20:3
33.9 [1] - 19:12
350 [1] - 1:23
37 [1] - 15:25
38 [1] - 15:25
3d [1] - 32:16

**4**

4 [1] - 3:2
400-page [1] - 31:16
405 [1] - 2:17
40B [2] - 24:22, 24:23
43.9 [1] - 19:12
4455 [1] - 1:24
45B [2] - 24:23
45C [1] - 24:23
47.4 [1] - 19:13

**5**

5 [1] - 9:23
50B [1] - 24:23
50D [1] - 24:23
53A [1] - 30:24
57C [1] - 24:24
57D [1] - 24:24

**6**

60B [1] - 24:24
60D [1] - 24:24
619)231-1058 [3] - 2:7, 2:12, 2:18
655 [2] - 2:6, 2:11

**7**

7 [1] - 9:23
70 [5] - 29:1, 35:19, 41:25, 42:2
735 [2] - 27:17, 27:21
75 [1] - 19:2
753 [1] - 48:12

**8**

816409 [1] - 24:25
86 [2] - 1:17, 3:2
894-2739 [1] - 1:25

**9**

90012 [1] - 1:24
92101 [3] - 2:7, 2:12, 2:18
926 [1] - 29:7
927 [1] - 19:5

**A**

A.M [1] - 4:3
able [3] - 28:13, 29:11, 34:8
ABOVE [1] - 48:15
ABOVE-ENTITLED [1] - 48:15
absurd [1] - 32:10
accelerated [1] - 15:2
acceleration [1] - 13:25
acceptable [1] - 7:3
access [3] - 20:8, 30:14, 38:14
accessible [1] - 38:8
accompanied [1] - 17:7
accompany [1] - 37:9
account [5] - 12:15, 19:8, 39:15, 39:18, 40:1
accounts [17] - 14:21, 15:2, 19:15, 23:11, 33:9, 34:5, 34:25, 37:24, 39:8, 39:10, 40:7, 41:6, 44:9, 44:12, 44:15, 44:20
accurate [1] - 16:19
accused [1] - 31:18
acknowledged [2] - 32:8, 41:22
acknowledgement [1] - 43:13
acquire [1] - 20:14
Act [2] - 19:22, 20:17
Act's [1] - 17:4
action [2] - 10:25, 18:8
actionable [1] - 17:20
actionably [1] - 16:20
active [12] - 14:21, 19:8, 33:9, 34:3, 34:4, 34:25, 39:15, 39:18, 40:1, 40:7, 41:6
actively [2] - 12:12, 12:25
actual [2] - 14:11, 20:3
add [3] - 18:16, 28:17, 38:12
addition [3] - 24:20, 27:9, 30:22
additional [2] - 23:19, 31:6
additive [1] - 28:17
address [4] - 32:3, 36:12, 36:22, 36:25
addressed [1] - 37:4
addressing [1] - 29:20
adequate [1] - 35:24
adequately [1] - 41:10
adjourned [1] - 47:9
admission [1] - 35:3
admit [1] - 35:2

admits [1] - 34:23
affirmatively [2] - 15:20, 16:9
afforded [1] - 30:5
age [1] - 38:14
agree [3] - 21:10, 27:18, 42:10
agreement [2] - 10:4, 10:5
ahead [15] - 4:19, 8:4, 8:24, 8:25, 9:5, 10:20, 11:21, 11:22, 16:3, 16:12, 20:19, 21:4, 24:5, 26:11, 46:13
Alex [3] - 4:10, 4:22, 7:13
ALEXANDER [1] - 2:16
allegation [12] - 18:2, 19:23, 20:4, 21:20, 43:10, 44:2, 44:3, 44:11, 45:1, 45:4, 46:17, 47:1
allegations [9] - 17:13, 18:16, 21:18, 22:4, 26:24, 30:19, 30:24, 32:14, 32:17
allege [4] - 30:7, 38:17, 39:3, 45:24
alleged [15] - 16:6, 16:7, 16:16, 16:25, 17:25, 19:19, 19:21, 20:13, 24:13, 24:21, 37:13, 43:14, 43:25, 45:7, 45:11
allegedly [5] - 11:4, 22:11, 24:14, 26:16, 42:18
alleges [1] - 22:13
alleging [3] - 17:4, 18:9, 25:3
allow [2] - 10:19, 37:12
allowed [1] - 33:9
allowing [1] - 8:18
almost [1] - 33:4
alone [1] - 26:20
amend [1] - 36:7
amended [1] - 30:13
amount [1] - 21:23
analysis [4] - 21:15, 21:17, 42:14, 42:15
analyst [7] - 18:21, 19:4, 29:2, 29:11, 29:13, 39:23, 39:25
analyst's [1] - 29:6
analysts [3] - 18:22, 35:20, 35:23
analyzed [1] - 43:22
AND [3] - 48:10, 48:13, 48:15
AND/OR [1] - 48:19
ANGELES [3] - 1:18, 1:24, 4:1
announced [1] - 12:11

admits [1] - 34:23

answer [4] - 23:19, 40:10, 40:22, 46:24
antithesis [2] - 15:5, 23:17
antithetical [1] - 42:16
ANY [1] - 48:18
apologize [5] - 6:17, 7:22, 16:5, 17:10, 18:19
appearances [3] - 4:8, 4:19, 7:11
appearing [1] - 7:14
apply [1] - 18:11
appropriate [1] - 28:22
apps [1] - 12:7
ARE [1] - 48:19
areas [2] - 8:6, 10:8
argue [5] - 17:3, 20:10, 20:12, 37:5, 42:5
argued [1] - 29:17
arguing [5] - 26:21, 27:6, 27:9, 27:10, 33:2
argument [20] - 8:6, 8:8, 10:19, 14:4, 14:5, 15:9, 16:24, 17:24, 22:16, 26:1, 28:24, 31:3, 34:11, 34:17, 35:9, 36:19, 38:7, 40:17, 41:11, 43:5
arguments [3] - 8:23, 8:25, 36:7
arranged [2] - 31:9, 40:12
artificially [1] - 22:11
aside [3] - 9:7, 16:24, 23:3
asserted [2] - 10:23, 26:7
asserting [1] - 26:4
assistance [1] - 6:18
ASSOCIATION [1] - 2:5
assume [1] - 41:15
assuming [2] - 18:11, 21:9
assumptions [1] - 45:10
AT [1] - 4:3
ATM [1] - 33:15
ATM-type [1] - 33:15
attempt [1] - 23:15
attendee [1] - 5:24
attention [2] - 33:21, 35:24
audio [1] - 7:25
August [2] - 28:20, 29:8
automatic [1] - 22:7
available [1] - 30:11
average [1] - 18:25
avoid [1] - 31:15

**aware** [1] - 46:9

## B

**BAAS** [4] - 13:1, 18:25, 29:10, 40:2
**bad** [1] - 42:7
**Bank** [2] - 19:3, 29:5
**banking** [5] - 11:24, 12:6, 12:13, 33:23, 40:2
**based** [2] - 45:10, 45:11
**basics** [1] - 15:13
**basis** [1] - 16:15
**bear** [1] - 31:2
**bearing** [1] - 21:14
**beat** [1] - 20:19
**become** [1] - 16:20
**begin** [1] - 9:2
**beginning** [7] - 12:8, 12:9, 12:20, 32:9, 33:8, 34:2, 46:1
**begins** [1] - 12:9
**begs** [1] - 22:3
**behalf** [4] - 4:11, 4:22, 7:14, 7:18
**BEHALF** [2] - 2:4, 2:14
**belabor** [2] - 36:25, 37:3
**belied** [1] - 14:11
**belong** [1] - 34:14
**below** [1] - 18:25
**benefit** [1] - 28:10
**benefits** [1] - 35:8
**best** [2] - 31:22, 43:15
**better** [6] - 6:18, 7:19, 7:25, 8:1, 9:8, 36:16
**between** [2] - 19:8, 27:15
**beyond** [5] - 24:14, 28:9, 30:24, 35:5, 41:20
**big** [3] - 33:13, 39:9, 46:8
**big-deal** [1] - 39:9
**bigger** [2] - 40:23, 40:25
**binder** [1] - 9:3
**binders** [2] - 9:5, 9:6
**bit** [3] - 5:14, 7:20, 40:15
**blank** [1] - 13:2
**bleed** [1] - 8:17
**body** [1] - 16:18
**boilerplate** [1] - 29:23
**bottom** [2] - 13:14, 14:8
**bought** [1] - 22:9
**boy** [1] - 6:10
**bread** [1] - 12:2
**breakdown** [3] - 19:7, 33:18, 34:21
**brief** [4] - 9:11, 17:1, 32:21, 36:22

**briefing** [1] - 25:7
**BROADWAY** [2] - 2:6, 2:11
**BUILDING** [1] - 2:17
**bullet** [1] - 17:5
**bullet-point** [1] - 17:5
**bunch** [1] - 38:12
**burden** [2] - 23:5, 37:11
**burning** [1] - 31:16
**business** [14] - 13:3, 18:25, 24:16, 28:15, 28:16, 28:17, 32:7, 32:9, 33:16, 33:21, 37:22, 37:23, 43:16, 44:4
**BUSTILLOS** [3] - 1:21, 48:10, 48:23
**but...** [1] - 40:10
**butter** [1] - 12:2
**buy** [2] - 22:14, 42:24
**buying** [1] - 22:12
**BY** [3] - 2:5, 2:10, 2:16

## C

**C.S.R** [1] - 1:22
**CA** [3] - 2:7, 2:12, 2:18
**calendar** [2] - 4:14, 7:8
**CALIFORNIA** [5] - 1:2, 1:18, 1:24, 4:1, 48:12
**capital** [1] - 26:21
**cards** [9] - 12:1, 12:4, 12:5, 12:17, 12:18, 22:19, 33:9, 33:15, 34:3
**care** [1] - 21:13
**case** [9] - 13:12, 13:20, 16:18, 24:25, 32:13, 32:14, 41:20, 45:17, 47:5
**cautionary** [6] - 17:7, 17:11, 18:5, 18:7, 18:9, 18:13
**CENTRAL** [2] - 1:2, 48:11
**CEO** [3] - 27:21, 32:22, 38:9
**certain** [5] - 11:18, 26:10, 26:24, 31:8
**certainly** [4] - 28:18, 29:14, 30:17, 42:9
**CERTIFY** [1] - 48:12
**challenge** [2] - 24:12, 24:21
**challenged** [2] - 11:6, 37:10
**change** [1] - 34:2
**changing** [3] - 12:12, 13:1, 33:8
**characterization** [1] - 41:5
**characterizations** [1] -

20:23
**characterize** [1] - 16:11
**characterized** [1] - 41:10
**CHARGED** [1] - 48:18
**chart** [3] - 9:24, 19:4, 25:25
**check** [1] - 5:10
**cherry** [3] - 27:11, 31:4, 31:8
**cherry-picked** [1] - 27:11
**cherry-picking** [2] - 31:4, 31:8
**CHRISTOPHER** [1] - 2:10
**Circuit** [5] - 16:18, 20:22, 23:5, 25:16, 37:8
**CIRCUIT** [1] - 48:18
**citation** [2] - 9:17, 9:25
**cite** [4] - 9:9, 21:4, 25:11, 39:25
**cited** [6] - 9:15, 9:19, 9:21, 12:22, 26:18, 29:6
**citing** [3] - 10:24, 25:23, 26:2
**CITY** [1] - 2:5
**claim** [1] - 24:12
**claims** [3] - 24:9, 32:1, 36:21
**clarify** [1] - 10:21
**clarity** [2] - 8:21, 43:21
**class** [27] - 10:25, 11:1, 12:8, 12:9, 12:10, 12:11, 12:20, 12:25, 13:9, 13:18, 14:12, 14:25, 15:8, 17:15, 19:21, 20:6, 21:21, 22:10, 22:21, 23:9, 26:2, 26:23, 33:1, 34:3, 34:24, 39:24, 43:8
**clear** [8] - 12:20, 15:11, 28:6, 35:10, 39:17, 39:22, 41:7, 43:18
**clearly** [1] - 39:15
**cliff** [1] - 17:22
**close** [2] - 15:4, 44:20
**closer** [2] - 6:11, 6:19
**clouds** [1] - 30:1
**CODE** [1] - 48:13
**coexist** [1] - 27:1
**cogent** [2] - 21:18, 39:4
**coming** [1] - 30:2
**comment** [1] - 22:16
**companies** [3] - 18:23, 23:8, 42:21
**company** [13] - 11:25, 12:14, 13:21, 14:11, 14:22, 18:22, 19:14,

22:9, 22:25, 23:11, 23:13, 28:15, 44:24
**company's** [7] - 13:14, 14:20, 16:16, 17:14, 19:8, 20:1, 46:15
**comparative** [3] - 21:17, 42:12, 42:15
**compelling** [1] - 39:4
**complaint** [32] - 9:16, 9:22, 9:25, 10:5, 12:22, 12:23, 18:9, 18:21, 19:2, 19:3, 19:22, 21:14, 21:22, 22:8, 22:13, 24:9, 25:4, 25:11, 26:24, 30:13, 30:19, 31:16, 32:21, 33:12, 36:8, 37:16, 38:17, 39:23, 45:8, 45:12, 45:13, 45:24
**complaints** [2] - 22:4, 39:25
**completely** [1] - 28:3
**completeness** [1] - 9:13
**completion** [1] - 14:18
**complex** [1] - 10:8
**complicated** [1] - 38:8
**components** [1] - 39:20
**composition** [3] - 19:7, 19:15, 44:12
**comprised** [1] - 40:25
**concealment** [2] - 41:16, 41:17
**concept** [2] - 33:16, 34:11
**concepts** [1] - 35:11
**concerned** [1] - 32:17
**conclude** [1] - 45:8
**conclusions** [1] - 45:10
**conduct** [5] - 10:7, 21:17, 23:17, 24:13, 42:15
**CONFERENCE** [2] - 48:17, 48:20
**conflated** [1] - 35:12
**conflating** [1] - 34:8
**CONFORMANCE** [2] - 48:16, 48:19
**considered** [2] - 25:6, 27:19
**considers** [1] - 25:19
**consistent** [1] - 10:15
**consumers** [1] - 12:15
**contain** [1] - 27:12
**contained** [2] - 26:10, 30:18
**contemporaneous** [1] - 37:12
**contemporaneously** [1] - 39:24
**contents** [2] - 20:24, 30:15

**context** [7] - 10:14, 11:7, 11:17, 27:13, 28:3, 37:5, 44:8
**contingent** [1] - 18:6
**continue** [2] - 4:19, 17:16
**continuum** [1] - 10:11
**contradict** [1] - 11:16
**contradicting** [2] - 20:5, 26:23
**contradictory** [4] - 27:16, 28:4, 28:11, 31:23
**contrary** [1] - 25:10
**conveniently** [1] - 12:23
**converted** [1] - 8:12
**core** [11] - 18:16, 24:16, 28:15, 28:17, 32:5, 32:7, 32:9, 32:17, 33:16, 33:21, 34:11
**corporate** [1] - 18:25
**CORRECT** [1] - 48:14
**correct** [3] - 25:21, 43:20, 44:1
**corrective** [5] - 14:13, 43:20, 43:24, 43:25, 46:3
**correlative** [1] - 14:15
**cost** [2] - 23:13, 28:1
**COUNCIL** [1] - 2:5
**counsel** [12] - 5:2, 5:7, 25:22, 27:14, 29:6, 30:10, 32:4, 32:8, 36:13, 39:5, 41:24, 45:23
**counsel's** [1] - 25:10
**course** [7] - 10:6, 11:1, 28:8, 32:15, 32:19, 35:5, 44:23
**COURT** [76] - 1:1, 1:22, 4:3, 4:13, 4:17, 4:23, 5:3, 5:10, 5:13, 5:16, 5:20, 6:1, 6:6, 6:10, 6:15, 6:20, 6:24, 7:3, 7:19, 8:1, 8:9, 9:5, 9:18, 10:3, 11:11, 11:21, 13:25, 14:13, 15:9, 15:16, 15:23, 16:1, 16:10, 17:8, 17:18, 20:7, 20:10, 20:18, 21:3, 23:22, 24:5, 26:6, 31:3, 31:11, 33:13, 34:10, 34:19, 35:9, 35:23, 36:3, 36:9, 36:14, 36:24, 37:17, 37:21, 38:6, 38:20, 39:7, 39:19, 40:4, 40:8, 40:14, 41:9, 42:4, 42:21, 43:3, 43:18, 44:7, 44:13, 44:16, 45:19, 46:13, 46:18, 47:6, 48:10, 48:11

51

**Court** [12] - 8:22, 9:11, 11:9, 18:19, 21:15, 21:16, 25:1, 25:19, 36:6, 39:3, 42:13, 45:15
**court** [3] - 16:1, 36:15, 37:8
**Court's** [1] - 9:9
**COURTHOUSE** [1] - 1:23
**COURTROOM** [12] - 4:4, 4:15, 5:11, 5:15, 5:18, 5:21, 6:4, 6:8, 6:14, 7:6, 7:8, 24:2
**courts** [1] - 21:17
**crater** [1] - 28:21
**create** [3] - 14:14, 15:20, 23:6
**creating** [1] - 21:7
**credibility** [4] - 10:9, 10:14, 10:24, 37:6
**criticized** [1] - 25:17
**cross** [1] - 25:17
**crossed** [3] - 4:18, 10:12, 38:22
**crystal** [1] - 41:7
**curve** [1] - 33:19
**customers** [1] - 12:18
**CV** [4] - 1:10, 4:6, 7:9, 24:3

## D

**data** [10] - 15:10, 15:15, 19:14, 32:22, 34:20, 38:7, 38:18, 43:21, 44:24, 45:2
**DATE** [1] - 48:23
**deal** [1] - 39:9
**dealing** [3] - 10:6, 10:7
**DEAN** [1] - 1:5
**debit** [3] - 11:25, 12:4, 12:5
**deceive** [1] - 15:5
**deceleration** [1] - 23:10
**DECEMBER** [2] - 1:19, 4:1
**deciding** [1] - 25:6
**decision** [2] - 9:9, 21:16
**decline** [3] - 13:14, 14:15, 33:10
**declines** [5] - 24:16, 24:17, 31:1, 33:6, 45:25
**defendant** [1] - 32:20
**defendant's** [4] - 19:24, 24:10, 32:23, 33:7
**DEFENDANTS** [1] - 2:14
**defendants** [32] - 4:11, 4:22, 7:15,

11:2, 12:11, 12:24, 13:12, 14:8, 21:8, 21:24, 22:13, 22:15, 24:8, 24:11, 24:20, 25:20, 27:23, 28:4, 28:6, 29:17, 30:7, 30:12, 31:21, 32:10, 32:18, 32:25, 33:2, 33:5, 34:24, 42:2, 45:25, 46:6
**defendants'** [1] - 34:23
**Defense** [7] - 25:10, 25:22, 27:14, 29:6, 30:10, 32:4, 32:8
**defense** [1] - 27:5
**defined** [2] - 34:3, 34:4
**definition** [2] - 38:3, 39:15
**defraud** [3] - 13:11, 21:11, 23:15
**degree** [1] - 26:24
**deliberate** [3] - 21:11, 23:15, 41:16
**deliberately** [1] - 22:23
**demand** [2] - 17:15, 18:14
**denied** [1] - 36:20
**deny** [2] - 24:10, 24:19
**departure** [1] - 21:13
**DEPOSIT** [1] - 48:19
**deposit** [3] - 12:7, 19:9, 29:10
**DEPUTY** [12] - 4:4, 4:15, 5:11, 5:15, 5:18, 5:21, 6:4, 6:8, 6:14, 7:6, 7:8, 24:2
**described** [1] - 45:24
**describing** [1] - 16:14
**detail** [7] - 30:11, 30:17, 31:2, 44:4, 44:7, 44:10, 44:11
**detailed** [1] - 17:1
**details** [1] - 35:25
**Deutsche** [2] - 19:3, 29:5
**DIEGO** [3] - 2:7, 2:12, 2:18
**different** [5] - 7:24, 27:21, 40:15, 43:4, 46:22
**digital** [3] - 12:6, 12:13, 40:2
**direct** [4] - 12:6, 18:18, 19:9, 29:10
**direction** [1] - 15:21
**directly** [2] - 17:12, 18:13
**directs** [1] - 21:17
**disagree** [2] - 27:7, 41:4
**disappointment** [1] - 28:25
**disclose** [10] - 12:24,

15:18, 16:21, 19:19, 35:4, 35:7, 39:15, 40:7, 40:8, 40:24
**disclosed** [11] - 13:16, 14:22, 15:3, 22:20, 23:12, 27:3, 28:8, 28:20, 30:20, 34:25, 38:5
**disclosing** [1] - 33:4
**disclosure** [23] - 14:17, 14:20, 15:3, 18:17, 19:15, 19:16, 26:10, 26:11, 27:4, 28:14, 29:4, 29:8, 29:12, 29:14, 43:7, 43:9, 43:25, 44:18, 44:19, 44:22, 45:23, 46:1, 46:2
**disclosures** [17] - 17:14, 18:22, 27:10, 29:2, 31:6, 34:20, 37:5, 37:7, 37:9, 39:17, 41:7, 41:14, 41:18, 43:20, 43:25, 46:4, 46:5
**discovery** [5] - 20:17, 25:19, 31:25, 36:2, 38:21
**discussing** [1] - 44:9
**dismiss** [10] - 24:8, 24:19, 25:7, 25:24, 27:8, 28:23, 31:14, 34:23, 35:2, 35:6
**DISMISS** [2] - 1:17, 3:2
**dismissal** [1] - 45:18
**disparity** [1] - 18:18
**disputed** [1] - 13:19
**disregarding** [1] - 31:4
**DISTRICT** [5] - 1:1, 1:2, 1:5, 48:11
**DIVISION** [1] - 1:3
**DO** [1] - 48:12
**doctrine** [2] - 10:2, 32:6
**document** [3] - 9:10, 9:21, 10:1
**documents** [14] - 9:12, 9:13, 9:15, 9:19, 10:2, 10:16, 10:22, 12:21, 16:23, 20:14, 25:11, 27:12, 37:2, 37:4
**dollars** [2] - 22:10, 42:18
**dominating** [1] - 47:2
**done** [4] - 9:8, 10:18, 12:16, 27:8
**Dot** [8] - 4:7, 4:11, 4:20, 7:9, 7:15, 11:24, 24:3, 26:1
**DOT** [2] - 1:7, 2:15
**Dot's** [3] - 13:4, 13:5, 24:16
**Dowd** [1] - 7:17

**DOWD** [2] - 2:5, 2:9
**down** [4] - 16:3, 16:5, 19:20, 42:8
**dozen** [2] - 11:2, 16:6
**draw** [1] - 45:15
**driven** [2] - 46:19, 46:20
**drop** [3] - 17:20, 29:1, 35:20
**dropped** [3] - 22:1, 41:25, 42:2
**due** [1] - 28:1
**dump** [1] - 42:7
**during** [7] - 17:15, 20:6, 21:21, 22:10, 26:1, 29:14, 39:24
**duty** [1] - 15:18

## E

**e-mail** [1] - 5:6
**earning** [1] - 33:19
**earnings** [6] - 12:19, 13:23, 14:10, 14:18, 20:2, 38:13
**economics** [1] - 46:5
**effect** [2] - 34:13, 37:18
**effective** [2] - 7:4, 8:23
**either** [2] - 11:14, 45:20
**element** [1] - 23:4
**elucidate** [1] - 30:20
**encompass** [1] - 8:20
**end** [4] - 14:25, 15:8, 19:18, 22:20
**ended** [3] - 16:15, 22:17, 33:3
**engaging** [1] - 12:12
**enterprise** [1] - 33:17
**entirely** [1] - 16:11
**entirety** [1] - 9:12
**ENTITLED** [1] - 48:15
**entitled** [3] - 10:2, 11:5, 31:24
**enunciate** [1] - 8:2
**erosion** [7] - 14:20, 15:1, 15:2, 22:18, 23:11, 43:9, 44:19
**ESQ** [3] - 2:5, 2:10, 2:16
**essentially** [3] - 34:17, 35:14, 37:23
**established** [2] - 11:5, 13:5
**estimate** [1] - 43:16
**evaluate** [1] - 25:1
**eventually** [1] - 38:5
**evolved** [2] - 12:3
**exactly** [2] - 38:2, 40:15
**example** [8] - 12:5, 12:21, 17:19, 24:11, 27:14, 27:17, 31:8, 40:13

**examples** [1] - 18:20
**excellent** [1] - 33:25
**except** [1] - 13:23
**exceptions** [1] - 8:18
**excerpt** [1] - 31:17
**excerpting** [1] - 29:19
**executive** [1] - 38:10
**exhibit** [1] - 25:15
**Exhibit** [4] - 19:1, 19:3, 25:13
**exhibits** [3] - 8:13, 25:23, 26:16
**Exhibits** [3] - 18:19, 18:20, 25:14
**exist** [1] - 45:3
**existed** [1] - 30:4
**existing** [3] - 15:19, 17:16, 18:14
**expectation** [1] - 13:3
**expectations** [2] - 8:14, 46:20
**explain** [1] - 39:19
**explanation** [1] - 45:7
**explicitly** [4] - 9:15, 12:24, 18:23, 40:3
**explosive** [1] - 33:24
**extent** [12] - 10:15, 25:19, 27:23, 28:7, 28:9, 28:14, 28:23, 29:10, 30:4, 31:21, 33:2, 36:5
**extreme** [1] - 21:12
**extrinsic** [2] - 27:17, 29:7

## F

**F.Supp.32** [1] - 32:16
**face** [1] - 27:20
**fact** [7] - 21:24, 22:8, 26:9, 30:9, 34:22, 40:21, 46:22
**factor** [1] - 42:12
**factors** [1] - 46:22
**facts** [11] - 19:21, 21:7, 23:6, 23:16, 27:3, 37:12, 38:17, 38:24, 41:20, 45:7, 45:12
**factual** [3] - 13:24, 16:24, 19:23
**failure** [4] - 16:21, 18:17, 19:19
**fair** [2] - 10:5, 47:6
**fairness** [1] - 20:11
**faith** [1] - 23:9
**fallen** [1] - 17:22
**false** [22] - 11:3, 13:20, 15:14, 15:20, 16:7, 16:9, 16:16, 16:17, 18:1, 18:3, 18:10, 21:9, 30:9, 30:25, 35:13, 37:14, 40:24, 43:11, 43:14, 43:15, 45:1, 45:4

**falsity** [2] - 23:3, 23:4
**far** [2] - 6:20, 20:15
**fast** [1] - 19:24
**fast-forward** [1] - 19:24
**February** [1] - 46:2
**FEE** [1] - 48:18
**fees** [1] - 12:1
**FEES** [1] - 48:18
**few** [1] - 23:20
**Feyko** [1] - 24:25
**figure** [1] - 38:13
**financial** [3] - 11:24, 13:21, 44:2
**fine** [2] - 23:22, 26:6
**first** [17] - 4:4, 9:3, 12:2, 12:10, 12:25, 14:19, 15:1, 15:3, 19:6, 20:1, 22:17, 44:5, 44:18, 44:21, 46:1
**five** [3] - 14:24, 22:20, 39:16
**focus** [1] - 8:7
**folks** [1] - 4:20
**FOR** [3] - 48:10, 48:11, 48:18
**forced** [1] - 33:7
**forecast** [5] - 23:1, 23:9, 23:14, 44:25, 45:1
**forecasts** [1] - 45:4
**FOREGOING** [1] - 48:13
**forgets** [1] - 22:8
**format** [1] - 17:6
**FORMAT** [1] - 48:16
**forth** [2] - 38:22, 41:7
**forward** [14] - 16:22, 17:2, 17:4, 17:6, 17:17, 18:4, 18:15, 19:24, 25:12, 28:13, 29:16, 29:17, 29:18, 30:4
**forward-alleging** [1] - 17:4
**forward-looking** [7] - 17:2, 17:6, 18:4, 29:16, 29:17, 29:18, 30:4
**fraction** [1] - 21:23
**frankly** [1] - 41:23
**fraud** [15] - 10:25, 13:10, 13:11, 21:19, 22:22, 23:6, 23:17, 38:3, 38:7, 39:5, 41:21, 42:16, 45:13, 45:16
**fraudulent** [1] - 23:18
**fraudulently** [1] - 21:10
**free** [8] - 28:19, 29:10, 34:6, 34:7, 46:8, 46:15, 47:3
**freestanding** [1] - 15:18

**frustration** [1] - 29:5
**FUND** [1] - 2:6

## G

**game** [1] - 10:5
**GELLAR** [2] - 2:4, 2:9
**Geller** [1] - 7:17
**general** [2] - 39:13, 41:11
**generate** [3] - 12:15, 12:19, 33:23
**generated** [1] - 13:6
**given** [2] - 37:21, 43:14
**grant** [1] - 37:11
**GREEN** [2] - 1:7, 2:15
**Green** [11] - 4:7, 4:11, 4:20, 7:9, 7:15, 11:24, 13:4, 13:5, 24:3, 24:16, 26:1
**ground** [1] - 32:14
**grouped** [3] - 40:17, 40:18, 40:21
**grouping** [2] - 34:13, 44:9
**growth** [10] - 13:22, 13:24, 14:21, 20:2, 33:24, 34:6, 40:1, 40:12, 40:14, 46:21
**guess** [3] - 15:12, 30:11, 42:1
**guidance** [7] - 14:23, 19:25, 22:21, 43:10, 43:13, 44:23

## H

**half** [1] - 25:11
**hands** [2] - 33:7, 38:9
**hands-on** [1] - 38:9
**happy** [3] - 7:1, 8:7, 23:19
**harbor** [2] - 17:4, 18:11
**hard** [1] - 7:21
**hear** [12] - 4:20, 4:23, 4:25, 5:4, 6:9, 6:12, 6:18, 6:23, 7:21, 8:4, 8:25
**heard** [2] - 5:8, 39:5
**HEARING** [2] - 1:17, 3:2
**hearing** [1] - 7:4
**heightened** [1] - 20:25
**HELD** [1] - 48:15
**held** [1] - 21:25
**helpful** [1] - 32:14
**HEREBY** [1] - 48:12
**HERRINGTON** [1] - 2:15
**hide** [1] - 33:5
**high** [4] - 12:1, 23:5, 23:11, 44:20

**higher** [3] - 40:18, 40:19, 44:12
**highly** [2] - 40:20, 42:12
**hindsight** [3] - 38:4, 38:7, 45:17
**historical** [1] - 16:19, 43:21
**history** [1] - 20:1
**hold** [2] - 22:5, 23:1
**holdings** [1] - 21:24
**Honor** [57] - 4:9, 4:21, 5:1, 5:5, 6:25, 7:12, 7:16, 7:23, 8:5, 9:1, 9:14, 9:20, 11:23, 14:23, 15:13, 17:23, 20:16, 23:18, 24:6, 24:18, 24:24, 25:6, 25:7, 25:8, 26:13, 27:19, 28:24, 30:12, 30:16, 31:7, 31:14, 31:16, 31:18, 31:19, 32:7, 32:12, 33:25, 34:16, 36:1, 36:5, 36:11, 36:17, 37:6, 37:20, 38:1, 38:16, 39:14, 40:6, 41:3, 41:12, 41:21, 42:25, 43:6, 45:9, 45:21, 46:11, 46:25
**HONORABLE** [1] - 1:5
**hope** [1] - 12:14
**hopeful** [1] - 7:25
**HOTEL** [2] - 2:4, 2:5
**HOWARD** [1] - 2:17
**hugely** [1] - 39:12
**hundred** [2] - 22:9, 42:17
**hunting** [1] - 29:13
**hypothetically** [2] - 17:19, 17:22

## I

**idea** [2] - 6:2, 33:16
**ignore** [2] - 37:6, 37:10
**impacted** [1] - 14:9
**implication** [1] - 43:12
**important** [5] - 8:16, 26:5, 32:6, 34:1
**importantly** [1] - 41:15
**imposes** [1] - 20:17
**impossible** [1] - 20:14
**impression** [3] - 15:21, 35:13, 40:24
**improper** [1] - 35:16
**IN** [6] - 1:7, 4:3, 48:10, 48:15, 48:16, 48:19
**INC** [1] - 2:5
**inches** [1] - 6:21
**included** [6] - 17:14, 21:21, 24:22, 35:1, 37:3, 37:4
**includes** [3] - 39:18,

40:1, 40:5
**including** [2] - 24:14, 46:7
**income** [1] - 12:19
**inconsistent** [3] - 10:15, 11:15, 23:18
**incorporation** [1] - 10:1
**increase** [4] - 14:1, 14:3, 46:23
**increased** [1] - 46:16
**increases** [1] - 46:20
**increasingly** [1] - 47:2
**incremental** [4] - 14:2, 28:16, 46:20, 46:23
**indicated** [1] - 15:10
**individual** [2] - 19:23, 32:25
**indulge** [1] - 28:24
**industry** [1] - 12:3
**inevitable** [4] - 14:7, 14:8, 22:3, 45:5
**inevitably** [2] - 13:14, 22:14
**inference** [13] - 21:8, 21:19, 23:6, 23:7, 28:10, 28:12, 31:24, 32:20, 32:23, 39:4, 41:21, 45:15, 45:17
**inferences** [5] - 21:16, 38:22, 39:2, 39:3, 42:13
**inflated** [2] - 22:11, 42:19
**inform** [1] - 22:24
**information** [16] - 11:3, 16:17, 16:19, 19:14, 23:2, 30:8, 32:2, 32:11, 32:18, 33:4, 38:15, 43:22, 44:1, 44:2, 44:24, 46:4
**initiative** [1] - 19:17
**initiatives** [1] - 18:24
**innuendo** [1] - 45:9
**insider** [1] - 21:20
**insiders** [2] - 20:23, 21:24
**instances** [1] - 9:10
**instant** [1] - 38:14
**instead** [1] - 15:7
**instructs** [1] - 42:13
**insufficient** [1] - 20:25
**intent** [4] - 13:11, 21:11, 22:22, 23:18
**inter** [1] - 11:14
**inter-relate** [1] - 11:14
**interesting** [1] - 13:17
**internal** [3] - 15:15, 20:3, 20:4
**International** [1] - 24:25
**interrupt** [1] - 43:19
**investors** [12] - 11:9, 12:11, 13:2, 14:2,

15:4, 17:15, 23:16, 33:19, 33:20, 34:20, 35:12, 43:11
**involve** [3] - 10:8, 10:9, 10:10
**involved** [1] - 19:17
**IS** [2] - 48:13, 48:16
**issue** [9] - 5:8, 5:22, 11:22, 25:5, 28:2, 36:24, 39:9, 40:16, 42:9
**issues** [8] - 5:23, 7:2, 8:7, 8:9, 11:19, 17:12, 17:24, 31:25
**IT** [2] - 5:7, 7:2
**item** [3] - 4:6, 7:8, 24:3
**itself** [3] - 22:9, 24:10, 35:16

## J

**James** [1] - 4:11
**JENSEN** [19] - 2:5, 6:13, 6:17, 6:23, 7:16, 7:22, 24:6, 26:13, 31:7, 31:12, 33:25, 34:16, 34:22, 35:17, 36:1, 36:4, 41:12, 45:21, 47:8
**Jensen** [9] - 5:6, 5:9, 6:9, 6:12, 7:2, 7:4, 7:17, 24:5, 41:11
**Jensen's** [1] - 41:11
**Jim** [1] - 7:14
**job** [1] - 9:8
**JUDGE** [1] - 1:5
**judgment** [5] - 8:12, 8:17, 10:13, 25:18, 27:2
**JUDICIAL** [2] - 48:17, 48:20
**judicial** [5] - 9:24, 25:8, 25:12, 26:3, 35:3
**judicially** [2] - 21:22, 41:19
**jut** [1] - 27:24

## K

**keep** [3] - 15:6, 16:2, 22:19
**key** [1] - 24:15
**Khoja** [1] - 25:17
**KINNON** [1] - 2:10
**knowledge** [1] - 19:24
**known** [4] - 37:23, 38:4, 38:9, 45:5
**knows** [1] - 25:8
**Kramer** [5] - 4:11, 4:23, 4:24, 4:25, 7:14
**KRAMER** [1] - 5:1

52

53

## L

**labeling** [1] - 34:12
**lack** [4] - 18:17, 30:10, 41:23, 45:11
**laid** [1] - 17:5
**land** [1] - 10:13
**language** [5] - 17:7, 17:11, 18:5, 18:7, 18:13
**large** [2] - 13:7, 14:10
**largely** [1] - 26:22
**largest** [2] - 22:1, 42:1
**last** [3] - 7:23, 13:23, 43:7
**lastly** [1] - 32:3
**law** [4] - 10:19, 11:4, 16:18, 18:8
**lazy** [1] - 13:4
**lead** [2] - 13:14, 40:24
**leading** [1] - 15:21
**least** [5] - 25:15, 26:20, 41:22, 44:18, 45:25
**led** [1] - 46:8
**left** [2] - 19:18, 35:12
**legacy** [12] - 14:21, 15:2, 17:16, 18:14, 19:8, 19:11, 19:17, 22:19, 33:14, 33:20, 35:10, 40:3
**legal** [1] - 16:24
**LESS** [1] - 48:18
**less** [2] - 35:11, 41:2
**liability** [1] - 24:12
**lifetime** [1] - 12:15
**light** [1] - 45:2
**likely** [1] - 40:23
**limited** [2] - 29:3, 35:22
**line** [8] - 10:12, 13:15, 14:8, 19:20, 25:17, 26:18, 26:19, 38:23
**lines** [3] - 13:3, 13:5, 13:7
**literal** [1] - 26:8
**Litigation** [3] - 4:7, 7:10, 24:4
**LITIGATION** [1] - 1:7
**litigation** [1] - 17:4
**LLP** [3] - 2:5, 2:9, 2:15
**log** [2] - 6:2, 6:3
**logged** [2] - 5:23
**look** [15] - 8:10, 9:11, 9:22, 10:5, 11:6, 15:24, 16:2, 25:24, 30:12, 36:24, 37:7, 37:24, 39:14, 42:7, 45:12
**looking** [8] - 8:11, 17:2, 17:6, 18:4, 29:16, 29:17, 29:18, 30:4
**looks** [2] - 6:4, 45:14
**LOS** [3] - 1:18, 1:24,

4:1
**losers** [1] - 42:1
**losses** [3] - 22:2, 33:7, 42:17
**Louis** [1] - 21:2
**low** [1] - 42:25
**lower** [5] - 12:17, 13:6, 18:24, 19:17, 40:19
**lowered** [1] - 44:17
**lumped** [2] - 34:5, 35:15

## M

**mail** [1] - 5:6
**majority** [4] - 14:12, 21:25, 29:9, 46:8
**manipulation** [1] - 24:15
**March** [1] - 22:18
**margin** [7] - 17:17, 23:11, 27:14, 35:10, 40:19, 44:12, 44:20
**marginally** [2] - 39:11, 41:1
**margins** [13] - 12:1, 12:17, 13:3, 13:5, 13:6, 18:15, 18:18, 18:24, 19:17, 27:22, 27:24, 27:25
**MARIA** [3] - 1:21, 48:10, 48:23
**MARK** [1] - 2:15
**Mark** [2] - 4:12, 7:15
**market** [9] - 11:4, 22:25, 27:5, 27:7, 28:22, 28:24, 29:24, 46:9, 46:19
**Mart** [1] - 12:6
**massive** [2] - 22:2, 42:16
**match** [1] - 17:20
**material** [2] - 30:18, 40:25
**materiality** [1] - 14:3
**materialized** [1] - 30:1
**materially** [1] - 13:6
**materials** [6] - 25:20, 26:2, 26:21, 27:18, 27:23, 29:7
**MATTER** [1] - 48:15
**matter** [9] - 4:4, 7:1, 7:5, 8:21, 13:24, 18:7, 26:7, 42:5
**matters** [1] - 10:23
**mean** [4] - 15:25, 31:7, 34:11, 43:12
**meaning** [2] - 11:17, 44:7
**meaningful** [4] - 29:22, 30:3, 43:23
**means** [3] - 11:10, 16:2, 43:15
**meant** [1] - 39:20
**meet** [1] - 20:25

**mention** [1] - 32:5
**mentioned** [1] - 27:15
**merge** [2] - 39:9, 39:10
**merging** [1] - 39:7
**merits** [1] - 32:1
**metric** [1] - 24:15
**metrics** [2] - 33:8, 34:2
**mic** [3] - 6:19, 6:20, 7:23
**microphone** [1] - 6:11
**might** [7] - 6:8, 6:21, 10:19, 18:15, 19:20, 33:23, 43:4
**million** [2] - 22:9, 42:17
**millions** [1] - 42:3
**mind** [1] - 14:23
**minimum** [1] - 21:11
**minute** [1] - 23:24
**minutes** [2] - 23:20, 23:23
**mischaracterization** [1] - 41:6
**mislead** [1] - 15:19
**misleading** [17] - 11:3, 15:14, 16:8, 16:20, 18:1, 18:3, 18:10, 24:14, 24:21, 26:17, 30:9, 31:20, 35:18, 35:19, 37:14, 43:12, 45:2
**misreported** [1] - 44:3
**misrepresentation** [3] - 25:2, 25:4, 34:13
**miss** [1] - 14:10
**missed** [1] - 32:5
**misstatements** [3] - 16:7, 16:25, 37:13
**mistook** [1] - 4:18
**mix** [1] - 47:2
**mixed** [2] - 12:13, 13:13
**model** [1] - 29:13
**models** [1] - 33:23
**modern** [1] - 38:14
**moment** [1] - 6:8
**MONDAY** [2] - 1:19, 4:1
**monitor** [1] - 8:11
**months** [10] - 10:7, 13:15, 14:24, 15:8, 19:20, 19:24, 22:20, 43:8, 45:6
**morning** [4] - 4:9, 4:13, 7:12, 7:16
**motion** [20] - 8:12, 24:8, 24:10, 24:19, 25:3, 25:6, 25:18, 25:24, 27:2, 27:8, 28:23, 31:14, 34:23, 35:2, 35:6, 36:20, 37:11, 39:16, 39:17, 41:8

**MOTION** [2] - 1:17, 3:2
**motivates** [1] - 42:11
**mouth** [2] - 15:6, 32:23
**move** [5] - 8:6, 24:8, 36:20, 41:4, 43:6
**moving** [2] - 5:4, 8:4
**MR** [50] - 4:9, 4:21, 5:1, 5:5, 5:22, 6:25, 7:12, 8:5, 9:1, 9:6, 9:20, 10:21, 11:20, 11:23, 14:5, 14:17, 15:12, 15:17, 15:24, 16:4, 16:13, 17:10, 17:23, 20:9, 20:16, 20:21, 21:5, 36:11, 36:17, 37:1, 37:19, 38:1, 38:16, 39:1, 39:14, 39:21, 40:6, 40:11, 41:3, 41:13, 42:11, 42:24, 43:6, 43:24, 44:10, 44:14, 44:17, 46:11, 46:14, 46:25
**MS** [18] - 6:13, 6:17, 6:23, 7:16, 7:22, 24:6, 26:13, 31:7, 31:12, 33:25, 34:16, 34:22, 35:17, 36:1, 36:4, 41:12, 45:21, 47:8
**multiple** [1] - 27:21
**must** [4] - 21:6, 38:4, 38:19, 45:15

## N

**NAME** [1] - 48:5
**nature** [1] - 37:21
**nearly** [1] - 34:7
**necessarily** [1] - 27:20
**necessary** [1] - 9:9
**need** [4] - 6:18, 10:20, 21:3, 25:24
**negative** [3] - 20:22, 31:4, 44:19
**negatively** [1] - 14:9
**negligence** [1] - 39:5
**negligent** [1] - 13:11
**negligently** [1] - 21:9
**never** [1] - 11:13
**new** [22] - 13:3, 13:7, 14:21, 18:15, 18:25, 19:8, 19:9, 19:10, 19:16, 23:1, 28:16, 29:4, 29:9, 35:1, 35:11, 35:22, 40:2, 44:24, 46:6, 46:7
**NEW** [2] - 2:4, 2:5
**newer** [2] - 18:23, 44:14
**next** [5] - 7:5, 7:23, 20:20, 26:19, 28:21
**nine** [1] - 24:21
**Ninth** [5] - 16:18,

20:22, 23:5, 25:16, 37:8
**non** [1] - 41:1
**non-profitable** [1] - 41:1
**nondiscretionary** [1] - 22:7
**none** [1] - 9:8
**note** [4] - 5:6, 25:1, 30:22, 32:4
**noted** [2] - 22:15, 24:24
**nothing** [1] - 23:14
**notice** [5] - 9:24, 25:8, 25:12, 26:3, 29:25
**noticeable** [2] - 21:22, 41:19
**notices** [1] - 14:14
**notion** [3] - 14:6, 25:22, 46:14
**notwithstanding** [2] - 38:16, 46:17
**November** [2] - 13:16, 14:10
**number** [13] - 4:6, 7:9, 24:3, 26:16, 27:12, 28:15, 28:18, 29:20, 29:25, 40:23, 40:25
**numbers** [3] - 26:3, 40:5, 40:19

## O

**objection** [1] - 28:5
**obligation** [1] - 25:1
**obscure** [2] - 33:10, 34:8
**obscured** [2] - 24:16, 33:7
**obviously** [3] - 27:19, 32:18, 46:6
**occurred** [2] - 32:25, 33:6
**OF** [10] - 1:2, 1:16, 2:4, 2:14, 48:11, 48:14, 48:17, 48:20
**offered** [1] - 47:3
**offerings** [1] - 24:18
**OFFICIAL** [3] - 1:22, 48:10, 48:23
**offset** [2] - 13:6, 33:11
**old** [3] - 19:17, 35:1, 44:25
**older** [1] - 44:20
**omission** [3] - 15:17, 15:19, 16:8
**omissions** [1] - 15:16
**omits** [1] - 22:8
**omitted** [2] - 11:4, 12:23
**ON** [2] - 2:4, 2:14
**once** [1] - 29:4
**one** [23] - 4:6, 6:15, 7:9, 9:13, 9:14, 9:18, 10:15, 12:16, 12:21,

54

16:23, 17:21, 18:16, 24:3, 25:3, 25:21, 25:23, 26:16, 27:12, 28:15, 29:20, 29:25, 39:8, 46:11
**ones** [1] - 8:16
**opening** [2] - 9:11, 17:1
**operated** [1] - 37:22
**operation** [1] - 32:17
**operations** [1] - 32:6
**operative** [1] - 9:16
**opportunity** [1] - 36:7
**oppose** [1] - 25:9
**opposed** [2] - 26:8, 27:3
**opposition** [2] - 25:7, 31:13
**oral** [1] - 10:9
**order** [1] - 31:15
**ordinary** [1] - 21:13
**originally** [1] - 11:25
**ORRICK** [2] - 2:15, 2:17
**otherwise** [3] - 8:8, 15:6, 23:20
**outset** [1] - 24:7
**outside** [1] - 8:19
**over-price** [1] - 43:1
**over-valued** [1] - 43:1
**overvalued** [1] - 22:12
**own** [3] - 22:10, 32:23, 42:2

## P

**PAGE** [2] - 3:2, 48:16
**page** [11] - 8:15, 17:1, 19:4, 19:5, 25:25, 27:17, 27:21, 39:16, 40:13
**pages** [4] - 9:5, 9:6, 9:23, 28:12
**pagination** [1] - 19:5
**paint** [1] - 23:16
**panelist** [1] - 5:25
**paper** [1] - 38:12
**papers** [2] - 9:3, 41:18
**paragraph** [3] - 9:25, 19:2
**paragraphs** [5] - 20:2, 24:22, 30:13, 30:24, 37:15
**parallels** [1] - 32:13
**part** [4] - 24:22, 24:23, 35:18
**partial** [1] - 46:2
**participant** [1] - 5:24
**particular** [6] - 11:17, 19:1, 20:5, 21:15, 23:5, 33:20
**particularized** [1] - 19:23
**particularly** [1] - 8:23
**parties** [1] - 4:7

**partner** [2] - 4:10, 7:13
**parts** [2] - 29:19, 35:3
**party** [3] - 5:4, 8:4, 45:20
**pass** [1] - 7:1
**past** [1] - 29:21
**patented** [1] - 16:2
**pattern** [1] - 15:11
**Pause** [1] - 7:7
**paying** [2] - 33:21, 35:24
**PENSION** [1] - 2:6
**people** [3] - 11:14, 15:7, 46:21
**per** [1] - 22:4
**perceive** [1] - 46:21
**percent** [10] - 19:11, 19:12, 19:13, 29:1, 35:19, 41:1, 41:25, 42:2
**percentage** [1] - 19:10
**percentages** [1] - 40:9
**performance** [1] - 24:15
**perhaps** [1] - 10:7
**period** [26] - 11:1, 12:8, 12:9, 12:10, 12:11, 12:21, 12:25, 13:9, 13:18, 14:12, 14:25, 15:8, 17:15, 19:21, 20:6, 21:21, 22:10, 22:21, 23:10, 26:2, 26:23, 33:1, 34:3, 34:24, 39:24, 43:8
**permit** [1] - 38:23
**permits** [1] - 37:8
**persuaded** [1] - 36:6
**phase** [1] - 16:21
**phone** [1] - 34:21
**phones** [1] - 12:7
**phrases** [1] - 11:18
**pick** [1] - 23:24
**picked** [1] - 27:11
**picking** [2] - 31:4, 31:8
**picture** [2] - 23:17, 33:14
**piece** [2] - 35:7, 43:7
**pieces** [3] - 29:11, 29:21, 35:7
**plaintiff** [4] - 5:7, 7:18, 9:16, 11:7
**PLAINTIFF** [1] - 48:5
**plaintiff's** [1] - 17:12
**plaintiffs** [4] - 13:19, 20:7, 25:2, 26:18
**PLAINTIFFS** [1] - 2:4
**plan** [1] - 22:7
**plead** [2] - 21:7, 37:13
**pleading** [2] - 20:25, 31:19
**pleadings** [1] - 8:19
**pled** [1] - 41:20
**PLSRA** [2] - 37:12,

45:18
**plus** [1] - 40:3
**point** [25] - 13:2, 17:5, 17:12, 18:13, 20:20, 21:14, 23:15, 24:7, 25:10, 26:6, 26:12, 26:14, 27:4, 27:14, 27:20, 28:21, 31:15, 31:19, 33:5, 33:10, 36:25, 39:22, 46:10, 46:12, 46:25
**pointed** [2] - 31:13, 37:15
**points** [1] - 36:12
**police** [1] - 21:1
**portfolio** [1] - 47:2
**portion** [3] - 9:18, 9:21, 16:13
**portions** [3] - 31:4, 31:5, 41:19
**possible** [1] - 23:21
**potential** [2] - 33:18, 33:22
**pouring** [1] - 30:2
**powerful** [3] - 21:7, 21:19, 39:4
**precedent** [1] - 37:8
**precipitous** [1] - 17:19
**PREGERSON** [1] - 1:5
**premise** [1] - 16:24
**prepaid** [7] - 11:25, 12:4, 12:16, 12:18, 14:21, 22:19, 33:15
**present** [2] - 8:23, 29:20
**PRESIDING** [1] - 1:5
**pretty** [1] - 37:25
**price** [9] - 14:15, 22:1, 22:12, 41:25, 42:1, 42:22, 42:25, 43:1
**prices** [2] - 22:11, 42:19
**principle** [1] - 39:13
**private** [1] - 17:3
**proceeding** [1] - 47:9
**proceedings** [1] - 7:7
**PROCEEDINGS** [2] - 1:16, 48:15
**product** [9] - 12:12, 13:1, 13:7, 13:13, 19:10, 19:16, 33:20, 35:14
**products** [24] - 12:14, 13:4, 17:16, 18:14, 18:15, 19:8, 19:9, 19:10, 19:11, 19:18, 28:19, 29:4, 29:9, 33:14, 34:7, 35:1, 35:10, 35:11, 35:22, 40:3, 41:2, 46:6, 46:7, 47:1
**profitability** [3] - 24:17, 35:10, 40:19
**profitable** [7] - 39:11, 39:12, 40:20, 41:1, 41:2

**profiting** [1] - 26:22
**profits** [1] - 34:9
**programs** [1] - 13:1
**prop** [1] - 42:22
**protected** [1] - 17:3
**provide** [5] - 31:5, 34:21, 37:5, 43:21, 44:4
**provided** [3] - 34:20, 43:11, 43:15
**pruning** [1] - 29:19
**PSLRA** [2] - 18:3, 21:1
**purchase** [1] - 12:5
**purported** [1] - 28:14
**purportedly** [1] - 29:16
**pursuant** [1] - 22:7
**PURSUANT** [1] - 48:12
**put** [5] - 7:5, 25:12, 27:7, 29:11, 29:24
**putting** [3] - 9:6, 16:24, 23:3
**puzzle** [1] - 31:19

## Q

**Q1** [2] - 15:4, 22:17
**Q3** [1] - 13:23
**qualifiers** [1] - 11:18
**qualify** [1] - 13:8
**quarter** [16] - 13:9, 13:18, 13:22, 13:23, 14:19, 16:14, 16:15, 19:7, 22:17, 40:7, 44:5, 44:21, 46:16
**quarter-by-quarter** [1] - 16:15
**quarters** [1] - 13:15
**questions** [3] - 18:4, 23:19, 30:20
**quick** [2] - 45:23, 46:12
**quickly** [3] - 36:12, 37:2, 46:4
**quiet** [2] - 22:19, 22:24
**quintessential** [1] - 27:5
**quote** [7] - 12:23, 13:2, 18:23, 18:24, 20:22, 30:15, 41:18
**quoted** [3] - 19:1, 32:21

## R

**RACHEL** [1] - 2:5
**Rachel** [2] - 5:6, 7:17
**rain** [1] - 30:1
**raise** [1] - 26:15
**raised** [2] - 17:12, 40:16
**rate** [1] - 14:1

**rather** [1] - 14:24
**ratios** [1] - 46:21
**RE** [3] - 1:7, 1:17, 3:2
**Re** [3] - 4:7, 7:9, 24:3
**reacted** [1] - 28:24
**reaction** [1] - 46:9
**read** [1] - 27:1
**readily** [1] - 38:8
**realistic** [1] - 8:14
**really** [9] - 8:20, 10:3, 29:24, 33:16, 34:10, 34:14, 40:22, 42:8, 43:13
**realtime** [3] - 15:10, 37:23, 37:25
**reason** [5] - 7:24, 24:10, 24:18, 25:14, 35:18
**reasonably** [1] - 43:14
**reasons** [1] - 43:4
**rebuild** [1] - 29:13
**received** [2] - 5:6, 23:2
**recess** [1] - 23:24
**Recess** [1] - 24:1
**reckless** [2] - 22:23, 30:9
**recklessness** [1] - 21:12
**recognized** [1] - 41:22
**recognizing** [1] - 10:11
**record** [2] - 24:2, 35:5
**REDUCTION** [1] - 48:19
**reference** [2] - 10:1, 20:24
**referenced** [1] - 10:4
**references** [1] - 20:2
**referring** [1] - 31:10
**Reform** [3] - 17:4, 19:22, 20:17
**refuge** [1] - 30:5
**regard** [1] - 30:3
**regular** [1] - 42:14
**REGULATIONS** [2] - 48:16, 48:20
**relate** [2] - 11:14, 31:22
**related** [1] - 32:7
**relative** [1] - 40:9
**relevant** [2] - 41:18, 42:12
**relied** [5] - 9:15, 9:19, 9:22, 19:2, 20:23
**relies** [2] - 18:21, 39:24
**remarks** [1] - 32:9
**reminder** [1] - 17:8
**render** [1] - 15:19
**rendered** [2] - 15:14, 16:20
**repeatedly** [1] - 23:12
**reply** [2] - 9:23, 36:22
**report** [2] - 19:4, 29:6
**REPORTED** [1] -

48:14

**reporter** [2] - 16:1, 36:15

**REPORTER** [3] - 1:22, 48:10, 48:23

**REPORTER'S** [1] - 1:16

**reporting** [2] - 16:17, 16:19

**reports** [12] - 18:21, 20:3, 20:4, 20:8, 20:23, 20:25, 29:2, 30:11, 30:14, 30:18, 39:23, 39:25

**repurchase** [1] - 42:21

**repurchased** [1] - 42:17

**request** [4] - 9:23, 25:8, 25:12, 26:3

**require** [1] - 45:18

**requirement** [2] - 21:6

**requirements** [1] - 21:1

**requires** [3] - 19:22, 21:12, 39:2

**reserve** [1] - 23:20

**resignations** [1] - 32:24

**resolved** [1] - 5:9

**respect** [2] - 36:19, 37:1

**respond** [1] - 46:11

**response** [1] - 41:13

**restatement** [1] - 13:20

**result** [1] - 14:22

**retirement** [1] - 21:2

**revealed** [2] - 13:16, 35:20

**revenue** [5] - 12:16, 13:22, 46:15, 46:23, 47:3

**revise** [2] - 19:25, 23:14

**revised** [1] - 22:21

**revising** [2] - 14:23, 43:9

**revision** [1] - 44:23

**rich** [1] - 13:4

**rise** [1] - 21:18

**risk** [3] - 17:13, 18:1, 18:2

**risks** [1] - 29:25

**RJN** [1] - 19:6

**ROBBINS** [2] - 2:4, 2:9

**Robbins** [1] - 7:17

**rosy** [1] - 16:21

**Rudman** [1] - 7:17

**RUDMAN** [2] - 2:4, 2:9

**rule** [1] - 24:12

**rules** [2] - 8:18, 8:20

**S**

**safe** [3] - 17:4, 18:11, 30:5

**sake** [1] - 9:12

**sales** [2] - 22:6, 33:1

**SAN** [3] - 2:7, 2:12, 2:18

**sandwiched** [1] - 27:15

**saw** [1] - 32:13

**scale** [1] - 13:7

**scaling** [2] - 27:25, 28:1

**scheme** [1] - 24:12

**scienter** [5] - 21:6, 23:4, 32:4, 42:6, 42:9

**scope** [2] - 28:9, 35:5

**screen** [5] - 5:17, 5:19, 6:6, 37:24

**second** [1] - 7:5

**secret** [1] - 23:13

**SECTION** [1] - 48:12

**Section** [1] - 15:18

**Securities** [3] - 4:7, 7:9, 24:4

**SECURITIES** [1] - 1:7

**securities** [2] - 10:25, 17:3

**see** [8] - 6:6, 10:15, 18:10, 27:22, 28:20, 35:4, 37:9, 37:24

**seeing** [1] - 15:1

**seek** [2] - 36:7, 38:23

**seized** [1] - 31:21

**sell** [1] - 22:6

**senior** [1] - 38:10

**sense** [6] - 22:12, 22:24, 33:3, 41:24, 42:19, 42:23

**service** [2] - 12:13, 40:2

**services** [3] - 11:24, 12:6, 40:2

**SESSION** [1] - 4:3

**set** [5] - 4:20, 14:6, 16:23, 38:22, 41:7

**shares** [5] - 21:25, 42:3, 42:18, 42:22

**Shenwick** [1] - 32:15

**SHIFKE** [1] - 2:15

**Shifke** [2] - 4:12, 7:15

**shift** [9] - 12:4, 12:13, 13:1, 13:8, 13:13, 21:5, 24:17, 28:15, 33:22

**shifting** [1] - 23:12

**short** [1] - 28:2

**short-term** [1] - 28:2

**show** [1] - 38:18

**showing** [6] - 5:11, 5:16, 5:18, 21:12, 38:18

**shown** [2] - 20:4, 38:19

**shows** [2] - 19:6, 19:9

**shut** [1] - 15:6

**significant** [1] - 14:2

**simple** [1] - 39:9

**single** [10] - 9:13, 9:14, 9:21, 13:9, 13:17, 13:22, 25:3, 46:15, 46:16

**situation** [1] - 38:11

**six** [5] - 13:15, 14:24, 15:7, 22:20, 25:25

**slow** [2] - 16:3, 16:5

**slower** [2] - 17:9, 36:16

**slowly** [1] - 8:2

**small** [1] - 22:6

**snippets** [2] - 27:11

**so-called** [1] - 12:16

**sold** [2] - 21:20, 21:23

**someone** [2] - 15:5, 15:6

**sometimes** [2] - 35:4, 35:7

**somewhere** [1] - 28:11

**soon** [3] - 14:25, 22:16, 43:8

**sorry** [5] - 18:19, 24:13, 24:23, 32:16, 43:19

**sort** [12] - 8:10, 26:7, 33:13, 33:16, 33:23, 34:10, 35:14, 38:14, 38:22, 38:25, 40:8, 41:10

**speaking** [1] - 40:14

**specific** [7] - 9:10, 20:24, 21:7, 31:1, 37:12, 38:17, 44:12

**specifically** [7] - 24:11, 24:21, 25:9, 30:25, 36:21, 40:1, 44:8

**specificity** [1] - 41:23

**spend** [1] - 11:21

**spirit** [1] - 8:19

**St** [1] - 21:2

**stage** [2] - 10:17, 14:6

**stand** [1] - 44:25

**standard** [1] - 21:13

**start** [1] - 9:3

**started** [3] - 11:25, 12:2, 33:17

**state** [2] - 18:22, 45:22

**statement** [15] - 10:24, 11:10, 11:15, 15:14, 15:19, 18:4, 18:8, 18:12, 20:5, 25:10, 26:8, 26:9, 28:11, 29:20, 31:23

**statements** [30] - 10:9, 11:1, 11:2, 11:6, 11:8, 13:8, 13:21, 16:9, 16:14, 17:2, 17:5, 18:10, 21:8, 24:14, 24:22, 26:17, 27:13, 27:16, 27:22, 28:5, 29:17, 29:18, 29:21, 30:8, 30:23, 31:9, 31:15, 31:20, 37:10

**STATES** [6] - 1:1, 1:23, 48:11, 48:13, 48:17, 48:20

**STENOGRAPHICALLY** [1] - 48:14

**STEVEN** [1] - 2:15

**Steven** [2] - 4:12, 7:15

**still** [6] - 7:21, 15:13, 17:8, 28:4, 37:11, 38:17

**stock** [20] - 14:15, 21:20, 21:23, 22:1, 22:5, 22:10, 22:12, 22:14, 28:21, 29:1, 33:1, 35:19, 41:25, 42:1, 42:7, 42:22, 42:24, 42:25, 46:9, 46:19

**straight** [1] - 8:8

**straightforward** [1] - 28:3

**STREET** [2] - 1:23, 2:17

**STREIT** [1] - 2:15

**Streit** [2] - 4:12, 7:15

**stretch** [1] - 18:12

**strong** [2] - 21:7, 23:6

**struggling** [1] - 36:15

**stuff** [2] - 40:18, 40:20

**subdivisions** [1] - 36:21

**submit** [4] - 8:13, 9:2, 10:2, 23:2

**submitted** [5] - 8:20, 9:11, 14:14, 25:20, 47:7

**submitting** [1] - 10:22

**subsequently** [1] - 38:24

**success** [2] - 14:11, 16:16

**sudden** [1] - 34:4

**suffered** [2] - 22:2, 42:16

**sufficient** [3] - 17:18, 30:7, 30:21

**suggesting** [1] - 11:11

**SUITE** [3] - 1:24, 2:6, 2:11

**summary** [5] - 8:12, 8:17, 10:13, 25:18, 27:2

**support** [2] - 9:23, 41:21

**supports** [1] - 26:1

**supposedly** [1] - 22:4

**Supreme** [2] - 21:16, 42:13

**surprise** [1] - 28:25

**survive** [1] - 25:3

**SUTCLIFFE** [1] - 2:15

**switched** [1] - 7:24

**systems** [1] - 21:2

**T**

**tactic** [2] - 25:16, 26:19

**tactics** [1] - 8:21

**TALARIDES** [50] - 2:16, 4:9, 4:21, 5:5, 5:22, 6:25, 7:12, 8:5, 9:1, 9:6, 9:20, 10:21, 11:20, 11:23, 14:5, 14:17, 15:12, 15:17, 15:24, 16:4, 16:13, 17:10, 17:23, 20:9, 20:16, 20:21, 21:5, 36:11, 36:17, 37:1, 37:19, 38:1, 38:16, 39:1, 39:14, 39:21, 40:6, 40:11, 41:3, 41:13, 42:11, 42:24, 43:6, 43:24, 44:10, 44:14, 44:17, 46:11, 46:14, 46:25

**Talarides** [4] - 4:10, 4:22, 5:2, 7:13

**Talarides...** [1] - 36:10

**talks** [2] - 18:13, 30:25

**tech** [1] - 11:24

**technical** [1] - 10:18

**technology** [1] - 12:3

**teeny** [1] - 39:10

**Tellabs** [3] - 21:16, 39:2, 45:18

**ten** [5] - 6:15, 16:9, 23:23, 23:24, 39:16

**ten-minute** [1] - 23:24

**tense** [1] - 29:21

**term** [1] - 28:2

**terms** [3] - 34:9, 34:17, 45:23

**THAT** [2] - 48:12, 48:15

**THE** [97] - 2:4, 2:14, 4:4, 4:13, 4:15, 4:17, 4:23, 5:3, 5:10, 5:11, 5:13, 5:15, 5:16, 5:18, 5:20, 5:21, 6:1, 6:4, 6:6, 6:8, 6:10, 6:14, 6:15, 6:20, 6:24, 7:3, 7:6, 7:8, 7:19, 8:1, 8:9, 9:5, 9:18, 10:3, 11:11, 11:21, 13:25, 14:13, 15:9, 15:16, 15:23, 16:1, 16:10, 17:8, 17:18, 20:7, 20:10, 20:18, 21:3, 23:22, 24:2, 24:5, 26:6, 31:3, 31:11, 33:13, 34:10, 34:19, 35:9, 35:23, 36:3, 36:9, 36:14, 36:24, 37:17,

55

37:21, 38:6, 38:20,
39:7, 39:19, 40:4,
40:8, 40:14, 41:9,
42:4, 42:21, 43:3,
43:18, 44:7, 44:13,
44:16, 45:19, 46:13,
46:18, 47:6, 48:10,
48:11, 48:13, 48:14,
48:15, 48:16, 48:17,
48:19, 48:20
**themselves** [6] -
11:16, 18:1, 18:3,
22:2, 32:20, 41:14
**theory** [3] - 13:10,
43:2, 45:13
**therein** [1] - 10:23
**they've** [2] - 38:22,
39:18
**THIS** [1] - 48:18
**three** [2] - 11:2, 16:6
**threshold** [1] - 25:5
**thrived** [1] - 26:1
**throughout** [4] - 13:9,
13:18, 14:12, 27:22
**TITLE** [1] - 48:13
**TO** [3] - 1:17, 3:2,
48:12
**today's** [1] - 4:17
**together** [5] - 29:12,
34:6, 34:14, 35:15
**top** [1] - 29:21
**topic** [1] - 31:9
**total** [1] - 21:23
**towels** [1] - 38:12
**TRADES** [1] - 2:4
**trading** [1] - 22:7
**TRANSCRIPT** [4] -
1:16, 48:14, 48:16,
48:18
**trend** [1] - 15:11
**trends** [1] - 15:15
**TRUE** [1] - 48:13
**true** [5] - 11:10, 16:11,
23:1, 26:4, 33:4
**Truth** [1] - 26:22
**truth** [9] - 10:22,
17:22, 25:23, 26:7,
26:8, 27:5, 27:7,
35:20, 37:18
**truth-on-the-market**
[1] - 27:5
**trying** [2] - 15:5, 31:17
**turn** [2] - 5:13, 7:20
**turning** [1] - 8:10
**Twitter** [3] - 32:11,
32:13, 32:15
**two** [11] - 6:21, 9:5,
17:24, 18:4, 19:4,
25:1, 28:18, 29:25,
34:8, 35:11, 39:20
**type** [3] - 26:19, 33:15,
33:24
**typically** [1] - 11:14

**U**

**ultimately** [2] - 13:16,
45:14
**unanticipated** [1] -
23:10
**unclear** [1] - 43:19
**under** [6] - 10:1,
15:18, 24:12, 25:1,
37:12, 45:18
**underlying** [2] - 34:19,
44:4
**understood** [7] - 5:3,
11:13, 28:22, 36:17,
37:1, 41:3, 47:7
**undertaken** [1] - 28:10
**unfortunately** [1] -
23:8
**UNITED** [6] - 1:1, 1:23,
48:11, 48:13, 48:17,
48:20
**unless** [1] - 32:5
**unmute** [2] - 6:10,
7:10
**unmuted** [1] - 6:13
**unreasonable** [1] -
45:2
**up** [15] - 4:16, 5:13,
7:20, 15:12, 16:3,
20:19, 23:24, 27:25,
28:1, 33:3, 38:12,
42:22, 45:22, 46:10,
47:3
**update** [1] - 22:25
**upheld** [1] - 25:4

**V**

**vague** [2] - 20:2, 29:24
**validation** [1] - 38:23
**value** [2] - 12:18,
27:20
**valued** [1] - 43:1
**vanessa** [1] - 4:14
**Vanessa** [3] - 5:10,
5:14, 7:20
**various** [5] - 10:25,
14:13, 27:12, 43:4,
44:9
**vast** [3] - 21:25, 29:9,
46:7
**versus** [1] - 30:21
**virtue** [2] - 11:3, 16:8
**vis-à-vis** [2] - 19:11,
44:14
**visa** [1] - 33:15
**visibility** [2] - 29:3,
35:22
**visual** [1] - 24:18
**volume** [4] - 5:13,
8:13, 9:7, 40:18
**voluminous** [2] - 9:3,
31:14
**vs** [1] - 32:15

**W**

**wait** [1] - 35:21
**waiting** [1] - 38:12
**Wal** [1] - 12:6
**Wal-Mart** [1] - 12:6
**warehouse** [1] - 38:13
**warning** [2] - 17:15,
30:3
**warnings** [5] - 17:13,
18:1, 18:2, 29:23
**weigh** [4] - 10:14,
10:23, 21:15, 39:3
**weighing** [1] - 42:12
**well-known** [1] - 38:9
**WEST** [3] - 1:23, 2:6,
2:11
**WESTERN** [1] - 1:3
**Westlaw** [1] - 24:25
**whole** [3] - 16:18,
25:25, 41:24
**wholistically** [1] - 23:7
**WITH** [2] - 48:16,
48:19
**wondering** [1] - 5:8
**word** [2] - 15:7, 31:22
**words** [4] - 6:16,
11:18, 27:25, 28:16
**works** [2] - 7:2, 47:4
**world** [1] - 26:25
**worth** [1] - 42:18

**Y**

**year** [4] - 19:6, 23:9,
46:16, 46:17
**YORK** [2] - 2:4, 2:5
**yourself** [1] - 6:10
**yourselves** [1] - 7:10
**Yuhe** [1] - 24:25

**Z**

**zero** [1] - 6:21
**zoom** [1] - 4:5
**ZOOM** [2] - 1:17, 3:2

UNITED STATES DISTRICT COURT