# EXHIBIT A

**Robbins Geller Rudman & Dowd LLP**

| Chicago | Melville | Nashville | San Diego | Wilmington |
|---------|----------|-----------|-----------|------------|
| Boca Raton | Manhattan | Philadelphia | San Francisco | Washington, D.C. |

Megan A. Rossi
mrossi@rgrdlaw.com
(619) 744-2620

November 15, 2024

<u>VIA EMAIL</u>

Mark E. Van Der Weide, General Counsel
Yvonne Mizusawa, Senior Counsel
Board of Governors of the Federal Reserve System
20th & C Streets N.W.
Washington, D.C.  20551
Email: mark.vanderweide@frb.gov
Yvonne.f.mizusawa@frb.gob

> Re:  Request for Confidential Supervisory Information in *In re Green Dot Corp. Sec. Litig.*, No. 2:19-cv-10701-DPP-E (C.D. Cal.)

Dear Mr. Van Der Weide:

We represent Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund and Plaintiff Teamsters Local Union No. 727 Pension Fund ("Plaintiffs") and a putative class of investors in the above-captioned matter (the "Action") and write pursuant to 12 C.F.R. §261.23 to request that the Board of Governors of the Federal Reserve System (the "Board") produce all documents received from Green Dot Corporation ("Green Dot"), or any of its former or current employees, and all documents provided to Green Dot, or any of its former or current employees, in connection with the Board's July 19, 2024 Cease and Desist Order ("Consent Order"), a copy of which is attached hereto as Exhibit A.

**A.      The Action**

On April 1, 2022, Robbins Geller Rudman & Dowd LLP ("Counsel"), on behalf of Plaintiffs, filed a complaint on behalf of purchasers of Green Dot common stock between May 9, 2018 and November 7, 2019, inclusive (the "Class Period") in the United States District Court for the Central District of California (the "Complaint").  The Complaint alleges that Green Dot, Steven W. Streit ("Streit"), Green Dot's founder and former Chief Executive Officer ("CEO"), and Mark Shifke ("Shifke"), Green Dot's former Chief Financial Officer (collectively, "Defendants") violated the Securities Exchange Act of 1934 and U.S. Securities and Exchange Commission Rule 10b-5.

**Robbins Geller
Rudman & Dowd** LLP

General Counsel, Board of Governors of the Federal Reserve System
November 15, 2024
Page 2

*See In re Green Dot Corporation Securities Litigation*, No. 2:19-cv-10701-DDP-E (C.D. Cal).  A copy of the Complaint is attached as Exhibit B.

**B.      Summary of Prior Judicial Decisions and Pending Motions**

On March 29, 2024, the Honorable Judge Dean D. Pregerson denied Defendants' Motion to Dismiss Plaintiffs' Complaint.  Thereafter, Plaintiffs began seeking discovery concerning their allegations that Defendants misled investors by concealing critical information about Green Dot's declining core prepaid debit card business during the Class Period.

On July 19, 2024, the Board issued its Consent Order and an Assessment of a Civil Money Penalty in the amount of $44 million against Green Dot for deceptive acts and practices closely related to Plaintiffs' allegations, including: (i) Green Dot's marketing, selling, and servicing of its prepaid debit cards accounts from November 2017 through January 2021; (ii) deficiencies relating to Green Dot's compliance risk management framework; and (iii) unfair or deceptive acts related to Green Dot's tax preparation payment services.

On July 19, 2024, Plaintiffs served Green Dot requests for production of documents and data, which sought, among other things, documents produced to or communications with the Federal Reserve as well as any other governmental agency or regulator (public or private).  Ex. C.  On August 19, 2024, Defendants objected to Plaintiffs' request citing the "bank examination or supervision privilege," refusing to produce responsive documents on this basis.  Ex. D.

On July 30, 2024, Plaintiffs sought additional discovery from Defendants concerning the Board's Consent Order, seeking, among other things, information concerning "all documents received from the Federal Reserve or provided to it."  Ex. E.  In response, Defendants conceded that its counsel "communicated via email, telephone, and in-person meetings with the Federal Reserve concerning the Consent Order" and that Green Dot's "[s]enior executives were briefed on such communications and may have participated in one or more external calls with the regulator."  Ex. F.  But Defendants again refused to provide or even describe the "documents received from the Federal Reserve or provided to it" (Ex. E), asserting that "[t]he nature and substance of all such communications are subject to the bank examination privilege and therefore Green Dot is prohibited from disclosing any such information."  Ex. F.

On October 11, 2024, Defendants provided Plaintiffs with the Board's October 10, 2024 letter to Green Dot explaining that Plaintiffs "may request access to CSI for use in litigation by filing a written request directly with the Board's General Counsel under the procedures set forth in 12 C.F.R. §261.23(b)."  Ex. G.

**Robbins Geller
Rudman & Dowd** LLP

General Counsel, Board of Governors of the Federal Reserve System
November 15, 2024
Page 3

Plaintiffs have subsequently moved to compel Defendants to produce business documents and factual information related to the Consent Order.

Finally, on November 11, 2024, Defendants informed Plaintiffs of additional government investigations into Green Dot conducted by the Department of Justice in July 2019 and the Consumer Financial Protection Bureau in September 2019 and August 2021.

**C.      Description of the Documents Plaintiffs Seek from the Board**

Plaintiffs seek from the Board any CSI and Green Dot's internal business documents concerning the Consent Order relating to Green Dot's prepaid debit cards accounts and its tax business (Topics A, B, and E of the Consent Order).  Specifically, Plaintiffs seek all documents that are responsive to Plaintiffs' Interrogatory No. 2 and Request for Production No. 38:

- **Plaintiffs' Interrogatory No. 2:**

  Identify each individual at Green Dot who communicated with anyone at the Federal Reserve from May 1, 2017 through the present concerning the Consent Order, including any preliminary, investigative, fact-finding, formal or informal presentations, interviews, submissions, or proffers, and describe the communications as follows: (a) name of the individual; (b) name of the individual with whom they communicated at the Federal Reserve; (c) where, how, and when they communicated with the Federal Reserve, including any testimony given; (d) all topics discussed; (e) all documents received from the Federal Reserve or provided to it; and (f) any conclusions, proposals, negotiations, compliance, oversight, implementations progress reports, penalties, reviews, tasking, or follow-up recommended, considered, or discussed beyond what is written in the Consent Order.

Ex. E.

- **Plaintiffs' Request for Production No. 38:**

  From May 1, 2017 to the present, documents produced to or communications with any governmental agency or regulator (public or private), including, but not limited to, the SEC, the DOJ, the NYSE, the Federal Reserve, or the Financial Industry Regulatory Authority, as well as requests from, draft or final consent orders or offers, or other actual or proposed actions or penalties concerning Defendants' public statements, compliance risk management (including consumer compliance and compliance with fraud or anti-money-laundering rules or regulations), and transactions in Green Dot Securities, including, but not limited to, transcripts or

4889-3827-9927.v1

**Robbins Geller**
**Rudman & Dowd** LLP

General Counsel, Board of Governors of the Federal Reserve System
November 15, 2024
Page 4

> notes of testimony or interviews provided, exhibits, or presentations thereto given by any present or former Green Dot employee or representative.

Ex. C.

Accordingly, Plaintiffs request that the Board produce all documents and communications that are responsive to the discovery requests identified above that relate to Topics A, B, and E of the Consent Order, including any documents the Board received from any other governmental entity.

**D.      The Relevance of the CSI to Plaintiffs' Allegations**

Plaintiffs allege that Defendants conspired and schemed to mislead investors about Green Dot's faltering business model.  Leading up to the Class Period, Green Dot's primary business model was selling high-fee, prepaid debit cards to lower-income Americans who lack access to a personal bank account.  By 2018, it was apparent to Green Dot's senior insiders, including defendants Streit and Shifke, that this "bread and butter" business was in decline. Ex. B, ¶2.  Rather than come clean with investors, however, they misled the market and capitalized on their deception through $62 million in insider sales.

Plaintiffs allege that Defendants manipulated key performance metrics to hide declines in the prepaid business and decreasing profitability as they shifted toward digital offerings.  Plaintiffs further allege that Defendants concealed these declines by, among other things, loosening risk management and anti-money laundering measures (to avoid losing more accounts) and with seasonal bumps in tax revenue.  Thus, the Board's investigatory findings that Green Dot engaged in deceptive acts and practices regarding: (i) Green Dot's Assessment of Fees on Zero Balance Accounts; (ii) Telephone Registration of Prepaid Debit Card Accounts; and (iii) Tax Return Preparation Payment Services Fees are extremely relevant to Plaintiffs' allegations.

Specifically, the Consent Order alleges that Green Dot's deceptive acts and practices included keeping "many accounts" open despite "zero-dollar account balances" so that "consumers continued to incur monthly fees," "misrepresenting" Green Dot's "GPR prepaid debit card[s]," and "failing to disclose … the full cost of their tax refund processing fee." Ex. A.  This directly relates to Plaintiffs' allegations that Defendants misled investors by concealing critical information about Green Dot's declining core prepaid debit card business, used its tax business revenue to conceal declining growth in the legacy prepaid card business management framework, and that CEO Streit forced Green Dot employees to turn a blind eye to Green Dot's risk management procedures in order to stop the bleeding of accounts and prop up its numbers.  Ex. B, ¶¶3, 32-33.  Thus, the documents and information sought "'bears on, or . . . reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'" *Atzin v. Anthem, Inc.*, 2021 WL 3085327, at *2 (C.D. Cal. Jan. 13, 2021).

4889-3827-9927.v1

**Robbins Geller
Rudman & Dowd** LLP

General Counsel, Board of Governors of the Federal Reserve System
November 15, 2024
Page 5

**E.      Plaintiffs Cannot Obtain this Information From Any Other Source**

Plaintiffs cannot obtain the pertinent CSI elsewhere.  Plaintiffs have sought the business documents and factual information related to these topics from Defendants.  But as the Board explained in its October 10, 2024 letter, "CSI is 'confidential and privileged' and the Board 'does not normally disclose [CSI] to the public or authorize third parties in possession of [CSI] to further use or disclosure the information.'" Ex. G.  Accordingly, Plaintiffs must seek this information from the Board directly.

**F.      Protective Order**

The Court has entered a protective order in this Action that will adequately protect any confidential information produced by the Board to Plaintiffs.  Exs. H-I.

Please do not hesitate to contact Plaintiffs' counsel to discuss Plaintiffs' request.

Respectfully submitted,

*Megan Rossi*

MEGAN A. ROSSI

MAR:dsg

Attachments

4889-3827-9927.v1

# EXHIBIT A

UNITED STATES OF AMERICA
BEFORE THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
WASHINGTON, D.C.

|  |  |
|---|---|
| In the Matter of:<br><br>GREEN DOT BANK<br>Provo, Utah<br><br>GREEN DOT CORPORATION<br>Austin, Texas | Docket Nos.   24-005-B-SM<br>24-005-B-HC<br>24-005-CMP-SM<br>24-005-CMP-HC<br><br>Order to Cease and Desist and Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended |

WHEREAS, Green Dot Corporation, Austin, Texas, (the "Holding Company") is a registered bank holding company that owns and controls Green Dot Bank, Provo, Utah, (the "Bank") a state member bank, and various nonbank subsidiaries (collectively, "Green Dot");

WHEREAS, the Board of Governors of the Federal Reserve System (the "Board of Governors") is the appropriate federal supervisor of the Bank and the Holding Company;

WHEREAS, recent examinations of Green Dot, conducted by the Federal Reserve Bank of San Francisco (the "San Francisco Reserve Bank") and the Federal Reserve Bank of Dallas (the "Dallas Reserve Bank") (collectively, "Reserve Banks") identified certain significant deficiencies relating to Green Dot's compliance risk management framework, including, but not limited to deficiencies in consumer compliance and compliance with applicable federal and state laws, rules, and regulations relating to anti-money laundering ("AML") compliance, including the Bank Secrecy Act ("BSA") (31 U.S.C. § 5311 et seq.); the rules and regulations issued thereunder by the U.S. Department of the Treasury (31 C.F.R. Chapter X); and the requirements

1

of Regulation H of the Board of Governors to report suspicious activity and to maintain an adequate BSA/AML compliance program (12 C.F.R. §§ 208.62 and 208.63) (collectively, the "BSA/AML Requirements");

WHEREAS, to address the deficiencies and manage the risks described in this Order, Green Dot is making enhancements to their consumer compliance risk management program and BSA/AML compliance program, but additional substantive corrective actions are required;

WHEREAS, following the submission of consumer complaints, the Board of Governors and the San Francisco Reserve Bank conducted a review of Green Dot's practices related to the marketing, selling, and servicing of general purpose reloadable ("GPR") prepaid debit card accounts and Green Dot's offering of tax return preparation payment services with a third party that have revealed certain consumer compliance deficiencies resulting in unfair or deceptive acts or practices in or affecting commerce, within the meaning of section 5(a)(1) of the Federal Trade Commission Act ("FTC Act") (15 U.S.C. § 45(a)(1)), and unsafe or unsound practices. Specifically, the review found that:

**Assessment of Fees on Zero Balance Accounts**

A.      From November 2017 through January 2021, the Bank engaged in a deceptive act or practice by misrepresenting through GPR prepaid debit card packaging, cardholder agreements, and online disclosures that such accounts would be closed after consumers spent their account balances down to zero dollars when, in fact, many accounts remained open despite having a zero-dollar account balance and those consumers continued to incur monthly fees.

**Telephone Registration of Prepaid Debit Card Accounts**

B.      From June 2019 through December 2020, the Bank engaged in a deceptive act or practice by misrepresenting through GPR prepaid debit card packaging, point-of-sale advertising

2

and online disclosures that consumers could register their GPR prepaid debit card accounts by telephone or online when, in fact, consumers could not register the cards telephonically and only could register their accounts online.  This violation resulted from the Bank's discontinuation of the telephonic registration option without updating the card packaging, which prevented customers who lacked internet access from registering and using their cards.

**Blocking Access to Prepaid Card Accounts Without Reasonable Policies and Procedures**

C.      From May 2020 through June 2020, the Bank engaged in unfair acts or practices through its lack of reasonable policies and procedures to permit the Bank's legitimate customers to cure account blocks and obtain access to their funds in their GPR prepaid debit card accounts receiving Washington state unemployment insurance benefits.

**Extended Authorization Holds**

D.      From August 2020 through at least September 2020, due to a third-party payment processor's data migration error, the Bank engaged in an unfair act or practice by failing to timely release extended authorization holds in connection with certain GPR prepaid debit card transactions made by consumers (including at gas station point-of-sale terminals) until several days after the settlement of the transactions, thereby reducing available account balances and denying consumers access to their funds.

**Tax Return Preparation Payment Services Fees**

E.      From January 2017 through December 2022, Santa Barbara Tax Products Group ("TPG"), a wholly owned nonbank subsidiary of the Holding Company that has contracted with a third party, a major tax preparer, to offer tax return preparation payment services to the major tax preparer's customers, engaged in a deceptive act or practice by failing to disclose clearly and conspicuously to the major tax preparer's customers the full cost of their tax refund processing

fee. The Holding Company is responsible for the disclosure of its fees on the major tax preparer's website. The major tax preparer's website offered customers the option to "pay nothing out of pocket" by deducting the tax preparation fee from the amount of their tax refund, but the website did not clearly and conspicuously disclose that customers also must pay a separate tax refund processing fee. Consumers had to click on hyperlinks located at the bottom of web pages or click on drop-down menus to reveal a lengthy list of small-print statements including the disclosure of the separate tax refund processing fee. Under the agreement with the major tax preparer, TPG received a small portion of the tax refund processing fee paid by consumers. By 2022, TPG implemented several enhancements on the website regarding the tax refund processing fee.

WHEREAS, the Bank and the Holding Company took actions to cease and remediate the practices as described in WHEREAS clauses paragraphs A. through E. above, but additional improvements related to unfair or deceptive acts or practices controls are required;

WHEREAS, the unfair or deceptive acts or practices in or affecting commerce in violation of section 5 of the FTC Act and unsafe or unsound practices in consumer compliance, as described in WHEREAS clauses paragraphs A. through E. above, warrant a combined Order to Cease and Desist and Order of Assessment of a Civil Money Penalty (the "Order") by the Board of Governors against Green Dot under sections 8(b)(1), (b)(2), (b)(3) and 8(i)(2) of the Federal Deposit Insurance Act, as amended ("FDI Act") (12 U.S.C. §§ 1818(b)(1), (b)(2), (b)(3) and 1818(i)(2));

WHEREAS, the Board of Governors, the Bank, and the Holding Company have mutually agreed to enter into this Order;

4

WHEREAS, it is the common goal of the Board of Governors, the Reserve Banks, the Bank, and the Holding Company that the Bank and the Holding Company operate in a safe and sound manner and comply with all applicable federal and state laws, rules, and regulations, including, but not limited to, the BSA/AML Requirements and section 5(a)(1) of the FTC Act; and

WHEREAS, the boards of directors of the Bank and the Holding Company, at duly constituted meetings, adopted resolutions authorizing and directing the undersigned to enter into this Order on behalf of the Bank and the Holding Company, respectively, and consenting to compliance with each and every provision of this Order by the Bank and the Holding Company, and waiving all rights that the Bank and the Holding Company may have pursuant to section 8 of the FDI Act (12 U.S.C. § 1818), including but not limited to: (i) the issuance of a notice of charges on any and all matters set forth in this Order; (ii) a hearing for the purpose of taking evidence on any matters set forth in this Order; (iii) judicial review of this Order; and (iv) challenging or contesting, in any matter, the basis, issuance, validity, terms, effectiveness or enforceability of this Order or any provision hereof.

NOW THEREFORE, before the filing of any notices, or taking of any testimony, or adjudication of or finding on any issues of fact or law herein, and without the Bank and the Holding Company admitting or denying any allegation made or implied by the Board of Governors in connection herewith, and solely for the purpose of settling this matter without a formal proceeding being filed and without the necessity for protracted or extended hearings or testimony, it is hereby ordered, pursuant to sections 8(b)(1), (b)(2), (b)(3) and 8(i)(2) of the FDI Act (12 U.S.C. §§1818(b)(1), (b)(2), (b)(3) and 1818(i)(2)), that:

5

**Source of Strength**

1. The board of directors of the Holding Company shall take appropriate steps to fully utilize the Holding Company's financial and managerial resources, pursuant to section 38A of the FDI Act (12 U.S.C. § 1831$o$-1) and section 225.4(a) of Regulation Y of the Board of Governors (12 C.F.R. § 225.4(a)), to serve as a source of strength to the Bank, including, but not limited to, taking steps to ensure that the Bank complies with any supervisory action taken by its federal or state regulators.

**BSA/AML Compliance Program**

2. Within 90 days of this Order, the Bank shall submit a written revised BSA/AML compliance program that is acceptable to the San Francisco Reserve Bank. The revised program shall include the following seven items:

(a) a system of internal controls designed to ensure compliance with the BSA/AML Requirements;

(b) measures to ensure adherence to approved compliance policies, procedures, and standards;

(c) a comprehensive BSA/AML risk assessment that appropriately identifies and considers all products and services of the Bank, customer types, and geographic locations, as appropriate, in determining inherent and residual risks;

(d) enhanced policies and procedures for the Customer Identification Program sufficient to ensure the Bank has a reasonable belief that it knows the true identity of its customers;

6

(e)    management of the Bank's BSA/AML compliance program by a qualified compliance officer, who is given full autonomy, independence, and responsibility for implementing and maintaining an effective BSA/AML compliance program that is commensurate with the Bank's size and risk profile, has meaningful decision-making authority, and is supported by adequate staffing levels and resources;

(f)    independent testing procedures to ensure that comprehensive and timely reviews of the Bank's BSA/AML compliance program are performed on a regular basis by qualified parties who are independent of the Bank's business lines and compliance function; and

(g)    effective training for all personnel, including targeted training for personnel with compliance-related responsibilities, in all aspects of the BSA/AML Requirements and applicable internal policies and procedures.

**Suspicious Activity Monitoring and Reporting**

3.    Within 90 days of this Order, the Bank shall submit a written program acceptable to the San Francisco Reserve Bank and reasonably designed to ensure the identification and timely, accurate, and complete reporting by the Bank of all known or suspected violations of law or suspicious transactions to law enforcement and supervisory authorities, as required by applicable suspicious activity reporting laws and regulations.  The program shall include the following four items:

(a)    a well-documented methodology for establishing monitoring rules and thresholds appropriate for the Bank's risk profile, which considers factors such as type of customer, type of product or service, geographic location, and banking activities;

(b)    policies, procedures, and processes that provide for periodic review of the monitoring rules;

7

(c)     effective monitoring of customer accounts and transactions; and

(d)     policies, procedures, and processes with respect to the review and analysis of suspicious activity, including the escalation and resolution of concerns, and measures to ensure that alert dispositions are supported with adequate rationale and documentation to evidence the research performed and the due diligence that was relied upon to arrive at the Bank's conclusion.

**Transaction Review**

4.     (a)     Within 30 days of this Order, the Bank shall engage an independent third party acceptable to the San Francisco Reserve Bank to conduct a review of the Bank's transaction monitoring activity from August 1, 2021 through and including October 31, 2022 to determine whether suspicious activity involving high risk customers or transactions at, by, or through the Bank was properly identified and reported in accordance with applicable suspicious activity reporting regulations (the "Transaction Review").  Within 60 days of completing the Transaction Review, the Bank shall provide to the San Francisco Reserve Bank a written report detailing the independent third party's findings (the "Transaction Review Report").

(b)     Based on the San Francisco Reserve Bank's evaluation of the results of the Transaction Review, the San Francisco Reserve Bank may direct the Bank to engage the independent third party to conduct a review of the types of transactions described in paragraph 4(a) for additional time periods.

5.     Within 30 days of the engagement of the independent third party, but prior to the commencement of the Transaction Review, the Bank shall submit to the San Francisco Reserve Bank for approval an engagement letter that sets forth:

(a)     the scope of the Transaction Review;

8

(b)    the methodology for conducting the Transaction Review, including any sampling procedures to be followed;

(c)    the expertise and resources to be dedicated to the Transaction Review;

(d)    the anticipated date of completion of the Transaction Review and the Transaction Review Report; and

(e)    a commitment that supporting material and any drafts thereof associated with the final Transaction Review and the Transaction Review Report will be made available to the San Francisco Reserve Bank upon request.

6.    Throughout the Transaction Review, Green Dot shall ensure that all matters or transactions required to be reported that have not previously been reported are reported in accordance with applicable rules and regulations.

**No Misrepresentations or Omissions**

7.    Green Dot shall continue to take all actions necessary to correct and prevent the re-occurrence of all violations of section 5(a)(1) of the FTC Act and maintain future compliance with section 5(a)(1) of the FTC Act.

8.    Green Dot shall refrain from making, or allowing to be made, in connection with any product or service, whether offered by the Bank directly or through a third party, any misleading or deceptive representation, statement, or omission, expressly or by implication, including but not limited to with respect to the marketing, selling, and servicing of GPR prepaid debit cards and tax return preparation payment services.

9.    Green Dot shall make no representations to any insured depository institution, any consumers, or any other person or entity that the Board of Governors, the Reserve Banks, or any

9

employee, agent, or representative of the Board of Governors or the Reserve Banks have endorsed or approved any aspect of any product or service offered by the Bank.

10.    (a)    Within 30 days of the effective date of this Order, Green Dot shall provide a copy of this Order to any existing third-party service provider or other third-party partner, including a federal, state, or municipal entity that:

(i)    provides services to Green Dot that are material to the offering of products, services, or benefits to consumers by Green Dot; or

(ii)    to which Green Dot provides services that are material to the offering of products, services, or benefits to consumers by such third-party service provider or third-party partner; and

(b)    Green Dot shall provide a copy of this Order to a prospective third-party service provider or other third-party partner prior to entering into any contract or other arrangement described in paragraph 10(a) with such third-party service provider or other partner.

11.    Green Dot shall develop policies and procedures that provide reasonable standards for applying and removing a fraud-related block to a GPR prepaid debit card account, and for permitting legitimate customers to cure such account blocks.

**Consumer Compliance Board Oversight Plan**

12.    Within 90 days of this Order, the board of directors of the Holding Company shall submit to the San Francisco Reserve Bank an acceptable written plan to strengthen the board of directors' oversight of the enterprise-wide consumer compliance risk management program ("Board Oversight Plan").  The Board Oversight Plan shall describe the actions that the board of directors has taken and/or will take to improve the enterprise-wide consumer compliance risk

10

management program and a timeline for the actions to be taken.  The Board Oversight Plan shall include the following four items:

(a)    measures to communicate the board of directors' clear expectations regarding compliance with consumer protection laws and regulations, including section 5(a)(1) of the FTC Act;

(b)    measures to ensure adherence to approved consumer compliance policies, procedures, and standards for consumer protection laws and regulations, including section 5(a)(1) of the FTC Act;

(c)    measures to ensure the appropriate and timely resolution of audit findings, consumer compliance risk assessments, and examination findings for consumer protection laws and regulations, including section 5(a)(1) of the FTC Act; and

(d)    measures to enhance reports on the status and results of consumer complaints, the measures taken, or to be taken, by senior management to remediate outstanding consumer compliance deficiencies identified by consumer complaints; and any initiatives necessary to comply fully with this Order.

**Consumer Compliance Risk Management Plan**

13.    Within 60 days of this Order, the Holding Company shall retain an independent consultant, acceptable to the San Francisco Reserve Bank, in consultation with the Board of Governors, to assist in developing an acceptable written plan to enhance the enterprise-wide consumer compliance risk management program to ensure that the marketing, selling, and servicing of consumer products and services, including, but not limited to, GPR prepaid debit cards and tax return preparation payment services, whether offered by Green Dot directly or

11

through a third party, comply with all consumer protection laws and regulations, including section 5(a)(1) of the FTC Act ("Consumer Compliance Risk Management Plan").

14.    Within 120 days of the engagement of the independent consultant, Green Dot and the independent consultant shall submit to the San Francisco Reserve Bank an acceptable Consumer Compliance Risk Management Plan.  The Consumer Compliance Risk Management Plan shall include the following seven items:

(a)    measures to ensure that Green Dot takes the actions required by paragraphs 7 through 11 of this Order;

(b)    measures to enhance Green Dot's marketing materials, disclosures, instructions, and similar documentation for consumer products and services to ensure that consumers receive material information in a manner that is accurate, clear, complete, and conspicuous;

(c)    measures to minimize unfair or deceptive acts and practices risk, as reflected by consumer complaints, with respect to the provision of consumer products and services, including, but not limited to: the disclosure of information related to account balances; minimum monthly deposit requirements; account transfer limitations; geographic use restrictions; refund limitations; the maintenance of reasonable policies and procedures for customer identity verification, account closures, and negative account balance resolution; and the assessment of account fees;

(d)    measures to enhance Green Dot's policies and procedures for:

(i)    the review, approval, and maintenance of all materials documenting the service-level standards for services provided by third parties as well as their partners, servicers, vendors, and any of their providers or sub-servicers;

12

(ii)    promptly addressing and resolving consumer complaints and regulatory inquiries arising in connection with consumer products or services with adequate levels and types of staff who have the requisite skills, knowledge, and abilities, monitoring such complaints and inquiries and identifying any trends concerning the nature of the complaints and inquiries, and promptly addressing the root causes of such complaints and inquiries, with a view to significantly reducing the volume of consumer complaints, as defined by Green Dot, to Green Dot and the San Francisco Reserve Bank, respectively, from the levels prior to this Order;

(iii)    remediating consumers who are harmed by Green Dot's products or services or related misconduct, including requiring the issuance of prompt refunds; and

(iv)    updating policies and procedures on an ongoing basis as necessary to incorporate new or changes to existing consumer protection laws and regulations;

(e)    measures to ensure on-going, periodic training of appropriate Green Dot personnel, including the board of directors and senior management, that addresses compliance with consumer protection laws and regulations, including section 5(a)(1) of the FTC Act;

(f)    measures to enhance the risk monitoring process and management information systems to identify, manage, and promptly correct consumer compliance weaknesses, including any weaknesses in compliance with consumer protection laws and regulations, including section 5(a)(1) of the FTC Act; and

(g)    measures to enhance the internal controls for compliance with consumer protection laws and regulations, including section 5(a)(1) of the FTC Act.

**Assessment of Civil Money Penalty**

15.    The Board of Governors hereby assesses Green Dot a civil money penalty in the amount of $44,000,000 which shall be paid upon the execution of this Order by Fedwire transfer

of immediately available funds to the Federal Reserve Bank of Richmond ABA No.051000033, beneficiary, Board of Governors of the Federal Reserve System.  This penalty is a penalty paid to a government agency for a violation of law for purposes of 26 U.S.C. § 162(f) and 26 C.F.R. § 1.162-21.  The Federal Reserve Bank of Richmond, on behalf of the Board of Governors, shall distribute this sum to the U.S. Department of the Treasury, pursuant to section 8(i) of the FDI Act (12 U.S.C. § 1818(i)).

**Approval, Implementation, and Progress Reports**

16.   (a)   The board of directors of the Holding Company and the Bank, as applicable, shall submit engagement letters, plans, and programs that are acceptable to the San Francisco Reserve Bank within the applicable time periods set forth in paragraphs 2, 3, 4, 5, 12, 13, and 14 of this Order.  Each plan and program shall contain a timeline for full implementation with specific deadlines for completion of each component.  Each plan and program shall also include and clearly identify any requirements under the applicable paragraphs that the Holding Company and the Bank, as applicable, previously submitted and were approved or not objected to by the Reserve Banks.

(b)   Within 10 days of approval by the San Francisco Reserve Bank, the board of directors of the Holding Company and the Bank, as applicable, shall adopt the approved plans and programs.  Upon adoption, the board of directors of the Holding Company and the Bank, as applicable, shall promptly implement the approved plans and programs and thereafter fully comply with them.

(c)   During the term of this Order, the approved plans and programs shall not be amended or rescinded without the prior written approval of the San Francisco Reserve Bank.

14

17.     Within 45 days after the end of the first full calendar quarter following the date of this Order and each quarter thereafter, the board of directors of the Holding Company and the Bank shall submit to the Reserve Banks consolidated written progress reports detailing the form and manner of all actions taken to comply with the provisions of this Order, a timetable, and schedule to implement specific remedial actions to be taken, and the results thereof.  The San Francisco Reserve Bank may, in writing, discontinue the requirement for the progress reports, request modification of form or content, or modify the reporting schedule.

**Primary Contact**

18.     Within 10 days of this Order, the Holding Company and the Bank shall designate officer(s) to be responsible for coordinating and submitting to the San Francisco Reserve Bank the engagement letters, plans and programs required under the terms of this Order.

**Communications**

19.     All communications regarding this Order shall be sent to:

(a)     Mongkha Pavlick
        Senior Vice President
        Federal Reserve Bank of San Francisco
        101 Market Street
        San Francisco, California 94105

(b)     Emily Greenwald
        Senior Vice President
        Federal Reserve Bank of Dallas
        2200 North Pearl Street
        Dallas, Texas 75201

(c)     Richard M. Ashton
        Deputy General Counsel
        Jason A. Gonzalez
        Deputy Associate General Counsel
        Board of Governors of the Federal Reserve System
        Washington, DC 20551

15

      (d)      George Gresham
                 Chief Executive Officer and President
                 Green Dot Corporation
                 114 West 7th Street, Suite 240
                 Austin, Texas 78701

      (e)      Amy Pugh
                 General Counsel and Interim Chief Risk Officer
                 Green Dot Bank
                 1675 North Freedom Boulevard
                 Provo, Utah 84064

With a copy to:

      (f)      Richard K. Kim, Esq.
                 Wachtell, Lipton, Rosen & Katz
                 51 West 52nd Street
                 New York, New York, 10019

      (g)      Juan Azel, Esq.
                 Carl Fornaris, Esq.
                 Winston & Strawn LLP
                 200 South Biscayne Boulevard
                 Miami, Florida 33131

      (h)      John H. Cobb, Esq.
                 Winston & Strawn LLP
                 300 South Tryon Street, 16th Floor
                 Charlotte, North Carolina 28202

**Miscellaneous**

20.    Notwithstanding any provision of this Order to the contrary, the San Francisco Reserve Bank may, in consultation with the Board of Governors, grant written extensions of time to the Holding Company and the Bank to comply with any provision of this Order. The Holding Company and the Bank must submit a written request to the San Francisco Reserve Bank for any extension of time.

21.    The provisions of this Order shall be binding on the Holding Company and the Bank and each of their institution-affiliated parties, as defined in sections 3(u) and 8(b)(3) of the

16

FDI Act, as amended (12 U.S.C. §§ 1813(u) and 1818(b)(3)), in their capacities as such, and their successors and assigns.

22. Each provision of this Order shall remain effective and enforceable until stayed, modified, terminated, or suspended in writing by the Board of Governors.

23. Except as otherwise provided in this paragraph, the Board of Governors hereby agrees not to initiate any further enforcement actions, including for civil money penalties, against the Holding Company, the Bank, and their affiliates, successors, and assigns, with respect to the conduct described in the WHEREAS clauses paragraphs A. through E. above, to the extent known by the Board of Governors as of the effective date of this Order. This release and discharge shall not preclude or affect: (i) any right of the Board of Governors to determine and ensure compliance with this Order, including further proceedings brought by the Board of Governors necessary to remedy unsatisfactory implementation of required corrective actions; (ii) any proceedings brought by the Board of Governors to enforce the terms of this Order; or (iii) any proceedings brought by the Board of Governors against individuals who are or were institution-affiliated parties of the Holding Company or the Bank.

24. Except as provided in paragraph 23, the provisions of this Order shall not bar, estop, or otherwise prevent the Board of Governors, the Reserve Banks, or any other federal or state agency from taking any other action affecting the Holding Company, the Bank, or any subsidiary thereof, or any of their current or former institution-affiliated parties and their successors and assigns.

25. Nothing in this Order, expressed or implied, shall give to any person or entity, other than the parties hereto and their successors hereunder, any legal or equitable right, remedy, or claim under this Order.

17

By Order of the Board of Governors of the Federal Reserve System effective as of the

19th day of July, 2024.

GREEN DOT CORPORATION                    BOARD OF GOVERNORS OF THE
                                         FEDERAL RESERVE SYSTEM


By:  /s/ George Gresham                  By:  /s/ Ann E. Misback
     George Gresham                           Ann E. Misback
     Chief Executive Officer and President     Secretary of the Board


GREEN DOT BANK


By: /s/ George Gresham
     George Gresham
     Chief Executive Officer and President

18

# EXHIBIT B

ROBBINS GELLER RUDMAN
  & DOWD LLP
JASON A. FORGE (181542)
RACHEL L. JENSEN (211456)
CHRISTOPHER R. KINNON (316850)
JOHN M. KELLEY (339965)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
jforge@rgrdlaw.com
rjensen@rgrdlaw.com
ckinnon@ rgrdlaw.com
jkelley@ rgrdlaw.com

Lead Counsel for Lead Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re GREEN DOT CORPORATION SECURITIES LITIGATION | Case No. 2:19-cv-10701-DDP (Ex) |
| | CLASS ACTION |
| | AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| | DEMAND FOR JURY TRIAL |

4895-9717-2499.v7

**TABLE OF CONTENTS**

**Page**

I. SUMMARY OF THE ACTION ...................................................................... 1

II. JURISDICTION AND VENUE ................................................................... 2

III. THE PARTIES ........................................................................................... 3

IV. OVERVIEW ............................................................................................... 4

    A. Defendants' High-Fee Prepaid Debit Cards .......................................... 4

    B. Defendants Prop Up the Prepaid Business by Buying Up the Competition ............................................................................................ 6

    C. Defendants' Manipulation Obscures Declines in the Core Prepaid Card Business During the Class Period ................................... 8

V. DEFENDANTS' FRAUDULENT SCHEME, WRONGFUL COURSE OF BUSINESS, AND MISLEADING STATEMENTS ......................... 10

    A. May 2018 Statements .......................................................................... 11

    B. August 2018 Statements ..................................................................... 15

    C. November 7, 2018 Statements ............................................................ 18

    D. February 2019 Statements................................................................... 20

    E. May 2019 Statements .......................................................................... 22

    F. August 2019 Statements ..................................................................... 23

VI. THE CORRECTIVE DISCLOSURES ...................................................... 24

    A. February 20, 2019 Corrective Disclosure ........................................... 25

    B. May 8, 2019 Corrective Disclosure .................................................... 26

    C. August 7, 2019 Corrective Disclosure................................................ 27

    D. November 7, 2019 Corrective Disclosure........................................... 29

VII. ADDITIONAL SCIENTER ALLEGATIONS ........................................... 31

VIII. THE PRESUMPTION OF RELIANCE APPLIES ................................... 34

IX. CLASS ACTION ALLEGATIONS .......................................................... 35

X. CAUSES OF ACTION ............................................................................. 37

    COUNT I................................................................................................ 37

- i -

|  |  |  | Page |
|---|---|---|---|
|  | COUNT II | | 39 |
| XI. | PRAYER FOR RELIEF | | 39 |
| XII. | JURY DEMAND | | 40 |

4895-9717-2499.v7

## I.    SUMMARY OF THE ACTION

1.     This is a securities fraud class action brought on behalf of purchasers of Green Dot Corporation ("Green Dot" or the "Company") common stock between May 9, 2018 and November 7, 2019, inclusive (the "Class Period"), against Green Dot, Steven W. Streit ("Streit"), its founder and former Chief Executive Officer ("CEO"), and Mark Shifke ("Shifke"), its former Chief Financial Officer ("CFO") (collectively, "Defendants") for violations of the Securities Exchange Act of 1934 ("Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.

2.     Green Dot's primary business is selling high-fee, prepaid debit cards ("legacy prepaid" cards) to lower-income Americans who lack access to a personal bank account.  By 2018, it was apparent to Green Dot's senior insiders that sales of the Company's "bread and butter" legacy prepaid cards were faltering.  Rather than come clean with investors, however, Green Dot's now-former senior executives chose to mislead the market and capitalize on their deception by selling $62 million dollars of their own Green Dot shares at artificially inflated prices, while investors lost hundreds of millions buying Green Dot stock at prices inflated by Defendants' misconduct.

3.     Defendants' fraudulent scheme and wrongful course of business was designed to and did defraud investors as they repeatedly made misleading statements concerning the value of Green Dot's prepaid customers and business, the scope of the decline in its prepaid business, and the effect of and reason for its shift to digital and direct deposit accounts.  Choosing to speak about the performance of Green Dot's prepaid debit cards, its active-account growth, and its shift to digital and direct deposit accounts, Defendants misled investors by concealing critical information about Green Dot's declining core prepaid debit card business, which generated the largest portion of Green Dot's revenue.  Green Dot's former CEO and CFO also obfuscated Green Dot's account and fee losses by intentionally conflating active accounts, high-fee

- 1 -

4895-9717-2499.v7

legacy prepaid accounts, low- to no-fee direct-deposit accounts, and low- to no-fee digital accounts (Banking as a Service ("BaaS") accounts). In doing so, Defendants Streit and Shifke propped up Green Dot's stock price long enough to sell $62 million dollars of their own Green Dot shares at artificially inflated prices.

4. The truth about Green Dot's operations began to emerge starting on February 20, 2019, when the Company disclosed a slowdown in account growth, and Green Dot's stock price declined 10%. Green Dot's stock dropped another 26% on May 8, 2019, when the Company disclosed that it had experienced a loss of 300,000 prepaid accounts and would have to expend $60 million to market Company cards. Then, on August 7, 2019, Green Dot revealed a loss of 500,000 prepaid accounts, a decline in the Company's active accounts, and slashed the Company's fiscal 2019 outlook. On this news, Green Dot's stock dropped another 42%. On November 7, 2019, Green Dot further revealed that the declines in pre-paid accounts would continue through the first half of 2020, causing Green Dot's stock to drop an additional 18% to a near-record low. Soon thereafter, Green Dot also announced that Streit and Shifke would "retire" at year-end and that Streit would be terminating his membership on Green Dot's Holding Company Board and as Chairman of the Green Dot Bank Board.

## II.   JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa) because the claims arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

6. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because Green Dot maintained its corporate headquarters in this District at all relevant times. Additionally, many of the acts charged herein, including the preparation and dissemination of materially misleading information, occurred in substantial part in this District.

- 2 -

4895-9717-2499.v7

7.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications and/or facilities of the national securities exchanges.

## III.     THE PARTIES

8.     Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund purchased Green Dot's common stock during the Class Period and suffered damages due to Defendants' misconduct.

9.     Plaintiff Teamsters Local Union No. 727 Pension Fund purchased Green Dot's common stock during the Class Period and suffered damages due to Defendants' misconduct.

10.     New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund and Teamsters Local Union No. 727 Pension Fund are collectively referred to herein as "Plaintiffs."

11.     Defendant Green Dot is a Delaware corporation with its principal executive offices located at 3465 East Foothill Boulevard, Pasadena, California 91107, at all relevant times.  The Company's Class A common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "GDOT."

12.     Defendant Steven W. Streit founded Green Dot and was its CEO from 2001 until immediately following the Class Period in December 2019.  Streit also served as a Director and President of Green Dot from October 1999 until December 2019.

13.     Defendant Mark Shifke was CFO of Green Dot from 2015 until immediately following the Class Period in December 2019.  Prior to assuming the CFO role, Shifke was Green Dot's Senior Vice President of Corporate Strategy and M&A.

14.     Defendants Streit and Shifke are collectively referred to herein as the "Individual Defendants."

- 3 -

4895-9717-2499.v7

15. The Individual Defendants, by virtue of their positions, had the power and authority to control the contents of Green Dot's statements to the market, including in earnings calls, SEC reports, shareholder letters, press releases, and other presentations to analysts, money and portfolio managers, and institutional investors. The Individual Defendants were provided with copies of releases and SEC reports before or shortly after issuance and had the ability and opportunity to prevent their issuance or to correct them. By virtue of their positions, and their personal knowledge of or access to material non-public information, the Individual Defendants knew and/or recklessly disregarded that material facts were being withheld from the investing public.

## IV. OVERVIEW

### A. Defendants' High-Fee Prepaid Debit Cards

16. Measured by market capitalization, Green Dot is the world's largest prepaid debit card company. Its high-fee, prepaid products are sold at nearly 100,000 retail stores, including at CVS, Rite Aid, Walgreens, Dollar Tree, with discounted offerings at Walmart and Meijer, and it sells co-branded cards with Walmart, Boost Mobile, AT&T and Citibank. Green Dot also operates a BaaS platform for consumer and technology companies.

17. Green Dot's legacy prepaid cards are debit cards, not lines of credit. A user loads money onto a card and subsequent purchases are then deducted from the stored balance. For a fee, the user can add more money to the card (called "reloading") by paying cash at a retailer or from their paycheck. The target market for Green Dot's legacy prepaid cards has historically been lower-income customers who lack access to a personal bank account. Defendants referred to this target group as the "unbanked" and "underbanked."

18. Leading up to and during the Class Period, revenue from legacy prepaid cards was Green Dot's core "bread-and-butter" business. As analysts at The Street noted in 2014, "Green Dot's bread and butter is made up of lower-income and lower-

- 4 -

4895-9717-2499.v7

credit consumers who have historically operated outside of the country's banking system." At the time Green Dot went public, over 75% of its revenue was legacy prepaid-related: 50.8% from new card, maintenance, ATM, and other fees; and 26.6% from cash transfer revenues. Green Dot's 2017 Form 10-K likewise stated that most of the Company's operating revenues "derived from prepaid financial services sold at our four largest retail distributors" and that operating revenue derived from products and services sold at Walmart store locations "was approximately 40%." Streit underscored the significance of prepaid cards to Green Dot's overall operations in a February 21, 2018 earnings call, emphasizing that "our bread and butter from the old days is still our bread and butter today."

19. Green Dot's legacy prepaid cards are extremely lucrative, as they generate high fees that traditional credit and debit cards do not, do not require interest to be paid to consumers on card balances, and lack of basic consumer protections that apply to traditional credit and debit cards. As a result, however, this core component of Green Dot's business model is particularly vulnerable to less-exploitive alternatives for the same customers.

20. Founder and former CEO Streit built Green Dot and his personal fortune by identifying and targeting unbanked and underbanked Americans. As Streit said on the Company's May 9, 2018 earnings call:

> [W]hen we first launched the company, if you think back to the IPO in 2010, we thought the TAM [total addressable market], we described as underbanked and unbanked American families. We said they were 60 million adults, I think is what the quote was, or the number was at that time, and we got that number from one of the federal agencies.

21. Before founding Green Dot, Streit was a radio DJ who went by the moniker "Ayatollah of Rock 'n' Rolla." As Streit told *Forbes* in 2011, when he and his first investor, Shifke, got started: "'We didn't have a product. We didn't have a bank. We didn't have a contract to give them.'"

- 5 -

4895-9717-2499.v7

22.     But by 2018, Green Dot was earning $1 billion annually targeting the unbanked and underbanked, with the bulk of the revenue from its legacy prepaid card fees.  Green Dot's Prepaid Visa Card, for example, was widely available at retailers, including Walmart, 7-Eleven, CVS/Pharmacy, and Dollar Tree in 2018 and 2019 and charged users, among other fees: a $1.95 purchase/activation fee; a $7.95 monthly fee; a $2.50 ATM fee; and a cash reload fee up to $4.95.  All told, the fees exceeded $35 per month for 20 purchases.  By comparison, the average monthly fee for a low-balance checking account in 2018 was around $10.

23.     The Company's legacy prepaid cards were a "high-margin" product, retaining (or re-upping) debit-card customers for additional monthly and reloading fees was critical to maintaining Green Dot's high margins and profitability.

24.     Given the importance of legacy prepaid card fees to Green Dot's business model, investors were laser focused on the growth of this core business.  Investment analysts recognized this, noting that "the company's core business is still a prepaid card issuer focused on unbanked/underbanked market segment" (February 21, 2018 Deutsche Bank analyst report) and that "underserved customers spent nearly $175B in fees and interest in 2016 across all products" (July 10, 2018 Jefferies analyst report).

**B.     Defendants Prop Up the Prepaid Business by Buying Up the Competition**

25.     Defendants tracked in real-time the performance of Green Dot's legacy prepaid business.  By 2017, competition from new, less-exploitive digital banking alternatives was starting to squeeze Green Dot's core business.  For example, Venmo, PayPal, and 'neo-banks' like Chime provided low-fee or no-fee services through digital platforms.  To compensate and mask declines in its own legacy prepaid business, Green Dot repeatedly acquired other prepaid card companies.  Although Green Dot was running out of competitors to buy, in January Green Dot acquired one of the last remaining, UniRush, for $147 million.  UniRush was a leading general-

- 6 -

4895-9717-2499.v7

purpose reloadable prepaid card provider, and the acquisition added 750,000 active accounts to Green Dot's total.

26. During 2017, Defendants emphasized growth in the legacy prepaid card business. For example, Green Dot's Q2 2017 Form 10-Q highlighted the UniRush acquisition as incremental to its existing legacy prepaid business, citing increasing revenue from prepaid cards, the cards' improved unit economics, and increased prepaid card fees: "We believe this increase in revenue reflects the increasing quality of customers within our active card base and improved unit economics on our suite of prepaid card products, which increased monthly maintenance fees and ATM fees earned within our Account Services segment . . . ."

27. On the Company's August 8, 2017 earnings call, Streit told investors that Green Dot "continue[d] to create and sell more of [their] own products that increasingly appeal[ed] to a more committed and more profitable customer base." Streit also said the Company's "old legacy [prepaid card] customers . . . deliver[ed] a lot of revenue, because *these are your best customers*," telling investors that the newer prepaid products had even "better fees . . . and generating more natural usage revenue and that's why you're seeing this continuing increased revenue per card holder." Streit said the Green Dot prepaid cards were "continuing to spin the wheel of synergy and revenue on top of a lower cost base."

28. On the November 7, 2017 earnings call, Streit again emphasized "solid growth across our enterprise, especially from our prepaid business lines." Streit stressed the health of Green Dot's legacy prepaid business, citing "momentum we're seeing in the retail demand for our products" and "retail demand for our products" at Walmart was driving "revenue growth 33% year-over-year for the consumer accounts segment." In response to a question from an analyst, Streit said "retention is showing up in that active card growth" and told investors to "expect that trend to continue into next year where you're going to see active card growth continue at some pace."

- 7 -

## C.    Defendants' Manipulation Obscures Declines in the Core Prepaid Card Business During the Class Period

29.    As Green Dot's founder, Streit was a very hands-on CEO to the point of micromanagement.   For example, he participated in weekly financial planning meetings and was aware of year-over-year declines in Green Dot's prepaid accounts (excluding acquisitions) during the Class Period, as reflected on near-real-time basis in Customer Relationship Management Reports, which Streit and Shifke received (the declining growth rate for these "home grown" legacy prepaid accounts began from mid-2017 to early 2018).  By late 2017, Green Dot's home-grown products, including its significant Walmart offerings, were declining at a steady pace and this continued throughout 2018 due to declines in both daily active card activity and numbers of cards sold.  By 2018, the Company was projecting flat active account growth, despite growth in BaaS.   Green Dot was losing legacy prepaid customers, in part, due to competition from cheap digital alternatives such as Chime, Venmo, Netspend and a Square product/service called "Cash."

30.    Other reports to which Streit and Shifke had free access reflected this grim performance and outlook, including the BIA dashboard, Financial Key Metrics, the Cohort Report, the Tableau Report, and the Revenue Pacing Report, as well as Consolidated Activity Reports ("CARs"), which the finance department (headed by Shifke) generated to reflect current and projected customer bases for the Company's product lines.  CARs included active customer base numbers broken down into 12 client portfolios, including current numbers, historical numbers, and projections. Like Streit, Shifke also adopted a hands-on management approach.   Both regularly reviewed all performance and forecasting metrics, including those for the failing legacy prepaid cards, and were intimately involved in marketing, which provided additional insight into Green Dot's decaying "bread and butter" legacy prepaid business.  For example, Streit ended a marketing campaign in August 2018 after

- 8 -

4895-9717-2499.v7

concluding that it was not attracting enough new customers to overcome significant drop-offs in new customer acquisitions.

31.	Because of the Company's struggles to grow its own customer base, Green Dot had purchased several regional card companies to show growth, with an estimated 40%-50% of customers obtained through acquisition. But by 2018, this well had run dry (actually, Defendants' acquisitions had largely drained it).

32.	Desperate to stop the account bleed, Streit personally halted the efforts of Green Dot's Fraud Management team to tighten loose customer identification procedures, also known as onboarding rules. To avoid losing more accounts, Streit forced Green Dot employees to accept an account base that was rife with fraud and made change recommendations to Customer Identification Procedures that influenced higher account-approval rates and aggravated a situation in which 30%-40% of accounts had some sort of negative status (*e.g.*, unmatched address or name, excessive disputes, and/or negative balance). At times, various individual customers could each have hundreds of accounts; one customer reached 1,000 accounts.

33.	In sum, by early 2018, Defendants knew: (i) the growth of the legacy prepaid card business was declining; (ii) the Company was facing existential competition from new low-fee digital banking; and (iii) that upon acquiring UniRush, the Company could no longer use acquisitions to hide declining growth in legacy prepaid cards. Seasonal bumps from Green Dot's tax business and the last gasps of growth from prior acquisitions had allowed Defendants to conceal declining growth in the legacy prepaid card business in the short term, but Defendants knew this mirage could not last.

34.	Between May 2018 and November 2019, Defendants misled investors about declining growth in Green Dot's legacy prepaid debit card business and diverted investor attention from this "bread and butter" product to BaaS and direct-deposit accounts, even though the vast majority of such accounts were offered with no fees. And Defendants concealed the reasons for their new emphasis, which included the

- 9 -

declining performance of the legacy prepaid cards and new competition from much less expensive digital alternatives, such as PayPal, Venmo, and neobanks like Chime.

35. By 2019, Defendants could no longer entirely obscure the declining growth in the legacy prepaid card business. Instead of being truthful with investors, however, Defendants changed tactics by understating the importance of the legacy prepaid business and overstating the value of new digital and direct deposit products.

## V. DEFENDANTS' FRAUDULENT SCHEME, WRONGFUL COURSE OF BUSINESS, AND MISLEADING STATEMENTS

36. Throughout the Class Period, Defendants engaged in a scheme to defraud investors by multiple methods and means, including:

(a) Repeatedly choosing to speak about the performance of Green Dot's prepaid debit cards, its active-account growth, and its shift to digital and direct deposit accounts in a misleading manner by omitting critical information about Green Dot's declining core prepaid debit card business, which comprised the largest portion of its revenue. In doing so, Defendants intentionally withheld information that reasonable investors would have viewed as significantly altering the information Defendants chose to make available.

(b) Making misleading statements concerning the value of Green Dot's prepaid customers and business, the scope of the decline in its prepaid business, and the effect of and reason for its shift to digital and direct deposit accounts. In doing so, Defendants intentionally withheld information that reasonable investors would have viewed as significantly altering the information Defendants chose to make available.

(c) Obscuring account and fee losses by conflating active accounts, legacy prepaid accounts, low- to no-fee direct-deposit accounts and low- to no-fee BaaS accounts. In doing so, Defendants intentionally withheld information that reasonable investors would have viewed as significantly altering the information Defendants chose to make available.

- 10 -

4895-9717-2499.v7

(d)    Propping up Green Dot's stock price long enough for the Individual Defendants to sell millions of dollars of their own Green Dot shares at artificially inflated prices.

37.    Defendants held quarterly earnings calls on May 9, August 8, and November 7, 2018, during which defendants Streit and Shifke delivered prepared remarks and answered analysts' questions. Additionally, on May 16, 2018, Streit and Shifke spoke at the JPMorgan Global Technology, Media and Communications Conference ("JPMorgan Conference"), during which they delivered prepared remarks and answered analysts' questions.

**A.    May 2018 Statements**

38.    During the May 9, 2018 earnings call, Streit and Shifke emphasized the performance of Green Dot's prepaid debit cards, its active-account growth, and its shift to digital and direct deposit accounts in a misleading manner, as they omitted critical information about Green Dot's declining core prepaid debit card business, which comprised the largest and highest margin portion of its revenues but its growth rate was shrinking, which would inevitably impact the Company's bottom line. Yet, Streit discussed the momentum of Green Dot's business, including Green Dot's legacy prepaid cards, stating:

(a)    "On the branded side of our shop, Green Dot continues to gain traction on nearly all fronts."

(b)    "Additionally, Green Dot has earned more than 5,000 new incremental shelf facings for its products and services at Safeway Albertson stores and other locations where Green Dot now occupies space formerly occupied by the now defunct American Express prepaid product line."

(c)    "Walmart MoneyCards and Green Dot classic Visa cards and MasterCards and GoBank . . . *continue[] to do extremely well*" and "I think we still have a *long way to go* before we come anywhere near what you'd call maxed out."

- 11 -

4895-9717-2499.v7

(d)  "**We don't intend to imply that we see a slowdown forthcoming**. In fact, as both Steve and I mentioned in our remarks, we feel upbeat about the likelihood of **continued strong momentum**."

39.  Streit's May 9, 2018 statements regarding the momentum of Green Dot's business were each misleading when made.  The true facts, which Defendants knew and/or recklessly disregarded included the following:

(a)  Green Dot was losing traction on its most important front (*i.e.*, its legacy prepaid cards).

(b)  Despite 5,000 new shelf facings, Green Dot was losing traction on its most important front (*i.e.*, its legacy prepaid cards).

(c)  The growth rate of Green Dot's legacy, high-margin prepaid card business was already declining and would inevitably impact the Company's bottom line.

40.  Streit also made the following statements during the May 9, 2018 conference call concerning Green Dot's product mix and account value:

(a)  "The continuing long-term portfolio **mix shift towards higher lifetime value accounts** helped push the Account Services gross dollar volume or GDV flowing through our various Account Services products up by 57% year-over-year to more than $11.7 billion, setting another new record for our company."

(b)  "[A]ttracting and retaining the right kinds of customers is actually more important than the number of active customers in and of itself.  Specifically, we have previously shared that a **direct deposit customer typically has a meaningfully higher lifetime value** than accounts that do not receive direct deposit."

(c)  "In our Account Services segment on a consolidated basis, total active accounts increased for the fifth consecutive quarter, **growing by 21% year-over-year** or an additional **nearly 1 million** more active accounts year-over-year, totaling 6 million active accounts in the quarter, a new record for Green Dot."

- 12 -

4895-9717-2499.v7

(d) "Step 1 was to continue to grow the number of active accounts year-over-year and to **improve the unit economics** of those accounts. . . . **[W]e are well ahead on this goal**, having added nearly 1 million new active accounts while increasing the number of accounts receiving direct deposit by 930,000."

(e) "So we're **not seeing any competitive pressure**, and you can see the growth is pretty robust. And we like the fact that there's more and more digital offerings because customers don't see the world as a net zero-sum game. . . . So the answer is no, **we're not feeling competitive pressure** from any of those . . . ."

41. Streit's May 9, 2018 statements concerning Green Dot's product mix and account value were each misleading when made. The true facts, which Defendants knew and/or recklessly disregarded were that:

(a) Competition from new low-fee or no-fee digital products was forcing Green Dot to shift from high-fee legacy prepaid cards to largely free products.

(b) The claimed increase in "GDV" (total card-loaded funds) masked a less-lucrative product-mix trend.

(c) Direct-deposit accounts were not generating the high-margin card fees of legacy prepaid accounts.

(d) The "vast majority" of the direct deposit and BaaS accounts were free.

(e) The only "revenue stream that would be enhanced" by direct deposit accounts was "from interchange," which was extremely low-margin.

(f) That as a result of (a)-(e) above, the per-unit economics of Green Dot's active accounts was part of a product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

42. During the May 9, 2018 earnings call, Shifke further stated, "[a]ll told, in the quarter, we attracted more highly engaged customers than ever before **with better unit economics**, as evidenced by the record interchange and fee revenue."

- 13 -

4895-9717-2499.v7

43. Shifke's May 9, 2018 statement was misleading when made. The true facts, which Defendants knew and/or recklessly disregarded were that the per-unit economics of Green Dot's card portfolio was part of a product-mix trend that had reversed card-revenue-and-fee-growth and would inevitably impact the Company's bottom line. Moreover, behind the increase in overall active accounts was a product-mix trend that was reversing card-revenue-and-fee growth and would inevitably impact the Company's bottom line.

44. Defendants' statements had the desired effect of misleading the market, as demonstrated by contemporaneous analyst reports. For example, Jefferies issued a May 9, 2018 report emphasizing Green Dot's "solid fundamentals" in its "core business," noting that "guidance was raised on the back of strong Q1 results" and emphasizing the "momentum in the core business." SunTrust Robinson Humphrey ("SunTrust") issued a May 9, 2018 report entitled, "Momentum Building Off Core Cards as Platform Programs Ramp," which reiterated that Green Dot's "legacy GPR business drives rev growth." And Morgan Stanley issued a May 10, 2018 report, which reiterated Streit's claim that there was "[n]o impact from seemingly increased competition" and Green Dot was seeing "no impact in its customer acquisition or attrition."

45. Streit and Shifke spoke at the May 16, 2018 JPMorgan Conference. Their statements highlighted the performance of Green Dot's prepaid cards, its active-account growth, and its shift to digital and direct deposit accounts while omitting critical information about Green Dot's declining core prepaid card business. For example, Streit represented that:

(a) "*[E]very one of our products is hitting it* and is either at or above plan, which is not common."

(b) "[O]ur *digital platform* has really been taking off, and the customers who get it online through the app stores are *many times more profitable*

- 14 -

than retail customers as they tend to be – use the account in a more sustainable, higher-quality way. They're more likely to be on direct deposit."

(c) "I think if you had to rank them in terms of the revenue per customer, our digital customers tend to be *higher-revenue customers*."

46. Defendant Shifke further represented that "we've concentrated on focusing on our direct deposit customer base. We've grown that very nicely. Now about 80% of our GDV comes from direct deposit. Nearly 50% of our active customers are on *direct deposit*. And with that, GDV is growing phenomenally, and *that's driving the engine to get the fees*, ATMs, purchase volume, interest income."

47. Streit and Shifke's May 16, 2018 statements were each misleading when made. The true facts, which Defendants knew and/or recklessly disregarded, were that:

(a) Digital and direct deposit accounts were not generating the high-margin fees associated with Green Dot's legacy prepaid accounts and thus were part of a product-mix trend that had reversed card-revenue-and-fee-growth which Defendants knew would inevitably adversely impact the Company's bottom line.

(b) The growth rate of Green Dot's legacy prepaid card business was shrinking.

**B.     August 2018 Statements**

48. On August 8, 2018, Defendants convened an earnings call to discuss Green Dot's Q2 2018 performance. During the call, Streit and Shifke highlighted the performance of Green Dot's prepaid debit cards, its active-account growth, and its shift to digital and direct deposit accounts in a misleading manner by omitting critical information about Green Dot's declining core prepaid debit card business, which comprised the largest and highest-margin portion of its revenues and was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line. For example, during the earnings call, defendant Streit assured investors that:

- 15 -

4895-9717-2499.v7

(a) "The BaaS side of the business grew a lot of accounts, obviously, with programs like the TurboTax program and the Uber driver program, those are active cards. But our *established product lines*, Bob, *are just really doing well*. So we're seeing growth from both. . . . So everything's growing in relative lockstep."

(b) "I mean, we experienced growth with our – I hate to use the word legacy because the products aren't legacy, they've been redone many, many times. But that *original part of the business*, if you will, selling cards and retail and whatnot. That's *really going well* for us."

(c) "Consolidated GAAP total operating revenue came in at $258.3 million, representing a year-over-year growth rate of just over 16%. We would note that this quarter's performance was entirely organic, with *material growth being driven for both our established product lines* and our new BaaS platform programs."

(d) "The *continuing long-term portfolio mix shift towards higher lifetime value accounts* helped push the gross dollar volume, or GDV, flowing through our various products to more than $9.4 billion, representing organic year-over-year GDV growth of 25%."

(e) "Step 1, as you'll recall, is to continue to grow the number of active accounts year-over-year and to *improve unit economics* of those accounts. As you know from our Q2 results and our first half results more broadly, *we're hitting the step 1 objective out of the park*."

(f) "Every metric in the Account Services segment reflects the powerful dynamic of an increasing number of active account holders who are generating far more usage and engagement with our products. The result continues to be an *ongoing tailwind to the profitability and value of our account active portfolio*."

49. Streit's August 8, 2018 statements were each misleading when made. The true facts, which Defendants knew and/or recklessly disregarded, were that:

(a) The growth rate for Green Dot's legacy prepaid card business was shrinking.

- 16 -

4895-9717-2499.v7

(b) The increase in overall active accounts was part of a product-mix trend that was reversing card-revenue-and-fee-growth, which Defendants knew would inevitably adversely impact the Company's bottom line.

(c) The per-unit economics of Green Dot's card portfolio was part of a product-mix trend that reversed card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

(d) That direct-deposit accounts did not generate high-margin fees associated with Green Dot's legacy prepaid accounts and thus were part of a product-mix trend that had reversed card-revenue-and-fee-growth, which the Individual Defendants knew would inevitably impact the Company's bottom line.

50. During the August 8, 2018 earnings call, defendant Shifke similarly emphasized the positive impact of the Company's "healthy growth metrics," stating:

(a) "We increased total active accounts in the quarter by 14% year-over-year to approximately 5.9 million active accounts. This active account growth was spectacular and *well ahead* of our internal expectations. Even more encouraging is that the growth in active accounts is being driven both by our newer BaaS Platform programs and *our own products*."

(b) "[T]he larger portfolio of actives also continues to demonstrate healthy growth metrics and a *more profitable* average account."

(c) "As you see the portfolio mix move more towards direct deposit customers as a percentage of total and away from one-and-dones, by definition, you'll have *more revenue per active on the direct deposit customers* than you will on your one-and-dones."

51. Shifke's August 8, 2018 statements were each misleading when made. Defendants knew and/or recklessly disregarded the fact that the increase in overall active accounts masked an underlying (and undisclosed) product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

- 17 -

4895-9717-2499.v7

52.     Defendants' August 8, 2018 representations had the desired effect of misleading the market, as demonstrated by contemporaneous analyst reports.  For example, BTIG issued an August 9, 2018 report, noting "solid organic growth in [Green Dot's] core prepaid debit card business."  And William Blair issued an August 8, 2018 report, which cited Green Dot's "improving customer mix."

**C.     November 7, 2018 Statements**

53.     On November 7, 2018, Defendants convened an earnings call in connection with Green Dot's release of its Q3 2018 results.  During that call, Streit again emphasized the performance of Green Dot's prepaid debit cards, its active-account growth, and its shift to digital and direct deposit accounts in a misleading manner by omitting critical information about Green Dot's declining core prepaid debit card business, which comprised the largest and highest-margin portion of its revenues, was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.  For example, Streit stated:

(a)     Green Dot achieved its "seventh consecutive quarter of active card growth . . . ."  In fact, as Defendants knew and/or recklessly disregarded, growth in Green Dot's legacy products and established product lines was declining, including prepaid active accounts which had declined by hundreds of thousands of accounts since December 2017.

(b)     "And then unrelated to BaaS, of course, we have ***our own legacy products*** and established business lines, which are no slouches.  I mean, ***those are doing very well and continue to grow***."  In fact, as Defendants knew and/or recklessly disregarded, growth in Green Dot's own legacy products and established business lines was declining.  For example, prepaid active accounts had declined by hundreds of thousands of accounts since December 2017.

(c)     "The percentage of people who acquire our accounts now are far more likely to reload and when they reload, they're far more likely to do it through electronic means, meaning direct deposit.  And that does mean ***more revenue per***

- 18 -

*card*. That is real, and is a trend we see continuing." In fact, as Defendants knew and/or recklessly disregarded, direct-deposit accounts did not generate the high-margin card fees of legacy prepaid accounts and thus were part of a product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

(d)     "Step 1 is to continue to grow the number of active accounts year-over-year and to improve the ***unit economics*** on those accounts. Total active accounts have grown 12% year-to-date compared to the same period last year . . . . So we are on track with step 1 and feel like our future prospects for further growth in both actives and the quality of those actives are very strong." In fact, as Defendants knew and/or recklessly disregarded, the per-unit economics of Green Dot's card portfolio was part of a product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

54.     Streit's November 7, 2018 statements were each misleading when made. The true facts, which Defendants knew and/or recklessly disregarded, were that:

(a)     The increase in overall active accounts was part of a product-mix trend that was reversing card-revenue-and-fee-growth, which Defendants knew would inevitably adversely impact the Company's bottom line.

(b)     Green Dot's legacy prepaid card business was shrinking.

(c)     That direct-deposit accounts did not generate high-margin fees associated with Green Dot's legacy prepaid accounts and thus were part of a product-mix trend that had reversed card-revenue-and-fee-growth, which the Individual Defendants knew would inevitably impact the Company's bottom line.

(d)     The per-unit economics of Green Dot's card portfolio was part of a product-mix trend that reversed card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

55.     Defendants' repeated representations had the desired effect of misleading the market as demonstrated by contemporaneous analyst reports. For example,

- 19 -

Jefferies issued a November 8, 2018 report, which emphasized Green Dot's "solid core business fundamentals." William Blair issued a November 7, 2018 report, which noted the Company "continues to benefit from improving customer mix highlighted by growth of direct deposit customers." And Craig-Hallum issued a November 8, 2018 report, which emphasized that Green Dot's "[c]ard economics continued to improve."

### D.    February 2019 Statements

56.    By the end of 2018, Green Dot's legacy prepaid card users were dropping so rapidly that they negated nearly all the Company's growth in low-margin BaaS and direct-deposit business, amounting to a total user growth of only 1%. The disclosure of this low total-growth rate caused Green Dot's stock price to drop 10%. Still, Defendants perpetuated their scheme by continuing to mislead investors about the fact that this was a continuation of Green Dot product-mix trend, which would negatively impact profitability. Instead, Defendants presented this adverse news as good news, proclaiming that "we are somewhat a victim of own success."

57.    After the market closed on February 20, 2019, Defendants convened an investor earnings call concerning Green Dot's Q4 2018 performance. On that call, Streit assured investors the slowed growth in accounts was "not relevant to our performance" and that Green Dot's prepaid card business was "growing nicely," stating:

(a)    "[Cards business] *has been growing nicely – very nicely*, in fact." In fact, as Defendants knew and/or recklessly disregarded, the Company's card business had been declining for months, and during 2018, the Company had lost 271,000 accounts. Even as Defendants were speaking, this downward trend was accelerating, resulting in a year-over-year loss of 586,000 accounts by July 30, 2019.

(b)    "So I wouldn't say we're satisfied with [active accounts] being up 1%, that's not great. *It's not relevant to our performance* and I'm glad that the people we're having are real customers who went to buy a real account to enroll in

- 20 -

direct deposit . . . ." In fact, as Defendants knew and/or recklessly disregarded, direct-deposit accounts did not generate the high-margin card fees of legacy prepaid accounts and thus were part of a product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

(c) "While the mix shift towards direct deposit and more engaged customers is *clearly better for profitability and growth*, the lower churn also means fewer accounts issued to short-term customers, which weighs down on unit sales and therefore the quarterly active account metric." In fact, as Defendants knew and/or recklessly disregarded, direct deposit accounts were not "clearly better for profitability and growth" because they did not generate the high-margin card fees of legacy prepaid accounts and thus were part of a product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

(d) "[S]trong year-over-year margin expansion of over 300 basis points was the net result of improving margins flow through across the business. And in particular, from *our base of direct deposit active accounts* where improving purchase volume and higher retention have a *positive impact on profitability*." In fact, as Defendants knew and/or recklessly disregarded, direct deposit accounts were not having a "positive impact on profitability" relative to the faltering legacy prepaid card accounts, as direct-deposit accounts were largely free, so they were part of a product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

58. Defendants' statements had the desired effect of misleading the market as demonstrated by contemporaneous analyst reports. Although analysts noted the news of slowing active accounts, they continued to credit Defendants' misleading explanations, thereby blunting the market's reaction. For example, Guggenheim issued a February 21, 2019 report, which reiterated Defendants' message that "direct deposit customers are creating more robust, durable revenue streams for the company" and noted "a stronger company with a higher quality financial profile [is] emerging."

- 21 -

J.P. Morgan issued a February 21, 2019 report, which took Defendants at their word that the decline in active cards was the result of "a more engaged user base (fewer 'one and done' users), which is supported by continued double-digit growth in direct deposit users and purchase volume growth."

### E.    May 2019 Statements

59.    On May 8, 2019, Green Dot filed a Form 8-K with the SEC, which incorporated a press release announcing the Company's Q1 2019 financial results. The Form 8-K stated that "our future prospects are looking ***materially stronger and incrementally more assured***."

60.    Defendants also convened an investor earnings call on May 8, 2019, during which Streit and Shifke delivered prepared remarks and answered questions from analysts concerning Green Dot's Q1 2019 performance.  During the call, Defendants chose to speak about Green Dot's declining core prepaid debit card business and perpetuated their scheme by assuring investors those customers and accounts were low value and that the decline "didn't appear to impact results in a material way."  Streit made the following statements:

(a)    "So while the decline in this ***low-value active component [legacy prepaid] isn't in and of itself a long-term strategic problem***, it is a short-term headwind to overall segment revenue since revenue is revenue and declining actives in any segment means less revenue."  In fact, as Defendants knew and/or recklessly disregarded, the decline in the high-margin card fees of legacy prepaid accounts was part of a product-mix trend that posed a long-term strategic problem because it had reversed card-revenue-and-fee-growth and would impact the Company's year-end bottom line.

(b)    "So the goal isn't to issue more ***low value [legacy prepaid] customers*** to try to get that segment to reembrace us.  We don't want that.  The goal is to sell enough new high-value customers to overcome it.  So that means if you're selling – if you're losing 4 low-value customers, we want to sell 1 or 1.5 new high-

- 22 -

value customers." In fact, as Defendants knew and/or recklessly disregarded, the legacy prepaid customers generated the Company's highest fees and revenues, which meant, on average, it would take more than 4 non-legacy customers to make up for the loss of 4 legacy prepaid customers. Further, the vast majority of non-legacy customers (BaaS and direct deposit) paid little to no fees.

(c) "Higher purchase volume and attracting the more committed customer base should in turn lead to **higher revenue and a better profit margin** on those accounts. Step two is to continue that trend. As our Q1 active [account] KPIs indicate, we are very much on track with this step two. . . . So, so far so good on step two." In fact, as Defendants knew and/or recklessly disregarded, for at least a year, this product-mix trend had yielded and would continue to yield lower revenue and worse profit margins, as the declining legacy prepaid customers generated the Company's highest fees and revenues.

(d) "But if you think about it roughly 3.5 to 1 difference of the value of a long-term customer, whether they're direct deposit or cash reloading, but **the relative value of a long-term customer versus a short-term customer on average is 3.5 to 1 and we're being generous**. If you're a one-and-done guy, 8 or 9 to 1. So the average is call it 3.5 to 1." In fact, as Defendants knew and/or recklessly disregarded, the legacy prepaid customers generated the Company's highest fees and revenues, which meant, on average, it would take more than 4 non-legacy customers to make up for the loss of 4 legacy prepaid customers as the vast majority of non-legacy customers (BaaS and direct deposit) paid little to no fees.

### F. August 2019 Statements

61. On August 7, 2019, Defendants convened an earnings call with investors to discuss Green Dot's Q2 2019 performance. They reduced FY 2019 guidance but continued to mislead investors with assurances about the short-term nature of the strategic problem posed by the product-mix change away from legacy prepaid cards:

- 23 -

4895-9717-2499.v7

(a)    Streit reassured investors "that *the challenges we are currently experiencing are short to intermediate term in nature*" and were "likely to impact *only this year's revenue growth trajectory*."

(b)    In response to an analyst question concerning Green Dot's launching of products that "are going head-on to address" the decline in the core business, Streit stated: "I think to expand upon that this is why we believe it's contained and sort of help you size it.  And this will lead into the growth.  *We expect to be back to growth in Q4*."

(c)    Shifke underscored Streit's positive comments stating: "And so *we feel pretty good about a return to growth in Q4* based on what we're seeing today and also assuming maybe something goes bump in the night."

62.    Streit and Shifke's foregoing August 7, 2019 statements were misleading as Defendants knew and/or recklessly disregarded that the decline in the high-margin fees of legacy prepaid card accounts was part of a product-mix trend that posed a long-term strategic problem for Green Dot because it had reversed card-revenue-and-fee-growth to such an extent that the Company could not realistically return to positive growth in Q4.

## VI.    THE CORRECTIVE DISCLOSURES

63.    As a result of Defendants' scheme, Green Dot common stock traded at artificially inflated levels throughout the Class Period, reaching a high of $93.00 per share on November 8, 2018.

64.    Defendants' scheme was revealed to the market through a series of partial disclosures in 2019.  As depicted below, the inflation in Green Dot's stock price dissipated via price declines starting on February 20, 2019, continuing on May 8, 2019, and August 7, 2019, and culminating on November 7, 2019.

- 24 -

4895-9717-2499.v7



## A.    February 20, 2019 Corrective Disclosure

65.    On the February 20, 2019, Q4 2018 earnings call, Defendants partially disclosed declining growth for the first time, stating that "quarterly active accounts [were] up around 1% year-over-year."

66.    Defendant Streit also admitted on the February 20, 2019 earnings call that a single new direct deposit account replaced as many as six (6) prepaid card active accounts:

> Here's how the math works: An active account is defined as a single card that has at least one customer generated transaction in the quarter. So for example, a customer who buys one card every 2 weeks to, say, load their wages to the card and then pay bills, shop online or whatever their purpose may be, that one customer would be generating 6 active accounts in the quarter. But when that same customer buys just one card in the quarter, decides to enroll in direct deposit and then keeps that card in their wallet and uses at the same way every 2 weeks to pay bills, shop online or whatever their purpose may have been; that same customer is now generating account of just one active account in the quarter.

- 25 -

4895-9717-2499.v7

67. As a result of the February 20, 2019 corrective disclosure, Green Dot's stock price fell $7.47 per share from a closing price of $74.67 per share on February 20, 2019, to $67.20 per share on February 21, 2019.

68. Analysts noted Defendants' February 20, 2019 corrective disclosure. For example, Deutsche Bank issued a February 20, 2019 report, which lowered its price target on Green Dot and noted that "Active Cards Disappoint; Revenue Growth Slowing Down." Likewise, Guggenheim reduced its price target for Green Dot shares in a February 21, 2019 report, noting that "active accounts metrics . . . were below consensus expectations this quarter (1% growth)." And J.P. Morgan issued a February 21, 2019 report, reducing its Green Dot price target dramatically, stating that "[a]ctive cards increased only 1% from the prior year period" and that "shares could take a breather near-term."

**B.      May 8, 2019 Corrective Disclosure**

69. On the May 8, 2019 earnings call, Defendants disclosed a loss of 300,000 prepaid, non-direct deposit accounts and made the unexpected disclosure that Green Dot would expend on a $60 million marketing campaign.

70. Analysts took note of Defendants' May 8, 2019 corrective disclosure. For example, Cowen issued a May 8, 2019 report, lowering its price target and noting that "GDOT has tempered its revenue expectation to +3%, now factoring in lower legacy non-direct deposit active accounts." BTIG issued a May 9, 2019 report, which downgraded Green Dot and lowered its price target for Green Dot shares, citing the Company's $60 million marketing-campaign and noting that "GDOT shares plunged during extended trading" as a result of "the abrupt and disconcerting shift in management's outlook, which created significant uncertainty." SunTrust issued a May 9, 2019 report, which likewise lowered its price target by $20 and remarked that "[w]e suspect greater investment is partially a response to legacy business erosion." Northland Capital Markets issued a May 9, 2019 report, downgrading Green Dot, reducing its price target for Green Dot shares because of the "surprising shift in the

- 26 -

4895-9717-2499.v7

company's strategy," and noting that the "economics of new BaaS customers vs legacy WMT customers paying a $6 monthly fee . . . [have] *not been clear for a while*." And J.P. Morgan issued a May 9, 2019 report, which noted that "Mgmt was previously dismissive of slowing active card growth."

71. As a result of the May 8, 2019 corrective disclosure, Green Dot's stock price declined $16.71 per share from a closing price of $63.27 per share on May 8, 2019, to $46.56 per share on May 9, 2019.

**C.     August 7, 2019 Corrective Disclosure**

72. On Green Dot's August 7, 2019 earnings call, Defendants revealed a severe decline in Green Dot's "legacy prepaid" business, significantly reducing the Company's guidance for FY 2019. Defendant Streit also revealed that this prepaid decline resulted from competitive pressures, stating:

> I want to address upfront that we're lowering full year guidance. While disappointing and unfortunate, it is necessary as a result of an acceleration in declining unit sales in our legacy prepaid card product line combined with a later than expected launch of our new limited product and a large BaaS program that together make it now unrealistic for us to achieve the growth we had intended in the second half.
>
> *        *        *
>
> In Q2 on a year-over-year basis, we were down by around 500,000 active prepaid accounts, primarily from the loss of nonreloading customers and cash reloading customers . . . . The digital banking industry segment has become incredibly competitive this year.

73. Streit also revealed that "the vast majority of our customers are free today because you have fee waivers for direct deposits. So if you think about the customer base of Green Dot today, both in terms of the BaaS side of the house and the prepaid side of the house, the product side, the vast majority are free."

- 27 -

4895-9717-2499.v7

74. Defendant Streit also disclosed that competition "is taking its toll on our new customer acquisition" and acknowledged "the damage the free neo-bank segment has done to our legacy product line."

75. Analysts took note of Defendants' August 7, 2019 corrective disclosure. For example, Cowen issued an August 7, 2019 report, which reduced Green Dot's price target by $22.00 per share, citing an "accelerated decline in the core" business and noting that "[r]evenue from new products is no longer expected to overcome the loss of revenue from lower active accounts in the legacy prepaid product." Barclays issued an August 7, 2019 report, noting that "[f]ull-year guidance [was] lowered on softness in legacy prepaid business." BTIG also issued an August 7, 2019 report, which stated: "While we expect the company's shares to become much less expensive tomorrow given their plunge during today's extended trading, we believe the stock is unownable at this point given the significant uncertainty arising from the sudden, steep drop in demand for its products in what remains its largest segment." On August 8, 2019, Deutsche Bank issued a report, noting the "shift [in] the revenue model cannibalizing the card fees (45% of revenues), and impair[ing] profitability by driving higher marketing expenses." The report attributed the stock decline to "***uncertainty brought on by decline in active cards as well as significant pressure on profitability and earnings***." Citing "limited visibility," the Deutsche Bank report concluded that it "will continue to monitor the ability to sustainably turn around the card growth given majority of revenues are still generated from the legacy prepaid product." And Northland Capital Markets issued an August 8, 2019 Green Dot report, which reduced its price target and questioned the "surprising shift in the company's strategy": "[W]hat are the economics of these BaaS accounts, we worry it takes several new BaaS accounts to equal one legacy 2016/2017 vintage WMT Moneycard with a $6 monthly fee"?

- 28 -

4895-9717-2499.v7

76.    As a result of the August 7, 2019 corrective disclosure, Green Dot's stock price dropped $19.84 per share from a closing price of $47.26 per share on August 7, 2019, to $27.42 per share on August 8, 2019.

**D.    November 7, 2019 Corrective Disclosure**

77.    On the November 7, 2019 earnings call, Defendants disclosed disappointing Q3 2019 results with regard to active accounts and quarterly revenue. Specifically, defendant Streit revealed:

(a)    "The year-over-year decline was around 250,000 accounts on a net basis, comprised of around 620,000 fewer active accounts from our Consumer Business, of which most were onetime use accounts . . . ."

(b)    "[T]he number of 90-day actives across all 6 portfolios in our Consumer Business declined year-over-year by around 586,000 accounts in aggregate by July 30, the date we launched Unlimited."

(c)    "It may be that we don't bottom now until, perhaps, Q1 of next year and then start climbing back to narrow the year-over-year gap.  So perhaps, a quarter or 2 later than we first expected . . . ."

(d)    "[T]he entire consolidated Consumer Business [will] bottom some time in Q1 or so – Q1 or Q2, given there – we're about a quarter later than we thought we would be, but pretty close and then in – pushing that boulder up.  So the boulder is already going up but we need to go past where we used to come down."

78.    Streit further explained that "the revenue per active is a combination of several different fees or revenue streams" and the only "revenue stream that would be enhanced" by direct deposit accounts was "from interchange," which is low-margin. Streit also noted that the separate "revenue stream" from its legacy prepaid cards included a "monthly fee or the subscription fee" that "can range anywhere from $3 to $9.95" and other generics fees like ATM fees.

79.    During the November 7, 2019 earnings call, Shifke further disclosed:

- 29 -

4895-9717-2499.v7

(a)    "[W]e expect the margin flow-through from revenue in Q4 to be somewhat lower as Platform Services revenue, while still profitable, ***does not fully make up for the lost margins on the lower consumer account revenue***."

(b)    "Based on the 2019 exit run rate, we expect the Consumer Business to enter 2020 at a ***materially lower non-GAAP revenue run rate*** than it had at the exit of 2018."

(c)    "So as Steve discussed, the headwinds in 2019 and heading into 2020, are ***primarily related to our consumer accounts business***."

80.    As depicted in the chart below the decline in Green Dot's prepaid card product line caused its card revenues and other fees to plummet during the Class Period:



81.    Securities analysts issued reports in response to the November 7, 2019 partial disclosure. For example, Cowen issued a November 8, 2019 earnings update, which stated that "the company's 2020 outlook was disappointing" and its 2020 revenue would fall to 2019 levels "***due to declines in the consumer card segment***." Jeffries issued a November 8, 2019 report, which stated: "Q319 Takeaways: Long Road Ahead." The report further stated that the Company's 2020 commentary

- 30 -

"implies *meaningful downside* to Street est[imate]s as the company continues to face *headwinds in its legacy consumer prepaid business that are unlikely to abate* . . . ."

82. On this news, Green Dot's stock price declined $5.41 per share from a close of $29.95 per share on November 7, 2019 to a close of $24.54 per share on November 8, 2019.

83. On December 18, 2019, the Company further surprised the market when it announced the departures of Streit and Shifke. The announcement jolted the market, with Deutsche Bank stating in a December 19, 2019 report, "[w]e were not expecting the management changes which came as a surprise to us." SunTrust said of the "surprise announcement" that "the damage done to management credibility, and the stock price (-67% YTD, vs SPX +27%) became too much for the BoD to ignore."

84. The timing and magnitude of the declines in the price of Green Dot common stock negates any inference that losses suffered by Plaintiffs and other Class members were fully caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

85. For the entire period from the initial partial disclosure in February 2019 to the final disclosure in November 2019, Green Dot's stock dropped from $74.67 per share to $24.54 per share, or more than $50 per share, a decline of more than 67%. In contrast, the S&P 500 rose 11% during the same time period.

86. As a result of their purchases of Green Dot common stock during the Class Period, and the subsequent decline in the value of those shares when the truth was revealed to the market, Plaintiffs and other members of the Class suffered economic loss (*i.e.*, damages), under the federal securities laws.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

87. Each Defendant knew or acted with deliberate recklessness that material facts were being concealed from investors during the Class Period and the statements set forth in ¶¶38, 40, 42, 45, 46, 48, 50, 53, 57, 60, and 61 above would be misleading to investors when made.

- 31 -

4895-9717-2499.v7

88. Defendants had the motive and opportunity to commit fraud. Defendants' misconduct was knowing or deliberately reckless based on the factual allegations above and the following:

89. **The Individual Defendants' Knowledge**: As revealed in Green Dot's November 7, 2019 Form 8-K regarding Q3 2019 earnings, Defendants had access to key metrics, including gross dollar volume and active accounts at quarter end, disaggregated by account type. The data was available since at least Q1 2018 and indicates that Defendants knew the year-over-year erosion of the core prepaid business. As just one example, during the May 9, 2018 earnings call, Streit responded as follows to a question concerning the quantity of active card growth that was attributable to the UniRush acquisition: "You're going to make me disaggregate[] [it] anyhow, aren't you? Okay, hold on, let me think about this. . . . We know what the internal numbers are."

90. **The Allegations Concern Green Dot's Core Operations**: Streit and Shifke were top executives at the Company and led its day-to-day operations. Likewise, Streit and Shifke monitored and/or oversaw the overall business strategy, which hinged upon knowledge of the growth (or lack thereof) of active accounts, direct-deposit accounts and legacy prepaid accounts each of the Individual Defendants attended meetings where declining active accounts were discussed. The Individual Defendants had ultimate responsibility for directing and managing the Company's business, operations, and communications to investors, and had to keep themselves informed of the Company's day-to-day business and operations.

91. Additionally, the Individual Defendants each made public statements on earnings calls and investor conferences about the growth or decline in active accounts, direct-deposit accounts, and legacy prepaid accounts, as well as the unit economics of each type of account. For example, on the Company's November 7, 2018 earnings call, Streit celebrated the "seventh consecutive quarter of active card growth," while dismissing "the active card number [a]s somewhat passé" and "not as relevant." And

- 32 -

4895-9717-2499.v7

on the August 7, 2019 earnings call, Streit referred to the same metrics, explaining lowered guidance because Green Dot was "down by around 500,000 active prepaid accounts, primarily from the loss of nonreloading customers and cash reloading customers."

92. Shifke made similar statements demonstrating his personal knowledge regarding active accounts and unit economics per each account. For example, in Q2 2018 Shifke said, "[a]s you see the portfolio mix move more towards direct deposit customers as a percentage of total and away from one-and-dones, by definition, you'll have more revenue per active on the direct deposit customers than you will on your one-and-dones."

93. **The Individual Defendants Held Themselves Out as Knowledgeable**: The Individual Defendants held themselves out as knowledgeable about the prepaid business, active accounts, market competition, and unit economics during earnings calls and investment conferences.

94. **The Individual Defendants Received Briefings**: As senior executive officers, the Individual Defendants were privy to confidential and proprietary information concerning the active accounts, failing legacy prepaid business, market competition and the unit economics underlying the Company's business strategies. Each had access to internal documents, internal communications, management meetings, Board of Directors meetings, and committee meetings, as well as information provided to them or made available to them.

95. **The Individual Defendants Executed SOX Certifications**: Streit and Shifke signed SOX certifications, undertaking the affirmative obligation to ensure the Company's disclosures to the market were not false or misleading and so represented that they had evaluated the effectiveness of Green Dot's disclosure controls.

96. **The Individual Defendants Directed Public Statements**: Streit and Shifke were able to, and did, control the content of SEC filings, press releases and other public statements. They attended earnings calls and spoke on behalf of Green

- 33 -

4895-9717-2499.v7

Dot throughout the Class Period. Streit and Shifke participated in the drafting, preparation, review, approval of and/or signed Green Dot's Forms 10-K, 10-Q and other public statements, and had the ability and/or opportunity to prevent their issuance or correct them.

97. **The Individual Defendants Pocketed Millions from Insider Trades**: Defendants' scheme inflated Green Dot's stock price, and the Individual Defendants capitalized on this artificial inflation, pocketing millions of dollars via the sale of their own Green Dot shares at artificially inflated prices. Streit reaped $56 million (nearly 40% of his total reported lifetime proceeds from stock sales) from sales during the Class Period, selling 731,191 shares at an average price of $76.87 per share. For his part, Shifke collected $6 million (nearly 45% of his total reported lifetime proceeds from stock sales) during the Class Period, selling 77,500 shares at an average price of $77.90 per share. When the dust had settled following Green Dot's final revelation, Green Dot stock was trading at less than $25 per share.

## VIII. THE PRESUMPTION OF RELIANCE APPLIES

98. The Class is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

99. The Class is entitled to a presumption of reliance under the *Basic* fraud-on-the-market doctrine because, among other things:

    (a)    Defendants failed to disclose material facts;

    (b)    The omissions and misrepresentations were material;

    (c)    The Company's stock traded in an efficient market; and

    (d)    Defendants' misleading statements and omissions would tend to induce a reasonable investor to misjudge the value of the Company.

100. Plaintiffs and other Class members purchased Green Dot common stock between the time Defendants misstated or failed to disclose material facts and the time that the truth was disclosed.

- 34 -

4895-9717-2499.v7

101. At all relevant times, the market for Green Dot common stock was efficient because, *inter alia*:

(a) Green Dot common stock met the requirements for listing, was listed, and was actively traded on the NYSE;

(b) Average daily trading volume exceeded 600,000 shares;

(c) As a regulated issuer, Green Dot filed periodic reports with the SEC;

(d) At least a dozen analysts covered Green Dot;

(e) Green Dot was eligible to file a SEC Registration Form S-3;

(f) Green Dot regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

(g) Unexpected material news about Green Dot was rapidly incorporated into its stock price.

102. The market for Green Dot common stock promptly digested current information from all publicly available sources and reflected such information in the prices of Green Dot common stock. Accordingly, all purchasers of Green Dot common stock during the Class Period suffered similar injury when the truth was revealed to the market in a series of partial disclosures, causing the stock price to decline.

## IX. CLASS ACTION ALLEGATIONS

103. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of a putative class consisting of all those who purchased or otherwise acquired the common stock of Green Dot between May 9, 2018 and November 7, 2019, inclusive (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, their immediate families

- 35 -

4895-9717-2499.v7

and their legal representatives, heirs, successors, or assigns, any entity in which Defendants have or had a controlling interest, and any judicial officer who presides over this action and their immediate families.

104. Class members are so numerous that joinder is impracticable. Throughout the Class Period, Green Dot's stock was actively traded on the NYSE, with over 50 million shares outstanding and average daily trading volume exceeding 600,000 shares. While the exact number of Class members can be determined only by appropriate discovery, there are likely thousands of Class members who are geographically dispersed. Record owners and other Class members may be identified from records maintained by Green Dot or its transfer agent. Notice can be provided to such record owners by a combination of publication notice and first-class mail, using techniques and a form of notice similar to those customarily used in securities class actions.

105. There is a well-defined community of interest in the questions of law and fact in this case. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members, including:

(a) whether Defendants violated the Exchange Act;

(b) whether Defendants engaged in a scheme to defraud;

(c) whether Defendants made misleading statements;

(d) whether Defendants concealed material facts;

(e) whether Defendants engaged in fraudulent course of business;

(f) whether Defendants knew, or were deliberately reckless in disregarding, that their public statements were misleading or otherwise acted with the requisite scienter;

(g) whether Defendants' misconduct artificially inflated the stock price during the Class Period; and

(h) the extent and appropriate measure of damages sustained by the Class.

- 36 -

106.    Plaintiffs believe their claims are typical of those of the Class, as all Class members were similarly damaged by Defendants' misconduct alleged herein.

107.    Plaintiffs believe they will adequately protect the interests of the Class and have retained counsel who are competent and experienced in class action securities litigation.  Moreover, neither Plaintiff nor Lead Counsel has any known interest that conflicts with those of the Class.

108.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for all members of the Class to individually redress the wrongs done to them.

109.    Plaintiffs are aware of no difficulty in the management of this action as a class action.

## X.     CAUSES OF ACTION

### COUNT I

### For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5 Against All Defendants

110.    Plaintiffs incorporate by reference and expressly re-allege all of the above allegations, as if fully set forth herein.

111.    During the Class Period, Green Dot and the Individual Defendants made statements that they knew or recklessly disregarded were untrue or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

112.    Defendants violated §10(b) of the Exchange Act and the subsections of Rule 10b-5 in that, by the use of means and instrumentalities of interstate commerce, the mails, and/or the facilities of a national securities exchange, they:

(a)    Employed devices, schemes, and/or artifices to defraud;

- 37 -

4895-9717-2499.v7

(b)     Omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made not misleading; and/or

(c)     Engaged in acts, practices, and a course of business which operated as a fraud or deceit upon Plaintiffs and the Class in connection with their purchase of Green Dot common stock during the Class Period.

113.   Defendants and the Company's officers, management, and agents, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information about Green Dot's business as detailed herein.

114.   Green Dot is liable for the alleged misconduct of its employees and agents, including the Individual Defendants, under the principle of respondent superior.  As CEO and CFO, respectively, throughout the Class Period, Streit and Shifke are liable for the misleading statements and omissions of Green Dot employees during the Class Period.

115.   Defendants had actual knowledge of the scheme, omitted material facts, and/or deceptive business practices, or acted with reckless disregard for the truth.

116.   As a result of Defendants' scheme, misleading statements, and wrongful course of business, Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Green Dot stock. Plaintiffs and the Class would not have purchased or acquired the stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' misconduct.

117.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their transactions in Green Dot common stock during the Class Period.

118.   By virtue of the foregoing, Green Dot and the Individual Defendants each violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

- 38 -

4895-9717-2499.v7

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against Defendants Streit and Shifke

119. Plaintiffs incorporate by reference and expressly re-allege all of the above allegations, as if fully set forth herein.

120. As alleged herein, Defendants violated §10(b) and SEC Rule 10b-5, and Plaintiffs and other members of the Class suffered damages due to their misconduct.

121. During the Class Period, the Individual Defendants were controlling persons of Green Dot within the meaning of §20(a) of the Exchange Act. By virtue of their high-level positions, their awareness of Green Dot's operations, knowledge of information disseminated to the public, and their ability to control and direct the Company's decision making and day-to-day operations, the Individual Defendants had the power and ability to control and influence – and, in fact, did control and influence, directly or indirectly – the wrongful conduct alleged herein, including, without limitation, the methods and means of the scheme set forth herein.

122. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act, jointly and severally with, and to the same extent as Green Dot is liable.

123. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. Certifying this as a class action pursuant to Federal Rule of Civil Procedure 23, appointing Plaintiffs to serve as Class Representatives and appointing Lead Counsel to serve as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and other Class members and against all Defendants, jointly and severally, for all damages sustained

- 39 -

as a result of Defendants' violations of the federal securities laws, in an amount to be proven at trial, including pre- and post-judgment interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, expenses and expert fees; and

D. Awarding such other further relief as the Court may deem just.

## XII. JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: April 1, 2022

ROBBINS GELLER RUDMAN
& DOWD LLP

/s/
JASON A. FORGE

JASON A. FORGE
RACHEL L. JENSEN
CHRISTOPHER R. KINNON
JOHN M. KELLEY
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Lead Plaintiffs

PITTA LLP
VINCENT F. PITTA
120 Broadway, 28th Floor
New York, NY 10271
Telephone: 212/652-3890
212/652-3891 (fax)

Additional Counsel for Lead Plaintiff

- 40 -

4895-9717-2499.v7

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

NEW YORK HOTEL TRADES COUNCIL & HOTEL ASSOCIATION OF NEW YORK CITY, INC. PENSION FUND ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing. Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*In re Livent Corporation Sec. Litig.*, No. 2:19-cv-02218 (E.D. Pa.)

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 17 day of March, 2022.

NEW YORK HOTEL TRADES COUNCIL & HOTEL ASSOCIATION OF NEW YORK CITY, INC. PENSION FUND

By: _____

John Heim, Chief Financial Officer

GREEN DOT

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 04/12/2019 | 2,020 | $62.48 |
| 04/12/2019 | 6,090 | $62.12 |
| 04/15/2019 | 4,037 | $62.25 |
| 05/17/2019 | 6,343 | $48.96 |
| 07/11/2019 | 6,653 | $48.76 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 08/12/2019 | 6,494 | $28.52 |
| 08/13/2019 | 8,952 | $29.09 |
| 08/14/2019 | 3,730 | $28.80 |
| 08/15/2019 | 5,967 | $29.36 |

Prices listed are rounded up to two decimal places.

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

TEAMSTERS LOCAL UNION NO. 727 PENSION FUND ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __17__ day of March, 2022.

TEAMSTERS LOCAL UNION NO. 727
PENSION FUND

By: _____
Robert Laino, Fund Manager

GREEN DOT

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Stock**

| Date<br>Acquired | Amount of<br>Shares Acquired | Price |
|---|---|---|
| 01/22/2019 | 2,282 | $77.67 |
| 06/11/2019 | 552 | $50.17 |
| 06/26/2019 | 621 | $47.84 |
| 06/28/2019 | 838 | $48.90 |
| 09/06/2019 | 822 | $28.26 |

Prices listed are rounded up to two decimal places.

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on April 1, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

/s/
JASON A. FORGE

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Email:  jforge@rgrdlaw.com

4895-9717-2499.v7

# Mailing Information for a Case 2:19-cv-10701-DDP-E In re Green Dot Corporation Securities Litigation

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ian D Berg**
  iberg@pgmbm.us,tkellar@aftlaw.com

- **Jason A Forge**
  jforge@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Mark Samuel Greenstone**
  mgreenstone@greenstonelaw.com,mark-greenstone-9025@ecf.pacerpro.com,info@glancylaw.com,cynthia-5403@ecf.pacerpro.com,info@greenstonelaw.com

- **Rachel L. Jensen**
  rjensen@rgrdlaw.com,agonzales@rgrdlaw.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Takeo A Kellar**
  tkellar@aftlaw.com

- **John M. Kelley**
  JKelley@rgrdlaw.com

- **Christopher R. Kinnon**
  CKinnon@rgrdlaw.com

- **Eduard Korsinsky**
  ek@zlk.com

- **James N Kramer**
  jkramer@orrick.com,lpatts@orrick.com,casestream@ecf.courtdrive.com

- **Nicole Lavallee**
  nlavallee@bermantabacco.com,sfservice@bermantabacco.com

- **Tricia L McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Kristin J Moody**
  kmoody@bermantabacco.com,sfservice@bermantabacco.com

- **Danielle S Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Jeffrey V Rocha**
  jrocha@bermantabacco.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com,lrosen@ecf.courtdrive.com

- **Juan Carlos Sanchez**
  jsanchez@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Alexander K Talarides**
  atalarides@orrick.com,lpatts@orrick.com

# Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

# EXHIBIT C

ROBBINS GELLER RUDMAN
   & DOWD LLP
JASON A. FORGE (181542)
RACHEL L. JENSEN (211456)
JESSICA T. SHINNEFIELD (234432)
CHRISTOPHER R. KINNON (316850)
MEGAN A. ROSSI (318643)
JOHN M. KELLEY (339965)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
jforge@rgrdlaw.com
rjensen@rgrdlaw.com
jshinnefield@rgrdlaw.com
ckinnon@rgrdlaw.com
mrossi@rgrdlaw.com
jkelley@rgrdlaw.com

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| In re GREEN DOT CORPORATION SECURITIES LITIGATION | ) ) ) ) | Case No. 2:19-cv-10701-DDP (Ex) |
| --- | --- | --- |
| | | CLASS ACTION |
| | | PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND DATA TO DEFENDANTS |

4873-8255-3549.v1

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund and plaintiff Teamsters Local Union No. 727 Pension Fund (collectively, "Plaintiffs") request that defendants Green Dot Corporation and its former executives Steven W. Streit and Mark Shifke (collectively, "Defendants") produce the requested documents, as defined below, no later than 30 days from the date of service hereof, or at such other time and place as the parties mutually agree.

Defendants are required to produce for inspection any and all requested documents and data that are in their actual or constructive possession, custody, or control, or in the actual or constructive possession, custody, or control of their officers, employees, agents, representatives, or attorneys.  Defendants shall produce documents as they are kept in the usual course of business or shall organize and label the documents to correspond with the categories in the request.  Such production shall be made in accordance with the "DEFINITIONS," "INSTRUCTIONS," and "FORM OF PRODUCTION" set forth below.

## I.   DEFINITIONS

1.     "All" shall include the term "each" and vice-versa, as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside the scope of the request.

2.     "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside the scope of the request.

3.     "Account Services" refers to revenues and expenses derived from Green Dot's deposit account programs during the Relevant Period, such as prepaid cards, debit cards, consumer and small business checking accounts, secured credit cards, payroll debit cards, and gift cards.  These deposit account programs are marketed under several of the Company's leading consumer brand names and under the brand names of the Company's "Banking as a Service," or "BaaS," partners.

- 1 -

4873-8255-3549.v1

4. The "Action" refers to the above-captioned lawsuit.

5. "Active Cards" refers to any general purpose reloadable prepaid debit card (or "GPR card"), prepaid card, or checking account in Green Dot's portfolio that had a purchase, reload, or ATM withdrawal transaction during a given quarter in the Relevant Period.

6. "Active Accounts" refers to any bank account within Green Dot's Account Services segment during a given quarter in the Relevant Period. This includes general purpose reloadable prepaid card accounts, demand deposit or "checking" accounts, and credit card accounts in Green Dot's portfolio that had a purchase, deposit, or ATM withdrawal transaction during the applicable quarter.

7. "BaaS" refers to products and services concerning Green Dot's "Banking as a Service" platform, providing financial services and related products to companies and businesses during the Relevant Period, including, but not limited to, debit and payroll cards, embedded financial and money movement services, tax products, mobile banking, and any similar Green Dot product or services that Green Dot's partners use to provide or facilitate banking and payments.

8. "Board of Directors" refers to Green Dot's Board of Directors and any committees or subcommittees thereof, including any ad hoc or special committees.

9. "Class Period" means the currently alleged class period of May 9, 2018 through November 7, 2019, inclusive.

10. "Communication" refers to any transmittal of information, including, but not limited to, words, numbers, and pictures, by any means of transmission, including, but not limited to, speech, writing, audio, video, documents (as defined below), or electronically stored information (as defined below), or other media of any kind. The term "communication" also includes, but is not limited to, all inquiries, discussions, conversations, correspondence, negotiations, agreements, presentations, understandings, meetings, notices, requests, responses, demands, complaints, press, publicity, or trade releases.

- 2 -

4873-8255-3549.v1

11. "Company" or "Green Dot" refers to Green Dot Corporation; any of its direct or indirect subsidiaries, divisions, or affiliates (foreign and domestic), predecessors, and successors; all of its present and former officers, directors, employees, members of the Board of Directors, agents, accountants, attorneys, and advisors; and all other persons acting or purporting to act on its behalf.

12. "Complaint" refers to the First Amended Complaint for Violations of the Federal Securities Laws filed in this Action, ECF 83.

13. "Concern" or "concerning" means relating to, referring to, reflecting upon, describing, evidencing, or constituting.

14. "Correspondence" means any letter, memorandum, note, email, facsimile, text message, instant message, internet message board posting, social media post or message, or any other writing containing a communication.

15. "Defendants" refers to Green Dot and its former executives Steven W. Streit and Mark Shifke.

16. "Documents" means all documents and data responsive to a particular request and is intended to have the broadest possible meaning under Fed. R. Civ. P. 34(a), including, but not limited to, electronically stored information ("ESI," as defined below), electronic or computerized data compilations, communications (as defined above), contracts, correspondence (as defined above), memoranda, invoices, records, presentations, summaries or audio or video recordings of conversations or interviews or meetings, photographs, press releases, handwritten or any other notes, and work papers. A draft of a non-identical copy of any document is a separate document within the meaning of this term.

17. "DOJ" refers to the U.S. Department of Justice and any of its direct or indirect subsidiaries, agencies, divisions, or affiliates (foreign or domestic), predecessors, successors, present and former officers, directors, employees, agents, accountants, and advisors, and all other persons acting or purporting to act on its behalf.

- 3 -

4873-8255-3549.v1

18.    "Electronically stored information" or "ESI" includes, but is not limited to, all items covered by Fed. R. Civ. P. 34(a)(1)(A) and includes all information or data that is generated, received, processed, transmitted, or stored electronically, including metadata (*e.g.*, author, recipient, file creation date, file modification date, file name, file path, etc.), regardless of the media or whether it is in the original format in which it was created.

19.    "Federal Reserve" refers to the United States' central banking system known as the Federal Reserve System created by the Federal Reserve Act, including in its regulatory and supervisory capacities.

20.    "GPR card" refers to general purpose reloadable prepaid debit cards.

21.    "Green Dot's Card Business" refers to any and all of Green Dot's GPR or prepaid debit cards , products, or services (including, but not limited to, Green Dot-branded or co-branded products, products sold at Walmart, CVS, Rite Aid, Walgreens, Dollar Tree, Meijer, Boost Mobile, AT&T, and Citibank); BaaS cards, products, or services (including, but not limited to, Uber, TurboTax, Pay Card, and Simply Paid); direct deposit cards, products, or services; and any other similar card, product, or service that could be or was included at any time as an Active Account or Active Card during the Relevant Period, any product or service on the "Green Dot Network," and any digital, online, or app-based card, product, or service.

22.    "Green Dot Network" refers to Green Dot's network of more than 90,000 retail distribution locations for its products and services in the United States.

23.    "Green Dot Security" or "Green Dot Securities" refers to any note, stock, bond, debenture, transferable share, evidence of indebtedness, or any other security issued by Green Dot or any derivative of the foregoing, including, but not limited to, any put or call option.

24.    "Identify," with respect to persons, means to give, to the extent known, the person's full name, present or last known address, present or last known email address, and when referring to a natural person, additionally, the present or last known

- 4 -

4873-8255-3549.v1

place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the information of that person.

25. "Identify," with respect to documents, means to give, to the extent known, the: (a) type of document; (b) general subject matter; (c) date of the document; and (d) author(s), addressee(s), and recipient(s).

26. "Including" is used to emphasize the type of document requested and does not limit the request in any way.

27. "Individual Defendants" refers to Steven W. Streit ("Streit") and Mark Shifke ("Shifke").

28. "Meeting" refers to the contemporaneous presence of any natural person (including by telephone or electronic connection) for any purpose, whether or not such presence was prearranged or by chance and whether or not the meeting was formal or informal or occurred in connection with some other activity. The term "meeting" also includes presentations.

29. "Person" includes any natural person, firm, association, organization, partnership, limited partnership, sole proprietorship, trust, corporation, or legal or governmental entity, association, or body.

30. "Prepaid cards" refers to any Green Dot prepaid debit cards, including, but not limited to, GPR cards, branded, and co-branded products.

31. "Policies" means any rule, procedure, practice, or course of conduct, whether formal or informal, written or unwritten, recorded or unrecorded, which was recognized or followed, explicitly or implicitly.

32. "Refer," "relate," "referring," or "relating" means all documents which explicitly or implicitly, in whole or in part, were received in conjunction with or were generated as a result of, the subject matter of the request, including, but not limited to, all documents which reflect, record, memorialize, discuss, describe, compare,

- 5 -

4873-8255-3549.v1

consider, concern, constitute, embody, evaluate, analyze, review, report on, comment on, impinge upon, or impact the subject matter of the request.

33.    "SEC" refers to the U.S. Securities and Exchange Commission and any of its direct or indirect subsidiaries, agencies, divisions, or affiliates (foreign or domestic), predecessors, successors, present and former officers, directors, employees, agents, accountants, and advisors, and all other persons acting or purporting to act on its behalf.

34.    "You" or "your" refers, respectively, to each Defendant to whom these requests are directed, including, but not limited to, any subsidiaries, divisions, subdivisions, affiliates, predecessors, successors, joint ventures, present and former officers, directors, employees, representatives, agents, and all other persons acting or purporting to act on behalf of the foregoing.

35.    The use of the singular form of any word includes the plural and vice versa.

## II.    INSTRUCTIONS

1.    In responding to these requests, all documents shall be produced in accordance with Fed. R. Civ. P. 26 and 34.

2.    In responding to these requests, you shall produce all responsive documents (including those stored electronically) that are in your possession, custody, or control or in the possession, custody, or control of your predecessors, successors, parents, subsidiaries, divisions, or affiliates or any of your respective directors, executives, officers, partners, managing agents, agents, employees, accountants, or any other representative.  A document shall be deemed to be within your control if you have the ability or right to secure the document or a copy of the document from another person having possession or custody of the document, including, but not limited to, any documents produced to you by third parties.

3.    All unique documents responsive to the requests herein that are stored on your electronic backup tapes or hard drives shall be produced.

- 6 -

4873-8255-3549.v1

4.      Pursuant to the Federal Rules of Civil Procedure, you are to produce for inspection and copying by Plaintiffs original documents as they are kept in the usual course of business in their original folders, binders, covers, and containers, or facsimiles thereof, or you shall organize and label the documents to correspond to the categories in these requests.  If the original document is not in your custody, then you are to produce an identical copy thereof, as well as any non-identical copies that differ for any reason (including, but not limited to, the making of notes thereon) from the original or from the other copies produced.  Plaintiffs reserve the right to request inspection of the original documents, including those stored electronically, as they are kept in the usual course of business.

5.      These requests are specifically intended to encompass any ESI maintained in any form of computer memory or on computer hard drives, diskettes, or "cloud" or virtual storage, including any word processing or spreadsheet programs or electronic mail systems, or in any form of electronic or computer-related storage, whether or not you currently have "hard copy" printouts of the same.  To the extent that there are documents containing information relevant to these requests that are currently in electronic format, the documents are to be produced in their native format.

6.      If you claim any form of privilege or any other objection, whether based on statute, common law, or otherwise, as a ground for not producing any requested document, you shall furnish a list identifying each document for which the privilege or other objection is claimed together with the following information:

(a)      the privilege being asserted;

(b)      the person on whose behalf the privilege is asserted;

(c)      a precise statement of the facts upon which the claim is based;

(d)      a description of the purported privileged document including: its nature (*e.g.*, letter, memorandum, tape, etc.); the date it was prepared; the date the document bears; the date the document was sent; the date the document was received; the name of the person who prepared the document; the name(s) of the person(s) who

- 7 -

4873-8255-3549.v1

received the document; the name of each person to whom it was sent or was intended to be sent, including all addresses and all recipients of copies; the subject matter of the document; and

(e)  a statement as to whom each identified person represented or purported to represent at all relevant times.

7. If a portion of any document responsive to these requests is withheld under claim of privilege, any non-privileged portion of such document must be produced with the portion claimed to be privileged redacted.  Whenever a document is not produced in full or is produced in redacted form, so indicate on the document, identifying those portions of the document which are not being produced.  For each document that is redacted, in addition to providing the redacted version of the document, the parties should furnish logs which comply with the legal requirements under federal law, but at a minimum will include the following information:

(a)  the Begin Production ID of the document;

(b)  the End Production ID of the document;

(c)  a description of why privilege is being asserted over the document; and

(d)  which privilege is asserted.

8. A privilege log of documents withheld or redacted as set forth in paragraphs 6-7 above shall be provided within 30 days of the production of documents responsive to these requests.

9. You are to produce each document requested herein in its entirety, without deletion or excision (except as redacted for privilege), regardless of whether you consider the entire document to be relevant or responsive to the requests.  All documents must be produced with all attachments and enclosures, and in their original folder, binder, or other cover or container, regardless of whether you consider the entire document to be relevant or responsive to the request.  Whenever a document or group of documents is removed from a file folder, binder, file drawer, file box,

- 8 -

4873-8255-3549.v1

notebook, or other cover or container, a copy of the label of such cover or container must be attached to the document or group of documents.

10. If a document responsive to these requests was at any time in your possession, custody, or control but is no longer available for production, as to each document state the following information:

(a) whether the document is missing or lost;

(b) whether it has been destroyed;

(c) whether the document has been transferred or delivered to another person, and, if so, at whose request;

(d) whether the document has been otherwise disposed of; and

(e) a precise statement of the circumstances surrounding the disposition of the document and the date of its disposition.

11. If in responding to these requests you claim any ambiguity in interpreting a document Request or a Definition or Instruction applicable thereto, such claim shall not be utilized by you as a basis for refusing to produce responsive documents, but there shall be set forth as part of your response the language deemed to be ambiguous and the interpretation chosen or used in responding to the request.

12. All requests shall be deemed continuing and ongoing, and you are required to supplement your responses with new or newly discovered material in accordance with Fed. R. Civ. P. 26(e).

**III.    FORM OF PRODUCTION OF HARD-COPY DOCUMENTS**

Hard-copy documents should be scanned as single-page, Group IV, 300 DPI TIFF images with an .opt image cross-reference file and a delimited database load file (*i.e.*, .dat). The database load file should contain the following fields: "BEGNO," "ENDNO," "PAGES," "VOLUME," and "CUSTODIAN." The documents should be logically unitized (*i.e.*, distinct documents shall not be merged into a single record, and single documents shall not be split into multiple records) and be produced in the order in which they are kept in the usual course of business. If an original document

- 9 -

contains color, and the color is necessary to understand the meaning or content of the document, the document shall be produced as *single-page, 300 DPI JPG images with JPG compression and a high quality setting as to not degrade the original image*. Multi-page OCR text for each document should also be provided. The OCR software shall maximize text quality. Settings such as "auto-skewing" and "auto-rotation" should be turned on during the OCR process.

**IV.     FORM OF PRODUCTION OF ESI**

1.     Format: Except where otherwise noted in this section, electronically stored information ("ESI") should be produced in single-page, black and white, TIFF Group IV, 300 DPI TIFF images. Spreadsheet and presentation type files, audio and video files, photo or graphic images, and documents with tracked changes reflected in the metadata should be produced in native format. Short message communications (*e.g.*, text messages, WhatsApp, Slack, iMessage, Teams, G-Chat, Bloomberg, etc.) will be produced in RSMF with all available metadata and attachments. Except for messages that contain privileged content, the complete communication will be produced, separated into 24-hour increments. To the extent RSMF cannot be provided, the parties shall meet and confer on the appropriate metadata fields and format of production. If an original document being produced in image format contains color, the document should be produced as *single-page, 300 DPI JPG images with JPG compression and a high quality setting as to not degrade the original image*. Parties are under no obligation to enhance an image beyond how it was kept in the usual course of business. TIFFs/JPGs should show any and all text, hidden content, and images that would be visible to the reader using the native software that created the document. For example, TIFFs/JPGs of email messages should include the BCC line, and documents should display comments and hidden content.

2.     Format – Native Files: If a document is produced in RSMF or in native format, a single-page, Bates stamped image slip sheet stating the document has been

- 10 -

4873-8255-3549.v1

produced in native format should also be provided, with the exception of PowerPoint presentations. PowerPoint documents should be produced in native format along with single-page, 300 DPI TIFF/JPG images which display both the slide and speaker's notes. Each native file should be named according to the Bates number it has been assigned, and should be linked directly to its corresponding record in the load file using the NATIVELINK field. To the extent that either party believes that specific documents or classes of documents, not already identified within this protocol, should be produced in native format, the parties should meet and confer in good faith.

3.      De-Duplication: Each party shall remove exact duplicate documents based on MD5 or SHA-1 hash values, at the family level. Attachments should not be eliminated as duplicates for purposes of production, unless the parent email and all attachments are also duplicates. An email that includes content in the BCC or other blind copy field shall not be treated as a duplicate of an email that does not include content in those fields, even if all remaining content in the email is identical. Removal of near-duplicate documents and email thread suppression is not acceptable. De-duplication should be done across the entire collection (global de-duplication) and the CUSTODIAN-ALL field should list each custodian, separated by a semicolon, who was a source of that document and the FILEPATH-DUP field will list each file path, separated by a semicolon, that was a source of that document. Should the CUSTODIAN-ALL or FILEPATH-DUP metadata fields produced become outdated due to rolling productions, an overlay file providing all the custodians and file paths for the affected documents should be produced prior to substantial completion of the document production.

4.      Technology-Assisted Review: Predictive coding/technology-assisted review or artificial intelligence shall not be used for the purpose of culling the documents to be reviewed or produced without notifying the requesting party prior to use and with ample time to meet and confer in good faith regarding a mutually agreeable protocol for the use of such technologies.

- 11 -

4873-8255-3549.v1

5.      Metadata: All ESI shall be produced with a delimited, database load file that contains the metadata fields listed in Table 1, attached hereto.  The metadata produced should have the correct encoding to enable preservation of the documents' original language.  For ESI other than email and e-docs that do not conform to the metadata listed in Table 1, such as text messages, Instant Bloomberg, iMessage, Google Chat, MS Teams, Slack, Google Docs, etc., the parties should meet and confer as to the appropriate metadata fields to be produced.

6.      Embedded Objects: Embedded files shall be produced as attachments to the document that contained the embedded file, with the parent/child relationship preserved.  The embedded files should be marked with a "YES" in the load file under the "Is Embedded" metadata field.  Logos need not be extracted as separate documents as long as they are displayed in the parent document.

7.      Attachments: If any part of an email or its attachments is responsive, the entire email and attachments should be produced, except any attachments that must be withheld or redacted on the basis of privilege.  The parties should meet and confer about whether there is an appropriate basis for withholding a family document for any reason other than attorney-client or work product privilege.  The attachments should be produced sequentially after the parent email.  The parties shall use their best efforts to collect and produce point-in-time documents that are links in documents and emails, including, but not limited to, Google G Suite, Microsoft 365, etc.  Documents extracted from links shall be populated with the BEGATTACH and ENDATTACH metadata fields to show the family relationship.  If documents cannot be extracted from links at the time of collection, the parties should promptly meet and confer to discuss alternative methods of collection and production.

8.      Compressed File Types: Compressed file types (*e.g.*, .ZIP, .RAR, .CAB, .Z) should be decompressed so that the lowest level document or file is extracted.

9.      Structured Data: To the extent a response to discovery requires production of electronic information stored in a database, the parties should meet and

- 12 -

4873-8255-3549.v1

confer regarding methods of production. Parties should consider whether all relevant information may be provided by querying the database for discoverable information and generating a report in a reasonably usable and exportable electronic file.

10. Exception Report: The producing party shall compile an exception report enumerating any unprocessed or unprocessable documents, their file type, and the file location.

11. Encryption: To maximize the security of information in transit, any media on which documents are produced may be encrypted. In such cases, the producing party shall transmit the encryption key or password to the receiving party, under separate cover, contemporaneously with sending the encrypted media.

12. Redactions: If documents that the parties have agreed to produce in native format need to be redacted, the parties should implement redactions while ensuring that proper formatting and usability are maintained. Spreadsheets requiring redaction should be redacted using native redaction software and produced in native format.

## V. RELEVANT TIME PERIOD

The requests herein refer to the time period from May 1, 2017 through March 25, 2020 (the "Relevant Period"), unless otherwise specifically indicated. Responsive documents and data shall include all those that relate to the Relevant Period, even if generated, modified, communicated, or published outside of the Relevant Period.

## VI. DOCUMENT REQUESTS

REQUEST NO. 1:

Corporate organizational charts, employee directories, or other documents sufficient to identify or describe Green Dot's organization and corporate structure (including divisions, business segments, operating units, departments, and the relationship between and among them) during the Class Period, including, but not limited to, directories and organizational charts sufficient to identify by name, title, or reporting relationship:

- 13 -

4873-8255-3549.v1

(a)    direct reports (including "dotted line" reporting relationships) to Defendants Streit and Shifke;

(b)    individuals that comprised Green Dot's senior management;

(c)    members of Green Dot's Board of Directors and committees and subcommittees thereof; and

(d)    members of the Financial Planning & Analysis ("FP&A") and sales groups.

REQUEST NO. 2:

Documents memorializing Green Dot Board of Directors meetings (whether formal or informal and including any committee or subcommittee thereof), including board packages, financial closing packages, meeting minutes, exhibits, agendas, memoranda, resolutions (whether adopted or discussed), notes (whether prepared prior to, during or subsequent to Board of Directors meetings), reports, and presentations, as well as documents and communications concerning any action of the Green Dot Board of Directors by written consent.

REQUEST NO. 3:

Documents concerning any communications, press releases, conference calls, presentations, telephone or Zoom/Teams calls, or meetings with Green Dot shareholders, securities analysts, financial analysts, investors, financial publications, news reporters, journalists, or investment bankers concerning Green Dot, including, but not limited to, any scripts, slide decks, transcripts, recordings, tapes, or videos prepared in connection with, or as a result of, such meetings, including, but not limited to:

(a)    May 9, 2018 1Q18 earnings call;

(b)    May 16, 2018 JPMorgan Conference;

(c)    August 8, 2018 2Q18 earnings call;

(d)    November 7, 2018 3Q18 earnings call;

(e)    February 20, 2019 4Q18 earnings call;

- 14 -

4873-8255-3549.v1

(f)    May 8, 2019 1Q19 earnings call;

(g)    August 7, 2019 2Q19 earnings call; and

(h)    November 7, 2019 3Q19 earnings call.

REQUEST NO. 4:

Documents prepared for, distributed at, or memorializing any Green Dot meetings, whether internal or external, involving the Individual Defendants or any other officer or executive of Green Dot, during which any aspect of Green Dot's Card Business was a topic or otherwise discussed, including, but not limited to, weekly financial planning and town-hall meetings.

REQUEST NO. 5:

Documents and communications concerning the retention, engagement, or consultation with any third party, including public relations consultants, disclosure consultants, or legal advisors in connection with Green Dot's public disclosures during the Class Period or any aspect of Green Dot's Card Business.

REQUEST NO. 6:

Documents sufficient to show indemnification agreements between Green Dot and either of the Individual Defendants, including agreements to assume liability, agreements to assume the defense, non-disparagement agreements, and joint defense agreements made by Defendants, any insurer for Defendants, or any other entities that may be financially affected by the claims in this Action.

REQUEST NO. 7:

Documents from 2015 to the present concerning the sales, revenue, or growth of Green Dot's Card Business, including, but not limited to:

(a)    related metrics on a per-product, per-unit, per-service, categorical, and aggregate basis, including, but not limited to, demand, charges and fees, purchase volume, interest income, churn, reloading, total card loaded funds (or "GDV"), card usage and engagement, total addressable market, margins, market share, average sales prices, inventory, cash transfers, economics and profitability, Active Accounts, Active

- 15 -

4873-8255-3549.v1

Cards, number of customers, incentives, promotions, discounts, and all other related metrics or key performance indicators;

(b)     retailers, sales channels, and partners; and

(c)     charts, projections, comparisons, analyses, evaluations, trends, or changes concerning any of the above on a comparative, per-product, per-unit, per-service, categorical, and aggregate basis, and any related trends or changes, including, but not limited to, related periodic (annual, quarterly, monthly, weekly, or daily) reports, dashboard reports, or other summary compilations or databases.

REQUEST NO. 8:

Documents from 2015 to the present concerning Green Dot's Card Business customer data by product or service, card type, and sales outlet, including: the lifetime value of customers; any differences in the relative, comparative, or absolute value of customers (*e.g.*, prepaid customers compared to other customers); the relative, comparative, or absolute value of long-term and short-term customers; how many and what kinds of products or services customers used; any customer overlap between products or services; any customer demographic information or profiles ; any analyses of Green Dot's "best customers," high-value or low-value customers, repeat customers, "unbanked" or "underbanked" customers; and any related analyses, trends, or changes in any of the above.

REQUEST NO. 9:

Documents concerning Green Dot's Card Business competitors, regarding any actual, potential, or forecasted loss of sales, growth, customers, business volume, or market share from such competitors, including, but not limited to, other prepaid cards, neo-banks (*e.g.*, Chime, Varo, N26, Aspiration), Square, PayPal, Venmo, and any other similar companies or products and services.

REQUEST NO. 10:

Documents from 2015 to the present concerning Green Dot's Active Accounts and Active Cards key metrics, including, but not limited to, composition, definition, or

- 16 -

4873-8255-3549.v1

calculation; products, categories, services, or cards included as Active Accounts or Active Cards; and any changes or trends over time.

REQUEST NO. 11:

Documents concerning Green Dot's discontinuance of its "Number of Active Cards" "Key Metric" and commencement of its "Number of Active Accounts" "Key Metric" in 2018, including:

(a) recommendations and analysis concerning the change;

(b) proposal(s) and alternative(s) considered;

(c) reason(s) for adopting the change;

(d) meetings and communications about the same; and

(e) documents sufficient to show all persons involved in the proposals and decision-making process.

REQUEST NO. 12:

Documents from 2015 through 2019 concerning Green Dot's actual or potential acquisition(s) of competitor(s) to Green Dot's Card Business, and the actual or potential impact of acquisition(s) on Green Dot's sales, revenue, growth, and customer acquisition.

REQUEST NO. 13:

Documents concerning Green Dot's purported shift to digital and direct deposit products from prepaid cards, including, but not limited to, "[t]he continuing long-term portfolio mix shift towards higher lifetime value accounts" (*see* ¶40(a) in the Complaint).

REQUEST NO. 14:

Documents concerning new or lost shelf facings (*i.e.*, retail outlets or doors) for Green Dot's prepaid cards, including circumstances and reasons for the same – for example, as described in ¶38(b) of the Complaint.

- 17 -

4873-8255-3549.v1

REQUEST NO. 15:

Documents concerning Green Dot's February 20, 2019 disclosure of a slowdown in "quarterly active accounts" as described in ¶¶65-66 of the Complaint.

REQUEST NO. 16:

Documents concerning Green Dot's May 8, 2019 disclosure that it had experienced a loss of 300,000 prepaid accounts and would have to expend $60 million to market Company cards as described in ¶69 of the Complaint.

REQUEST NO. 17:

Documents concerning Green Dot's August 7, 2019 disclosure that it lost "500,000 active prepaid accounts," that the Company's Active Accounts had declined, and slashing the Company's fiscal 2019 outlook as described in ¶¶72-74 of the Complaint.

REQUEST NO. 18:

Documents concerning Green Dot's November 7, 2019 disclosure that the declines in Green Dot's prepaid accounts would continue through the first half of 2020 as described in ¶¶77-79 of the Complaint.

REQUEST NO. 19:

Documents concerning Green Dot's Customer Relationship Management Report, BIA dashboard, Financial Key Metric Report, Cohort Report, Tableau Report, Revenue Pacing Report, and Consolidated Activity Reports ("CARs"), and any other reports or databases related to Green Dot's Card Business, and Streit and Shifke's (or their assistants' or direct reports') access to and knowledge of same.

REQUEST NO. 20:

Documents concerning Streit's decision to end a marketing campaign in August 2018 after concluding it was not attracting enough new customers to overcome significant drop-offs in new customer acquisitions, as described in ¶30 of the Complaint, including all meetings and communications concerning same.

- 18 -

4873-8255-3549.v1

REQUEST NO. 21:

Documents concerning or memorializing any actual, proposed, or otherwise considered changes to Green Dot's customer-identification, risk-management, or anti-money-laundering procedures or protocols, including, but not limited to, involving Green Dot's Fraud Management team, Streit, Shifke, or other Green Dot executives, including the allegations in ¶32 of the Complaint.

REQUEST NO. 22:

Documents concerning negative status accounts (including, but not limited to, unmatched address or name, excessive disputes, or negative balance) at Green Dot – for example, as described in ¶32 of the Complaint.

REQUEST NO. 23:

Documents concerning Green Dot customers with numerous accounts – for example, as described in ¶32 of the Complaint, including internal and external reports and communications concerning the same.

REQUEST NO. 24:

Documents concerning any seasonal revenue, sales, or growth variations or changes in Green Dot's tax business and any impact on Green Dot's Card Business, Active Accounts, or Active Cards, including, but not limited to, Green Dot's Turbo Tax cards.

REQUEST NO. 25:

Documents concerning Green Dot's actual or projected financial condition, performance, or prospects, including documents (and retailer or sales-outlet-specific information) relating to budgets, business plans, marketing plans, merchandise or sales plans and forecasts, performance targets, strategic goals, profitability analyses, financial statements, reviews, or similar economic or financial comparisons.

REQUEST NO. 26:

Documents concerning statements made by Defendants in SEC filings and press releases or made during conference or industry calls with analysts or investors during

- 19 -

4873-8255-3549.v1

the Class Period, including, but not limited to, statements concerning fiscal 2018 and 2019's actual or anticipated sales, revenue, growth, gross or profit margins, customers, products, product health or demand, value of customers or products, or product sales mix (*e.g.*, the shift to digital products), and documents forming the basis and/or contradicting those statements.

REQUEST NO. 27:

Documents concerning meeting, exceeding, or missing market estimates or Company guidance of Green Dot's revenue, earnings per share, growth, or common stock price.

REQUEST NO. 28:

Documents concerning the price or value of Green Dot stock (*i.e.*, GDOT on the New York Stock Exchange ("NYSE")), including analysis of or the reasons that the market price of Green Dot stock increased or decreased on a particular date or over time.

REQUEST NO. 29:

Documents concerning the Individual Defendants' Class Period transactions in Green Dot Securities, including any 10b5-1 trading plans and all amendments thereto, including the circumstances and reasons for the same.

REQUEST NO. 30:

Documents and communications concerning the Individual Defendants' compensation from Green Dot for or during calendar years 2017 through 2019, including, but not limited to, documents related to:

(a)     any severance packages, termination agreements, or parachute payments;

(b)     payments made pursuant to §280G of the Internal Revenue Code, 26 U.S.C. §280G;

(c)     all bonuses or other compensation policies, terms, and agreements;

(d)     any performance reviews;

- 20 -

4873-8255-3549.v1

(e)    the benchmarking of salaries against peer groups; and

(f)    all payments, loans, or taxable benefits received from Green Dot.

REQUEST NO. 31:

Documents and communications regarding Green Dot's share price, market capitalization, number of shareholders, volume of shares traded, or the value of any Green Dot Security.

REQUEST NO. 32:

Documents concerning any affirmative defense you have raised or anticipate raising in this litigation.

REQUEST NO. 33:

Documents concerning Green Dot's Class Period public filings with the SEC, including Sarbanes-Oxley certifications.

REQUEST NO. 34:

Documents concerning the Company's policies, procedures and practices relating to: (i) sales; (ii)  revenue; (iii) fraud prevention; (iv) internal controls; (v) public or corporate disclosures; (vi) insider trading; (vii) code of business conduct and ethics; and (viii) the retention or destruction of documents, including the retention or destruction of ESI; and documents concerning the Company's compliance with or violation of any such policies or procedures.

REQUEST NO. 35:

Documents relating to executive departures (whether planned or unplanned), including Streit, Shifke, Brett Narlinger, and Daniel Henry.

REQUEST NO. 36:

Documents concerning the decision to promote Daniel Henry to the role of CEO and President, and his promotion, as announced by the Company on March 25, 2020, and any interim or acting CEO or President before then.

- 21 -

4873-8255-3549.v1

REQUEST NO. 37:

Documents concerning or communications with, by, among, or between Ernst & Young, the Public Accounting Oversight Board, and the American Institute of Certified Public Accountants, including, but not limited to, transcripts of testimony, exhibits, or presentations thereto given by any Green Dot employee (including, without limitation, any former employee of Green Dot).

REQUEST NO. 38:

From May 1, 2017 to the present, documents produced to or communications with any governmental agency or regulator (public or private), including, but not limited to, the SEC, the DOJ, the NYSE, the Federal Reserve, or the Financial Industry Regulatory Authority, as well as requests from, draft or final consent orders or offers, or other actual or proposed actions or penalties concerning Defendants' public statements, compliance risk management (including consumer compliance and compliance with fraud or anti-money-laundering rules or regulations), and transactions in Green Dot Securities, including, but not limited to, transcripts or notes of testimony or interviews provided, exhibits, or presentations thereto given by any present or former Green Dot employee or representative.

REQUEST NO. 39:

Documents concerning Plaintiffs, Plaintiffs' counsel, and this Action.

REQUEST NO. 40:

Calendars, date books, appointment books, and telephone logs reflecting Green Dot-related activities maintained by or for each of the Individual Defendants and each current or former Green Dot employee or other person identified as a potential defense witness in Defendants' Fed. R. Civ. P. 26(a)(1) disclosures.

REQUEST NO. 41:

Documents sufficient to identify all personal and business phone numbers, email addresses, social media aliases or screen names or handles, of each Individual

- 22 -

Defendant, their personal or executive assistants, and for each current or former Green Dot employee identified in Defendants' Fed. R. Civ. P. 26(a)(1) disclosures.

REQUEST NO. 42:

Documents and communications regarding the employment or severance agreement(s) of each of the Individual Defendants and each current or former Green Dot employee identified in Defendants' Fed. R. Civ. P. 26(a)(1) disclosures.

REQUEST NO. 43:

A current résumé or curriculum vitae for each of the Individual Defendants and each current or former Green Dot employee identified in Defendants' Fed. R. Civ. P. 26(a)(1) disclosures.

REQUEST NO. 44:

Documents identified in your Fed. R. Civ. P. 26(a)(1) disclosures.

REQUEST NO. 45:

Documents received from any third party subpoenaed in this Action.

REQUEST NO. 46:

To the extent not captured by the above requests, documents you know to be relevant to this Action.  This request is made without regard to the Relevant Period.

REQUEST NO. 47:

All analyst reports concerning Green Dot, and documents regarding coverage of Green Dot by securities analysts or the news media.

- 23 -

4873-8255-3549.v1

REQUEST NO. 48:

Documents concerning any internal inquiry, audit, or formal or informal investigation concerning Green Dot's Card Business or of the Individual Defendants.

DATED: July 19, 2024

ROBBINS GELLER RUDMAN
  & DOWD LLP
JASON A. FORGE
RACHEL L. JENSEN
JESSICA T. SHINNEFIELD
CHRISTOPHER R. KINNON
MEGAN A. ROSSI
JOHN M. KELLEY

_____

CHRISTOPHER R. KINNON

655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

PITTA LLP
VINCENT F. PITTA
120 Broadway, 28th Floor
New York, NY  10271
Telephone: 212/652-3890
212/652-3891 (fax)

Additional Counsel for Plaintiffs

- 24 -

4873-8255-3549.v1

**TABLE 1: METADATA FIELDS**[1]

| Field Name | Example / Format | Description |
|---|---|---|
| BEGNO | ABC0000001  (Unique ID) | The Document ID number associated with the first page of a document. |
| ENDNO | ABC0000003  (Unique ID) | The Document ID number associated with the last page of a document. |
| BEGATTACH | ABC0000001  (Unique ID Parent-Child Relationships) | The Document ID number associated with the first page of the parent document. |
| ENDATTACH | ABC0000008  (Unique ID Parent-Child Relationships) | The Document ID number associated with the last page of the last attachment. |
| VOLUME | VOL001 | The name of CD, DVD, or Hard Drive. |
| RECORDTYPE | eMail, Attachment, Scanned Doc, eFile, Chat/Text | The record type of a document. |
| SENTDATE | MM/DD/YYYY | The date the email or calendar entry was sent. |
| SENTTIME | HH:MM | The time the email or calendar entry was sent. |
| RECEIVEDDATE | MM/DD/YYYY | The date the document was received. |
| RECEIVEDTIME | HH:MM | The time the document was received. |
| CREATEDATE | MM/DD/YYYY | The date the document was created. |
| CREATETIME | HH:MM | The time the document was created. |
| LASTMODDATE | MM/DD/YYYY | The date the document was last modified. |
| LASTMODTIME | HH:MM | The time the document was last modified. |
| MEETING START DATE | MM/DD/YYYY | Start date of calendar entry. |
| MEETING START TIME | HH:MM | Start time of calendar entry. |
| MEETING END DATE | MM/DD/YYYY | End date of calendar entry. |
| MEETING END TIME | HH:MM | End time of calendar entry. |
| FILEPATH | i.e. /JsmithPC/Users/Jsmith/Desktop | The file path from the location in which the document was stored in the usual course of business.  This field should be populated for both email and e-files. |
| FILEPATH-DUP | i.e.  /JSmith.pst/Inbox<br>/Network Share/Accounting/…<br>/TJohnsonPC/Users/TJohnson/My Documents/... | The file paths from the locations in which the duplicate documents were stored in the usual course of business.  This field should be populated for both email and e-files and separated by semicolons. |
| AUTHOR | jsmith | The author or owner of a document from extracted metadata. |
| LASTEDITEDBY | jsmith | The name of the last person to edit the document from extracted metadata. |
| FROM | Joe Smith <jsmith@email.com> | The display name and email address of the author of an email/calendar item.<br>An email address should always be provided. |
| TO | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and email address of the recipient(s) of an email/calendar item.<br>An email address should always be provided for every email if a recipient existed. |
| CC | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and email of the copyee(s) of an email/calendar item.  An email address should always be provided for every email if a copyee existed. |
| BCC | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and email of the blind copyee(s) of an email or calendar item. An email address should always be provided for every email if a blind copyee existed. |
| SUBJECT | | The subject line of the email/calendar item. |
| MESSAGE TYPE | Appointment, Contact, Task, Distribution List, Message, etc. | An indication of the email system message type. |
| IMPORTANCE | Normal, Low, High | Email Importance Flag |
| TITLE | | The extracted document title of a document. |
| CUSTODIAN-ALL | Smith, Joe; Doe, Jane | All of the custodians of a document from which the document originated, separated by semicolons. |
| SOURCE | Computer, Mobile Phone, Email, Network Share, Slack, WhatsApp, Teams, Database Name, etc. | The source from which the document was collected. |
| ATTACH COUNT | Numeric | The number of attachments to a document. |
| FILEEXT | XLS | The file extension of a document. |
| FILENAME | Document Name.xls | The file name of a document. |
| FILESIZE | Numeric | The file size of a document (including embedded attachments). |
| TRACK CHANGES | Yes or No | The yes/no indicator of whether tracked changes exist in the file. |
| IS EMBEDDED | Yes or No | The yes/no indicator of whether a file is embedded in another document. |
| HASH | | The MD5 or SHA-1 Hash value or "de-duplication key" assigned to a document.  The same hash method (MD5 or SHA-1) should be used throughout production. |
| CONVERSATION INDEX | | ID used to tie together email threads. |
| REDACTED | Yes or Blank | If a document contains a redaction, this field will display 'Yes'. |
| TIMEZONE PROCESSED | PST, CST, EST, etc | The time zone the document was processed in.  **NOTE:** This should be the time zone where the documents were located at time of collection. |
| NATIVELINK | D:\NATIVES\ABC000001.xls | The full path to a native copy of a document. |
| FULLTEXT | D:\TEXT\ABC000001.txt | The path to the full extracted text of the document.  There should be a folder on the deliverable, containing a separate text file per document.  These text files should be named with their corresponding Bates numbers.  **Note**: Emails should include header information: author, recipient, cc, bcc, date, subject, etc.  If the attachment or e-file does not extract any text, then OCR for the document should be provided. |

[1] For ESI other than email and e-docs that do not conform to the metadata listed here, such as text messages, Instant Bloomberg, iMessage, Google Chat, MS Teams, Slack, etc., the parties will meet and confer as to the appropriate metadata fields to be produced.

## DECLARATION OF SERVICE BY EMAIL

I, CHRISTOPHER R. KINNON, not a party to the within action, hereby declare that on July 19, 2024, I served the attached PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND DATA TO DEFENDANTS on the parties in the within action by email addressed as follows:

**COUNSEL FOR PLAINTIFFS:**

| NAME | FIRM | EMAIL |
|---|---|---|
| Jason A. Forge<br>Rachel L. Jensen<br>Jessica T. Shinnefield<br>Christopher R. Kinnon<br>Megan A. Rossi<br>John M. Kelley | Robbins Geller Rudman & Dowd LLP<br>655 West Broadway<br>Suite 1900<br>San Diego, CA  92101 | jforge@rgrdlaw.com<br>rjensen@rgrdlaw.com<br>jshinnefield@rgrdlaw.com<br>ckinnon@rgrdlaw.com<br>mrossi@rgrdlaw.com<br>jkelley@rgrdlaw.com |
| Vincent F. Pitta | Pitta LLP<br>120 Broadway, 28th Floor<br>New York, NY  10271 | vpitta@pittalaw.com |

**COUNSEL FOR DEFENDANTS:**

| NAME | FIRM | EMAIL |
|---|---|---|
| James M. Kramer<br>Alexander K. Talarides<br>M. Todd Scott | Orrick, Herrington & Sutcliffe LLP<br>The Orrick Building<br>405 Howard Street<br>San Francisco, CA  94105 | jkramer@orrick.com<br>atalarides@orrick.com<br>tscott@orrick.com |
| Adam Miller | Orrick, Herrington & Sutcliffe LLP<br>2100 Pennsylvania Avenue NW<br>Washington, D.C.  20037 | adam.miller@orrick.com |
| Megan Benton | Orrick, Herrington & Sutcliffe LLP<br>400 Capitol Mall<br>Suite 3000<br>Sacramento, CA  95814-4497 | mbenton@orrick.com |
| Richard E. Gottlieb<br>Emil Petrossian<br>Jacob Yang | Glaser Weil Fink Howard Jordan & Shapiro LLP<br>10250 Constellation Boulevard<br>19th Floor<br>Los Angeles, CA  90067 | rgottlieb@glaserweil.com<br>epetrossian@glaserweil.com<br>jyang@glaserweil.com |

4873-8255-3549.v1

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 19, 2024, at San Diego, California.

CHRISTOPHER R. KINNON

4873-8255-3549.v1

# EXHIBIT D

JAMES N. KRAMER (SBN 154709)
jkramer@orrick.com
ALEXANDER K. TALARIDES (SBN 268068)
atalarides@orrick.com
M. TODD SCOTT (SBN 226885)
tscott@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, California 94105
Telephone:   (415) 773-5700
Facsimile:   (415) 773-5759

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| IN RE GREEN DOT CORPORATION SECURITIES LITIGATION | Case No. 2:19-cv-10701-DDP-E |
|---|---|
| | CLASS ACTION |
| | **DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND DATA** |
| | Judge:  Honorable Dean D. Pregerson |

Defendants Green Dot Corporation, Steven W. Streit, and Mark Shifke (collectively, "Defendants"), by and through their undersigned attorneys, hereby object and respond to Plaintiffs' First Set of Requests for Production of Documents and Data to Defendants (the "Requests" and each, "a Request"), which Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund and Plaintiff Teamsters Local Union No. 727 Pension Fund (collectively, the "Plaintiffs") served in the above-captioned action (the "Action") on July 19, 2024, as follows:

## PRELIMINARY STATEMENT

Defendants make these responses solely for the purpose of this Action. Defendants' responses are made to the best of their present, actual knowledge. The responses are at all times subject to such additional or different information as discovery or further investigation may disclose and, while based on the present state of Defendants' recollection, are subject to such refreshing of recollection, and such additional knowledge of fact, as may result from Defendants' further discovery and/or investigation. Defendants reserve the right to amend, limit, supplement, and correct the objections and responses as they learn further information. Defendants reserve the right to rely on, at any time, including trial, subsequently discovered information of which Defendants are currently unaware, as well as information omitted from these responses as a result of mistake, error, oversight, or inadvertence.

Defendants are providing these responses, and will disclose information, without waiver of, or prejudice to, their right at any later time to raise objections to the competence, relevance, materiality, privilege, or admissibility of: (a) the Requests or any part thereof; (b) statements made in connection with Defendants' responses to the Requests or any part thereof; (c) any information disclosed in Defendants' responses to the Requests; or (d) any other demand for discovery involving or relating to the matters raised in the Requests or the information disclosed in response to the Requests.

- 1 -

Defendants' responses to the Requests are not an admission of matters stated, implied, or assumed by any or all of the Requests.  Unless expressly stated, Defendants do not admit, adopt, or acquiesce in any factual or legal contention, assertion, assumption, characterization, or implication contained in the Requests. Accordingly, Plaintiffs shall not construe Defendants' response or objection to any Request as an admission that Defendants accept or admit the existence of any facts assumed by the Requests, and Plaintiffs shall not construe any response or objection as admissible evidence of any such assumed facts.

## GENERAL OBJECTIONS

Defendants make the following objections to the Requests, which form a part of Defendants' response to each and every Request, and are set forth here to avoid repetition and duplication.  Although Defendants may specifically invoke some or all of these General Objections in a response to a specific Request, failure to mention a General Objection specifically is not a waiver of any General Objection.

1.     Defendants object to the Requests, and to the Definitions and Instructions thereto, to the extent that they seek to impose obligations that differ from or exceed those imposed by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Local Rules of the United States District Court for the Central District of California, this Court's individual practices, and/or any other applicable law or rule (collectively, the "Governing Rules").  Defendants will respond to the Requests in accordance with the Governing Rules.

2.     Defendants' assertion that they will search for or produce documents in response to a particular Request, if any, is not to be construed as an admission that any document exists within any requested category or categories, but solely as an assertion that Defendants will produce (consistent with objections) any non-privileged, responsive documents within their possession, custody, or control that can be located after a reasonably diligent and proportionate search (the "Search Parameters").  For the avoidance of doubt, Defendants will not collect from or search

- 2 -

for documents in the possession of their counsel or any third-party agents or advisors.

3. To the extent that Defendants agree to produce any documents in response to the Requests, Defendants reserve the right to produce documents responsive to the Requests on a rolling basis at a time, place, and manner to be agreed on by the parties.

4. Defendants object to the Requests to the extent that they are inconsistent with or purport to supersede any order or directive of the Court or any written agreement by the parties concerning discovery in this Action.

5. Defendants object to the Requests, and to the Definitions, to the extent they seek documents or information protected by the attorney-client privilege, the work product doctrine, the joint defense or common interest privilege, or any other applicable privilege, protection, exemption, or immunity ("Privileged Information"). To the extent that Defendants agree to produce any documents, they will not produce Privileged Information. Inadvertent production or disclosure of any Privileged Information or otherwise protected documents or information by Defendants shall not operate as a waiver of any claim of privilege, protection, exemption, or immunity, in whole or in part. Defendants reserve the right to seek the return or destruction of any Privileged Information that is inadvertently produced.

6. Defendants object to the Requests to the extent they are redundant or duplicative of other Requests. Where information or a document may be responsive to more than one Request, to the extent that Defendants agree to provide information or produce a document in response to a Request, Defendants will provide that information or produce that document only once.

7. Defendants object generally to the Requests to the extent that they assume facts not established in these proceedings. Defendants do not hereby admit, adopt, or acquiesce in any factual or legal contention, characterization, or implication that is contained in the Requests.

- 3 -

DEFS' RESPONSES & OBJECTIONS TO PLTS' REQUESTS FOR PRODUCTION OF DOCUMENTS & DATA

8.      Defendants object to the Requests to the extent they seek disclosure of any document or information that is confidential, proprietary, non-public, or otherwise sensitive information including the information of third parties. Defendants will only produce confidential, proprietary, or otherwise sensitive documents or information subject to an appropriate Protective Order.  In addition, any of Defendants' responses stating that they will produce documents is subject to compliance with the terms of any applicable third-party confidentiality agreements. Defendants will take reasonable steps to produce documents after complying with third-party confidentiality agreements and will inform Plaintiffs if they withhold any documents pending compliance with third-party confidentiality agreements.

9.      Defendants object to the Requests to the extent that they lack proportionality or purport to require the identification and/or restoration of any deleted, legacy, backup, or archival data, or otherwise seek the production of any documents that is not accessible without undue burden, disproportionate efforts, or unreasonable expense.  Defendants will conduct a reasonably diligent and proportionate search for, and produce documents in accordance with, the Search Parameters.

10.    Defendants object to any Request seeking "any" or "all" documents because Defendants cannot guarantee that they can locate every single document responsive to a particular Request.  To the extent that Defendants agree to produce documents responsive to any Request and subject to Defendants' objections and responses to that Request, Defendants will collect and produce documents responsive to the Requests pursuant to the Search Parameters.

11.    Defendants object to the Requests to the extent that they seek to require Defendants to provide documents or information not within their own possession, custody, or control.  Defendants further object to the Requests and Plaintiffs' purported Instructions to the extent that they seek documents that can be obtained from some other source that is more convenient, less burdensome, or less expensive.

- 4 -

DEFS' RESPONSES & OBJECTIONS TO PLTS' REQUESTS FOR PRODUCTION OF DOCUMENTS & DATA

Any specific Objection on the grounds that the documents can be obtained from some other source that is more convenient, less burdensome, or less expensive should not be construed as a statement about whether Defendants have documents responsive to a specific Request in their possession, custody, or control.

12.     Defendants object to each Request on the grounds and to the extent that it calls for the discovery of information not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

13.     Defendants object to the Requests to the extent that they purport to require Defendants to draw legal conclusions or are predicated on legal conclusions and arguments.  Subject to and without waiving any of the Objections, Defendants state that any response, or provision of documents or information in response, to the Requests is not intended to provide, and shall not constitute providing, a legal conclusion or admission concerning any of the terms used in the Requests.

14.     Defendants are willing to meet and confer with Plaintiffs on any of the objections or responses contained herein.

15.     Defendants will supplement their objections and responses to the extent Rule 26(e) requires.

## OBJECTIONS TO DEFINITIONS

Defendants incorporate the following Objections to Definitions into its Specific Objections and Responses to the Requests.  Each Specific Objection and Response is made subject to, and without waiver of, the following Objections to Definitions:

1.     Defendants object to the Definitions to the extent that they purport to impose obligations on Defendants beyond those imposed by the Governing Rules and/or other applicable law.  Defendants will respond to these Requests in

- 5 -

DEFS' RESPONSES & OBJECTIONS TO PLTS' REQUESTS FOR PRODUCTION OF DOCUMENTS & DATA

compliance with the Governing Rules.

2. Defendants object to the Definitions to the extent that they (i) are vague, ambiguous, overly broad, or unduly burdensome; (ii) are inconsistent with the ordinary and customary meaning of the words or phrases they purport to define; and (iii) purport to impose any requirements or discovery obligations beyond those set forth in the applicable rules.

3. Defendants object to the definitions of the terms "All"; "Refer," "Relate," "Referring," or "Relating"; "Communication"; "Correspondence"; "Policies"; "Meeting"; and "Person" as vague and ambiguous, and overbroad.

4. Defendants object to the definitions of the terms "Account Services," "Active Cards," "Active Accounts," "BaaS," "GPR card," "Green Dot's Card Business," "Green Dot Network," "Green Dot Security" or "Green Dot Securities," and "Prepaid Cards" to the extent Plaintiffs' use of the Definitions renders any Request overly broad and neither relevant to any party's claim or defense, nor proportional to the needs of this Action to the extent that it is not tethered to the issues in this Action, much less to information that might reasonably be within Defendants' possession, custody or control.

5. Defendants object to the definitions of the terms "Company" or "Green Dot" as overly broad and unduly burdensome to the extent that the Definitions attempt to encompass any and all individuals or entities acting on behalf of Green Dot. In particular, Defendants object to the inclusion in the definition of individuals or entities beyond Green Dot Corporation, including "direct or indirect subsidiaries, divisions, or affiliates (foreign and domestic), predecessors, and successors," in addition to "all of its … former officers, directors, employees, members of the Board of Directors, agents, accountants, attorneys, and advisers," and "any other persons acting or purporting to act on its behalf." Defendants construe "Company" and "Green Dot" to refer to the entity, Green Dot Corporation.

- 6 -

6.      Defendants object to the definition of the term "Communication" to the extent that it is overbroad, not reasonably particularized, or purports to impose obligations beyond or inconsistent with those imposed by the Governing Rules.  For example, this Definition encompasses "any transmittal of information . . . by any means of transmission," regardless of whether the communications are reasonably accessible.

7.      Defendants object to the definitions of the terms "Concern" or "Concerning" because it renders the Requests overbroad, unduly burdensome, oppressive, disproportionate to the needs of this Action, and/or not reasonably calculated to lead to the discovery of admissible evidence.  Defendants further object to this Definition to the extent that it seeks the production of documents that are not reasonably accessible.  Defendants will interpret this term according to its plain meaning.

8.      Defendants object to the definition of the term "Documents" to the extent that it imposes obligations inconsistent with and in excess of the Governing Rules.  Defendants further object to the definition of "Documents" to the extent that it incorporates definitions of ESI and Electronic Messages that differ from, add to, or are otherwise inconsistent with any forthcoming stipulation or order establishing an agreed-upon ESI protocol in this Action.

9.      Defendants object to the definition of the term "Electronically stored information" or "ESI" to the extent each and every Request in which this term appears calls for information that is not within Defendants' possession, custody, or control.

10.     Defendants object to the definition of the term "Identify" to the extent each and every Request in which the term appears calls for information that is not within Defendants' possession, custody, or control.  Defendants further object to Plaintiffs' definition of "Identify" to the extent each and every Request in which this term appears calls for information subject to the attorney-client privilege, the work

- 7 -

product doctrine, the joint-defense privilege, or any other applicable privilege or protection.

11.    Defendants object to the definitions of the terms "You" or "Your" as overly broad and unduly burdensome, as it seeks documents beyond the subject matter involved in the pending Action.  In particular, Defendants object to the inclusion in the definition of individuals or entities beyond Green Dot Corporation, including "any subsidiaries, divisions, subdivisions, affiliates, predecessors, successors, joint ventures, present and former officers, directors, employees, representatives, agents, and all persons acting or purporting to act on behalf of the foregoing."  Plaintiffs' use of this definition renders any topic in which this term appears overbroad and neither relevant to any party's claim or defense, nor proportional to the needs of this Action.  Defendants are construing "You" and "Your" to refer to the Green Dot Corporation entity, as well as Mr. Shifke and Mr. Streit.

### **OBJECTIONS TO INSTRUCTIONS**

1.    Defendants object to Plaintiff's Instructions to the extent that they purport to impose obligations on Defendants beyond those imposed by the Governing Rules, including Rules 26 and 34 of the Federal Rules of Civil Procedure. Defendants will respond to these Requests in compliance with the Governing Rules.

2.    Defendants object to Instruction No. 2 because it purports to require Defendants to produce documents outside their possession, custody, or control, including but not limited to, documents in the possession, custody, or control of third parties such as Defendants' "predecessors, successors, parents, subsidiaries, divisions, or affiliates or any of [their] respective directors, executives, officers, partners, managing agents, agents, employees, accountants, or any other representative." Defendants further object to Instruction No. 2 as overbroad, unduly burdensome, and not proportional to the needs of the case.  Defendants further object to Instruction No. 2 to the extent that it uses an improper definition and standard for

possession, custody, or control that includes the "practical ability" to obtain documents as opposed to "legal right" to obtain them as set forth in applicable law from the Ninth Circuit and Central District of California.  Without waiver of any objections, to the extent that Defendants agree to produce any documents in response to the Requests, Defendants will undertake a reasonably diligent and proportionate search and produce relevant and non-privileged documents that are responsive to a specific Request.

3.    Defendants object to Instruction No. 3 to the extent that it purports to require the identification and/or restoration of any deleted, legacy, backup, or archival data, or otherwise seek the production of any documents that is not reasonably accessible without undue burden or unreasonable expense, and not proportionate to the needs of the Action.

4.    Defendants object to Instruction No. 4 in its entirety.  Absent an agreement to the contrary, Defendants will not make any documents or other materials available for inspection or copying, nor will Defendants produce any documents or materials in any format other than as follows:

**Hard Copy Documents:**  Subject to the objections herein, responsive, non-privileged hard copy documents will be scanned as black and white single-page, Group IV, 300 DPI TIFF images with an .opt image cross-reference file and a delimited database load file (*i.e.*, .dat).  The database load file will contain the following fields:  "BEGNO," "ENDNO," "PAGES," "VOLUME," and "CUSTODIAN."

**ESI:**  Subject to the objections herein, responsive, non-privileged documents or other materials stored during the ordinary course of business as ESI will be produced as single-page, black and white, TIFF Group IV, 300 DPI TIFF images with the exception of spreadsheet files.  To the extent available and non-privileged, Defendants will include cross-referenced load files (*i.e.*, .dat) containing the following fields:    BegBates, EndBates, BegAttach, EndAttach, Custodian,

- 9 -

All_Custodians, AttachmentCount, PageCount, Author, To, From, CC, BCC, Date Created, Subject, Sent Date, Sent Time, File Type, File Extension, File Name, Title, Modified Date, Modified Time, Create Date, Create Time, Parent Date, Parent ID, HiddenText, Nativelink, Text Path, Confidentiality, and Redaction.

To the extent the foregoing production format is not possible for a given document, Defendants will produce documents in the form or forms in which they are maintained in the ordinary course of business or in a reasonably usable form or forms.  Except as set forth herein, Defendants will not produce documents in a manner or format beyond what is required under the Governing Rules.

5.    Defendants object to Instruction No. 5 in its entirety.  Defendants will not produce documents in native format, except as set forth above in Defendants' objection to Instruction No. 4, and will disregard any contrary terms specified in the Instructions to Plaintiff's Requests.

6.    Defendants object to Instruction Nos. 6 through 9 to the extent they are inconsistent with or seek to impose obligations beyond those imposed by the Governing Rules and/or the terms of any Privilege Log Agreement that may be reached in this matter.  Any production by Defendants will be made pursuant to the parameters established in such Agreement or the Governing Rules, and Defendants will disregard any contrary terms specified in the Instructions to Plaintiff's Requests.

7.    Defendants object to Instruction No. 10 to the extent that it is inconsistent with or seeks to impose obligations beyond those imposed by the Governing Rules.  Defendants will respond to these Requests in compliance with the Governing Rules.

8.    Defendants object to Plaintiff's Definition and Instructions of "Relevant Time Period," which seeks documents and information "from May 1, 2017 through March 25, 2020" as unreasonably overbroad and seeking information beyond the timeframe relevant to the claims or defenses that remain at issue in this case. Defendants will answer all Requests based on reasonable and relevant time periods,

- 10 -

about which Defendants are willing to meet and confer.

## OBJECTIONS TO FORM OF PRODUCTION OF HARD-COPY DOCUMENTS AND ESI (Sections III and IV)

Defendants object to Plaintiffs' requested "Form of Production of Hard-Copy Documents" and "Form of Production of ESI" in their entirety.  Instead, Defendants will produce all Hard Copy documents and ESI in the format set forth in Defendants Objections to Instruction 4, above.  Plaintiffs' requested "form of production" exceeds the requirements of the Governing Rules, and purports to instruct Defendants on how to collect, analyze, and review their own documents.

## REQUESTS FOR PRODUCTION

**DOCUMENT REQUEST NO. 1**:

Corporate organizational charts, employee directories, or other documents sufficient to identify or describe Green Dot's organization and corporate structure (including divisions, business segments, operating units, departments, and the relationship between and among them) during the Class Period, including, but not limited to, directories and organizational charts sufficient to identify by name, title, or reporting relationship:

(a)   direct reports (including "dotted line" reporting relationships) to Defendants Streit and Shifke;

(b)   individuals that comprised Green Dot's senior management;

(c)   members of Green Dot's Board of Directors and committees and subcommittees thereof; and

(d)   members of the Financial Planning & Analysis ("FP&A") and sales groups.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case.

- 11 -

DEFS' RESPONSES & OBJECTIONS TO PLTS' REQUESTS FOR PRODUCTION OF DOCUMENTS & DATA

Subject to the foregoing general and specific objections, and to the extent such documents exist and are located upon a reasonably diligent and proportionate search, Defendants will produce non-privileged documents responsive to this Request that are sufficient to show the identity of: (a) direct reports (including "dotted line" reporting relationships, if applicable) to Mr. Shifke and Mr. Streit during the Class Period; (b) members of Green Dot's Board of Directors and committees and subcommittees thereof during the Class Period; and (c) members of the Financial Planning & Analysis and retail sales teams during the Class Period.  Defendants object to the terms "senior management" and "sales groups" as vague and ambiguous and, for that reason, cannot identify documents responsive to those portions of the Request.

**DOCUMENT REQUEST NO. 2**:

Documents memorializing Green Dot Board of Directors meetings (whether formal or informal and including any committee or subcommittee thereof), including board packages, financial closing packages, meeting minutes, exhibits, agendas, memoranda, resolutions (whether adopted or discussed), notes (whether prepared prior to, during or subsequent to Board of Directors meetings), reports, and presentations, as well as documents and communications concerning any action of the Green Dot Board of Directors by written consent.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2**:

Defendants object to this Request as overbroad and unduly burdensome, including to the extent that is seeks "[d]ocuments memorializing Green Dot Board of Directors meetings," without limitation to a reasonable scope.  Defendants further object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case. Defendants further object to this Request to the extent that it seeks information that is protected from disclosure or discovery by the attorney-client privilege, the attorney work-product doctrine, or the common-interest privilege, and any other applicable

- 12 -

DEFS' RESPONSES & OBJECTIONS TO PLTS' REQUESTS FOR PRODUCTION OF DOCUMENTS & DATA

privilege or protection against disclosure.

Subject to the foregoing general and specific objections, Defendants will conduct a reasonably diligent and proportionate search for board packages, financial closing packages, meeting minutes, agendas, memoranda, resolutions, notes, reports, and presentations memorializing Green Dot Board of Directors meetings and written consents that are in their possession, custody, or control, and will produce, on a rolling basis, non-privileged documents responsive to this Request.

**DOCUMENT REQUEST NO. 3**:

Documents concerning any communications, press releases, conference calls, presentations, telephone or Zoom/Teams calls, or meetings with Green Dot shareholders, securities analysts, financial analysts, investors, financial publications, news reporters, journalists, or investment bankers concerning Green Dot, including, but not limited to, any scripts, slide decks, transcripts, recordings, tapes, or videos prepared in connection with, or as a result of, such meetings, including, but not limited to:

(a) May 9, 2018 1Q18 earnings call;

(b) May 16, 2018 JPMorgan Conference;

(c) August 8, 2018 2Q18 earnings call;

(d) November 7, 2018 3Q18 earnings call;

(e) February 20, 2019 4Q18 earnings call;

(f) May 8, 2019 1Q19 earnings call;

(g) August 7, 2019 2Q19 earnings call; and

(h) November 7, 2019 3Q19 earnings call.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3**:

Defendants object to this Request as overbroad and unduly burdensome insofar as it seeks documents without limitation to a reasonable scope concerning "communications, press releases, conference calls, presentations, telephone or Zoom/Teams calls, or meetings" other than those identified in subdivisions (a)

- 13 -

through (h) of this Request.  Defendants further object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case.

Subject to the foregoing general and specific objections, Defendants will conduct a reasonably diligent and proportionate search of documents responsive to this Request concerning the earnings calls identified in (a) through (h) of the Request, that are in their possession, custody, or control, and will produce, on a rolling basis, non-privileged documents responsive to this Request.

**DOCUMENT REQUEST NO. 4**:

Documents prepared for, distributed at, or memorializing any Green Dot meetings, whether internal or external, involving the Individual Defendants or any other officer or executive of Green Dot, during which any aspect of Green Dot's Card Business was a topic or otherwise discussed, including, but not limited to, weekly financial planning and town-hall meetings.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4**:

Defendants object to this Request to the extent that it seeks information that is protected from disclosure or discovery by the attorney-client privilege, the attorney work-product doctrine, or the common-interest privilege, and any other applicable privilege or protection against disclosure.  Defendants further object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case.

Subject to the foregoing general and specific objections, Defendants are willing to meet and confer with Plaintiffs regarding appropriate limitations to this Request.

**DOCUMENT REQUEST NO. 5**:

Documents and communications concerning the retention, engagement, or consultation with any third party, including public relations consultants, disclosure consultants, or legal advisors in connection with Green Dot's public disclosures

- 14 -

during the Class Period or any aspect of Green Dot's Card Business.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5**:

Defendants object to this Request as overbroad and unduly burdensome insofar as it seeks documents and communications concerning "any aspect of Green Dot's Card Business," without limitation to a reasonable time period. Defendants further object to this Request to the extent that it seeks information that is protected from disclosure or discovery by the attorney-client privilege, the attorney work-product doctrine, or the common-interest privilege, and any other applicable privilege or protection against disclosure. Defendants further object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case.

Subject to the foregoing general and specific objections, Defendants are willing to meet and confer with Plaintiffs regarding appropriate limitations to this Request.

**DOCUMENT REQUEST NO. 6**:

Documents sufficient to show indemnification agreements between Green Dot and either of the Individual Defendants, including agreements to assume liability, agreements to assume the defense, non-disparagement agreements, and joint defense agreements made by Defendants, any insurer for Defendants, or any other entities that may be financially affected by the claims in this Action.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case. Defendants further object to this Request to the extent that it seeks information that is protected from disclosure or discovery by the attorney-client privilege, the attorney work-product doctrine, or the common-interest privilege, and any other applicable privilege or protection against disclosure.

DEFS' RESPONSES & OBJECTIONS TO PLTS' REQUESTS FOR PRODUCTION OF DOCUMENTS & DATA

Subject to and without waiving any of their specific or general objections, Defendants will conduct a reasonably diligent and proportionate search of documents that are in their possession, custody, or control, and will produce, on a rolling basis, non-privileged documents responsive to this Request.

**DOCUMENT REQUEST NO. 7**:

Documents from 2015 to the present concerning the sales, revenue, or growth of Green Dot's Card Business, including, but not limited to:

(a) related metrics on a per-product, per-unit, per-service, categorical, and aggregate basis, including, but not limited to, demand, charges and fees, purchase volume, interest income, churn, reloading, total card loaded funds (or "GDV"), card usage and engagement, total addressable market, margins, market share, average sales prices, inventory, cash transfers, economics and profitability, Active Accounts, Active Cards, number of customers, incentives, promotions, discounts, and all other related metrics or key performance indicators;

(b) retailers, sales channels, and partners; and

(c) charts, projections, comparisons, analyses, evaluations, trends, or changes concerning any of the above on a comparative, per-product, per-unit, per-service, categorical, and aggregate basis, and any related trends or changes, including, but not limited to, related periodic (annual, quarterly, monthly, weekly, or daily) reports, dashboard reports, or other summary compilations or databases.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7**:

Defendants object to this Request as overly broad and unduly burdensome in that it asks for documents concerning "the sales, revenue, or growth of Green Dot's Card Business" from 2015 to almost five years after the end of the Class Period in this Action. Defendants further object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case.

- 16 -

Subject to and without waiving any of their specific or general objections, Defendants are willing to meet and confer with Plaintiff regarding appropriate limitations to this Request.

**DOCUMENT REQUEST NO. 8**:

Documents from 2015 to the present concerning Green Dot's Card Business customer data by product or service, card type, and sales outlet, including: the lifetime value of customers; any differences in the relative, comparative, or absolute value of customers (e.g., prepaid customers compared to other customers); the relative, comparative, or absolute value of long-term and short-term customers; how many and what kinds of products or services customers used; any customer overlap between products or services; any customer demographic information or profiles; any analyses of Green Dot's "best customers," high-value or low-value customers, repeat customers, "unbanked" or "underbanked" customers; and any related analyses, trends, or changes in any of the above.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case. Defendants further object to this Request as overly broad and unduly burdensome in that it asks for documents from 2015 to almost five years after the end of the Class Period in this Action.

Subject to and without waiving any of their specific or general objections, Defendants are willing to meet and confer with Plaintiff regarding appropriate limitations to this Request.

**DOCUMENT REQUEST NO. 9**:

Documents concerning Green Dot's Card Business competitors, regarding any actual, potential, or forecasted loss of sales, growth, customers, business volume, or market share from such competitors, including, but not limited to, other prepaid cards, neo-banks (e.g., Chime, Varo, N26, Aspiration), Square, PayPal, Venmo, and

- 17 -

any other similar companies or products and services.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case.  Defendants further object to this Request as overly broad and unduly burdensome in that it asks for documents without limitation to a reasonable time period.  Defendants further object to this Request to the extent that it seeks information that is publicly available or otherwise equally within Plaintiff's possession, custody, or control.  Defendants further object to the undefined term "competitors" as vague and ambiguous.

Subject to and without waiving any of their specific or general objections, Defendants are willing to meet and confer with Plaintiff regarding appropriate limitations to this Request.

**DOCUMENT REQUEST NO. 10**:

Documents from 2015 to the present concerning Green Dot's Active Accounts and Active Cards key metrics, including, but not limited to, composition, definition, or calculation; products, categories, services, or cards included as Active Accounts or Active Cards; and any changes or trends over time.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case.  Defendants further object to this Request as overly broad and unduly burdensome in that it asks for documents without limitation to a reasonable time period.

Subject to and without waiving any of their specific or general objections, Defendants are willing to meet and confer with Plaintiff regarding appropriate limitations to this Request.

- 18 -

**DOCUMENT REQUEST NO. 11**:

Documents concerning Green Dot's discontinuance of its "Number of Active Cards" "Key Metric" and commencement of its "Number of Active Accounts" "Key Metric" in 2018, including:

(a) recommendations and analysis concerning the change;

(b) proposal(s) and alternative(s) considered;

(c) reason(s) for adopting the change;

(d) meetings and communications about the same; and

(e) documents sufficient to show all persons involved in the proposals and decision-making process.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case.

Subject to and without waiving any of their specific or general objections, Defendants are willing to meet and confer with Plaintiff regarding appropriate limitations to this Request.

**DOCUMENT REQUEST NO. 12**:

Documents from 2015 through 2019 concerning Green Dot's actual or potential acquisition(s) of competitor(s) to Green Dot's Card Business, and the actual or potential impact of acquisition(s) on Green Dot's sales, revenue, growth, and customer acquisition.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case. Defendants further object to this Request to the extent that it seeks information that is protected from disclosure or discovery by the attorney-client privilege, the attorney work-product doctrine, or the common-interest privilege, and

DEFS' RESPONSES & OBJECTIONS TO PLTS' REQUESTS FOR PRODUCTION OF DOCUMENTS & DATA

any other applicable privilege or protection against disclosure. Defendants further object to the undefined phrase "potential acquisitions of competitors" as vague and ambiguous.

Subject to and without waiving any of their specific or general objections, Defendants are willing to meet and confer with Plaintiff regarding appropriate limitations to this Request.

**DOCUMENT REQUEST NO. 13**:

Documents concerning Green Dot's purported shift to digital and direct deposit products from prepaid cards, including, but not limited to, "[t]he continuing long-term portfolio mix shift towards higher lifetime value accounts" (*see* ¶40(a) in the Complaint).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case.

Subject to and without waiving any of their specific or general objections, Defendants are willing to meet and confer with Plaintiff regarding appropriate limitations to this Request.

**DOCUMENT REQUEST NO. 14**:

Documents concerning new or lost shelf facings (i.e., retail outlets or doors) for Green Dot's prepaid cards, including circumstances and reasons for the same – for example, as described in ¶38(b) of the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case.

Subject to and without waiving any of their specific or general objections, Defendants are willing to meet and confer with Plaintiff regarding appropriate

- 20 -

limitations to this Request.

**DOCUMENT REQUEST NO. 15**:

Documents concerning Green Dot's February 20, 2019 disclosure of a slowdown in "quarterly active accounts" as described in ¶¶65-66 of the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case.  Defendants further object to this Request to the extent that it seeks information that is protected from disclosure or discovery by the attorney-client privilege, the attorney work-product doctrine, or the common-interest privilege, and any other applicable privilege or protection against disclosure.

Subject to and without waiving any of their specific or general objections, Defendants will conduct a reasonably diligent and proportionate search of documents that are in their possession, custody, or control, and will produce, on a rolling basis, non-privileged documents responsive to this Request.

**DOCUMENT REQUEST NO. 16**:

Documents concerning Green Dot's May 8, 2019 disclosure that it had experienced a loss of 300,000 prepaid accounts and would have to expend $60 million to market Company cards as described in ¶69 of the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case.  Defendants further object to this Request to the extent that it seeks information that is protected from disclosure or discovery by the attorney-client privilege, the attorney work-product doctrine, or the common-interest privilege, and any other applicable privilege or protection against disclosure.

Subject to and without waiving any of their specific or general objections, Defendants will conduct a reasonably diligent and proportionate search of documents

- 21 -

that are in their possession, custody, or control, and will produce, on a rolling basis, non-privileged documents responsive to this Request.

**DOCUMENT REQUEST NO. 17**:

Documents concerning Green Dot's August 7, 2019 disclosure that it lost "500,000 active prepaid accounts," that the Company's Active Accounts had declined, and slashing the Company's fiscal 2019 outlook as described in ¶¶72-74 of the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17**:

Defendants object to this Request on the grounds that it seeks that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case. Defendants further object to this Request to the extent that it seeks information that is protected from disclosure or discovery by the attorney-client privilege, the attorney work-product doctrine, or the common-interest privilege, and any other applicable privilege or protection against disclosure.

Subject to and without waiving any of their specific or general objections, Defendants will conduct a reasonably diligent and proportionate search of documents that are in their possession, custody, or control, and will produce, on a rolling basis, non-privileged documents responsive to this Request.

**DOCUMENT REQUEST NO. 18**:

Documents concerning Green Dot's November 7, 2019 disclosure that the declines in Green Dot's prepaid accounts would continue through the first half of 2020 as described in ¶¶77-79 of the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case. Defendants further object to this Request to the extent that it seeks information that is protected from disclosure or discovery by the attorney-client privilege, the attorney work-product doctrine, or the common-interest privilege, and

- 22 -

any other applicable privilege or protection against disclosure.

Subject to and without waiving any of their specific or general objections, Defendants will conduct a reasonably diligent and proportionate search of documents that are in their possession, custody, or control, and will produce, on a rolling basis, non-privileged documents responsive to this Request.

**DOCUMENT REQUEST NO. 19**:

Documents concerning Green Dot's Customer Relationship Management Report, BIA dashboard, Financial Key Metric Report, Cohort Report, Tableau Report, Revenue Pacing Report, and Consolidated Activity Reports ("CARs"), and any other reports or databases related to Green Dot's Card Business, and Streit and Shifke's (or their assistants' or direct reports') access to and knowledge of same.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 19**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case.

Subject to and without waiving any of their specific or general objections, Defendants are willing to meet and confer with Plaintiff regarding appropriate limitations to this Request.

**DOCUMENT REQUEST NO. 20**:

Documents concerning Streit's decision to end a marketing campaign in August 2018 after concluding it was not attracting enough new customers to overcome significant drop-offs in new customer acquisitions, as described in ¶30 of the Complaint, including all meetings and communications concerning same.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 20**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case. Defendants further object to this Request to the extent that it seeks information that is protected from disclosure or discovery by the attorney-client

- 23 -

privilege, the attorney work-product doctrine, or the common-interest privilege, and any other applicable privilege or protection against disclosure.

Subject to and without waiving any of their specific or general objections, Defendants will conduct a reasonably diligent and proportionate search of documents that are in their possession, custody, or control, and will produce, on a rolling basis, non-privileged documents responsive to this Request.

**DOCUMENT REQUEST NO. 21**:

Documents concerning or memorializing any actual, proposed, or otherwise considered changes to Green Dot's customer-identification, risk-management, or anti-money-laundering procedures or protocols, including, but not limited to, involving Green Dot's Fraud Management team, Streit, Shifke, or other Green Dot executives, including the allegations in ¶32 of the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case. Defendants further object to the phrase "otherwise considered" as vague and ambiguous. Defendants further object to this Request to the extent that it seeks information that is protected from disclosure or discovery by the attorney-client privilege, the attorney work-product doctrine, or the common-interest privilege, and any other applicable privilege or protection against disclosure.

Subject to and without waiving any of their specific or general objections, Defendants are willing to meet and confer with Plaintiff regarding appropriate limitations to this Request.

**DOCUMENT REQUEST NO. 22**:

Documents concerning negative status accounts (including, but not limited to, unmatched address or name, excessive disputes, or negative balance) at Green Dot – for example, as described in ¶32 of the Complaint.

- 24 -

**RESPONSE TO REQUEST FOR PRODUCTION NO. 22**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case, including but not limited to the extent to which it seeks documents reflecting individual customer accounts.  Defendants further object to this Request to the extent that it seeks documents reflecting individual customer accounts because such documents are protected by various privacy regulations.  Defendants further object to the phrase "negative status accounts" as vague and ambiguous, as well as overbroad and unduly burdensome.  Defendants further object to this Request as overly broad and unduly burdensome in that it asks for documents without limitation to a reasonable time period or scope.

Subject to and without waiving any of their specific or general objections, Defendants are willing to meet and confer with Plaintiff regarding appropriate limitations to this Request.

**DOCUMENT REQUEST NO. 23**:

Documents concerning Green Dot customers with numerous accounts – for example, as described in ¶32 of the Complaint, including internal and external reports and communications concerning the same.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 23**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case including but not limited to the extent to which it seeks documents reflecting individual customer accounts.  Defendants further object to this Request to the extent that it seeks documents reflecting individual customer accounts because such documents are protected by various privacy regulations.  Defendants further object to this Request as overly broad and unduly burdensome in that it asks for documents without limitation to a reasonable time period or scope.

- 25 -

DEFS' RESPONSES & OBJECTIONS TO PLTS' REQUESTS FOR PRODUCTION OF DOCUMENTS & DATA

Subject to and without waiving any of their specific or general objections, Defendants are willing to meet and confer with Plaintiff regarding appropriate limitations to this Request.

**DOCUMENT REQUEST NO. 24**:

Documents concerning any seasonal revenue, sales, or growth variations or changes in Green Dot's tax business and any impact on Green Dot's Card Business, Active Accounts, or Active Cards, including, but not limited to, Green Dot's Turbo Tax cards.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 24**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case.  Defendants further object to this Request as overly broad and unduly burdensome in that it asks for documents without limitation to a reasonable time period.

Subject to and without waiving any of their specific or general objections, Defendants are willing to meet and confer with Plaintiff regarding appropriate limitations to this Request.

**DOCUMENT REQUEST NO. 25**:

Documents concerning Green Dot's actual or projected financial condition, performance, or prospects, including documents (and retailer or sales-outlet-specific information) relating to budgets, business plans, marketing plans, merchandise or sales plans and forecasts, performance targets, strategic goals, profitability analyses, financial statements, reviews, or similar economic or financial comparisons.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 25**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case.  Defendants further object to this Request as overly broad and unduly burdensome in that it asks for documents without limitation to a reasonable time

- 26 -

period.   Defendants further object to this Request to the extent that it seeks information that is protected from disclosure or discovery by the attorney-client privilege, the attorney work-product doctrine, or the common-interest privilege, and any other applicable privilege or protection against disclosure.

Subject to and without waiving any of their specific or general objections, Defendants are willing to meet and confer with Plaintiff regarding appropriate limitations to this Request.

**DOCUMENT REQUEST NO. 26**:

Documents concerning statements made by Defendants in SEC filings and press releases or made during conference or industry calls with analysts or investors during the Class Period, including, but not limited to, statements concerning fiscal 2018 and 2019's actual or anticipated sales, revenue, growth, gross or profit margins, customers, products, product health or demand, value of customers or products, or product sales mix (*e.g.*, the shift to digital products), and documents forming the basis and/or contradicting those statements.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 26**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case.   Defendants further object to this Request to the extent that it seeks information that is protected from disclosure or discovery by the attorney-client privilege, the attorney work-product doctrine, or the common-interest privilege, and any other applicable privilege or protection against disclosure.

Subject to and without waiving any of their specific or general objections, Defendants will conduct a reasonably diligent and proportionate search of documents that are in their possession, custody, or control, and will produce, on a rolling basis, non-privileged documents responsive to this Request.

- 27 -

DEFS' RESPONSES & OBJECTIONS TO PLTS' REQUESTS FOR PRODUCTION OF DOCUMENTS & DATA

**DOCUMENT REQUEST NO. 27**:

Documents concerning meeting, exceeding, or missing market estimates or Company guidance of Green Dot's revenue, earnings per share, growth, or common stock price.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 27**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case. Defendants further object to this Request as overly broad and unduly burdensome in that it asks for documents without limitation to a reasonable time period.

Subject to and without waiving any of their specific or general objections, Defendants will conduct a reasonably diligent and proportionate search of documents that are in their possession, custody, or control, and will produce, on a rolling basis, non-privileged documents responsive to this Request.

**DOCUMENT REQUEST NO. 28**:

Documents concerning the price or value of Green Dot stock (i.e., GDOT on the New York Stock Exchange ("NYSE")), including analysis of or the reasons that the market price of Green Dot stock increased or decreased on a particular date or over time.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 28**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case. Defendants further object to this Request as overly broad and unduly burdensome in that it asks for documents without limitation to a reasonable time period. Defendants further object to this Request to the extent that it seeks information that is publicly available or otherwise equally within Plaintiff's possession, custody, or control.

- 28 -

Subject to and without waiving any of their specific or general objections, Defendants will conduct a reasonably diligent and proportionate search of documents that are in their possession, custody, or control, and will produce, on a rolling basis, non-privileged documents responsive to this Request.

**DOCUMENT REQUEST NO. 29**:

Documents concerning the Individual Defendants' Class Period transactions in Green Dot Securities, including any 10b5-1 trading plans and all amendments thereto, including the circumstances and reasons for the same.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 29**:

Defendants object to this Request on the grounds that it seeks information that is neither relevant to any parties' claims or defenses nor proportional to the needs of the case.  Defendants further object to this Request on the grounds that it is overbroad.

Subject to and without waiving any of their specific or general objections, Defendants will conduct a reasonably diligent and proportionate search of documents that are in their possession, custody, or control, and will produce, on a rolling basis, non-privileged documents responsive to this Request.

**DOCUMENT REQUEST NO. 30**:

Documents and communications concerning the Individual Defendants' compensation from Green Dot for or during calendar years 2017 through 2019, including, but not limited to, documents related to:

(a) any severance packages, termination agreements, or parachute payments;

(b) payments made pursuant to §280G of the Internal Revenue Code, 26 U.S.C. §280G;

(c) all bonuses or other compensation policies, terms, and agreements;

(d) any performance reviews;

(e) the benchmarking of salaries against peer groups; and

(f) all payments, loans, or taxable benefits received from Green Dot.

- 29 -

**RESPONSE TO REQUEST FOR PRODUCTION NO. 30**:

Defendants object to this Request on the grounds that it seeks information that is neither relevant to any parties' claims or defenses nor proportional to the needs of the case. Defendants further object to this Request on the grounds that it is overbroad and unduly burdensome.

Subject to and without waiving any of their specific or general objections, Defendants will conduct a reasonably diligent and proportionate search of documents that are in their possession, custody, or control, and will produce, on a rolling basis, non-privileged documents responsive to this Request.

**DOCUMENT REQUEST NO. 31**:

Documents and communications regarding Green Dot's share price, market capitalization, number of shareholders, volume of shares traded, or the value of any Green Dot Security.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 31**:

Defendants object to this Request insofar as it is duplicative of Request No. 28. Defendants further object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case. Defendants further object to this Request as overly broad and unduly burdensome in that it asks for documents without limitation to a reasonable time period. Defendants further object to this Request to the extent that it seeks information that is publicly available or otherwise equally within Plaintiff's possession, custody, or control.

Subject to and without waiving any of their specific or general objections, Defendants will conduct a reasonably diligent and proportionate search of documents that are in their possession, custody, or control, and will produce, on a rolling basis, non-privileged documents responsive to this Request.

**DOCUMENT REQUEST NO. 32**:

Documents concerning any affirmative defense you have raised or anticipate raising in this litigation.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 32**:

Defendants object to this Request on the grounds that it is overbroad and unduly burdensome, particularly to the extent that it seeks "Documents concerning" any of Defendants' affirmative defenses.

Subject to and without waiving any of their specific or general objections, Defendants will conduct a reasonably diligent and proportionate search of documents that are in their possession, custody, or control, and will produce, on a rolling basis, non-privileged documents responsive to this Request.

**DOCUMENT REQUEST NO. 33**:

Documents concerning Green Dot's Class Period public filings with the SEC, including Sarbanes-Oxley certifications.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 33**:

Defendants object to this Request on the grounds that it is overbroad and unduly burdensome, particularly to the extent that it seeks "Documents concerning" Green Dot's public filings, without any reasonable limitation to subject matter or scope. Defendants further object to this Request insofar as it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case. Defendants further object to this Request to the extent that it seeks information that is protected from disclosure or discovery by the attorney-client privilege, the attorney work-product doctrine, or the common-interest privilege, and any other applicable privilege or protection against disclosure. Defendants further object to this Request to the extent that it seeks information that is publicly available or otherwise equally within Plaintiff's possession, custody, or control.

Subject to and without waiving any of their specific or general objections, Defendants are willing to meet and confer with Plaintiff regarding appropriate

- 31 -

limitations to this Request.

**DOCUMENT REQUEST NO. 34**:

Documents concerning the Company's policies, procedures and practices relating to: (i) sales; (ii) revenue; (iii) fraud prevention; (iv) internal controls; (v) public or corporate disclosures; (vi) insider trading; (vii) code of business conduct and ethics; and (viii) the retention or destruction of documents, including the retention or destruction of ESI; and documents concerning the Company's compliance with or violation of any such policies or procedures.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 34**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case. Defendants further object to this Request as overly broad and unduly burdensome in that it asks for documents without limitation to a reasonable time period. Defendants further object to this Request as an inappropriate and premature request for "discovery on discovery" since it seeks information about where and how information is stored or retained without regard to whether such information is relevant. Defendants further object to this Request to the extent that it seeks information that is protected from disclosure or discovery by the attorney-client privilege, the attorney work-product doctrine, or the common-interest privilege, and any other applicable privilege or protection against disclosure.

Subject to and without waiving any of their specific or general objections, Defendants will conduct a reasonably diligent and proportionate search for policies and procedures relating to the enumerated topics that are in their possession, custody, or control, and will produce, on a rolling basis, non-privileged documents responsive to this Request. Defendants object to the term "practices" as vague, ambiguous, and overbroad and, for that reason, cannot identify documents responsive to those portions of the Request.

- 32 -

**DOCUMENT REQUEST NO. 35**:

Documents relating to executive departures (whether planned or unplanned), including Streit, Shifke, Brett Narlinger, and Daniel Henry.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 35**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case.  Defendants further object to this Request as overly broad and unduly burdensome in that it asks for documents without limitation to a reasonable time period or scope.  Defendants further object to this Request to the extent that it seeks information that is protected from disclosure or discovery by the attorney-client privilege, the attorney work-product doctrine, or the common-interest privilege, and any other applicable privilege or protection against disclosure.

Subject to and without waiving any of their specific or general objections, Defendants are willing to meet and confer with Plaintiff regarding appropriate limitations to this Request.

**DOCUMENT REQUEST NO. 36**:

Documents concerning the decision to promote Daniel Henry to the role of CEO and President, and his promotion, as announced by the Company on March 25, 2020, and any interim or acting CEO or President before then.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 36**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case.  Defendants further object to this Request to the extent that it seeks information that is protected from disclosure or discovery by the attorney-client privilege, the attorney work-product doctrine, or the common-interest privilege, and any other applicable privilege or protection against disclosure.

Subject to and without waiving any of their specific or general objections, Defendants are willing to meet and confer with Plaintiff regarding appropriate

- 33 -

limitations to this Request.

**DOCUMENT REQUEST NO. 37**:

Documents concerning or communications with, by, among, or between Ernst & Young, the Public Accounting Oversight Board, and the American Institute of Certified Public Accountants, including, but not limited to, transcripts of testimony, exhibits, or presentations thereto given by any Green Dot employee (including, without limitation, any former employee of Green Dot).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 37**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case. Defendants further object to this Request as overly broad and unduly burdensome in that it asks for documents without limitation to a reasonable time period. Defendants further object to this Request to the extent that it seeks information that is protected from disclosure or discovery by the attorney-client privilege, the attorney work-product doctrine, or the common-interest privilege, and any other applicable privilege or protection against disclosure.

Subject to and without waiving any of their specific or general objections, Defendants are willing to meet and confer with Plaintiff regarding appropriate limitations to this Request.

**DOCUMENT REQUEST NO. 38**:

From May 1, 2017 to the present, documents produced to or communications with any governmental agency or regulator (public or private), including, but not limited to, the SEC, the DOJ, the NYSE, the Federal Reserve, or the Financial Industry Regulatory Authority, as well as requests from, draft or final consent orders or offers, or other actual or proposed actions or penalties concerning Defendants' public statements, compliance risk management (including consumer compliance and compliance with fraud or anti-money-laundering rules or regulations), and transactions in Green Dot Securities, including, but not limited to, transcripts or notes

- 34 -

of testimony or interviews provided, exhibits, or presentations thereto given by any present or former Green Dot employee or representative.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 38**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case. Defendants further object to this Request to the extent that it seeks information that is protected from disclosure or discovery by the attorney-client privilege, the attorney work-product doctrine, the bank examination or supervision privilege, or the common-interest privilege, and any other applicable privilege or protection against disclosure. Defendants further object to this Request as overly broad and unduly burdensome in that it asks for documents without limitation to a reasonable scope.

Subject to and without waiving any of their specific or general objections, Defendants are willing to meet and confer with Plaintiff regarding appropriate limitations to this Request.

**DOCUMENT REQUEST NO. 39**:

Documents concerning Plaintiffs, Plaintiffs' counsel, and this Action.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 39**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case. Defendants further object to this Request as overly broad and unduly burdensome in that it asks for documents without limitation to a reasonable time period. Defendants further object to this Request to the extent that it seeks information that is protected from disclosure or discovery by the attorney-client privilege, the attorney work-product doctrine, or the common-interest privilege, and any other applicable privilege or protection against disclosure.

Subject to the foregoing general and specific objections, and to the extent such documents exist and are located upon a reasonably diligent and proportionate search,

- 35 -

Defendants will produce non-privileged documents responsive to this Request that specifically concern Plaintiffs. Defendants do not intend to produce documents in response to this Request concerning the catchall categories of "Plaintiffs' counsel" and "this Action."

**DOCUMENT REQUEST NO. 40**:

Calendars, date books, appointment books, and telephone logs reflecting Green Dot-related activities maintained by or for each of the Individual Defendants and each current or former Green Dot employee or other person identified as a potential defense witness in Defendants' Fed. R. Civ. P. 26(a)(1) disclosures.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 40**:

Defendants object to this Request on the grounds that it seeks information that is neither relevant to any party's claims or defenses nor proportional to the needs of the case. Defendants further object to this Request on the grounds that it is overbroad and unduly burdensome.

Defendants do not intend to produce documents in response to this Request.

**DOCUMENT REQUEST NO. 41**:

Documents sufficient to identify all personal and business phone numbers, email addresses, social media aliases or screen names or handles, of each Individual Defendant, their personal or executive assistants, and for each current or former Green Dot employee identified in Defendants' Fed. R. Civ. P. 26(a)(1) disclosures.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 41**:

Defendants object to this Request on the grounds that it seeks information that is neither relevant to any party's claims or defenses nor proportional to the needs of the case. Defendants further object to this Request on the grounds that it is overbroad and unduly burdensome. Defendants further object to this Request on the grounds that it seeks information implicating individuals' constitutional right to privacy.

Defendants do not intend to produce documents in response to this Request.

- 36 -

**DOCUMENT REQUEST NO. 42**:

Documents and communications regarding the employment or severance agreement(s) of each of the Individual Defendants and each current or former Green Dot employee identified in Defendants' Fed. R. Civ. P. 26(a)(1) disclosures.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 42**:

Defendants object to this Request on the grounds that it seeks information that is neither relevant to any party's claims or defenses nor proportional to the needs of the case. Defendants further object to this Request on the grounds that it is overbroad and unduly burdensome. Defendants further object to this Request on the grounds that it seeks information implicating individuals' constitutional right to privacy.

Subject to the foregoing general and specific objections, and to the extent such documents exist and are located upon a reasonably diligent and proportionate search, Defendants will produce employment or severance agreements of Mr. Streit and Mr. Shifke and each current or former Green Dot employee identified in Defendants' Rule 26(a)(1) disclosures.

**DOCUMENT REQUEST NO. 43**:

A current résumé or curriculum vitae for each of the Individual Defendants and each current or former Green Dot employee identified in Defendants' Fed. R. Civ. P. 26(a)(1) disclosures.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 43**:

Defendants object to this Request on the grounds that it seeks information that is neither relevant to any party's claims or defenses nor proportional to the needs of the case. Defendants further object to this Request on the grounds that it is overbroad and unduly burdensome.

Subject to the foregoing general and specific objections, and to the extent such documents exist and are located upon a reasonably diligent and proportionate search, Green Dot will produce the most current version of a résumé or curriculum vitae that it has on file for each current or former Green Dot employee identified in Defendants'

- 37 -

Fed. R. Civ. P. 26(a)(1) disclosures other than the Individual Defendants, and the Individual Defendants will each produce the most current version of their résumé or curriculum vitae that can be located.

**DOCUMENT REQUEST NO. 44**:

Documents identified in your Fed. R. Civ. P. 26(a)(1) disclosures.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 44**:

Subject to and without waiving any of their specific or general objections, Defendants will conduct a reasonably diligent and proportionate search of documents that are in their possession, custody, or control, and will produce, on a rolling basis, non-privileged documents responsive to this Request.

**DOCUMENT REQUEST NO. 45**:

Documents received from any third party subpoenaed in this Action.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 45**:

Defendants object to this Request on the grounds that it is overbroad and unduly burdensome. Defendants further object to this Request to the extent that it seeks documents that are not relevant to any party's claims or defenses or proportional to the needs of the case. Defendants further object to this Request to the extent that it seeks information that is protected from disclosure or discovery by the attorney-client privilege, the attorney work-product doctrine, or the common-interest privilege, and any other applicable privilege or protection against disclosure.

Subject to and without waiving any of their specific or general objections, Defendants will produce all documents produced by any third party in response to a subpoena issued by Defendants in this action.

**DOCUMENT REQUEST NO. 46**:

To the extent not captured by the above requests, documents you know to be relevant to this Action. This request is made without regard to the Relevant Period.

- 38 -

**RESPONSE TO REQUEST FOR PRODUCTION NO. 46**:

Defendants object to this Request on the grounds that it is overbroad and unduly burdensome.  Defendants further object to this Request to the extent that it seeks information that is protected from disclosure or discovery by the attorney-client privilege, the attorney work-product doctrine, or the common-interest privilege, and any other applicable privilege or protection against disclosure.

Subject to and without waiving any of their specific or general objections, Defendants are willing to meet and confer with Plaintiff regarding appropriate limitations to this Request.  Subject to those limitations, Defendants will conduct a reasonably diligent and proportionate search of documents that are in their possession, custody, or control, and will produce, on a rolling basis, non-privileged documents responsive to this Request.

**DOCUMENT REQUEST NO. 47**:

All analyst reports concerning Green Dot, and documents regarding coverage of Green Dot by securities analysts or the news media.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 47**:

Defendants object to this Request to the extent that it seeks documents that are not relevant to any party's claims or defenses or proportional to the needs of the case. Defendants further object to this Request to the extent that it seeks information that is publicly available or otherwise equally available to Plaintiff.  Defendants further object to this Request on the grounds that it is overbroad and unduly burdensome, including to the extent that it seeks "[a]ll analyst reports," without limitation, and because it is not limited to a reasonable time period.

Subject to and without waiving any of their specific or general objections, Defendants are willing to meet and confer with Plaintiff regarding appropriate limitations to this Request.

DEFS' RESPONSES & OBJECTIONS TO PLTS' REQUESTS FOR PRODUCTION OF DOCUMENTS & DATA

**DOCUMENT REQUEST NO. 48**:

Documents concerning any internal inquiry, audit, or formal or informal investigation concerning Green Dot's Card Business or of the Individual Defendants.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 48**:

Defendants object to this Request on the grounds that it seeks materials that are neither relevant to any parties' claims or defenses nor proportional to the needs of the case. Defendants further object to this Request as overly broad and unduly burdensome in that it asks for documents without limitation to a reasonable time period. Defendants further object to this Request to the extent that it seeks information that is protected from disclosure or discovery by the attorney-client privilege, the attorney work-product doctrine, or the common-interest privilege, and any other applicable privilege or protection against disclosure. Defendants further object to the terms "inquiry" and "information investigation" as vague and ambiguous.

Subject to and without waiving any of their specific or general objections, Defendants are willing to meet and confer with Plaintiff regarding appropriate limitations to this Request.

Dated: August 19, 2024

**ORRICK, HERRINGTON & SUTCLIFFE LLP**
JAMES N. KRAMER
ALEXANDER K. TALARIDES
M. TODD SCOTT

_____
ALEXANDER K. TALARIDES
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:  415-773-5700
Facsimile:  415-773-5957
*Attorneys for Defendants*

- 40 -

## PROOF OF SERVICE BY ELECTRONIC MAIL

I am over the age of eighteen years and not a party to the within-entitled action. My business address is Orrick, Herrington & Sutcliffe LLP, The Orrick Building, 405 Howard Street, San Francisco, California 94105-2669.

On August 19, 2024, I served the following document(s):

- **DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND DATA**

on the interested parties in this action by email addressed as follows:

| NAME | FIRM | EMAIL |
|---|---|---|
| Jason A. Forge<br>Rachel L. Jensen<br>Jessica T. Shinnefield<br>Christopher R. Kinnon<br>Megan A. Rossi<br>John M. Kelley<br><br>*Lead Counsel for Plaintiffs* | ROBBINS GELLER RUDMAN & DOWD LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101-8498<br>Telephone: (619) 231-1058<br>Facsimile: (619) 231-7423 | jforge@rgrdlaw.com<br>rjensen@rgrdlaw.com<br>jshinnefield@rgrdlaw.com<br>ckinnon@rgrdlaw.com<br>mrossi@rgrdlaw.com<br>jkelley@rgrdlaw.com |
| Vincent F. Pitta<br><br>*Additional Counsel for Plaintiffs* | PITTA LLP<br>120 Broadway, 28th Floor<br>New York, NY 10271<br>Telephone: (212) 652-3890<br>Facsimile: (212) 652-3891 | vpitta@pittalaw.com |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 19, 2024, at San Francisco, California.

_____
LENNY T. PATTS

# EXHIBIT E

ROBBINS GELLER RUDMAN
  & DOWD LLP
JASON A. FORGE (181542)
RACHEL L. JENSEN (211456)
JESSICA T. SHINNEFIELD (234432)
CHRISTOPHER R. KINNON (316850)
MEGAN A. ROSSI (318643)
JOHN M. KELLEY (339965)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
jforge@rgrdlaw.com
rjensen@rgrdlaw.com
jshinnefield@rgrdlaw.com
ckinnon@rgrdlaw.com
mrossi@rgrdlaw.com
jkelley@rgrdlaw.com

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re GREEN DOT CORPORATION SECURITIES LITIGATION | ) ) ) ) | Case No. 2:19-cv-10701-DDP (Ex) <br><br> <u>CLASS ACTION</u> <br><br> LEAD PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT GREEN DOT CORPORATION |

4875-0162-4019.v1

Pursuant to Federal Rules of Civil Procedure 26 and 33, Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund demands that Defendant Green Dot Corporation ("you," defined below) answer the following Interrogatories separately and fully under oath within 30 days from the date of service.  You must respond to each Interrogatory in accordance with the instructions and definitions set forth below.  These Interrogatories are continuing and require supplemental answers upon discovery of additional pertinent information according to Fed. R. Civ. P. 26(e).

## I.    PROCEDURES FOR INTERROGATORIES

The following definitions, instructions, and procedures are to be considered applicable to each Interrogatory and are hereby incorporated into each Interrogatory to which it pertains.

1.    These Interrogatories are continuing in nature.  Therefore, any information coming into your possession or that of your counsel that would change the answers or responses in any way must be promptly furnished to Lead Counsel, in any event, no later than 30 days after receipt of such information.  You are hereby notified that an order will be sought at trial barring the admission of any evidence responsive to any Interrogatory which you have failed to disclose.

2.    Where an Interrogatory asks for a date, an amount, or any other specific information, a statement that the precise date, amount, or other specific information is unknown to you is inadequate where you are capable of approximating the information requested.

3.    If any of these Interrogatories cannot be answered in full, answer to the extent possible, specifying your reasons for your inability to answer the remainder and stating whatever information, knowledge, or belief you do have concerning (defined below) the unanswered portion.

4.    If you withhold any information or documents (defined below) based upon a claim of privilege or work product protection, please provide a privilege log

- 1 -

that is consistent with any agreed-upon privilege protocol, or in the absence of such agreement, the privilege log should be in a searchable and sortable format containing the following information: (a) identify (defined below) the withheld information or document(s), including its date, author(s), addressee(s), and any other recipients[1]; (b) identify the contents of the information being withheld with sufficient particularity to enable Plaintiffs to bring the matter before the Court for a ruling on the claim of privilege; and (c) identify the privilege or doctrine under which the information is being withheld.  Attorneys and third parties should be clearly identified.

5.    Throughout these Interrogatories, language should be read in light of the context in which it is used.  Consequently, the singular includes the plural and the plural includes the singular where appropriate.  Furthermore, the masculine is intended to also refer to the feminine where appropriate and vice versa.

6.    If your answer to any Interrogatory or subpart thereof is "N/A" or "Not Applicable," describe in detail your reason(s) for making such reply.  Furthermore, in reply to any Interrogatory or subpart thereof, do not merely state "see attached records" unless you have no additional memory of the matters referred to in the specific Interrogatory or subpart thereof.  If you have any additional memory of the matters referred to, describe it in detail.

---

[1]    For emails and e-docs, metadata fields, including, but not limited to, Author, Subject, Title, Attachment Name, File Name, Custodian(s), Sender/From, Recipient/To/CC/BCC, Sent Date/Time, Create Date/Time, Date/Time Last Modified, File Extension, Attachment Count, Hash Value, Conversation ID, or Thread ID, and information sufficient to understand family relationship of withheld documents should be provided.  For electronically stored information other than email and e-docs that do not conform to the metadata fields listed here, such as text messages, Instant Bloomberg, iMessage, Google Chat, Yammer, Slack, etc., you will provide the metadata fields that are similar to the above-listed fields and other fields that are reasonably available and relevant to the privilege assertion.

- 2 -

4875-0162-4019.v1

## II.    DEFINITIONS

1.    "All" shall include the term "each" and vice-versa, as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside the scope of the request.

2.    "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside the scope of the request.

3.    "Account Services" refers to revenues and expenses derived from Green Dot's deposit account programs during the Relevant Period (defined below), such as prepaid cards, debit cards, consumer and small business checking accounts, secured credit cards, payroll debit cards, and gift cards.  These deposit account programs are marketed under several of the Company's leading consumer brand names and under the brand names of the Company's "Banking as a Service," or "BaaS," partners.

4.    The "Action" refers to the above-captioned lawsuit.

5.    "Active Accounts" refers to any bank account within Green Dot's Account Services segment during a given quarter in the Relevant Period.  This includes general purpose reloadable prepaid card accounts, demand deposit or "checking" accounts, and credit card accounts in Green Dot's portfolio that had a purchase, deposit, or ATM withdrawal transaction during the applicable quarter.

6.    "Active Cards" refers to any general purpose reloadable prepaid debit card (or "GPR card"), prepaid card, or checking account in Green Dot's portfolio that had a purchase, reload, or ATM withdrawal transaction during a given quarter in the Relevant Period.

7.    "BaaS" refers to products and services concerning Green Dot's "Banking as a Service" platform, providing financial services and related products to companies and businesses during the Relevant Period, including, but not limited to, debit and payroll cards, embedded financial and money movement services, tax products,

- 3 -

4875-0162-4019.v1

mobile banking, and any similar Green Dot product or services that Green Dot's partners use to provide or facilitate banking and payments.

8. "Board of Directors" refers to Green Dot's Board of Directors and any committees or subcommittees thereof, including any ad hoc or special committees.

9. "Card Meetings" means any recurring or regular Green Dot meetings concerning Green Dot's Card Business, including, but not limited to, task forces, working groups, and email listservs.

10. "Card Reports" means regular (daily, weekly, monthly, quarterly, yearly) reports and databases that collected, analyzed, gathered, or distributed any metrics concerning Green Dot's Card Business, including, but not limited to, BIA dashboard, Financial Key Metrics, the Cohort Report, the Tableau Report, and the Revenue Pacing Report, as well as Consolidated Activity Reports ("CARs"), generated to reflect current and projected customer bases for the Company's product lines.

11. "Class Period" means the currently alleged class period of May 9, 2018 through November 7, 2019, inclusive.

12. "Communication" refers to any transmittal of information, including, but not limited to, words, numbers, and pictures, by any means of transmission, including, but not limited to, speech, writing, audio, video, documents (as defined below), or electronically stored information (as defined below), or other media of any kind. The term "communication" also includes, but is not limited to, all inquiries, discussions, conversations, correspondence, negotiations, agreements, presentations, understandings, meetings, notices, requests, responses, demands, complaints, press, publicity, or trade releases.

13. "Company" or "Green Dot" refers to Green Dot Corporation; any of its direct or indirect subsidiaries, divisions, or affiliates (foreign and domestic), predecessors, and successors; all of its present and former officers, directors, employees, members of the Board of Directors, agents, accountants, attorneys, and advisors; and all other persons acting or purporting to act on its behalf.

- 4 -

14.    "Concern" or "concerning" means relating to, referring to, reflecting upon, describing, evidencing, or constituting.

15.    "Consent Order" means the Board of Governors of the Federal Reserve System's July 19, 2024 Order to Cease and Desist and Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, concerning Green Dot Corporation and Green Dot Bank.

16.    "Correspondence" means any letter, memorandum, note, email, facsimile, text message, instant message, internet message board posting, social media post or message, or any other writing containing a communication.

17.    "Defendants" refers to Green Dot and its former executives Steven W. Streit and Mark Shifke.

18.    "Documents" means all documents and data responsive to a particular request and is intended to have the broadest possible meaning under Fed. R. Civ. P. 34(a), including, but not limited to, electronically stored information ("ESI," as defined below), electronic or computerized data compilations, communications (as defined above), contracts, correspondence (as defined above), memoranda, invoices, records, presentations, summaries or audio or video recordings of conversations or interviews or meetings, photographs, press releases, handwritten or any other notes, and work papers.  A draft of a non-identical copy of any document is a separate document within the meaning of this term.

19.    "Electronically stored information" or "ESI" includes, but is not limited to, all items covered by Fed. R. Civ. P. 34(a)(1)(A) and includes all information or data that is generated, received, processed, transmitted, or stored electronically, including metadata (*e.g.*, author, recipient, file creation date, file modification date, file name, file path, etc.), regardless of the media or whether it is in the original format in which it was created.

20.    "Federal Reserve" refers to the United States' central banking system known as the Federal Reserve System created by the Federal Reserve Act, including

- 5 -

4875-0162-4019.v1

in its regulatory and supervisory capacities, the Federal Reserve Bank of San Francisco, the Federal Reserve Bank of Dallas, and the Board of Governors of the Federal Reserve System.

21. "GPR card" refers to general purpose reloadable prepaid debit cards.

22. "Green Dot's Card Business" refers to any and all of Green Dot's GPR or prepaid debit cards, products, or services (including, but not limited to, Green Dot-branded or co-branded products, products sold at Walmart, CVS, Rite Aid, Walgreens, Dollar Tree, Meijer, Boost Mobile, AT&T, and Citibank); BaaS cards, products, or services (including, but not limited to, Uber, TurboTax, Pay Card, and Simply Paid); direct deposit cards, products, or services; and any other similar card, product, or service that could be or was included at any time as an Active Account or Active Card during the Relevant Period, any product or service on the "Green Dot Network," and any digital, online, or app-based card, product, or service.

23. "Identify," with respect to persons, means to give, to the extent known, the person's full name, present or last known address, present or last known email address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the information of that person.

24. "Identify," with respect to documents, means to give, to the extent known, the: (a) type of document; (b) general subject matter; (c) date of the document; and (d) author(s), addressee(s), and recipient(s).

25. "Including" is used to emphasize the type of information requested and does not limit the request in any way.

26. "Individual Defendants" refers to Steven W. Streit ("Streit") and Mark Shifke ("Shifke").

27. "Meeting" or "meetings" refers to the contemporaneous presence of any natural person (including by telephone or electronic connection) for any purpose,

- 6 -

4875-0162-4019.v1

whether or not such presence was prearranged or by chance and whether or not the meeting was formal or informal or occurred in connection with some other activity. The term "meeting" also includes presentations.

28.    "Person" includes any natural person, firm, association, organization, partnership, limited partnership, sole proprietorship, trust, corporation, or legal or governmental entity, association, or body.

29.    "Prepaid cards" refers to any Green Dot prepaid debit cards, including, but not limited to, GPR cards, branded, and co-branded products.

30.    "Regular" or "regularly" means yearly, quarterly, monthly, weekly, or daily.

31.    "You" or "your" refers, respectively, to Green Dot, including, but not limited to, any subsidiaries, divisions, subdivisions, affiliates, predecessors, successors, joint ventures, present and former officers, directors, employees, representatives, agents, and all other persons acting or purporting to act on behalf of the foregoing.

32.    The use of the singular form of any word includes the plural and vice versa.

**III.    RELEVANT TIME PERIOD**

The Interrogatories herein refer to the time period from May 1, 2017 through March 25, 2020 (the "Relevant Period"), unless otherwise specifically indicated. Responsive answers shall include all information to make the answers complete and accurate throughout the Relevant Period.

**IV.    INTERROGATORIES**

INTERROGATORY NO. 1:

For each of the following retailers and partners for Green Dot's Card Business products and services, state (a) the individuals with whom Green Dot communicated regularly concerning Green Dot's products and services, and (b) the individuals at

- 7 -

4875-0162-4019.v1

Green Dot who communicated regularly with each retailer or partner concerning Green Dot's Card Business products and services:

- Walmart Inc.

- CVS Pharmacy, Inc.

- Rite Aid Corporation

- 7-Eleven, Inc.

- Walgreens Boots Alliance, Inc.

- Dollar Tree, Inc.

- Meijer, Inc.

- DISH Wireless L.L.C. (dba Boost Mobile)

- AT&T Inc.

- Citibank, N.A.

- Uber Technologies, Inc.

- Intuit Inc.

- Apple Inc. (regarding Apple Cash)

INTERROGATORY NO. 2:

Identify each individual at Green Dot who communicated with anyone at the Federal Reserve from May 1, 2017 through the present concerning the Consent Order, including any preliminary, investigative, fact-finding, formal or informal presentations, interviews, submissions, or proffers, and describe the communications as follows: (a) name of the individual; (b) name of the individual with whom they communicated at the Federal Reserve; (c) where, how, and when they communicated with the Federal Reserve, including any testimony given; (d) all topics discussed; (e) all documents received from the Federal Reserve or provided to it; and (f) any conclusions, proposals, negotiations, compliance, oversight, implementations,

- 8 -

4875-0162-4019.v1

progress reports, penalties, reviews, tasking, or follow-up recommended, considered, or discussed beyond what is written in the Consent Order.

INTERROGATORY NO. 3:

Identify each Card Report, including: (a) name, purpose, content, location, and cadence of each Card Report, including, but not limited to, listing any key metrics, products and services, and other information collected or analyzed; (b) the recipients, senders, and custodians of each Card Report.

INTERROGATORY NO. 4:

Identify any Card Meetings, including the name(s) and purpose(s) of such meetings, attendees, meeting cadence (*i.e.*, daily, weekly, monthly, or yearly), whether notes or minutes were taken and by whom as well as the location of such notes, and any related summaries, reports, or presentations.

DATED:  July 30, 2024

ROBBINS GELLER RUDMAN
 & DOWD LLP
JASON A. FORGE
RACHEL L. JENSEN
JESSICA T. SHINNEFIELD
CHRISTOPHER R. KINNON
MEGAN A. ROSSI
JOHN M. KELLEY

_____
CHRISTOPHER R. KINNON

655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

PITTA LLP
VINCENT F. PITTA
120 Broadway, 28th Floor
New York, NY  10271
Telephone: 212/652-3890
212/652-3891 (fax)

Additional Counsel for Plaintiffs

- 9 -

4875-0162-4019.v1

## DECLARATION OF SERVICE BY EMAIL

I, SUSAN M. WILLIAMS, not a party to the within action, hereby declare that on July 30, 2024, I served the attached **LEAD PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT GREEN DOT CORPORATION** on the parties in the within action by email addressed as follows:

### COUNSEL FOR PLAINTIFFS:

| NAME | FIRM | EMAIL |
|---|---|---|
| Jason A. Forge<br>Rachel L. Jensen<br>Jessica T. Shinnefield<br>Christopher R. Kinnon<br>Megan A. Rossi<br>John M. Kelley | Robbins Geller Rudman & Dowd LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101 | jforge@rgrdlaw.com<br>rjensen@rgrdlaw.com<br>jshinnefield@rgrdlaw.com<br>ckinnon@rgrdlaw.com<br>mrossi@rgrdlaw.com<br>jkelley@rgrdlaw.com |
| Vincent F. Pitta | Pitta LLP<br>120 Broadway, 28th Floor<br>New York, NY 10271 | vpitta@pittalaw.com |

### COUNSEL FOR DEFENDANTS:

| NAME | FIRM | EMAIL |
|---|---|---|
| James M. Kramer<br>Alexander K. Talarides<br>M. Todd Scott | Orrick, Herrington & Sutcliffe LLP<br>The Orrick Building<br>405 Howard Street<br>San Francisco, CA 94105 | jkramer@orrick.com<br>atalarides@orrick.com<br>tscott@orrick.com |
| Adam Miller | Orrick, Herrington & Sutcliffe LLP<br>2100 Pennsylvania Avenue NW<br>Washington, D.C. 20037 | adam.miller@orrick.com |
| Megan Benton | Orrick, Herrington & Sutcliffe LLP<br>400 Capitol Mall, Suite 3000<br>Sacramento, CA 95814-4497 | mbenton@orrick.com |
| Richard E. Gottlieb<br>Emil Petrossian<br>Jacob Yang | Glaser Weil Fink Howard Jordan<br>& Shapiro LLP<br>10250 Constellation Boulevard<br>19th Floor<br>Los Angeles, CA 90067 | rgottlieb@glaserweil.com<br>epetrossian@glaserweil.com<br>jyang@glaserweil.com |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 30, 2024, at San Diego, California.

*Susan M. Williams*

_____
SUSAN M. WILLIAMS

4875-0162-4019.v1

# EXHIBIT F

JAMES N. KRAMER (SBN 154709)
jkramer@orrick.com
ALEXANDER K. TALARIDES (SBN 268068)
atalarides@orrick.com
M. TODD SCOTT (SBN 226885)
tscott@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, California 94105
Telephone:   (415) 773-5700
Facsimile:    (415) 773-5759

RICHARD E. GOTTLIEB (SBN 289370)
rgottlieb@glaserweil.com
EMIL PETROSSIAN (SBN 264222)
epetrossian@glaserweil.com
JACOB YANG (SBN 327251)
jyang@glaserweil.com
GLASER WEIL FINK HOWARD
    JORDAN & SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone: (310) 553-3000
Facsimile: (310) 556-2920

Attorneys for Defendant Green Dot Corporation

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| IN RE GREEN DOT CORPORATION SECURITIES LITIGATION | Case No. 2:19-cv-10701-DDP-E |
| | <u>CLASS ACTION</u> |
| | **DEFENDANT GREEN DOT CORPORATION'S ANSWERS AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES** |
| | Judge:  Honorable Dean D. Pregerson |

In accordance with Rules 26 and 33 of the Federal Rules of Civil Procedure, defendant Green Dot Corporation ("Green Dot"), by and through its undersigned attorneys, hereby answers and objects ("Answers") to Plaintiffs' First Set of Interrogatories (the "Interrogatories" and each, "a Interrogatory"), which Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund and Plaintiff Teamsters Local Union No. 727 Pension Fund (collectively, the "Plaintiffs") served in the above-captioned action (the "Action") on July 30, 2024, as follows:

## PRELIMINARY STATEMENT

The following statement applies to each of the Answers set forth below:

Green Dot has not completed its investigation of the facts relating to the case, has not completed discovery, and has not completed its preparation for trial. Further discovery, investigation, legal research, and analysis may supply additional facts, add meaning to known facts, and/or establish entirely new factual conclusions or legal contentions, all of which may lead to additions to, changes in, and variations from the present Answers. Green Dot reserves the right to amend, limit, supplement, and correct the objections and Answers as it learns further information.

Green Dot provides these Answers solely for the purpose of this Action. These Answers are given without prejudice to Green Dot's right to use or rely on at any time, including trial, subsequently discovered facts or any information omitted from these Answers by inadvertence, oversight, or otherwise. Each Answer is subject to all objections as to relevance, materiality, and admissibility, and to any and all objections on any ground that would require or permit the exclusion of any Answer or any portion of any Answer, if the facts or information contained therein were offered in evidence. All objections and grounds are expressly reserved and may be interposed at the time of deposition, a later hearing, or at trial.

Green Dot is providing these Answers, and will disclose information, without waiver of, or prejudice to, its right at any later time to raise objections to the

competence, relevance, materiality, privilege, or admissibility of: (a) the Interrogatories or any part thereof; (b) statements made in connection with Green Dot's Answers to the Interrogatories or any part thereof; (c) any information disclosed in Green Dot's Answers to the Interrogatories; or (d) any other demand for discovery involving or relating to the matters raised in the Interrogatories or the information disclosed in the Answers to the Interrogatories.  Green Dot reserves the right to interpose any such objection at the time of deposition, a later hearing, or at trial.

Green Dot's Answers to the Interrogatories are not an admission of matters stated, implied, or assumed by any or all of the Interrogatories.  Unless expressly stated, Green Dot does not admit, adopt, or acquiesce in any factual or legal contention, assertion, assumption, characterization, or implication contained in the Interrogatories.  Accordingly, Plaintiffs shall not construe Green Dot's Answer or objection to any Interrogatory as an admission that Green Dot accepts or admits the existence of any facts assumed by the Interrogatories, and Plaintiffs shall not construe any Answer or objection as admissible evidence of any such assumed facts.

## **GENERAL OBJECTIONS**

In addition to the specific objections noted below, Green Dot asserts the following General Objections to each and every Interrogatory.  These General Objections form a part of Green Dot's Answer to each individual Interrogatory, as though fully set forth therein, and are set forth herein to avoid duplication and repetition by restating them in the Answer to each Interrogatory.  These General Objections, or one or more of them, may specifically be referred to for the purpose of clarity in any particular Answer; however, the absence of any specific reference to the General Objections should not be construed as a waiver of these General Objections.

- 2 -

1.      Green Dot objects to each Interrogatory to the extent that it is overly broad, unduly burdensome, unduly repetitive, vexatious, or intended for harassment purposes.

2.      Green Dot objects to each Interrogatory to the extent that it calls for the discovery of information that is not relevant to any party's claim or defense or proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

3.      Green Dot objects to each Interrogatory to the extent that it seeks information protected from disclosure by any applicable privilege, including but not limited to, the attorney-client privilege, the work-product doctrine or immunity, the joint-defense or common-interest privilege, and any other applicable privilege, immunity, or exemption from discovery as outlined in the Federal Rules of Civil Procedure and applicable law.  Any inadvertent disclosure by Green Dot shall not constitute a waiver of any such privilege or protection.

4.      Green Dot objects to each Interrogatory to the extent that it seeks information that is protected from disclosure or discovery by the bank examination or supervision privilege, any regulation governing the disclosure of confidential supervisory information, and any other applicable privilege or protection held by others requiring Green Dot to keep information confidential.

5.      Green Dot objects to each Interrogatory to the extent that it seeks discovery of information that is not in the possession, custody, or control of Green Dot or seeks information already within Plaintiffs' possession, or in the possession of individuals or entities other than Green Dot and equally available to Plaintiffs.

6.      Green Dot objects to each Interrogatory to the extent that it is vague (including but not limited to vagueness as to time), compound, ambiguous, or

- 3 -

susceptible to more than one interpretation. Subject to and without waiving this objection or any of the specific objections, Green Dot will provide Answers subject to a reasonable interpretation of the individual Interrogatory.

7. Green Dot objects to each Interrogatory to the extent that it assumes disputed facts or legal conclusions or may be construed as an admission by Green Dot that any fact or circumstance alleged in, or suggested by, the Interrogatory actually occurred or existed. Green Dot hereby denies any such disputed facts or legal conclusions. Any Answer or objection is not intended to be, and shall not be construed as, an agreement or concurrence by Green Dot as to Plaintiffs' characterization of any facts or circumstances.

8. Green Dot objects to the "Procedures for Interrogatories" and Definitions to the extent that they purport to impose obligations on Green Dot beyond those imposed by Rules 26 and 33 of the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Central District of California, and any other applicable law. Green Dot will answer each Interrogatory in compliance with the Federal Rules of Civil Procedure and the Local Rules (the "Governing Rules").

9. Green Dot objects to Procedure No. 4, including the footnote therein. If any information or documents are withheld based upon a claim of privilege or work product protection, Green Dot will fulfill its obligations under Rule 26(b)(5) by expressly making the claim and describing the withheld information or documents in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

10. Green Dot objects to the definitions of the terms "Company"; "Green Dot"; and "You" and "Your" as impermissibly overbroad because the definitions attempt to encompass any and all individuals and entities purporting to act on behalf of Green Dot whether or not they have such authority. In particular, Green Dot object to the definitions' inclusion of individuals or entities beyond Green Dot

- 4 -

DEF GREEN DOT'S ANSWERS & OBJECTIONS TO PLTS' FIRST SET OF INTERROGATORIES

Corporation, including "direct or indirect subsidiaries, divisions, or affiliates (foreign and domestic), predecessors, and successors," in addition to "all of its … former officers, directors, employees, members of the Board of Directors, agents, accountants, attorneys, and advisers," and "any other persons acting or purporting to act on its behalf."  In answering these Interrogatories, Green Dot construes the terms "Company," "Green Dot," "You," and "Your" to refer to the entity Green Dot Corporation.

11.    Green Dot objects to the definition of the term "Communication," specifically the use of the term "including, but not limited to," as overbroad and vague and ambiguous to the extent that the term includes forms of communications not identified in the definition.  Green Dot will construe the term "Communication" to mean the transmittal of any information in any manner, including any oral, written, or electronic correspondence and evidence thereof, no matter how that correspondence or evidence is stored, memorialized, or fixed.  It also includes any letters, emails, text messages or other instant messaging application, Twitter posts or direct or messages, or any other social media platform posts or direct or group messages, comments on websites, voice recordings, transcripts, records of statements, summaries, memoranda, reviews, reports, notes, logs, records, journals, minutes, or outlines concerning the transmittal of information.

12.    Green Dot objects to the definition of the term "Correspondence" as vague and ambiguous insofar as it includes "any other writing containing a communication."

13.    Green Dot objects to the definitions of the terms "Meeting" or "Meetings" as overbroad insofar as they encompass gatherings "for any purpose," "whether or not such presence was prearranged or by chance."  Green Dot will construe the terms "Meeting" and "Meetings" to mean any arranged gathering of two or more persons to discuss matters pertaining to Green Dot.

DEF GREEN DOT'S ANSWERS & OBJECTIONS TO PLTS' FIRST SET OF INTERROGATORIES

14.     Green Dot objects to the definitions of the terms "Account Services," "Active Accounts," "Active Cards," "BaaS," "Card Meetings," "Card Reports," "GPR Card," "Green Dot's Card Business," and "Prepaid Cards" to the extent that Plaintiffs' use of the definitions renders any Interrogatory overly broad and neither relevant to any party's claim or defense, nor proportional to the needs of this case to the extent that it is not tethered to the issues in this case, much less to information that might reasonably be within Green Dot's possession, custody, or control.

15.     Green Dot objects to the definition of the term "Account Services" as vague and ambiguous insofar as it refers to "the Company's leading consumer brand names."

16.     Green Dot objects to the definition of the term "BaaS" as vague and ambiguous to the extent that it encompasses "related products" not specifically enumerated in the definition.

17.     Green Dot objects to the definition of the term "Card Meetings" as vague and ambiguous: (1) to the extent it includes the undefined term of "recurring" meetings; (2) because the undefined term "Card business" is vague and ambiguous; and (3) to the extent it is unclear which meetings qualify.  Green Dot further objects to the definition of the term "Card Meetings" as overbroad insofar as it incorporates Plaintiffs' definition of the terms "Meeting" or "Meetings."  For purposes of these Answers, Green Dot will construe the term "Card Meetings" to refer only to arranged internal meetings attended solely by Green Dot personnel.

18.     Green Dot objects to the definition of the term "Relevant Time Period," which seeks information "from May 1, 2017 through March 25, 2020" as unreasonably overbroad and seeking information beyond the timeframe relevant to the claims or defenses that remain at issue in this case.  Unless otherwise stated, Green Dot will answer all Interrogatories based on a reasonable and relevant time period of January 1, 2018 through December 31, 2019.

19. In responding and objecting to the Interrogatories, Green Dot does not concede that any of the information provided is relevant, material, admissible as evidence, or reasonably calculated to lead to the discovery of admissible evidence.

## SPECIFIC OBJECTIONS AND ANSWERS TO INTERROGATORIES

Subject to the Preliminary Statement and General Objections set forth above, and any objection that may be interposed at trial, and without conceding the materiality or relevance of the Interrogatory or, therefore, any information contained in the Answers, Green Dot specifically answers the Interrogatories as follows.

## INTERROGATORY NO. 1:

For each of the following retailers and partners for Green Dot's Card Business products and services, state (a) the individuals with whom Green Dot communicated regularly concerning Green Dot's products and services, and (b) the individuals at Green Dot who communicated regularly with each retailer or partner concerning Green Dot's Card Business products and services:

- Walmart Inc.
- CVS Pharmacy, Inc.
- Rite Aid Corporation
- 7-Eleven, Inc.
- Walgreens Boots Alliance, Inc.
- Dollar Tree, Inc.
- Meijer, Inc.
- DISH Wireless L.L.C. (dba Boost Mobile)
- AT&T Inc.
- Citibank, N.A.
- Uber Technologies, Inc.
- Intuit Inc.
- Apple Inc. (regarding Apple Cash).

- 7 -

**ANSWER TO INTERROGATORY NO. 1:**

Green Dot incorporates by reference herein its Preliminary Statement and General Objections.  Green Dot objects to this Interrogatory on the ground that it calls for the discovery of information that is not relevant to any party's claim or defense or proportional to the needs of the case insofar as it relates to communications concerning Green Dot's "products and services" not at issue in this case.  Green Dot objects to this Interrogatory to the extent that it seeks information more efficiently and appropriately sought through other discovery devices, including requests for production of documents.

Subject to and without waiving the foregoing objections, Green Dot answers as follows: Green Dot's investigation of the relevant facts is ongoing and as of the date of these Answers it does not know the identities of all of the individuals at Green Dot and its partners who "communicated regularly" regarding Green Dot's products and services during the time period specified above.  However, it is aware that the individuals at Green Dot who engaged in the relevant communications likely included some or all of the following: Abhijit Chaudhary, Daniel Eckert, Adam Evans, Robert Hrin, Mike Keesler, Francis Lauderdale, Crystal Bryant Minter, Brett Narlinger, Elizabeth Sanchez, Brinson Silver, and Denise Tirado. Green Dot will supplement this Answer as its investigation continues.

**INTERROGATORY NO. 2:**

Identify each individual at Green Dot who communicated with anyone at the Federal Reserve from May 1, 2017 through the present concerning the Consent Order, including any preliminary, investigative, fact-finding, formal or informal presentations, interviews, submissions, or proffers, and describe the communications as follows: (a) name of the individual; (b) name of the individual with whom they communicated at the Federal Reserve; (c) where, how, and when they communicated with the Federal Reserve, including any testimony given; (d) all topics discussed; (e) all documents received from the Federal Reserve or provided

- 8 -

to it; and (f) any conclusions, proposals, negotiations, compliance, oversight, implementations progress reports, penalties, reviews, tasking, or follow-up recommended, considered, or discussed beyond what is written in the Consent Order.

**ANSWER TO INTERROGATORY NO. 2:**

Green Dot incorporates by reference herein its Preliminary Statement and General Objections.  Green Dot objects to this Interrogatory to the extent that it seeks information that is protected from disclosure or discovery by the bank examination or supervision privilege, any regulation governing the disclosure of confidential supervisory information, and any other applicable privilege or protection requiring Green Dot to keep information confidential.  Green Dot objects to this Interrogatory, including the identified time period, on the ground that it is overbroad, unduly burdensome, and not proportional to the needs of the case.  Green Dot objects to this Interrogatory on the ground that it calls for the discovery of information that is not relevant to any party's claim or defense or proportional to the needs of the case.

Subject to and without waiving the foregoing objections, Green Dot answers as follows: During the period preceding the disclosure of the Consent Order on July 19, 2024, Green Dot's Legal Department and its outside counsel, initially Davis, Polk & Wardwell, and then, later, Winston & Strawn, communicated via email, telephone, and in-person meetings with the Federal Reserve concerning the Consent Order.  Senior executives were briefed on such communications and may have participated in one or more external calls with the regulator.  The nature and substance of all such communications are subject to the bank examination privilege and therefore Green Dot is prohibited from disclosing any such information.  Green Dot further notes that the Consent Order is publicly available, and it asserts no such privilege with respect to the underlying bank practices.

- 9 -

**INTERROGATORY NO. 3:**

Identify each Card Report, including: (a) name, purpose, content, location, and cadence of each Card Report, including, but not limited to, listing any key metrics, products and services, and other information collected or analyzed; (b) the recipients, senders, and custodians of each Card Report.

**ANSWER TO INTERROGATORY NO. 3:**

Green Dot incorporates by reference herein its Preliminary Statement and General Objections.  Green Dot objects to this Interrogatory on the ground that it calls for discovery of information that is not relevant to any party's claim or defense or proportional to the needs of the case.  Green Dot objects to the term "key metrics" as vague and ambiguous.  Green Dot objects to this Interrogatory to the extent that it seeks information more efficiently and appropriately sought through other discovery devices, including requests for production of documents.

Subject to and without waiving the foregoing objections, Green Dot answers as follows: Green Dot's investigation of the relevant facts is ongoing and as of the date of these Answers it cannot identify all relevant Card Reports in use during the time period specified above.  However, it has determined that the following reports and information may have been used during that time period:  Revenue Pacing Report, Flash Report, Consolidated Forecast, Bank Activity Report, BI Extract (BIA Dashboard), GDC Cohort Report, GDC KPI Report, GDC Quarterly Business Review, Marketing Dashboard, and Product and Feature Dashboard.  Green Dot will supplement this aspect of its Answer to Interrogatory No. 3 as its investigation continues.  The remainder of the information sought about each Card Report can be determined by reviewing the Card Reports themselves (along with related documents, such as transmittal emails) and the burden of ascertaining the information will be substantially the same for either party.  Therefore, pursuant to Rule 33(d), Green Dot directs Plaintiffs to those documents, which will be produced to the extent they can be located upon a reasonably diligent and

- 10 -

proportionate search according to the schedule adopted by the Court.

**INTERROGATORY NO. 4:**

Identify any Card Meetings, including the name(s) and purpose(s) of such meetings, attendees, meeting cadence (i.e., daily, weekly, monthly, or yearly), whether notes or minutes were taken and by whom as well as the location of such notes, and any related summaries, reports, or presentations.

**ANSWER TO INTERROGATORY NO. 4:**

Green Dot incorporates by reference herein its Preliminary Statement and General Objections.  To the extent that this Interrogatory seeks the dates, subject matter, and content of such meetings or the names of any persons attending such meetings, Green Dot objects to this Interrogatory on the ground that it seeks information more efficiently and appropriately sought through other discovery devices, including requests for production of documents.

Subject to and without waiving the foregoing objections, Green Dot answers as follows: Green Dot's investigation of the relevant facts is ongoing and as of the date of these Answers it cannot identify all relevant Card Meetings conducted during the time period specified above.  However, it has determined that such meetings would most likely have included a "monthly close" meeting, a weekly "pacing" meeting, and "earnings and guidance prep" meetings, with some or all of the following individuals as attendees: Brett Narlinger, Mike Keesler, Jess Unruh, Steve Streit, and Mark Shifke.  Green Dot will supplement this aspect of its Answer to Interrogatory No. 4 as its investigation continues.  The remainder of the information sought about each Card Meeting can be determined by reviewing documents relating to each meeting, such as calendar invitations, and the burden of ascertaining the information will be substantially the same for either party.  Therefore, pursuant to Rule 33(d), Green Dot directs Plaintiffs to those documents, which will be produced to the extent they can be located upon a reasonably diligent and proportionate search according to the schedule adopted by the Court.

DEF GREEN DOT'S ANSWERS & OBJECTIONS TO PLTS' FIRST SET OF INTERROGATORIES

Dated:  August 29, 2024        **ORRICK, HERRINGTON & SUTCLIFFE LLP**
JAMES N. KRAMER
ALEXANDER K. TALARIDES
M. TODD SCOTT


_____
ALEXANDER K. TALARIDES
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:  415-773-5700
Facsimile:  415-773-5957

-   and   -

**GLASER WEIL FINK HOWARD
  JORDAN & SHAPIRO LLP**
RICHARD E. GOTTLIEB
EMIL PETROSSIAN
JACOB YANG
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone: (310) 553-3000
Facsimile: (310) 556-2920

*Attorneys for Defendant Green Dot Corporation*

- 12 -

DEF GREEN DOT'S ANSWERS & OBJECTIONS TO PLTS' FIRST SET OF INTERROGATORIES

## **VERIFICATION**

I, Chris Ruppel, am Chief Revenue Officer at Green Dot Corporation and am authorized to make this verification on its behalf. I have reviewed the foregoing Answers and Objections to Plaintiffs' First Set of Interrogatories. I am informed and believe that the factual matters stated therein are true and on that ground declare under penalty of perjury that the same are true and correct.

Executed on August 21, 2024, at _Portland, ME_.

_____

CHRIS RUPPEL

- 13 -

## PROOF OF SERVICE BY ELECTRONIC MAIL

I am over the age of eighteen years and not a party to the within-entitled action. My business address is Orrick, Herrington & Sutcliffe LLP, The Orrick Building, 405 Howard Street, San Francisco, California 94105-2669.

On August 29, 2024, I served the following document(s):

- **DEFENDANT GREEN DOT CORPORATION'S ANSWERS AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES**

on the interested parties in this action by email addressed as follows:

| NAME | FIRM | EMAIL |
|---|---|---|
| Jason A. Forge<br>Rachel L. Jensen<br>Jessica T. Shinnefield<br>Christopher R. Kinnon<br>Megan A. Rossi<br>John M. Kelley<br><br>*Lead Counsel for Plaintiffs* | ROBBINS GELLER RUDMAN & DOWD LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101-8498<br>Telephone: (619) 231-1058<br>Facsimile: (619) 231-7423 | jforge@rgrdlaw.com<br>rjensen@rgrdlaw.com<br>jshinnefield@rgrdlaw.com<br>ckinnon@rgrdlaw.com<br>mrossi@rgrdlaw.com<br>jkelley@rgrdlaw.com |
| Vincent F. Pitta<br><br>*Additional Counsel for Plaintiffs* | PITTA LLP<br>120 Broadway, 28th Floor<br>New York, NY 10271<br>Telephone: (212) 652-3890<br>Facsimile: (212) 652-3891 | vpitta@pittalaw.com |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 29, 2024, at San Francisco, California.

_____
LENNY T. PATTS

- 14 -

# EXHIBIT G



**Orrick, Herrington & Sutcliffe LLP**
2100 Pennsylvania Avenue NW
Washington, DC 20037-3202

October 11, 2024

+1 202 339 8400
**orrick.com**

*Via Email*

**Adam Miller**

Christopher R. Kinnon
Robbins Geller Rudman & Dowd LLP
ckinnnon@rgrdlaw.com

**E** adam.miller@orrick.com
**D** +1 202 349 7958
**F** +1 202 339 8500

Re:    *In re Green Dot Corporation Securities Litigation*
       Response to Plaintiffs' August 30, 2024 Bank Examination Privilege Letter

Dear Chris:

We write to further address Plaintiffs' request, in Interrogatory No. 2, for discovery of all information concerning the Consent Order in light of our discussion on our last meet-and-confer.  This request is objectionable for three distinct reasons.

*First*, as I stated in my September 20, 2024, letter, much of the information concerning the Consent Order is plainly irrelevant to this lawsuit.  Of the five categories of conduct described in the Consent Order, two occurred entirely after the purported class period in this case, and a third relates specifically to an alleged failure to disclose fees to consumers associated with tax refund processing, which has nothing to do with the allegations in this case.  Information relating to these issues is not discoverable without regard to whether or not it is privileged or subject to the regulations discussed below.  To be clear, Green Dot also contests the relevance of information relating to the other two categories of conduct identified in the Consent Order (denoted as Categories A and B in the Consent Order) but will not withhold such information from discovery on that basis.

*Second*, even if otherwise discoverable, all information and communications concerning the Consent Order are confidential supervisory information ("CSI") subject to the regulations described in detail in my September 20 letter.  In this regard, I enclose a letter received yesterday by Green Dot from the Legal Division of the Federal Reserve Board (the "FRB letter") in response to the company's request for guidance.  It is forwarded with the FRB's express permission (see footnote 3).  As confirmed by the FRB letter, "Green Dot is prohibited by the Board's regulations from producing CSI to plaintiffs."  FRB letter at 2.  Instead, and as set forth in my September 20 letter, Plaintiffs must first comply with the applicable regulations – in particular, the provision requiring Plaintiffs to make an administrative request to the FRB, 12 C.F.R. § 261.23(b).

Your citation to *In Re Bankers Trust Co.*, 61 F.3d 465 (6th Cir. 1995), is not to the contrary.  Unlike Plaintiffs in this case, the party seeking discovery in *Bankers Trust* had in fact "made a written request to the [FRB], pursuant to [the applicable] regulations, for the documents in question" and sought relief after that request was denied.  *Id.* at 468.  Accordingly, more recent cases from within the Ninth Circuit have



Christopher R. Kinnon
October 11, 2024
Page 2

also required parties seeking discovery of CSI to first comply with the cited regulations.  *See, e.g.*, *In re Countrywide Fin. Corp. Sec. Litig.*, 2009 WL 5125089, at *2 (C.D. Cal. Dec. 28, 2009) ("[A] determination of discoverability is premature pending a determination by the FRB and OCC of whether they will release the information through the established administrative process."); *In re CitiMortgage, Inc., Home Affordable Modification Program ("HAMP") Litig.*, 2012 WL 10450139, at *8 (C.D. Cal. June 7, 2012) ("The Court agrees with defendant that as to those documents exempted from disclosure pursuant to 12 C.F.R. § 4.31 et seq., plaintiffs must first exhaust all administrative procedures and submit requests to use the documents in this litigation to the OCC, pursuant to federal regulations, before Court review.") (cleaned up).

*Third*, as likewise confirmed by the FRB letter, potentially relevant information (if any) concerning the Consent Order is, in meaningful part, subject to the related bank examination privilege, which is held by the FRB.  The bank examination privilege "protects agency opinions and recommendations, as well as banks' responses to those opinions and recommendations, from disclosure." *Teachers Ins. & Annuity Ass'n v. Munro*, 2022 WL 2234972, at *4 (C.D. Cal. May 9, 2022).  The privilege cannot be waived by Green Dot, which is what would happen if Green Dot produced the information you seek in Interrogatory No. 2.  And, as the FRB letter makes clear, your argument that Green Dot somehow lacks standing fails because Plaintiffs have not yet exhausted their administrative remedies by "provid[ing] the Board the opportunity to assert" its privilege. FRB letter at 4.

We are happy to continue discussing these matters if that would be helpful.  Defendants reserve all rights.

Sincerely,

Adam Miller



# BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
## WASHINGTON, DC 20551

LEGAL DIVISION

October 10, 2024

By Electronic Mail
Amy Pugh, Esq.
General Counsel and Interim Chief Risk Officer
Green Dot Corporation
114 West 7th Street, Suite 240
Austin, TX 778701
apugh@greendotcorp.com

Re:    Discovery Requests for Confidential Supervisory Information in
       *In re Green Dot Corp. Sec. Litig.*, No.2:19-cv-10701-DDP-E (C.D. Cal.)

Dear Ms. Pugh:

On behalf of the Board of Governors of the Federal Reserve System ("Board"), I write in response to your inquiry in your capacity as General Counsel for the defendant, Green Dot Corporation ("Green Dot") in the above-captioned securities class action pending in the U.S. District Court for the Central District of California. You have written to inform the Board pursuant to 12 C.F.R. § 261.24(a)(1) that certain documents and information responsive to plaintiffs' discovery requests in this action may contain confidential supervisory information ("CSI") of the Board governed by its regulations at 12 C.F.R. §§ 261.2(b)(1), .20, .23 and .24.

In particular, you write that, after publication of the Board's July 19, 2024 Consent Cease and Desist Order[1] ("Consent Order") with Green Dot, plaintiff served Green Dot with Interrogatories and related discovery requests, including Interrogatory No. 2, which requests in pertinent part that Green Dot:

Identify each individual at Green Dot who communicated with anyone at the Federal Reserve from May 1, 2017 through the present concerning the Consent Order, including any preliminary, investigative, fact-finding, formal or informal presentations, interviews, submissions, or proffers, and describe the communications as follows: (a) name of the individual; (b) name of the individual with whom they communicated at the Federal Reserve; (c) where, how, and when

---

[1] *Available at*
https://www.federalreserve.gov/newsevents/pressreleases/files/enf20240719b1.pdf

they communicated with the Federal Reserve, including any testimony given; (d) all topics discussed; (e) all documents received from the Federal Reserve or provided to it; and (f) any conclusions, proposals, negotiations, compliance, oversight, implementations progress reports, penalties, reviews, tasking, or follow-up recommended, considered, or discussed beyond what is written in the Consent Order.

Green Dot served its Answers and Objections to the Interrogatories on plaintiffs on August 29, 2024, including its objections to Interrogatory No. 2, which provided in pertinent part that:

> Green Dot objects to … Interrogatory [No. 2] to the extent that it seeks information that is protected from disclosure or discovery by the bank examination or supervision privilege, any regulation governing the disclosure of confidential supervisory information, and any other applicable privilege or protection requiring Green Dot to keep information confidential. …

> The nature and substance of all such communications [between Green Dot and the Federal Reserve regarding supervisory matters] are subject to the bank examination privilege and therefore Green Dot is prohibited from disclosing any such information. Green Dot further notes that the Consent Order is publicly available, and it asserts no such privilege with respect to the underlying bank practices.

In response to Green Dot's objections that it was prohibited by Federal Reserve regulations and the bank examination privilege from disclosing supervisory communications with the Federal Reserve, you state that plaintiffs refused to accept Green Dot's objections to production of CSI. In particular, by letter to Green Dot dated August 30, 2024, a copy of which you provided, plaintiffs asserted that courts "including the Central District of California" where this action is pending "hold that defendants lack standing to assert the purported bank examiners privilege." Aug. 30 Letter at 1 (citing *Teachers. Ins. & Annuity Ass'n of Am. v. Munro*, 2022 WL 2234972, at *4 (C.D. Cal. May 9, 2022) and *United States v. Heine*, 2016 WL 1270907, at *9 (D. Or. Mar. 31, 2016)). Plaintiffs also inquired whether "the Federal Reserve [has] asserted privilege" over any or all of the materials requested by plaintiffs including but not limited to Interrogatory No. 2. You seek the Federal Reserve's guidance regarding this issue.

As explained below, in the absence of prior written approval from the Board's General Counsel under its regulations, which plaintiffs have neither sought nor obtained (despite their awareness), Green Dot is prohibited by the Board's regulations from producing CSI to plaintiffs.

3

***Plaintiffs Must Exhaust Their Administrative Remedies Under the Board's Regulations***

You are correct that communications between a supervised financial institution such as Green Dot and the Federal Reserve pertaining to supervisory matters such as formal or informal enforcement actions, investigations, consent orders, or other supervisory matters, and internal bank documents that contain or would reveal CSI, among other documents and information, are CSI under the Board's regulations. Those regulations define CSI to include "information that is or was created or obtained in furtherance of the Board's supervisory, investigatory, or enforcement activities, including activities conducted [under delegated authority] by a Federal Reserve Bank," and includes, by way of example, "reports of examination, inspection, and visitation; … *investigative requests for documents or other information*, and supervisory correspondence or other supervisory communications"; as well as "any portion of a document in the possession of … a supervised financial institution, that contains or would reveal" CSI.[2] 12 C.F.R. § 261.2(b)(1) (emphasis supplied).

CSI is "confidential and privileged" and the Board "does not normally disclose [CSI] to the public or authorize third parties in possession of [CSI] to further use or disclose the information." *Id.* § 261.23(a)(1). Even in the hands of supervised financial institutions such as Green Dot, CSI is the property of the Board and may not be disclosed without the prior written approval of the Board's General Counsel, which the plaintiffs have not sought or obtained in this case. 12 C.F.R. §§ 261.2(b)(1), .20(a), .23(b)(1)(iii); *see Schreiber v. Society for Sav. Bancorp*, 11 F.3d 217, 222 (D.C. Cir. 1993) (examination reports and related correspondence are records of the agency and may be obtained from a bank only with the agency's permission); 12 U.S.C. § 326 ("The Board of Governors of the Federal Reserve System, at its discretion, may furnish any report of examination or other confidential supervisory information concerning any State member bank or other entity examined under any other authority of the Board … to any other person that the Board determines to be proper.").

Under the Board's regulations, litigants such as the plaintiffs may request access to CSI for use in litigation by filing a written request directly with the Board's General Counsel under the procedures set forth in 12 C.F.R. § 261.23(b). This regulation requires the litigant to provide certain information regarding the judicial proceeding, as well as a "narrow and specific description" of the CSI sought, the relevance of the information to the issues or matters raised by the litigation, and the reason why "the information sought, or equivalent information adequate to the needs of the case, cannot be obtained from any other source." *Id.* The litigant must also commit to obtain an appropriate protective order acceptable to the Board to preserve the confidentiality of the information. *Id.* Armed with this information, the Board can make a reasoned determination whether to permit use of CSI in a particular case, subject to conditions and limitations if necessary to protect confidentiality, *id.* 261.23(d)(2), or, alternatively, to assert privilege.

_____

[2] CSI "does not include … [d]ocuments prepared by or for a supervised financial institution for its own business purposes that are in its own possession and that do not include [CSI]." 12 C.F.R. § 261.2(b)(2)(i). Pursuant to this regulation, portions of Green Dot's internal business documents that do not contain or reveal the Board's CSI may be produced to the plaintiffs, provided that all CSI has first been redacted.

Despite Green Dot's objections based on the Board's regulations, plaintiffs have neither requested nor obtained the Board's permission to access CSI for use in this litigation, and therefore have not exhausted their administrative remedies or provided the Board the opportunity to assert the bank examination privilege. *See In re Bankers Trust Co.*, 61 F.3d 465, 472 (6th Cir. 1995) (holding, in case where the requesting party had first exhausted administrative remedies, that "[t]he bank examination privilege belongs to the Federal Reserve"); *see also Alaska Electrical Pension Fund v. Bank of America Corp.*, No. 14-cv-7126 (JMF), 2016 WL 6779901, at *6 (S.D.N.Y. Nov. 16, 2016) ("[p]laintiff would have to seek relief 'through the established administrative process' before coming back to this court" seeking production of the Federal Reserve's and Office of the Comptroller of the Currency's CSI (internal quotation omitted)); *In re CitiMortgage HAMP Litig.*, 2012 WL 10450139, at *8 (C.D. Cal. June 7, 2012) ("[p]laintiffs here have not yet sought the responsive documents from the OCC, and therefore their request that the Court balance the interests involved in production is premature"); *In re Countrywide Fin. Corp. Sec. Litig.*, 2009 WL 5125089, at *2 (C.D. Cal. Dec. 28, 2009) ("[p]laintiffs must first exhaust all administrative procedures and submit requests to use the documents in this litigation to the FRB and OCC").

While plaintiffs correctly acknowledge the existence of the bank examination privilege and that the privilege belongs to the applicable bank regulator, Aug. 30 Letter at 1, 2, their assertion that "defendants lack standing to assert" the bank examination privilege, *id*. at 1, is inapplicable here where plaintiffs have not exhausted their administrative remedies. *In re B of I Holding, Inc. Sec. Litig.*, 2022 WL 507663, at *1 (S.D. Cal. Feb. 18, 2022) ("Because it is the [agency] and not the Bank who holds the privilege, it was then incumbent upon plaintiff to request that the [agency] waive the privilege as to any protected documents."). In that regard, the Board's regulations provide that CSI is "confidential and privileged ... and not normally disclose[d] ... to the public," 12 C.F.R. § 261.23(a), and that CSI "remains the property of the Board" and that "no person [or] entity ... to whom [CSI] is made available or who otherwise possesses [CSI] ... may use any such information for an unauthorized purpose or disclose any such information without the prior written permission of the [Board's] General Counsel." *Id*. § 261.20(a); *see Schreiber*, 11 F.3d at 222 (examination reports and related correspondence are records of the agency and may be obtained from a bank only with the agency's permission).

The cases cited by plaintiffs do not suggest otherwise. The *Munro* decision contains no discussion of the need to exhaust administrative remedies, nor is there any indication that the parties brought to the court's attention the regulations of any particular regulator prohibiting disclosure of CSI absent prior agency approval, as the Board's regulations require here. *See* 2022 WL 2234972, at *4. Indeed, the court in *Munro* acknowledged that "the bank examiner's privilege . . . 'protects agency opinions and recommendations, as well as banks' responses to those opinions and recommendations, from disclosure.'" *Id*. (quoting *Heine*, 2016 WL 1270907, at *9). Similarly, *Heine*, in which the FDIC produced to criminal defendants "non-privileged materials responsive to the[ir] first and third requests" and "did not refuse to produce responsive documents based on the bank examination privilege," 2016 WL 1270907, at *9, is inapposite here where plaintiffs have not served the Board with a written request for access to CSI, nor has the Board been given the opportunity to respond to such a request.

5

If the Board can provide further assistance in this matter,[3] please do not hesitate to contact Yvonne Mizusawa of the Board's Legal Division staff at yvonne.f.mizusawa@frb.gov.

Sincerely,

/s/  Alye S. Foster

Alye S. Foster
Associate General Counsel

cc:  (by email)

Avery Belka
Vice President and Deputy General Counsel
Federal Reserve Bank of San Francisco
avery.belka@sf.frb.org

Emily Greenwald
Senior Vice President
Federal Reserve Bank of Dallas
emily.greenwald@dal.frb.org

---

[3] Green Dot may provide this letter to the parties or the Court, including in public filings, as needed in connection with this litigation.

# EXHIBIT H

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**


| Case No. | CV 19-10701-DDP(Ex) | Date | November 4, 2024 |
|---|---|---|---|

| Title | IN RE GREEN DOT CORPORATION SECURITIES LITIGATION |
|---|---|


Present: The Honorable   Charles F. Eick, United States Magistrate Judge

| Valencia Munroe | None | None |
|---|---|---|
| Deputy Clerk | Court Reporter/Recorder | Tape No. |

**Attorneys Present for Plaintiffs:**
None

**Attorneys Present for Defendants:**
None

**Proceedings:**          **(IN CHAMBERS)**


The Magistrate Judge has read and considered all papers filed in support of and in opposition to "Plaintiffs' Motion for Entry of Stipulated Protective Order and Defendants' Cross-Motion for Entry of Stipulated Protective Order," filed October 24, 2024.  The previously noticed November 15, 2024 hearing is vacated.  The Magistrate Judge has taken the matter under submission without oral argument.

The Magistrate Judge hereby issues and enters Plaintiffs' proposed protective order (Exhibit B to the Declaration of Christopher R. Kinnon, filed October 24, 2024).  Defendants have failed to demonstrate sufficient cause of a more restrictive protective order.  See Fed. R. Civ. P. 26(c).


cc:     Judge Pregerson
          All Counsel of Record


Initials of Deputy Clerk  VMUN

---

CV-90 (06/04)                          Civil Minutes – General                          Page **1** of **1**

# EXHIBIT I

ROBBINS GELLER RUDMAN
  &DOWD LLP
RACHEL L. JENSEN (211456)
JESSICA T. SHINNEFIELD (234432)
CHRISTOPHER R. KINNON (316850)
MEGAN A. ROSSI (318643)
JOHN M. KELLEY (339965)
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
rjensen@rgrdlaw.com
jshinnefield@rgrdlaw.com
ckinnon@rgrdlaw.com
mrossi@rgrdlaw.com
jkelley@rgrdlaw.com

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re GREEN DOT CORPORATION SECURITIES LITIGATION | ) ) ) ) |

Case No. 2:19-cv-10701-DDP (Ex)

<u>CLASS ACTION</u>

DISCOVERY MATTER

JOINT STIPULATION REGARDING PLAINTIFFS' MOTION FOR ENTRY OF STIPULATED PROTECTIVE ORDER AND DEFENDANTS' CROSS-MOTION FOR ENTRY OF STIPULATED PROTECTIVE ORDER

Date: November 15, 2024
Time: 9:30 A.M.
Dept: 750

Discovery Cutoff: October 31, 2025
Pretrial Conference: October 5, 2026
Trial: November 3, 2026

4888-5037-1303.v1

**TABLE OF AUTHORITIES**

**Page**

I. INTRODUCTORY STATEMENTS ................................................................. 1

    A.    Plaintiffs' Introductory Statement ........................................................ 1

    B.    Defendants' Introductory Statement ..................................................... 2

II. THE PARTIES DISPUTE ONE CLAUSE IN OTHERWISE STIPULATED PROTECTIVE ORDER ........................................................ 4

    A.    Plaintiffs' Position ............................................................................... 4

        1.    Statement of Facts ..................................................................... 4

        2.    Good Cause Exists to Enter Plaintiffs' Proposed Protective Order ...................................................................... 6

        3.    The Court Should Reject Defendants' Unusual and Unreasonable Expert Disclosure Demand ................................. 6

            a.    Defendants' Proposed Expert Disclosure Limitations Are Overbroad and Impracticable ............... 7

            b.    Defendants' Proposed Expert Disclosure Limitations Are Unnecessary .......................................... 8

            c.    The Expert Disclosure Limitations Prejudice Plaintiffs and Unfairly Advantage Defendants ............... 9

        4.    Conclusion ............................................................................... 10

    B.    Defendants' Position ......................................................................... 10

        1.    Background and Statement of Facts ......................................... 10

        2.    Argument: Good Cause Exists to Enter Defendants' Proposed Protective Order ...................................................... 12

        3.    Conclusion ............................................................................... 16

4888-5037-1303.v1

Pursuant to Central District Local Civil Rule 37-2.1, Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund and plaintiff Teamsters Local Union No. 727 Pension Fund (together, "Plaintiffs") hereby respectfully submit this joint stipulation between Plaintiffs and defendants Green Dot Corporation ("Green Dot" or the "Company"), former Chief Executive Officer Steven W. Streit ("Streit"), and former Chief Financial Officer Mark Shifke ("Shifke") (collectively, "Defendants" and together with Plaintiffs, the "Parties") regarding the Parties' cross-motions for entry of a stipulated protective order.

## I. INTRODUCTORY STATEMENTS

### A. Plaintiffs' Introductory Statement

This case concerns Defendants' scheme to mislead investors about Green Dot's faltering business model, which depended upon selling high-fee, prepaid debit cards ("legacy prepaid cards") to lower-income Americans who lack access to personal bank accounts. By 2018, Green Dot's senior insiders, including individual defendants Streit and Shifke, were aware that this "bread and butter" business was in decline. ¶2.[1] Rather than come clean with investors, however, they misled the market and capitalized on their deception through $62 million in insider sales. Among other deceptions facilitating their fraudulent scheme, Defendants manipulated key performance metrics to hide declining sales and profitability in Green Dot's prepaid business, as Green Dot shifted toward digital offerings. Further, Defendants were so desperate to conceal Green Dot's dying prepaid business that Streit halted efforts by the fraud management team to tighten customer identification procedures for prepaid accounts, even though 30%-40% of these accounts had a negative status, such as an unmatched address or name. ¶32. These

---

[1] Unless otherwise noted, all "¶_" or "¶¶_" references are to the Amended Complaint for Violations of the Federal Securities Laws (ECF 83) (the "Complaint"), emphasis is added, and citations are omitted.

- 1 -

4888-5037-1303.v1

loose identification procedures enabled individual customers to have hundreds of prepaid accounts, with at least one having 1,000 separate accounts. *Id.*

Plaintiffs have attempted to negotiate a stipulated protective order with Defendants for months now in order to facilitate Defendant and third-party document productions, but Defendants have refused to agree to standard terms. Instead, they demand a highly unusual provision that would require Plaintiffs to disclose to Defendants their experts prior to the expert disclosure date if the experts either: (i) consult for or are "associated" with any Green Dot competitor (competitor is undefined), *or are "likely" to consult for or be associated with one in the future*; or (ii) worked in any capacity for Green Dot for any amount of time on or after January 1, 2018. *See* Declaration of Christopher R. Kinnon in Support of Plaintiffs' Motion for Entry of Stipulated Protective Order ("Kinnon Decl."), Ex. A at 3 (the "Expert Disclosure Limitations"), filed concurrently herewith. Defendants' proposed Expert Disclosure Limitations would effectively give them veto power over Plaintiffs' experts. Delay in third-party discovery has resulted from Defendants' unwillingness to abandon this unreasonable term. Accordingly, to avoid any further delay, Plaintiffs ask the Court to enter Plaintiffs' Stipulated Protective Order. *See* Kinnon Decl., Ex. B (Plaintiffs' version of the proposed Stipulated Protective Order).

**B.     Defendants' Introductory Statement**

As the Supreme Court has made clear, the federal securities laws are not intended to provide insurance against investment losses. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). But that is exactly what Plaintiffs seek.

Green Dot is a fintech company that offers various financial services to consumers, including debit, credit, and prepaid cards, tax refunds, and other services. After going public in 2010, Green Dot was financially successful for several years and its stock price rose accordingly. But in 2019, facing increasing competition from

- 2 -

4888-5037-1303.v1

newer digital and mobile banking companies, Green Dot's overall performance slowed and its stock price fell accordingly.

Plaintiffs allege that the stock price declines were the result of the market learning that the Company had concealed important information about its performance and future prospects. The evidence will show otherwise. Defendants' public disclosures were the product of a thorough and reliable process in which numerous professionals participated, and that resulted in disclosures that were accurate, comprehensive, and accompanied by meaningful cautionary language regarding the future.

All investors know that investing in a company's stock comes with risk. Sometimes business goes well, and sometimes it does not. Plaintiffs here suffered ordinary investment losses, not fraud.

At issue in this motion is the Parties' stipulated protective order. The Parties have worked together to prepare a comprehensive protective order that will govern the production of confidential information in this action, but cannot reach agreement on one point. Specifically, Green Dot seeks inclusion of a provision, Paragraph 12.4, that would preclude Plaintiffs from sharing Green Dot's confidential information with any competitors or former employees that Plaintiffs may retain as experts. Plaintiffs unreasonably have refused to agree to this provision, thus necessitating this motion.

As explained below, Green Dot has the right to preclude its competitors and former employees from gaining access to its confidential information, even if Plaintiffs retain any of those competitors or former employees as experts. Accordingly, Defendants respectfully request that the Court enter the version of the stipulated protective order that Defendants have proposed, which contains Paragraph 12.4 but is otherwise identical to Plaintiffs' proposed stipulated protective order.

- 3 -

4888-5037-1303.v1

## II. THE PARTIES DISPUTE ONE CLAUSE IN OTHERWISE STIPULATED PROTECTIVE ORDER

Plaintiffs respectfully ask the Court to enter Plaintiffs' proposed Stipulated Protective Order, whereas Defendants respectfully ask the Court to enter Defendants' version of the proposed Stipulated Protective Order.[2]  The Parties' respective positions are set forth below.

### A. Plaintiffs' Position

#### 1. Statement of Facts

On April 23, 2024, Plaintiffs sent Defendants a draft protective order.  The Parties subsequently exchanged drafts and met and conferred several times in attempts to negotiate a stipulated protective order.  *See* Kinnon Decl., ¶3.

By August 22, 2024, the Parties had largely agreed to a mutually acceptable protective order, with the primary remaining dispute concerning Defendants' request to limit the standard protective order provision permitting disclosure of materials designated confidential to experts.  *Id.*, ¶6.  Plaintiffs proposed (and propose) keeping the definition of "expert" from the Sample Stipulated Protective Order for the United States District Court for the Central District of California (the "Sample Order") – "a person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its Counsel to serve as an expert witness or as a consultant in this Action" – which would permit disclosure of confidentially designated material to experts.  *See id.*, Ex. C, ¶¶2.7, 7.2 (the Sample Order).

---

[2]  A copy of Plaintiffs' proposed Stipulated Protective Order, without the additional clause requested by Defendants, is attached as Exhibit B to the Kinnon Declaration ("Plaintiffs' Stipulated Protective Order").  A copy of Defendants' Proposed Stipulated Protective Order, with the additional clause Plaintiffs oppose included as Paragraph 12.4, is attached as Exhibit 1 to the Declaration of M. Todd Scott in Support of Defendants' Opposition to Plaintiffs' Motion for Entry of Stipulated Protective Order and Cross-Motion for Entry of Stipulated Protective Order ("Scott Decl."), also filed concurrently herewith.

- 4 -

4888-5037-1303.v1

Defendants provided no good reason for deviating from the Sample Order's expert language.  In the intervening period, Plaintiffs served Defendants and third parties document discovery requests.  Kinnon Decl., ¶¶4-5.  To date, ***at least three third parties, including Deutsche Bank Securities Inc. ("Deutsche Bank"), Barclays Capital Inc. ("Barclays"), and Canaccord Genuity, LLC ("Canaccord"), have delayed producing documents until the Stipulated Protective Order is complete***.  *Id.*, ¶¶7-9; *id.*, Ex. D (correspondence with third parties).

On September 11, 2024, Defendants sent Plaintiffs their proposed Expert Disclosure Limitations:

> A Party (the "Retaining Party") wishing to retain a testifying or consulting expert who is ***associated with another Party*** (the "Affected Party") ***must disclose the identity of the proposed expert*** to the Affected Party before providing the proposed expert with any information designated CONFIDENTIAL by the Affected Party under this Protective Order.  The Affected Party can object to the retention by serving a letter pursuant to Local Rule 37-1, in which case the Retaining Party may not provide the proposed expert with any information designated CONFIDENTIAL until the dispute is resolved by agreement or court order.  For purposes of this paragraph, a person is considered to be "associated with" another Party if he or she (i) was a director or employee of the Affected Party on or after January 1, 2018, or (ii) is at the time of the retention in competition with the Affected Party, or reasonably ***likely*** in the future to be in competition with the Affected Party, whether as an director, owner, employee, or ***consultant of a competing company*** or otherwise.

Kinnon Decl., ¶10; *id.*, Ex. A at 3.

On September 17, 2024, Plaintiffs advised Defendants they would move the Court to enter Plaintiffs' Stipulated Protective Order without the Expert Disclosure

- 5 -

4888-5037-1303.v1

Limitations that Defendants insisted upon. Kinnon Decl., ¶11. On September 17, 2024, Defendants stated that they would oppose the motion and ask the Court to add the Expert Disclosure Limitations "as a stand-alone Paragraph 12.4." *Id.*, ¶12; *id.*, Ex. A at 1. On September 24, 2024, Plaintiffs proposed adopting the Sample Order, an offer Defendants refused on September 27, 2024. *Id.*, ¶¶13-14; *id.*, Ex. C.

### 2. Good Cause Exists to Enter Plaintiffs' Proposed Protective Order

The party seeking a protective order has the burden of showing that "'good cause'" for the order exists. *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992). Good cause exists here. First, the Parties have agreed to everything but the Expert Disclosure Limitations. Second, without a stipulated protective order, some third parties are unwilling to produce documents to Plaintiffs. Indeed, third parties Deutsche Bank, Canaccord, and Barclays are withholding relevant documents until a protective order is entered. Kinnon Decl., ¶¶7-9; *id.*, Ex. D. Thus, Plaintiffs have demonstrated good cause for the Court to enter Plaintiffs' Stipulated Protective Order.

### 3. The Court Should Reject Defendants' Unusual and Unreasonable Expert Disclosure Demand

Plaintiffs negotiated with Defendants for months in good faith to reach agreement on all the necessary terms for a protective order in this case. *See* Kinnon Decl., Ex. B (Plaintiffs' Stipulated Protective Order). But Defendants are now delaying third-party discovery until and unless Plaintiffs agree to their Expert Disclosure Limitations. Specifically, Defendants seek to preclude Plaintiffs' experts from obtaining any documents Defendants designate confidential without Defendants' prior consent if any Plaintiffs' expert either: (i) consults with or is "associated" with any Green Dot competitor, a term left undefined, ***or is "likely" to consult for or be associated with one in the future***; or (ii) worked in any capacity for Green Dot for any amount of time on or after January 1, 2018. *See* Expert Disclosure Limitations *supra*, §II.A.2; *see also* Kinnon Decl., Ex. A at 3.

- 6 -

Nothing in this case justifies such a drastic departure from the relevant expert provisions in the Court's Sample Order, which is the basis for Plaintiffs' position in Plaintiffs' Stipulated Protective Order. The Court should enter Plaintiffs' Stipulated Protective Order without the Expert Disclosure Limitations for the three reasons set forth below. *See Sampson v. City of El Centro*, 2015 WL 11658713, at \*4 (S.D. Cal. Aug. 31, 2015) ("'courts are in the best position to prevent both the overly broad use of [protective] orders'").

### a. Defendants' Proposed Expert Disclosure Limitations Are Overbroad and Impracticable

Protective orders must be narrowly tailored and no broader than necessary. *Hullinger v. Anand*, 2016 WL 7444614, at \*4 (C.D. Cal. June 20, 2016). Plaintiffs' Stipulated Protective Order is narrowly tailored and not overbroad. Defendants' proposed Expert Disclosure Limitations, however, are impermissibly overbroad, vague, and thus impracticable.

For example, Plaintiffs would have to disclose the name of any expert who is "***likely in the future***" to be "***in competition***" with Green Dot, whether "***as a director, owner, employee, or consultant of a competing company***." Kinnon Decl., Ex. A at 3. Requiring Plaintiffs to make such prognostications is impracticable and unwarranted. And because Defendants do not define "in competition," Plaintiffs would have to disclose any expert working with or consulting for any banking, credit or debit card, or technology business ***or who may do so in the future***. This expansive competitor language includes virtually any potential experts Plaintiffs might retain and effectively requires Plaintiffs to disclose their expert before he or she is permitted to review documents in this case necessary to establishing liability, "making it impossible for plaintiff[s] to effectively litigate this case." *See Ho v. Marathon Pat. Grp., Inc.*, 2021 WL 10862800, at \*4 (C.D. Cal. June 23, 2021) (declining to impose similar limitations because "prohibiting plaintiff from disclosing highly confidential materials to plaintiff's own experts without

- 7 -

4888-5037-1303.v1

authorization from defendant will unfairly restrict plaintiff's ability to work with his experts").  Such overbroad language also invites disputes that will burden the Court.

### b.    Defendants' Proposed Expert Disclosure Limitations Are Unnecessary

Defendants bear the burden "of showing that specific prejudice or harm will result" without the Expert Disclosure Limitations.  *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130-31 (9th Cir. 2003) (listing cases).  Defendants cannot make this requisite good cause showing here because the stale and generic business information at issue in this case is useless to Green Dot's competitors.  Defendants' "generalized, unsupported assertions of unfair advantage" over five-year-old business records fail to explain "'how a competitor would use the information to obtain an unfair advantage,'" let alone support the extreme protections Defendants propose.  *Whitecryption Corp. v. Arxan Techs., Inc.*, 2016 WL 7852471, at *2 (N.D. Cal. Mar. 9, 2016); *see also Rivera v. Nibco Inc.*, 2024 WL 3429662, at *4 (E.D. Cal. July 16, 2024) (declining to protect "'stale information that is too old to be presently confidential'").

The courts' model protective orders in this Circuit and District further demonstrate why Defendants' proposed limitations are also unnecessary to protect their routine business records here.  For example, the Sample Order in this District for standard litigation does not limit disclosure to experts.  *See* Kinnon Decl., Ex. C. Similarly, the Northern District of California's model orders only limit disclosure to experts in cases concerning patents and trade secrets, not in standard litigation as here.  *Id.*, Exs. E-F (model orders).  Indeed, even the Northern District's Model Stipulated Protective Order for Litigation Involving Patents, Highly Sensitive Confidential Information and/or Trade Secrets does not prevent disclosure to experts who may be consultants to competitors in the future; rather, it limits only those experts "anticipated to become an employee of a Party or of a Party's competitor." *Id.*, Ex. F, ¶2.7.

- 8 -

4888-5037-1303.v1

Thus, Plaintiffs' Stipulated Protective Order (without Defendants' Expert Disclosure Limitations) is more than sufficient to protect the information in this case, which does not involve litigation between competitors or concern patents or trade secrets. *See Tilei v. Cal. Dep't of Corrs. & Rehab.*, 2017 WL 4310755, at \*3 (N.D. Cal. Sept. 28, 2017) ("Any vague threats of harm to safety and security are addressed by the fact the information will be produced subject to the protective order already in place . . . ."); *see also Trevino v. ACB Am., Inc.*, 232 F.R.D. 612, 617 (N.D. Cal. 2006) ("plaintiffs are not competitors of defendants, so with a stipulated protective order in place, there is virtually no risk that defendants' 'secrets' will be disclosed").

### c. The Expert Disclosure Limitations Prejudice Plaintiffs and Unfairly Advantage Defendants

Defendants' proposed language would also hamstring Plaintiffs' choice of expert by requiring Plaintiffs to prematurely disclose any expert who has or may in the future work or consult for any party Green Dot asserts competes in one of its industries (banking, credit or debit cards, or technology). This would effectively give Defendants veto power over Plaintiffs' expert selection and provide a preview of Plaintiffs' litigation strategy. For these reasons, courts in this District have rejected similar efforts to limit disclosure to experts. *See Ho*, 2021 WL 10862800, at \*4 ("Requiring defendant's authorization to share materials with experts would force plaintiff to disclose to defendant what documents he intends to show his experts as well as the identity of the experts well before the expert disclosure deadline, giving defendant an unfair preview of plaintiff's experts and restricting plaintiff's ability to show his experts relevant information."). And because Plaintiffs have no competitors, these prejudices are entirely one-sided, creating a major advantage for Defendants and a considerable disadvantage for Plaintiffs.

Concerning the Expert Disclosure Limitations' prohibition on hiring former employees as experts, Plaintiffs do not anticipate hiring a former Green Dot employee as an expert. But Plaintiffs understand that the universe of prepaid debit

- 9 -

4888-5037-1303.v1

card experts is likely very small, and Defendants' expansive protections would prevent Plaintiffs from hiring any expert who worked for Green Dot for even one day in any role since 2018. This is especially problematic given the Complaint's allegation that Green Dot grew by acquisition, potentially transforming the entire prepaid debit card business into former Green Dot employees. *See, e.g.*, ¶25 ("[t]o compensate and mask declines in its own legacy prepaid business, Green Dot repeatedly acquired other prepaid card companies [and] was running out of competitors to buy"). For example, if only two such experts exist, Defendants have retained one, and the other worked at Green Dot, then the Expert Disclosure Limitations would unfairly deprive Plaintiffs of a prepaid card expert.

In sum, "permitting experts to access highly confidential materials so long as they agree to be bound by the protective order is sufficient to adequately protect defendant's privacy interests, while allowing plaintiff's experts to access relevant information." *Ho*, 2021 WL 10862800, at *4.

### 4.    Conclusion

Accordingly, Plaintiffs respectfully request that the Court enter Plaintiffs' Stipulated Protective Order without Defendants' Expert Disclosure Limitations provision.

### B.    Defendants' Position

#### 1.    Background and Statement of Facts

Since the commencement of discovery earlier this year, the Parties have worked in good faith to negotiate three separate agreements that will control discovery in this complex securities fraud case. The Parties have agreed on the terms of a Privilege Log Agreement and an ESI Protocol, and those will be submitted for the Court's approval shortly.

The Parties have also worked together in good faith to negotiate a detailed Stipulated Protective Order to protect confidential information exchanged in discovery. Plaintiffs made the initial proposal, which differed from the sample

- 10 -

4888-5037-1303.v1

protective order on the Court's website.  Scott Decl. ¶ 4 & Ex. 2.  Defendants responded by proposing certain changes, and then several proposed versions were exchanged back-and-forth.

As Plaintiffs state, "[b]y August 22, 2024, the Parties had largely agreed to a mutually acceptable protective order." *Supra* at 4.  At that point, "the primary remaining dispute" concerned the expert clause—one paragraph in a 15-page document. *Id.* Defendants' prior proposed iterations of the Stipulated Protective Order contained language addressing their concerns relating to disclosure to competitors and former employees, but they revised that language in a proposal to Plaintiffs on September 11, 2024. *Id.* The revised language was as follows:

> A Party (the "Retaining Party") wishing to retain a testifying or consulting expert who is associated with another Party (the "Affected Party") must disclose the identity of the proposed expert to the Affected Party before providing the proposed expert with any information designated CONFIDENTIAL by the Affected Party under this Protective Order.  The Affected Party can object to the retention by serving a letter pursuant to Local Rule 37-1, in which case the Retaining Party may not provide the proposed expert with any information designated CONFIDENTIAL until the dispute is resolved by agreement or court order.  For purposes of this paragraph, a person is considered to be "associated with" another Party if he or she (i) was a director or employee of the Affected Party on or after January 1, 2018, or (ii) is at the time of the retention in competition with the Affected Party, or reasonably likely in the future to be in competition with the Affected Party, whether as an director, owner, employee, or consultant of a competing company or otherwise.

Kinnon Decl., Ex. A.

- 11 -

4888-5037-1303.v1

On September 17, Plaintiffs rejected Defendants' revised language and the parties agreed that they would raise the issue to the Court for resolution, with Plaintiffs preparing the initial portion of this joint stipulation.  Plaintiffs then waited nearly a month before finally doing so on October 15, 2024.

Meanwhile, the Parties had already begun serving discovery requests on each other and on third parties.  Plaintiffs state that some third parties have refused to produce documents until a Protective Order is entered, *supra* at 4-5, but omit that at least ten other third parties have produced documents.  Scott Decl. ¶ 6.  Plaintiffs also fail to note that Defendants themselves agreed to produce confidential documents before entry of the Protective Order, provided that Plaintiffs agree to treat them as though subject to Defendants' proposed version of the Order.  Scott Decl. ¶ 7 & Ex. 4.

**2.     Argument: Good Cause Exists to Enter Defendants' Proposed Protective Order**

The sole issue in dispute is whether it is reasonable to include a clause in the Protective Order restricting disclosure of a party's confidential information to its former employees and competitors.  Contrary to Plaintiffs' claims, there is nothing unusual or unfair about Green Dot's proposed language preventing disclosure of its confidential information to competitors or former employees.

Green Dot's proposed language is simple, reasonable, and narrowly tailored to achieve the protection Green Dot seeks, and to which Green Dot is entitled under applicable law.  Unfortunately, Plaintiffs have refused to agree to include the provision, thus necessitating this motion, even though the provision would not prevent Plaintiffs from hiring any experts they want—it only prevents them from providing Green Dot's confidential information to Green Dot's competitors or former employees.  Indeed, the very fact that Plaintiffs have refused to agree to this basic type of protection suggests that they have already retained, or intend to retain, competitors or former employees of Green Dot with whom they intend to share

- 12 -

4888-5037-1303.v1

Green Dot's confidential business information. This only underscores the need for the protective language Defendants have proposed in Paragraph 12.4.

Ninth Circuit courts have repeatedly held that a protective order should include language preventing the disclosure of confidential information to a party's anticipated competitors or former employees. *See, e.g.*, *Doe v. Kaiser Found. Health Plan, Inc.*, 2023 WL 8281690, at *5 (N.D. Cal. Nov. 30, 2023) ("Retaining former employees of Kaiser or of a competitor (or people who are actively seeking employment from Kaiser or a Kaiser competitor) raises legitimate concerns which cannot be adequately addressed by other provisions of the Protective Order."); *TD Prof'l Servs. v. Truyo Inc.*, 2022 WL 3098985, at *7 (D. Ariz. Aug. 4, 2022) ("The very purpose of protective orders would be in jeopardy, then, if the Court were to allow Plaintiff to employ Defendants' competitors or Plaintiff's closely related associates to access Defendants' highly sensitive and confidential business information."); *Corley v. Google, Inc.*, 2016 WL 3421402, at *2 (N.D. Cal. June 22, 2016) ("This court has repeatedly ruled that it is usually improper to hire an opponent's former employee as an expert because such an expert is substantially likely to inflict unfair prejudices which the former employer cannot realistically discover or guard against."). This Court should likewise require the Protective Order in this case to shield confidential information from a party's competitors or former employees.

Plaintiffs offer a series of arguments regarding Defendants' proposed expert disclosure limitation, arguing that it is unusual, impractical, unnecessary, and prejudicial. These arguments are speculative, unsupported, and meritless.[3]

---

[3] Plaintiffs also charge that Defendants are delaying discovery because of their "unwillingness to abandon this unreasonable term." *Supra* at 4. Not so. Plaintiffs fail to acknowledge that Defendants, as well as several third parties, have already begun producing documents, and that there is more than a year remaining in the fact discovery period. *Supra* at 11; Scheduling Order (ECF No. 118). Plus, if Plaintiffs were really concerned about getting documents from third parties as quickly as possible, they could have abandoned their own unreasonable refusal to agree to a

- 13 -

4888-5037-1303.v1

*First*, Defendants' proposed limitation is not unusual. As shown above, Ninth Circuit courts frequently adopt protective orders that limit disclosure of confidential information to a party's former employees or actual or potential competitors. Further, Plaintiffs note that the Northern District of California's model order "does not prevent disclosure to experts who may be consultants to competitors in the future; rather, it limits only those experts anticipated to become an employee of a Party or of a Party's competitor." *Supra* at 8 (emphasis added). But that very language shows that the Northern District adopts Defendants' view that it is appropriate to limit disclosure to competitors, with only a minor difference between employees and consultants of a competitor. *TVIIM, LLC v. McAfee, Inc.*, 2014 WL 2768641, at *2 (N.D. Cal. June 18, 2014) ("This district clearly requires that an 'expert' under the Protective Order may not be a past or current employee of a Party or of a Party's competitor or anticipated to become an employee of a Party or a Party's competitor." (cleaned up)). Plaintiffs also complain about Defendants' "drastic departure from the relevant expert provisions in the Court's sample order." *Supra* at 6. But both sides have proposed certain deviations from the Court's sample order and, as shown above, Plaintiffs did so first. *Supra* at 10.[4]

*Second*, Defendants' proposed limitation is not impractical. Plaintiffs complain that they "would have to disclose the name of any expert who is 'likely in the future' to be 'in competition' with Green Dot." *Supra* at 7 (emphasis omitted).

---

protection that multiple courts have endorsed. *Infra* at 12-13. They also could have submitted their portion of this Joint Stipulation sooner than a month after the parties reached an impasse on this very narrow issue. *Supra* at 11.

[4] Plaintiffs quote *Sampson v. City of El Centro*, 2015 WL 11658713, at *4 (S.D. Cal. Aug. 31, 2015), for the proposition that "'courts are in the best position to prevent both the overly broad use of [protective] orders.'" *Supra* at 6. But they omit the remainder of the quoted language, which makes clear that there is a countervailing consideration: "courts are in the best position to prevent both the overly broad use of [protective] orders *and the unnecessary denial of confidentiality for information that deserves it*." *Sampson*, 2015 WL 11658713, at *4 (emphasis added).

- 14 -

4888-5037-1303.v1

Plaintiffs' argument rests on a distortion of Defendants' proposed language. Defendants actual proposal would apply only to an expert who "is at the time of the retention in competition with the Affected Party, or *reasonably* likely in the future to be in competition with the Affected Party." *Supra* at 11. Plaintiffs merely need to ask a potential expert, at the time of retention, to confirm that she is not actively competing against Green Dot and has no specific plans to do so. Plaintiffs' interpretation of the "in competition" language is similarly overwrought—it would not apply to "any banking, credit or debit card, or technology business," *supra* at 7, but rather competition with Green Dot. At the end of the day, Green Dot's position is entirely reasonable—confidential information it must disclose only because it has been sued should not be at risk of winding up in the hands of competitors or former employees. That, after all, is the core purpose of protective orders in the first place.

*Third*, Defendants' proposed limitation is not unnecessary. Plaintiffs refer to "the stale and generic business information at issue in this case." *Supra* at 7. But Plaintiffs' first set of discovery requests belie that characterization, as they have requested certain information pertaining to sensitive government investigations and other matters "through the present." Scott Decl., Ex. 3. In any event, the Parties have already agreed that discovery in this case will include information sufficiently sensitive that it warrants the protections of a protective order; the only question now is whether those protections should apply to competitors and former employees.

*Fourth*, Defendants' proposed limitation is not prejudicial. Defendants are not seeking and will not have "veto power" over Plaintiffs' choice of experts. *Supra* at 9. Plaintiffs' position is based on the entirely speculative and unsubstantiated claim that "Plaintiffs understand that the universe of prepaid debit card experts is likely very small," even positing that "only such two such experts exist." *Supra* at 9-10. This is pure conjecture, unsupported by any evidence whatsoever, and thus not properly considered by the Court in resolving this motion under Local Rule 7-6 ("Factual contentions involved in any motion and opposition to motions shall be

- 15 -

4888-5037-1303.v1

presented, heard, and determined upon declarations and other written evidence (including documents, photographs, deposition excerpts, etc.) alone . . . ."). This case involves consumer financial services, not classified weapons systems. There is no reason to believe that the pool of qualified potential experts is unusually shallow or limited to Green Dot's competitors or former employees.[5]

### 3. Conclusion

Defendants respectfully request that the Court enter the version of the Stipulated Protective Order attached as Exhibit 1, which includes the disputed Paragraph 12.4.

DATED:  October 24, 2024

ROBBINS GELLER RUDMAN
 & DOWD LLP
RACHEL L. JENSEN
JESSICA T. SHINNEFIELD
CHRISTOPHER R. KINNON
MEGAN A. ROSSI
JOHN M. KELLEY

s/ Christopher R. Kinnon
CHRISTOPHER R. KINNON

655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

---

[5] Plaintiffs cite *Ho v. Marathon Patent Group, Inc.*, 2021 WL 10862800, at *4 (C.D. Cal. June 23, 2021), for the proposition that Defendants are seeking to require Plaintiffs to disclose their experts to Defendants, and that this would "mak[e] it impossible for [Plaintiffs] to effectively litigate this case." *Supra* at 7. Once again, Plaintiffs omit important context from their quotation. The full quotation in *Ho* shows why that decision is inapposite here: "*defendant's position that anyone plaintiff would call as an expert is a potential competitor* suggests defendant may well not authorize plaintiff to show highly confidential documents to his experts, making it impossible for plaintiff to effectively litigate this case." *Ho*, 2021 WL 10862800 at *4 (emphasis added). Defendants here do not contend that any expert Plaintiffs may retain would be a potential competitor or former employee; to the contrary, Defendants assert that there is no legitimate need for Plaintiffs to retain Green Dot employees or competitors because there are so many other potential experts in this field. Scott Decl. ¶ 9.

- 16 -

4888-5037-1303.v1

PITTA LLP
VINCENT F. PITTA
120 Broadway, 28th Floor
New York, NY  10271
Telephone:  212/652-3890
212/652-3891 (fax)

Additional Counsel for Plaintiffs

DATED:  October 24, 2024

ORRICK, HERRINGTON
  & SUTCLIFFE LLP
JAMES N. KRAMER
ALEXANDER K. TALARIDES
M. TODD SCOTT


                    s/ M. Todd Scott
              M. TODD SCOTT

405 Howard Street
San Francisco, CA  94105
Telephone:  415/773-5700
619/773-5759 (fax)
jkramer@orrick.com
atalarides@orrick.com
tscott@orrick.com

Attorneys for Defendants

GLASER WEIL FINK HOWARD
  JORDAN & SHAPIRO LLP
RICHARD E. GOTTLIEB
EMIL PETROSSIAN
AYAD MATHEWS
10250 Constellation Boulevard, 19th
Floor
Los Angeles, CA  90067
Telephone:  310/553-3000
310/556-2920 (fax)
rgottlieb@glaserweil.com
epetrossian@glaserweil.com
amathews@glaserweil.com

Additional Counsel for Defendant Green
Dot Corporation

- 17 -

4888-5037-1303.v1

**ATTESTATION PURSUANT TO LOCAL RULE 5-4.3.4**

Pursuant to L.R. 5-4.3.4, I hereby attest that all signatories listed above concurred in this filing.

DATED: October 24, 2024

     s/ Christopher R. Kinnon
CHRISTOPHER R. KINNON

4888-5037-1303.v1

ROBBINS GELLER RUDMAN
  & DOWD LLP
RACHEL L. JENSEN (211456)
JESSICA T. SHINNEFIELD (234432)
CHRISTOPHER R. KINNON (316850)
MEGAN A. ROSSI (318643)
JOHN M. KELLEY (339965)
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
rjensen@rgrdlaw.com
jshinnefield@rgrdlaw.com
ckinnon@rgrdlaw.com
mrossi@rgrdlaw.com
jkelley@rgrdlaw.com

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re GREEN DOT CORPORATION SECURITIES LITIGATION | Case No. 2:19-cv-10701-DDP (Ex) |
| | CLASS ACTION |
| | DISCOVERY MATTER |
| | DECLARATION OF CHRISTOPHER R. KINNON IN SUPPORT OF PLAINTIFFS' MOTION FOR ENTRY OF STIPULATED PROTECTIVE ORDER |
| | Date: November 15, 2024 |
| | Time: 9:30 A.M. |
| | Dept: 750 |
| | Discovery Cutoff: October 31, 2025 |
| | Pretrial Conference: October 5, 2026 |
| | Trial: November 3, 2026 |

4855-2716-6439.v1

I, CHRISTOPHER R. KINNON, declare as follows:

1. I am an attorney licensed to practice in all courts in the State of California. I am an associate at Robbins Geller Rudman & Dowd LLP, counsel for Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund and plaintiff Teamsters Local Union No. 727 Pension Fund (together, "Plaintiffs") and the putative class in the above-captioned matter. The matters set forth herein are based upon my own personal knowledge, and if called as a witness, I could and would testify competently to such matters. I submit this declaration in support of the Joint Stipulation Regarding Plaintiffs' Motion for Entry of Stipulated Protective Order, filed concurrently herewith.

2. The Parties[1] began their initial Federal Rule of Civil Procedure 26(f) conference on April 19, 2024 with a meet and confer phone call.

3. On April 23, 2024, Plaintiffs sent Defendants a draft protective order, and the Parties subsequently exchanged drafts and met and conferred to negotiate a stipulated protective order, including on June 3, 2024, August 14, 2024, August 22, 2024, August 26, 2024, and September 4, 2024.

4. Plaintiffs served requests for production of documents and data to Defendants and third parties on July 19, 2024.

5. Plaintiffs served Lead Plaintiff's First Set of Interrogatories to Defendant Green Dot Corporation on July 30, 2024.

6. By August 22, 2024, the Parties had largely agreed to a protective order, with the main remaining dispute concerning Defendants' insistence that the order limit the disclosure of materials designated confidential to experts far beyond the protections this District's Sample Stipulated Protective Order provides.

7. On August 22, 2024, Deutsche Bank Securities Inc. delayed producing documents until the protective order is complete.

---

[1] "Parties" refers collectively to Plaintiffs, and defendants Green Dot Corporation, Steven W. Streit, and Mark Shifke.

- 1 -

4855-2716-6439.v1

8. On September 3, 2024, Barclays Capital Inc. delayed producing documents until the protective order is complete.

9. On September 19, 2024, Canaccord Genuity, LLC delayed producing documents until the protective order is complete.

10. On September 11, 2024, Defendants sent Plaintiffs their proposed Expert Disclosure Limitations.

11. On September 17, 2024, Plaintiffs told Defendants that Plaintiffs would move the Court to enter the Stipulated Protective Order (*i.e.*, the negotiated protective order excluding the Expert Disclosure Clause).

12. On September 17, 2024, Defendants stated they would oppose the motion and ask the Court to add the Expert Disclosure Limitations "as a stand-alone Paragraph 12.4."

13. On September 24, 2024, Plaintiffs offered to adopt the Sample Stipulated Protective Order for the United States District Court for the Central District of California.

14. On September 27, 2024, Defendants rejected Plaintiffs' offer to adopt the Sample Stipulated Protective Order for the United States District Court for the Central District of California.

15. Attached are true and correct copies of the following exhibits:

Exhibit A: Email string between Christopher R. Kinnon and Adam Miller dated September 17, 2024 that includes Defendants' proposed Expert Disclosure Limitations;

Exhibit B: A copy of the Stipulated Protective Order, which represents the agreement of the Parties, excluding the Expert Disclosure Limitations Defendants propose and Plaintiffs oppose;

Exhibit C: Sample Stipulated Protective Order for the United States District Court for the Central District of California;

- 2 -

4855-2716-6439.v1

Exhibit D: A copy of correspondence with third parties Deutsche Bank Securities Inc., Barclays Capital Inc., and Canaccord Genuity, LLC in which those third parties delay production of requested documents until a protective order is entered;

Exhibit E: Model Stipulated Protective Order for Standard Litigation for the United States District Court for the Northern District of California;

Exhibit F: Model Stipulated Protective Order for Litigation Involving Patents, Highly Sensitive Confidential Information and/or Trade Secrets for the United States District Court for the Northern District of California; and

Exhibit G: Scheduling Order (ECF 118).

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 24, 2024, at San Diego, California.

s/ Christopher R. Kinnon
CHRISTOPHER R. KINNON

- 3 -

# EXHIBIT A

## Katie Woods

| | |
|---|---|
| **From:** | Miller, Adam <adam.miller@orrick.com> |
| **Sent:** | Tuesday, September 17, 2024 7:50 PM |
| **To:** | Christopher Kinnon; Patts, Lenny; Susan Williams; Jason Forge; Rachel Jensen; Jessica Shinnefield; Megan Rossi; Jack Kelley; 'vpitta@pittalaw.com'; Katie Woods; Ariana Gonzales |
| **Cc:** | Kramer, James N.; Talarides, Alex; Scott, M. Todd; Benton, Megan; 'rgottlieb@glaserweil.com'; 'epetrossian@glaserweil.com'; 'jyang@glaserweil.com'; 'cbraschi@glaserweil.com'; McCafferty, Molly; Patts, Lenny |
| **Subject:** | RE: In re Green Dot Corp. Sec. Litig., No. 2:19-cv-10701-DDP (Ex) (C.D. Cal.) |

EXTERNAL SENDER

Chris, we will oppose your motion for entry of the protective order.  We agree to the version you sent on Sept. 13 except for the omission of the expert-related paragraph I sent you on Sept. 11.  To be clear, though, we will suggest adding that as a stand-alone Paragraph 12.4, not adding it to the end of Paragraph 2.7.  Meanwhile, we will review the proposed custodians and search terms and get back to you with any comments.  Thanks.

**Adam Miller**
Senior Counsel
Orrick
Washington, DC
T +1 202-349-7958
adam.miller@orrick.com



---

**From:** Christopher Kinnon <CKinnon@rgrdlaw.com>
**Sent:** Tuesday, September 17, 2024 6:30 PM
**To:** Miller, Adam <adam.miller@orrick.com>; Patts, Lenny <lpatts@orrick.com>; Susan Williams <SusanW@rgrdlaw.com>; Jason Forge <JForge@rgrdlaw.com>; Rachel Jensen <RachelJ@rgrdlaw.com>; Jessica Shinnefield <jshinnefield@rgrdlaw.com>; Megan Rossi <MRossi@rgrdlaw.com>; Jack Kelley <JKelley@rgrdlaw.com>; 'vpitta@pittalaw.com' <vpitta@pittalaw.com>; Katie Woods <KWoods@rgrdlaw.com>; Ariana Gonzales <AGonzales@rgrdlaw.com>
**Cc:** Kramer, James N. <jkramer@orrick.com>; Talarides, Alex <atalarides@orrick.com>; Scott, M. Todd <tscott@orrick.com>; Benton, Megan <mbenton@orrick.com>; 'rgottlieb@glaserweil.com' <rgottlieb@glaserweil.com>; 'epetrossian@glaserweil.com' <epetrossian@glaserweil.com>; 'jyang@glaserweil.com' <jyang@glaserweil.com>; 'cbraschi@glaserweil.com' <cbraschi@glaserweil.com>; McCafferty, Molly <mmccafferty@orrick.com>; Patts, Lenny <lpatts@orrick.com>
**Subject:** RE: In re Green Dot Corp. Sec. Litig., No. 2:19-cv-10701-DDP (Ex) (C.D. Cal.)

**[EXTERNAL]**

Adam, please see plaintiffs' attached search term and custodian proposals, which we submit reserving our rights to augment or change.  As we explained on the last call, we have drafted these without the benefit of the Green Dot

1

organizational charts and calendars we requested.  Once you produce those, we may add additional custodians and terms.

Please let us know your availability for a call next week to discuss so we can keep this moving along.

And please also let us know as soon as possible whether Defendants will oppose our motion for an order approving the protective order that excludes Defendants' proposed expert language concerning ¶2.7.  If you will oppose the motion, please confirm that the draft PO I circulated below on Sept. 13, 2024 otherwise reflects the parties' agreement (*i.e.*, excluding the expert language Defendants' sought in ¶2.7).

Thanks,
Chris

**Christopher Kinnon**

Robbins Geller
Rudman & Dowd LLP

655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

  

---

**From:** Christopher Kinnon
**Sent:** Friday, September 13, 2024 2:23 PM
**To:** 'Miller, Adam' <adam.miller@orrick.com>; Patts, Lenny <lpatts@orrick.com>; Susan Williams <SusanW@rgrdlaw.com>; Jason Forge <JForge@rgrdlaw.com>; Rachel Jensen <RachelJ@rgrdlaw.com>; Jessica Shinnefield <jshinnefield@rgrdlaw.com>; Megan Rossi <MRossi@rgrdlaw.com>; Jack Kelley <JKelley@rgrdlaw.com>; 'vpitta@pittalaw.com' <vpitta@pittalaw.com>; Katie Woods <KWoods@rgrdlaw.com>; Ariana Gonzales <AGonzales@rgrdlaw.com>
**Cc:** Kramer, James N. <jkramer@orrick.com>; Talarides, Alex <atalarides@orrick.com>; Scott, M. Todd <tscott@orrick.com>; Benton, Megan <mbenton@orrick.com>; 'rgottlieb@glaserweil.com' <rgottlieb@glaserweil.com>; 'epetrossian@glaserweil.com' <epetrossian@glaserweil.com>; 'jyang@glaserweil.com' <jyang@glaserweil.com>; 'cbraschi@glaserweil.com' <cbraschi@glaserweil.com>; McCafferty, Molly <mmccafferty@orrick.com>; Patts, Lenny <lpatts@orrick.com>
**Subject:** RE: In re Green Dot Corp. Sec. Litig., No. 2:19-cv-10701-DDP (Ex) (C.D. Cal.)

Hi Adam, here's the PO we intend to ask the Court to approve, which we believe reflects the parties agreement and excludes Defendants' proposed expert language concerning ¶2.7 (both in prior proposed drafts and in your below correspondence).  Please let us know by early next week whether Defendants will oppose the motion.  And notwithstanding ¶2.7, please let us know if you believe this does not reflect the parties' agreement.

Please also send us the bank examination letter you mentioned on the call at your earliest convenience.

Thanks and have a good weekend.

**Christopher Kinnon**

Robbins Geller
Rudman & Dowd LLP

655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058



---

**From:** Miller, Adam <adam.miller@orrick.com>
**Sent:** Wednesday, September 11, 2024 11:06 AM
**To:** Christopher Kinnon <CKinnon@rgrdlaw.com>; Patts, Lenny <lpatts@orrick.com>; Susan Williams <SusanW@rgrdlaw.com>; Jason Forge <JForge@rgrdlaw.com>; Rachel Jensen <RachelJ@rgrdlaw.com>; Jessica Shinnefield <jshinnefield@rgrdlaw.com>; Megan Rossi <MRossi@rgrdlaw.com>; Jack Kelley <JKelley@rgrdlaw.com>; 'vpitta@pittalaw.com' <vpitta@pittalaw.com>; Katie Woods <KWoods@rgrdlaw.com>; Ariana Gonzales <AGonzales@rgrdlaw.com>
**Cc:** Kramer, James N. <jkramer@orrick.com>; Talarides, Alex <atalarides@orrick.com>; Scott, M. Todd <tscott@orrick.com>; Benton, Megan <mbenton@orrick.com>; 'rgottlieb@glaserweil.com' <rgottlieb@glaserweil.com>; 'epetrossian@glaserweil.com' <epetrossian@glaserweil.com>; 'jyang@glaserweil.com' <jyang@glaserweil.com>; 'cbraschi@glaserweil.com' <cbraschi@glaserweil.com>; McCafferty, Molly <mmccafferty@orrick.com>; Patts, Lenny <lpatts@orrick.com>
**Subject:** RE: In re Green Dot Corp. Sec. Litig., No. 2:19-cv-10701-DDP (Ex) (C.D. Cal.)

EXTERNAL SENDER
My apologies Chris.  Here it is:

A Party (the "Retaining Party") wishing to retain a testifying or consulting expert who is associated with another Party (the "Affected Party") must disclose the identity of the proposed expert to the Affected Party before providing the proposed expert with any information designated CONFIDENTIAL by the Affected Party under this Protective Order.  The Affected Party can object to the retention by serving a letter pursuant to Local Rule 37-1, in which case the Retaining Party may not provide the proposed expert with any information designated CONFIDENTIAL until the dispute is resolved by agreement or court order.  For purposes of this paragraph, a person is considered to be "associated with" another Party if he or she (i) was a director or employee of the Affected Party on or after January 1, 2018, or (ii) is at the time of the retention in competition with the Affected Party, or reasonably likely in the future to be in competition with the Affected Party, whether as an director, owner, employee, or consultant of a competing company or otherwise.

---

**From:** Christopher Kinnon <CKinnon@rgrdlaw.com>
**Sent:** Wednesday, September 11, 2024 1:57 PM
**To:** Miller, Adam <adam.miller@orrick.com>; Patts, Lenny <lpatts@orrick.com>; Susan Williams <SusanW@rgrdlaw.com>; Jason Forge <JForge@rgrdlaw.com>; Rachel Jensen <RachelJ@rgrdlaw.com>; Jessica Shinnefield <jshinnefield@rgrdlaw.com>; Megan Rossi <MRossi@rgrdlaw.com>; Jack Kelley <JKelley@rgrdlaw.com>; 'vpitta@pittalaw.com' <vpitta@pittalaw.com>; Katie Woods <KWoods@rgrdlaw.com>; Ariana Gonzales <AGonzales@rgrdlaw.com>
**Cc:** Kramer, James N. <jkramer@orrick.com>; Talarides, Alex <atalarides@orrick.com>; Scott, M. Todd <tscott@orrick.com>; Benton, Megan <mbenton@orrick.com>; 'rgottlieb@glaserweil.com' <rgottlieb@glaserweil.com>; 'epetrossian@glaserweil.com' <epetrossian@glaserweil.com>; 'jyang@glaserweil.com' <jyang@glaserweil.com>; 'cbraschi@glaserweil.com' <cbraschi@glaserweil.com>; McCafferty, Molly <mmccafferty@orrick.com>; Patts, Lenny <lpatts@orrick.com>
**Subject:** RE: In re Green Dot Corp. Sec. Litig., No. 2:19-cv-10701-DDP (Ex) (C.D. Cal.)

[EXTERNAL]

Adam, so we can have a productive conversation Friday, please send the compromise language you propose on the protective order today.

Thanks,
Chris

**Christopher Kinnon**

Robbins Geller
Rudman & Dowd LLP

655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

   

---

**From:** Christopher Kinnon
**Sent:** Friday, September 6, 2024 2:31 PM
**To:** 'Miller, Adam' <adam.miller@orrick.com>; Patts, Lenny <lpatts@orrick.com>; Susan Williams <SusanW@rgrdlaw.com>; Jason Forge <JForge@rgrdlaw.com>; Rachel Jensen <RachelJ@rgrdlaw.com>; Jessica Shinnefield <jshinnefield@rgrdlaw.com>; Megan Rossi <MRossi@rgrdlaw.com>; Jack Kelley <JKelley@rgrdlaw.com>; 'vpitta@pittalaw.com' <vpitta@pittalaw.com>; Katie Woods <KWoods@rgrdlaw.com>; Ariana Gonzales <AGonzales@rgrdlaw.com>
**Cc:** Kramer, James N. <jkramer@orrick.com>; Talarides, Alex <atalarides@orrick.com>; Scott, M. Todd <tscott@orrick.com>; Benton, Megan <mbenton@orrick.com>; 'rgottlieb@glaserweil.com' <rgottlieb@glaserweil.com>; 'epetrossian@glaserweil.com' <epetrossian@glaserweil.com>; 'jyang@glaserweil.com' <jyang@glaserweil.com>; cbraschi@glaserweil.com; McCafferty, Molly <mmccafferty@orrick.com>; Patts, Lenny <lpatts@orrick.com>
**Subject:** RE: In re Green Dot Corp. Sec. Litig., No. 2:19-cv-10701-DDP (Ex) (C.D. Cal.)

Thanks, Adam. Please also send us the potential compromise you mentioned on the protective order dispute over experts at your earliest convenience.

Have a good weekend,
Chris

---

**From:** Miller, Adam <adam.miller@orrick.com>
**Sent:** Friday, September 6, 2024 2:03 PM
**To:** Christopher Kinnon <CKinnon@rgrdlaw.com>; Patts, Lenny <lpatts@orrick.com>; Susan Williams <SusanW@rgrdlaw.com>; Jason Forge <JForge@rgrdlaw.com>; Rachel Jensen <RachelJ@rgrdlaw.com>; Jessica Shinnefield <jshinnefield@rgrdlaw.com>; Megan Rossi <MRossi@rgrdlaw.com>; Jack Kelley <JKelley@rgrdlaw.com>; 'vpitta@pittalaw.com' <vpitta@pittalaw.com>; Katie Woods <KWoods@rgrdlaw.com>; Ariana Gonzales <AGonzales@rgrdlaw.com>
**Cc:** Kramer, James N. <jkramer@orrick.com>; Talarides, Alex <atalarides@orrick.com>; Scott, M. Todd <tscott@orrick.com>; Benton, Megan <mbenton@orrick.com>; 'rgottlieb@glaserweil.com' <rgottlieb@glaserweil.com>;

'epetrossian@glaserweil.com' <epetrossian@glaserweil.com>; 'jyang@glaserweil.com' <jyang@glaserweil.com>; cbraschi@glaserweil.com; McCafferty, Molly <mmccafferty@orrick.com>; Patts, Lenny <lpatts@orrick.com>
**Subject:** RE: In re Green Dot Corp. Sec. Litig., No. 2:19-cv-10701-DDP (Ex) (C.D. Cal.)

EXTERNAL SENDER

Chris, attached please find a response to your August 30 letter regarding our meet-and-confer discussions relating to the RFPs. Also, and in response to those discussions, we intend to supplement our answer to Interrogatory No. 2 and will likewise respond to your letter regarding the bank examination privilege at that time. I should have a more precise date for that supplementation by early next week. Thanks and have a nice weekend.

**Adam Miller**
Senior Counsel
Orrick
Washington, DC
T +1 202-349-7958
adam.miller@orrick.com



---

**From:** Christopher Kinnon <CKinnon@rgrdlaw.com>
**Sent:** Friday, August 30, 2024 6:22 PM
**To:** Patts, Lenny <lpatts@orrick.com>; Susan Williams <SusanW@rgrdlaw.com>; Jason Forge <JForge@rgrdlaw.com>; Rachel Jensen <RachelJ@rgrdlaw.com>; Jessica Shinnefield <jshinnefield@rgrdlaw.com>; Megan Rossi <MRossi@rgrdlaw.com>; Jack Kelley <JKelley@rgrdlaw.com>; 'vpitta@pittalaw.com' <vpitta@pittalaw.com>; Katie Woods <KWoods@rgrdlaw.com>; Ariana Gonzales <AGonzales@rgrdlaw.com>
**Cc:** Kramer, James N. <jkramer@orrick.com>; Talarides, Alex <atalarides@orrick.com>; Scott, M. Todd <tscott@orrick.com>; Miller, Adam <adam.miller@orrick.com>; Benton, Megan <mbenton@orrick.com>; 'rgottlieb@glaserweil.com' <rgottlieb@glaserweil.com>; 'epetrossian@glaserweil.com' <epetrossian@glaserweil.com>; 'jyang@glaserweil.com' <jyang@glaserweil.com>; cbraschi@glaserweil.com
**Subject:** RE: In re Green Dot Corp. Sec. Litig., No. 2:19-cv-10701-DDP (Ex) (C.D. Cal.)

**[EXTERNAL]**

Counsel,

Please see the attached correspondence. Please respond to the open RFP items at your earliest convenience—hopefully by our call next Wednesday 1:00-2:00 PT (which we can confirm; we'll send a calendar invite and number shortly) but no later than Friday, September 6, 2024.

Thanks and have a nice Labor Day.

Best,
Chris

**Christopher Kinnon**

Robbins Geller
Rudman & Dowd LLP

5

655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058



---

**From:** Patts, Lenny <lpatts@orrick.com>
**Sent:** Thursday, August 29, 2024 2:21 PM
**To:** Susan Williams <SusanW@rgrdlaw.com>; Jason Forge <JForge@rgrdlaw.com>; Rachel Jensen <RachelJ@rgrdlaw.com>; Jessica Shinnefield <jshinnefield@rgrdlaw.com>; Christopher Kinnon <CKinnon@rgrdlaw.com>; Megan Rossi <MRossi@rgrdlaw.com>; Jack Kelley <JKelley@rgrdlaw.com>; 'vpitta@pittalaw.com' <vpitta@pittalaw.com>; Katie Woods <KWoods@rgrdlaw.com>; Ariana Gonzales <AGonzales@rgrdlaw.com>
**Cc:** Kramer, James N. <jkramer@orrick.com>; Talarides, Alex <atalarides@orrick.com>; Scott, M. Todd <tscott@orrick.com>; Miller, Adam <adam.miller@orrick.com>; Benton, Megan <mbenton@orrick.com>; 'rgottlieb@glaserweil.com' <rgottlieb@glaserweil.com>; 'epetrossian@glaserweil.com' <epetrossian@glaserweil.com>; 'jyang@glaserweil.com' <jyang@glaserweil.com>; cbraschi@glaserweil.com
**Subject:** In re Green Dot Corp. Sec. Litig., No. 2:19-cv-10701-DDP (Ex) (C.D. Cal.)

EXTERNAL SENDER
Counsel,

Attached please find Defendant Green Dot Corporation's Answers and Objections to Plaintiffs' First Set of Interrogatories.

Thanks,
Lenny Patts


**Lenny T. Patts**
Senior Litigation Paralegal Specialist

Orrick
San Francisco Ⓥ
T 415.773.5913
M 707.567.3916
lpatts@orrick.com



Securities Litigation Blog

---

**From:** Susan Williams <SusanW@rgrdlaw.com>
**Sent:** Tuesday, July 30, 2024 3:57 PM
**To:** Kramer, James N. <jkramer@orrick.com>; Talarides, Alex <atalarides@orrick.com>; Scott, M. Todd <tscott@orrick.com>; Miller, Adam <adam.miller@orrick.com>; Benton, Megan <mbenton@orrick.com>; 'rgottlieb@glaserweil.com' <rgottlieb@glaserweil.com>; 'epetrossian@glaserweil.com' <epetrossian@glaserweil.com>; 'jyang@glaserweil.com' <jyang@glaserweil.com>; Patts, Lenny <lpatts@orrick.com>
**Cc:** Jason Forge <JForge@rgrdlaw.com>; Rachel Jensen <RachelJ@rgrdlaw.com>; Jessica Shinnefield <jshinnefield@rgrdlaw.com>; Christopher Kinnon <CKinnon@rgrdlaw.com>; Megan Rossi <MRossi@rgrdlaw.com>; Jack Kelley <JKelley@rgrdlaw.com>; 'vpitta@pittalaw.com' <vpitta@pittalaw.com>; Katie Woods <KWoods@rgrdlaw.com>
**Subject:** In re Green Dot Corp. Sec. Litig., No. 2:19-cv-10701-DDP (Ex) (C.D. Cal.) - Interrogatories

[EXTERNAL]

Counsel:

Please see the attached Lead Plaintiff's First Set of Interrogatories to Defendant Green Dot Corporation.


Susan M. Williams
Paralegal
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058


**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.


**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of

7

the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

# EXHIBIT B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| IN RE GREEN DOT CORPORATION SECURITIES LITIGATION | Case No. 2:19-CV-10701-DDP-E<br><br>CLASS ACTION<br><br>**[PROPOSED] STIPULATED PROTECTIVE ORDER**<br><br>Judge:  Honorable Dean D. Pregerson |

WHEREAS, Federal Rule of Civil Procedure Rule 26(c) and this District's Sample Stipulated Protective Order contemplate the issuance of protective orders limiting the disclosure of discovered information in appropriate circumstances, and good cause having been shown, the Parties hereby stipulate, subject to the Court's approval, that this Stipulated Protective Order ("Order") governs the treatment of all discovery in these proceedings.

## 1.    PURPOSES AND LIMITATIONS

The purpose of this Order is to provide for the prompt, efficient, and orderly conduct of discovery proceedings, to preserve and maintain the confidentiality of

1

4895-5185-0992.v1

certain documents and information produced or exchanged in the litigation by the parties or by any nonparties, to prevent the waiver of applicable evidentiary privileges and doctrines, and to comply with all applicable state and federal rules and regulations.

This Order does not confer blanket protections on all disclosures or responses to discovery.  Rather, the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under applicable legal principles. The Parties further acknowledge, as set forth in Section 12.3, below, that this Stipulated Protective Order does not entitle them to file confidential information under seal. Civil Local Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a Party seeks permission from the Court to file material under seal.

2.      **DEFINITIONS**

2.1     Action:  *In re Green Dot Corporation Securities Litigation*, No. 2:19-CV-10701-DDP-E (C.D. Cal.).

2.2     Challenging Party:  a Party or Non-Party that challenges the designation of information or items under this Order.

2.3     "CONFIDENTIAL" Information or Items:  information (regardless of how it is generated, stored, or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c) or private identifacatory information such as Social Security numbers, home telephone numbers and addresses, tax returns (including attached schedules and forms), W-2s, 1099s, banking or credit information.

2.4     Counsel:  Outside Counsel of Record and In-House Counsel (as well as their support staff).

2.5     Designating Party:  a Party or Non-Party that designates information or items produced by any Party or Non-Party in disclosures or in responses to

2

4895-5185-0992.v1

discovery as "CONFIDENTIAL."

2.6 <u>Disclosure or Discovery Material</u>: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

2.7 <u>Expert</u>: a person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its Counsel to serve as an expert witness or as a consultant in this Action.

2.8 <u>In-House Counsel</u>: attorneys who are employees of a Party to this Action. In-House Counsel does not include Outside Counsel.

2.9 <u>Non-Party</u>: any natural person, partnership, corporation, association, or other legal entity not named as a Party to this Action.

2.10 <u>Outside Counsel</u>: attorneys who are not employees of a Party to this Action but are retained to represent or advise a Party to this Action.

2.11 <u>Party</u>: any Party[1] to this Action, including all of its officers, directors, employees, retained Experts, In-House Counsel, and Outside Counsel (and their support staffs). For the avoidance of doubt, prior to class certification, no putative class member other than a named plaintiff, the Lead Plaintiff, or a proposed class representative in the Action may be given access to Protected Material unless such putative class member may otherwise access Protected Material under another provision of this Order.

2.12 <u>Producing Party</u>: a Party or Non-Party that produces Disclosure or Discovery Material in this Action.

2.14 <u>Professional Vendors</u>: persons or entities that provide litigation support services (*e.g.*, photocopying, videotaping, translating, preparing exhibits or

---

[1] The current Parties are Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund, and additional named plaintiff Teamsters Local Union No. 727 Pension Fund ("Plaintiffs"); and defendants Green Dot Corporation, Steven W. Streit, and Mark Shifke ("Defendants").

[PROPOSED] STIPULATED PROTECTIVE ORDER

4895-5185-0992.v1

demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.15 <u>Protected Material</u>:  any Disclosure or Discovery Material that (1) qualifies for protection under Rule 26(c) that is designated as "CONFIDENTIAL" ("Protected Information"), (2) information copied or extracted from Protected Information; (2) all copies, excerpts, summaries, or compilations of Protected Information; and (4) any testimony, conversations, or presentations made by Parties that might reveal Protected Information.

2.16 <u>Receiving Party</u>:  a Party that receives Disclosure or Discovery Material from a Producing Party.

**3.      SCOPE**

All Protected Material is governed, and protected by the remedies and relief provided, by this Order.  Notwithstanding the foregoing, the protections conferred by this Stipulated Protective Order do not cover any information:

(a) that is in the public domain at the time of disclosure to a Receiving Party or that becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and

(b) known to the Receiving Party prior to the disclosure, or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party.

Any use of Protected Material at trial shall be governed by a separate agreement or order.

[PROPOSED] STIPULATED PROTECTIVE ORDER

## 4. DURATION

The terms of this Protective Order do not govern the use of information at trial in this Action.[2] However, any information that was designated as confidential or maintained pursuant to this protective order and not used at the trial shall retain its confidential status and remain subject to the restrictions set forth herein, except as otherwise agreed by the Producing Party or ordered by the Court.

If this Action is resolved without a trial, the confidentiality obligations imposed by this Order shall remain in effect until the Designating Party agrees otherwise in writing or a court order otherwise directs. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this Action, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, re-hearings, remands, trials, or reviews of this Action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

## 5. DESIGNATING PROTECTED MATERIAL

5.1 Exercise of Restraint and Care in Designating Material for Protection. Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards.

Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (*e.g.*, to unnecessarily encumber or retard the case development process or to impose unnecessary expenses and burdens on other parties) expose the Designating Party to sanctions.

---

[2] Determinations regarding restrictions on the use or public disclosure of Confidential Information at trial or in trial exhibits are reserved and shall be made in accordance with the Local Rules or as the Court directs at an appropriate time before trial, before any such Confidential Information is disclosed beyond the limits established by this Order.

5

4895-5185-0992.v1

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection, that Designating Party must promptly notify all other Parties that it is withdrawing the mistaken designation.

5.2 <u>Manner and Timing of Designations</u>. Except as otherwise provided in this Order (*see, e.g.*, Section 5.3 below), or as otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced or promptly after the Designating Party becomes aware of the need to so designate.

Designation in conformity with this Order requires:

(a) for information in documentary form (*e.g.*, paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Designating Party affix the legend "CONFIDENTIAL" to each page that contains Protected Material.

For documents produced in native format, the "CONFIDENTIAL" legend shall be affixed to the placeholder bates numbered TIFF image that accompanies the native file in the production.

A Party or Non-Party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting Party has indicated which material it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "CONFIDENTIAL." After the inspecting Party has identified the documents it wants copied and produced, the Designating Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, or as soon as is practicable, the Designating Party must affix the appropriate legend ("CONFIDENTIAL") to each page that contains Protected Material.

(b) for testimony given in deposition or in other pretrial or trial proceedings, that the Designating Party identify on the record during the deposition,

6

4895-5185-0992.v1

hearing, or other proceeding or in writing to Counsel for all other Parties and any Non-Parties who attended the deposition or other proceeding no later than ten days after the conclusion of the deposition or other proceeding.  Transcripts containing Protected Material shall have an obvious legend on the title page that the transcript contains Protected Material. The Designating Party shall inform the court reporter of these requirements. Any transcript that is prepared before the expiration of the 10-day period for designation shall be treated during that period as if it had been designated "CONFIDENTIAL" in its entirety unless otherwise agreed. After the expiration of that period, the transcript shall be treated only as actually designated. Designations must be specific as to the portions of the transcript and/or any exhibits to which that Confidentiality Designation applies, except that any exhibit that was marked with a Confidentiality Designation at the time of production, and which still bears that mark at the time of its use in a deposition, shall be presumed to fall within the provisions of this Order without further designation.

(c)  for information produced in some form other than documentary and for any other tangible items, that the Designating Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL."  If only a portion or portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s).

5.3    Inadvertent Failures to Designate.  If timely corrected, an inadvertent failure to designate qualified information or items does not waive the Designating Party's right to secure protection under this Order for such material. Such correction is timely if made within a reasonable time after the inadvertent failure to designate is discovered by the Designating Party.  Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

In the event that a Producing Party inadvertently fails to designate Protected

7

[PROPOSED] STIPULATED PROTECTIVE ORDER

4895-5185-0992.v1

Material, the Producing Party shall give written notice of such inadvertent failure to designate to the Receiving Party (the "Inadvertent Failure to Designate Notice") and shall reproduce copies of the Protected Material that are labeled with the appropriate confidentiality designation. Upon receipt of an Inadvertent Production Notice and properly labeled Protected Material, the Receiving Party shall promptly destroy the inadvertently produced Protected Material and all copies thereof. Upon request, the Receiving Party shall notify the Producing Party in writing of such destruction within 14 calendar days of receipt of the Inadvertent Production Notice and properly labeled Protected Material. This provision is not intended to apply to any production of any document, material, or testimony protected by attorney-client or other privileges or the work product doctrine.

**6.    CHALLENGING CONFIDENTIALITY DESIGNATIONS**

6.1    <u>Timing of Challenges</u>.  Any Party or Non-Party may challenge a designation (or non-designation) of confidentiality at any time. Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2    <u>Meet and Confer</u>.  The Challenging Party shall initiate the dispute resolution process in accordance with Local Rule 37-1 *et seq*.

6.3    <u>Judicial Intervention</u>.

(a)  If the Parties cannot resolve a challenge without court intervention, the Challenging Party shall file and  serve a stipulation concerning the matters in dispute pursuant to Civil Local Rules 37-1 and 37-2 within 14 days after the conclusion of the meet-and-confer conducted pursuant to Section 6.2. Either Party may declare that the meet-and-confer process has concluded.

[PROPOSED] STIPULATED PROTECTIVE ORDER

4895-5185-0992.v1

(b) The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges, and those made for an improper purpose (*e.g.*, to harass or impose unnecessary expenses and burdens on other Parties) may expose the Challenging Party to sanctions.

(c) During the challenge process, all Parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the Court rules on the challenge.

**7.     ACCESS TO AND USE OF PROTECTED MATERIAL**

7.1     Basic Principles.  A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this case only for prosecuting, defending, or attempting to settle this litigation and associated appeals. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the litigation has been terminated, a Receiving Party must comply with the provisions of Section 13 below.

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

Counsel shall maintain the originals of the "Acknowledgment and Agreement to Be Bound" forms signed by persons acknowledging their obligations under this Order for a period of 60 days after final disposition of these proceedings and shall provide copies of any relevant forms to counsel for another Party if such counsel certifies that it has a basis to believe that a violation of the Protective Order has occurred.

7.2     Disclosure of "CONFIDENTIAL" Information or Items.  Unless otherwise ordered by the Court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

9

4895-5185-0992.v1

(a) attorneys and other employees of a law firm acting as the Receiving Party's Outside Counsel in this Action to whom it is reasonably necessary to disclose the information for this litigation;

(b) officers, directors, and employees (including In-House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this litigation;

(c) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d) the Court and its personnel, including any special master or Court-appointed official and their staff;(e) court reporters and their staff,

(f) professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(g) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information; and

(h) in preparation for or during their depositions, witnesses, and attorneys for witnesses, in the Action to whom disclosure is reasonably necessary provided: (1) the Party requests that the witness sign the form attached as Exhibit A hereto; and (2) they will not be permitted to keep any confidential information unless they sign the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Parties or ordered by the Court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order;

(i) any mediator who is assigned to this matter and his or her staff, who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A); and

(j) insurance carriers providing coverage in this matter.

[PROPOSED] STIPULATED PROTECTIVE ORDER

4895-5185-0992.v1

**8.     PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION**

If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this Action as "CONFIDENTIAL," that Party must:

(a)  promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

(b)  promptly notify in writing the Party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Stipulated Protective Order; and

(c)  cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this Action as "CONFIDENTIAL" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission.  The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this Action to disobey a lawful directive from another court.

**9.     A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION**

9.1     The terms of this Order are applicable to information produced by a Non-Party in this Action and designated as "CONFIDENTIAL."  Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

11

4895-5185-0992.v1

9.2     In the event that a Party is required, by a valid discovery request in this Action, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

(a)  promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

(b)  promptly provide the Non-Party with a copy of the Stipulated Protective Order in this litigation, the relevant discovery request(s), and a reasonably specific description of the information requested; and

(c)  make the information requested available for inspection by the Non-Party.

9.3     If the Non-Party fails to object or seek a protective order from this Court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the Court. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this Court of its Protected Material.

**10.     <u>UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL</u>**

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately: (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this

12

4895-5185-0992.v1

Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

## 11. INADVERTENT PRODUCTION OR DISCLOSURE OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL

The Parties agree that the protections of Federal Rule of Evidence 502(d) shall apply. Consistent with Federal Rule of Evidence 502(d), the production or disclosure in this Action of any Disclosure or Discovery Material which a Party or Non-Party later claims in good faith should not have been produced in this Action because of the attorney-client privilege, the attorney work product protection, the joint defense or common interest doctrine, or other similar doctrine, or by another legal privilege protecting information from discovery ("Privileged Discovery Material"), will not, in and of itself, be deemed to have waived any privilege for the Privileged Discovery Matter in this Action or any other proceeding or investigation.

If the Producing Party timely notifies the Receiving Party in writing that Privileged Discovery Materials have been produced, the Receiving Party shall promptly sequester, return, or destroy the Privileged Discovery Material. Such notification is timely if made within a reasonable time after the disclosure of Privileged Discovery Material is discovered. The Receiving Party shall promptly sequester or delete the Privileged Discovery Material (and all paper and electronic copies) from any systems used to house the documents, including document review databases, e-rooms and any other location that stores the documents. If the Receiving Party has made any onward disclosures of the Privileged Discovery Material, it must also immediately notify all parties who received such material, instruct them to destroy or return it immediately, and identify the other party or parties in question to the Producing Party. Any Producing Party that claws back Privileged Discovery Material will promptly provide the Receiving Party with a privilege log that reasonably identifies the basis for the assertion of privilege or protection over the clawed-back documents.

13

4895-5185-0992.v1

Nothing contained herein is intended to or shall serve to limit the right of a Party to challenge the privilege or protection asserted with respect to any Disclosure or Discovery Material. The Receiving Party may file a motion with the Court for an order compelling production of the purportedly Privileged Discovery Material that has been clawed back. In so doing, the Receiving Party may not use the Privileged Discovery Material, except to the extent necessary to submit the document to the Court for *in camera* review.  Nor may the Receiving Party make use of the Privileged Discovery Material during any aspect of this Action or any other matter, including in depositions or at trial, unless the documents are later designated by the Court as not privileged or protected.

This provision is not intended to modify whatever procedure may be established in an e-discovery order or other agreement that provides for production without prior privilege review.

**12.      MISCELLANEOUS**

12.1   Right to Further Relief.  Nothing in this Order abridges the right of any person to seek its modification by the Court in the future.

12.2   Right to Assert Other Objections.  By stipulating to the entry of this Protective Order, no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Stipulated Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

12.3   Filing Protected Material.  A Party that seeks to file with the Court any Protected Material produced by another Party must seek to file such Material under seal in compliance with Civil Local Rule 79-5.

**13.      FINAL DISPOSITION**

Within 60 days after the final disposition of this Action, as defined in Section 4, or such other time period as the Parties agree or the Court directs, and upon the request of the Producing or Designating Party, each Receiving Party must return all

14

4895-5185-0992.v1

Protected Material to the Producing Party or destroy such material. If a Receiving Party has forwarded such material on to another party, the Receiving Party must also ensure that the recipient(s) also fully complies with this Section. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. This provision does not require the return or destruction of Protected Material stored on backup media made in accordance with regular data backup procedures for disaster recovery purposes, subject to legal hold obligations, or whose return or destruction would violate applicable federal or state law or regulation. Whether the Protected Material is returned or destroyed, the Receiving Party must, upon request from the Producing or Designating Party, submit a written certification to the Producing or Designating Party by the deadline referenced in this Section that (1) affirms that all reasonable efforts were made to ensure that all the Protected Material that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, Expert reports, attorney work product, and consultant and Expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4.

**FOR GOOD CAUSE SHOWN, IT IS SO ORDERED**.

Dated: _____, 2024 _____

Honorable Dean D. Pregerson
United States District Judge

15

[PROPOSED] STIPULATED PROTECTIVE ORDER

4895-5185-0992.v1

# EXHIBIT A

## ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of _____ _____ [print or type full address], declare under penalty of perjury that I have read in its entirety and understand the Stipulated Protective Order that was issued by the United States District Court for the Central District of California on _____, 2024, in the case of *In re Green Dot Corp. Sec. Litig.*, No. 2:19-CV-10701-DDP-E, (C.D. Cal.).

I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt.  I solemnly promise that I will not disclose in any manner any information or item that is subject to this Stipulated Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the Central District of California for the purpose of enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this Action.

Date: _____

City and State where Sworn and Signed: _____

Printed Name: _____

Signature: _____

i

4895-5185-0992.v1

# EXHIBIT C

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Plaintiff, | Case No. |
| v. | STIPULATED PROTECTIVE ORDER |
| Defendant. | |

1.    A. <u>PURPOSES AND LIMITATIONS</u>

Discovery in this action is likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted. Accordingly, the parties hereby stipulate to and petition the Court to enter the following Stipulated Protective Order. The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles. The parties further acknowledge, as set forth in Section 12.3, below, that this Stipulated Protective Order does not entitle them to

file confidential information under seal; Civil Local Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal.

B. GOOD CAUSE STATEMENT

[*The "Good Cause Statement" should be edited to include or exclude specific information that applies to the particular case, i.e., what harm will result from the disclosure of the confidential information likely to be produced in this case? Below is an example]:

This action is likely to involve trade secrets, customer and pricing lists and other valuable research, development, commercial, financial, technical and/or proprietary information for which special protection from public disclosure and from use for any purpose other than prosecution of this action is warranted. Such confidential and proprietary materials and information consist of, among other things, confidential business or financial information, information regarding confidential business practices, or other confidential research, development, or commercial information (including information implicating privacy rights of third parties), information otherwise generally unavailable to the public, or which may be privileged or otherwise protected from disclosure under state or federal statutes, court rules, case decisions, or common law. Accordingly, to expedite the flow of information, to facilitate the prompt resolution of disputes over confidentiality of discovery materials, to adequately protect information the parties are entitled to keep confidential, to ensure that the parties are permitted reasonable necessary uses of such material in preparation for and in the conduct of trial, to address their handling at the end of the litigation, and serve the ends of justice, a protective order for such information is justified in this matter. It is the intent of the parties that information will not be designated as confidential for tactical reasons and that nothing be so

2

designated without a good faith belief that it has been maintained in a confidential, non-public manner, and there is good cause why it should not be part of the public record of this case.

2.   DEFINITIONS

2.1   Action: [this pending federal law suit]. [*Option: consolidated or related actions.]

2.2   Challenging Party:  a Party or Non-Party that challenges the designation of information or items under this Order.

2.3   "CONFIDENTIAL" Information or Items:  information (regardless of how it is generated, stored or maintained) or tangible things that qualify  for protection under Federal Rule of Civil Procedure 26(c), and as specified above in the Good Cause Statement.

2.4   Counsel:  Outside Counsel of Record and House Counsel (as well as their support staff).

2.5   Designating Party: a Party or Non-Party that designates information  or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL."

2.6   Disclosure or Discovery Material:  all items or information, regardless of the medium or manner in which it is generated, stored, or maintained  (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

2.7   Expert:  a person with specialized knowledge or experience in a  matter pertinent to the litigation who has been retained by a Party or its counsel to serve  as an expert witness or as a consultant in this Action.

2.8   House Counsel:  attorneys who are employees of a party to this  Action. House Counsel does not include Outside Counsel of Record or any other outside counsel.

3

2.9 <u>Non-Party</u>: any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

2.10 <u>Outside Counsel of Record</u>: attorneys who are not employees of a party to this Action but are retained to represent or advise a party to this Action and have appeared in this Action on behalf of that party or are affiliated with a law firm which has appeared on behalf of that party, and includes support staff.

2.11 <u>Party</u>: any party to this Action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staffs).

2.12 <u>Producing Party</u>: a Party or Non-Party that produces Disclosure or Discovery Material in this Action.

2.13 <u>Professional Vendors</u>: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.14 <u>Protected Material</u>: any Disclosure or Discovery Material that is designated as "CONFIDENTIAL."

2.15 <u>Receiving Party</u>: a Party that receives Disclosure or Discovery Material from a Producing Party.

3. <u>SCOPE</u>

The protections conferred by this Stipulation and Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material.

Any use of Protected Material at trial shall be governed by the orders of the trial judge. This Order does not govern the use of Protected Material at trial.

4

4.      DURATION

[ONE POSSIBLE PARAGRAPH] Once a case proceeds to trial, all of the information that was designated as confidential or maintained pursuant to this protective order becomes public and will be presumptively available to all members of the public, including the press, unless compelling reasons supported by specific factual findings to proceed otherwise are made to the trial judge in advance of the trial.  See Kamakana v. City and County of Honolulu, 447 F.3d 1172, 1180-81 (9th Cir. 2006) (distinguishing "good cause" showing for sealing documents produced in discovery from "compelling reasons" standard when merits-related documents are part of court record). Accordingly, the terms of this protective order do not extend beyond the commencement of the trial.

[ALTERNATIVE POSSIBLE PARAGRAPH] Even after final disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this Action, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this Action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

5.      DESIGNATING PROTECTED MATERIAL

5.1      Exercise of Restraint and Care in Designating Material for Protection. Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards. The Designating Party must designate for protection only those parts of material, documents, items, or oral or written communications that qualify so that other portions of the material, documents,

5

items, or communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order.

Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber the case development process or to impose unnecessary expenses and burdens on other parties) may expose the Designating Party to sanctions.

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection, that Designating Party must promptly notify all other Parties that it is withdrawing the inapplicable designation.

5.2 Manner and Timing of Designations. Except as otherwise provided in this Order (see, e.g., second paragraph of section 5.2(a) below), or as otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.

Designation in conformity with this Order requires:

(a) for information in documentary form (e.g., paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix at a minimum, the legend "CONFIDENTIAL" (hereinafter "CONFIDENTIAL legend"), to each page that contains protected material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

A Party or Non-Party that makes original documents available for inspection need not designate them for protection until after the inspecting Party has indicated which documents it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "CONFIDENTIAL." After the inspecting Party has identified the

6

documents it wants copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the "CONFIDENTIAL legend" to each page that contains Protected Material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

(b)  for testimony given in depositions that the Designating Party identify the Disclosure or Discovery Material on the record, before the close of the deposition all protected testimony.

(c)  for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information is stored the legend "CONFIDENTIAL." If only a portion or portions of the information warrants protection, the Producing Party, to the extent practicable, shall identify the protected portion(s).

5.3    Inadvertent Failures to Designate.  If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

6.    CHALLENGING CONFIDENTIALITY DESIGNATIONS

6.1    Timing of Challenges.  Any Party or Non-Party may challenge a designation of confidentiality at any time that is consistent with the Court's Scheduling Order.

6.2    Meet and Confer.  The Challenging Party shall initiate the dispute

resolution process under Local Rule 37.1 et seq.

6.3 The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges, and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived or withdrawn the confidentiality designation, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the Court rules on the challenge.

7. ACCESS TO AND USE OF PROTECTED MATERIAL

7.1 Basic Principles. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this Action only for prosecuting, defending, or attempting to settle this Action. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the Action has been terminated, a Receiving Party must comply with the provisions of section 13 below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

7.2 Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a) the Receiving Party's Outside Counsel of Record in this Action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this Action;

8

(b)  the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this Action;

(c)  Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this Action and who have signed    the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d)  the court and its personnel;

(e)  court reporters and their staff;

(f)  professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(g)  the author or recipient of a document containing the information or   a custodian or other person who otherwise possessed or knew the information;

(h)  during their depositions, witnesses ,and attorneys for witnesses, in  the Action to whom disclosure is reasonably necessary provided: (1) the deposing  party requests that the witness sign the form attached as Exhibit 1 hereto; and (2) they will not be permitted to keep any confidential information unless they sign     the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Designating Party or ordered by the court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material may be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order; and

(i)  any mediator or settlement officer, and their supporting personnel, mutually agreed upon by any of the parties engaged in settlement discussions.

8.    PROTECTED  MATERIAL  SUBPOENAED  OR  ORDERED PRODUCED IN OTHER LITIGATION

If a Party is served with a subpoena or a court order issued in other    litigation that compels disclosure of any information or items designated in this Action as

"CONFIDENTIAL," that Party must:

(a) promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

(b) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Stipulated Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this Action to disobey a lawful directive from another court.

9. <u>A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION</u>

(a) The terms of this Order are applicable to information produced by a Non-Party in this Action and designated as "CONFIDENTIAL." Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(b) In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's

confidential information, then the Party shall:

(1) promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

(2) promptly provide the Non-Party with a copy of the Stipulated Protective Order in this Action, the relevant discovery request(s), and a reasonably specific description of the information requested; and

(3) make the information requested available for inspection by the Non-Party, if requested.

(c) If the Non-Party fails to seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

10.   UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

\\

11

**11. INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL**

When a Producing Party gives notice to Receiving Parties that certain inadvertently produced material is subject to a claim of privilege or other protection, the obligations of the Receiving Parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). This provision is not intended to modify whatever procedure may be established in an e-discovery order that provides for production without prior privilege review. Pursuant to Federal Rule of Evidence 502(d) and (e), insofar as the parties reach an agreement on the effect of disclosure of a communication or information covered by the attorney-client privilege or work product protection, the parties may incorporate their agreement in the stipulated protective order submitted to the court.

**12. MISCELLANEOUS**

12.1 Right to Further Relief. Nothing in this Order abridges the right of any person to seek its modification by the Court in the future.

12.2 Right to Assert Other Objections. By stipulating to the entry of this Protective Order no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Stipulated Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

12.3 Filing Protected Material. A Party that seeks to file under seal any Protected Material must comply with Civil Local Rule 79-5. Protected Material may only be filed under seal pursuant to a court order authorizing the sealing of the specific Protected Material at issue. If a Party's request to file Protected Material under seal is denied by the court, then the Receiving Party may file the information in the public record unless otherwise instructed by the court.

12

13. FINAL DISPOSITION

After the final disposition of this Action, as defined in paragraph 4, within 60 days of a written request by the Designating Party, each Receiving Party must return all Protected Material to the Producing Party or destroy such material. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60 day deadline that (1) identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION).

\\
\\
\\
\\
\\
\\
\\
\\
\\

13

14. Any violation of this Order may be punished by any and all appropriate measures including, without limitation, contempt proceedings and/or monetary sanctions.

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

DATED_____

_____
Attorneys for Plaintiff

DATED:_____

_____
Attorneys for Defendant

FOR GOOD CAUSE SHOWN, IT IS SO ORDERED.

DATED:_____

_____
[Name of Judge]
United States District/Magistrate Judge

14

## EXHIBIT A

### ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of _____ [print or type full address], declare under penalty of perjury that I have read in its entirety and understand the Stipulated Protective Order that was issued by the United States District Court for the Central District of California on [date] in the case of _____ **[insert formal name of the case and the number and initials assigned to it by the court]**. I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Stipulated Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the Central District of California for the purpose of enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this action. I hereby appoint_____[print or type full name] of_____ [print or type full address and telephone number] as my California agent for service of process in connection with this action or any proceedings related to enforcement of this Stipulated Protective Order.

Date: _____

City and State where sworn and signed:_____

Printed name: _____

Signature: _____

15

# EXHIBIT D

## Katie Woods

| | |
|---|---|
| **From:** | Brittany Brudnicki <brittany.brudnicki@db.com> |
| **Sent:** | Thursday, August 22, 2024 9:31 AM |
| **To:** | Megan Rossi; Theresa Julian |
| **Subject:** | RE: In re Green Dot Corporation Securities Litigation |

EXTERNAL SENDER

**Classification: Confidential**

Hey Megan,

Unfortunately we'll need to review the protective order before producing any documents. Please just send it over to us once it is finalize and we'll continue preparing the production in the meantime.

Best,
Brittany



Brittany Brudnicki
Secondee
Deutsche Bank AG, Filiale New York
Legal Department
1 Columbus Circle, 10019-8735 New York NY, USA
Tel. +1 646-341-2083
Email brittany.brudnicki@db.com

#PositiveImpact

**From:** Megan Rossi <MRossi@rgrdlaw.com>
**Sent:** Thursday, August 22, 2024 12:01 PM
**To:** Theresa Julian <theresa.julian@db.com>
**Cc:** Brittany Brudnicki <brittany.brudnicki@db.com>
**Subject:** RE: In re Green Dot Corporation Securities Litigation

Hi Theresa,

I apologize for my delay. I was hoping we would have an agreed upon protective order to send out shortly. However, we are still in the process of negotiating the protective order with defense counsel. In the meantime, we can consider any production made by Deutsche Bank confidential under the standard terms of the forthcoming protective order.

Please let me know if this is agreeable to you all.

Thank you,

Megan

**Megan A. Rossi**
Associate

**Robbins Geller Rudman & Dowd** LLP

655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

   

---

**From:** Theresa Julian <theresa.julian@db.com>
**Sent:** Wednesday, August 14, 2024 9:38 AM
**To:** Megan Rossi <MRossi@rgrdlaw.com>
**Cc:** Brittany Brudnicki <brittany.brudnicki@db.com>
**Subject:** In re Green Dot Corporation Securities Litigation

EXTERNAL SENDER
Dear Ms. Rossi –

In connection with the subpoena regarding: In re Green Dot Corporation Securities Litigation – Civil Action NO.: 2:19-cv-10701-DDP 9Ex), we have located some responsive documents. Please provide us with a copy of the Protective Order or Confidentiality Agreement and we will be able to produce the materials to you.

Kind regards,

Theresa Julian

---



Theresa Julian
Litigation Paralegal
Litigation & Regulatory Enforcement

**DB USA Core Corporation**
**Legal Department**
**5201 Gate Parkway**
**Jacksonville, Florida, 32256 USA**
**Email: theresa.julian@db.com**

---

This communication may contain confidential and/or privileged information. If you are not the intended

recipient (or have received this communication in error) please notify the sender immediately and destroy this communication. Any unauthorized copying, disclosure or distribution of the material in this communication is strictly forbidden.

Please refer to https://db.com/disclosures for additional EU corporate and regulatory disclosures.

Deutsche Bank does not render legal or tax advice, and the information contained in this communication should not be regarded as such.

**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

---

This communication may contain confidential and/or privileged information. If you are not the intended recipient (or have received this communication in error) please notify the sender immediately and destroy this communication. Any unauthorized copying, disclosure or distribution of the material in this communication is strictly forbidden.

Please refer to https://db.com/disclosures for additional EU corporate and regulatory disclosures.

Deutsche Bank does not render legal or tax advice, and the information contained in this communication should not be regarded as such.

## Katie Woods

**From:** clara.crenshaw1@barclays.com
**Sent:** Tuesday, September 3, 2024 10:32 AM
**To:** Christopher Kinnon; ellen.hu@barclays.com
**Subject:** RE: In re Green Dot Corp. Sec. Litig., 2:19-cv-10701-DDP (C.D. Cal.)

EXTERNAL SENDER
Thanks, Chris.  Please let us know when you receive a so-ordered PO from the court and then we will move forward with the production.

Restricted - External

**From:** Christopher Kinnon <CKinnon@rgrdlaw.com>
**Sent:** Tuesday, September 3, 2024 12:26 PM
**To:** Crenshaw, Clara : Legal <clara.crenshaw1@barclays.com>; Hu, Ellen: Legal (NYK) <ellen.hu@barclays.com>
**Subject:** RE: In re Green Dot Corp. Sec. Litig., 2:19-cv-10701-DDP (C.D. Cal.)

**CAUTION:** This email originated from outside our organization - ckinnon@rgrdlaw.com Do not click on links, open attachments, or respond unless you recognize the sender and can validate the content is safe.

Hi Clara,

Thanks. We are still negotiating it (hung up on a clause or two about experts).  I can send you the draft, but if you stamp the documents as confidential, we'll treat them as such.  It might take a week or two to wrap up the PO and get an order.

Best,
Chris

**Christopher Kinnon**

655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

**From:** clara.crenshaw1@barclays.com <clara.crenshaw1@barclays.com>
**Sent:** Tuesday, September 3, 2024 7:14 AM
**To:** ellen.hu@barclays.com; Christopher Kinnon <CKinnon@rgrdlaw.com>
**Subject:** RE: In re Green Dot Corp. Sec. Litig., 2:19-cv-10701-DDP (C.D. Cal.)

1

EXTERNAL SENDER

Hi Chris,

Could you please share the so-ordered confidentiality/protective order in the case?

Thank you,
Clara

---

Restricted - External

**From:** Hu, Ellen: Legal (NYK) <ellen.hu@barclays.com>
**Sent:** Monday, August 26, 2024 5:56 PM
**To:** Christopher Kinnon <CKinnon@rgrdlaw.com>; Crenshaw, Clara : Legal <clara.crenshaw1@barclays.com>
**Subject:** RE: In re Green Dot Corp. Sec. Litig., 2:19-cv-10701-DDP (C.D. Cal.)

Hi Chris, we expect to be able to produce responsive research reports in the next two weeks, and would suggest that we regroup after you have reviewed the reports to discuss whether an ecomms pull/review is appropriate.

Thanks,

Ellen

Ellen Hu | Legal
+1 (212) 526-4285 (O)
+1 (917) 945-2297 (M)

---

Restricted - External

**From:** Christopher Kinnon <CKinnon@rgrdlaw.com>
**Sent:** Monday, August 26, 2024 2:40 PM
**To:** Hu, Ellen: Legal (NYK) <ellen.hu@barclays.com>; Crenshaw, Clara : Legal <clara.crenshaw1@barclays.com>
**Subject:** RE: In re Green Dot Corp. Sec. Litig., 2:19-cv-10701-DDP (C.D. Cal.)

---

**CAUTION:** This email originated from outside our organization - ckinnon@rgrdlaw.com Do not click on links, open attachments, or respond unless you recognize the sender and can validate the content is safe.

---

Hi Ellen,

Just checking in.  Are you able to send an update?

Best,
Chris

**Christopher Kinnon**

2

655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

☐ ☐ ☐ ☐ ☐

---

**From:** ellen.hu@barclays.com <ellen.hu@barclays.com>
**Sent:** Monday, August 12, 2024 2:40 PM
**To:** Christopher Kinnon <CKinnon@rgrdlaw.com>; clara.crenshaw1@barclays.com
**Subject:** RE: In re Green Dot Corp. Sec. Litig., 2:19-cv-10701-DDP (C.D. Cal.)

EXTERNAL SENDER
Thanks Chris, we will look into this.

Ellen Hu | Legal
+1 (212) 526-4285 (O)
+1 (917) 945-2297 (M)

Restricted - External

---

**From:** Christopher Kinnon <CKinnon@rgrdlaw.com>
**Sent:** Thursday, August 8, 2024 5:20 PM
**To:** Crenshaw, Clara : Legal <clara.crenshaw1@barclays.com>
**Cc:** Hu, Ellen: Legal (NYK) <ellen.hu@barclays.com>
**Subject:** RE: In re Green Dot Corp. Sec. Litig., 2:19-cv-10701-DDP (C.D. Cal.)

---

**CAUTION:** This email originated from outside our organization - ckinnon@rgrdlaw.com Do not click on links, open attachments, or respond unless you recognize the sender and can validate the content is safe.

---

Hi Ellen and Clara,

Thanks for your time today. As discussed, given your representation that Barclays did not provide investment banking for Green Dot, we can narrow the requests as follows:

- Dates: May 9, 2018 through November 21, 2019;
- Email Custodians: Ransey El-Assal, Damian Wille, Benjamin Budish (see attached reports);
- Search Terms: "Green Dot"
- Full set of analyst reports; and
- Bloomberg Chats search on "Green Dot" (unless you can confirm the analysts didn't use Bloomberg Chat or their Bloomberg Chats are captured by the email search.

Best,
Chris

**Christopher Kinnon**

3

655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

☐ ☐ ☐ ☐ ☐

---

**From:** clara.crenshaw1@barclays.com <clara.crenshaw1@barclays.com>
**Sent:** Tuesday, August 6, 2024 1:16 PM
**To:** Christopher Kinnon <CKinnon@rgrdlaw.com>
**Cc:** ellen.hu@barclays.com
**Subject:** RE: In re Green Dot Corp. Sec. Litig., 2:19-cv-10701-DDP (C.D. Cal.)

EXTERNAL SENDER
Hi Chris,

We are available this Thursday, August 8th between 10-11am or 2-4:30pm EST.

Best,
Clara

**From:** Christopher Kinnon <CKinnon@rgrdlaw.com>
**Sent:** Tuesday, August 6, 2024 12:21 PM
**To:** Crenshaw, Clara : Legal <clara.crenshaw1@barclays.com>
**Cc:** Hu, Ellen: Legal (NYK) <ellen.hu@barclays.com>
**Subject:** RE: In re Green Dot Corp. Sec. Litig., 2:19-cv-10701-DDP (C.D. Cal.)

---

**CAUTION:** This email originated from outside our organization - ckinnon@rgrdlaw.com Do not click on links, open attachments, or respond unless you recognize the sender and can validate the content is safe.

---

Hi Clara,

Thank you.  If you please send some convenient times for a call, I will confirm with a calendar invite promptly.

Best,
Chris

**Christopher Kinnon**

655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

☐ ☐ ☐ ☐ ☐

**From:** clara.crenshaw1@barclays.com <clara.crenshaw1@barclays.com>
**Sent:** Tuesday, August 6, 2024 6:27 AM
**To:** Christopher Kinnon <CKinnon@rgrdlaw.com>
**Cc:** ellen.hu@barclays.com
**Subject:** In re Green Dot Corp. Sec. Litig., 2:19-cv-10701-DDP (C.D. Cal.)

EXTERNAL SENDER
Mr. Kinnon,

Please find attached non-party Barclays Capital Inc.'s Responses and Objections to the *In re Green Dot Corp. Sec. Litig.*, subpoena served on July 23, 2024.

Best,
Clara

Clara D. Crenshaw
Litigation, Investigations & Enforcement  I  Barclays Legal
Tel +1 212 526 1575  |  Email clara.crenshaw1@barclays.com
**BARCLAYS**, 745 Seventh Avenue, New York, NY  10019

This message is for information purposes only. It is not a recommendation, advice, offer or solicitation to buy or sell a product or service, nor an official confirmation of any transaction. It is directed at persons who are professionals and is intended for the recipient(s) only. It is not directed at retail customers. This message is subject to the terms at: https://www.ib.barclays/disclosures/web-and-email-disclaimer.html.

For important disclosures, please see: https://www.ib.barclays/disclosures/sales-and-trading-disclaimer.html regarding marketing commentary from Barclays Sales and/or Trading desks, who are active market participants; https://www.ib.barclays/disclosures/barclays-global-markets-disclosures.html regarding our standard terms for Barclays Investment Bank where we trade with you in principal-to-principal wholesale markets transactions; and in respect to Barclays Research, including disclosures relating to specific issuers, see: https://publicresearch.barclays.com.

If you are incorporated or operating in Australia, read these important disclosures: https://www.ib.barclays/disclosures/important-disclosures-asia-pacific.html.

For more details about how we use personal information, see our privacy notice: https://www.ib.barclays/disclosures/personal-information-use.html.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

This message is for information purposes only. It is not a recommendation, advice, offer or solicitation to buy or sell a product or service, nor an official confirmation of any transaction. It is directed at persons who are professionals and is intended for the recipient(s) only. It is not directed at retail customers. This message is subject to the terms at: https://www.ib.barclays/disclosures/web-and-email-disclaimer.html.

For important disclosures, please see: https://www.ib.barclays/disclosures/sales-and-trading-disclaimer.html regarding marketing commentary from Barclays Sales and/or Trading desks, who are active market participants; https://www.ib.barclays/disclosures/barclays-global-markets-disclosures.html regarding our standard terms for Barclays Investment Bank where we trade with you in principal-to-principal wholesale markets transactions; and in respect to Barclays Research, including disclosures relating to specific issuers, see: https://publicresearch.barclays.com.

If you are incorporated or operating in Australia, read these important disclosures: https://www.ib.barclays/disclosures/important-disclosures-asia-pacific.html.

For more details about how we use personal information, see our privacy notice: https://www.ib.barclays/disclosures/personal-information-use.html.

**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

This message is for information purposes only. It is not a recommendation, advice, offer or solicitation to buy or sell a product or service, nor an official confirmation of any transaction. It is directed at persons who are professionals and is intended for the recipient(s) only. It is not directed at retail customers. This message is subject to the terms at: https://www.ib.barclays/disclosures/web-and-email-disclaimer.html.

For important disclosures, please see: https://www.ib.barclays/disclosures/sales-and-trading-disclaimer.html regarding marketing commentary from Barclays Sales and/or Trading desks, who are active market participants; https://www.ib.barclays/disclosures/barclays-global-markets-disclosures.html regarding our standard terms for Barclays Investment Bank where we trade with you in principal-to-principal wholesale markets transactions; and in respect to Barclays Research, including disclosures relating to specific issuers, see: https://publicresearch.barclays.com.

If you are incorporated or operating in Australia, read these important disclosures: https://www.ib.barclays/disclosures/important-disclosures-asia-pacific.html.

For more details about how we use personal information, see our privacy notice: https://www.ib.barclays/disclosures/personal-information-use.html.

**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

This message is for information purposes only. It is not a recommendation, advice, offer or solicitation to buy or sell a product or service, nor an official confirmation of any transaction. It is directed at persons who are professionals and is intended for the recipient(s) only. It is not directed at retail customers. This message is subject to the terms at: https://www.ib.barclays/disclosures/web-and-email-disclaimer.html.

For important disclosures, please see: https://www.ib.barclays/disclosures/sales-and-trading-disclaimer.html regarding marketing commentary from Barclays Sales and/or Trading desks, who are active market participants; https://www.ib.barclays/disclosures/barclays-global-markets-disclosures.html regarding our standard terms for Barclays Investment Bank where we trade with you in principal-to-principal wholesale markets transactions; and in respect to Barclays Research, including disclosures relating to specific issuers, see: https://publicresearch.barclays.com.

---

If you are incorporated or operating in Australia, read these important disclosures: https://www.ib.barclays/disclosures/important-disclosures-asia-pacific.html.

---

For more details about how we use personal information, see our privacy notice: https://www.ib.barclays/disclosures/personal-information-use.html.

---

**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

This message is for information purposes only. It is not a recommendation, advice, offer or solicitation to buy or sell a product or service, nor an official confirmation of any transaction. It is directed at persons who are professionals and is intended for the recipient(s) only. It is not directed at retail customers. This message is subject to the terms at: https://www.ib.barclays/disclosures/web-and-email-disclaimer.html.

For important disclosures, please see: https://www.ib.barclays/disclosures/sales-and-trading-disclaimer.html regarding marketing commentary from Barclays Sales and/or Trading desks, who are active market participants; https://www.ib.barclays/disclosures/barclays-global-markets-disclosures.html regarding our standard terms for Barclays Investment Bank where we trade with you in principal-to-principal wholesale markets transactions; and in respect to Barclays Research, including disclosures relating to specific issuers, see: https://publicresearch.barclays.com.

---

If you are incorporated or operating in Australia, read these important disclosures: https://www.ib.barclays/disclosures/important-disclosures-asia-pacific.html.

---

For more details about how we use personal information, see our privacy notice: https://www.ib.barclays/disclosures/personal-information-use.html.

---

## Katie Woods

| | |
|---|---|
| **From:** | Johnson, Lola <LaJohnson@cgf.com> |
| **Sent:** | Thursday, September 19, 2024 7:48 AM |
| **To:** | Megan Rossi |
| **Cc:** | Teipner, Larissa |
| **Subject:** | Re: In re Green Dot Corporation Securities Litigation Subpoena Objection Letter |

EXTERNAL SENDER

Hi Megan,

Pardon my delayed response here. Our concern is that the order may never be put in place, so we are not comfortable producing prior to the order's finalization. We can confirm that Joseph Vafi and Pallav Sani were the only analysts covering Green Dot during the relevant time period as defined in the subpoena. Once the order is in place, we are happy to produce final research reports and external communications with those analysts as custodians, as stated on our call.

Best,
Lola

Lola Johnson
Legal
Canaccord Genuity LLC
T: +1.212.389.8254 (Calls and Text) / C: +1.240.938.8406 (Calls Only)

**Driven by your success.**

Canaccord Genuity LLC member finra & sipc

---

**From:** Megan Rossi <MRossi@rgrdlaw.com>
**Sent:** Friday, September 6, 2024 12:25 PM
**To:** Johnson, Lola <LaJohnson@cgf.com>
**Cc:** Teipner, Larissa <lteipner@cgf.com>
**Subject:** RE: In re Green Dot Corporation Securities Litigation Subpoena Objection Letter

**[Caution: External Message]**

Hi Lola,

I apologize for my delay on this. I was hoping I would be able to send you a protective order soon, but we are still negotiating it with defendants. In the meantime, we can consider any production made by Canaccord confidential under the standard terms of the forthcoming protective order.

In addition, I believe the custodians we would be interested in are Joseph Vafi and Pallav Saini, and for search terms, "Green Dot" and "GDOT." As I mentioned during our call, we are interested in internal communications as well. Would you be able to confirm that Joseph Vafi and Pallav Saini were the only analysts covering Green Dot during the relevant time period as defined in the subpoena?

I am happy to discuss further or answer any questions.

Thank you,

Megan

**From:** Johnson, Lola <LaJohnson@cgf.com>
**Sent:** Friday, August 2, 2024 2:19 PM
**To:** Megan Rossi <MRossi@rgrdlaw.com>
**Cc:** Teipner, Larissa <lteipner@cgf.com>
**Subject:** RE: In re Green Dot Corporation Securities Litigation Subpoena Objection Letter

EXTERNAL SENDER

Thanks, Megan. We will await the confidentiality order to begin production. As discussed, if there is a list of custodians you'd like for us to search for external communications, please let us know.

Best,
Lola

Lola Johnson
Legal
Canaccord Genuity LLC
T: +1.212.389.8254 (Calls and Text)  /  C: +1.240.938.8406 (Calls Only)

**Driven by your success.**

CANACCORD GENUITY LLC MEMBER FINRA & SIPC

**From:** Megan Rossi <MRossi@rgrdlaw.com>
**Sent:** Wednesday, July 31, 2024 5:11 PM
**To:** Johnson, Lola <LaJohnson@cgf.com>
**Cc:** Teipner, Larissa <lteipner@cgf.com>
**Subject:** RE: In re Green Dot Corporation Securities Litigation Subpoena Objection Letter

   **[Caution: External Message]**

Hi Lola,

Per our conversation today, I am sending over a copy of the operative complaint.

Best,

Megan

**Megan A. Rossi**
Associate

655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

☐ ☐ ☐ ☐ ☐

**From:** Johnson, Lola <LaJohnson@cgf.com>
**Sent:** Thursday, July 25, 2024 11:24 AM
**To:** Megan Rossi <MRossi@rgrdlaw.com>
**Cc:** Teipner, Larissa <lteipner@cgf.com>
**Subject:** In re Green Dot Corporation Securities Litigation Subpoena Objection Letter

EXTERNAL SENDER
Ms. Rossi,

Pursuant to Fed. R. Civ. Pro. 45, attached please find Canaccord Genuity's formal Objection Letter to the Subpoena to Produce Documents. This letter will also arrive via Federal Express Mail.

Best,
Lola

Lola Johnson
Legal
Canaccord Genuity LLC
535 Madison Ave., New York, NY, 10022

T: +1.212.389.8254 (Calls and Text) /  C: +1.240.938.8406 (Calls Only)
E:  lajohnson@cgf.com  /  www.cgf.com



CANACCORD GENUITY LLC MEMBER FINRA & SIPC

The information contained in this communication may be confidential and/or legally privileged. If you are not the intended recipient, please contact the sender and destroy all copies of this message and any attachments. Any disclosure, copying, distribution or taking any action in reliance on this information other than by the intended recipient is strictly prohibited and may be unlawful. Canaccord Genuity LLC is required by regulation to review and store both outgoing and incoming electronic correspondence. E-mail transmissions cannot be guaranteed to be secure, timely or error-free. This communication is not an offer or solicitation to buy or sell any security or other investment product. Additional information, including disclosures regarding securities under research coverage, is available at http://disclosures.canaccordgenuity.com/EN/Pages/default.aspx - Any information regarding specific investment products is subject to change without notice. Canaccord Genuity LLC - Member FINRA/SIPC. (Disclaimer)

**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and**

**protected from disclosure by the attorney-client privilege, as
attorney work product, or by other applicable privileges.  Any
unauthorized review, use, disclosure or distribution is prohibited.
If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message.**

# EXHIBIT E



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Plaintiff, | Case No. |
| v. | MODEL STIPULATED PROTECTIVE ORDER (for standard litigation) |
| Defendant. | |

1. <u>PURPOSES AND LIMITATIONS</u>

Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted. Accordingly, the parties hereby stipulate to and petition the court to enter the following Stipulated Protective Order. The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles. The parties further acknowledge, as set forth in Section 12.3, below, that this Stipulated Protective Order does not entitle them to file confidential information under seal; Civil Local Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal.

2. <u>DEFINITIONS</u>

2.1 <u>Challenging Party</u>: a Party or Non-Party that challenges the designation of information or items under this Order.

2.2 <u>"CONFIDENTIAL" Information or Items</u>: information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c).

United States District Court
Northern District of California

2.3     Counsel (without qualifier): Outside Counsel of Record and House Counsel (as well as their support staff).

2.4     Designating Party: a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL."

2.5     Disclosure or Discovery Material: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

2.6     Expert: a person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action.

2.7     House Counsel: attorneys who are employees of a party to this action. House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.8     Non-Party: any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

2.9     Outside Counsel of Record: attorneys who are not employees of a party to this action but are retained to represent or advise a party to this action and have appeared in this action on behalf of that party or are affiliated with a law firm which has appeared on behalf of that party.

2.10    Party: any party to this action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staffs).

2.11    Producing Party: a Party or Non-Party that produces Disclosure or Discovery Material in this action.

2.12    Professional Vendors: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.13    Protected Material: any Disclosure or Discovery Material that is designated as "CONFIDENTIAL."

2.14    Receiving Party: a Party that receives Disclosure or Discovery Material from a

2

Producing Party.

3.    SCOPE

The protections conferred by this Stipulation and Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material. However, the protections conferred by this Stipulation and Order do not cover the following information: (a) any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and (b) any information known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party. Any use of Protected Material at trial shall be governed by a separate agreement or order.

4.    DURATION

Even after final disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this action, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

5.    DESIGNATING PROTECTED MATERIAL

5.1    Exercise of Restraint and Care in Designating Material for Protection. Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards. The Designating Party must designate for protection only those parts of material, documents, items, or oral or written communications that qualify – so that other portions of the material, documents, items, or communications for which protection is not warranted are not swept unjustifiably within

3

the ambit of this Order.

Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber or retard the case development process or to impose unnecessary expenses and burdens on other parties) expose the Designating Party to sanctions.

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection, that Designating Party must promptly notify all other Parties that it is withdrawing the mistaken designation.

5.2     Manner and Timing of Designations. Except as otherwise provided in this Order (see, e.g., second paragraph of section 5.2(a) below), or as otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.

Designation in conformity with this Order requires:

(a) For information in documentary form (e.g., paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL" to each page that contains protected material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

A Party or Non-Party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting Party has indicated which material it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "CONFIDENTIAL." After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the "CONFIDENTIAL" legend to each page that contains Protected Material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

(b) for testimony given in deposition or in other pretrial or trial proceedings, that the Designating Party identify on the record, before the close of the deposition, hearing, or other proceeding, all protected testimony.

(c) for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL." If only a portion or portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s).

5.3     Inadvertent Failures to Designate. If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

6.     CHALLENGING CONFIDENTIALITY DESIGNATIONS

6.1     Timing of Challenges. Any Party or Non-Party may challenge a designation of confidentiality at any time. Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2     Meet and Confer. The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific paragraph of the Protective Order. The parties shall attempt to resolve each challenge in good faith and must begin the process by conferring directly (in voice to voice dialogue; other forms of communication are not sufficient) within 14 days of the date of service of notice. In conferring, the Challenging Party must explain the basis for its belief that the confidentiality designation was not proper and

must give the Designating Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation. A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet and confer process first or establishes that the Designating Party is unwilling to participate in the meet and confer process in a timely manner.

6.3 <u>Judicial Intervention</u>. If the Parties cannot resolve a challenge without court intervention, the Designating Party shall file and serve a motion to retain confidentiality under Civil Local Rule 7 (and in compliance with Civil Local Rule 79-5, if applicable) within 21 days of the initial notice of challenge or within 14 days of the parties agreeing that the meet and confer process will not resolve their dispute, whichever is earlier. Each such motion must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed in the preceding paragraph. Failure by the Designating Party to make such a motion including the required declaration within 21 days (or 14 days, if applicable) shall automatically waive the confidentiality designation for each challenged designation. In addition, the Challenging Party may file a motion challenging a confidentiality designation at any time if there is good cause for doing so, including a challenge to the designation of a deposition transcript or any portions thereof. Any motion brought pursuant to this provision must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed by the preceding paragraph.

The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges, and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived the confidentiality designation by failing to file a motion to retain confidentiality as described above, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the court rules on the challenge.

7. <u>ACCESS TO AND USE OF PROTECTED MATERIAL</u>

7.1 <u>Basic Principles</u>. A Receiving Party may use Protected Material that is disclosed or

produced by another Party or by a Non-Party in connection with this case only for prosecuting, defending, or attempting to settle this litigation. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the litigation has been terminated, a Receiving Party must comply with the provisions of section 13 below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

7.2     Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A;

(b) the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d) the court and its personnel;

(e) court reporters and their staff, professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(f) during their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Designating Party or ordered by the court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately

7

bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order.

(g) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

8.   PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this action as "CONFIDENTIAL," that Party must:

(a) promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

(b) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Stipulated Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

9.   A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION

(a) The terms of this Order are applicable to information produced by a Non-Party in this action and designated as "CONFIDENTIAL." Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order.

8

Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(b) In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

(1) promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

(2) promptly provide the Non-Party with a copy of the Stipulated Protective Order in this litigation, the relevant discovery request(s), and a reasonably specific description of the information requested; and

(3) make the information requested available for inspection by the Non-Party.

(c) If the Non-Party fails to object or seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

10. UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

11. INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL

When a Producing Party gives notice to Receiving Parties that certain inadvertently produced material is subject to a claim of privilege or other protection, the obligations of the Receiving Parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). This provision is not intended to modify whatever procedure may be established in an e-discovery order that provides for production without prior privilege review. Pursuant to Federal Rule of Evidence 502(d) and (e), insofar as the parties reach an agreement on the effect of disclosure of a communication or information covered by the attorney-client privilege or work product protection, the parties may incorporate their agreement in the stipulated protective order submitted to the court.

12. MISCELLANEOUS

12.1 Right to Further Relief. Nothing in this Order abridges the right of any person to seek its modification by the court in the future.

12.2 Right to Assert Other Objections. By stipulating to the entry of this Protective Order no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Stipulated Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

12.3 Filing Protected Material. Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material. A Party that seeks to file under seal any Protected Material must comply with Civil Local Rule 79-5. Protected Material may only be filed under seal pursuant to a court order authorizing the sealing of the specific Protected Material at issue. Pursuant to Civil Local Rule 79-5, a sealing order will issue only upon a request establishing that the Protected Material at issue is privileged, protectable as a trade secret, or otherwise entitled to protection under the law. If a Receiving Party's request to file Protected Material under seal pursuant to Civil Local Rule 79-5 is denied by the court, then the Receiving Party may file the information in the public record pursuant to Civil Local Rule 79-5 unless otherwise instructed by the court.

13. FINAL DISPOSITION

Within 60 days after the final disposition of this action, as defined in paragraph 4, each

10

Receiving Party must return all Protected Material to the Producing Party or destroy such material. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60 day deadline that (1) identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION).

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

DATED: _____  _____
                                                    Attorney for Plaintiff


DATED: _____  _____
                                                    Attorney for Defendant


PURSUANT TO STIPULATION, IT IS SO ORDERED.


DATED: _____  _____
                                                    United States District/Magistrate Judge

11

EXHIBIT A

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of _____ [print or type full address], declare under penalty of perjury that I have read in its entirety and understand the Stipulated Protective Order that was issued by the United States District Court for the Northern District of California on [date] in the case of _____ **[insert formal name of the case and the number and initials assigned to it by the court]**. I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Stipulated Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the Northern District of California for the purpose of enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this action.

I hereby appoint _____ [print or type full name] of _____ [print or type full address and telephone number] as my California agent for service of process in connection with this action or any proceedings related to enforcement of this Stipulated Protective Order.


Date: _____

City and State where sworn and signed: _____


Printed name: _____


Signature: _____


12

# EXHIBIT F

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Plaintiff, | Case No.  C |
| v. | STIPULATED PROTECTIVE ORDER FOR LITIGATION INVOLVING PATENTS, HIGHLY SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS |
| Defendant. | |

1.      PURPOSES AND LIMITATIONS

Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted. Accordingly, the parties hereby stipulate to and petition the court to enter the following Stipulated Protective Order. The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles. The parties further acknowledge, as set forth in Section 14.4, below, that this Stipulated Protective Order does not entitle them to file confidential information under seal; Civil Local Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal.

2.      DEFINITIONS

2.1      Challenging Party: a Party or Non-Party that challenges the designation of information or items under this Order.

2.2      "CONFIDENTIAL" Information or Items: information (regardless of how it is generated,

stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c).

2.3 Counsel (without qualifier): Outside Counsel of Record and House Counsel (as well as their support staff).

2.4 [*Optional*: Designated House Counsel: House Counsel who seek access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information in this matter.]

2.5 Designating Party: a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" [*Optional*: or "HIGHLY CONFIDENTIAL – SOURCE CODE"].

2.6 Disclosure or Discovery Material: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

2.7 Expert: a person with specialized knowledge or experience in a matter pertinent to the litigation who (1) has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action, (2) is not a past or current employee of a Party or of a Party's competitor, and (3) at the time of retention, is not anticipated to become an employee of a Party or of a Party's competitor.

2.8 "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items: extremely sensitive "Confidential Information or Items," disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.9 [*Optional*: "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items: extremely sensitive "Confidential Information or Items" representing computer code and associated comments and revision histories, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs, disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.]

2.10 House Counsel: attorneys who are employees of a party to this action. House Counsel does

United States District Court
Northern District of California

not include Outside Counsel of Record or any other outside counsel.

2.11    Non-Party: any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

2.12    Outside Counsel of Record: attorneys who are not employees of a party to this action but are retained to represent or advise a party to this action and have appeared in this action on behalf of that party or are affiliated with a law firm which has appeared on behalf of that party.

2.13    Party: any party to this action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staffs).

2.14    Producing Party: a Party or Non-Party that produces Disclosure or Discovery Material in this action.

2.15    Professional Vendors: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.16    Protected Material: any Disclosure or Discovery Material that is designated as "CONFIDENTIAL," or as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." [*Optional*: or as "HIGHLY CONFIDENTIAL – SOURCE CODE."]

2.17    Receiving Party: a Party that receives Disclosure or Discovery Material from a Producing Party.

3.    SCOPE

The protections conferred by this Stipulation and Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material. However, the protections conferred by this Stipulation and Order do not cover the following information: (a) any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and (b) any information known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a

3

source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party. Any use of Protected Material at trial shall be governed by a separate agreement or order.

4. DURATION

Even after final disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this action, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

5. DESIGNATING PROTECTED MATERIAL

5.1 Exercise of Restraint and Care in Designating Material for Protection. Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards. To the extent it is practical to do so, the Designating Party must designate for protection only those parts of material, documents, items, or oral or written communications that qualify – so that other portions of the material, documents, items, or communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order.

Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber or retard the case development process or to impose unnecessary expenses and burdens on other parties) expose the Designating Party to sanctions.

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection at all or do not qualify for the level of protection initially asserted, that Designating Party must promptly notify all other parties that it is withdrawing the mistaken designation.

5.2 Manner and Timing of Designations. Except as otherwise provided in this Order (see, e.g., second paragraph of section 5.2(a) below), or as otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated before the

4

material is disclosed or produced.

Designation in conformity with this Order requires:

(a) for information in documentary form (e.g., paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" [*Optional*: or "HIGHLY CONFIDENTIAL – SOURCE CODE"] to each page that contains protected material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins) and must specify, for each portion, the level of protection being asserted.

A Party or Non-Party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting Party has indicated which material it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the appropriate legend ("CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" [*Optional:* or "HIGHLY CONFIDENTIAL – SOURCE CODE]) to each page that contains Protected Material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins) and must specify, for each portion, the level of protection being asserted.

(b) for testimony given in deposition or in other pretrial or trial proceedings, that the Designating Party identify on the record, before the close of the deposition, hearing, or other proceeding, all protected testimony and specify the level of protection being asserted. When it is impractical to identify separately each portion of testimony that is entitled to protection and it appears that substantial portions of the testimony may qualify for protection, the Designating Party may invoke on the record (before the deposition, hearing, or other proceeding is concluded) a right to have up to 21 days to identify the specific portions of the testimony as to which protection is sought and to specify the level of protection being

asserted. Only those portions of the testimony that are appropriately designated for protection within the 21 days shall be covered by the provisions of this Stipulated Protective Order. Alternatively, a Designating Party may specify, at the deposition or up to 21 days afterwards if that period is properly invoked, that the entire transcript shall be treated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

Parties shall give the other parties notice if they reasonably expect a deposition, hearing or other proceeding to include Protected Material so that the other parties can ensure that only authorized individuals who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A) are present at those proceedings. The use of a document as an exhibit at a deposition shall not in any way affect its designation as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

Transcripts containing Protected Material shall have an obvious legend on the title page that the transcript contains Protected Material, and the title page shall be followed by a list of all pages (including line numbers as appropriate) that have been designated as Protected Material and the level of protection being asserted by the Designating Party. The Designating Party shall inform the court reporter of these requirements. Any transcript that is prepared before the expiration of a 21-day period for designation shall be treated during that period as if it had been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" in its entirety unless otherwise agreed. After the expiration of that period, the transcript shall be treated only as actually designated.

(c) for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" [*Optional*: or "HIGHLY CONFIDENTIAL – SOURCE CODE"]. If only a portion or portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s) and specify the level of protection being asserted.

5.3    Inadvertent Failures to Designate. If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this

6

Order.

6.    CHALLENGING CONFIDENTIALITY DESIGNATIONS

6.1    Timing of Challenges. Any Party or Non-Party may challenge a designation of confidentiality at any time. Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2    Meet and Confer. The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific paragraph of the Protective Order. The parties shall attempt to resolve each challenge in good faith and must begin the process by conferring directly (in voice to voice dialogue; other forms of communication are not sufficient) within 14 days of the date of service of notice. In conferring, the Challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation. A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet and confer process first or establishes that the Designating Party is unwilling to participate in the meet and confer process in a timely manner.

6.3    Judicial Intervention. If the Parties cannot resolve a challenge without court intervention, the Designating Party shall file and serve a motion to retain confidentiality under Civil Local Rule 7 (and in compliance with Civil Local Rule 79-5, if applicable) within 21 days of the initial notice of challenge or within 14 days of the parties agreeing that the meet and confer process will not resolve their dispute, whichever is earlier.[1] Each such motion must be accompanied by a competent declaration affirming that the

---

[1] Alternative: It may be appropriate in certain circumstances for the parties to agree to shift the burden to move on the Challenging Party after a certain number of challenges are made to avoid an abuse of the process. The burden of persuasion would remain on the Designating Party.

7

movant has complied with the meet and confer requirements imposed in the preceding paragraph. Failure by the Designating Party to make such a motion including the required declaration within 21 days (or 14 days, if applicable) shall automatically waive the confidentiality designation for each challenged designation. In addition, the Challenging Party may file a motion challenging a confidentiality designation at any time if there is good cause for doing so, including a challenge to the designation of a deposition transcript or any portions thereof. Any motion brought pursuant to this provision must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed by the preceding paragraph.

The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived the confidentiality designation by failing to file a motion to retain confidentiality as described above, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the court rules on the challenge.

7.     ACCESS TO AND USE OF PROTECTED MATERIAL

7.1     Basic Principles. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this case only for prosecuting, defending, or attempting to settle this litigation. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the litigation has been terminated, a Receiving Party must comply with the provisions of section 15 below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner[2] that ensures that access is limited to the persons authorized under this Order.

7.2     Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or

---

[2] It may be appropriate under certain circumstances to require the Receiving Party to store any electronic Protected Material in password-protected form.

United States District Court
Northern District of California

item designated "CONFIDENTIAL" only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A;

(b) the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d) the court and its personnel;

(e) court reporters and their staff, professional jury or trial consultants, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(f) during their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), **unless otherwise agreed by the Designating Party or ordered by the court**. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order.

(g) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" [*Optional*: and "HIGHLY CONFIDENTIAL – SOURCE CODE"] Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" [*Optional*: or "HIGHLY CONFIDENTIAL – SOURCE CODE"] only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of said

United States District Court
Northern District of California

9

Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A;

[(b) *Optional as deemed appropriate in case-specific circumstances:* Designated House Counsel of the Receiving Party[3] (1) who has no involvement in competitive decision-making, (2) to whom disclosure is reasonably necessary for this litigation, (3) who has signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), and (4) as to whom the procedures set forth in paragraph 7.4(a)(1), below, have been followed];[4]

(c) Experts of the Receiving Party (1) to whom disclosure is reasonably necessary for this litigation, (2) who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), and (3) as to whom the procedures set forth in paragraph 7.4(a)(2), below, have been followed];

(d) the court and its personnel;

(e) court reporters and their staff, professional jury or trial consultants,[5] and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A); and

(f) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

7.4 Procedures for Approving or Objecting to Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" [*Optional*: or "HIGHLY CONFIDENTIAL – SOURCE CODE"] Information or Items to Designated House Counsel[6] or Experts.[7]

---

[3] It may be appropriate under certain circumstances to limit the number of Designated House Counsel who may access "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information under this provision.

[4] This Order contemplates that Designated House Counsel shall not have access to any information or items designated "HIGHLY CONFIDENTIAL – SOURCE CODE." It may also be appropriate under certain circumstances to limit how Designated House Counsel may access "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information. For example, Designated House Counsel may be limited to viewing "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information only if it is filed with the court under seal, or in the presence of Outside Counsel of Record at their offices.

[5] *Alternative:* The parties may wish to allow disclosure of information not only to professional jury or trial consultants, but also to mock jurors, to further trial preparation. In that situation, the parties may wish to draft a simplified, precisely tailored Undertaking for mock jurors to sign.

[6] *Alternative*: The parties may exchange names of a certain number of Designated House Counsel instead of following

10

(a)(1) Unless otherwise ordered by the court or agreed to in writing by the Designating Party, a Party that seeks to disclose to Designated House Counsel any information or item that has been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" pursuant to paragraph 7.3(b) first must make a written request to the Designating Party that (1) sets forth the full name of the Designated House Counsel and the city and state of his or her residence, and (2) describes the Designated House Counsel's current and reasonably foreseeable future primary job duties and responsibilities in sufficient detail to determine if House Counsel is involved, or may become involved, in any competitive decision-making.[8]

(a)(2) Unless otherwise ordered by the court or agreed to in writing by the Designating Party, a Party that seeks to disclose to an Expert (as defined in this Order) any information or item that has been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" [*Optional*: or "HIGHLY CONFIDENTIAL – SOURCE CODE"] pursuant to paragraph 7.3(c) first must make a written request to the Designating Party that (1) identifies the general categories of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" [*Optional*: or "HIGHLY CONFIDENTIAL – SOURCE CODE"] information that the Receiving Party seeks permission to disclose to the Expert, (2) sets forth the full name of the Expert and the city and state of his or her primary residence, (3) attaches a copy of the Expert's current resume, (4) identifies the Expert's current employer(s), (5) identifies each person or entity from whom the Expert has received compensation or funding for work in his or her areas of expertise or to whom the expert has provided professional services, including in connection with a litigation, at any time during the preceding five years,[9] and (6) identifies (by name and number of the case, filing date, and location of court) any litigation in connection with which the Expert has offered expert testimony,

this procedure.

[7] *Alternative:* "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information or items may be disclosed to an Expert without disclosure of the identity of the Expert as long as the Expert is not a current officer, director, or employee of a competitor of a Party or anticipated to become one.

[8] It may be appropriate in certain circumstances to require any Designated House Counsel who receives "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information pursuant to this Order to disclose any relevant changes in job duties or responsibilities prior to final disposition of the litigation to allow the Designating Party to evaluate any later-arising competitive decision-making responsibilities.

[9] If the Expert believes any of this information is subject to a confidentiality obligation to a third-party, then the Expert should provide whatever information the Expert believes can be disclosed without violating any confidentiality agreements, and the Party seeking to disclose to the Expert shall be available to meet and confer with the Designating Party regarding any such engagement.

11

including through a declaration, report, or testimony at a deposition or trial, during the preceding five years.[10]

(b) A Party that makes a request and provides the information specified in the preceding respective paragraphs may disclose the subject Protected Material to the identified Designated House Counsel or Expert unless, within 14 days of delivering the request, the Party receives a written objection from the Designating Party. Any such objection must set forth in detail the grounds on which it is based.

(c) A Party that receives a timely written objection must meet and confer with the Designating Party (through direct voice to voice dialogue) to try to resolve the matter by agreement within seven days of the written objection. If no agreement is reached, the Party seeking to make the disclosure to Designated House Counsel or the Expert may file a motion as provided in Civil Local Rule 7 (and in compliance with Civil Local Rule 79-5, if applicable) seeking permission from the court to do so. Any such motion must describe the circumstances with specificity, set forth in detail the reasons why the disclosure to Designated House Counsel or the Expert is reasonably necessary, assess the risk of harm that the disclosure would entail, and suggest any additional means that could be used to reduce that risk. In addition, any such motion must be accompanied by a competent declaration describing the parties' efforts to resolve the matter by agreement (i.e., the extent and the content of the meet and confer discussions) and setting forth the reasons advanced by the Designating Party for its refusal to approve the disclosure.

In any such proceeding, the Party opposing disclosure to Designated House Counsel or the Expert shall bear the burden of proving that the risk of harm that the disclosure would entail (under the safeguards proposed) outweighs the Receiving Party's need to disclose the Protected Material to its Designated House Counsel or Expert.

8.     PROSECUTION BAR [*OPTIONAL*]

Absent written consent from the Producing Party, any individual who receives access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" [*Optional*: or "HIGHLY CONFIDENTIAL – SOURCE CODE"] information shall not be involved in the prosecution of patents or patent applications

_____

[10] It may be appropriate in certain circumstances to restrict the Expert from undertaking certain limited work prior to the termination of the litigation that could foreseeably result in an improper use of the Designating Party's "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information.

12

relating to [insert subject matter of the invention and of highly confidential technical information to be produced], including without limitation the patents asserted in this action and any patent or application claiming priority to or otherwise related to the patents asserted in this action, before any foreign or domestic agency, including the United States Patent and Trademark Office ("the Patent Office").[11] For purposes of this paragraph, "prosecution" includes directly or indirectly drafting, amending, advising, or otherwise affecting the scope or maintenance of patent claims.[12] To avoid any doubt, "prosecution" as used in this paragraph does not include representing a party challenging a patent before a domestic or foreign agency (including, but not limited to, a reissue protest, *ex parte* reexamination or *inter partes* reexamination). This Prosecution Bar shall begin when access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" [*Optional*: or "HIGHLY CONFIDENTIAL – SOURCE CODE"] information is first received by the affected individual and shall end two (2) years after final termination of this action.[13]

9.    SOURCE CODE [*OPTIONAL*]

(a)    To the extent production of source code becomes necessary in this case, a Producing Party may designate source code as "HIGHLY CONFIDENTIAL - SOURCE CODE" if it comprises or includes confidential, proprietary or trade secret source code.

(b)    Protected Material designated as "HIGHLY CONFIDENTIAL – SOURCE CODE" shall be subject to all of the protections afforded to "HIGHLY CONFIDENTIAL – SOURCE CODE" shall be subject to all of the protections afforded to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information [*Optional*: including the Prosecution Bar set forth in Paragraph 8], and may be disclosed only to the individuals to whom "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information may be disclosed, as set forth in Paragraphs 7.3 and 7.4, with the exception of Designated House

---

[11] It may be appropriate under certain circumstances to require Outside and House Counsel who receive access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information to implement an "Ethical Wall."

[12] Prosecution includes, for example, original prosecution, reissue and reexamination proceedings.

[13] *Alternative:* It may be appropriate for the Prosecution Bar to apply only to individuals who receive access to another party's "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" technical or source code information pursuant to this Order, such as under circumstances where one or more parties is not expected to produce "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information that is technical in nature or "HIGHLY CONFIDENTIAL – SOURCE CODE" information,

United States District Court
Northern District of California

Counsel.[14]

(c) Any source code produced in discovery shall be made available for inspection, in a format allowing it to be reasonably reviewed and searched, during normal business hours or at other mutually agreeable times, at an office of the Producing Party's counsel or another mutually agreed upon location.[15] The source code shall be made available for inspection on a secured computer in a secured room without Internet access or network access to other computers, and the Receiving Party shall not copy, remove, or otherwise transfer any portion of the source code onto any recordable media or recordable device. The Producing Party may visually monitor the activities of the Receiving Party's representatives during any source code review, but only to ensure that there is no unauthorized recording, copying, or transmission of the source code.[16]

(d) The Receiving Party may request paper copies of limited portions of source code that are reasonably necessary for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial, but shall not request paper copies for the purposes of reviewing the source code other than electronically as set forth in paragraph (c) in the first instance. The Producing Party shall provide all such source code in paper form including bates numbers and the label "HIGHLY CONFIDENTIAL - SOURCE CODE." The Producing Party may challenge the amount of source code requested in hard copy form pursuant to the dispute resolution procedure and timeframes set forth in Paragraph 6 whereby the Producing Party is the "Challenging Party" and the Receiving Party is the "Designating Party" for purposes of dispute resolution.

(e) The Receiving Party shall maintain a record of any individual who has inspected any portion of the source code in electronic or paper form. The Receiving Party shall maintain all paper copies

---

[14] It may be appropriate under certain circumstances to allow House Counsel access to derivative materials including "HIGHLY CONFIDENTIAL - SOURCE CODE" information, such as exhibits to motions or expert reports,

[15] *Alternative*: Any source code produced in discovery shall be made available for inspection in a format through which it could be reasonably reviewed and searched during normal business hours or other mutually agreeable times at a location that is reasonably convenient for the Receiving Party and any experts to whom the source code may be disclosed. This alternative may be appropriate if the Producing Party and/or its counsel are located in a different jurisdiction than counsel and/or experts for the Receiving Party.

[16] It may be appropriate under certain circumstances to require the Receiving Party to keep a paper log indicating the names of any individuals inspecting the source code and dates and times of inspection, and the names of any individuals to whom paper copies of portions of source code are provided.

United States District Court
Northern District of California

of any printed portions of the source code in a secured, locked area. The Receiving Party shall not create any electronic or other images of the paper copies and shall not convert any of the information contained in the paper copies into any electronic format. The Receiving Party shall only make additional paper copies if such additional copies are (1) necessary to prepare court filings, pleadings, or other papers (including a testifying expert's expert report), (2) necessary for deposition, or (3) otherwise necessary for the preparation of its case. Any paper copies used during a deposition shall be retrieved by the Producing Party at the end of each day and must not be given to or left with a court reporter or any other unauthorized individual.[17]

10.      <u>PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION</u>

If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" [*Optional*: or "HIGHLY CONFIDENTIAL – SOURCE CODE"] that Party must:

(a) promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

(b) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Stipulated Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.[18]

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL"

---

[17] The nature of the source code at issue in a particular case may warrant additional protections or restrictions, For example, it may be appropriate under certain circumstances to require the Receiving Party to provide notice to the Producing Party before including "HIGHLY CONFIDENTIAL – SOURCE CODE" information in a court filing, pleading, or expert report.

[18] The purpose of imposing these duties is to alert the interested parties to the existence of this Protective Order and to afford the Designating Party in this case an opportunity to try to protect its confidentiality interests in the court from which the subpoena or order issued.

or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" [*Optional*: or "HIGHLY CONFIDENTIAL – SOURCE CODE"] before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

11.     A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION

(a)     The terms of this Order are applicable to information produced by a Non-Party in this action and designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" [*Optional:* or "HIGHLY CONFIDENTIAL – SOURCE CODE"]. Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(b)     In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

1.     promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

2.     promptly provide the Non-Party with a copy of the Stipulated Protective Order in this litigation, the relevant discovery request(s), and a reasonably specific description of the information requested; and

3.     make the information requested available for inspection by the Non-Party.

(c)     If the Non-Party fails to object or seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination

16

by the court.[19] Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

12.     UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

13.     INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL

When a Producing Party gives notice to Receiving Parties that certain inadvertently produced material is subject to a claim of privilege or other protection, the obligations of the Receiving Parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B).[20] This provision is not intended to modify whatever procedure may be established in an e-discovery order that provides for production without prior privilege review. Pursuant to Federal Rule of Evidence 502(d) and (e), insofar as the parties reach an agreement on the effect of disclosure of a communication or information covered by the attorney-client privilege or work product protection, the parties may incorporate their agreement in the stipulated protective order submitted to the

---

[19] The purpose of this provision is to alert the interested parties to the existence of confidentiality rights of a Non-Party and to afford the Non-Party an opportunity to protect its confidentiality interests in this court.

[20] *Alternative*: The parties may agree that the recipient of an inadvertent production may not "sequester" or in any way use the document(s) pending resolution of a challenge to the claim of privilege or other protection to the extent it would be otherwise allowed by Federal Rule of Civil Procedure 26(b)(5)(B) as amended in 2006. This could include a restriction against "presenting" the document(s) to the court to challenge the privilege claim as may otherwise be allowed under Rule 26(b)(5)(B) subject to ethical obligations.

An alternate provision could state: "If information is produced in discovery that is subject to a claim of privilege or of protection as trial-preparation material, the party making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return or destroy the specified information and any copies it has and may not sequester, use or disclose the information until the claim is resolved. This includes a restriction against presenting the information to the court for a determination of the claim."

17

court.

14.    MISCELLANEOUS

14.1    Right to Further Relief. Nothing in this Order abridges the right of any person to seek its modification by the court in the future.

14.2    Right to Assert Other Objections. By stipulating to the entry of this Protective Order no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Stipulated Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

14.3    [*Optional:* Export Control. Disclosure of Protected Material shall be subject to all applicable laws and regulations relating to the export of technical data contained in such Protected Material, including the release of such technical data to foreign persons or nationals in the United States or elsewhere. The Producing Party shall be responsible for identifying any such controlled technical data, and the Receiving Party shall take measures necessary to ensure compliance.]

14.4    Filing Protected Material. Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material. A Party that seeks to file under seal any Protected Material must comply with Civil Local Rule 79-5. Protected Material may only be filed under seal pursuant to a court order authorizing the sealing of the specific Protected Material at issue. Pursuant to Civil Local Rule 79-5, a sealing order will issue only upon a request establishing that the Protected Material at issue is privileged, protectable as a trade secret, or otherwise entitled to protection under the law. If a Receiving Party's request to file Protected Material under seal pursuant to Civil Local Rule 79-5 is denied by the court, then the Receiving Party may file the Protected Material in the public record pursuant to Civil Local Rule 79-5 unless otherwise instructed by the court.

15.    FINAL DISPOSITION

Within 60 days after the final disposition of this action, as defined in paragraph 4, each Receiving Party must return all Protected Material to the Producing Party or destroy such material. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned

18

or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60-day deadline that (1) identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION).

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

DATED: _____  _____
                                                      Attorneys for Plaintiff

DATED: _____  _____
                                                      Attorneys for Defendant

PURSUANT TO STIPULATION, IT IS SO ORDERED.

DATED: _____  _____
                                                      [Name of Judge]
                                                      United States District/Magistrate Judge

United States District Court
Northern District of California

19

United States District Court
Northern District of California

EXHIBIT A

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of _____ [print or type full address], declare under penalty of perjury that I have read in its entirety and understand the Stipulated Protective Order that was issued by the United States District Court for the Northern District of California on [date] in the case of _____ **[insert formal name of the case and the number and initials assigned to it by the court]**. I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Stipulated Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the Northern District of California for the purpose of enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this action.

I hereby appoint _____ [print or type full name] of _____ [print or type full address and telephone number] as my California agent for service of process in connection with this action or any proceedings related to enforcement of this Stipulated Protective Order.


Date: _____

City and State where sworn and signed: _____

Printed name: _____
                          [printed name]

Signature: _____
                          [signature]

20

# EXHIBIT G

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In re RE GREEN DOT CORPORATION SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) | Case No. CV 19-10701-DDP(Ex) SCHEDULING ORDER |

Pursuant to the Federal Rules of Civil Procedure 16(b), the Court issues the following Order:

Counsel must agree on the date for the disclosure of expert witness reports pursuant to the Federal Rules of Civil Procedure 26(a)2. The agreed-upon disclosure date must precede the discovery cut-off date such that all discovery, including expert depositions, must be completed prior to the discovery cut-off date. All discovery motions must be heard prior to the discovery cut-off date.

***Counsel are ordered to abide by the dates as set forth in the Rule 26 (f) Report.

///

///

///

```
        LAST DAY TO JOIN OTHER PARTIES
        AND TO AMEND THE PLEADINGS:   August 1, 2025

        FACT DISCOVERY CUT-OFF:       October 31, 2025

        EXPERT DISCOVERY CUT-OFF:     February 27, 2026

        LAST DAY TO FILE MOTIONS:     July 6, 2026

        FINAL PRE TRIAL CONFERENCE:   October 5, 2026 at 11:00 a.m.

        **15** DAY JURY TRIAL:           November 3, 2026 at 9:00 a.m.
```

Dated: JULY 15, 2024

DEAN D. PREGERSON
United States District Judge

2

JAMES N. KRAMER (SBN 154709)
jkramer@orrick.com
ALEXANDER K. TALARIDES (SBN 268068)
atalarides@orrick.com
M. TODD SCOTT (SBN 226885)
tscott@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, California 94105
Telephone:   (415) 773-5700
Facsimile:   (415) 773-5759

RICHARD E. GOTTLIEB (SBN 289370)
rgottlieb@glaserweil.com
EMIL PETROSSIAN (SBN 264222)
epetrossian@glaserweil.com
GLASER WEIL FINK HOWARD
     JORDAN & SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone: (310) 553-3000
Facsimile: (310) 556-2920

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| IN RE GREEN DOT CORPORATION SECURITIES LITIGATION | Case No. 2:19-cv-10701-DDP-E<br><br>CLASS ACTION<br><br>**DECLARATION OF M. TODD SCOTT IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ENTRY OF STIPULATED PROTECTIVE ORDER AND CROSS-MOTION FOR ENTRY OF STIPULATED PROTECTIVE ORDER**<br><br>Judge:  Honorable Dean D. Pregerson |

DECLARATION OF M. TODD SCOTT

I, M. Todd Scott, declare as follows:

1. I am an attorney licensed to practice in the State of California. I am a Senior Associate at Orrick, Herrington & Sutcliffe LLP, co-counsel of record for Defendants Green Dot Corporation, Steven W. Streit, and Mark Shifke ("Defendants") in the above-captioned litigation. I submit this declaration in support of Defendants' Opposition to Plaintiffs' Motion for Entry of Stipulated Protective Order and Cross-Motion for Entry of Stipulated Protective Order.

2. I have personal knowledge of the facts stated in this declaration. If called as a witness, I could and would testify competently to each fact.

3. Attached hereto as Exhibit 1 is Defendants' proposed version of the Stipulated Protective Order, which is identical to Plaintiffs' proposed version except that Defendants' version also includes Paragraph 12.4 relating to experts.

4. On April 23, 2024, Rachel Jensen, counsel for Plaintiffs, circulated by email a proposed Stipulated Protective Order that differed from the sample protective order on the Court's website. This was the first version of a protective order that either side had proposed. A true and correct copy of Ms. Jensen's email (with irrelevant attachments omitted) is attached hereto as Exhibit 2.

5. On July 19, 2024, Plaintiffs served their First Set of Requests for Production of Documents and Data to Defendants. A true and correct copy of that document is attached hereto as Exhibit 3.

6. As of the date of this Declaration, at least ten different non-parties have produced documents in response to subpoenas issued in this case.

7. On September 24, 2024, Defendants had an email exchange with Christopher Kinnon, counsel for Plaintiffs, in which the parties agreed that Defendants would produce confidential documents prior to the entry of a Protective Order provided that Plaintiffs agreed to treat them as though subject to Defendants' proposed version of the Protective Order until a final version of the Protective Order was entered by the Court. A true and correct copy of that email exchange is attached

- 1 -

as Exhibit 4.

8.     Since the email exchange reflected in Exhibit 4, Defendants have made multiple productions of confidential documents to Plaintiffs.

9.     As stated in Mr. Kinnon's Declaration, we have had multiple meet-and-confer discussions with counsel for Plaintiffs about the proposed Stipulated Protective Order and, in particular, the basis for Defendants' position that the provisions of Paragraph 12.4 are appropriate.  In those discussions, Defendants expressed the view that the provisions relating to a party's ability to retain former employees or present or future competitors of another party should not affect Plaintiffs because there are so many potential experts in the relevant fields that they should have no difficulty finding suitable experts not covered by Paragraph 12.4.  At no time have Defendants stated or implied that we were seeking to prevent Plaintiffs from hiring experts or to have any ability to control Plaintiffs' choice of experts other than the restrictions on each side's ability to hire the other's former employees or present or future competitors as set forth in Paragraph 12.4.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 22, 2024, at San Francisco, CA.

_/s/ M. Todd Scott_
M. TODD SCOTT

- 2 -

DECLARATION OF M. TODD SCOTT

UNITED STATES DISTRICT COURT

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| IN RE GREEN DOT CORPORATION SECURITIES LITIGATION | Case No. 2:19-CV-10701-DDP-E |
| | <u>CLASS ACTION</u> |
| | **[PROPOSED] STIPULATED PROTECTIVE ORDER** |
| | Judge: Honorable Dean D. Pregerson |

WHEREAS, Federal Rule of Civil Procedure Rule 26(c) and this District's Sample Stipulated Protective Order contemplate the issuance of protective orders limiting the disclosure of discovered information in appropriate circumstances, and good cause having been shown, the Parties hereby stipulate, subject to the Court's approval, that this Stipulated Protective Order ("Order") governs the treatment of all discovery in these proceedings.

## 1. <u>PURPOSES AND LIMITATIONS</u>

The purpose of this Order is to provide for the prompt, efficient, and orderly conduct of discovery proceedings, to preserve and maintain the confidentiality of

1

certain documents and information produced or exchanged in the litigation by the parties or by any nonparties, to prevent the waiver of applicable evidentiary privileges and doctrines, and to comply with all applicable state and federal rules and regulations.

This Order does not confer blanket protections on all disclosures or responses to discovery.  Rather, the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under applicable legal principles. The Parties further acknowledge, as set forth in Section 12.3, below, that this Stipulated Protective Order does not entitle them to file confidential information under seal. Civil Local Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a Party seeks permission from the Court to file material under seal.

## 2.    DEFINITIONS

2.1    Action:  *In re Green Dot Corporation Securities Litigation*, No. 2:19-CV-10701-DDP-E (C.D. Cal.).

2.2    Challenging Party:  a Party or Non-Party that challenges the designation of information or items under this Order.

2.3    "CONFIDENTIAL" Information or Items:  information (regardless of how it is generated, stored, or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c) or private identifacatory information such as Social Security numbers, home telephone numbers and addresses, tax returns (including attached schedules and forms), W-2s, 1099s, banking or credit information.

2.4    Counsel:  Outside Counsel of Record and In-House Counsel (as well as their support staff).

2.5    Designating Party:  a Party or Non-Party that designates information or items produced by any Party or Non-Party in disclosures or in responses to

2

discovery as "CONFIDENTIAL."

2.6  Disclosure or Discovery Material:  all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

2.7  Expert:  a person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its Counsel to serve as an expert witness or as a consultant in this Action.

2.8  In-House Counsel:  attorneys who are employees of a Party to this Action.  In-House Counsel does not include Outside Counsel.

2.9  Non-Party:  any natural person, partnership, corporation, association, or other legal entity not named as a Party to this Action.

2.10  Outside Counsel:  attorneys who are not employees of a Party to this Action but are retained to represent or advise a Party to this Action.

2.11  Party: any Party[1] to this Action, including all of its officers, directors, employees, retained Experts, In-House Counsel, and Outside Counsel (and their support staffs). For the avoidance of doubt, prior to class certification, no putative class member other than a named plaintiff, the Lead Plaintiff, or a proposed class representative in the Action may be given access to Protected Material unless such putative class member may otherwise access Protected Material under another provision of this Order.

2.12  Producing Party:  a Party or Non-Party that produces Disclosure or Discovery Material in this Action.

2.14  Professional Vendors:  persons or entities that provide litigation support services (*e.g.*, photocopying, videotaping, translating, preparing exhibits or

---

[1] The current Parties are Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund, and additional named plaintiff Teamsters Local Union No. 727 Pension Fund ("Plaintiffs"); and defendants Green Dot Corporation, Steven W. Streit, and Mark Shifke ("Defendants").

3

demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.15  Protected Material:  any Disclosure or Discovery Material that (1) qualifies for protection under Rule 26(c) that is designated as "CONFIDENTIAL" ("Protected Information"), (2) information copied or extracted from Protected Information; (2) all copies, excerpts, summaries, or compilations of Protected Information; and (4) any testimony, conversations, or presentations made by Parties that might reveal Protected Information.

2.16  Receiving Party:  a Party that receives Disclosure or Discovery Material from a Producing Party.

**3.      SCOPE**

All Protected Material is governed, and protected by the remedies and relief provided, by this Order.  Notwithstanding the foregoing, the protections conferred by this Stipulated Protective Order do not cover any information:

(a) that is in the public domain at the time of disclosure to a Receiving Party or that becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and

(b) known to the Receiving Party prior to the disclosure, or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party.

Any use of Protected Material at trial shall be governed by a separate agreement or order.

**4.      DURATION**

4

The terms of this Protective Order do not govern the use of information at trial in this Action.[2] However, any information that was designated as confidential or maintained pursuant to this protective order and not used at the trial shall retain its confidential status and remain subject to the restrictions set forth herein, except as otherwise agreed by the Producing Party or ordered by the Court.

If this Action is resolved without a trial, the confidentiality obligations imposed by this Order shall remain in effect until the Designating Party agrees otherwise in writing or a court order otherwise directs. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this Action, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, re-hearings, remands, trials, or reviews of this Action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

**5.  DESIGNATING PROTECTED MATERIAL**

5.1    Exercise of Restraint and Care in Designating Material for Protection. Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards.

Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber or retard the case development process or to impose unnecessary expenses and burdens on other parties) expose the Designating Party to sanctions.

If it comes to a Designating Party's attention that information or items that it

---

[2] Determinations regarding restrictions on the use or public disclosure of Confidential Information at trial or in trial exhibits are reserved and shall be made in accordance with the Local Rules or as the Court directs at an appropriate time before trial, before any such Confidential Information is disclosed beyond the limits established by this Order.

[PROPOSED] STIPULATED PROTECTIVE ORDER

designated for protection do not qualify for protection, that Designating Party must promptly notify all other Parties that it is withdrawing the mistaken designation.

5.2     Manner and Timing of Designations.  Except as otherwise provided in this Order (*see, e.g.*, Section 5.3 below), or as otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced or promptly after the Designating Party becomes aware of the need to so designate.

Designation in conformity with this Order requires:

(a)  for information in documentary form (*e.g.*, paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Designating Party affix the legend "CONFIDENTIAL" to each page that contains Protected Material.

For documents produced in native format, the "CONFIDENTIAL" legend shall be affixed to the placeholder bates numbered TIFF image that accompanies the native file in the production.

A Party or Non-Party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting Party has indicated which material it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "CONFIDENTIAL." After the inspecting Party has identified the documents it wants copied and produced, the Designating Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, or as soon as is practicable, the Designating Party must affix the appropriate legend ("CONFIDENTIAL") to each page that contains Protected Material.

(b)  for testimony given in deposition or in other pretrial or trial proceedings, that the Designating Party identify on the record during the deposition, hearing, or other proceeding or in writing to Counsel for all other Parties and any

6

Non-Parties who attended the deposition or other proceeding no later than ten days after the conclusion of the deposition or other proceeding.  Transcripts containing Protected Material shall have an obvious legend on the title page that the transcript contains Protected Material. The Designating Party shall inform the court reporter of these requirements. Any transcript that is prepared before the expiration of the 10-day period for designation shall be treated during that period as if it had been designated "CONFIDENTIAL" in its entirety unless otherwise agreed. After the expiration of that period, the transcript shall be treated only as actually designated. Designations must be specific as to the portions of the transcript and/or any exhibits to which that Confidentiality Designation applies, except that any exhibit that was marked with a Confidentiality Designation at the time of production, and which still bears that mark at the time of its use in a deposition, shall be presumed to fall within the provisions of this Order without further designation.

(c)  for information produced in some form other than documentary and for any other tangible items, that the Designating Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL."  If only a portion or portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s).

5.3    Inadvertent Failures to Designate.  If timely corrected, an inadvertent failure to designate qualified information or items does not waive the Designating Party's right to secure protection under this Order for such material. Such correction is timely if made within a reasonable time after the inadvertent failure to designate is discovered by the Designating Party.  Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

In the event that a Producing Party inadvertently fails to designate Protected Material, the Producing Party shall give written notice of such inadvertent failure to

7

[PROPOSED] STIPULATED PROTECTIVE ORDER

designate to the Receiving Party (the "Inadvertent Failure to Designate Notice") and shall reproduce copies of the Protected Material that are labeled with the appropriate confidentiality designation. Upon receipt of an Inadvertent Production Notice and properly labeled Protected Material, the Receiving Party shall promptly destroy the inadvertently produced Protected Material and all copies thereof. Upon request, the Receiving Party shall notify the Producing Party in writing of such destruction within 14 calendar days of receipt of the Inadvertent Production Notice and properly labeled Protected Material. This provision is not intended to apply to any production of any document, material, or testimony protected by attorney-client or other privileges or the work product doctrine.

**6.     CHALLENGING CONFIDENTIALITY DESIGNATIONS**

6.1     <u>Timing of Challenges</u>.  Any Party or Non-Party may challenge a designation (or non-designation) of confidentiality at any time. Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2     <u>Meet and Confer</u>.  The Challenging Party shall initiate the dispute resolution process in accordance with Local Rule 37-1 *et seq*.

6.3     <u>Judicial Intervention</u>.

(a)  If the Parties cannot resolve a challenge without court intervention, the Challenging Party shall file and  serve a stipulation concerning the matters in dispute pursuant to Civil Local Rules 37-1 and 37-2 within 14 days after the conclusion of the meet-and-confer conducted pursuant to Section 6.2. Either Party may declare that the meet-and-confer process has concluded.

(b)  The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges, and those made for an improper

8

purpose (*e.g.*, to harass or impose unnecessary expenses and burdens on other Parties) may expose the Challenging Party to sanctions.

(c) During the challenge process, all Parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the Court rules on the challenge.

## 7. ACCESS TO AND USE OF PROTECTED MATERIAL

7.1 Basic Principles. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this case only for prosecuting, defending, or attempting to settle this litigation and associated appeals. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the litigation has been terminated, a Receiving Party must comply with the provisions of Section 13 below.

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

Counsel shall maintain the originals of the "Acknowledgment and Agreement to Be Bound" forms signed by persons acknowledging their obligations under this Order for a period of 60 days after final disposition of these proceedings and shall provide copies of any relevant forms to counsel for another Party if such counsel certifies that it has a basis to believe that a violation of the Protective Order has occurred.

7.2 Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise ordered by the Court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a) attorneys and other employees of a law firm acting as the Receiving Party's Outside Counsel in this Action to whom it is reasonably

9

necessary to disclose the information for this litigation;

(b)  officers, directors, and employees (including In-House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this litigation;

(c)  Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d)   the Court and its personnel, including any special master or Court-appointed official and their staff;(e)  court reporters and their staff,

(f)      professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(g)  the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information; and

(h)  in preparation for or during their depositions, witnesses, and attorneys for witnesses, in the Action to whom disclosure is reasonably necessary provided: (1) the Party requests that the witness sign the form attached as Exhibit A hereto; and (2) they will not be permitted to keep any confidential information unless they sign the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Parties or ordered by the Court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order;

(h) any mediator who is assigned to this matter and his or her staff, who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A); and

(j)  insurance carriers providing coverage in this matter.

**8.      PROTECTED MATERIAL SUBPOENAED OR ORDERED**

**PRODUCED IN OTHER LITIGATION**

If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this Action as "CONFIDENTIAL," that Party must:

(a) promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

(b) promptly notify in writing the Party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Stipulated Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this Action as "CONFIDENTIAL" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this Action to disobey a lawful directive from another court.

**9.     A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION**

9.1     The terms of this Order are applicable to information produced by a Non-Party in this Action and designated as "CONFIDENTIAL."  Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

11

9.2     In the event that a Party is required, by a valid discovery request in this Action, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

(a)  promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

(b)  promptly provide the Non-Party with a copy of the Stipulated Protective Order in this litigation, the relevant discovery request(s), and a reasonably specific description of the information requested; and

(c)  make the information requested available for inspection by the Non-Party.

9.3     If the Non-Party fails to object or seek a protective order from this Court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the Court. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this Court of its Protected Material.

**10.     <u>UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL</u>**

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately: (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this

12

Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

## 11. INADVERTENT PRODUCTION OR DISCLOSURE OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL

The Parties agree that the protections of Federal Rule of Evidence 502(d) shall apply.  Consistent with Federal Rule of Evidence 502(d), the production or disclosure in this Action of any Disclosure or Discovery Material which a Party or Non-Party later claims in good faith should not have been produced in this Action because of the attorney-client privilege, the attorney work product protection, the joint defense or common interest doctrine, or other similar doctrine, or by another legal privilege protecting information from discovery ("Privileged Discovery Material"), will not, in and of itself, be deemed to have waived any privilege for the Privileged Discovery Matter in this Action or any other proceeding or investigation.

If the Producing Party timely notifies the Receiving Party in writing that Privileged Discovery Materials have been produced, the Receiving Party shall promptly sequester, return, or destroy the Privileged Discovery Material. Such notification is timely if made within a reasonable time after the disclosure of Privileged Discovery Material is discovered.  The Receiving Party shall promptly sequester or delete the Privileged Discovery Material (and all paper and electronic copies) from any systems used to house the documents, including document review databases, e-rooms and any other location that stores the documents. If the Receiving Party has made any onward disclosures of the Privileged Discovery Material, it must also immediately notify all parties who received such material, instruct them to destroy or return it immediately, and identify the other party or parties in question to the Producing Party. Any Producing Party that claws back Privileged Discovery Material will promptly provide the Receiving Party with a privilege log that reasonably identifies the basis for the assertion of privilege or protection over the clawed-back documents.

13

Nothing contained herein is intended to or shall serve to limit the right of a Party to challenge the privilege or protection asserted with respect to any Disclosure or Discovery Material. The Receiving Party may file a motion with the Court for an order compelling production of the purportedly Privileged Discovery Material that has been clawed back. In so doing, the Receiving Party may not use the Privileged Discovery Material, except to the extent necessary to submit the document to the Court for *in camera* review.  Nor may the Receiving Party make use of the Privileged Discovery Material during any aspect of this Action or any other matter, including in depositions or at trial, unless the documents are later designated by the Court as not privileged or protected.

This provision is not intended to modify whatever procedure may be established in an e-discovery order or other agreement that provides for production without prior privilege review.

## 12. **MISCELLANEOUS**

12.1 <u>Right to Further Relief</u>.  Nothing in this Order abridges the right of any person to seek its modification by the Court in the future.

12.2 <u>Right to Assert Other Objections</u>.  By stipulating to the entry of this Protective Order, no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Stipulated Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

12.3 <u>Filing Protected Material</u>.  A Party that seeks to file with the Court any Protected Material produced by another Party must seek to file such Material under seal in compliance with Civil Local Rule 79-5.

12.4 <u>Restrictions on Disclosures to Experts</u>.  A Party (the "Retaining Party") wishing to retain a testifying or consulting expert who is associated with another Party (the "Affected Party") must disclose the identity of the proposed expert to the Affected Party before providing the proposed expert with any

information designated CONFIDENTIAL by the Affected Party under this Protective Order. The Affected Party can object to the retention by serving a letter pursuant to Local Rule 37-1, in which case the Retaining Party may not provide the proposed expert with any information designated CONFIDENTIAL until the dispute is resolved by agreement or court order. For purposes of this paragraph, a person is considered to be "associated with" another Party if he or she (i) was a director or employee of the Affected Party on or after January 1, 2018, or (ii) is at the time of the retention in competition with the Affected Party, or reasonably likely in the future to be in competition with the Affected Party, whether as an director, owner, employee, or consultant of a competing company or otherwise.

## 13. **FINAL DISPOSITION**

Within 60 days after the final disposition of this Action, as defined in Section 4, or such other time period as the Parties agree or the Court directs, and upon the request of the Producing or Designating Party, each Receiving Party must return all Protected Material to the Producing Party or destroy such material. If a Receiving Party has forwarded such material on to another party, the Receiving Party must also ensure that the recipient(s) also fully complies with this Section. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. This provision does not require the return or destruction of Protected Material stored on backup media made in accordance with regular data backup procedures for disaster recovery purposes, subject to legal hold obligations, or whose return or destruction would violate applicable federal or state law or regulation. Whether the Protected Material is returned or destroyed, the Receiving Party must, upon request from the Producing or Designating Party, submit a written certification to the Producing or Designating Party by the deadline referenced in this Section that (1) affirms that all reasonable efforts were made to ensure that all the Protected Material that was returned or destroyed and (2) affirms that the

Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, Expert reports, attorney work product, and consultant and Expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4.

**IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.**

Dated: _____ , 2024

Respectfully submitted,
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
JAMES N. KRAMER
ALEXANDER K. TALARIDES
M. TODD SCOTT

_____*Draft*_____
ALEXANDER K. TALARIDES
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:  415-773-5700
Facsimile:  415-773-5957

*Attorneys for Defendants*

[PROPOSED] STIPULATED PROTECTIVE ORDER

Dated: _____, 2024    **ROBBINS GELLER RUDMAN & DOWD LLP**
JASON A. FORGE
RACHEL L. JENSEN
CHRISTOPHER R. KINNON
JOHN M. KELLEY

_____*Draft*_____
RACHEL L. JENSEN
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone:  619-231-1058
Facsimile:  619-231-7423

- and -

**PITTA LLP**
VINCENT F. PITTA
120 Broadway, 28th Floor
New York, NY 10271
Telephone: 212-652-3890
Facsimile:  212-652-3891

*Attorneys for Plaintiffs*

**FOR GOOD CAUSE SHOWN, IT IS SO ORDERED.**

Dated:                    , 2024    _____
Honorable Dean D. Pregerson
United States District Judge

17

[PROPOSED] STIPULATED PROTECTIVE ORDER

[PROPOSED] STIPULATED PROTECTIVE ORDER

# **ATTESTATION**

Pursuant to Civil Local Rule 5-4.3.4(a)(2)(ii), I, Alexander K. Talarides, attest that all other signatories listed, and on whose behalf the filing is submitted, concur in this filing's content and have authorized such filing.

_Draft_
ALEXANDER K. TALARIDES

[PROPOSED] STIPULATED PROTECTIVE ORDER

# EXHIBIT A

## ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of _____ _____ [print or type full address], declare under penalty of perjury that I have read in its entirety and understand the Stipulated Protective Order that was issued by the United States District Court for the Central District of California on _____, 2024, in the case of *In re Green Dot Corp. Sec. Litig.*, No. 2:19-CV-10701-DDP-E, (C.D. Cal.).

I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Stipulated Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the Central District of California for the purpose of enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this Action.

Date: _____

City and State where Sworn and Signed: _____

Printed Name: _____

Signature: _____

i

EXHIBIT A: ACKNOWLEDGEMENT AND AGREEMENT TO BE BOUND

**CERTIFICATE OF SERVICE**

The undersigned certifies that on _____, 2024, a true and correct copy of the foregoing **[Proposed] Stipulated Protective Order** was served upon each attorney of record through the Court's CM/ECF system.

_____
Alexander Talarides

i

## Miller, Adam

| | |
|---|---|
| **From:** | Rachel Jensen <RachelJ@rgrdlaw.com> |
| **Sent:** | Tuesday, April 23, 2024 8:26 PM |
| **To:** | Scott, M. Todd; Kramer, James N.; Talarides, Alex; Patts, Lenny; Miller, Adam; Benton, Megan |
| **Cc:** | Jason Forge; Christopher Kinnon; Jack Kelley; Lea Bays |
| **Subject:** | Green Dot - Rule 26(f) conference |
| **Attachments:** | [DRAFT] ELECTRONIC DISCOVERY AGREEMENT v.1 4.23.24 RGRD.docx; [DRAFT] PRIVILEGE LOG AGREEMENT v.1 4.23.24 RGRD.docx; [DRAFT] STIPULATED CONFIDENTIALITY AND PROTECTIVE ORDER v.1 4.23.24 RGRD.docx |

**[EXTERNAL]**

Scott, Adam, and Megan:

Thanks for speaking with us last Friday to kick off the parties' Rule 26(f) conference. As promised, attached are draft ESI and privilege log protocols for your review. We also had a protective order handy, so sending it over as well.

Below is a summary of our discussion of the Rule 26(f)(2) topics:

1. The nature of the claims and defenses in the case: Defendants had no questions about Plaintiffs' claims, and the defenses will be set forth in the forthcoming answer after which the Parties may confer further.

2. Possibility for a prompt settlement and insurance coverage: Defendants will revert about early mediation after speaking with the insurers.

3. Rule 26(a) disclosures: Defendants will revert on Plaintiffs' proposal of 30 days from the conference.

4. Preservation of documents: The Parties are unaware of preservation issues, and you agreed to confirm after a meeting with the Company and then to advise of any preservation issues going forward.

5. Discovery plan and case schedule: Plaintiffs will provide a first draft of a discovery plan and case schedule within 14 days, with a target to file within 30 days of the conference.

6. Protective order: Defendants offered to send a draft proposed protective order for Plaintiffs' review. We had one handy so sending for your consideration.

7. ESI and privilege log protocols: Draft protocols attached for your review and comment. Plaintiffs reserve the right to make additional changes to these drafts. Let us know if you have any questions.

8. Already segregated documents: Plaintiffs requested production within 30 days of already segregated materials, including documents produced to the government (or Federal Reserve). Such a production imposes no burden on Defendants and will inform Plaintiffs on ESI issues, including custodians, search terms. You indicated that you are unsure what materials have been produced, but agreed to provide such materials early if possible.

If your understanding differs from ours, please let us know. We look forward to your response.

Best,
Rachel

**Rachel L. Jensen**
Partner

Robbins Geller
Rudman & Dowd LLP

655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

   

**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

**DRAFT** — October 22, 2024 – 6:54:23 PM –

ROBBINS GELLER RUDMAN
   & DOWD LLP
JASON A. FORGE (181542)
RACHEL L. JENSEN (211456)
CHRISTOPHER R. KINNON (316850)
JOHN M. KELLEY (339965)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
jforge@rgrdlaw.com
rjensen@rgrdlaw.com
ckinnon@rgrdlaw.com
jkelley@rgrdlaw.com

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re GREEN DOT CORPORATION SECURITIES LITIGATION | Case No. 2:19-cv-10701-DDP (Ex) |
| | CLASS ACTION |
| | [DRAFT] STIPULATED CONFIDENTIALITY AND PROTECTIVE ORDER |

4856-6089-9256.v1

Pursuant to Federal Rule of Civil Procedure 26(c), Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund and Plaintiff Teamsters Local Union No. 727 Pension Fund ("Plaintiffs") and Defendants Green Dot, Steven W. Streit, and Mark Shifke ("Defendants") (collectively, the "Parties"), by and through their counsel, hereby stipulate to and petition the Court to enter the following Stipulated Confidentiality and Protective Order in the above-captioned action.

## 1. PURPOSES AND LIMITATIONS

Disclosure and discovery in this action are likely to involve production of confidential or proprietary information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted. The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles. The parties further acknowledge that this Stipulated Protective Order does not automatically entitle them to file confidential information under seal.

## 2. DEFINITIONS

**2.1 Challenging Party**: A Party or Non-Party that challenges the designation of information or items under this Order.

**2.2 "CONFIDENTIAL" Information or Items**: Information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection from public disclosure including trade secrets; confidential research, development, or commercial information that would cause hard to the Designating Party if made public; and sensitive personal information such as health information, payment card numbers, financial account numbers, social security numbers, and tax identification numbers.

- 1 -

4856-6089-9256.v1

**2.3** **Counsel (without qualifier)**: Outside Counsel and In-House Counsel (as well as their support staff).

**2.4** **Designating Party**: A Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL."

**2.5** **Disclosure or Discovery Material**: All items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

**2.6** **Expert/Consultant**: A person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action.

**2.7** **In-House Counsel**: Attorneys who are employees of a party to this action. In-House Counsel does not include Outside Counsel in this action or any other outside counsel.

**2.8** **Non-Party**: Any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

**2.9** **Outside Counsel**: Attorneys who are not employees of a party to this action but are retained to represent or advise a party to this action and have appeared in this action on behalf of that party or are affiliated with a law firm which has appeared on behalf of that party.

**2.10** **Party:** Any party to this action, including all of its officers, directors, employees, and Outside Counsel (and their support staffs).

**2.11** **Producing Party**: A Party or Non-Party that produces Disclosure or Discovery Material in this action.

**2.12** **Professional Vendors**: Persons or entities that provide or advise on litigation support services (*e.g.*, photocopying, videotaping, translating, preparing

- 2 -

4856-6089-9256.v1

exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

**2.13 Protected Material**: Any Disclosure or Discovery Material that is designated as "CONFIDENTIAL."

**2.14 Receiving Party**: a Party that receives Disclosure or Discovery Material from a Producing Party.

**3. SCOPE**

The protections conferred by this Stipulation and Order cover not only Protected Material (as defined above), but also: (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material. However, the protections conferred by this Stipulation and Order do not cover the following information: (a) any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and (b) any information known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party. Any use of Protected Material at trial shall be governed by a separate agreement or order.

**4. DURATION**

Even after final disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs. Final disposition shall be deemed to be the later of: (1) dismissal of all claims and defenses in this action, with or without prejudice; (2) final approval of settlement between and among all parties; and (3) final judgment herein after the completion and exhaustion of all appeals,

- 3 -

4856-6089-9256.v1

rehearings, remands, trials, or reviews of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

## 5.   DESIGNATING PROTECTED MATERIAL

**5.1   Exercise of Restraint and Care in Designating Material for Protection**.   Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards.   The Designating Party must designate for protection only those parts of material, documents, items, or oral or written communications that qualify – so that other portions of the material, documents, items, or communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order.   Mass, indiscriminate, or routinized designations are prohibited.

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection, that Designating Party must promptly notify all other Parties that it is withdrawing the mistaken designation.

**5.2   Manner and Timing of Designations**.   Except as otherwise provided in this Order , or as otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.

Designation in conformity with this Order requires:

(a)   For information in documentary form (*e.g.*, paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party shall indicate in the accompanying cover letter that the production includes protected information and affix the legend "CONFIDENTIAL" to each page of the production that contains protected material. For documents produced in native format, the "CONFIDENTIAL" legend shall be affixed to the placeholder bates numbered TIFF image that accompanies the native file.

- 4 -

4856-6089-9256.v1

(b) A Party or Non-Party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting Party has indicated which material it would like copied and produced. Then, before producing the specified documents, the Producing Party must affix the "CONFIDENTIAL" legend to each page that contains Protected Material.

(c) For testimony given in deposition or in other pretrial or trial proceedings, that the Designating Party identify on the record, before the close of the deposition, hearing, or other proceeding, all protected testimony. The Designating Party will have up to 14 days from the receipt of the transcript to designate information for protection and all testimony will be treated as CONFIDENTIAL until then. If only a portion of the testimony qualifies for protection, the Designating Party must clearly identify the protected portion(s).

(d) For information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL." If only a portion or portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s).

**5.3     Inadvertent Failures to Designate**. If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

**6.     CHALLENGING CONFIDENTIALITY DESIGNATIONS**

**6.1     Timing of Challenges**. Any Party or Non-Party may challenge a designation of confidentiality at any time. Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial

- 5 -

4856-6089-9256.v1

unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

**6.2** **Meet and Confer**.  The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging.  The parties shall attempt to resolve each challenge in good faith and must begin the process by conferring directly (by phone, video conference, or in person) within seven days of the date of notice of the challenge.  A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet-and-confer process first or establishes that the Designating Party is unwilling to participate in the meet-and-confer process in a timely manner.

**6.3** **Judicial Intervention**.  If the Parties cannot resolve a challenge without court intervention, the Designating Party shall file and serve a motion to retain confidentiality within 21 days of the initial notice of challenge or within seven days of the parties agreeing that the meet-and confer-process will not resolve their dispute, whichever is earlier.  Each such motion must be accompanied by a competent declaration affirming that the movant has complied with the meet-and-confer requirements imposed in the preceding paragraph.  Failure by the Designating Party to make such a motion including the required declaration within 21 days (or seven days, if applicable) shall automatically waive the confidentiality designation for each challenged designation.  In addition, the Challenging Party may file a motion challenging a confidentiality designation at any time if there is good cause for doing so, including a challenge to the designation of a deposition transcript or any portions thereof.  Any motion brought pursuant to this provision must be accompanied by a competent declaration affirming that the movant has complied with the meet-and-confer requirements imposed by the preceding paragraph.

The burden of persuasion in any such challenge proceeding shall be on the Designating Party.  Unless the Designating Party has waived the confidentiality

- 6 -

4856-6089-9256.v1

designation by failing to file a motion to retain confidentiality as described above, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the Court rules on the challenge.

**7.     ACCESS TO AND USE OF PROTECTED MATERIAL**

**7.1     Basic Principles**.  A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this case only for prosecuting, defending, or attempting to settle this litigation.  Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order.  When the litigation has been terminated, a Receiving Party must comply with the provisions regarding the Final Disposition of Protected Material.

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

**7.2     Disclosure of "CONFIDENTIAL" Information or Items**.  Unless otherwise ordered by the Court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a)     the Receiving Party's Outside Counsel in this action, as well as employees of said Outside Counsel to whom it is reasonably necessary to disclose the information for this litigation;

(b)     the officers, directors, and employees (including In-House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this litigation;

(c)     Experts/Consultants and their staff and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

- 7 -

4856-6089-9256.v1

(d)    the Court and its personnel, special masters, and any Court-appointed official and their staff;

(e)    court reporters and their staff;

(f)    professional jury or trial consultants and mock jurors who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(g)    Professional Vendors and their staff;

(h)    mediators and their staff;

(i)    witnesses or potential witnesses in the action, during or in preparation for deposition or trial testimony, to whom disclosure is reasonably necessary, so long as they are not permitted to retain copies of Protected Material;

(j)    the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information; and/or

(k)    insurance carriers providing coverage in this matter.

**8.    PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION**

If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this action as "CONFIDENTIAL," that Party must:

(a)    promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

(b)    promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Stipulated Protective Order; and

(c)    cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this

- 8 -

action as "CONFIDENTIAL" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

**9.      A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION**

The terms of this Order are applicable to information produced by a Non-Party in this action and designated as "CONFIDENTIAL." Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

**10.     UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL**

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately: (1) notify in writing the Designating Party of the unauthorized disclosures; (2) use its best efforts to retrieve all unauthorized copies of the Protected Material; (3) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order; and (4) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

**11.     INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL**

When a Producing Party gives notice to Receiving Parties that certain inadvertently produced material is subject to a claim of privilege or other protection, the obligations of the Receiving Parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). This provision is not intended to modify whatever procedure

- 9 -

4856-6089-9256.v1

may be established in an order that provides for production without prior privilege review.

## 12. MISCELLANEOUS

**12.1 Right to Further Relief**. Nothing in this Order abridges the right of any person to seek its modification by the court in the future.

**12.2 Right to Assert Other Objections**. By stipulating to the entry of this Protective Order no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Stipulated Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

## 13. FINAL DISPOSITION

At any time after 60 days of the final disposition of this action, upon the request of the Producing Party, the Receiving Party must make commercially reasonable efforts to return or destroy all Protected Material. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. This provision does not require the return or destruction of Protected Material stored on backup media made in accordance with regular data backup procedures for disaster recovery purposes, subject to legal hold obligations, or whose return or destruction would violate applicable federal or state law or regulations. Whether the Protected Material is returned or destroyed, upon request, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) within 30 days of the request that affirms that commercially reasonable efforts were made to ensure that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial

- 10 -

4856-6089-9256.v1

exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order.

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

DATED: _____, 2024

ROBBINS GELLER RUDMAN & DOWD LLP
JASON A. FORGE
RACHEL L. JENSEN
CHRISTOPHER R. KINNON
JOHN M. KELLEY

[DRAFT]

[ATTORNEY SIGNATURE]

655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

PITTA LLP
VINCENT F. PITTA
120 Broadway, 28th Floor
New York, NY 10271
Telephone: 212/652-3890
212/652-3891 (fax)

Additional Counsel for Plaintiffs

DATED: _____, 2024

ORRICK, HERRINGTON & SUTCLIFFE LLP
JAMES M. KRAMER
ALEXANDER K. TALARIDES
M. TODD SCOTT

[DRAFT]

[ATTORNEY SIGNATURE]

The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: 415/773-5700
415/773-5957 (fax)

- 11 -

4856-6089-9256.v1

**DRAFT** — October 22, 2024 – 6:54:23 PM –

Attorneys for Defendants

\*       \*       \*

# O R D E R

PURSUANT TO STIPULATION, IT IS SO ORDERED.

DATED: _____

_____
THE HONORABLE DEAD D. PREGERSON
UNITED STATES MAGISTRATE JUDGE

- 12 -

4856-6089-9256.v1

**DRAFT** — October 22, 2024 – 6:54:23 PM –

*In re Green Dot Corporation Securities Litigation*
No. 2:19-cv-10701-DDP (EX) (C.D. Cal.)

# EXHIBIT A

## ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of

_____ [print or type employer], acknowledge

that I have read in its entirety and understand the Stipulated Protective Order that was

issued in the above captioned case on _____ [insert date ordered]. I

agree to comply with and to be bound by all the terms of this Stipulated Protective

Order and I understand and acknowledge that failure to so comply could expose me to

sanctions and punishment in the nature of contempt. I agree that I will not disclose in

any manner any information or item that is subject to this Stipulated Protective Order

to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court

for the Central District of California for the purpose of enforcing the terms of this

Stipulated Protective Order, even if such enforcement proceedings occur after

termination of this action.


DATED: _____   _____
                                                        *Printed Name*


                                                _____
                                                          *Signature*

- 13 -

4856-6089-9256.v1

ROBBINS GELLER RUDMAN
& DOWD LLP
JASON A. FORGE (181542)
RACHEL L. JENSEN (211456)
JESSICA T. SHINNEFIELD (234432)
CHRISTOPHER R. KINNON (316850)
MEGAN A. ROSSI (318643)
JOHN M. KELLEY (339965)
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
jforge@rgrdlaw.com
rjensen@rgrdlaw.com
jshinnefield@rgrdlaw.com
ckinnon@rgrdlaw.com
mrossi@rgrdlaw.com
jkelley@rgrdlaw.com

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

In re GREEN DOT CORPORATION
SECURITIES LITIGATION

   )
   )
   )
   )

Case No. 2:19-cv-10701-DDP (Ex)

CLASS ACTION

PLAINTIFFS' FIRST SET OF
REQUESTS FOR PRODUCTION OF
DOCUMENTS AND DATA TO
DEFENDANTS

4873-8255-3549.v1

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund and plaintiff Teamsters Local Union No. 727 Pension Fund (collectively, "Plaintiffs") request that defendants Green Dot Corporation and its former executives Steven W. Streit and Mark Shifke (collectively, "Defendants") produce the requested documents, as defined below, no later than 30 days from the date of service hereof, or at such other time and place as the parties mutually agree.

Defendants are required to produce for inspection any and all requested documents and data that are in their actual or constructive possession, custody, or control, or in the actual or constructive possession, custody, or control of their officers, employees, agents, representatives, or attorneys. Defendants shall produce documents as they are kept in the usual course of business or shall organize and label the documents to correspond with the categories in the request. Such production shall be made in accordance with the "DEFINITIONS," "INSTRUCTIONS," and "FORM OF PRODUCTION" set forth below.

## I. DEFINITIONS

1. "All" shall include the term "each" and vice-versa, as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside the scope of the request.

2. "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside the scope of the request.

3. "Account Services" refers to revenues and expenses derived from Green Dot's deposit account programs during the Relevant Period, such as prepaid cards, debit cards, consumer and small business checking accounts, secured credit cards, payroll debit cards, and gift cards. These deposit account programs are marketed under several of the Company's leading consumer brand names and under the brand names of the Company's "Banking as a Service," or "BaaS," partners.

- 1 -

4873-8255-3549.v1

4. The "Action" refers to the above-captioned lawsuit.

5. "Active Cards" refers to any general purpose reloadable prepaid debit card (or "GPR card"), prepaid card, or checking account in Green Dot's portfolio that had a purchase, reload, or ATM withdrawal transaction during a given quarter in the Relevant Period.

6. "Active Accounts" refers to any bank account within Green Dot's Account Services segment during a given quarter in the Relevant Period. This includes general purpose reloadable prepaid card accounts, demand deposit or "checking" accounts, and credit card accounts in Green Dot's portfolio that had a purchase, deposit, or ATM withdrawal transaction during the applicable quarter.

7. "BaaS" refers to products and services concerning Green Dot's "Banking as a Service" platform, providing financial services and related products to companies and businesses during the Relevant Period, including, but not limited to, debit and payroll cards, embedded financial and money movement services, tax products, mobile banking, and any similar Green Dot product or services that Green Dot's partners use to provide or facilitate banking and payments.

8. "Board of Directors" refers to Green Dot's Board of Directors and any committees or subcommittees thereof, including any ad hoc or special committees.

9. "Class Period" means the currently alleged class period of May 9, 2018 through November 7, 2019, inclusive.

10. "Communication" refers to any transmittal of information, including, but not limited to, words, numbers, and pictures, by any means of transmission, including, but not limited to, speech, writing, audio, video, documents (as defined below), or electronically stored information (as defined below), or other media of any kind. The term "communication" also includes, but is not limited to, all inquiries, discussions, conversations, correspondence, negotiations, agreements, presentations, understandings, meetings, notices, requests, responses, demands, complaints, press, publicity, or trade releases.

- 2 -

4873-8255-3549.v1

11. "Company" or "Green Dot" refers to Green Dot Corporation; any of its direct or indirect subsidiaries, divisions, or affiliates (foreign and domestic), predecessors, and successors; all of its present and former officers, directors, employees, members of the Board of Directors, agents, accountants, attorneys, and advisors; and all other persons acting or purporting to act on its behalf.

12. "Complaint" refers to the First Amended Complaint for Violations of the Federal Securities Laws filed in this Action, ECF 83.

13. "Concern" or "concerning" means relating to, referring to, reflecting upon, describing, evidencing, or constituting.

14. "Correspondence" means any letter, memorandum, note, email, facsimile, text message, instant message, internet message board posting, social media post or message, or any other writing containing a communication.

15. "Defendants" refers to Green Dot and its former executives Steven W. Streit and Mark Shifke.

16. "Documents" means all documents and data responsive to a particular request and is intended to have the broadest possible meaning under Fed. R. Civ. P. 34(a), including, but not limited to, electronically stored information ("ESI," as defined below), electronic or computerized data compilations, communications (as defined above), contracts, correspondence (as defined above), memoranda, invoices, records, presentations, summaries or audio or video recordings of conversations or interviews or meetings, photographs, press releases, handwritten or any other notes, and work papers. A draft of a non-identical copy of any document is a separate document within the meaning of this term.

17. "DOJ" refers to the U.S. Department of Justice and any of its direct or indirect subsidiaries, agencies, divisions, or affiliates (foreign or domestic), predecessors, successors, present and former officers, directors, employees, agents, accountants, and advisors, and all other persons acting or purporting to act on its behalf.

- 3 -

4873-8255-3549.v1

18. "Electronically stored information" or "ESI" includes, but is not limited to, all items covered by Fed. R. Civ. P. 34(a)(1)(A) and includes all information or data that is generated, received, processed, transmitted, or stored electronically, including metadata (*e.g.*, author, recipient, file creation date, file modification date, file name, file path, etc.), regardless of the media or whether it is in the original format in which it was created.

19. "Federal Reserve" refers to the United States' central banking system known as the Federal Reserve System created by the Federal Reserve Act, including in its regulatory and supervisory capacities.

20. "GPR card" refers to general purpose reloadable prepaid debit cards.

21. "Green Dot's Card Business" refers to any and all of Green Dot's GPR or prepaid debit cards , products, or services (including, but not limited to, Green Dot-branded or co-branded products, products sold at Walmart, CVS, Rite Aid, Walgreens, Dollar Tree, Meijer, Boost Mobile, AT&T, and Citibank); BaaS cards, products, or services (including, but not limited to, Uber, TurboTax, Pay Card, and Simply Paid); direct deposit cards, products, or services; and any other similar card, product, or service that could be or was included at any time as an Active Account or Active Card during the Relevant Period, any product or service on the "Green Dot Network," and any digital, online, or app-based card, product, or service.

22. "Green Dot Network" refers to Green Dot's network of more than 90,000 retail distribution locations for its products and services in the United States.

23. "Green Dot Security" or "Green Dot Securities" refers to any note, stock, bond, debenture, transferable share, evidence of indebtedness, or any other security issued by Green Dot or any derivative of the foregoing, including, but not limited to, any put or call option.

24. "Identify," with respect to persons, means to give, to the extent known, the person's full name, present or last known address, present or last known email address, and when referring to a natural person, additionally, the present or last known

- 4 -

place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the information of that person.

25. "Identify," with respect to documents, means to give, to the extent known, the: (a) type of document; (b) general subject matter; (c) date of the document; and (d) author(s), addressee(s), and recipient(s).

26. "Including" is used to emphasize the type of document requested and does not limit the request in any way.

27. "Individual Defendants" refers to Steven W. Streit ("Streit") and Mark Shifke ("Shifke").

28. "Meeting" refers to the contemporaneous presence of any natural person (including by telephone or electronic connection) for any purpose, whether or not such presence was prearranged or by chance and whether or not the meeting was formal or informal or occurred in connection with some other activity. The term "meeting" also includes presentations.

29. "Person" includes any natural person, firm, association, organization, partnership, limited partnership, sole proprietorship, trust, corporation, or legal or governmental entity, association, or body.

30. "Prepaid cards" refers to any Green Dot prepaid debit cards, including, but not limited to, GPR cards, branded, and co-branded products.

31. "Policies" means any rule, procedure, practice, or course of conduct, whether formal or informal, written or unwritten, recorded or unrecorded, which was recognized or followed, explicitly or implicitly.

32. "Refer," "relate," "referring," or "relating" means all documents which explicitly or implicitly, in whole or in part, were received in conjunction with or were generated as a result of, the subject matter of the request, including, but not limited to, all documents which reflect, record, memorialize, discuss, describe, compare,

- 5 -

consider, concern, constitute, embody, evaluate, analyze, review, report on, comment on, impinge upon, or impact the subject matter of the request.

33. "SEC" refers to the U.S. Securities and Exchange Commission and any of its direct or indirect subsidiaries, agencies, divisions, or affiliates (foreign or domestic), predecessors, successors, present and former officers, directors, employees, agents, accountants, and advisors, and all other persons acting or purporting to act on its behalf.

34. "You" or "your" refers, respectively, to each Defendant to whom these requests are directed, including, but not limited to, any subsidiaries, divisions, subdivisions, affiliates, predecessors, successors, joint ventures, present and former officers, directors, employees, representatives, agents, and all other persons acting or purporting to act on behalf of the foregoing.

35. The use of the singular form of any word includes the plural and vice versa.

## II. INSTRUCTIONS

1. In responding to these requests, all documents shall be produced in accordance with Fed. R. Civ. P. 26 and 34.

2. In responding to these requests, you shall produce all responsive documents (including those stored electronically) that are in your possession, custody, or control or in the possession, custody, or control of your predecessors, successors, parents, subsidiaries, divisions, or affiliates or any of your respective directors, executives, officers, partners, managing agents, agents, employees, accountants, or any other representative. A document shall be deemed to be within your control if you have the ability or right to secure the document or a copy of the document from another person having possession or custody of the document, including, but not limited to, any documents produced to you by third parties.

3. All unique documents responsive to the requests herein that are stored on your electronic backup tapes or hard drives shall be produced.

- 6 -

4.      Pursuant to the Federal Rules of Civil Procedure, you are to produce for inspection and copying by Plaintiffs original documents as they are kept in the usual course of business in their original folders, binders, covers, and containers, or facsimiles thereof, or you shall organize and label the documents to correspond to the categories in these requests.  If the original document is not in your custody, then you are to produce an identical copy thereof, as well as any non-identical copies that differ for any reason (including, but not limited to, the making of notes thereon) from the original or from the other copies produced.  Plaintiffs reserve the right to request inspection of the original documents, including those stored electronically, as they are kept in the usual course of business.

5.      These requests are specifically intended to encompass any ESI maintained in any form of computer memory or on computer hard drives, diskettes, or "cloud" or virtual storage, including any word processing or spreadsheet programs or electronic mail systems, or in any form of electronic or computer-related storage, whether or not you currently have "hard copy" printouts of the same.  To the extent that there are documents containing information relevant to these requests that are currently in electronic format, the documents are to be produced in their native format.

6.      If you claim any form of privilege or any other objection, whether based on statute, common law, or otherwise, as a ground for not producing any requested document, you shall furnish a list identifying each document for which the privilege or other objection is claimed together with the following information:

        (a)      the privilege being asserted;

        (b)      the person on whose behalf the privilege is asserted;

        (c)      a precise statement of the facts upon which the claim is based;

        (d)      a description of the purported privileged document including: its nature (*e.g.*, letter, memorandum, tape, etc.); the date it was prepared; the date the document bears; the date the document was sent; the date the document was received; the name of the person who prepared the document; the name(s) of the person(s) who

- 7 -

4873-8255-3549.v1

received the document; the name of each person to whom it was sent or was intended to be sent, including all addresses and all recipients of copies; the subject matter of the document; and

(e) a statement as to whom each identified person represented or purported to represent at all relevant times.

7. If a portion of any document responsive to these requests is withheld under claim of privilege, any non-privileged portion of such document must be produced with the portion claimed to be privileged redacted. Whenever a document is not produced in full or is produced in redacted form, so indicate on the document, identifying those portions of the document which are not being produced. For each document that is redacted, in addition to providing the redacted version of the document, the parties should furnish logs which comply with the legal requirements under federal law, but at a minimum will include the following information:

(a) the Begin Production ID of the document;

(b) the End Production ID of the document;

(c) a description of why privilege is being asserted over the document; and

(d) which privilege is asserted.

8. A privilege log of documents withheld or redacted as set forth in paragraphs 6-7 above shall be provided within 30 days of the production of documents responsive to these requests.

9. You are to produce each document requested herein in its entirety, without deletion or excision (except as redacted for privilege), regardless of whether you consider the entire document to be relevant or responsive to the requests. All documents must be produced with all attachments and enclosures, and in their original folder, binder, or other cover or container, regardless of whether you consider the entire document to be relevant or responsive to the request. Whenever a document or group of documents is removed from a file folder, binder, file drawer, file box,

- 8 -

4873-8255-3549.v1

notebook, or other cover or container, a copy of the label of such cover or container must be attached to the document or group of documents.

10. If a document responsive to these requests was at any time in your possession, custody, or control but is no longer available for production, as to each document state the following information:

(a) whether the document is missing or lost;

(b) whether it has been destroyed;

(c) whether the document has been transferred or delivered to another person, and, if so, at whose request;

(d) whether the document has been otherwise disposed of; and

(e) a precise statement of the circumstances surrounding the disposition of the document and the date of its disposition.

11. If in responding to these requests you claim any ambiguity in interpreting a document Request or a Definition or Instruction applicable thereto, such claim shall not be utilized by you as a basis for refusing to produce responsive documents, but there shall be set forth as part of your response the language deemed to be ambiguous and the interpretation chosen or used in responding to the request.

12. All requests shall be deemed continuing and ongoing, and you are required to supplement your responses with new or newly discovered material in accordance with Fed. R. Civ. P. 26(e).

**III. FORM OF PRODUCTION OF HARD-COPY DOCUMENTS**

Hard-copy documents should be scanned as single-page, Group IV, 300 DPI TIFF images with an .opt image cross-reference file and a delimited database load file (*i.e.*, .dat). The database load file should contain the following fields: "BEGNO," "ENDNO," "PAGES," "VOLUME," and "CUSTODIAN." The documents should be logically unitized (*i.e.*, distinct documents shall not be merged into a single record, and single documents shall not be split into multiple records) and be produced in the order in which they are kept in the usual course of business. If an original document

- 9 -

contains color, and the color is necessary to understand the meaning or content of the document, the document shall be produced as ***single-page, 300 DPI JPG images with JPG compression and a high quality setting as to not degrade the original image***. Multi-page OCR text for each document should also be provided. The OCR software shall maximize text quality. Settings such as "auto-skewing" and "auto-rotation" should be turned on during the OCR process.

## IV. FORM OF PRODUCTION OF ESI

1. Format: Except where otherwise noted in this section, electronically stored information ("ESI") should be produced in single-page, black and white, TIFF Group IV, 300 DPI TIFF images. Spreadsheet and presentation type files, audio and video files, photo or graphic images, and documents with tracked changes reflected in the metadata should be produced in native format. Short message communications (*e.g.*, text messages, WhatsApp, Slack, iMessage, Teams, G-Chat, Bloomberg, etc.) will be produced in RSMF with all available metadata and attachments. Except for messages that contain privileged content, the complete communication will be produced, separated into 24-hour increments. To the extent RSMF cannot be provided, the parties shall meet and confer on the appropriate metadata fields and format of production. If an original document being produced in image format contains color, the document should be produced as ***single-page, 300 DPI JPG images with JPG compression and a high quality setting as to not degrade the original image***. Parties are under no obligation to enhance an image beyond how it was kept in the usual course of business. TIFFs/JPGs should show any and all text, hidden content, and images that would be visible to the reader using the native software that created the document. For example, TIFFs/JPGs of email messages should include the BCC line, and documents should display comments and hidden content.

2. Format – Native Files: If a document is produced in RSMF or in native format, a single-page, Bates stamped image slip sheet stating the document has been

- 10 -

4873-8255-3549.v1

produced in native format should also be provided, with the exception of PowerPoint presentations. PowerPoint documents should be produced in native format along with single-page, 300 DPI TIFF/JPG images which display both the slide and speaker's notes. Each native file should be named according to the Bates number it has been assigned, and should be linked directly to its corresponding record in the load file using the NATIVELINK field. To the extent that either party believes that specific documents or classes of documents, not already identified within this protocol, should be produced in native format, the parties should meet and confer in good faith.

3. De-Duplication: Each party shall remove exact duplicate documents based on MD5 or SHA-1 hash values, at the family level. Attachments should not be eliminated as duplicates for purposes of production, unless the parent email and all attachments are also duplicates. An email that includes content in the BCC or other blind copy field shall not be treated as a duplicate of an email that does not include content in those fields, even if all remaining content in the email is identical. Removal of near-duplicate documents and email thread suppression is not acceptable. De-duplication should be done across the entire collection (global de-duplication) and the CUSTODIAN-ALL field should list each custodian, separated by a semicolon, who was a source of that document and the FILEPATH-DUP field will list each file path, separated by a semicolon, that was a source of that document. Should the CUSTODIAN-ALL or FILEPATH-DUP metadata fields produced become outdated due to rolling productions, an overlay file providing all the custodians and file paths for the affected documents should be produced prior to substantial completion of the document production.

4. Technology-Assisted Review: Predictive coding/technology-assisted review or artificial intelligence shall not be used for the purpose of culling the documents to be reviewed or produced without notifying the requesting party prior to use and with ample time to meet and confer in good faith regarding a mutually agreeable protocol for the use of such technologies.

- 11 -

4873-8255-3549.v1

5.      Metadata: All ESI shall be produced with a delimited, database load file that contains the metadata fields listed in Table 1, attached hereto.  The metadata produced should have the correct encoding to enable preservation of the documents' original language.  For ESI other than email and e-docs that do not conform to the metadata listed in Table 1, such as text messages, Instant Bloomberg, iMessage, Google Chat, MS Teams, Slack, Google Docs, etc., the parties should meet and confer as to the appropriate metadata fields to be produced.

6.      Embedded Objects: Embedded files shall be produced as attachments to the document that contained the embedded file, with the parent/child relationship preserved.  The embedded files should be marked with a "YES" in the load file under the "Is Embedded" metadata field.  Logos need not be extracted as separate documents as long as they are displayed in the parent document.

7.      Attachments: If any part of an email or its attachments is responsive, the entire email and attachments should be produced, except any attachments that must be withheld or redacted on the basis of privilege.  The parties should meet and confer about whether there is an appropriate basis for withholding a family document for any reason other than attorney-client or work product privilege.  The attachments should be produced sequentially after the parent email.  The parties shall use their best efforts to collect and produce point-in-time documents that are links in documents and emails, including, but not limited to, Google G Suite, Microsoft 365, etc.  Documents extracted from links shall be populated with the BEGATTACH and ENDATTACH metadata fields to show the family relationship.  If documents cannot be extracted from links at the time of collection, the parties should promptly meet and confer to discuss alternative methods of collection and production.

8.      Compressed File Types: Compressed file types (*e.g.*, .ZIP, .RAR, .CAB, .Z) should be decompressed so that the lowest level document or file is extracted.

9.      Structured Data: To the extent a response to discovery requires production of electronic information stored in a database, the parties should meet and

- 12 -

4873-8255-3549.v1

confer regarding methods of production. Parties should consider whether all relevant information may be provided by querying the database for discoverable information and generating a report in a reasonably usable and exportable electronic file.

10. Exception Report: The producing party shall compile an exception report enumerating any unprocessed or unprocessable documents, their file type, and the file location.

11. Encryption: To maximize the security of information in transit, any media on which documents are produced may be encrypted. In such cases, the producing party shall transmit the encryption key or password to the receiving party, under separate cover, contemporaneously with sending the encrypted media.

12. Redactions: If documents that the parties have agreed to produce in native format need to be redacted, the parties should implement redactions while ensuring that proper formatting and usability are maintained. Spreadsheets requiring redaction should be redacted using native redaction software and produced in native format.

## V. RELEVANT TIME PERIOD

The requests herein refer to the time period from May 1, 2017 through March 25, 2020 (the "Relevant Period"), unless otherwise specifically indicated. Responsive documents and data shall include all those that relate to the Relevant Period, even if generated, modified, communicated, or published outside of the Relevant Period.

## VI. DOCUMENT REQUESTS

REQUEST NO. 1:

Corporate organizational charts, employee directories, or other documents sufficient to identify or describe Green Dot's organization and corporate structure (including divisions, business segments, operating units, departments, and the relationship between and among them) during the Class Period, including, but not limited to, directories and organizational charts sufficient to identify by name, title, or reporting relationship:

- 13 -

4873-8255-3549.v1

(a)    direct reports (including "dotted line" reporting relationships) to Defendants Streit and Shifke;

(b)    individuals that comprised Green Dot's senior management;

(c)    members of Green Dot's Board of Directors and committees and subcommittees thereof; and

(d)    members of the Financial Planning & Analysis ("FP&A") and sales groups.

REQUEST NO. 2:

Documents memorializing Green Dot Board of Directors meetings (whether formal or informal and including any committee or subcommittee thereof), including board packages, financial closing packages, meeting minutes, exhibits, agendas, memoranda, resolutions (whether adopted or discussed), notes (whether prepared prior to, during or subsequent to Board of Directors meetings), reports, and presentations, as well as documents and communications concerning any action of the Green Dot Board of Directors by written consent.

REQUEST NO. 3:

Documents concerning any communications, press releases, conference calls, presentations, telephone or Zoom/Teams calls, or meetings with Green Dot shareholders, securities analysts, financial analysts, investors, financial publications, news reporters, journalists, or investment bankers concerning Green Dot, including, but not limited to, any scripts, slide decks, transcripts, recordings, tapes, or videos prepared in connection with, or as a result of, such meetings, including, but not limited to:

(a)    May 9, 2018 1Q18 earnings call;

(b)    May 16, 2018 JPMorgan Conference;

(c)    August 8, 2018 2Q18 earnings call;

(d)    November 7, 2018 3Q18 earnings call;

(e)    February 20, 2019 4Q18 earnings call;

- 14 -

4873-8255-3549.v1

(f)     May 8, 2019 1Q19 earnings call;

(g)     August 7, 2019 2Q19 earnings call; and

(h)     November 7, 2019 3Q19 earnings call.

REQUEST NO. 4:

Documents prepared for, distributed at, or memorializing any Green Dot meetings, whether internal or external, involving the Individual Defendants or any other officer or executive of Green Dot, during which any aspect of Green Dot's Card Business was a topic or otherwise discussed, including, but not limited to, weekly financial planning and town-hall meetings.

REQUEST NO. 5:

Documents and communications concerning the retention, engagement, or consultation with any third party, including public relations consultants, disclosure consultants, or legal advisors in connection with Green Dot's public disclosures during the Class Period or any aspect of Green Dot's Card Business.

REQUEST NO. 6:

Documents sufficient to show indemnification agreements between Green Dot and either of the Individual Defendants, including agreements to assume liability, agreements to assume the defense, non-disparagement agreements, and joint defense agreements made by Defendants, any insurer for Defendants, or any other entities that may be financially affected by the claims in this Action.

REQUEST NO. 7:

Documents from 2015 to the present concerning the sales, revenue, or growth of Green Dot's Card Business, including, but not limited to:

(a)     related metrics on a per-product, per-unit, per-service, categorical, and aggregate basis, including, but not limited to, demand, charges and fees, purchase volume, interest income, churn, reloading, total card loaded funds (or "GDV"), card usage and engagement, total addressable market, margins, market share, average sales prices, inventory, cash transfers, economics and profitability, Active Accounts, Active

- 15 -

Cards, number of customers, incentives, promotions, discounts, and all other related metrics or key performance indicators;

               (b)     retailers, sales channels, and partners; and

               (c)     charts, projections, comparisons, analyses, evaluations, trends, or changes concerning any of the above on a comparative, per-product, per-unit, per-service, categorical, and aggregate basis, and any related trends or changes, including, but not limited to, related periodic (annual, quarterly, monthly, weekly, or daily) reports, dashboard reports, or other summary compilations or databases.

REQUEST NO. 8:

Documents from 2015 to the present concerning Green Dot's Card Business customer data by product or service, card type, and sales outlet, including: the lifetime value of customers; any differences in the relative, comparative, or absolute value of customers (*e.g.*, prepaid customers compared to other customers); the relative, comparative, or absolute value of long-term and short-term customers; how many and what kinds of products or services customers used; any customer overlap between products or services; any customer demographic information or profiles ; any analyses of Green Dot's "best customers," high-value or low-value customers, repeat customers, "unbanked" or "underbanked" customers; and any related analyses, trends, or changes in any of the above.

REQUEST NO. 9:

Documents concerning Green Dot's Card Business competitors, regarding any actual, potential, or forecasted loss of sales, growth, customers, business volume, or market share from such competitors, including, but not limited to, other prepaid cards, neo-banks (*e.g.*, Chime, Varo, N26, Aspiration), Square, PayPal, Venmo, and any other similar companies or products and services.

REQUEST NO. 10:

Documents from 2015 to the present concerning Green Dot's Active Accounts and Active Cards key metrics, including, but not limited to, composition, definition, or

- 16 -

calculation; products, categories, services, or cards included as Active Accounts or Active Cards; and any changes or trends over time.

REQUEST NO. 11:

Documents concerning Green Dot's discontinuance of its "Number of Active Cards" "Key Metric" and commencement of its "Number of Active Accounts" "Key Metric" in 2018, including:

    (a)    recommendations and analysis concerning the change;

    (b)    proposal(s) and alternative(s) considered;

    (c)    reason(s) for adopting the change;

    (d)    meetings and communications about the same; and

    (e)    documents sufficient to show all persons involved in the proposals and decision-making process.

REQUEST NO. 12:

Documents from 2015 through 2019 concerning Green Dot's actual or potential acquisition(s) of competitor(s) to Green Dot's Card Business, and the actual or potential impact of acquisition(s) on Green Dot's sales, revenue, growth, and customer acquisition.

REQUEST NO. 13:

Documents concerning Green Dot's purported shift to digital and direct deposit products from prepaid cards, including, but not limited to, "[t]he continuing long-term portfolio mix shift towards higher lifetime value accounts" (*see* ¶40(a) in the Complaint).

REQUEST NO. 14:

Documents concerning new or lost shelf facings (*i.e.*, retail outlets or doors) for Green Dot's prepaid cards, including circumstances and reasons for the same – for example, as described in ¶38(b) of the Complaint.

- 17 -

4873-8255-3549.v1

REQUEST NO. 15:

Documents concerning Green Dot's February 20, 2019 disclosure of a slowdown in "quarterly active accounts" as described in ¶¶65-66 of the Complaint.

REQUEST NO. 16:

Documents concerning Green Dot's May 8, 2019 disclosure that it had experienced a loss of 300,000 prepaid accounts and would have to expend $60 million to market Company cards as described in ¶69 of the Complaint.

REQUEST NO. 17:

Documents concerning Green Dot's August 7, 2019 disclosure that it lost "500,000 active prepaid accounts," that the Company's Active Accounts had declined, and slashing the Company's fiscal 2019 outlook as described in ¶¶72-74 of the Complaint.

REQUEST NO. 18:

Documents concerning Green Dot's November 7, 2019 disclosure that the declines in Green Dot's prepaid accounts would continue through the first half of 2020 as described in ¶¶77-79 of the Complaint.

REQUEST NO. 19:

Documents concerning Green Dot's Customer Relationship Management Report, BIA dashboard, Financial Key Metric Report, Cohort Report, Tableau Report, Revenue Pacing Report, and Consolidated Activity Reports ("CARs"), and any other reports or databases related to Green Dot's Card Business, and Streit and Shifke's (or their assistants' or direct reports') access to and knowledge of same.

REQUEST NO. 20:

Documents concerning Streit's decision to end a marketing campaign in August 2018 after concluding it was not attracting enough new customers to overcome significant drop-offs in new customer acquisitions, as described in ¶30 of the Complaint, including all meetings and communications concerning same.

- 18 -

4873-8255-3549.v1

REQUEST NO. 21:

Documents concerning or memorializing any actual, proposed, or otherwise considered changes to Green Dot's customer-identification, risk-management, or anti-money-laundering procedures or protocols, including, but not limited to, involving Green Dot's Fraud Management team, Streit, Shifke, or other Green Dot executives, including the allegations in ¶32 of the Complaint.

REQUEST NO. 22:

Documents concerning negative status accounts (including, but not limited to, unmatched address or name, excessive disputes, or negative balance) at Green Dot – for example, as described in ¶32 of the Complaint.

REQUEST NO. 23:

Documents concerning Green Dot customers with numerous accounts – for example, as described in ¶32 of the Complaint, including internal and external reports and communications concerning the same.

REQUEST NO. 24:

Documents concerning any seasonal revenue, sales, or growth variations or changes in Green Dot's tax business and any impact on Green Dot's Card Business, Active Accounts, or Active Cards, including, but not limited to, Green Dot's Turbo Tax cards.

REQUEST NO. 25:

Documents concerning Green Dot's actual or projected financial condition, performance, or prospects, including documents (and retailer or sales-outlet-specific information) relating to budgets, business plans, marketing plans, merchandise or sales plans and forecasts, performance targets, strategic goals, profitability analyses, financial statements, reviews, or similar economic or financial comparisons.

REQUEST NO. 26:

Documents concerning statements made by Defendants in SEC filings and press releases or made during conference or industry calls with analysts or investors during

- 19 -

4873-8255-3549.v1

the Class Period, including, but not limited to, statements concerning fiscal 2018 and 2019's actual or anticipated sales, revenue, growth, gross or profit margins, customers, products, product health or demand, value of customers or products, or product sales mix (*e.g.*, the shift to digital products), and documents forming the basis and/or contradicting those statements.

REQUEST NO. 27:

Documents concerning meeting, exceeding, or missing market estimates or Company guidance of Green Dot's revenue, earnings per share, growth, or common stock price.

REQUEST NO. 28:

Documents concerning the price or value of Green Dot stock (*i.e.*, GDOT on the New York Stock Exchange ("NYSE")), including analysis of or the reasons that the market price of Green Dot stock increased or decreased on a particular date or over time.

REQUEST NO. 29:

Documents concerning the Individual Defendants' Class Period transactions in Green Dot Securities, including any 10b5-1 trading plans and all amendments thereto, including the circumstances and reasons for the same.

REQUEST NO. 30:

Documents and communications concerning the Individual Defendants' compensation from Green Dot for or during calendar years 2017 through 2019, including, but not limited to, documents related to:

(a) any severance packages, termination agreements, or parachute payments;

(b) payments made pursuant to §280G of the Internal Revenue Code, 26 U.S.C. §280G;

(c) all bonuses or other compensation policies, terms, and agreements;

(d) any performance reviews;

- 20 -

4873-8255-3549.v1

(e)     the benchmarking of salaries against peer groups; and

(f)     all payments, loans, or taxable benefits received from Green Dot.

REQUEST NO. 31:

Documents and communications regarding Green Dot's share price, market capitalization, number of shareholders, volume of shares traded, or the value of any Green Dot Security.

REQUEST NO. 32:

Documents concerning any affirmative defense you have raised or anticipate raising in this litigation.

REQUEST NO. 33:

Documents concerning Green Dot's Class Period public filings with the SEC, including Sarbanes-Oxley certifications.

REQUEST NO. 34:

Documents concerning the Company's policies, procedures and practices relating to: (i) sales; (ii)  revenue; (iii) fraud prevention; (iv) internal controls; (v) public or corporate disclosures; (vi) insider trading; (vii) code of business conduct and ethics; and (viii) the retention or destruction of documents, including the retention or destruction of ESI; and documents concerning the Company's compliance with or violation of any such policies or procedures.

REQUEST NO. 35:

Documents relating to executive departures (whether planned or unplanned), including Streit, Shifke, Brett Narlinger, and Daniel Henry.

REQUEST NO. 36:

Documents concerning the decision to promote Daniel Henry to the role of CEO and President, and his promotion, as announced by the Company on March 25, 2020, and any interim or acting CEO or President before then.

- 21 -

4873-8255-3549.v1

REQUEST NO. 37:

Documents concerning or communications with, by, among, or between Ernst & Young, the Public Accounting Oversight Board, and the American Institute of Certified Public Accountants, including, but not limited to, transcripts of testimony, exhibits, or presentations thereto given by any Green Dot employee (including, without limitation, any former employee of Green Dot).

REQUEST NO. 38:

From May 1, 2017 to the present, documents produced to or communications with any governmental agency or regulator (public or private), including, but not limited to, the SEC, the DOJ, the NYSE, the Federal Reserve, or the Financial Industry Regulatory Authority, as well as requests from, draft or final consent orders or offers, or other actual or proposed actions or penalties concerning Defendants' public statements, compliance risk management (including consumer compliance and compliance with fraud or anti-money-laundering rules or regulations), and transactions in Green Dot Securities, including, but not limited to, transcripts or notes of testimony or interviews provided, exhibits, or presentations thereto given by any present or former Green Dot employee or representative.

REQUEST NO. 39:

Documents concerning Plaintiffs, Plaintiffs' counsel, and this Action.

REQUEST NO. 40:

Calendars, date books, appointment books, and telephone logs reflecting Green Dot-related activities maintained by or for each of the Individual Defendants and each current or former Green Dot employee or other person identified as a potential defense witness in Defendants' Fed. R. Civ. P. 26(a)(1) disclosures.

REQUEST NO. 41:

Documents sufficient to identify all personal and business phone numbers, email addresses, social media aliases or screen names or handles, of each Individual

- 22 -

4873-8255-3549.v1

Defendant, their personal or executive assistants, and for each current or former Green Dot employee identified in Defendants' Fed. R. Civ. P. 26(a)(1) disclosures.

REQUEST NO. 42:

Documents and communications regarding the employment or severance agreement(s) of each of the Individual Defendants and each current or former Green Dot employee identified in Defendants' Fed. R. Civ. P. 26(a)(1) disclosures.

REQUEST NO. 43:

A current résumé or curriculum vitae for each of the Individual Defendants and each current or former Green Dot employee identified in Defendants' Fed. R. Civ. P. 26(a)(1) disclosures.

REQUEST NO. 44:

Documents identified in your Fed. R. Civ. P. 26(a)(1) disclosures.

REQUEST NO. 45:

Documents received from any third party subpoenaed in this Action.

REQUEST NO. 46:

To the extent not captured by the above requests, documents you know to be relevant to this Action. This request is made without regard to the Relevant Period.

REQUEST NO. 47:

All analyst reports concerning Green Dot, and documents regarding coverage of Green Dot by securities analysts or the news media.

- 23 -

4873-8255-3549.v1

REQUEST NO. 48:

Documents concerning any internal inquiry, audit, or formal or informal investigation concerning Green Dot's Card Business or of the Individual Defendants.

DATED: July 19, 2024

ROBBINS GELLER RUDMAN
   & DOWD LLP
JASON A. FORGE
RACHEL L. JENSEN
JESSICA T. SHINNEFIELD
CHRISTOPHER R. KINNON
MEGAN A. ROSSI
JOHN M. KELLEY

CHRISTOPHER R. KINNON

655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

PITTA LLP
VINCENT F. PITTA
120 Broadway, 28th Floor
New York, NY 10271
Telephone: 212/652-3890
212/652-3891 (fax)

Additional Counsel for Plaintiffs

- 24 -

4873-8255-3549.v1

## TABLE 1: METADATA FIELDS[1]

| Field Name | Example / Format | Description |
|---|---|---|
| BEGNO | ABC0000001 (Unique ID) | The Document ID number associated with the first page of a document. |
| ENDNO | ABC0000003 (Unique ID) | The Document ID number associated with the last page of a document. |
| BEGATTACH | ABC0000001 (Unique ID Parent-Child Relationships) | The Document ID number associated with the first page of the parent document. |
| ENDATTACH | ABC0000008 (Unique ID Parent-Child Relationships) | The Document ID number associated with the last page of the last attachment. |
| VOLUME | VOL001 | The name of CD, DVD, or Hard Drive. |
| RECORDTYPE | eMail, Attachment, Scanned Doc, eFile, Chat/Text | The record type of a document. |
| SENTDATE | MM/DD/YYYY | The date the email or calendar entry was sent. |
| SENTTIME | HH:MM | The time the email or calendar entry was sent. |
| RECEIVEDDATE | MM/DD/YYYY | The date the document was received. |
| RECEIVEDTIME | HH:MM | The time the document was received. |
| CREATEDATE | MM/DD/YYYY | The date the document was created. |
| CREATETIME | HH:MM | The time the document was created. |
| LASTMODDATE | MM/DD/YYYY | The date the document was last modified. |
| LASTMODTIME | HH:MM | The time the document was last modified. |
| MEETING START DATE | MM/DD/YYYY | Start date of calendar entry. |
| MEETING START TIME | HH:MM | Start time of calendar entry. |
| MEETING END DATE | MM/DD/YYYY | End date of calendar entry. |
| MEETING END TIME | HH:MM | End time of calendar entry. |
| FILEPATH | i.e. /JsmithPC/Users/Jsmith/Desktop | The file path from the location in which the document was stored in the usual course of business. This field should be populated for both email and e-files. |
| FILEPATH-DUP | i.e. /JSmith.pst/Inbox /Network Share/Accounting/… /TJohnsonPC/Users/TJohnson/My Documents/... | The file paths from the locations in which the duplicate documents were stored in the usual course of business. This field should be populated for both email and e-files and separated by semicolons. |
| AUTHOR | jsmith | The author or owner of a document from extracted metadata. |
| LASTEDITEDBY | jsmith | The name of the last person to edit the document from extracted metadata. |
| FROM | Joe Smith <jsmith@email.com> | The display name and email address of the author of an email/calendar item. An email address should always be provided. |
| TO | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and email address of the recipient(s) of an email/calendar item. An email address should always be provided for every email if a recipient existed. |
| CC | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and email of the copyee(s) of an email/calendar item. An email address should always be provided for every email if a copyee existed. |
| BCC | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and email of the blind copyee(s) of an email or calendar item. An email address should always be provided for every email if a blind copyee existed. |
| SUBJECT | | The subject line of the email/calendar item. |
| MESSAGE TYPE | Appointment, Contact, Task, Distribution List, Message, etc. | An indication of the email system message type. |
| IMPORTANCE | Normal, Low, High | Email Importance Flag |
| TITLE | | The extracted document title of a document. |
| CUSTODIAN-ALL | Smith, Joe; Doe, Jane | All of the custodians of a document from which the document originated, separated by semicolons. |
| SOURCE | Computer, Mobile Phone, Email, Network Share, Slack, WhatsApp, Teams, Database Name, etc. | The source from which the document was collected. |
| ATTACH COUNT | Numeric | The number of attachments to a document. |
| FILEEXT | XLS | The file extension of a document. |
| FILENAME | Document Name.xls | The file name of a document. |
| FILESIZE | Numeric | The file size of a document (including embedded attachments). |
| TRACK CHANGES | Yes or No | The yes/no indicator of whether tracked changes exist in the file. |
| IS EMBEDDED | Yes or No | The yes/no indicator of whether a file is embedded in another document. |
| HASH | | The MD5 or SHA-1 Hash value or "de-duplication key" assigned to a document. The same hash method (MD5 or SHA-1) should be used throughout production. |
| CONVERSATION INDEX | | ID used to tie together email threads. |
| REDACTED | Yes or Blank | If a document contains a redaction, this field will display 'Yes'. |
| TIMEZONE PROCESSED | PST, CST, EST, etc | The time zone the document was processed in. **NOTE:** This should be the time zone where the documents were located at time of collection. |
| NATIVELINK | D:\NATIVES\ABC000001.xls | The full path to a native copy of a document. |
| FULLTEXT | D:\TEXT\ABC000001.txt | The path to the full extracted text of the document. There should be a folder on the deliverable, containing a separate text file per document. These text files should be named with their corresponding Bates numbers. **Note**: Emails should include header information: author, recipient, cc, bcc, date, subject, etc. If the attachment or e-file does not extract any text, then OCR for the document should be provided. |

[1] For ESI other than email and e-docs that do not conform to the metadata listed here, such as text messages, Instant Bloomberg, iMessage, Google Chat, MS Teams, Slack, etc., the parties will meet and confer as to the appropriate metadata fields to be produced.

## DECLARATION OF SERVICE BY EMAIL

I, CHRISTOPHER R. KINNON, not a party to the within action, hereby declare that on July 19, 2024, I served the attached PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND DATA TO DEFENDANTS on the parties in the within action by email addressed as follows:

### COUNSEL FOR PLAINTIFFS:

| NAME | FIRM | EMAIL |
|---|---|---|
| Jason A. Forge<br>Rachel L. Jensen<br>Jessica T. Shinnefield<br>Christopher R. Kinnon<br>Megan A. Rossi<br>John M. Kelley | Robbins Geller Rudman<br>& Dowd LLP<br>655 West Broadway<br>Suite 1900<br>San Diego, CA 92101 | jforge@rgrdlaw.com<br>rjensen@rgrdlaw.com<br>jshinnefield@rgrdlaw.com<br>ckinnon@rgrdlaw.com<br>mrossi@rgrdlaw.com<br>jkelley@rgrdlaw.com |
| Vincent F. Pitta | Pitta LLP<br>120 Broadway, 28th Floor<br>New York, NY 10271 | vpitta@pittalaw.com |

### COUNSEL FOR DEFENDANTS:

| NAME | FIRM | EMAIL |
|---|---|---|
| James M. Kramer<br>Alexander K. Talarides<br>M. Todd Scott | Orrick, Herrington<br>& Sutcliffe LLP<br>The Orrick Building<br>405 Howard Street<br>San Francisco, CA 94105 | jkramer@orrick.com<br>atalarides@orrick.com<br>tscott@orrick.com |
| Adam Miller | Orrick, Herrington<br>& Sutcliffe LLP<br>2100 Pennsylvania Avenue NW<br>Washington, D.C. 20037 | adam.miller@orrick.com |
| Megan Benton | Orrick, Herrington<br>& Sutcliffe LLP<br>400 Capitol Mall<br>Suite 3000<br>Sacramento, CA 95814-4497 | mbenton@orrick.com |
| Richard E. Gottlieb<br>Emil Petrossian<br>Jacob Yang | Glaser Weil Fink Howard<br>Jordan & Shapiro LLP<br>10250 Constellation Boulevard<br>19th Floor<br>Los Angeles, CA 90067 | rgottlieb@glaserweil.com<br>epetrossian@glaserweil.com<br>jyang@glaserweil.com |

4873-8255-3549.v1

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 19, 2024, at San Diego, California.

_____
CHRISTOPHER R. KINNON

## Miller, Adam

| | |
|---|---|
| **From:** | Christopher Kinnon <CKinnon@rgrdlaw.com> |
| **Sent:** | Tuesday, September 24, 2024 2:48 PM |
| **To:** | Miller, Adam |
| **Cc:** | Patts, Lenny; Jason Forge; Rachel Jensen; Jessica Shinnefield; Megan Rossi; Jack Kelley; 'vpitta@pittalaw.com'; Katie Woods; Ariana Gonzales; Kramer, James N.; Talarides, Alex; Scott, M. Todd; Benton, Megan; 'rgottlieb@glaserweil.com'; 'epetrossian@glaserweil.com'; 'jyang@glaserweil.com'; 'cbraschi@glaserweil.com' |
| **Subject:** | RE: In re Green Dot Corp. Sec. Litig., No. 2:19-cv-10701-DDP (Ex) (C.D. Cal.) |

**[EXTERNAL]**

Adam, I understand this issue is resolved.  You will produce the insurance documents this week, and we will treat them as confidential.

- Chris

**From:** Christopher Kinnon
**Sent:** Tuesday, September 24, 2024 10:56 AM
**To:** 'Miller, Adam' <adam.miller@orrick.com>
**Cc:** Patts, Lenny <lpatts@orrick.com>; Jason Forge <JForge@rgrdlaw.com>; Rachel Jensen <RachelJ@rgrdlaw.com>; Jessica Shinnefield <jshinnefield@rgrdlaw.com>; Megan Rossi <MRossi@rgrdlaw.com>; Jack Kelley <JKelley@rgrdlaw.com>; vpitta@pittalaw.com; Katie Woods <KWoods@rgrdlaw.com>; Ariana Gonzales <AGonzales@rgrdlaw.com>; Kramer, James N. <jkramer@orrick.com>; Talarides, Alex <atalarides@orrick.com>; Scott, M. Todd <tscott@orrick.com>; Benton, Megan <mbenton@orrick.com>; rgottlieb@glaserweil.com; epetrossian@glaserweil.com; jyang@glaserweil.com; cbraschi@glaserweil.com
**Subject:** RE: In re Green Dot Corp. Sec. Litig., No. 2:19-cv-10701-DDP (Ex) (C.D. Cal.)

Adam, you should produce these mandatory disclosures immediately without any conditions.  Trying to extort us to grant protections for Green Dot's standard business documents akin to patents or trade secrets in a suit between competitors is unethical.  You can produce them subject to the negotiated protections we will be asking the court to enter (excluding your unnecessary, severe, and inappropriate limitations on expert disclosures), or we will seek sanctions.  Obviously insurance documents are not even the sort of documents that implicate experts in any way. *See In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 655 F. Supp. 3d 899, 935 (N.D. Cal. 2023) (sanctioning Defendants and their counsel over $900,000 for "the systematic, conscious, bad-faith approach they took to this litigation" including the "repeated use of frivolous legal arguments to delay the production of highly probative evidence").

**From:** Miller, Adam <adam.miller@orrick.com>
**Sent:** Tuesday, September 24, 2024 10:50 AM
**To:** Christopher Kinnon <CKinnon@rgrdlaw.com>
**Cc:** Patts, Lenny <lpatts@orrick.com>; Susan Williams <SusanW@rgrdlaw.com>; Jason Forge <JForge@rgrdlaw.com>; Rachel Jensen <RachelJ@rgrdlaw.com>; Jessica Shinnefield <jshinnefield@rgrdlaw.com>; Megan Rossi <MRossi@rgrdlaw.com>; Jack Kelley <JKelley@rgrdlaw.com>; vpitta@pittalaw.com; Katie Woods <KWoods@rgrdlaw.com>; Ariana Gonzales <AGonzales@rgrdlaw.com>; Kramer, James N. <jkramer@orrick.com>; Talarides, Alex <atalarides@orrick.com>; Scott, M. Todd <tscott@orrick.com>; Benton, Megan <mbenton@orrick.com>;

1

rgottlieb@glaserweil.com; epetrossian@glaserweil.com; jyang@glaserweil.com; cbraschi@glaserweil.com
**Subject:** RE: In re Green Dot Corp. Sec. Litig., No. 2:19-cv-10701-DDP (Ex) (C.D. Cal.)

EXTERNAL SENDER
Chris, I am writing to address your demand for the immediate production of the insurance agreements. I'll address the issues relating to the Federal Reserve matters separately.

Defendants' Initial Disclosures, dated June 24, 2024, stated that "Defendants will provide copies of the applicable insurance policies to Lead Plaintiff upon entry of a suitable protective order." You have not objected to that position until your email below, when you purport to demand production of the documents within two business days or else you will file a motion for sanctions. Your position is wrong on the law and inconsistent with your meet-and-confer obligations.

First, caselaw supports Defendants' ability to refuse to produce the documents until a protective order is in place. *Bell v. Nusil Tech. LLC*, 2020 WL 6565258, at *5 (E.D. Cal. Nov. 9, 2020) ("[T]he Court finds Defendants' request for a protective order to be in place prior to production [of insurance agreements subject to Rule 26(a)] to be reasonable."); *Lennard v. Yeung*, 2012 WL 13005998, at *3 (C.D. Cal. May 25, 2012) (ordering defendant to produce insurance policies only after entry of protective order); *Johnson v. United States*, 2018 WL 6136768, at *2 (C.D. Cal. July 10, 2018) (same).

Rather than debating this issue further, however, we suggest a compromise. Green Dot will produce the insurance agreements this week and designate them Confidential if Plaintiffs agree to treat them, immediately upon receipt, as though they are fully subject to the version of the Protective Order that Green Dot has advised that it will ask the Court to enter. As you know, this version of the Protective Order is identical to Plaintiffs' proposal but for the inclusion of Paragraph 12.4 relating to experts. Then, once the Court enters a final Protective Order, the documents would become subject to that version of the Protective Order. Please let me know if this is agreeable.

**Adam Miller**
Senior Counsel
Orrick
Washington, DC
T +1 202-349-7958
adam.miller@orrick.com



---

**From:** Christopher Kinnon <CKinnon@rgrdlaw.com>
**Sent:** Sunday, September 22, 2024 3:26 PM
**To:** Miller, Adam <adam.miller@orrick.com>
**Cc:** Patts, Lenny <lpatts@orrick.com>; Susan Williams <SusanW@rgrdlaw.com>; Jason Forge <JForge@rgrdlaw.com>; Rachel Jensen <RachelJ@rgrdlaw.com>; Jessica Shinnefield <jshinnefield@rgrdlaw.com>; Megan Rossi <MRossi@rgrdlaw.com>; Jack Kelley <JKelley@rgrdlaw.com>; vpitta@pittalaw.com; Katie Woods <KWoods@rgrdlaw.com>; Ariana Gonzales <AGonzales@rgrdlaw.com>; Kramer, James N. <jkramer@orrick.com>; Talarides, Alex <atalarides@orrick.com>; Scott, M. Todd <tscott@orrick.com>; Benton, Megan <mbenton@orrick.com>; rgottlieb@glaserweil.com; epetrossian@glaserweil.com; jyang@glaserweil.com; cbraschi@glaserweil.com
**Subject:** Re: In re Green Dot Corp. Sec. Litig., No. 2:19-cv-10701-DDP (Ex) (C.D. Cal.)

<span style="background-color:red;color:white">**[EXTERNAL]**</span>

Adam, we dispute all the law and purported facts in your letter. If we don't have satisfactory amended interrogatory responses and your insurance documents by 5 pm PT on Tuesday, Sept. 24, we will move to compel both and seek sanctions under Rule 37 for your failure to produce mandatory disclosures.

Thanks,
Chris

On Sep 20, 2024, at 12:49 PM, Miller, Adam <adam.miller@orrick.com> wrote:

 EXTERNAL SENDER
Chris, please see the attached letter regarding the Federal Reserve issues.  Thanks and have a good weekend.

**From:** Christopher Kinnon <CKinnon@rgrdlaw.com>
**Sent:** Friday, August 30, 2024 6:22 PM
**To:** Patts, Lenny <lpatts@orrick.com>; Susan Williams <SusanW@rgrdlaw.com>; Jason Forge <JForge@rgrdlaw.com>; Rachel Jensen <RachelJ@rgrdlaw.com>; Jessica Shinnefield <jshinnefield@rgrdlaw.com>; Megan Rossi <MRossi@rgrdlaw.com>; Jack Kelley <JKelley@rgrdlaw.com>; 'vpitta@pittalaw.com' <vpitta@pittalaw.com>; Katie Woods <KWoods@rgrdlaw.com>; Ariana Gonzales <AGonzales@rgrdlaw.com>
**Cc:** Kramer, James N. <jkramer@orrick.com>; Talarides, Alex <atalarides@orrick.com>; Scott, M. Todd <tscott@orrick.com>; Miller, Adam <adam.miller@orrick.com>; Benton, Megan <mbenton@orrick.com>; 'rgottlieb@glaserweil.com' <rgottlieb@glaserweil.com>; 'epetrossian@glaserweil.com' <epetrossian@glaserweil.com>; 'jyang@glaserweil.com' <jyang@glaserweil.com>; cbraschi@glaserweil.com
**Subject:** RE: In re Green Dot Corp. Sec. Litig., No. 2:19-cv-10701-DDP (Ex) (C.D. Cal.)

**[EXTERNAL]**

Counsel,

Please see the attached correspondence.  Please respond to the open RFP items at your earliest convenience—hopefully by our call next Wednesday 1:00-2:00 PT (which we can confirm; we'll send a calendar invite and number shortly) but no later than Friday, September 6, 2024.

Thanks and have a nice Labor Day.

Best,
Chris

**Christopher Kinnon**

<image001.png>

655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

<image002.gif>

<image003.gif>

<image004.gif>

<image005.gif>

<image006.gif>

---

**From:** Patts, Lenny <lpatts@orrick.com>
**Sent:** Thursday, August 29, 2024 2:21 PM
**To:** Susan Williams <SusanW@rgrdlaw.com>; Jason Forge <JForge@rgrdlaw.com>; Rachel Jensen <RachelJ@rgrdlaw.com>; Jessica Shinnefield <jshinnefield@rgrdlaw.com>; Christopher Kinnon <CKinnon@rgrdlaw.com>; Megan Rossi <MRossi@rgrdlaw.com>; Jack Kelley <JKelley@rgrdlaw.com>; 'vpitta@pittalaw.com' <vpitta@pittalaw.com>; Katie Woods <KWoods@rgrdlaw.com>; Ariana Gonzales <AGonzales@rgrdlaw.com>
**Cc:** Kramer, James N. <jkramer@orrick.com>; Talarides, Alex <atalarides@orrick.com>; Scott, M. Todd <tscott@orrick.com>; Miller, Adam <adam.miller@orrick.com>; Benton, Megan <mbenton@orrick.com>; 'rgottlieb@glaserweil.com' <rgottlieb@glaserweil.com>; 'epetrossian@glaserweil.com' <epetrossian@glaserweil.com>; 'jyang@glaserweil.com' <jyang@glaserweil.com>; cbraschi@glaserweil.com
**Subject:** In re Green Dot Corp. Sec. Litig., No. 2:19-cv-10701-DDP (Ex) (C.D. Cal.)

EXTERNAL SENDER
Counsel,

Attached please find Defendant Green Dot Corporation's Answers and Objections to Plaintiffs' First Set of Interrogatories.

Thanks,
Lenny Patts

**Lenny T. Patts**
Senior Litigation Paralegal Specialist

<image009.jpg>

Orrick
San Francisco
T 415.773.5913
M 707.567.3916
lpatts@orrick.com

<image010.png>

Securities Litigation Blog

---

**From:** Susan Williams <SusanW@rgrdlaw.com>
**Sent:** Tuesday, July 30, 2024 3:57 PM
**To:** Kramer, James N. <jkramer@orrick.com>; Talarides, Alex <atalarides@orrick.com>; Scott, M. Todd <tscott@orrick.com>; Miller, Adam <adam.miller@orrick.com>; Benton, Megan

<mbenton@orrick.com>; 'rgottlieb@glaserweil.com' <rgottlieb@glaserweil.com>; 'epetrossian@glaserweil.com' <epetrossian@glaserweil.com>; 'jyang@glaserweil.com' <jyang@glaserweil.com>; Patts, Lenny <lpatts@orrick.com>
**Cc:** Jason Forge <JForge@rgrdlaw.com>; Rachel Jensen <RachelJ@rgrdlaw.com>; Jessica Shinnefield <jshinnefield@rgrdlaw.com>; Christopher Kinnon <CKinnon@rgrdlaw.com>; Megan Rossi <MRossi@rgrdlaw.com>; Jack Kelley <JKelley@rgrdlaw.com>; 'vpitta@pittalaw.com' <vpitta@pittalaw.com>; Katie Woods <KWoods@rgrdlaw.com>
**Subject:** In re Green Dot Corp. Sec. Litig., No. 2:19-cv-10701-DDP (Ex) (C.D. Cal.) - Interrogatories

[EXTERNAL]

Counsel:

Please see the attached Lead Plaintiff's First Set of Interrogatories to Defendant Green Dot Corporation.

Susan M. Williams
Paralegal
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

<2024-09-20 Letter re FRB Matters.pdf>

**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**