JAMES N. KRAMER (SBN 154709)
jkramer@orrick.com
ALEXANDER K. TALARIDES (SBN 268068)
atalarides@orrick.com
M. TODD SCOTT (SBN 226885)
tscott@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, California 94105
Telephone:   (415) 773-5700
Facsimile:   (415) 773-5759

RICHARD E. GOTTLIEB (SBN 289370)
rgottlieb@glaserweil.com
EMIL PETROSSIAN (SBN 264222)
epetrossian@glaserweil.com
PETER M. BRANSTEN (SBN 113352)
pbransten@glaserweil.com
AYAD MATHEWS (SBN 339785)
amathews@glaserweil.com
GLASER WEIL FINK HOWARD
      JORDAN & SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone: (310) 553-3000
Facsimile: (310) 556-2920

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| IN RE GREEN DOT CORPORATION SECURITIES LITIGATION | Case No. 2:19-cv-10701-FLA-E |
| | <u>CLASS ACTION</u> |
| | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| | Judge: Hon. Fernando L. Aenlle-Rocha |

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................ 1

I.      INTRODUCTION ................................................................................. 1

II.     FACTUAL BACKGROUND ................................................................ 3

    A.   Defendants Disclosed That Green Dot's Product Mix Trend Was Toward Newer Digital Banking Accounts............................................. 5

    B.   Defendants Disclosed That Green Dot's Prepaid Card or "Legacy" Business was Experiencing Declining Growth. ................ 10

    C.   Defendants Disclosed That Green Dot's Newer Digital Banking Products Had Materially Lower Margins than Historically High-Margin Legacy Prepaid Cards. ............................................................ 12

    D.   Defendants Disclosed That Green Dot's "Revenue-and-Fee" Growth Was Slowing. ........................................................................... 13

III.    APPLICABLE LEGAL STANDARDS ...................................................... 14

IV.     ARGUMENT ....................................................................................... 17

    A.   The Court Should Grant Defendants Partial Summary Judgment With Respect to the Four Categories of Information Plaintiffs Wrongly Allege Were Omitted. ....................................................... 17

    B.   The Court Should Reject Plaintiffs' Inevitable Effort to Overcome  the Dispositive Nature of These Admissions. ................. 18

    C.   The Court Should Hold that Plaintiffs' Securities Fraud Claim Will Proceed Only With Respect to the Remaining Alleged Omissions. ........................................................................................ 19

V.      CONCLUSION ................................................................................... 20

i

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*In re Am. Apparel, Inc. S'holder Litig.*,
    855 F. Supp. 2d 1043 (C.D. Cal. 2012).............................................................17

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .........................................................................................15

*Erhart v. BofI Holding, Inc.*,
    612 F. Supp. 3d 1062 (S.D. Cal. 2020) .............................................................16

*Fried v. Lehman Bros. Real Est. Assocs. III, L.P.*,
    2011 WL 1345097 (S.D.N.Y. Mar. 29, 2011).....................................................19

*Grigsby v. BofI Holding, Inc.*,
    979 F.3d 1198 (9th Cir. 2020).............................................................................19

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) .........................................................................................18

*United States ex rel. Hong v. Newport Sensors, Inc.*,
    728 F. App'x 660 (9th Cir. 2018)........................................................................17

*Jimenez v. Haxton Masonry, Inc.*,
    2020 WL 3035797 (N.D. Cal. June 5, 2020) ......................................................15

*In re Keyspan Corp. Sec. Litig.*,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003).................................................................19

*Klein v. Gen. Nutrition Co., Inc.*,
    186 F.3d 338 (3d Cir. 1999) ...............................................................................11

*Lahoti v. VeriCheck, Inc.*,
    586 F.3d 1190 (9th Cir. 2009)............................................................................16

*Lies v. Farrell Lines, Inc.*,
    641 F.2d 765 (9th Cir. 1981)...............................................................................15

*Magic Link Garment Ltd. v. ThirdLove, Inc.*,
    445 F. Supp. 3d 346 (N.D. Cal. 2020)................................................................15

*McGovney v. Aerohive Networks, Inc.*,
    367 F. Supp. 3d 1038 (N.D. Cal. 2019)..............................................................20

ii

# <u>TABLE OF AUTHORITIES (CONTINUED)</u>

**Cases**                                                                                          **Page(s)**

*In re Metro. Sec. Litig.*,
   532 F. Supp. 2d 1260 (W.D. Wash. 2007) .................................................................. 19

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ...................................................................................... 20

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010) ...................................................................................... 15

*Par Investment Partners, LP v. Aruba Networks, Inc.*,
   681 F. App'x 618 (9th Cir. 2017) ............................................................................... 20

*In re Progress Energy, Inc.*,
   371 F. Supp. 2d 548 (S.D.N.Y. 2005) ........................................................................ 20

*Ret. Tr. v. RH, Inc.*,
   302 F. Supp. 3d 1028 (N.D. Cal. 2018) ..................................................................... 17

*Rojas v. Target Corp.*,
   2016 WL 11744739 (C.D. Cal. Apr. 5, 2016) ........................................................... 16

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
   485 F. Supp. 3d 1113 (N.D. Cal. 2020) ..................................................................... 20

*Tadros v. Celladon Corp.*,
   738 F. App'x 448 (9th Cir. 2018) ............................................................................... 20

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
   2017 WL 6041723 (N.D. Cal. Dec. 6, 2017) ..................................................... 16, 20

*In re Worlds of Wonder Sec. Litig.*,
   35 F.3d 1407 (9th Cir. 1994) ...................................................................................... 11

*Wynn v. Chanos*,
   75 F. Supp. 3d 1228 (N.D. Cal. 2014) ....................................................................... 17

iii

# **TABLE OF AUTHORITIES (CONTINUED)**

**Statutes and Rules**                                                                    **Page(s)**

15.U.S.C.
  § 78j(b), Exchange Act Section 10(b) ...........................................................*passim*

17 C.F.R.
  § 240.10b-1, SEC Rule 10b-5 ..............................................................................4

Civ. L.R.
  Rule 7-3 ..............................................................................................................2

Fed. R. Civ. P.
  Rule 1...................................................................................................................3
  Rule 36.......................................................................................................*passim*
  Rule 36(b) .........................................................................................................16
  Rule 56........................................................................................................1, 15
  Rule 56(a) .........................................................................................................15
  Rule 56(c)(1).....................................................................................................16
  Rule 56(g) .............................................................................................15, 20, 21

Fed. R. Evid.
  Rule 201(b)(2) ..................................................................................................17

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

By this motion, Defendants[1] seek partial summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Partial summary judgement is sought because Plaintiffs' case is premised on the accusation that Defendants misled investors by failing to disclose Green Dot's changing product mix and its impact on Green Dot's business. *See, e.g.*, Amended Complaint ("AC"), ¶¶ 3, 36 (ECF No. 83). However, this accusation has now been disproven by the discovery taken to date and documents of which the Court may take judicial notice, which establish that Defendants in fact did disclose those changes.

The core facts at issue here are now uncontested. In dozens of written admissions to Defendants' Rule 36 requests, Plaintiffs have conceded that Defendants' Class Period statements—detailed in transcripts of quarterly "earnings calls" between Defendants and stock market analysts, as well as in publicly-filed SEC reports—included *four significant categories* of information that the Amended Complaint alleges was omitted. These disclosures, now admitted, modify the genuine issues of material fact and otherwise severely undermine Plaintiffs' lawsuit by resolving in Defendants' favor several significant factual allegations. Moreover, as further shown below, Plaintiffs have also admitted that the precise disclosures of facts were so plainly known to the market that they were included in reports by stock market analysts that followed the Company.[2]

---

[1] "Defendants" refers to defendants Green Dot Corporation (individually, "Green Dot" or the "Company"), and former executives Steven W. Streit (individually, "Streit") and Mark Shifke (individually, "Shifke"). The "Individual Defendants" refers collectively to Messrs. Streit and Shifke. "Plaintiffs" refers to (i) lead plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund and (ii) Teamsters Local Union No. 727 Pension Fund.

[2] Much of this evidence is not "new" and has long been part of the public record. Indeed, it was part of Defendants' motion to dismiss. However, the Court did not consider the disclosures at that time because it determined that the documents reflecting them were not appropriate for consideration at the pleading stage. *See* ECF

This motion *should* have been unnecessary. On multiple occasions, and as more fully explained in the motion for leave to file this motion, Defendants have sought to streamline this outsized lawsuit and reduce the discovery burdens of both parties by engaging Plaintiffs in a meaningful exchange of information designed to demonstrate that Defendants disclosed the changing product mix of the Company. In making such proposals to Plaintiffs, Defendants explained that the process would facilitate an early resolution of the case by narrowing the allegations in dispute, focusing the remaining litigation (including discovery, motion practice, and trial), and facilitating more productive settlement negotiations. Rather than meaningfully engage with Defendants, as Local Civil Rule 7-3 and this Court's standing order each require,[3] Plaintiffs repeatedly refused, relying largely on the denial of the motion to dismiss. *See* Defendants' Memorandum in Support of Motion for Leave to File Motion for Partial Summary Judgment (ECF No. 153-1) at 4-5; Declaration of M. Todd Scott in Support of Motion for Leave (ECF No. 154), ¶¶ 8-16.

Plaintiffs' refusal to acknowledge the impact of their discovery admissions does not change the basic and now uncontested facts. Specifically, Plaintiffs no longer dispute that the quarterly earnings call transcripts upon which Defendants rely (the same ones Plaintiffs cite throughout their operative complaint) are authentic, that

---

No. 102 at 6–8. Now, however, Defendants have utilized the discovery process to confirm many of the critical disclosures via Rule 36 admissions. Also, all of those disclosures plus several others offered for background purposes (such as pre-Class Period disclosures) are also appropriately subject to judicial notice, as explained herein and in the accompanying Request for Judicial Notice. Combined, the Rule 36 admissions and the judicially noticeable facts leave no genuine issue of material fact that Defendants disclosed the very information Plaintiffs accused them of failing to disclose.

[3] In relevant part Local Civil Rule 7-3 provides that, counsel contemplating the filing of any motion must first contact opposing counsel to discuss thoroughly, preferably in person, the substance of the contemplated motion and any potential resolution. Likewise, under this Court's standing order, "the Court expects counsel to resolve discovery problems among themselves in a courteous, reasonable and professional manner."

MP&A IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants did in fact make the disclosures at issue, that this information was received by the stock market analysts as reflected in their reports, and that there are no other facts bearing upon whether Defendants disclosed these facts.

As detailed below, this motion is directed to most, but not all, of Plaintiffs' alleged omissions, and therefore seeks *partial* summary judgment in the form of an order that: (i) there is no genuine issue of material fact that the four categories of disclosures identified below were made, and (ii) as a result, there was no securities fraud with respect to those alleged statements or omissions.[4]

To resolve this motion, the Court need not pass upon whether those specific disclosures were accurate, whether the Defendants had a particular mental state, whether investors relied upon the disclosures, or anything else. Instead, the Court need only determine that Defendants did in fact make the very disclosures Plaintiffs claim were concealed. Plaintiffs should not be permitted to force Defendants to defend further against allegations that they failed to disclose information that Plaintiffs now concede was repeatedly disclosed. By ruling now on this narrowly tailored and targeted motion, the Court streamlines the remainder of fact and expert discovery and facilitates the resolution of this case, thereby promoting a more "just, speedy, and inexpensive determination" of the action. Fed. R. Civ. P. 1.

## II.    FACTUAL BACKGROUND

Plaintiffs' Amended Complaint is based on the now *demonstrably false* premise that Defendants defrauded investors by "repeatedly" making "misleading statements concerning the value of Green Dot's prepaid customers and business, the scope of the decline in its prepaid business, and the effect of and reason for its shift to digital and direct deposit accounts." Amended Complaint ("AC") ¶ 3. Plaintiffs

---

[4] While Plaintiffs' allegations are broader, Defendants limit this motion to those factual allegations that Plaintiffs have now expressly admitted. While Defendants assert there are legal reasons why the remaining "omissions" do not give rise to a valid securities fraud claim, those issues are not yet ripe and so are reserved for another day.

3

allege that these misleading statements took place between May 9, 2018 and November 7, 2019 (the "Class Period"), *id.* ¶ 103, and that Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5. *Id.* ¶¶ 110–118.

Green Dot is a financial technology and banking services company that went public in 2010. AC ¶ 20. It was initially focused on selling prepaid debit cards that were marketed to various consumers that earn less than $75,000, including those that were new to banking, underbanked, or without bank accounts. *Id.* ¶¶ 17–18. Although those "one and done" cash cards typically have higher fees and yield higher profit margins than traditional banking accounts, they tend to have a much shorter account lifespan. *Id.* ¶¶ 19, 23. Green Dot typically refers to those prepaid debit cards as its "legacy business" or "established business lines." *See, e.g.*, SUF No. 10 (citing Ex. G (2/21/18 EC Tr.) at 16).[5]

Plaintiffs' lawsuit alleges that, "between May 2018 and November 2019, Defendants misled investors about declining growth in Green Dot's legacy prepaid debit card business and diverted investor attention from this 'bread and butter' product to BaaS [banking as a service] and direct-deposit accounts, even though the vast majority of such accounts were offered with no fees." AC ¶ 34; *see also id.,* ¶¶ 3, 36 (to same effect). Overall, Plaintiffs allege that Defendants made 39 oral statements, on six quarterly earnings calls and at one industry conference, that were misleading because they failed to disclose certain specific negative information about Green Dot's business, and fault Defendants in each instance for supposedly failing to disclose the following four categories of information:

[5] "SUF" refers to the accompanying Statement of Uncontroverted Facts in Support of Defendants' Motion for Partial Summary Judgment. "Pl. Adm." refers to Plaintiffs' responses to specific Rule 36 Requests for Admission. "Ex." Refers to the exhibits to the accompanying Declaration of Alexander K. Talarides. And "EC Tr." refers to the various earnings call transcripts, which are noted with their dates. Some of the exhibits to the Talarides Declaration are lengthy, but the Court need not review those documents in full.  The citations herein and in the accompanying SUF identify the specific relevant passages of each document, and those passages are highlighted in the exhibits.

MP&A IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1.    That Green Dot's "product mix trend" was moving away from legacy pre-paid cards toward newer digital banking accounts. (AC ¶¶ 41, 43, 47, 49, 51, 54, 57, 60, 62).

2.    That the "growth rate of Green Dot's legacy, high-margin prepaid card business was declining." *Id.* ¶¶ 39, 43, 47, 49, 54, 57, 60, 62.

3.    That "direct-deposit accounts were not generating the high-margin card fees of legacy prepaid accounts." *Id.* ¶¶ 41, 43, 47, 49, 54, 57, 60.

4.    That "the per-unit economics of Green Dot's active accounts was part of a product-mix trend that was reversing card-revenue-and-fee-growth." *Id.* ¶¶ 41, 43, 47, 49, 51, 54, 57, 60, 62.

But the now uncontested facts reveal an entirely different story. As detailed below, Plaintiffs' Rule 36 admissions and documents subject to judicial notice definitively establish that Defendants repeatedly disclosed precisely these four categories of information, and that the stock market analysts who followed Green Dot reported that Defendants had made these disclosures.

### A.   <u>Defendants Disclosed That Green Dot's Product Mix Trend Was Toward Newer Digital Banking Accounts.</u>

Selectively quoting from various earnings call transcripts, Plaintiffs' Amended Complaint repeatedly alleges that Defendants, during the Class Period, effectively hid the ball from investors about its changing business model. *See, e.g.*, AC ¶¶ 3, 28, 33–36, 38–42, 46–50, 53–54, 57, and 60–61. Plaintiffs likewise allege that these statements had the desired effect of misleading the market as reflected in contemporaneous analyst reports. *Id.* ¶ 24, 44–45, 52, 55, and 58. As shown below, however, Plaintiffs now concede through answers to Requests for Admissions that Green Dot in fact disclosed in the very same earnings calls the company's changing business model starting long before the Class Period began, and continued to disclose its changing product mix and reduced margins throughout such period as it shifted to newer technologies and consumer demands.

5

Starting in 2015, Green Dot announced "a number of new products and initiatives that [it] expect[ed] to generate positive results," including direct deposit accounts that could be digitally reloaded, like traditional banking accounts. *See* SUF No. 1 (citing Ex. A (11/5/15 EC Tr.) at 5). And, in 2016, Green Dot reported strong enrollment in direct deposit accounts, with "growth as both a percentage of [total] active cards and growth in the absolute number of direct deposit accounts." SUF No. 2 (citing Ex. B (11/9/16 EC Tr.) at 5).

If there were any doubt whatsoever of Green Dot's changing product mix, the Company disclosed the *continued growth of direct deposit accounts* as a percentage of total active cards for each of the four quarters in 2017, the year before the purported Class Period:

- First Quarter of 2017: "[D]irect deposit penetration as a percentage of active accounts is up 44%, continuing the trend of increasing direct deposit penetration that we saw all throughout last year." SUF No. 4 (citing Ex. C (5/9/17 EC Tr.) at 5).

- Second Quarter of 2017: "[O]ur direct deposit active base continues to soar, with record year-over-year consolidated growth of a whopping 83% in accounts receiving direct deposit, with 75% of all card loads coming from direct deposit in the quarter." SUF No. 5 (citing Ex. D (8/8/17 EC Tr.) at 5.

- Third Quarter of 2017: "[T]he percentage of active cards receiving direct deposit was up a spectacular 90% year-over-year." SUF No. 7 (citing Ex. F (11/7/17 EC Tr.) at 4.

- Fourth Quarter of 2017: "[A]ctive accounts receiving direct deposit, gr[ew] by 21% in the quarter" as part of a "***continuing long-term portfolio mix shift towards higher lifetime value accounts***." SUF No. 14, Pl. Adm. No. 5 (citing Ex. G (2/21/18 EC Tr.) at 5 (emphasis added)).

6

In 2017, Green Dot also disclosed its new "Banking as a Service, or 'BaaS Platform,'" *see* SUF No. 6, Pl. Adm. No. 10 (citing Ex. E (11/7/17 SEC Form 8-K) at 4), and likewise provided updates about growth in BaaS accounts in the quarters leading up to the Class Period:

- Discussing Green Dot's "increasingly important and relevant Banking as a Service, or BaaS Platform, . . . with Intuit in a new partnership, where they're using [its] BaaS Platform," and "another of [its] Banking as a Service partnerships, Apple Pay Cash." SUF No. 8 (citing Ex. F (11/7/17 EC Tr.) at 4-5.

- Green Dot "had multiple new Banking as a Service program wins." SUF No. 15 (citing Ex. G (2/21/18 EC Tr.) at 4).

- Green Dot began offering its new "Banking as a Service" platform, or BaaS, where Green Dot partners with other companies to develop their own digital banking services to distribute to their customers, such as with Apple Pay.[6] *See* SUF No. 6, Pl. Adm. No. 10 (citing Ex. E (11/7/17 SEC Form 8-K) at 4).

Although Green Dot had made its changing business model abundantly clear by 2018, Plaintiffs now admit that the Company continued to disclose to investors and the market its evolving product mix shortly before and throughout the Class Period.

On its February 21, 2018 quarterly earnings call for Q4 2017, Green Dot executives shared that the growth of the Company's newer digital services was enabling Green Dot to "***continue[] to successfully evolve from*** what used to be largely a monoline, single channel model of ***selling prepaid cards*** … ***into a*** … ***technology-forward branchless bank*** that offers ***many products and services***

---

[6] Green Dot generally referred to its direct deposit and BaaS programs, along with other newer digital banking products, as its "newer" products and services, in contrast to its legacy prepaid cards.

directly to consumers and through enterprise-level partnerships via our Banking as a Service platform." SUF No. 11, Pl. Adm. No. 8 (citing Ex. G (2/21/18 EC Tr.) at 9 (emphasis added)). The Company further disclosed that for FY 2018, "*we intend to focus on attracting … consumer segments who are more likely to enroll in direct deposit*," SUF No. 16, Pl. Adm. No. 6 (citing Ex. G (2/21/2018 EC Tr.) at 6 (emphasis added)), and expected the newer products and services to become "more and more material," as time went on, SUF No. 17, Pl. Adm. No. 7 (citing Ex. G (2/21/2018 EC Tr.) at 16).

Defendants' transparency about Green Dot's product mix shift continued during the Class Period. For example, Plaintiffs now admit that:

- On May 9, 2018, CEO Steve Streit disclosed in an earnings call that Green Dot was experiencing "ongoing momentum in [its] efforts to attract and retain direct deposit accounts," SUF No. 21, Pl. Adm. No. 33 (citing Ex. I (5/9/28 EC Tr.) at 5), and had "increase[ed] the number of accounts receiving direct deposit by 930,000 on a year-over-year basis." SUF No. 20, Pl. Adm. No. 32 (citing Ex. I (5/9/2018 EC Tr.) at 7)). Streit explained that this was part of Green Dot "*continuing [its] long-term portfolio mix shift* towards higher lifetime value accounts," SUF No. 22, Pl. Adm. No. 34 (citing Ex. I (5/9/2018 EC Tr.) at 5 (emphasis added)). He also stated that "the mix of customers receiving direct deposit of funds grew substantially … such that now approximately 1/2 of all our active accounts received direct deposit in the quarter." SUF No. 23, Pl. Adm. No. 35 (citing Ex. I (5/9/2018 EC Tr.) at 9).

- On May 16, 2018, CFO Mark Shifke discussed at the JP Morgan Conference how Green Dot was "focusing on [its] direct deposit customer base," and that "[n]ow about 80% of [its] [volume] comes from direct deposit" and "*[n]early 50% of [its] active customers are on*

8

*direct deposit*.” SUF No. 32 (citing Ex. M (5/16/18 JP Morgan Conf. Tr.) at 10 (emphasis added)).

- On August 8, 2018, Streit made clear that the “portfolio mix [was] mov[ing] more *towards direct deposit customers as a percentage of total* and *away from one-and-dones*.” SUF No. 36, Pl. Adm. No. 75 (citing Ex. O (8/8/18 EC Tr.) at 12 (emphasis added)). He also informed investors that, of the 700,000 active accounts the Company added year-over-year for the quarter, “approximately 500,000 were new direct deposit accounts.” SUF No. 35, Pl. Adm. No. 76 (citing Ex. O (8/18/18 EC Tr.) at 5).

- On November 7, 2018, Streit disclosed that “the number of active accounts receiving direct deposit grew by 13% year-over-year,” with “a 2-year growth rate of 33% in actives and 114% in direct deposit actives” year-over-year. SUF Nos. 38-39, Pl. Adm. Nos. 99-100 (citing Ex. Q (11/7/18 EC Tr.) at 6).

- On February 20, 2019, Streit noted the “mix shift towards direct deposit,” and stated that “the number of active accounts receiving direct deposit grew by 10% year-over-year,” despite total actives growing only “1% year-over-year.” SUF No. 45, Pl. Adm. No. 118 (citing Ex. U (2/20/19 EC Tr.) at 5); SUF No. 46 (citing Ex. U (2/20/19 EC Tr.) at 5).

- On May 8, 2019, Streit stated that the “new product lines, primarily consisting of BaaS programs, contributed over 420,000 new active accounts” year-over-year. SUF No. 48, Pl. Adm. No. 137 (citing Ex. X (5/8/19 EC Tr.) at 5).

Contrary to Plaintiffs’ allegations, Plaintiffs now admit that market analysts reported that Green Dot’s product mix was moving away from legacy prepaid cards. For instance, on May 10, 2018, Morgan Stanley reported to investors that “GDOT’s adjusted EBITDA margins compressed 240 bps YoY during the quarter due to *mix*

9

*shift* towards newer branded product lines and BaaS program launches that come with upfront expenses." SUF No. 29, Pl. Adm. No. 55 (citing Ex. L (5/10/18 Morgan Stanley Report) at 2). On July 10, 2018, Jefferies Group reported to investors that Green Dot "is amid a ***fundamental shift in terms of its business model*** (e.g., focus on BaaS)." SUF No. 34, Pl. Adm. No. 65 (citing Ex. N (7/10/18 Jefferies Group LLC Report) at 3). On November 7, 2018, an analyst for William Blair & Co., Robert Napoli, stated on the Company's earnings call that Green Dot's "business is changing so rapidly." SUF No. 40, Pl. Adm. No. 102 (citing Ex. Q (11/7/18 EC Tr.) at 11).

### B.   Defendants Disclosed That Green Dot's Prepaid Card or "Legacy" Business was Experiencing Declining Growth.

Green Dot regularly disclosed the "number of active accounts," a "key metric" reported in each of the company's quarterly and annual reports that includes "any bank account" within Green Dot. SUF No. 27 (citing Ex. K (5/10/18 SEC Form 10-Q) at 29 and Ex. Y (5/9/19 SEC Form 10-Q) at 27). Throughout the Class Period, the Company continued to disclose the total number of active accounts, and the growth in active accounts on a year-over-year basis. *See, e.g.*, SUF No. 12, Pl. Adm. No. 5 (citing Ex. G (2/21/18 EC Tr.) at 5). There is no allegation that these disclosures were inaccurate. During the Class Period, the numbers plainly showed declining year-over-year growth:

| Quarter Ended | Active Accounts | % Change Y/Y |
|---|---|---|
| Q1 2018 | 6.01 M | +19% |
| Q2 2018 | 5.86 M | +14% |
| Q3 2018 | 5.43 M | +4% |
| Q4 2018 | 5.34 M | +1% |
| Q1 2019 | 6.05 M | +1% |
| Q2 2019 | 5.66 M | -1% |
| Q3 2019 | 5.18 M | -5% |

*See* SUF No. 49 (citing Ex. AA (11/7/19 SEC Form 8-K) at 6); SUF No. 28, Pl. Adm. No. 29 (citing Ex. K (5/10/18 SEC Form 10-Q) at 29); SUF No. 37, Pl. Adm. No. 74 (citing Ex. P (8/9/18 SEC Form 10-Q) at 30).

10

These disclosures, coupled with Green Dot alerting investors before and during the Class Period that its newer products were comprising a larger and larger share of total active accounts, indisputably show that Defendants disclosed that the Company's "legacy" business was slowing.[7] Plaintiffs admit as much in the Amended Complaint, citing Green Dot's Class Period disclosure about the "decline in Green Dot's 'legacy prepaid' business" as a "corrective disclosure." AC ¶ 72.

Plaintiffs also now admit that market analysts duly reported that the growth rate of Green Dot's legacy prepaid card segment was diminishing. For instance, on November 7, 2018, Deutsche Bank reported to investors that as "[c]ard attrition pick[ed] up[,] *[a]ctive card growth moderated to 3% Y/Y* in 3Q18, which the [C]ompany blamed on difficult comps in September and reiterated mid-single-digit growth for 4Q18 and going forward. However, we would highlight that *net active cards declined 430K from 2Q to 3Q*, which the [C]ompany attributed to normal seasonality and highlighted 250K direct deposit additions in the quarter." SUF No. 41, Pl. Adm. No. 109 (citing Ex. R (11/7/18 Deutsche Bank Report) at 1). Likewise, consistent with the disclosures, on February 20, 2019, Cowen & Co. reported to investors that Green Dot's "[a]ctive accounts growth was ~1%, a *deceleration* from 3Q18's ~3%, reflecting higher conversion of active accounts to direct deposit active accounts." SUF No. 47, Pl. Adm. No. 121 (citing Ex. V (2/20/19 Cowen & Co. Report) at 1).

---

[7] The "[f]ederal securities laws do not require a company to state the obvious," *Klein v. Gen. Nutrition Co., Inc.*, 186 F.3d 338, 343 (3d Cir. 1999), and these disclosures make it obvious that the growth rate of the legacy prepaid card segment was diminishing. There were only two parts of this pie—high margin legacy prepaid cards and lower margin newer products. If the overall pie (active accounts) was getting smaller and the newer product segment was getting larger, then there is no way to escape the fact that the legacy product segment was necessarily getting smaller. *See also In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1418 (9th Cir. 1994) ("[i]t is not a violation of any securities laws to fail to disclose a result that is obvious" (quoting *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1220 (9th Cir. 1980)).

11

## C.      Defendants Disclosed That Green Dot's Newer Digital Banking Products Had Materially Lower Margins than Historically High-Margin Legacy Prepaid Cards.

Plaintiffs further now admit that, both before and during the Class Period, Green Dot disclosed to investors that its newer digital banking products had materially lower profit margins than the legacy "one and done" prepaid cards.

As early as May 9, 2017, CEO Streit referenced in an earnings call the "lower margin of the [Company's] new revenue." SUF No. 3 (citing Ex. C (5/9/17 EC Tr.) at 15). Approximately nine months later, during Green Dot's February 21, 2018 earnings call, Defendants further clarified that "the margins on some of [Green Dot's] new BaaS programs are *materially lower* than those of [its] established and at scale legacy product lines." SUF No. 18, Pl. Adm. No. 14 (citing Ex. G (2/21/18 EC Tr.) at 7 (emphasis added)). Then on February 27, 2018, Green Dot warned in its 2017 SEC annual report that the "margins for new products and services may not be as high as the margins we have experienced in the past," SUF No. 19, Pl. Adm. No. 2 (citing Ex. H (2/27/18 SEC Form 10-K) at 13).

As Plaintiffs now admit, Green Dot continued to disclose that same information during the Class Period. For example, at the outset of the Class Period, Defendants made plain that "*[o]ur new product lines currently have margins below our established product lines*," SUF No. 30, Pl. Adm. No. 26 (citing Ex. K (5/10/18 SEC Form 10-Q) at 28 (emphasis added)), that there was no "*expectation that margins*" on the new business lines would "*ever be as rich as [Green Dot's] legacy products*," SUF No. 33, Pl. Adm. No. 40 (citing Ex. I (5/9/18 EC. Tr.) at 23 (emphasis added)), and that "*expanded margins on [Green Dot's] established product lines [were] being offset by the materially lower margins generated on [its] large-scale new product lines*," *id.* at 7 (emphasis added); *see* SUF No. 24, Pl. Adm. No. 40 (citing Ex. I (5/9/18 EC. Tr.) at 10) at 10 (citing the "lower-margin revenue from our new product lines"), SUF No. 25, Pl. Adm. No. 38 (citing Ex. I (5/9/18 EC. Tr.) at 4 (the "newer branded product lines . . . *have a much lower contribution margin than*

12

*our established product lines*.") (emphasis added)).

Green Dot continued to disclose the lower margins of its newer digital products during the Class Period in quarterly filings and on earnings calls. *See* SUF No. 37 (citing Ex. P (8/9/18 SEC Form 10-Q) at 44 ("operating margins for new products and services may not be as high as the margins we have experienced in the past")); SUF No. 42 (citing Ex. Q (11/7/18 EC Tr.) at 17 (BaaS programs "contribute at a lower margin than [the Company's] established programs")); SUF No. 44 (citing Ex. T (11/8/18 SEC Form 10-Q) at 46 ("operating margins for new products and services may not be as high as the margins [the Company] ha[d] experienced in the past")).

As with the Company's product mix shift and the decline in legacy business, market analysts reported, based on Defendants' disclosures, that the Company's new products had lower margins than legacy prepaid cards. As Plaintiffs admit, on May 9, 2018, Deutsche Bank reported to investors that Green Dot's "EBITDA margins declined y-o-y in 1Q18 and came in below expectations and [C]ompany guided to 2Q18 EBITDA significantly below street estimates potentially due to *lower contribution margin for new programs*." SUF No. 26, Pl. Adm. No. 43 (citing Ex. J (5/9/18 Deutsche Bank Report) at 1 (emphasis added)). A few months later, on November 7, 2018, William Blair & Co. reported to investors that the "*margins on the BaaS business are below the corporate average* currently due to heavy investment" and that "[m]anagement's commentary suggests *newer initiatives initially have lower margins* but ramp up as customer usage grows." SUF No. 43, Pl. Adm. No. 103 (citing Ex. S (11/7/18 William Blair & Co. Report) at 1-2).

### D.    Defendants Disclosed That Green Dot's "Revenue-and-Fee" Growth Was Slowing.

Green Dot also disclosed that revenue and fee growth rates were slowing. In fact, "card revenues and other fees" was a "key component" of Green Dot's results that it reported in each of its quarterly and annual filings, and those disclosures clearly showed that card revenue and fee growth rates were declining throughout the Class

Period, as follows:

| Quarter Ended | Card Revenue and Other Fees | % Change Y/Y |
| --- | --- | --- |
| Q1 2018 | 130,060 | +29% |
| Q2 2018 | 120,783 | +13% |
| Q3 2018 | 113,474 | +13% |
| Q4 2018 | 118,564 | +12% |
| Q1 2019 | 129,577 | -0.4%% |
| Q2 2019 | 121,613 | +0.7% |
| Q3 2019 | 102,231 | -10% |

*See* SUF No. 50 (citing Ex. W (2/26/19 SEC Form 10-K) at 31; Ex. Y (5/9/19 SEC Form 10-Q) at 2; Ex. Z (8/9/19 SEC Form 10-Q) at 2; Ex. AA (11/7/19 SEC Form 8-K) at 12.

As before, Plaintiffs admit the reality of these Class Period disclosures. In fact, they highlight the "decline in Green Dot's prepaid card product line" in a graph in the Amended Complaint, the data in which was disclosed throughout the Class Period (not merely after the fact as Plaintiffs falsely imply). *See* AC ¶ 80.[8]

## III.    APPLICABLE LEGAL STANDARDS

Summary judgment is proper when "there is no genuine dispute as to any material fact" and Defendants are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendants must either negate with evidence an element of Plaintiffs' claim or show that Plaintiffs lack enough evidence to create a triable issue as to that element. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

---

[8] The demonstrably false omission allegations identified above are together referred to as the "false omission allegations," and for the Court's ease of reference are highlighted in red on Exhibit DD to the Talarides Declaration. The handful of omissions allegations that are not immediately proven false by Green Dot's public disclosures are highlighted in yellow.

14

The same holds true on motions for *partial* summary judgment. "Rule 56 authorizes a summary adjudication that . . . fall[s] short of a final determination, even of a single claim." *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981). Rule 56(a) specifies that a motion for summary judgment should "identify[] each claim or defense—or the ***part of*** each claim or defense—on which summary judgment is sought." In fact, Rule 56(g) states that the Court "may enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case." *See Magic Link Garment Ltd. v. ThirdLove, Inc.*, 445 F. Supp. 3d 346, 356 (N.D. Cal. 2020) ("[W]ithout granting summary judgment of an entire claim, courts may rely upon Rule 56 to determine certain facts or elements of a claim as established and thereby dispose of the need to adjudicate them at trial.").

The Court thus has the power to grant summary judgment as to Plaintiffs' false omission allegations even where doing so does not entirely dispose of Plaintiffs' Section 10(b) claim. *See, e.g.*, *Jimenez v. Haxton Masonry, Inc.*, 2020 WL 3035797, at *1 (N.D. Cal. June 5, 2020) (granting motion for partial summary judgment only insofar as claims arose from allegations of work performed at federal enclaves); *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1202 n. 9 (9th Cir. 2009) ("Although Vericheck must prove all the requisite elements to recover under the [statute], … the district court may render partial summary judgment on those facts, including bad faith, not genuinely at issue"); *Rojas v. Target Corp.*, 2016 WL 11744739, at *3 (C.D. Cal. Apr. 5, 2016) (granting partial summary judgment motion attacking allegations concerning non-compliant wage statements); *Erhart v. BofI Holding, Inc.*, 612 F. Supp. 3d 1062, 1114 n.23 (S.D. Cal. 2020) (granting request for partial summary judgment on allegation regarding altered Bank Secrecy Act reports).

Likewise, the Court may grant partial summary judgment with respect to alleged misrepresentations or omissions of material fact. For example, in *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2017 WL 6041723 (N.D. Cal. Dec. 6, 2017), after Volkswagen entered into criminal plea

15

agreements admitting certain conduct, Judge Breyer granted *partial* summary judgment to a securities class action plaintiff as to both the falsity of challenged statements and to defendant's scienter even though those findings did not entirely resolve Plaintiffs' Section 10(b) claims. *Id.* at \*4.

Like criminal plea agreements, matters admitted in response to Rule 36 requests are "conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b). Here, Defendants may show that they are entitled to summary judgment on Plaintiffs' omission allegations by relying on Plaintiffs' own admissions regarding the existence of Green Dot's disclosures during the Class Period. *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to … *admissions*.") (emphasis added). Indeed, because "[e]vidence inconsistent with a Rule 36 admission is properly excluded," summary judgment may be granted solely based on Rule 36 admissions even where other evidence might contradict those admissions. *999 v. C.I.T. Corp.*, 776 F.2d 866, 869-70 (9th Cir. 1985).

In addition, the existence and content of the public disclosures that defeat Plaintiffs' false omission allegations are subject to judicial notice, as the fact of the disclosures "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see also United States ex rel. Hong v. Newport Sensors, Inc.*, 728 F. App'x 660, 661 (9th Cir. 2018) (affirming taking of judicial notice of documents "not for the truth of the information contained within [the documents], but merely to show that the information was publicly available" (internal quotation marks omitted)).[9]

---

[9] As more fully explained in the accompanying Request for Judicial Notice in Support of Defendants' Motion for Partial Summary Judgment, Green Dot's SEC filings and the earnings call transcripts are the types of documents of which courts frequently take judicial notice. *See, e.g.*, *Wynn v. Chanos*, 75 F. Supp. 3d 1228, 1235 (N.D. Cal. 2014) ("SEC forms such as a Form 8-K or Form 10-K are matters of public record and may be subject to judicial notice."); *City of Miami Gen. Emps.' & Sanitation*

MP&A IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Whether based on Plaintiffs' admissions in discovery or the judicial notice doctrine, the result is the same. Defendants are not asking the Court to adjudicate the truth of the Defendants' public statements, only to acknowledge the indisputable fact that they were made. Put another way, the SEC reports and the earnings call transcripts say what they say, and nothing more is necessary to show that many of Plaintiffs' omission allegations are flat wrong. The Court did not consider these contradictions when ruling on the motion to dismiss, but at this stage of the case they are properly presented and not in genuine dispute.

## IV.   **ARGUMENT**

### A.   **The Court Should Grant Defendants Partial Summary Judgment With Respect to the Four Categories of Information Plaintiffs Wrongly Allege Were Omitted.**

To state a claim under Section 10(b) of the Exchange Act, Plaintiffs must show: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (citations omitted). This motion focuses on the threshold element, that is, whether Defendants made the challenged misrepresentations or omissions.

As shown above, Defendants disclosed each of the following four identified categories of information that Plaintiffs claim constitute actionable misrepresentations or omissions of fact:

*First*, as demonstrated in Section II(A), Defendants disclosed that Green Dot's "product mix trend" was moving away from legacy pre-paid cards toward newer

---

*Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1033 n.1 (N.D. Cal. 2018) (court may "properly take judicial notice of . . . earnings call transcripts … under Federal Rule of Evidence 201(b)(2)"). Courts "take[] judicial notice of only of the ***existence and contents*** of the SEC filings, not the truth of information contained in them." *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1062 n.143 (C.D. Cal. 2012) (emphasis added).

17

digital banking accounts. *Compare* AC ¶¶ 41, 43, 47, 49, 51, 54, 57, 60, 62; *with* SUF Nos.1-2, 4-8, 11, 14-17, 20-23, 29, 32, 34-35, 38-40, 45-46, 48.

*Second,* as shown in Section II(B), Defendants disclosed that the "growth rate of Green Dot's legacy, high-margin prepaid card business was declining." *Compare* AC ¶¶ 39, 43, 47, 49, 54, 57, 60, 62; *with* SUF Nos. 12, 27-28, 37, 41, 47, 49.

*Third,* as demonstrated in Section II(C), Defendants disclosed that "direct-deposit accounts were not generating the high-margin card fees of legacy prepaid accounts." *Compare* AC ¶¶ 41, 43, 47, 49, 54, 57, 60; *with* SUF Nos. 3, 18-19, 24-26, 30, 33, 37, 42-44.

*Fourth,* as shown in Section II(D), Defendants disclosed that "the per-unit economics of Green Dot's active accounts was part of a product-mix trend that was reversing card-revenue-and-fee-growth." *Compare AC* ¶¶ 41, 43, 47, 49, 51, 54, 57, 60, 62; *with* SUF No. 50.

As a result, Defendants are entitled to partial summary judgment concerning Plaintiffs' allegations that they failed to make these disclosures.

**B.      The Court Should Reject Plaintiffs' Inevitable Effort to Overcome the Dispositive Nature of These Admissions.**

Plaintiffs may argue that the Court must first review the *other* disclosures and statements before granting partial summary judgment with respect to these specific disclosures. This argument fails for the simple reason that there is no longer any question that Defendants disclosed the very information Plaintiffs alleged was concealed with respect to these four categories. "[W]here, as here, the allegedly omitted statements were actually disclosed, the § 10(b) claim fails." *Fried v. Lehman Bros. Real Est. Assocs. III, L.P.*, 2011 WL 1345097, at *10 (S.D.N.Y. Mar. 29, 2011).

And Plaintiffs cannot explain away their admissions. That is, even if Plaintiffs protest that they somehow qualified their admissions, investors are nonetheless "charged [] with knowledge of documents posted" on SEC websites, *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 374 (E.D.N.Y. 2003), and "presumed to have

18

information available in the public domain," *In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1280 (W.D. Wash. 2007) (citation omitted); *see also Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020) (discussing the "public filings and other publicly available sources' of which the stock market was presumed to be aware") (citing *Loos v. Immersion Corp.*, 762 F.3d 880, 886 (9th Cir. 2014)).

### C.   The Court Should Hold that Plaintiffs' Securities Fraud Claim Will Proceed Only With Respect to the Remaining Alleged Omissions.

Defendants' detailed disclosures, as catalogued above and confirmed by Plaintiffs' admissions and the judicial notice doctrine, conclusively establish that Defendants did not conceal most of the categories of information about which Plaintiffs complain. In these circumstances, the Court may and should hold that Plaintiffs' securities fraud claim will proceed only with respect to those limited alleged omissions not addressed by this motion. *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2017 WL 6041723, *4 (N.D. Cal. Dec. 6, 2017) (granting partial summary judgment to securities plaintiff with respect to some but not all alleged false or misleading statements).

As a result, Defendants are entitled to partial summary judgment with respect to these alleged omissions, and the entry of an order (1) that there is no genuine issue in dispute with respect to these material facts such that they are deemed "established in the case" pursuant to Fed. R. Civ. P. 56(g), and (2) that Defendants did not commit securities fraud with respect to such disclosures. *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014) (Plaintiff's "omissions theory fails to state a claim because the Defendants clearly disclosed [the allegedly omitted] information to investors."). As courts have long recognized, defendants "generally cannot be held liable for securities fraud" for omissions where "the company had already made 'detailed disclosures concerning'" the allegedly omitted information. *Par Investment Partners, LP v. Aruba Networks, Inc.*, 681 F. App'x 618, 619 (9th Cir.

19

2017) (citation omitted).[10]

## V.   <u>CONCLUSION</u>

While this motion does not seek to resolve each and every claimed misrepresentation and omission in the Amended Complaint, the uncontested facts and the corresponding securities laws demonstrate that Green Dot disclosed each of the four significant categories of information listed above that Plaintiffs claim were concealed. As a result, Defendants respectfully move for an order that: (i) there is no genuine issue of material fact that the disclosures identified above were provided and are deemed "established in the case" per Fed. R. Civ. P. 56(g) and, (ii) as a result, there was no securities fraud with respect to those alleged statements or omissions.

Dated:  June 13, 2025

**ORRICK, HERRINGTON & SUTCLIFFE LLP**
JAMES N. KRAMER
ALEXANDER K. TALARIDES
M. TODD SCOTT


 /s/ Alexander K. Talarides
ALEXANDER K. TALARIDES
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:415-773-5700
Facsimile:415-773-5957

-      and      -

---

[10] *See also Tadros v. Celladon Corp.*, 738 F. App'x 448, (Mem) 449 (9th Cir. 2018) ("As this information was already part of the total mix of information available to investors, defendants' statements were not misleading."); *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1126 (N.D. Cal. 2020) (rejecting fraud claim because it "selectively emphasizes parts of [defendant's] statement, while ignoring the context and the full statements that were made"); *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1056 (N.D. Cal. 2019) (statements not misleading because "Aerohive discloses exactly what Plaintiffs claim Aerohive omitted"); *In re Progress Energy, Inc.*, 371 F. Supp. 2d 548, 552 (S.D.N.Y. 2005) ("[I]t is indisputable that there can be no omission where the allegedly omitted facts are disclosed.").

**GLASER WEIL FINK HOWARD JORDAN & SHAPIRO LLP**
RICHARD E. GOTTLIEB
EMIL PETROSSIAN
PETER M. BRANSTEN
AYAD MATHEWS
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone: (310) 553-3000
Facsimile: (310) 556-2920

*Attorneys for Defendants*

21