# Exhibit DD

ROBBINS GELLER RUDMAN
 & DOWD LLP
JASON A. FORGE (181542)
RACHEL L. JENSEN (211456)
CHRISTOPHER R. KINNON (316850)
JOHN M. KELLEY (339965)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
jforge@rgrdlaw.com
rjensen@rgrdlaw.com
ckinnon@ rgrdlaw.com
jkelley@ rgrdlaw.com

Lead Counsel for Lead Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re GREEN DOT CORPORATION SECURITIES LITIGATION | Case No. 2:19-cv-10701-DDP (Ex)<br><br>CLASS ACTION<br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

4895-9717-2499.v7

declining performance of the legacy prepaid cards and new competition from much less expensive digital alternatives, such as PayPal, Venmo, and neobanks like Chime.

35. By 2019, Defendants could no longer entirely obscure the declining growth in the legacy prepaid card business. Instead of being truthful with investors, however, Defendants changed tactics by understating the importance of the legacy prepaid business and overstating the value of new digital and direct deposit products.

## V. DEFENDANTS' FRAUDULENT SCHEME, WRONGFUL COURSE OF BUSINESS, AND MISLEADING STATEMENTS

36. Throughout the Class Period, Defendants engaged in a scheme to defraud investors by multiple methods and means, including:

(a) Repeatedly choosing to speak about the performance of Green Dot's prepaid debit cards, its active-account growth, and its shift to digital and direct deposit accounts in a misleading manner by omitting critical information about Green Dot's declining core prepaid debit card business, which comprised the largest portion of its revenue. In doing so, Defendants intentionally withheld information that reasonable investors would have viewed as significantly altering the information Defendants chose to make available.

(b) Making misleading statements concerning the value of Green Dot's prepaid customers and business, the scope of the decline in its prepaid business, and the effect of and reason for its shift to digital and direct deposit accounts. In doing so, Defendants intentionally withheld information that reasonable investors would have viewed as significantly altering the information Defendants chose to make available.

(c) Obscuring account and fee losses by conflating active accounts, legacy prepaid accounts, low- to no-fee direct-deposit accounts and low- to no-fee BaaS accounts. In doing so, Defendants intentionally withheld information that reasonable investors would have viewed as significantly altering the information Defendants chose to make available.

- 10 -

4895-9717-2499.v7

(d)     Propping up Green Dot's stock price long enough for the Individual Defendants to sell millions of dollars of their own Green Dot shares at artificially inflated prices.

37.     Defendants held quarterly earnings calls on May 9, August 8, and November 7, 2018, during which defendants Streit and Shifke delivered prepared remarks and answered analysts' questions. Additionally, on May 16, 2018, Streit and Shifke spoke at the JPMorgan Global Technology, Media and Communications Conference ("JPMorgan Conference"), during which they delivered prepared remarks and answered analysts' questions.

**A.     May 2018 Statements**

38.     During the May 9, 2018 earnings call, Streit and Shifke emphasized the performance of Green Dot's prepaid debit cards, its active-account growth, and its shift to digital and direct deposit accounts in a misleading manner, as they omitted critical information about Green Dot's declining core prepaid debit card business, which comprised the largest and highest margin portion of its revenues but its growth rate was shrinking, which would inevitably impact the Company's bottom line. Yet, Streit discussed the momentum of Green Dot's business, including Green Dot's legacy prepaid cards, stating:

(a)     "On the branded side of our shop, Green Dot continues to gain traction on nearly all fronts."

(b)     "Additionally, Green Dot has earned more than 5,000 new incremental shelf facings for its products and services at Safeway Albertson stores and other locations where Green Dot now occupies space formerly occupied by the now defunct American Express prepaid product line."

(c)     "Walmart MoneyCards and Green Dot classic Visa cards and MasterCards and GoBank . . . *continue[] to do extremely well*" and "I think we still have a *long way to go* before we come anywhere near what you'd call maxed out."

- 11 -

4895-9717-2499.v7

(d)    "**We don't intend to imply that we see a slowdown forthcoming**. In fact, as both Steve and I mentioned in our remarks, we feel upbeat about the likelihood of **continued strong momentum**."

39.    Streit's May 9, 2018 statements regarding the momentum of Green Dot's business were each misleading when made.  The true facts, which Defendants knew and/or recklessly disregarded included the following:

(a)    Green Dot was losing traction on its most important front (*i.e.*, its legacy prepaid cards).

(b)    Despite 5,000 new shelf facings, Green Dot was losing traction on its most important front (*i.e.*, its legacy prepaid cards).

(c)    The growth rate of Green Dot's legacy, high-margin prepaid card business was already declining and would inevitably impact the Company's bottom line.

40.    Streit also made the following statements during the May 9, 2018 conference call concerning Green Dot's product mix and account value:

(a)    "The continuing long-term portfolio **mix shift towards higher lifetime value accounts** helped push the Account Services gross dollar volume or GDV flowing through our various Account Services products up by 57% year-over-year to more than $11.7 billion, setting another new record for our company."

(b)    "[A]ttracting and retaining the right kinds of customers is actually more important than the number of active customers in and of itself.  Specifically, we have previously shared that a **direct deposit customer typically has a meaningfully higher lifetime value** than accounts that do not receive direct deposit."

(c)    "In our Account Services segment on a consolidated basis, total active accounts increased for the fifth consecutive quarter, **growing by 21% year-over-year** or an additional **nearly 1 million** more active accounts year-over-year, totaling 6 million active accounts in the quarter, a new record for Green Dot."

- 12 -

(d)     "Step 1 was to continue to grow the number of active accounts year-over-year and to *improve the unit economics* of those accounts. . . . *[W]e are well ahead on this goal*, having added nearly 1 million new active accounts while increasing the number of accounts receiving direct deposit by 930,000."

(e)     "So we're *not seeing any competitive pressure*, and you can see the growth is pretty robust.  And we like the fact that there's more and more digital offerings because customers don't see the world as a net zero-sum game. . . .  So the answer is no, *we're not feeling competitive pressure* from any of those . . . ."

41.     Streit's May 9, 2018 statements concerning Green Dot's product mix and account value were each misleading when made.  The true facts, which Defendants knew and/or recklessly disregarded were that:

(a)     Competition from new low-fee or no-fee digital products was forcing Green Dot to shift from high-fee legacy prepaid cards to largely free products.

(b)     The claimed increase in "GDV" (total card-loaded funds) masked a less-lucrative product-mix trend.

(c)     Direct-deposit accounts were not generating the high-margin card fees of legacy prepaid accounts.

(d)     The "vast majority" of the direct deposit and BaaS accounts were free.

(e)     The only "revenue stream that would be enhanced" by direct deposit accounts was "from interchange," which was extremely low-margin.

(f)     That as a result of (a)-(e) above, the per-unit economics of Green Dot's active accounts was part of a product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

42.     During the May 9, 2018 earnings call, Shifke further stated, "[a]ll told, in the quarter, we attracted more highly engaged customers than ever before *with better unit economics*, as evidenced by the record interchange and fee revenue."

- 13 -

43. Shifke's May 9, 2018 statement was misleading when made. The true facts, which Defendants knew and/or recklessly disregarded were that the per-unit economics of Green Dot's card portfolio was part of a product-mix trend that had reversed card-revenue-and-fee-growth and would inevitably impact the Company's bottom line. Moreover, behind the increase in overall active accounts was a product-mix trend that was reversing card-revenue-and-fee growth and would inevitably impact the Company's bottom line.

44. Defendants' statements had the desired effect of misleading the market, as demonstrated by contemporaneous analyst reports. For example, Jefferies issued a May 9, 2018 report emphasizing Green Dot's "solid fundamentals" in its "core business," noting that "guidance was raised on the back of strong Q1 results" and emphasizing the "momentum in the core business." SunTrust Robinson Humphrey ("SunTrust") issued a May 9, 2018 report entitled, "Momentum Building Off Core Cards as Platform Programs Ramp," which reiterated that Green Dot's "legacy GPR business drives rev growth." And Morgan Stanley issued a May 10, 2018 report, which reiterated Streit's claim that there was "[n]o impact from seemingly increased competition" and Green Dot was seeing "no impact in its customer acquisition or attrition."

45. Streit and Shifke spoke at the May 16, 2018 JPMorgan Conference. Their statements highlighted the performance of Green Dot's prepaid cards, its active-account growth, and its shift to digital and direct deposit accounts while omitting critical information about Green Dot's declining core prepaid card business. For example, Streit represented that:

(a) "*[E]very one of our products is hitting it* and is either at or above plan, which is not common."

(b) "[O]ur *digital platform* has really been taking off, and the customers who get it online through the app stores are *many times more profitable*

- 14 -

4895-9717-2499.v7

than retail customers as they tend to be – use the account in a more sustainable, higher-quality way. They're more likely to be on direct deposit."

(c) "I think if you had to rank them in terms of the revenue per customer, our digital customers tend to be *higher-revenue customers*."

46. Defendant Shifke further represented that "we've concentrated on focusing on our direct deposit customer base. We've grown that very nicely. Now about 80% of our GDV comes from direct deposit. Nearly 50% of our active customers are on *direct deposit*. And with that, GDV is growing phenomenally, and *that's driving the engine to get the fees*, ATMs, purchase volume, interest income."

47. Streit and Shifke's May 16, 2018 statements were each misleading when made. The true facts, which Defendants knew and/or recklessly disregarded, were that:

(a) Digital and direct deposit accounts were not generating the high-margin fees associated with Green Dot's legacy prepaid accounts and thus were part of a product-mix trend that had reversed card-revenue-and-fee-growth which Defendants knew would inevitably adversely impact the Company's bottom line.

(b) The growth rate of Green Dot's legacy prepaid card business was shrinking.

**B. August 2018 Statements**

48. On August 8, 2018, Defendants convened an earnings call to discuss Green Dot's Q2 2018 performance. During the call, Streit and Shifke highlighted the performance of Green Dot's prepaid debit cards, its active-account growth, and its shift to digital and direct deposit accounts in a misleading manner by omitting critical information about Green Dot's declining core prepaid debit card business, which comprised the largest and highest-margin portion of its revenues and was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line. For example, during the earnings call, defendant Streit assured investors that:

- 15 -

4895-9717-2499.v7

(a)  "The BaaS side of the business grew a lot of accounts, obviously, with programs like the TurboTax program and the Uber driver program, those are active cards.  But our **established product lines**, Bob, **are just really doing well**.  So we're seeing growth from both. . . .  So everything's growing in relative lockstep."

(b)  "I mean, we experienced growth with our – I hate to use the word legacy because the products aren't legacy, they've been redone many, many times.  But that **original part of the business**, if you will, selling cards and retail and whatnot.  That's **really going well** for us."

(c)  "Consolidated GAAP total operating revenue came in at $258.3 million, representing a year-over-year growth rate of just over 16%.  We would note that this quarter's performance was entirely organic, with **material growth being driven for both our established product lines** and our new BaaS platform programs."

(d)  "The **continuing long-term portfolio mix shift towards higher lifetime value accounts** helped push the gross dollar volume, or GDV, flowing through our various products to more than $9.4 billion, representing organic year-over-year GDV growth of 25%."

(e)  "Step 1, as you'll recall, is to continue to grow the number of active accounts year-over-year and to **improve unit economics** of those accounts.  As you know from our Q2 results and our first half results more broadly, **we're hitting the step 1 objective out of the park**."

(f)  "Every metric in the Account Services segment reflects the powerful dynamic of an increasing number of active account holders who are generating far more usage and engagement with our products.  The result continues to be an **ongoing tailwind to the profitability and value of our account active portfolio**."

49.  Streit's August 8, 2018 statements were each misleading when made. The true facts, which Defendants knew and/or recklessly disregarded, were that:

(a)  The growth rate for Green Dot's legacy prepaid card business was shrinking.

- 16 -

4895-9717-2499.v7

(b) The increase in overall active accounts was part of a product-mix trend that was reversing card-revenue-and-fee-growth, which Defendants knew would inevitably adversely impact the Company's bottom line.

(c) The per-unit economics of Green Dot's card portfolio was part of a product-mix trend that reversed card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

(d) That direct-deposit accounts did not generate high-margin fees associated with Green Dot's legacy prepaid accounts and thus were part of a product-mix trend that had reversed card-revenue-and-fee-growth, which the Individual Defendants knew would inevitably impact the Company's bottom line.

50. During the August 8, 2018 earnings call, defendant Shifke similarly emphasized the positive impact of the Company's "healthy growth metrics," stating:

(a) "We increased total active accounts in the quarter by 14% year-over-year to approximately 5.9 million active accounts. This active account growth was spectacular and *well ahead* of our internal expectations. Even more encouraging is that the growth in active accounts is being driven both by our newer BaaS Platform programs and *our own products*."

(b) "[T]he larger portfolio of actives also continues to demonstrate healthy growth metrics and a *more profitable* average account."

(c) "As you see the portfolio mix move more towards direct deposit customers as a percentage of total and away from one-and-dones, by definition, you'll have *more revenue per active on the direct deposit customers* than you will on your one-and-dones."

51. Shifke's August 8, 2018 statements were each misleading when made. Defendants knew and/or recklessly disregarded the fact that the increase in overall active accounts masked an underlying (and undisclosed) product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

- 17 -

4895-9717-2499.v7

52.     Defendants' August 8, 2018 representations had the desired effect of misleading the market, as demonstrated by contemporaneous analyst reports.  For example, BTIG issued an August 9, 2018 report, noting "solid organic growth in [Green Dot's] core prepaid debit card business."  And William Blair issued an August 8, 2018 report, which cited Green Dot's "improving customer mix."

### C.     November 7, 2018 Statements

53.     On November 7, 2018, Defendants convened an earnings call in connection with Green Dot's release of its Q3 2018 results.  During that call, Streit again emphasized the performance of Green Dot's prepaid debit cards, its active-account growth, and its shift to digital and direct deposit accounts in a misleading manner by omitting critical information about Green Dot's declining core prepaid debit card business, which comprised the largest and highest-margin portion of its revenues, was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.  For example, Streit stated:

(a)     Green Dot achieved its "seventh consecutive quarter of active card growth . . . ."  In fact, as Defendants knew and/or recklessly disregarded, growth in Green Dot's legacy products and established product lines was declining, including prepaid active accounts which had declined by hundreds of thousands of accounts since December 2017.

(b)     "And then unrelated to BaaS, of course, we have *our own legacy products* and established business lines, which are no slouches.  I mean, *those are doing very well and continue to grow*."  In fact, as Defendants knew and/or recklessly disregarded, growth in Green Dot's own legacy products and established business lines was declining.  For example, prepaid active accounts had declined by hundreds of thousands of accounts since December 2017.

(c)     "The percentage of people who acquire our accounts now are far more likely to reload and when they reload, they're far more likely to do it through electronic means, meaning direct deposit.  And that does mean *more revenue per*

- 18 -

4895-9717-2499.v7

*card*. That is real, and is a trend we see continuing." In fact, as Defendants knew and/or recklessly disregarded, direct-deposit accounts did not generate the high-margin card fees of legacy prepaid accounts and thus were part of a product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

(d) "Step 1 is to continue to grow the number of active accounts year-over-year and to improve the **unit economics** on those accounts. Total active accounts have grown 12% year-to-date compared to the same period last year . . . . So we are on track with step 1 and feel like our future prospects for further growth in both actives and the quality of those actives are very strong." In fact, as Defendants knew and/or recklessly disregarded, the per-unit economics of Green Dot's card portfolio was part of a product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

54. Streit's November 7, 2018 statements were each misleading when made. The true facts, which Defendants knew and/or recklessly disregarded, were that:

(a) The increase in overall active accounts was part of a product-mix trend that was reversing card-revenue-and-fee-growth, which Defendants knew would inevitably adversely impact the Company's bottom line.

(b) Green Dot's legacy prepaid card business was shrinking.

(c) That direct-deposit accounts did not generate high-margin fees associated with Green Dot's legacy prepaid accounts and thus were part of a product-mix trend that had reversed card-revenue-and-fee-growth, which the Individual Defendants knew would inevitably impact the Company's bottom line.

(d) The per-unit economics of Green Dot's card portfolio was part of a product-mix trend that reversed card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

55. Defendants' repeated representations had the desired effect of misleading the market as demonstrated by contemporaneous analyst reports. For example,

- 19 -

4895-9717-2499.v7

Jefferies issued a November 8, 2018 report, which emphasized Green Dot's "solid core business fundamentals." William Blair issued a November 7, 2018 report, which noted the Company "continues to benefit from improving customer mix highlighted by growth of direct deposit customers." And Craig-Hallum issued a November 8, 2018 report, which emphasized that Green Dot's "[c]ard economics continued to improve."

### D. February 2019 Statements

56. By the end of 2018, Green Dot's legacy prepaid card users were dropping so rapidly that they negated nearly all the Company's growth in low-margin BaaS and direct-deposit business, amounting to a total user growth of only 1%. The disclosure of this low total-growth rate caused Green Dot's stock price to drop 10%. Still, Defendants perpetuated their scheme by continuing to mislead investors about the fact that this was a continuation of Green Dot product-mix trend, which would negatively impact profitability. Instead, Defendants presented this adverse news as good news, proclaiming that "we are somewhat a victim of own success."

57. After the market closed on February 20, 2019, Defendants convened an investor earnings call concerning Green Dot's Q4 2018 performance. On that call, Streit assured investors the slowed growth in accounts was "not relevant to our performance" and that Green Dot's prepaid card business was "growing nicely," stating:

(a) "[Cards business] *has been growing nicely – very nicely*, in fact." In fact, as Defendants knew and/or recklessly disregarded, the Company's card business had been declining for months, and during 2018, the Company had lost 271,000 accounts. Even as Defendants were speaking, this downward trend was accelerating, resulting in a year-over-year loss of 586,000 accounts by July 30, 2019.

(b) "So I wouldn't say we're satisfied with [active accounts] being up 1%, that's not great. *It's not relevant to our performance* and I'm glad that the people we're having are real customers who went to buy a real account to enroll in

- 20 -

4895-9717-2499.v7

direct deposit . . . ." In fact, as Defendants knew and/or recklessly disregarded, direct-deposit accounts did not generate the high-margin card fees of legacy prepaid accounts and thus were part of a product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

(c)     "While the mix shift towards direct deposit and more engaged customers is *clearly better for profitability and growth*, the lower churn also means fewer accounts issued to short-term customers, which weighs down on unit sales and therefore the quarterly active account metric." In fact, as Defendants knew and/or recklessly disregarded, direct deposit accounts were not "clearly better for profitability and growth" because they did not generate the high-margin card fees of legacy prepaid accounts and thus were part of a product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

(d)     "[S]trong year-over-year margin expansion of over 300 basis points was the net result of improving margins flow through across the business. And in particular, from *our base of direct deposit active accounts* where improving purchase volume and higher retention have a *positive impact on profitability*." In fact, as Defendants knew and/or recklessly disregarded, direct deposit accounts were not having a "positive impact on profitability" relative to the faltering legacy prepaid card accounts, as direct-deposit accounts were largely free, so they were part of a product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

58.     Defendants' statements had the desired effect of misleading the market as demonstrated by contemporaneous analyst reports. Although analysts noted the news of slowing active accounts, they continued to credit Defendants' misleading explanations, thereby blunting the market's reaction. For example, Guggenheim issued a February 21, 2019 report, which reiterated Defendants' message that "direct deposit customers are creating more robust, durable revenue streams for the company" and noted "a stronger company with a higher quality financial profile [is] emerging."

- 21 -

J.P. Morgan issued a February 21, 2019 report, which took Defendants at their word that the decline in active cards was the result of "a more engaged user base (fewer 'one and done' users), which is supported by continued double-digit growth in direct deposit users and purchase volume growth."

**E.    May 2019 Statements**

59.    On May 8, 2019, Green Dot filed a Form 8-K with the SEC, which incorporated a press release announcing the Company's Q1 2019 financial results. The Form 8-K stated that "our future prospects are looking ***materially stronger and incrementally more assured***."

60.    Defendants also convened an investor earnings call on May 8, 2019, during which Streit and Shifke delivered prepared remarks and answered questions from analysts concerning Green Dot's Q1 2019 performance.  During the call, Defendants chose to speak about Green Dot's declining core prepaid debit card business and perpetuated their scheme by assuring investors those customers and accounts were low value and that the decline "didn't appear to impact results in a material way."  Streit made the following statements:

(a)    "So while the decline in this ***low-value active component [legacy prepaid] isn't in and of itself a long-term strategic problem***, it is a short-term headwind to overall segment revenue since revenue is revenue and declining actives in any segment means less revenue."  In fact, as Defendants knew and/or recklessly disregarded, the decline in the high-margin card fees of legacy prepaid accounts was part of a product-mix trend that posed a long-term strategic problem because it had reversed card-revenue-and-fee-growth and would impact the Company's year-end bottom line.

(b)    "So the goal isn't to issue more ***low value [legacy prepaid] customers*** to try to get that segment to reembrace us.  We don't want that.  The goal is to sell enough new high-value customers to overcome it.  So that means if you're selling – if you're losing 4 low-value customers, we want to sell 1 or 1.5 new high-

- 22 -

value customers." In fact, as Defendants knew and/or recklessly disregarded, the legacy prepaid customers generated the Company's highest fees and revenues, which meant, on average, it would take more than 4 non-legacy customers to make up for the loss of 4 legacy prepaid customers. Further, the vast majority of non-legacy customers (BaaS and direct deposit) paid little to no fees.

(c) "Higher purchase volume and attracting the more committed customer base should in turn lead to *higher revenue and a better profit margin* on those accounts. Step two is to continue that trend. As our Q1 active [account] KPIs indicate, we are very much on track with this step two. . . . So, so far so good on step two." In fact, as Defendants knew and/or recklessly disregarded, for at least a year, this product-mix trend had yielded and would continue to yield lower revenue and worse profit margins, as the declining legacy prepaid customers generated the Company's highest fees and revenues.

(d) "But if you think about it roughly 3.5 to 1 difference of the value of a long-term customer, whether they're direct deposit or cash reloading, but *the relative value of a long-term customer versus a short-term customer on average is 3.5 to 1 and we're being generous*. If you're a one-and-done guy, 8 or 9 to 1. So the average is call it 3.5 to 1." In fact, as Defendants knew and/or recklessly disregarded, the legacy prepaid customers generated the Company's highest fees and revenues, which meant, on average, it would take more than 4 non-legacy customers to make up for the loss of 4 legacy prepaid customers as the vast majority of non-legacy customers (BaaS and direct deposit) paid little to no fees.

**F.     August 2019 Statements**

61.     On August 7, 2019, Defendants convened an earnings call with investors to discuss Green Dot's Q2 2019 performance. They reduced FY 2019 guidance but continued to mislead investors with assurances about the short-term nature of the strategic problem posed by the product-mix change away from legacy prepaid cards:

- 23 -

4895-9717-2499.v7

(a)     Streit reassured investors "that *the challenges we are currently experiencing are short to intermediate term in nature*" and were "likely to impact *only this year's revenue growth trajectory*."

(b)     In response to an analyst question concerning Green Dot's launching of products that "are going head-on to address" the decline in the core business, Streit stated: "I think to expand upon that this is why we believe it's contained and sort of help you size it.  And this will lead into the growth.  *We expect to be back to growth in Q4*."

(c)     Shifke underscored Streit's positive comments stating: "And so *we feel pretty good about a return to growth in Q4* based on what we're seeing today and also assuming maybe something goes bump in the night."

62.     Streit and Shifke's foregoing August 7, 2019 statements were misleading as Defendants knew and/or recklessly disregarded that the decline in the high-margin fees of legacy prepaid card accounts was part of a product-mix trend that posed a long-term strategic problem for Green Dot because it had reversed card-revenue-and-fee-growth to such an extent that the Company could not realistically return to positive growth in Q4.

## VI.     THE CORRECTIVE DISCLOSURES

63.     As a result of Defendants' scheme, Green Dot common stock traded at artificially inflated levels throughout the Class Period, reaching a high of $93.00 per share on November 8, 2018.

64.     Defendants' scheme was revealed to the market through a series of partial disclosures in 2019.  As depicted below, the inflation in Green Dot's stock price dissipated via price declines starting on February 20, 2019, continuing on May 8, 2019, and August 7, 2019, and culminating on November 7, 2019.

- 24 -

4895-9717-2499.v7

as a result of Defendants' violations of the federal securities laws, in an amount to be proven at trial, including pre- and post-judgment interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, expenses and expert fees; and

D. Awarding such other further relief as the Court may deem just.

## XII. JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: April 1, 2022

ROBBINS GELLER RUDMAN
& DOWD LLP

/s/
JASON A. FORGE

JASON A. FORGE
RACHEL L. JENSEN
CHRISTOPHER R. KINNON
JOHN M. KELLEY
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Lead Plaintiffs

PITTA LLP
VINCENT F. PITTA
120 Broadway, 28th Floor
New York, NY 10271
Telephone: 212/652-3890
212/652-3891 (fax)

Additional Counsel for Lead Plaintiff

- 40 -

4895-9717-2499.v7