**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

**HONORABLE FERNANDO L. AENLLE-ROCHA, U.S. DISTRICT JUDGE**

IN RE GREEN DOT CORPORATION     )
SECURITIES LITIGATION.          )
                                )          CASE NO.
                                )
                                )          CV 19-10701-FLA
                                )
                                )          PAGES 1 TO 48
_____)

**REPORTER'S TRANSCRIPT OF**
**STATUS CONFERENCE RE SCHEDULING**
**WEDNESDAY, JUNE 25, 2025**
**9:47 A.M.**
**LOS ANGELES, CALIFORNIA**

_____

**MIRANDA ALGORRI, CSR 12743, RPR, CRR**
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4455
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

ROBBINS GELLER RUDMAN & DOWD LLP
BY:   CHRISTOPHER R. KINNON
BY:   JESSICA T. SHINNEFIELD
655 West Broadway
Suite 1900
San Diego, California 92101


**FOR THE DEFENDANT GREEN DOT CORPORATION:**

ORRICK HERRINGTON & SUTCLIFFE LLP
BY:   JAMES N. KRAMER
Orrick Building
405 Howard Street
San Francisco, California 94105

GLASER WEIL FINK HOWARD JORDAN & SHAPIRO
BY:   RICHARD E. GOTTLIEB
10250 Constellation Boulevard
19th Floor
Los Angeles, California 90067

GLASER WEIL FINK HOWARD JORDAN & SHAPIRO
BY:   AYAD MATHEWS
600 West Broadway
Suite 2850
San Diego, California 92101

**LOS ANGELES, CALIFORNIA; WEDNESDAY, JUNE 25, 2025**

**9:47 A.M.**

**---**

THE CLERK:  Calling LA CV 19-10701, In re Green Dot Corporation Securities Litigation.

Counsel, please make your appearances beginning with the plaintiff.

MR. KINNON:  Christopher Kinnon, lead plaintiff in the putative class.

MS. SHINNEFIELD:  Good morning, Your Honor. Jessica Shinnefield on behalf of the plaintiff and the class.

MR. KRAMER:  Good morning, Your Honor. James Kramer from Orrick Harrington & Sutcliffe on behalf of defendants.

MR. GOTTLEIB:  Your Honor, Richard Gottleib and Ayad Mathews from Glaser Weil on behalf of defendants.

THE COURT:  All right.  Good morning to everyone.

So, as you know, I set a status conference in this case and the two other companion cases for today so that we can just coordinate and find a way to get these cases obviously through our court.  And, as you know, all three of them were recently transferred from the prior judge's docket.

So I issued several OSCs.  You've all responded to them, so thank you for that.  I have reviewed them.

I guess my primary objective this morning with respect to this case, the 2019 case, is to just come up with a realistic schedule to get this case to trial if it doesn't settle.  Okay.  So let's discuss that.

It sounds like document discovery is nearly done, document productions.

MR. KRAMER:  Yes, Your Honor.  We should have it completed by the end of July.  And we're really close.  There are -- because of the nature of the defendant's bank privilege, there are privilege logs being rounded out.  But we are I think about 95 percent done.  So there's some stuff trickling in.  But I realize if I give you a date, that's a date.  So July 31 should be the end date.

THE COURT:  Okay.  And you're saying you're at about 95 percent right now as of today?

MR. KRAMER:  It may be actually closer to 98 percent.  I was talking with the team last night.  But yes.  We're very, very close, Your Honor.

THE COURT:  Okay.

MR. KRAMER:  As you can see, Your Honor, we actually have a number of depos scheduled already, both as it relates to class cert and also 30(b)(6).  So we're not in a situation, of course, where we're waiting to schedule those things.  We've got them on the calendar already.

THE COURT:  Okay.  And you've produced about --

it was a good size figure.

MR. KRAMER:  Well, I have data, Your Honor, because we all love data.

We have pulled over 11 terabytes of data which is 34 million documents.  And we have produced several million because as you may recall, Your Honor, the Court did not narrow the case on the Motion to Dismiss.  The case is quite broad, lots of statements.  And so we had to do a lot of work, and we have done that work.  In fact, to meet the schedule that Judge Pregerson put in place, we actually retained 60 contract attorneys to help us get through this.  So we have been working really hard, very diligently to try to get the documents produced.

THE COURT:  How large is your privilege log?

MR. KRAMER:  I don't know because I haven't seen a final version.  It will be more significant than most cases, again, because of the bank examination privilege that the Court may be familiar with.  But we are --

THE COURT:  I'm actually not.  Tell me about that.  What's the bank --

MR. KRAMER:  Actually, I'm going to have my colleague Mr. Gottlieb who has subject matter expertise in this area maybe can explain the bank examination privilege in more detail.

MR. GOTTLEIB:  So basically --

THE COURT:  Why don't you go to the lectern.

MR. GOTTLEIB:  Actually, two categories.  You have the bank examination privilege, and you've got something called confidential supervisory information, CSI.  A third category of import to understand are suspicious activity reports.  The bank examination privilege is basically a privilege that is held by the regulator.  The regulator of Green Dot Bank is the federal reserve.  And so because they hold the privilege, a request to release those documents has to first go to them, and then they have to agree after they're reviewed to release documents.

To the extent they haven't agreed -- and so far they haven't fully agreed, and they don't even view their request by plaintiffs to be complete -- they will not perform that review and give an answer.  So what we're doing is we're withholding documents that are subject to the bank examination privilege.

And the bank examination privilege addresses two categories.  It's examination, in other words, any bank examinations that occur, plus enforcement actions.  Confidential supervisory information is somewhat broader.  It includes anything that is supervisory communications.  They're normally sort of conflated by courts, but one is a privilege, and one is a category.  Right.  So we have to withhold information that is CSI, and we have to withhold information

that is bank examination privileged.

The other very sensitive area are suspicious activity reports and references to them.  The bank is precluded by federal criminal law from releasing information that is the subject of a suspicious activity report.  So the bank cannot release a suspicious activity report, can't release a reference to a suspicious activity report or the identity of those individuals.

Because the search terms were extremely broad, there are a number of suspicious activity reports and references to suspicious activity reports in the files.  And literally there will be criminal liability to the bank to release that information.  So it has to be individually reviewed.

THE COURT:  And why are these different categories relevant to this action?

MR. GOTTLEIB:  We don't think they are.  Of course, plaintiffs will take a different view.  There was a consent order where AMLBSA issues, anti-money laundering, bank secrecy issues were raised.  So, therefore, I believe maybe that was the reference plaintiffs made to it.  We think that is completely irrelevant to the lawsuit.  They make an allegation that it is.  I'm sure they will take a different view.

THE COURT:  All right.  The second -- the documents that you say fall within a category that aren't

privileged or subject to a privilege, why are they not disclosable?

MR. GOTTLEIB:  The issue is that the regulator has to release.  So, in other words, once they see the privilege log, they could theoretically -- plaintiffs could theoretically go back with the privilege log to the federal reserve and say we think these categories of documents should be released.  They would then conduct that review and either agree or disagree as far as the privilege.  We don't have the right to produce them.

THE COURT:  Right.  But maybe I'm misunderstanding you.  You talked about an initial category of documents that are, quote, "privileged," that the privilege belongs to the regulator and that this involves, I presume, communications, examinations you referred to, just the job of the regulator, vis-à-vis, a financial institution.  I assume product of communications maybe in -- I don't know if there is internal work product on the part of the regulator.

Okay.  So those materials; correct?  And you're telling me that those are subject to a recognized statutorily created privilege --

MR. GOTTLEIB:  That is correct.

THE COURT:  -- that applies to the regulator; right.  And only it can waive it.

MR. GOTTLEIB:  Correct.

THE COURT:  So from there you shifted to a second category that I think you called --

MR. GOTTLEIB:  CSI, confidential supervised information.

THE COURT:  Right.  So what makes -- what prevents you, your client, from producing that?

MR. GOTTLEIB:  By regulation, by federal regulation, it is treated identically.  In other words, the federal reserve says that confidential supervisory information is the property of the federal reserve, and they must be the one to release it.  So they're basically conflated within the regulation such that the obligation is on the party seeking that discovery to go to the general counsel of the federal reserve by federal regulation to request a release.

They have done this once, and there was a release of some documents, and we did turn those over.  They were documents subject to an earlier discovery motion.  This is a much broader category.  But they wouldn't have basis to even know what the documents are until they see the privilege log.  So perhaps it's not ripe for them yet.

THE COURT:  How soon will that log be ready?

MR. KRAMER:  Back to me, Your Honor.

We should certainly have that log certainly by July 31.  We can -- if it's helpful, we could provide an interim version of it.  We worked hard to get the nonprivileged

documents out right away and then, of course, turned to the mundane task within the privilege log.  So whatever the Court prefers.

But I think, as my colleague said, the vast majority of these, maybe all of them, I don't think are quite honestly relevant to the nature of these claims which is really about what was happening to the company business, did the company disclosures fairly characterize what were happening where the risks fairly disclosed those issues.  Of course, my friends on the other side could have a different view.  I guess the theme I'm trying to push forward is we are not --

60 contract attorneys, you know 13 million documents -- or 30 million documents to start, we have been pushing really hard to get this out the door.

THE COURT:  Any idea about how many documents are on that log right now?

MR. KRAMER:  My colleague just pointed out we think it is approximately 50,000 because -- and I can tell you, Your Honor, I'm quite involved in the SVB case, Silicone Valley Bank case, where I represent the CEO.  The number of documents in that case are similar.  Because the regulators are in frequent communication with the banks and when you have a three-year -- I mean, a document request here go back three years, it's not unusual with that number of documents.  We were not able to narrow the search terms.  So I think the 50,000 is

the result of the breadth of the search terms.  So we kind of are where we are.

THE COURT:  Are you feeling pretty confident with respect to the state of the log at the moment meaning made decisions concerning the assertion of privilege over the materials that are on the log right now?

MR. KRAMER:  We are, Your Honor.  Because the thing I don't want is where we have not applied it correctly, we're in front of the Court, and then it affects my credibility as a party in the courts.  We have been very careful working closely with our subject matter experts to make sure we're doing the best we can.  I'm not promising you there won't be a dispute.

But I think, honestly, as the Court probably -- I think the Court alluded to earlier, I don't think there's going to be a lot of stuff on the log that is really core to this case.  That's my instinct just based on the nature of the allegations and the disclosures we're dealing with.  It's not a situation where we failed to disclose the bank was under regulatory scrutiny.  It's not a situation where we failed to disclose that the FDIC was going to issue an MOU or some sort of enforcement action.

The disclosures are about the business and the transition of the business.  So it doesn't implicate the communications with the regulators in the way it does in other

bank cases if that makes sense.

THE COURT:  Okay.  The core of the plaintiff's claims are essentially what, that the business evolved, it changed and there were insufficient disclosures to the public about those changes?

MR. KRAMER:  I will start but --

THE COURT:  I will hear from them in a minute.

MR. KRAMER:  Of course.

So Green Dot, I think, originally served the unbanked folks, folks that had bank accounts and could buy these prepaid cards.  Over time in the industry the regulations changed.  So the disclosures -- the idea of having a bank account where you get monthly statements, those regulations applied to these prepaid cards.  So it got to a point where -- and then you had the PayPals and Venmos of the world where you could have something set up online without a bank account.

Realizing that the market for the prepaid card was shrinking -- and this is not a Green Dot issue.  We're a small player.  It's an industry issue -- the bank began to transition to stickier relationships with folks that had previously bought these cards.  The transition by definition meant that the profitability of the initial engagement was less because its prepaid cards, these one and done cards, were quite profitable from a bank perspective.

Our belief is we disclosed that.  The plaintiffs,

I believe, say you didn't fairly disclose it.  I believe it's an omissions case.  So that's essentially the core, I think, of the theory.

THE COURT:  The nondisclosure being --

MR. KRAMER:  We didn't disclose the impact of transitioning from the earlier business model to the later business model.  I think what we would say, Your Honor, just to give you 30 seconds on it is --

THE COURT:  You mean the prospective impact?

MR. KRAMER:  That's correct, Your Honor.  When we -- the prospective impact.  As you saw from the papers, from the beginning of the class period to the end, for six quarters in a row we exceeded guidance.  We exceeded what the market expected.  For six quarters we hit our numbers.  We exceeded what the market expected because we were doing really well.  But at the end of the class period the profitability was down because there were -- you know, some of the risks that we think we warned of in our Ks and our Qs about this transition came home.

The plaintiffs, I believe, are claiming that you knew the six quarters earlier that, in fact, the transition was going to hurt your profitability.  And, again, Your Honor, I don't know if you've looked at Judge Pregerson's Motion to Dismiss, he did not take into account any of the judicially noticeable documents, the Ks, the Qs.  He didn't look at, we

think, stuff that's typically available at a Motion to Dismiss and most courts consider which did disclose these risks and did disclose these facts.

So I believe it's an omissions case.  But, again, I think these risks that the plaintiffs claim about were warned.  Again, we were, of course, disappointed that the Court didn't take judicial notice because I believe that is what the Court is supposed to do to narrow these cases, and that didn't happen.

THE COURT:  All right.  I think -- in order to move this case along, I think it would be prudent to produce the log as is with the caveat that, of course, it's still -- it's kind of like a rolling production; right?  So it's still going to take you a little more time to finalize it.  You may be adding additional documents to it.  But that way at least you will get it into their hands.  They can start going through it.  Hopefully through a meet-and-confer process just resolve any issues so we don't have any litigation concerning the log.

MR. KRAMER:  That's fine, Your Honor.  I would -- because I haven't checked in with my team on the log as opposed to -- as you know, we're in the middle of opposing class certification which Your Honor moved up the schedule.  We're working hard to meet the July 3rd deadline.  Depositions are happening today.  Some of the people who are working on the log are taking those depos.  So if we could have a little time

until next week to get the log out, that would be helpful.

The other thing I would say, Your Honor, we are mindful of the schedule here and mindful of not opposing class certification if there's not a good argument. Defense counsel, I know, has a reputation in cases of filing every motion. That's not going to be the case here. We're going to sit down with the team, and if at the end of discovery -- of class discovery we believe there is not a good motion, we will not oppose it. So the Court is -- won't be burdened with that.

Thematically, Your Honor, we are prepared to move this case forward. I have the schedule from Judge Pregerson in front of us. Certainly, if the Court is inclined, we would be prepared to move up the dates. On some of these dates we're prepared to move quickly. It's in the interest of the company to resolve this case which, as you know, has been out there quite long.

And, Your Honor, as noted in Footnote 4 of the joint submission on the derivative case is not because the parties haven't been pushing it. We, of course, had to wait quite a while for lead plaintiff and the Motion to Dismiss. And I will say I think we have good relations with the other side. We are all repeat players in this world. There's a lot of mutual respect. It doesn't mean we won't have a fight, but we -- you know, we know how to -- we have a good working relationship as far as those things go.

THE COURT:  Okay.  Yeah, I certainly am not putting in counsel's lap the time it took the Court to rule on motions.  So I recognize that.  And for what it's worth, we are just extravagantly busy as a district, and it does take time to get orders out.  Hopefully not that long, but it still takes time.  You're not the only few cases on our dockets.

MR. KRAMER:  Understood.

THE COURT:  But, you know, I will do my best to address outstanding motions, but it still takes me time.  So I am not in a position to say that I can get orders out, you know, really quickly.  But hopefully so as not to cause too much more delay to the case.

I just looked at a schedule that looked to be pretty drawn out, and I really did want to tighten it up a bit. It sounded as if everyone was on a path to getting depositions done, the written discovery produced that we could probably modify the dates a bit.

MR. KRAMER:  Your Honor, I have the schedule in front of me.  We have not --

THE COURT:  The current schedule?

MR. KRAMER:  Yes.  Docket 148 which has the fact discovery cutoff on January 30 of '26 and then experts.  We'd be happy to discuss with the Court today whether we should move up the dates.  We would also, if the Court preferred, be happy to meet and confer with the plaintiffs.  I do think we could

get fact discovery done, you know, a month or two earlier.  I think we can get the experts.  If we did that, I think we can move up the expert dates with a similar interval.  You know, just spending time thinking about it earlier today and, you know, over the weekend in anticipation of today.

One of the issues we do have is -- and we alluded to this in the statement, Your Honor -- the parties presumptively have ten depos.  At the first CMC, plaintiff's counsel said we think we want 20.  It was -- you know, I literally said it may be appropriate.  It may not be.  Let's kind of see what happens.  We haven't produced a single document, no interrogatories, nothing.  The Court said I will give you 15.  We're at 15 now plus a bunch of 30(b)(6) depos.  So that adds pressure on the schedule.  15 is the -- is the law of the case now unless you change it.  But it does -- 15 plus the 30(b)(6) I think does, you know, put some pressure on the schedule.  We just want to be mindful of that, Your Honor.

THE COURT:  You said a bunch.  There's more than one 30(b)(6) per side?

MR. KRAMER:  Well, their notice I think is going to require us to produce -- I believe it's going to be two or three witnesses, Your Honor.  I think it's going to be two or three.  We're still working through that, Your Honor, because they're pretty broad categories.  If we can get one educated, that may be what we do.  But right now I think we're thinking

maybe two, maybe three.  We're still working through it.

THE COURT:  And everybody knows who is up for deposition?

MR. KRAMER:  We have -- as set forth in the papers, there are named people scheduled already.  I don't believe we have identified specifically the 30(b)(6) folks.

THE COURT:  But remind -- I looked at your papers a few days ago.  Just remind me -- give me a minute.

MR. KRAMER:  Your Honor, you may be looking for document 192.

THE COURT:  So the plaintiffs have identified 15 deponents; right?  You know who those are.

MR. KRAMER:  Yes, Your Honor.  They are listed on page 3 and 4 of document 192.

THE COURT:  All right.  Some of these have already been scheduled; right?

MR. KRAMER:  That's correct, Your Honor.

THE COURT:  According to your filing.  I don't know if anything has been changed since then.  But four -- four have been scheduled.

MR. KRAMER:  One, two, three, four, yes, Your Honor.

THE COURT:  Okay.  So that leaves another 11 to schedule.

MR. KRAMER:  Correct.

THE COURT: And another two or three 30(b)(6) witnesses.

MR. KRAMER: That's right. And I should note that witnesses 10 through 15 haven't been noticed yet. We still need to schedule them, but there haven't been notices yet.

THE COURT: Right. Understood. But you know they're coming.

MR. KRAMER: That's correct, Your Honor.

THE COURT: Part of this also may be because of the scheduling; right? The current schedule. If I tighten it up, I have to think everything will get done a little faster.

MR. KRAMER: I think that's right. And I think the class certification opposition was one of those moments we thought we had more time than we did, and now we're showing more urgency than I think we would have prior to the Court's order.

THE COURT: Are you taking issue with any of the 15 identified deponents?

MR. KRAMER: Not beyond the fact that we set forth in our statement that we believe a number of these are overlapping and speak to the same topics. But beyond that, we don't have more granular arguments to make, and we certainly are not in front of Court on a protective order if that's what Your Honor is asking. We do think, again, some of them

overlap.  They're not necessary.  It may be that, as plaintiffs go through this, they decide not to take some of the depos. Other than that observation, Your Honor, we're not taking issue with it.

THE COURT:  Have they given you any kind of an offer of proof as to the folks you think are overlapping?

MR. KRAMER:  Not yet, Your Honor.  But in fairness to my friends, we have not pushed that with them.  So they may -- that may be part of the meet and confer.

THE COURT:  All right.  And then you have noticed four depositions?

MR. KRAMER:  Yes, Your Honor.  These are the class cert, the ones listed on page 4 of document 192 in the bottom right corner.  These are all as part of the class certification opposition, Your Honor.  They're not merits based folks.

THE COURT:  If all of these depos move forward as in their current state, right, that the list doesn't change, can you get them done by the end of October?  I mean, you're defending most of these; right?

MR. KRAMER:  Your Honor, so I think we can get the defense done.  The problem is there are a number of analysts who we may depose.  So in addition to the 15, we haven't listed the folks that we are going to depose.  So, for example, there's a number of Green Dot analysts who we think

their analyst reports show they reported on the alleged omission.  They reported that the business transition would impact the profitability.  We want to depose those.

THE COURT:  They reported how?

MR. KRAMER:  Analyst reports, Your Honor.

THE COURT:  That are public; right?

MR. KRAMER:  They are public, Your Honor.  That's right.

THE COURT:  Why do you need to depose those people?

MR. KRAMER:  We may not need to, but a number of them have -- there's language in there which back cast to prior disclosures, and it's not as crisp as I think a deposition might elucidate because what we want to do is connect for summary judgment prior company disclosures and ensure that these prior company disclosures, for example, are the things being referenced in the analyst reports.

So we may not need to because they are public.  Of course, for summary judgment, Your Honor, we have to offer those for the truth, perhaps.  Maybe it's a notice issue because the statement was made.  We haven't met and conferred with the plaintiffs on that.  But to answer your question, Your Honor, I think the answer is yes.  We can get the fact depos done by October 31st which I think is where you're going with just the understanding that we may take a number of

depositions in our case --

THE COURT:  Of your own people.

MR. KRAMER:  Not my own people.  We would never depose our own people but witnesses, Your Honor.

THE COURT:  All right.  I'm sorry.  So these analysts, they don't work for Green Dot?

MR. KRAMER:  No, Your Honor.  And, Your Honor, you may know but in the market you've got the company and then you have stock analysts, Bank of America, Goldman Sachs who issue reports that basically tell the market what the company disclosed, predicted prices, headwinds in the industry, and those are commonly considered by the Court in terms of what disclosures were made.  They're an important part of the market and the efficient market hypothesis, the information entering the market.

THE COURT:  So thank you for that.  So these are third party --

MR. KRAMER:  Exactly.

THE COURT:  -- deponents.

MR. KRAMER:  Exactly, Your Honor.

THE COURT:  You haven't subpoenaed them.

MR. KRAMER:  Well, a number of them have been subpoenaed.  They're listed in the joint statement, Your Honor.  There's a bunch listed.  But I guess the -- to respond to your question, yes, we will make sure that we defend our folks and

take the affirmative depos, and we're prepared to be done by October 31.

And, Your Honor, if you look at page 6 of document 192 --

THE COURT:  I'm looking at that page.

MR. KRAMER:  Perfect.

THE COURT:  I guess I thought these were documents requests.

MR. KRAMER:  Those are, Your Honor.  I'm talking about depositions.  We may decide to depose some of these folks.  We have the documents.  That's my only point.  I didn't want to Court to think we are simply a punching bag for plaintiffs to depose our people.  We may do some affirmative depositions as well is my point.

THE COURT:  Okay.  Aside from the class.

MR. KRAMER:  Exactly, Your Honor.  On the merits.  Exactly.  The class stuff will be done by July --

THE COURT:  So what you're basically telling me is your four is not four.  Your four may be more than that.

MR. KRAMER:  It may be, but I don't think it will be, Your Honor.  My best estimate is that it won't --

THE COURT:  Is that in this notice, this report, the status report?

MR. KRAMER:  I'm sorry?

THE COURT:  These analysts.

MR. KRAMER:  Not beyond being listed here, Your Honor.  We do have -- we do have some information about, you know, our experts and topics and the like which our part is on page 8.

THE COURT:  All right.  But you didn't list this category of possible depositions; right?

MR. KRAMER:  I believe we did, Your Honor.  Page 7, Your Honor.

THE COURT:  Page 7.  All right.  Let me find page 7.

MR. KRAMER:  So it's above D.  This is actually document 192.  And it's above "The defendants may also seek to serve subpoenas for documents or testimony on one or more of the nonparty stock analysts."  So it's line 16 through 20.  There's also a reference to perhaps deposing the auditors although I don't know if that will be necessary, Your Honor.

And, Your Honor, I think at the end of the day, just to kind of jump ahead, the Court granted our motion for leave for that Motion for Partial Summary Judgment.  The order on that motion I think informs what we do here because there are disclosures there that I think, depending on how the Court rules, could impact our need to do some of these nonparty depositions.

THE COURT:  So the way these analysts work is they have access to key people at the company who speak to them

privately or only in these public forums?

MR. KRAMER:  Only in the public forums.  Your Honor may be familiar with regulation FD, fair disclosure, that precludes private conversations between the company personnel and others.  Reg FD was passed by the Securities and Exchange Commission to preclude people from trading on inside information.  So what these analysts do is they listen to the earnings calls, they review the company's public filings.  And on the calls they ask questions, and they try to model the company.

And then you will see in analyst reports, usually on the first page in the right corner, it has a rating, buy, cell, hold, and it has a price target.  In the paragraphs below, they identify the upside and the risks to the specific issuer.  These are important -- these are critical market participants that investors rely on, and many courts, including the 9th Circuit, have noted help ensure that company information is immediately reflected in the stock price.  So it's a really important thing to do.

We look at the Ks and the Qs.  We look at the analyst reports.  It tells you what information was in the market.  Particularly here in an omissions case, it's going to be really important.  If the claim is you didn't disclose, that transitioning from these prepaid highly profitable cards to these less profitable stickier banking relationships where

people open accounts and maybe make less in the front end but make more over time, if that's the argument, we're going to be putting in our Form 10Ks and Form 10Qs but also analyst reports to show that the analysts who were listening heard exactly what we said and the market understood.

THE COURT:  The public forums are recorded?

MR. KRAMER:  No, Your Honor.  They're filed with the Securities and Exchange Commission under oath.  So the part of the EDGAR, the electronic filing system.  They're typically not recorded in audio format.  They're in writing.  Although some companies do record their earnings calls and leave them available on the websites for a number of weeks in case someone missed it.  But typically they're not recorded.  There are transcripts available, written transcripts.  But they're typically not recorded beyond, you know, being available for a few weeks.

THE COURT:  So how are these transcripts created? Is somebody transcribing, like a court reporter?

MR. KRAMER:  That's right, Your Honor.  That's right, Your Honor.  That's right.  So circling back --

THE COURT:  All of that is out there in the public domain available to investors?

MR. KRAMER:  That's right, Your Honor.  And it's all I think subject appropriately to judicial notice.  You know, again, for the was the statement made as opposed to for

hearsay purposes.  And there's long lines of cases in the 9th Circuit that say, yes, on a Motion to Dismiss you should consider this which harkens back --

THE COURT:  We're not going back to --

MR. KRAMER:  I understand, Your Honor.  I just wanted to tie that off.

THE COURT:  I understand you're holding a grudge.  I get it.

MR. KRAMER:  I wouldn't say I'm holding a grudge.  I'm allowed to be disappointed at this point in my life, Your Honor.

THE COURT:  Yes.  We all are.

MR. KRAMER:  Yes.  Exactly.  But we're happy to be here, Your Honor.  How's that?

THE COURT:  We will see what happens.  I'm not sure if that will last.

MR. KRAMER:  We will see.

THE COURT:  All right.

MR. KRAMER:  Look, we're prepared to get the fact discovery done, going back to Your Honor --

THE COURT:  That's because -- everything is going to follow that.  So if you get all fact discovery done by, say, end of October, we can move other dates up accordingly.  My intent is not to cheat you of time that you need to adequately prosecute and defend your case, but it's also not to

unnecessarily give you time that may not be.

MR. KRAMER:  Well, Your Honor, we're prepared to move forward.  If you want to move the fact discovery cutoff to October 31st -- and I don't know if that's a weekend or not -- but October 31, then we would be in a position where we could move up the opening merits expert reports to I think December 31st.

THE COURT:  Let me give you dates I have got in mind.

MR. KRAMER:  Okay.  Perfect, Your Honor.

THE COURT:  I will hear you out.  I know the plaintiffs have been patiently sitting there.

MR. KRAMER:  Yes.

THE COURT:  So I was thinking of fact discovery cutoff of 10/31, your initial expert disclosures 12/5, your rebuttal expert disclosures 1/9, close of expert discovery 2/6, motions due 2/20.

MR. KRAMER:  I was with you until just then, Your Honor.

THE COURT:  Well, you've already filed one MSJ. Obviously, you know, I will do my best to get you a ruling on that as soon as possible.  I know we're still in briefing.  So if you're going to file a second one, which I granted leave, I'm assuming it's going to be narrowly tailored.

MR. KRAMER:  It will be.  But more than two weeks

would be --

THE COURT:  Plaintiffs don't anticipate filing one.  So I don't know if you've got something else in mind, but that's probably your motion; right?

MR. KRAMER:  Well, I'm focused on the following. I think this is going to be perhaps an expert heavy case on some of the industry and analyst experts.  Having more than -- and a bunch of the people who are involved in experts, like myself, will be involved in the motion.  If I could get three weeks instead of two, that's the only thing I would ask.  So instead of the motion being due on the 20th, which is two weeks, if we could have the 27th.

THE COURT:  Your fact discovery has been done for several months now; right?  So obviously that piece of it --

MR. KRAMER:  Right.

THE COURT:  You're telling me experts are going to matter for remaining MSJ?

MR. KRAMER:  Possibly, Your Honor.  I think that's possibly the case.

THE COURT:  That's the thing.  All right.  How about February 27?

MR. KRAMER:  Perfect, Your Honor.  Thank you.  I appreciate the accommodation.

Did you want to set a briefing schedule?

THE COURT:  Yes.  Yes.  Hold on.

MR. KRAMER:  Okay.

THE COURT:  So I'm thinking March 20th for opposition.  And you could just -- we can table that until I hear from the other side.  I will say April 3 for reply.  We will set it for hearing on April 24.  I don't know if we will have a hearing.  A lot of times I just rule on the papers.  If I think there's some value to the Court -- we will just set it for hearing April 24.

Have you already -- you haven't had a settlement conference in this case, have you?

MR. KRAMER:  No, Your Honor.  But without disclosing too much, the parties are always discussing resolution.

THE COURT:  Sure.  But I have to give you a deadline by which to get it done.  I'm sure everyone is motivated to try to settle the case as soon as possible, even the lawyers.  So I'm thinking 6/19 for your cutoff to have a settlement conference.  If the case still isn't over by then, first round of trial documents July 10.  This includes your MILs and if there's any -- if there are *Daubert* issues or not.

MR. KRAMER:  So you want to do *Dauberts* on July 10?

THE COURT:  Trial documents due.  That means your motions.

MR. KRAMER:  Yes, Your Honor.  What about

*Daubert*?

THE COURT:  July 10.

MR. KRAMER:  July 10 for *Daubert*s also?

THE COURT:  MILs and *Daubert*s.

MR. KRAMER:  Thank you, Your Honor.

THE COURT:  Second round would be two weeks later, July 24.  That's going to be two -- in my order, which I presume I haven't issued, it will spell out what each tranche consists of in terms of trial documents.  So that deadline will also apply to oppositions, to MILs and *Daubert*s, so 7/24.  We will set it for hearing on MILs and *Daubert*s on August 7, final pretrial conference August 14, trial, if needed, August 25.

MR. KRAMER:  Very good, Your Honor.  Thank you.

THE COURT:  You okay with that?

MR. KRAMER:  Yes.  Of course, if you wanted to do the final pretrial at the same time as MILs and *Daubert*s --

THE COURT:  My experience is -- has been -- obviously it's case-by-case.  But my experience has been that it's usually just a little too much.  Okay.

MR. KRAMER:  Fair enough.

THE COURT:  You're not the only case I've got on a calendar that week.

MR. KRAMER:  Fair enough, Your Honor.

THE COURT:  I hear criminal cases too.

MR. KRAMER:  Understood.  I appreciate it.  I

will yield the podium to my friends on the other side.  Thank you, Your Honor.

MR. GOTTLEIB:  May I just offer one thought?

THE COURT:  Yes, sir.  Just use the mic, please.

MR. GOTTLEIB:  No problem.

The one comment I would make is it would be helpful to the process if the Court tried to calendar a date before October 31 to give us a ruling on the partial summary judgment.  It will impact dramatically the experts.  I know that's a tight --

THE COURT:  Before 10/31?

MR. GOTTLEIB:  Because 10/31 you said is the close of fact discovery.  The earlier we can get it before then -- the impact is quite substantial on the breadth of the case and on what the experts have to prepare.  So if we can target that, it would be wonderful.

THE COURT:  So all briefs will be due by the 18th of July.

MR. GOTTLEIB:  So three months plus.

THE COURT:  It sounds like a lot, doesn't it?

MR. GOTTLEIB:  I understand, but it's meaningful.

THE COURT:  I will do my best.  Okay.  Look, also, in cases what typically happens is, you know, if I can't get that final order out on an MSJ, I will just vacate trial dates.  So I don't -- my intention is not to make counsel

prematurely file trial documents when I haven't ruled on something that is important.  But I hear you.  I always want to say yes, but I have 350 cases sitting back there and another hundred motions and whatever else.  But I will -- we will do our best.  Okay.

MR. GOTTLEIB:  Thank you, Your Honor.

THE COURT:  Maybe you can give me some of those 60 contract attorneys.

MR. KINNON:  Thank you, Your Honor.  Christopher Kinnon for the lead plaintiff in the putative class from Robbins Geller.

Where would you like me to start?

THE COURT:  Well, you have had the benefit of listening through the exchange that just occurred.  So why don't I just punt it back to you and tell me if there's anything that jumps out at you that you think I should know that I don't know.  Obviously I'm the newest person on this case in this courtroom.

MR. KINNON:  I would be happy too.

First low hanging fruit, that schedule sounds great to us.  We're eager to get this in front of a jury.  So the sooner the better on our part.

On the depositions, Your Honor, we think there's more than adequate grounds for the 15 we have noticed.  We're happy to work with defendants in some cases where they point to

duplicity.  There are, in fact, two ICR employees that they've got on their initial disclosures.  As we understand it, they're going to bring those people to trial.  We need to depose them.

THE COURT:  I think duplicity sounds a little bad.

MR. KINNON:  That's the wrong word, isn't it?

THE COURT:  I think duplication maybe.

MR. KINNON:  Right.  Thanks for that correction.

Nonetheless, we think there's really only about seven more deponents beyond the eight that are on their initial disclosures.  We will try to get that down.  We're not interested in taking depositions for deposition sake.  Nonetheless, the schedule looks great to us.

A bit of a backup and, as they say, level set on the case, I understand, while my friends want to call it an omissions case, what we did, Your Honor, I assure you, plead both misstatements and -- affirmative misstatements and some omissions, and with the benefit of discovery, this is a statement case, Your Honor.  It's a misleading statement case.  It's principally a case about prepaid cards.

So this is a company that had a mere monopoly in these prepaid debit cards.  So you go into Walmart, for instance, and you provide cash and you get a card back with it for people without a bank account so they can buy stuff online, et cetera.  Now, that was -- that business was going great.

They turned it into a massive business to their credit.

But when it started to downturn in 2018, at the beginning of 2018, the company knew that internally.  And not just a few low level employees but, in fact, the founder, the CEO, and the CFO.

THE COURT:  When do you contend that started to happen?

MR. KINNON:  Well, that started -- the documents that we have show it could have been earlier but on information we believe around March 2018.  So our class period begins in May 2018.  So the prepaid sales are going this way.  The company sees those documents -- the two individual defendants see those documents, those reports.  And they decide -- and this is express decision in e-mails we have that they're not going to disclose that.  It says, "this decline will not be disclosed either on our earnings calls or in our filed SEC documents."  Then they go out the same day and tell the market the prepaid is going like this when they know internally it's going like this.

So for us those are classic misstatements.  We're not talking about omissions.  There might be information they probably should have disclosed when they decided to talk positively about those things.  You have to give the bad with the good once you decide to talk.  You can't hold some things back if you choose to speak about --

THE REPORTER:  Counsel, can you please slow down.

THE COURT:  Yes.

MR. KINNON:  So this is principally a misstatements case about those prepaid claims, Your Honor, about those prepaid cards.  This continued for a year, for a year with the market analyst saying, yes, the price is going way up because we see the core business is intact and doing well.  Now, at the same time, there's a bit of what we have called a smokescreen where they have got new products, it's true, and they're telling the market, not only is prepaid going great, but we've got this incremental growth from these new products which are direct deposit -- digital direct deposit accounts and what they call bass.  So these are cards that Uber drivers get principally that they can transfer their daily earnings from Uber onto kind of a bank account.

And they said that these new products are going great too.  So we're getting incremental growth on top of growth basically.  And as it turns out they knew.  They later had to disclose those products were almost all free.  They were worth less than the prepaid.  What they told the market is they're worth more.  And they told the market that there was this change but the change is incremental.  We're growing, and we're adding new products and they're better than even the old products.  In truth, as they discussed internally, the product makeshift was bad.  It was worsening.  And these new products,

whereas they had to disclose in August of 2019, the vast majority were free.  So there was no margin on them.

And internally they're talking about how these margins are negative, that investors would never know that these Intuit and Uber, their two biggest banking as a service, these Uber cards were negative margin and break even.

So that's the case in a nutshell, Your Honor.  Of course, you will get our brief, and we will go into that a little bit more.  I just wanted to level set on that it's not an omissions case.  It's an affirmative misstatement case where they're looking at the contrary information making statements that are inconsistent with that information.  So that's actual knowledge.  For us that's standard and falsity tied up in a neat little bow.

Now, their disclosure arguments are defenses. These are defenses for the jury according to province and effect.  You know, they would have to show that not only do these purported disclosures effectively counterbalance the misleading statements or the alleged misleading statements but that, in fact, no reasonable jury could find that these statements were misleading.  And you will see in our papers, Your Honor, that that's an almost impossible test for them to satisfy under province and effect and other 9th Circuit authorities.  So just to give you a little --

THE COURT:  Right.  They claimed they made

disclosures, right, at a very superficial level?

MR. KINNON:  Yes, sir.  So that's to give you a little bit --

THE COURT:  So your position is --

MR. KINNON:  That they --

THE COURT:  They're incomplete disclosures?

MR. KINNON:  Well, some of them, Your Honor, were incomplete.

THE COURT:  Or they just weren't made at all?

MR. KINNON:  On the prepaids we would say there was no disclosure whatsoever.  None of the documents they point to say our prepaid's going down.  What they posit is kind of a breadcrumbs theory of disclosure that the investors should have been detectives who figured this out by looking at the clues all along the way.  That's not the law.

But there are, for instance, margins -- the margins of these new products.  There were some partial disclosures.  We don't deny they told the market, for instance, that the margins on these new products were lower than the margins on the high products.  But the devil is in the details.  These are classic half-truths.  What they knew was not that the margins were currently or maybe lower on these new products.  They knew that they were structurally lower because they had these share pay agreements within Intuit and Uber that it wasn't a matter of a new product and you have to build it up

and there's start-up costs.  These were structurally different products with much lower margins.  They were fixed low.  It wasn't a situation where they were currently low.  They were margin dogs, so to speak.

And at the end of the class period, there's very clear statements that the market is kind of shocked.  They say, well, these are essentially worthless, you know.  So there were certainly some partial disclosures.  We just dispute that they were truthful -- truth on the market, rather.

THE COURT:  Okay.  Thank you for the summary.

MR. KINNON:  Thank you, Your Honor.

Now, just on a quick point on the privilege log issue, so if you look at, Your Honor, ECF 140 is an order from Magistrate Eick in this case.  And the bank exam privilege is a privilege that defendants can't assert.  It's the Government's privilege.  And --

THE COURT:  You said defendants cannot assert.

MR. KINNON:  That's right.  Under the law.  It's a privilege reserved for the Government.  As Judge Eick noted, there is no government that's intervened in this case.  So there simply isn't an assertion of privilege.  Judge Eick on that basis ordered that the documents in dispute in an earlier Motion to Compel should be produced to us, and they were produced to us.

So the relevance there -- I understand why

defendants would dispute that they're relevant, but there was a $44 million fine from the Federal Reserve in 2024 concerning Green Dot's consumer practices, and they found deceptive acts and conduct related to how these cards were marketed to people. One in particular stands --

THE COURT:  Prepaid or --

MR. KINNON:  Yes, sir.  And one of the allegations, it was an order from the Federal Reserve that states that they had misled consumers about the price of these cards.  So, in other words, they continued to assess fees on these cards when the fees were -- when the cards were inactive. So they kept charging customers who weren't using the card for their remaining balances fees that the consumers weren't informed of.

Now, one of our allegations is that with the prepaids they were so lucrative because of these fees.  So the fees that their bass and direct deposits didn't have, the prepaids did.  So to our mind the connection here -- we're not arguing that this is on all fours with our case, but we don't know what we know.  What we do know is that the effort to try to recapture fees to us overlaps with the decline of these prepaids.  So they're making an effort during the class period, I would add, to try to increase these fees by any means necessary.  According to the Federal Reserve, that was by deceiving their customers as to the fees on the products.  So

41

that's just one example of why we think those are relevant.

THE COURT:  So the fed's problem was with the nondisclosure, not the fees themselves.  Had they been disclosed, it would have been okay.

MR. KINNON:  Had the decline in prepaid been disclosed, did you mean, Your Honor?

THE COURT:  The additional fees, the fees that were still being charged to the cards during the inactive period, as you said, they're not, according to the Federal Reserve, right -- I'm putting you in the position of articulating their view.  But what you're saying is they're not inherently unlawful.  It's just that the consumer, I guess, allegedly wasn't or they found was not told that there are these continuing fees.

MR. KINNON:  On information and belief -- I don't want to caveat that too much -- but I think you're right.

THE COURT:  Have you been given anything that the fed issued?  Did the fed write a letter?  Issue an order?

MR. KINNON:  We have an order that was public, Your Honor, and what it says -- and I'm quoting from it -- is it says, "From November 2017 through January 2021" -- so that period encompasses our class period -- "the bank engaged in a deceptive act or practice by misrepresenting through GPR prepaid debit card packaging" -- those are our cards at issue in our case -- "called cardholder agreements and online

disclosures that such accounts would be closed after consumers spent their account balances down to zero dollars when, in fact, many accounts remained open despite having a zero dollar account balance and those consumers continued to incur monthly fees."

THE COURT: All right. So your position is that these fees are, I guess, reflected in future earnings?

MR. KINNON: In current earnings. During the class period. The fees were inflating --

THE COURT: How is the consumer to pay for the fees if there are no funds in the -- on the card?

MR. KINNON: I suspect there must have been some marginal fees -- money left on the card or they had, perhaps, access to a bank account. I'm speculating, though, to be honest.

THE COURT: Okay. So you're basically --

MR. KRAMER: Well --

THE COURT: Hold on. Just jot down your thoughts. I will get back to you.

MR. KRAMER: Thank you, Your Honor.

THE COURT: So your theory is that at least with respect to that fed investigation, that I guess communications with the bank may be relevant to your case.

MR. KINNON: I promise we're not going to go down a rabbit hole on this.

THE COURT: The rabbit hole only goes so deep and for so long.

MR. KINNON: Apart from that, I don't think I have anything more, Your Honor, unless you have further questions for us.

THE COURT: Obviously, if there are depos that you decide don't -- aren't necessary or fruitful, it sounds like the two sides work well together and will -- you're not going to do that; right?

MR. KINNON: Absolutely not. We will do what we can. We think 15 -- we still have a number of documents to review. We're doing our best. For each of those we have identified documents we would probably want to use at trial. So we need a sponsoring witness for that and a deposition to get them in, so to speak. We will do our best to get below that number.

THE COURT: A witness just to, like, lay foundation for it, or are you talking about a witness to interpret it and provide evidence that you would need, you know, substantive evidence at trial?

MR. KINNON: Could be both at this point. We are still working on that.

THE COURT: Okay. Thank you.

MR. KINNON: Thank you.

MR. GOTTLEIB: May I respond?

THE COURT:  If you need.  We're not here to litigate that motion today.

MR. GOTTLEIB:  Fair enough.  I want to comment quickly.  First of all, we will stipulate on authenticity.  I don't know why we would need any of that extra stuff.

THE COURT:  I wouldn't think.

MR. GOTTLEIB:  I wanted to make that point.  The consent order of reference was a 2024 consent order.  The main point, this big sticking point about charging fees was under 50 accounts.  Not material.  Not material when you're talking about hundreds of thousands of accounts.  50 accounts --

THE COURT:  Large fine, though, for 50 accounts.

MR. KRAMER:  Well, the fine was related to AMLBSA more than anything else, Anti-Money Laundering and Bank Secrecy Act issues.  Not related to that.  There were five different categories of information that they raised UDAAP for, Unfair Deceptive Acts and Practices.  So that was one of five categories.

THE COURT:  Okay.

MR. GOTTLEIB:  Very minor part of the consent order.  Very quickly, our partial Summary Judgment Motion, just for the record, is not a truth on the market partial Summary Judgment Motion.  We're actually saying we made the disclosures.  The truth on the market defense works when we fail to make the disclosures and yet the market is aware.  So

all of his arguments are irrelevant to the partial summary judgment.

I think that covers it; right?

MR. KRAMER:  Yes.

THE COURT:  So I guess the only remaining issues impact the other two cases.

I will issue a scheduling order with all the dates we discussed today, and you will have that.  Be mindful of the fact that my discovery cutoff date requires you to resolve discovery disputes before it.  Okay.  So you can't be filing a Motion to Compel, you know, the day before the cutoff.  It violates the order.

Something else you want to tell me?

MR. KRAMER:  I'm sorry, Your Honor.  I thought you were talking about the other two cases.

THE COURT:  The other two cases I think we probably should call them.  So the lawyers in those cases can come on up, and we can address --

MR. GOTTLEIB:  I did forget one important --

THE COURT:  Sure.

MR. GOTTLEIB:  I apologize.  I knew I had forgotten something, looked to Jim.  Mr. Kinnon made a reference to the bank exam privilege and said we don't hold it, and Judge Eick said we don't hold it.  He's ignoring that on December 26, 2024, Judge Pregerson overruled that order and

said that we are not precluded from asserting the bank exam privilege.  So on that point he was wrong.  That was 152.

THE COURT:  Maybe you can help me out.  Is what the Court was saying that essentially you have standing to assert it but you're not the holder of the privilege?

MR. GOTTLEIB:  The Court specifically said at -- the last part of the ruling was that we are not precluded from asserting the bank exam privilege.  Nothing in the order precludes that.

THE COURT:  Is the Court holding that you are a co-holder of the privilege?

MR. GOTTLEIB:  No.  I don't believe it's as broad as that.  It was simply saying, to the extent Judge Eick was saying we can't assert it, we can.  But it's held by the bank, the regulator rather.

THE COURT:  Yes.  You explained the process to me earlier.  So presumably you will be in contact or have been in contact with the regulator in the event that there's something that the plaintiff wants or doesn't believe should be on the log.

MR. GOTTLEIB:  The Federal Reserve is on record taking the position that the plaintiffs have not even made the request and that it is their obligation to do so.  However, we as a bank are obligated to communicate fully with the Federal Reserve and are in contact with them about this issue.  They

are fully aware of it, and they are waiting for a letter from them making a request.

THE COURT:  I imagine they need your log.

MR. GOTTLEIB:  Fair enough.

THE COURT:  Okay.  I'm going to ask that the other two cases be called, please.

(Proceedings concluded at 10:49 a.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS _7TH_ DAY OF JULY, 2025.

/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER